No. 19-56417

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

AL OTRO LADO, INC., *et al.*,
                                        *Appellees*,

v.

CHAD WOLF, Acting Secretary of Homeland Security, *et al.*,
                                        *Appellants*.

————————————

APPEAL FROM DECISION OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

————————————

**APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD IN
SUPPORT OF OPPOSITION TO MOTION FOR STAY PENDING
APPEAL**

**VOLUME 4
PROVISIONALLY FILED UNDER SEAL**

Melissa Crow
SOUTHERN POVERTY LAW CENTER
1101 17th Street, N.W., Suite 705
Washington, DC 20036
(202) 355-4471

Baher Azmy
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Matthew H. Marmolejo
Mayer Brown LLP
350 S. Grand St., 25th Floor
Los Angeles, CA 90071
(213) 621-9483

Ori Lev
Stephen M. Medlock
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Sarah Rich
Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404)-521-6700

Karolina Walters
AMERICAN IMMIGRATION COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005
(202) 507-7523

*Counsel for Appellees*

# TABLE OF CONTENTS

**Page**

Appellees' Reply in Support of Motion for Preliminary
Injunction, with supporting exhibits\* (Oct. 17, 2019)                ER 766

Appellees' Memorandum and Points of Authority in
Support of Motion for Preliminary Injunction, with                   ER 810
supporting sealed exhibits (exhibits 41-43)\* (Sept. 26,
2019)

    *The non-sealed exhibits (exhibits 1-40, 44-49) are*
    *included in Appellees' publicly filed Excerpts of*
    *Record.*

\*These documents lack CM/ECF numbering from S.D. Cal. because they
were filed under seal in the district court and served on Appellants by
email.

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION PROHIBITING GOVERNMENT FROM APPLYING ASYLUM BAN TO PROVISIONAL CLASS MEMBERS** |
| v. | |
| Kevin K. McAleenan,[1] *et al.*, | |
| Defendants. | *PORTIONS FILED UNDER SEAL* |
| | Hearing Date: October 21, 2019 |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................... 1

ARGUMENT................................................................................................ 1

I.     This Court Is Empowered to Issue the Injunction Plaintiffs Seek ................ 1

II.    Plaintiffs Have Satisfied the Preliminary Injunction Standard ..................... 3

    A.     Plaintiffs Are Likely To Succeed on the Merits ................................... 3

    B.     Plaintiffs Easily Satisfy the Irreparable Harm, Balance of
        Equities and Public Interest Requirements ........................................... 8

III.   This Court Has Jurisdiction....................................................................... 10

CONCLUSION............................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke*,
280 F. Supp. 3d 373 (W.D.N.Y. 2017) ............................................................. 12

*Abu Ali v. Ashcroft*,
350 F. Supp. 2d 28 (D.D.C. 2004) ..................................................................... 3

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) ................................................................... 4

*Arce v. United States*,
899 F.3d 796 (9th Cir. 2018) (per curiam) ..................................................... 13

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ........................................................................... 2

*Bailey v. Pataki*,
708 F.3d 391 (2d Cir. 2013) .............................................................................. 9

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ................................................................. 12

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ............................................................................. 2

*F.T.C. v. Dean Foods Co.*,
384 U.S. 597 (1966) ........................................................................................... 3

*Flores v. Barr*,
934 F.3d 910 (9th Cir. 2019) ............................................................................. 8

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ........................................................................... 4

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012), *aff'd sub nom, Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ........................................... 3

*Grace v. Whitaker*,
344 F. Supp. 3d 96 (D.D.C. 2018) ................................................................... 12

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ............................................................................................... 9

*J.E.F.M. v. Lynch*,
837 F.3d 1026 (9th Cir. 2016) ......................................................................... 12

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) ....................................................................................... 12

REPLY IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

*Medina v. U.S. DHS,*
  313 F. Supp. 3d 1237 (W.D. Wash. 2018) ........................................................ 2

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................ 10

*Padilla v. ICE,*
  354 F. Supp. 3d 1218 (W.D. Wash. 2018) ...................................................... 12

*R.I.L-R v. Johnson,*
  80 F. Supp. 3d 164 .......................................................................................... 12

*Rodriguez v. Hayes,*
  591 F.3d 1105 (9th Cir. 2010) ........................................................................ 12

*Rodriguez v. Marin,*
  909 F.3d 252 (9th Cir. 2018) .......................................................................... 12

*Sale v. Haitian Ctrs. Council, Inc.,*
  509 U.S. 155 (1993) .......................................................................................... 3

*SEC v. United Fin. Grp., Inc.,*
  474 F.2d 354 (9th Cir. 1973) ............................................................................ 2

*Textile Unlimited, Inc. v. A. BMH & Co.,*
  240 F.3d 781 (9th Cir. 2001) ............................................................................ 2

*United States v. Cortez,*
  449 U.S. 411 (1981) .......................................................................................... 9

**Statutes**

8 U.S.C. § 1225(b)(1) ........................................................................................ 11

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................... 8

8 U.S.C. § 1229a ........................................................................................... 8, 12

8 U.S.C. § 1252 ........................................................................................... 10, 13

8 U.S.C. § 1252(a)(2)(A) ................................................................................... 10

8 U.S.C. § 1252(a)(2)(A)(i) ............................................................................... 11

8 U.S.C. § 1252(a)(2)(A)(ii) .............................................................................. 10

8 U.S.C. § 1252(a)(2)(A)(iii) ............................................................................. 11

8 U.S.C. § 1252(a)(2)(A)(iv) ............................................................................. 11

8 U.S.C. § 1252(a)(5) ........................................................................................ 13

8 U.S.C. § 1252(b)(9) ........................................................................................ 12

8 U.S.C. § 1252(e) ............................................................................................. 11

8 U.S.C. § 1252(e)(1)(A) ................................................................ 11

8 U.S.C. § 1252(e)(1)(B) ................................................................ 12

8 U.S.C. § 1252(e)(2) .................................................................... 12

8 U.S.C. § 1252(e)(3) .............................................................. 11, 12

8 U.S.C. § 1252(f) .......................................................................... 12

8 U.S.C. § 1252(f)(1) ..................................................................... 12

28 U.S.C. 1651 .................................................................. 1, 2, 3, 13

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, 11A Federal Practice &
     Procedure Civ .§ 2948 (3d ed. 2019) .................................................... 2

Fed. R. Civ. P. 65 ........................................................................... 1

**<u>CITATION FORM</u>**

"Ex." refers to the exhibits to the Declaration of Melissa Crow in Support of Plaintiffs' Motion for Preliminary Injunction, Dkt. 294-2.

"Gov't Ex." refers to the exhibits to the Declaration of Alexander J. Halaska, Dkt. 307-1.

"Rep. Ex." refers to exhibits to the Declaration of Melissa Crow filed concurrently with this brief.

REPLY IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

v

**INTRODUCTION**

Plaintiffs seek a preliminary injunction to ensure that access to asylum remains an option for provisional class members, who—but for CBP's illegal metering policy—would never have been subject to the Asylum Ban. Absent an injunction to preserve the status quo, this Court would be foreclosed from granting class members full relief and restoring them to the position they would have been in prior to Defendants' unlawful conduct.

The bulk of Defendants' opposition rests on the fundamentally incorrect premise that Plaintiffs' motion challenges the validity of the Asylum Ban. Defendants' arguments fail in numerous respects. First, this Court has ample authority under Rule 65 and the All Writs Act to preserve the status quo and Plaintiffs' ability to obtain meaningful relief if they prevail in challenging the metering policy. Second, Defendants cannot overcome the collective force of the record evidence demonstrating that the asserted capacity justification for turnbacks is a pretext. Third, provisional class members will suffer irreparable harm if the relief they seek—access to the asylum process as it existed when Defendants subjected them to metering—is foreclosed by the effects of metering. Fourth, the balance of the equities favors the Plaintiffs, who seek only to preserve the status quo for long enough to litigate their claims. Finally, because Plaintiffs do not challenge particular outcomes in individual cases, but rather Defendants' systematic failure to provide meaningful access to the asylum process, the jurisdiction stripping provisions Defendants cite are irrelevant.

**ARGUMENT**

**I.    THIS COURT IS EMPOWERED TO ISSUE THE INJUNCTION PLAINTIFFS SEEK**

Defendants' claim that the Court is not authorized to issue the requested injunction, Dkt. 307 ("Gov't Br.") at 10, rests on a fundamental misunderstanding of Plaintiffs' motion. As Plaintiffs stressed, their motion does "not challeng[e] the

Asylum Ban itself," which is under review elsewhere, Dkt. 294-1 ("Op. Br.") at 9-10. Even assuming the validity of the Asylum Ban, Plaintiffs seek to preserve the legal status of provisional class members prior to its enactment so that they are not penalized by the illegal conduct actually challenged in this case—Defendants' denial of access to the asylum process through their metering policy. Rule 65 grants district courts "'broad powers and wide discretion to frame the scope of appropriate equitable relief' when issuing a preliminary injunction to preserve the status quo," *Medina v. U.S. DHS*, 313 F. Supp. 3d 1237, 1248 (W.D. Wash. 2018) (quoting *SEC v. United Fin. Grp., Inc.*, 474 F.2d 354, 358-59 (9th Cir. 1973)), and to prevent the "irreparable loss of rights" that might occur before a final judgment. *Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014).

Put another way, Plaintiffs' requested injunction accomplishes exactly what Defendants concede is appropriate, as it "preserve[s] a court's post-judgment remedial powers," Gov't Br. at 10, by ensuring that any relief provided will be meaningful. *See also* Charles Alan Wright & Arthur R. Miller, 11A Federal Practice & Procedure Civ .§ 2948 (3d ed. 2019); *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017) ("[A] preliminary injunction can also act to restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it.").

For the same reason, Defendants misunderstand the Court's power under the All Writs Act ("AWA"), 28 U.S.C. 1651, because Plaintiffs in no way are making a "collateral challenge . . . on the implementation" of the Asylum Ban. Gov't. Br. at 24. Accordingly, Plaintiffs are not seeking to "enlarge [this] court's jurisdiction" to address the Asylum Ban, Gov't Br. at 24; they are seeking an order to preserve the court's existing jurisdiction over Plaintiffs' claims challenging the metering policy. Absent the requested relief, application of the Asylum Ban—which Defendants concede will bar access to the statutory process that would allow for consideration of provisional class members' asylum claims on the merits—functionally would

REPLY IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

extinguish the Court's ability to provide effective relief in a well-pled and long-litigated challenge to the metering policy. Fundamentally grounded in equity, the AWA recognizes that Defendants should not benefit from the very illegality before the Court—the functional denial of access to the asylum process through metering—to insulate their claims from review. *See F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (AWA allows court "to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action"); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (courts "may and should take such action as will defeat attempts to wrongfully deprive parties" of their right to pursue claims).

## II. PLAINTIFFS HAVE SATISFIED THE PRELIMINARY INJUNCTION STANDARD

### A. Plaintiffs Are Likely To Succeed on the Merits

Plaintiffs' primary legal argument is that metering is a blatant violation of the law for which Defendants lack statutory and constitutional authority. Much of Defendants' rebuttal to Plaintiffs' likelihood of success on the merits argument merely reasserts legal arguments already rejected by this Court.[2] Defendants did not seek reconsideration of the Court's decision on its Second Motion to Dismiss, and Defendants provide no reason for doing so now through briefing on this motion. *See Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012), *aff'd sub nom, Arizona v.*

---

[2] *Compare, e.g.*, Gov't Br. at 14 ("[E]ven if metering were done for deterrence purposes, a policy that seeks to deter irregular migration would be lawful" and citing *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 163–64, 165 (1993)) *with* Dkt. 280 at 24, 63 (finding that deterrence policy based on false claims of capacity is "plausibly inconsistent with and violative of the scheme Congress enacted" and citing *Sale* while explaining that Plaintiffs raise cognizable statutory claims); Gov't Br. at 19 ("The Constitution and the INA grant the Executive the authority and duty to manage the flow of trade and travel through ports of entry.") *with* Dkt. 280 at 58 ("Whatever authority the Secretary may possess . . . over the 'flow of traffic' across the border, Congress's general allowance for the Secretary to 'perform such other acts as [she] deems necessary for carrying out' her authority to administer and enforce the INA, . . . cannot entail the authority to rewrite specific congressional mandates or to pretend that such mandates do not exist."); Gov't Br. at 20-21 ("Plaintiffs have no statutory rights under sections 1225 or 1158 while standing in Mexico.") *with* Dkt. 280 at 42 ("The Court concludes that the statute's language sufficiently displaces the presumption [against extraterritoriality].").

REPLY IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

1    *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).

2        On Plaintiffs' alternative argument that metering is an effort to unlawfully

3    deter asylum seekers and is based on pretextual claims of lack of capacity,

4    Defendants' factual arguments regarding the likelihood of success on the merits

5    ignore their own documents. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 140-

6    41, 148 (D.D.C. 2018) (ICE official's "self-serving declaration" was "not sufficient

7    to discredit" credible evidence to the contrary—including evidence of the agency's

8    own past statement—at PI stage); *cf. FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th

9    Cir. 2010) ("[A court] need not find a genuine issue of fact if, in its determination,

10   the particular declaration was uncorroborated and self-serving."). Defendants point

11   to evidence that the overall number of asylum seekers attempting to enter the United

12   States at ports of entry has increased. That may be true, but it is also irrelevant. The

13   relevant question is whether Defendants had sufficient capacity to inspect and

14   process these increased numbers of asylum seekers without resorting to metering.

15   *See* Dkt. 280 at 60-62. The evidence unequivocally shows that Defendants had

16   excess capacity and workable contingency plans to deal with the increased numbers

17   of asylum seekers, but they chose to violate the law instead. As a result, each of

18   Defendants' six factual arguments fails.

19        First, Defendants encourage the Court to ignore the fact that the Brownsville

20   POE was operating well below the capacity set out in a Laredo Field Office

21   Contingency Plan by arguing that the Plan is only for "urgent and emergent

22   situations," not for daily operations "as a matter of general course." Gov't. Br. at 16.

23   But that argument is belied by the text of the Plan itself, which states clearly that it

24   is intended for "manage[ment of] a mass migration event *and/or a sustained

25   migration occurring at the port of entry*." Ex. 43 at 131 (emphasis added). The Plan

26   is meant "[t]o ensure port management is provided the necessary resources to

27   address the influx of unaccompanied alien children, family units, or other alien

28   populations expressing fear of returning to Mexico or country of origin and minimize

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION

the impact to legitimate trade and travel." Ex. 43 at 122. Defendants argue that it must meter individuals due to the "significant surge in the number of inadmissible aliens arriving at land ports of entry along the southwest border." Gov't Br. at 5. But at the Brownsville POE at the very least, as far back as August 31, 2017, Defendants had a reasonable system to deal with an influx of asylum seekers that increased the daily holding capacity of the POE from 137 persons to 300 persons. Ex. 43 at 123, 134-35. Defendants chose not to utilize this additional capacity. Instead, recently produced Queue Management Reports for the Laredo Field Office show that it was forcing individuals to wait at the limit line when less than 50% of the port's daily holding capacity was being utilized and ports reported the flow of migrants was not impacting port operations. See, e.g., Rep. Ex. 1 (4 metered at boundary line while Brownsville port was at 33% capacity; 36 metered at boundary line while Laredo port was at 37% capacity, and no impact to these ports' operations); Rep. Ex. 2-4 (similar). [3]

Second, Defendants argue that a January 22, 2019 and February 22, 2019 Queue Management Report show that the total number of asylum seekers at ports of entry was increasing year over year.[4] Gov't Br. at 14-15. But these documents show

_____

[3] Ongoing discovery will shed further light on the meaning of each column in CBP's Queue Management Reports and Migrant Crisis Action Team ("MCAT") Reports. For example, Plaintiffs suspect that "Number in Queue @ Boundary Line," *see, e.g.*, Rep. Ex. 1, refers only to individuals physically present at the international boundary, and does not account for the much larger number of people previously metered whose names are on waitlists from which CBP calls names or numbers to be inspected at a POE on a given day. Plaintiffs also suspect that "% of Capacity," *see id.*, refers to capacity when the contingency plan is not in effect, rather than the much higher capacity available during utilization of the contingency plan. Moreover, Defendants' confusion regarding the chart on page 16 of Plaintiffs' opening motion is, itself, perplexing. Plaintiffs' chart compares the number of asylum seekers processed at the Brownsville port of entry each day according to CBP's own Migration Crisis Action Team ("MCAT") Reports to the Brownsville port's stated maximum capacity. *Compare* Ex. 42 at 014 (22 noncitizens in custody at Brownsville POE on January 22, 2019) *and* Rep. Exs. 1-6 *with* Ex. 43 at 135 (POE could process 300 noncitizens per day).

[4] Defendants argue that these reports do not, as a whole, show a "cut" in the total number of asylum seekers processed compared to the same month the prior year. Given Defendants' clarification of the meaning of the "FY 2018" column heading,

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION

1    that regardless of the total number of asylum seekers processed, CBP was using far

2    less than its total daily holding capacity. *See* Ex. 42 at 12012-13 (CBP using 27% of

3    total holding capacity); Gov't Ex. 8 at AOL-DEF-00012241 (CBP using 54% of total

4    holding capacity). The Migration Crisis Action Team ("MCAT") reports tell the

5    same story. *See, e.g.*, Rep. Ex. 5 at 336 (March 6, 2019: 38%); Rep Ex. 6 at 410

6    (March 14, 2019: 57%). Therefore, these documents show, on a border-wide basis,

7    that Defendants' capacity excuse is bogus and the metering policy is pretextual.

8         Third, Defendants argue that CBP's increased funding and staffing are

9    irrelevant because a Senate report stated that these funds and personnel would be

10   used to interdict opioids. Gov't Br. at 16. Not true. Defendants' own exhibit makes

11   clear that the increased funds and front-line personnel also addressed the number of

12   asylum seekers at ports of entry because "Port Officers . . . are also responsible for

13   conducting admissibility interviews." Gov't Ex. 1 at 13.

14        Fourth, Defendants attempt to minimize the statements of Jud Murdock and

15   President Trump, suggesting they were either not linked directly to the metering

16   policy or merely describe a salutary policy of efficiently managing port resources.

17   Gov't Br. at 14.[5] Not so. These statements were made contemporaneous to CBP's

18   implementation of the metering policy and describe Defendants' deterrence motive

19   in vivid terms. The Court has already acknowledged the relevance and temporal

20   scope of these comments in its motion to dismiss opinion. *See* Dkt. 280 at 10-11.

21   Defendants' stilted reading of Acting Assistant Commissioner Murdock's statement

22   is particularly telling. In a Congressional briefing where he represented CBP, Mr.

23   Murdock said "[t]he more we process, the more will come" when describing why

24   _____

25   Gov't Br. at 15 n.3, Plaintiffs concede that appears to be true, but it misses the point.
     These reports strongly support Plaintiffs' argument that Defendants operate well
     below capacity and therefore their "explanation of metering is pretextual." Op. Br.

26   at 16. CBP's own data also demonstrates that in general, CBP has been inspecting
     and processing fewer asylum seekers per month since metering was implemented

27   border-wide. Op. Br. at 17-18; Ex. 23 ¶ 6.

28   [5] Defendants entirely ignore the statements Plaintiffs quoted from the President's
     senior policy advisor, Stephen Miller.

                                                              REPLY IN SUPP. OF MOT. FOR PRELIMINARY
                                        6                                                  INJUNCTION

"DHS had chosen to limit processing to 100 asylum seekers per day at the San Ysidro [POE]." Ex. 35 at 1. Defendants inaccurately claim that the statement was "offered without any context." But Mr. Murdock plainly stated that Defendants are metering in order to deter, notwithstanding Defendants' post hoc effort to recharacterize his words.

Fifth, Defendants attempt to re-write the September 2018 and September 2019 OIG reports. Defendants claim that the fact that ports of entry have excess capacity while metering is occurring is evidence that "metering is working." Gov't Br. at 17. But this is inconsistent with the sworn testimony of Randy Howe, who claims that metering is implemented only when a port of entry does not have "sufficient capacity to conduct . . . inspections, as well as capacity to temporarily hold [asylum seekers]." Gov't Ex. 7 ¶ 2. It cannot be true that metering is implemented only when a port is at or near capacity when OIG observed ports with excess capacity engaging in metering. In response to Defendants' emphasis on OIG's failure to "corroborate that CBP managers issued a specific instruction to Tecate Port personnel . . . to start returning and redirecting asylum seekers," the September 2019 report documents that a whistleblower reported such an instruction, that turnbacks did happen during the relevant time period, and that "some witnesses may have chosen to be less than forthcoming regarding a practice most witnesses acknowledged as improper." Dkt. 300-2 at 8-9 & n.9. Moreover, Defendants draw the lesson that CBP can police itself from the fact that OIG determined that CBP officers at the Tecate POE were violating federal immigration law by turning asylum seekers back to Mexico. That is not true. Despite noting rampant illegality at the Tecate POE, the September 2019 OIG report "contains no recommendations" for fixing the problem. Dkt. 300-2 at 4. Any such recommendations would be unenforceable, in any case. This is not a problem that can be solved with a few sternly worded memos.

Sixth, Defendants claim that "'throughput,' or the rate at which third-parties

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION

ER 00779

1    transport mandatory detainees from ports to longer-term detention," is "the single

2    biggest factor" causing the supposedly dire need for metering. Gov't Br. at 18. But

3    as explained above, Defendants' own documents belie their claim that "[i]f other

4    agencies do not move people from the ports, then OFO will remain at or near

5    capacity." *Id.* Nor can Defendants blame metering on "third-party" delays in

6    transfers of asylum seekers to ICE or HHS custody on the theory that a statute

7    prohibits their release. Defendants fail to mention that they themselves control

8    whether an asylum seeker at a POE is placed in expedited removal and allegedly

9    subject to mandatory detention under § 1225(b)(1)(B)(ii), or alternatively, is placed

10   in full removal proceedings under 8 U.S.C. § 1229a and generally not subject to

11   mandatory detention. *Flores v. Barr*, 934 F.3d 910, 916-17 (9th Cir. 2019) ("The

12   government has discretion to place noncitizens in standard removal proceedings

13   even if the expedited removal statute could be applied to them[,] . . . [thereby]

14   avoiding any mandatory detention allegedly required for expedited removal."

15   (citation omitted)).[6]

16   **B.    Plaintiffs Easily Satisfy the Irreparable Harm, Balance of Equities**

17   **and Public Interest Requirements**

18          Defendants fail to contend with the primary harm asserted by Plaintiffs: *but*

19   *for* Defendants' metering policy, provisional class members would have been

20   processed for asylum prior to the effective date of the Asylum Ban. Instead of

21   addressing this irreparable harm, Defendants argue that the implementation of a

22   preliminary injunction would result in a "crushing burden on government agencies

23

---

24   [6] Defendant's invocation of asylum seekers' need for sanitary conditions is
     particularly disingenuous. Gov't Br. at 18-19. Defendants raise this excuse when
25   convenient in service of their efforts to send asylum seekers into harm's way, but in
     other contexts, they disavow any understanding of what "sanitary" conditions even
26   include. *See Flores*, 934 F.3d at 915 (noting the Government's argument that the
     term "safe and sanitary" is so vague as to be unenforceable and that "requir[ing] that
27   Border Patrol stations provide the most basic human necessities—accommodations
     that allow for adequate sleep, essential hygiene items, and adequate, clean food and
28   water" does not fall within the plain meaning of "safe and sanitary").

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION

1  not a part of this litigation" of determining which asylum applicants had been
2  metered and which had not. Gov't Br. at 22. Any burden is of Defendants' own
3  making, a fact that tips the balance of the equities sharply in Plaintiffs' favor. *Cf.*
4  *Bailey v. Pataki*, 708 F.3d 391, 403 (2d Cir. 2013) (finding that where "any
5  exceptional burden that the State faced was of its own making" that factor should
6  not work in the government's favor). Defendants state that "CBP does not maintain
7  records of who has been metered" and yet asserts that it cannot rely on the waitlists
8  or records from migrant shelters listing those who have been metered. Gov't Br. at
9  22. This position is nonsensical given that CBP relies on these very same lists for
10 the day-to-day operation of Defendants' metering policy. *See* Dkt. 293, Ex. 26 at ¶
11 7 ("CBP communicates its daily capacity to Grupo Beta, which uses that information
12 to call the appropriate numbers from the top of the list. Grupo Beta then loads the
13 asylum seekers into vans and transports them to CBP for processing.").

14     Further, Defendants assert harms related to an injunction of the Asylum Ban,
15 the legality of which Plaintiffs have not challenged, as explained *infra*. If, as
16 Plaintiffs assert, provisional class members have been unlawfully metered, then
17 Defendants denied them the statutory process due to them when they first presented
18 themselves at the border. Rectifying this statutory violation is in the public interest.

19     Moreover, Defendants rely on distinguishable cases to suggest that
20 provisional class members' harm should be balanced against an injunction's
21 purported interference with foreign affairs and the public interest in "'prevent[ion]'
22 [of] irregular migration at the southern border." Gov't Br. at 21-22. In Defendants'
23 cited cases, plaintiffs either sought to support organizations designated as foreign
24 terrorist organizations or were suspected of smuggling migrants into the United
25 States. *See United States v. Cortez*, 449 U.S. 411, 413-15 (1981); *Holder v.*
26 *Humanitarian Law Project*, 561 U.S. 1, 10 (2010). Here, provisional class members
27 are migrants lawfully seeking to access the U.S. asylum process. As to asylum
28 seekers, the Supreme Court is clear that it is in the public interest to "prevent[]

REPLY IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

ER 00781

1  [noncitizens] from being wrongfully removed, particularly to countries where they
2  are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). The
3  removal of any provisional class member following a denial of asylum based on the
4  Asylum Ban will be "wrongful" because the individual will never have had access
5  to the asylum process as it existed when she first presented herself at the southern
6  border.[7] And if not removed despite application of the Asylum Ban, she will have
7  had to sustain a much higher burden of proof for the lesser forms of relief that remain
8  available. The availability of these lesser forms of relief does not negate the
9  irreparable harm of being denied access to the asylum process, to which provisional
10 class members would have had meaningful access but for Defendants' unlawful
11 metering policy. Therefore, the balance of the equities and the public interest favor
12 the provisional class members.

13 **III.  THIS COURT HAS JURISDICTION**

14      Defendants erroneously contend that various provisions of 8 U.S.C. § 1252
15 foreclose this Court's jurisdiction to grant the requested injunction. Their arguments
16 are rooted in a fundamental misunderstanding of the purpose of Plaintiffs' motion,
17 which is to preserve meaningful access to the asylum *process* for provisional class
18 members, rather than challenging a particular outcome in an individual case.

19      Section 1252(a)(2)(A): Section 1252(a)(2)(A), which limits review of certain
20 matters related to expedited removal, is inapplicable because Plaintiffs do not
21 challenge Defendants' discretion to put provisional class members into expedited
22 removal or any findings specific to their cases.

23      Section 1252(a)(2)(A)(ii) bars review of Defendants' decision to invoke the
24 INA's expedited removal provisions. However, Plaintiffs take no position on
25 whether provisional class members should be put into expedited removal, or instead

---

27  [7] As Plaintiffs' previously explained, nearly all provisional class members are barred
28  from obtaining asylum in Mexico, and their likelihood of obtaining a waiver of the
    30-day bar is virtually nil. Op. Br. at 12.

placed directly into regular removal proceedings or paroled into the United States, *see* SAC at ¶ 205. Defendants' ultimate decision about *how* to process provisional class members has no bearing on its decision about *whether* these individuals can access the statutory process they were entitled to when Defendants metered them.

Sections 1252(a)(2)(A)(i) and (iii) preclude judicial review of credible fear determinations and expedited removal orders *in individual cases*, as well as claims "arising from or relating to the implementation or operation" of such orders. But Plaintiffs do not challenge any individual substantive decisions concerning the merits of an individual's asylum claim. For those provisional class members whom Defendants opt to put into expedited removal, Plaintiffs' principal concern is to preserve the opportunity to have their asylum claims adjudicated on the merits— which would have been available had they not been illegally metered. Otherwise, provisional class members will automatically receive negative credible fear determinations regardless of the credibility of their fear or the seriousness of their anticipated harm. *See* Gov't Br. at 3.

Finally, section 1252(a)(2)(A)(iv) bars judicial review of policies and procedures adopted to implement 8 U.S.C. § 1225(b)(1). Here, Plaintiffs challenge only Defendants' metering policy, which is distinct from their decisions about whether to invoke section 1225(b)(1) in a particular case. Plaintiffs do not seek judicial review of the legality of the Asylum Ban's expedited review provisions. Section 1252(a)(2)(A)(iv) is thus irrelevant.

Section 1252(e): This provision specifies the limited circumstances under which a court many grant equitable relief "in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)." 8 U.S.C. § 1252(e)(1)(A). As previously noted, this action seeks only to rectify the adverse impact of Defendants' metering policy on Plaintiffs' meaningful access to the asylum process. Plaintiffs do not seek review of individual expedited removal orders or challenge the "validity of" the expedited removal "system." 8 U.S.C. § 1252(e)(3). Thus, neither

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION

the jurisdictional limitations in sections 1252(e)(2) and (e)(3) nor the prohibition on class actions relating to expedited removal orders in section 1252(e)(1)(B) have any bearing on this motion.

Section 1252(f)(1): As Defendants note, 8 U.S.C. § 1252(f)(1) "prohibits federal courts from granting classwide injunctive relief *against the operation of §§ 1221-123[2]*." *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018) (emphasis added) (internal citation and quotation omitted).[8] Plaintiffs do not seek an order from this Court enjoining or restraining any of those statutory provisions, but rather an order "to enjoin conduct . . . not authorized by the statutes." *See id.* (internal citation omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010).[9] Specifically, Plaintiffs seek to preserve provisional class members' meaningful access to the asylum process despite the Ban—which would not have affected them absent Defendants' metering policy. Section 1252(f)(1) therefore "poses no bar." *Grace v. Whitaker*, 344 F. Supp. 3d 96, 143 (D.D.C. 2018); *see Rodriguez*, 80 F. Supp. 3d at 1120 (holding section 1252(f) does not limit a court's ability to enjoin a violation of the INA).

Section 1252(b)(9): This section bars judicial review only where a legal question "arise[s] from" a noncitizen's removal proceedings under 8 U.S.C. § 1229a. *See Jennings*, 138 S. Ct. at 841 n.3 (2018) (plurality opinion). Section 1252(b)(9) does not apply to "claims that are independent of or collateral to the removal process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016); *accord Jennings*, 138 S. Ct. at 841 (affirming that (b)(9) covers only challenges to a removal order, the decision to detain or seek removal, or the process by which removability will be

---

[8] Defendants do not contend that Section 1252(f)(1) bars this Court's ability to enter a declaratory judgment, nor could they. *See Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018) (Section 1252(f)(1) "does not affect classwide declaratory relief").

[9] *See also Padilla v. ICE*, 354 F. Supp. 3d 1218 (W.D. Wash. 2018); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 328 (D.D.C. 2018); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184; *Abdi v. Duke*, 280 F. Supp. 3d 373, 409 (W.D.N.Y. 2017).

REPLY IN SUPP. OF MOT. FOR PRELIMINARY INJUNCTION

1   decided). The issues here do not "arise from" removal proceedings, but rather from

2   Defendants' unlawful metering policy.

3        Section 1252(a)(5): This section, which bars "judicial review of an order of

4   removal," is likewise inapplicable. Plaintiffs' motion seeks only to preserve

5   provisional class members' access to the statutory process providing for

6   consideration of their asylum claims on the merits, not to affect the outcome of that

7   process—which may or may not result in a removal order.

8        For the foregoing reasons, the jurisdictional bars in 8 U.S.C. § 1252 do not

9   apply in this case.[10] This Court must resolve any remaining doubts and ambiguities

10  in favor of jurisdiction. *See Arce v. United States*, 899 F.3d 796, 801 (9th Cir. 2018)

11  (per curiam).

## CONCLUSION

13       For the foregoing reasons, Plaintiffs' motion should be granted.

Dated: October 17, 2019                MAYER BROWN LLP
15                                         Matthew H. Marmolejo
                                           Ori Lev
16                                         Stephen S. Medlock

17                                     SOUTHERN POVERTY LAW
18                                     CENTER
                                           Melissa Crow
19                                         Sarah Rich
20                                         Rebecca Cassler

21                                     CENTER FOR CONSTITUTIONAL
22                                     RIGHTS
                                           Baher Azmy
23                                         Ghita Schwarz
                                           Angelo Guisado
24

25

26  [10] Where § 1252 bars judicial review, this includes actions brought under the AWA.
    The fact that the statute explicitly mentions 28 U.S.C. 1651 as one type of "judicial
27  review" is irrelevant because no provision of § 1252 bars judicial review in this
    instance.
28

                                                     REPLY IN SUPP. OF MOT. FOR PRELIMINARY
                                    13                                          INJUNCTION

1  AMERICAN IMMIGRATION
2  COUNCIL
   Karolina Walters
3

4  By: */s/ Stephen M. Medlock*
   Stephen M. Medlock
5

6  *Attorneys for Plaintiffs*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **CERTIFICATE OF SERVICE**

2          I certify that I caused a copy of the foregoing document to be served on all

3    counsel via the Court's CM/ECF system.

4    Dated:  October 17, 2019                    MAYER BROWN LLP

5

6                                               By _/s/ Stephen M. Medlock_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPP. OF MOT. FOR PRELIMINARY
INJUNCTION

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
     (*pro hac vice*)
5     *olev@mayerbrown.com*
     Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
     *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
     (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12  Washington, D.C. 20036
   Telephone: +1.202.355.4471
13  Facsimile: +1.404.221.5857

14  *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16              **SOUTHERN DISTRICT OF CALIFORNIA**
17
18  Al Otro Lado, Inc., *et al.*,          Case No.:  17-cv-02366-BAS-KSC
19              Plaintiffs,
20         v.                              **EXHIBIT 1 TO PLAINTIFFS'
                                           REPLY IN SUPPORT OF THEIR
21  Kevin K. McAleenan,[1] *et al.*,       MOTION FOR PRELIMINARY
                                           INJUNCTION**
22              Defendants.
23                                         ***FILED UNDER SEAL***
24
25
26
27  _____
28  [1]  Acting Secretary McAleenan is automatically substituted for former Secretary
   Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
*mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.561

**From:** FLORES, MARIBEL on behalf of LAREDO OPS CENTER
**Sent:** Saturday, February 2, 2019 1:56 PM
**To:** LAREDO OPS CENTER; HOWE, RANDY J; CAMPBELL, CARL S; DRAGANAC, JOSEPH; HIGGERSON, DAVID P; CBP-MCAT-TEAM; SKINNER, BRADD M.
**CC:** HARRIS, RODNEY H; GUERRA, ADRIAN C; DOVALINA, MUCIA C; FLORES1, LILIANA; GALLEGOS, MARIA; CALDERON, GEORGE G; GARCIA, ENRIQUE A
**Subject:** LFO Queue Management Report for February 2, 2019

ALCON,

Attached is the Laredo Field Office - Queue Management Report for February 2, 2019, @ 1000 hours CST.

Report Date: February 2, 2019 @ 1000 Hrs CST

| Field Office | Port | Total number of Detainees | % of CF Migrant Capacity | Number in Queue @ Boundary Line | Minors Detained | Minors Processed | Minors Medically Screened | Impact to Port Operations |
|---|---|---|---|---|---|---|---|---|
| Laredo | Brownsville | 23 | 33% | 4 | 7 | 7 | 7 | None |
| Laredo | Progreso | 0 | 0% | 0 | 0 | 0 | 0 | None |
| Laredo | Hidalgo | 23 | 55% | 0 | 3 | 0 | 3 | None |
| Laredo | Rio Grande City | 0 | 0% | 0 | 0 | 0 | 0 | None |
| Laredo | Roma | 4 | 25% | 0 | 2 | 2 | 2 | None |
| Laredo | Laredo | 46 | 37% | 36 | 2 | 2 | 2 | No Impact to Port Operations |
| Laredo | Eagle Pass | 3 | 21% | 0 | 0 | 0 | 0 | The number of Credible Fear applicants being processed affects the Port's Operational Capacity. |
| Laredo | Del Rio | 7 | 25% | 0 | 1 | 0 | 0 | None |

Respectfully,

*Maribel Flores*
Customs and Border Protection Officer
Laredo Field Office | Laredo Operations Center
109 Shiloh Dr., Suite 300 | Laredo, TX 78045
Office (956) 753-1756
Maribel.Flores@cbp.dhs.gov



Report Smuggling Activities at ReportSmuggling@cbp.dhs.gov

WARNING: This document is LAW ENFORCEMENT SENSITIVE and is designated FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5USC552). Printouts and/or screen prints from the Automated Targeting System (ATS) are not part of CBP's System of Record Notification (SORN); therefore should not be used as evidence in Court Proceedings. CBP Official records must be obtained through TECS and reviewed by Office of Chief Counsel prior to dissemination of records outside CBP. This document is to be controlled, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FOUO information, and is not to be released outside of CBP or the public without the prior approval from the Laredo Field Office.

1  MAYER BROWN LLP
       Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16
                 **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |

19              Plaintiffs,

20        v.                        **EXHIBIT 2 TO PLAINTIFFS'**
                                    **REPLY IN SUPPORT OF THEIR**
21 Kevin K. McAleenan,[1] *et al.*, **MOTION FOR PRELIMINARY**
                                    **INJUNCTION**
22              Defendants.

23                                  ***FILED UNDER SEAL***

24

25

26

27  ─────────────────
    [1] Acting Secretary McAleenan is automatically substituted for former Secretary
28 Nielsen pursuant to Fed. R. Civ. P. 25(d).

ER 00791

1  CENTER FOR CONSTITUTIONAL RIGHTS
2      Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
       *bazmy@ccrjustice.org*
3      Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
       *gschwarz@ccrjustice.org*
4      Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
       *aguisado@ccrjustice.org*
   666 Broadway, 7th Floor
5  New York, NY 10012
   Telephone: +1.212.614.6464
6  Facsimile: +1.212.614.6499

7  SOUTHERN POVERTY LAW CENTER
       Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
8      *mary.bauer@splcenter.org*
   1000 Preston Ave.
9  Charlottesville, VA
       Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
10     *sarah.rich@splcenter.org*
       Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
11     *rebecca.cassler@splcenter.org*
   150 E. Ponce de Leon Ave., Suite 340
12 Decatur, GA 30030

13 AMERICAN IMMIGRATION COUNCIL
       Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
14     *kwalters@immcouncil.org*
   1331 G St. NW, Suite 200
15 Washington, D.C. 20005
   Telephone: +1.202.507.7523
16 Facsimile: +1.202.742.561

17

18

19

20

21

22

23

24

25

26

27

28

**From:** CAMARILLO, ERIKA D on behalf of LAREDO OPS CENTER
**Sent:** Friday, December 21, 2018 1:58 PM
**To:** LAREDO OPS CENTER; HOWE, RANDY J; CAMPBELL, CARL S; DRAGANAC, JOSEPH; HIGGERSON, DAVID P; CBP-MCAT-TEAM; SKINNER, BRADD M.
**CC:** HARRIS, RODNEY H; GUERRA, ADRIAN C; DOVALINA, MUCIA C; FLORES1, LILIANA; 'LONGORIA, FRANK S'; GALLEGOS, MARIA; CALDERON, GEORGE G; GARCIA, ENRIQUE A
**Subject:** LFO Queue Management Report for December 21, 2018 @ 1000 hours CST.

ALCON,

Attached is the Laredo Field Office - Queue Management Report for December 21, 2018 @ 1000 hours CST.

| Field Office | Port | Total number of Detainees | % of Capacity | Number in Queue @ Boundary Line | Impact to Port Operations |
|---|---|---|---|---|---|
| Laredo | Brownsville | 14 | 20% | 34 | None |
| Laredo | Progreso | 2 | 12% | 0 | None |
| Laredo | Hidalgo | 19 | 45% | 0 | None |
| Laredo | Rio Grande City | 0 | 0% | 0 | None |
| Laredo | Roma | 2 | 13% | 0 | Queue Management Staffing Overtime. |
| Laredo | Laredo | 54 | 43% | 32 | No impact to operations. |
| Laredo | Eagle Pass | 9 | 64% | 0 | The number of Credible Fear applicants being processed affects the Port's Operational Capacity. |
| Laredo | Del Rio | 4 | 25% | 17 | None |

Respectfully,

*Erika D. Camarillo*
CBP Officer
Erika.d.camarillo@cbp.dhs.gov
Laredo Field Office
Desk: (956)753-1722 / (956)753-1795



**Report Smuggling Activities at** ReportSmuggling@cbp.dhs.gov

WARNING: This document is LAW ENFORCEMENT SENSITIVE and is designated FOR OFFICIAL USE ONLY.  It contains information that may be exempt from public release under the Freedom of Information Act (5 USC 552).  This document is to be controlled, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FOUO information, and is not to be released outside of CBP or the public without the prior approval from the Laredo Field Office.

1  MAYER BROWN LLP
     Matthew H. Marmolejo (CA Bar No. 242964)
2      *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4      Ori Lev (DC Bar No. 452565)
       (*pro hac vice*)
5      *olev@mayerbrown.com*
       Stephen M. Medlock (VA Bar No. 78819)
6      (*pro hac vice*)
       *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:   +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10     Melissa Crow (DC Bar No. 453487)
       (*pro hac vice*)
11     *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                 **UNITED STATES DISTRICT COURT**
16            **SOUTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **EXHIBIT 3 TO PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** |
| Kevin K. McAleenan,[1] *et al.*, | |
| Defendants. | *FILED UNDER SEAL* |

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
*mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.561

**From:** FLORES, MARIBEL on behalf of LAREDO OPS CENTER
**Sent:** Thursday, December 20, 2018 1:43 PM
**To:** LAREDO OPS CENTER; HOWE, RANDY J; CAMPBELL, CARL S; DRAGANAC, JOSEPH; HIGGERSON, DAVID P; CBP-MCAT-TEAM; SKINNER, BRADD M.
**CC:** HARRIS, RODNEY H; GUERRA, ADRIAN C; DOVALINA, MUCIA C; FLORES I, LILIANA; GALLEGOS, MARIA; CALDERON, GEORGE G; GARCIA, ENRIQUE A; EVERSON, ERIC J.; BLANKS, LISSETTE
**Subject:** LFO Queue Management Report for December 20, 2018

ALCON,

Attached is the Laredo Field Office - Queue Management Report for December 20, 2018 @ 1000 hours CST.

| Report Date: December 20, 2018 @ 1000 Hrs CST | | | | | |
| --- | --- | --- | --- | --- | --- |
| Field Office | Port | Total number of Detainees | % of Capacity | Number in Queue @ Boundary Line | Impact to Port Operations |
| Laredo | Brownsville | 19 | 28% | 10 | None |
| Laredo | Progreso | 2 | 12% | 0 | None |
| Laredo | Hidalgo | 20 | 48% | 0 | None |
| Laredo | Rio Grande City | 0 | 0% | 0 | None |
| Laredo | Roma | 2 | 13% | 0 | Queue Management Staffing Overtime. |
| Laredo | Laredo | 25 | 20% | 36 | No impact to operations. |
| Laredo | Eagle Pass | 13 | 93% | 6 | The number of Credible Fear applicants being processed affects the Port's Operational Capacity. |
| Laredo | Del Rio | 6 | 38% | 20 | None |

Respectfully,

*Maribel Flores*
Customs and Border Protection Officer
Laredo Field Office | Laredo Operations Center
109 Shiloh Dr., Suite 300 | Laredo, TX 78045
Office (956) 753-1756
Maribel.Flores@cbp.dhs.gov



Report Smuggling Activities at ReportSmuggling@cbp.dhs.gov

WARNING: This document is LAW ENFORCEMENT SENSITIVE and is designated FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5USC552). Printouts and/or screen prints from the Automated Targeting System (ATS) are not part of CBP's System of Record Notification (SORN); therefore should not be used as evidence in Court Proceedings. CBP Official records must be obtained through TECS and reviewed by Office of Chief Counsel prior to dissemination of records outside CBP. This document is to be controlled, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FOUO information, and is not to be released outside of CBP or the public without the prior approval from the Laredo Field Office.

MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
    *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
    Ori Lev (DC Bar No. 452565)
    (*pro hac vice*)
    *olev@mayerbrown.com*
    Stephen M. Medlock (VA Bar No. 78819)
    (*pro hac vice*)
    *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:   +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
    Melissa Crow (DC Bar No. 453487)
    (*pro hac vice*)
    *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | **EXHIBIT 4 TO PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** |
| Kevin K. McAleenan,[1] *et al.*, | |
| Defendants. | ***FILED UNDER SEAL*** |

---

[1]  Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
*bazmy@ccrjustice.org*
Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
*gschwarz@ccrjustice.org*
Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
*mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
*sarah.rich@splcenter.org*
Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.561

**From:** DOMINGUEZ, ADRIAN NMI on behalf of LAREDO OPS CENTER
**Sent:** Wednesday, December 19, 2018 1:36 PM
**To:** LAREDO OPS CENTER; HOWE, RANDY J; CAMPBELL, CARL S; DRAGANAC, JOSEPH; HIGGERSON, DAVID P; CBP-MCAT-TEAM; SKINNER, BRADD M.
**CC:** HARRIS, RODNEY H; GUERRA, ADRIAN C; DOVALINA, MUCIA C; FLORES1, LILIANA; GALLEGOS, MARIA; CALDERON, GEORGE G; GARCIA, ENRIQUE A; EVERSON, ERIC J.; BLANKS, LISSETTE
**Subject:** LFO Queue Management Report for December 19, 2018
**Attachments:** 12192018 LFO Queue Management Report.xlsx

ALCON,

Attached is the Laredo Field Office - Queue Management Report for December 19, 2018 @ 1000 hours CST.

Report Date: December 19, 2018 @ 1000 Hrs CST

| Field Office | Port | Total number of Detainees | % of Capacity | Number in Queue @ Boundary | Impact to Port Operations |
|---|---|---|---|---|---|
| Laredo | Brownsville | 13 | 19% | 4 | None |
| Laredo | Progreso | 0 | 0% | 0 | None |
| Laredo | Hidalgo | 10 | 24% | 0 | None |
| Laredo | Rio Grande City | 0 | 0% | 0 | None |
| Laredo | Roma | 1 | 6% | 0 | Queue Management Staffing Overtime. |
| Laredo | Laredo | 27 | 22% | 30 | No impact to operations. |
| Laredo | Eagle Pass | 24 | 171% | 0 | The number of Credible Fear applicants being processed affects the Port's Operational Capacity. |
| Laredo | Del Rio | 4 | 25% | 12 | None |

Respectfully,

*Adrian Dominguez*
CBP Officer
Adrian.nmi.Dominguez@cbp.dhs.gov
Laredo Field Office
Desk: (956)753-1708 / (956)753-1795



**Report Smuggling Activities at ReportSmuggling@cbp.dhs.gov**

WARNING: This document is LAW ENFORCEMENT SENSITIVE and is designated FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 USC 552). This document is to be controlled, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FOUO information, and is not to be released outside of CBP or the public without the prior approval from the Laredo Field Office.

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Kevin K. McAleenan,[1] *et al.*,<br><br>Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 5 TO PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**<br><br>***FILED UNDER SEAL*** |

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
    Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
    *bazmy@ccrjustice.org*
    Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
    *gschwarz@ccrjustice.org*
    Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
    *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
    Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
    *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
    Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
    *sarah.rich@splcenter.org*
    Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
    *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
    Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
    *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.561

From: CBP-MCAT-TEAM
Sent: Wednesday, March 6, 2019 3:39 PM
Cc: CBP-MCAT-TEAM
Subject: Field Office Queue Management Report March 6, 2019
Attachments: Field Queue Management Report 3.6.19.pdf

Good Afternoon All,

Please see attached spreadsheet with updated numbers for each field office.

### March 6, 2019

#### Laredo Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Numb aliens pi by ICE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brownsville | 20 | 29% | 10 | No. | 1,280,869 | 3,020,375 | 31 | 9 | 1654 | 1945 | 1 |
| Progreso | 2 | 12% | 11 | Redirecting to Brownsville as necessary. | 480,183 | 994,234 | 2 | 1 | 96 | 131 | 0 |
| Hidalgo | 25 | 60% | 26 | No. | 990,613 | 2,519,926 | 34 | 18 | 2041 | 4255 | 1 |
| Rio Grande | 0 | 0% | 0 | Redirecting to Hidalgo as necessary. | 16,220 | 53,122 | 0 | 0 | 100 | 196 | 0 |
| Roma | 5 | 31% | 27 | Redirecting to Hidalgo as necessary. | 104,558 | 231,723 | 2 | 3 | 230 | 1061 | 2 |
| Laredo | 66 | 53% | 0 | No. | 1,870,871 | 4,919,511 | 10 | 23 | 3835 | 5775 | 2 |
| Eagle Pass | 13 | 93% | 25 | No. | 336,955 | 1,062,667 | 13 | 13 | 1546 | 1595 | 7 |
| Del Rio | 3 | 11% | 0 | No. | 51,324 | 115,292 | 6 | 3 | 696 | 347 | 1 |
| Total/Average | 134 | 36% | 99 | | 5,131,623 | 12,916,850 | 98 | 20 | 10,198 | 15,304 | 5 |
| Percentages compared to FY 2018 | | | | | 39.73% | | | | 67.52% | | |

#### El Paso Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Numb aliens pi by ICE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Port of El Paso | 113 | 98% | 2030 | No | 3,125,720 | 7,319,489 | 24 | 43 | 6479 | 5830 | 3 |
| Santa Teresa | 0 | 0% | 0 | No | 29,504 | 147,145 | 4 | 4 | 601 | 769 | 5 |
| Columbus | 0 | 0% | 0 | No | 113,844 | 282,686 | 0 | 0 | 97 | 33 | 4 |
| Tornillo | 7 | 8% | 0 | No | 17,203 | 38,438 | 0 | 2 | 92 | 32 | 6 |
| Presidio | 0 | 0% | 0 | No | 60,455 | 241,536 | 0 | 1 | 217 | 149 | 5 |
| Total/Average | 120 | 21% | 2030 | | 3,346,726 | 8,029,294 | 28 | 50 | 7,486 | 6,833 | 6 |
| Percentages compared to FY 2018 | | | | | 41.68% | | | | 109.56% | | |

Confidential

AOL-DEF-00012335

ER 00802

### Tucson Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18 | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Num aliens p by IC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | 7 | 175% | 0 | No | 375,105 | 820,518 | 10 | 5 | 525 | 202 | |
| Lukeville | 0 | 0% | 0 | No | 19,489 | 69,086 | 0 | 0 | 14 | 16 | |
| Naco | 0 | 0% | 0 | No | 10,909 | 53,576 | 0 | 0 | 19 | 4 | |
| Nogales | 35 | 69% | 0 | No | 1,254,969 | 3,554,943 | 17 | 17 | 2995 | 2809 | |
| San Luis | 13 | 68% | 0 | No | 1,206,783 | 2,629,266 | 13 | 2 | 708 | 890 | |
| Total/Average | 55 | 62% | 0 | | 2,867,255 | 7,127,389 | 40 | 24 | 4,261 | 3,921 | |
| Percentages compared to FY 2018 | | | | | 40.23% | | | | 108.67% | | |

### San Diego Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18 | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Num aliens up ICE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| San Ysidro | 229 | 76% | 2640 | No. | 4,194,033 | 8,981,830 | 66 | 44 | 8147 | 9820 | |
| Otay Mesa | 0 | 0% | 0 | Referred to San Ysidro. | 1,513,031 | 3,717,617 | 0 | 1 | 200 | 581 | |
| Tecate | 0 | 0% | 0 | Referred to San Ysidro. | 359,515 | 815,259 | 0 | 0 | 30 | 24 | |
| Calexico West | 84 | 125% | 340 | No. | 1,716,198 | 4,388,192 | 0 | 6 | 1226 | 1719 | |
| Calexico East | 0 | 0% | 0 | If encountered they will be referred to Calexico West | 193,712 | 494,945 | 0 | 0 | 50 | 267 | |
| Andrade | 0 | 0% | 0 | If encountered they will be referred to Calexico West | 471,817 | 910,895 | 0 | 0 | 7 | 21 | |
| Total/Average | 313 | 34% | 2,980 | | 8,448,306 | 19,308,738 | 66 | 51 | 9,660 | 12,432 | |
| Percentages compared to FY 2018 | | | | | 43.75% | | | | 77.70% | | |

### OFO SWB

| | Total/Average | 622 | 38% | 5,159 | | 19,793,910 | 47,382,271 | 232 | 195 | 31,605 | 38,290 | 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Percentages compared to FY 2018 | | | | | | 41.77% | | | | 82.54% | | |

U.S. Customs and Border Protection
Migrant Crisis Action Team (M-CAT)

Confidential

AOL-DEF-00012336

ER 00803

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>      v.<br><br>Kevin K. McAleenan,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 6 TO PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**<br><br>***FILED UNDER SEAL*** |

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

1    CENTER FOR CONSTITUTIONAL RIGHTS
        Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
2        *bazmy@ccrjustice.org*
        Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
3        *gschwarz@ccrjustice.org*
        Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
4        *aguisado@ccrjustice.org*
     666 Broadway, 7th Floor
5    New York, NY 10012
     Telephone: +1.212.614.6464
6    Facsimile: +1.212.614.6499

7    SOUTHERN POVERTY LAW CENTER
        Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
8        *mary.bauer@splcenter.org*
     1000 Preston Ave.
9    Charlottesville, VA
        Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
10       *sarah.rich@splcenter.org*
        Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
11       *rebecca.cassler@splcenter.org*
     150 E. Ponce de Leon Ave., Suite 340
12   Decatur, GA 30030

13   AMERICAN IMMIGRATION COUNCIL
        Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
14       *kwalters@immcouncil.org*
     1331 G St. NW, Suite 200
15   Washington, D.C. 20005
     Telephone: +1.202.507.7523
16   Facsimile: +1.202.742.561

17

18

19

20

21

22

23

24

25

26

27

28

March 14, 2019

| Laredo Field Office | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
| Brownsville | 24 | 35% | 0 | No. | 1,346,819 | 3,020,375 | 15 | 9 | 1,732 | 1,946 | 19 |
| Progreso | 4 | 24% | 9 | Redirecting to Brownsville as necessary. | 517,412 | 994,234 | 3 | 1 | 103 | 131 | 3 |
| Hidalgo | 53 | 126% | 35 | No. | 1,040,091 | 2,519,926 | 36 | 18 | 2,227 | 4,255 | 25 |
| Rio Grande | 6 | 38% | 2 | Redirecting to Hidalgo as necessary. | 17,198 | 53,122 | 0 | 0 | 104 | 195 | 0 |
| Roma | 3 | 19% | 35 | Redirecting to Hidalgo as necessary. | 109,130 | 231,723 | 3 | 3 | 253 | 1,061 | 2 |
| Laredo | 50 | 40% | 0 | No | 1,969,359 | 4,919,511 | 10 | 23 | 4,043 | 5,776 | 21 |
| Eagle Pass | 14 | 100% | 25 | No | 354,452 | 1,062,667 | 13 | 13 | 1,619 | 1,595 | 12 |
| Del Rio | 10 | 36% | 0 | No | 54,468 | 115,292 | 1 | 3 | 718 | 147 | 0 |
| Total/Average | 164 | 52% | 106 | | 5,408,929 | 12,916,850 | 81 | 70 | 10,799 | 15,106 | 82 |
| Percentages compared to FY 2018 | | | | | 41.87% | | | | 71.49% | | |

Confidential

AOL-DEF-00012407

**El Paso Field Office**

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Port of El Paso | 100 | 87% | 2250 | No | 3,280,703 | 7,319,489 | 8 | 43 | 6,910 | 5,851 | 69 |
| Santa Teresa | 0 | 0% | 0 | No | 30,767 | 147,145 | 10 | 4 | 645 | 769 | 8 |
| Columbus | 6 | 50% | 0 | No | 118,744 | 282,686 | 6 | 0 | 126 | 33 | 0 |
| Tornillo | 6 | 7% | 0 | No | 18,100 | 38,438 | 0 | 2 | 92 | 32 | 0 |
| Presidio | 6 | 50% | 0 | No | 63,355 | 241,536 | 4 | 1 | 243 | 149 | 4 |
| **Total/Average** | 118 | 39% | 2250 | | 3,511,669 | 8,029,294 | 28 | 50 | 8,016 | 6,834 | 81 |
| **Percentages compared to FY 2018** | | | | | 43.74% | | | | 117.30% | | |

Confidential

**Tucson Field Office**

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | 15 | 375% | 0 | No | 390,785 | 820,518 | 16 | 5 | 578 | 202 | 11 |
| Lukeville | 0 | 0% | 0 | No | 20,838 | 69,086 | 2 | 0 | 25 | 18 | 4 |
| Naco | 0 | 0% | 0 | No | 11,478 | 53,576 | 0 | 0 | 24 | 4 | 0 |
| Nogales | 42 | 82% | 0 | No | 1,316,232 | 3,554,943 | 12 | 17 | 3,124 | 2,809 | 15 |
| San Luis | 16 | 84% | 0 | No | 1,269,440 | 2,629,266 | 4 | 2 | 732 | 890 | 1 |
| Total/Average | 73 | 108% | 0 | | 3,008,773 | 7,127,389 | 34 | 24 | 4,483 | 3,923 | 31 |
| Percentages compared to FY 2018 | | | | | 42.21% | | | | 114.27% | | |

| | | | | San Diego Field Office | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| San Ysidro | 266 | 89% | 3015 | No. | 4,415,446 | 8,981,830 | 43 | 44 | 8,574 | 9,823 | 35 |
| Otay Mesa | 0 | 0% | 0 | Referred to San Ysidro. | 1,591,709 | 3,717,617 | 0 | 1 | 214 | 582 | 3 |
| Tecate | 0 | 0% | 0 | Referred to San Ysidro. | 377,627 | 815,259 | 0 | 0 | 30 | 24 | 0 |
| Calexico West | 51 | 76% | 302 | No. | 1,803,570 | 4,388,192 | 3 | 6 | 1,273 | 1,719 | 4 |
| Calexico East | 0 | 0% | 0 | If encountered they will be referred to Calexico West. | 201,836 | 494,945 | 2 | 0 | 52 | 267 | 0 |
| Andrade | 0 | 0% | 0 | If encountered they will be referred to Calexico West. | 503,254 | 910,895 | 0 | 0 | 7 | 21 | 0 |
| **Total/Average** | 317 | 27% | 3,317 | | 8,893,442 | 19,308,738 | 48 | 51 | 10,150 | 12,436 | 42 |
| **Percentages compared to FY 2018** | | | | | 46.06% | | | | 81.62% | | |

| | | | | OFO SWB | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total/Average** | 672 | 57% | 5,673 | | 20,822,813 | 47,382,271 | 191 | 195 | 33,448 | 38,299 | 236 |
| **Percentages compared to FY 2018** | | | | | 43.95% | | | | 87.33% | | |

Confidential

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>              Plaintiffs,<br><br>      v.<br><br>Kevin K. McAleenan,[1] *et al.*,<br><br>              Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION PROHIBITING GOVERNMENT FROM APPLYING ASYLUM BAN TO PROVISIONAL CLASS MEMBERS**<br><br>***PORTIONS FILED UNDER SEAL***<br><br>Hearing Date: November 4, 2019<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
  *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA 22903
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................. 2

    A.    Defendants' Illegal Metering Policy .................................. 2

    B.    The Asylum Ban and Its Legal Challenges ....................... 4

    C.    Because of the Illegal Metering Policy, Provisional Class Members Have Been Deprived of Access to the Asylum Process Through Operation of the Asylum Ban ................. 6

LEGAL STANDARD ...................................................................... 8

ARGUMENT ................................................................................. 9

I.    BECAUSE PROVISIONAL CLASS MEMBERS WILL SUFFER IRREPARABLE INJURY AND ARE LIKELY TO SUCCEED ON THE MERITS, A PRELIMINARY INJUNCTION IS WARRANTED. ....................................................................... 9

    A.    Provisional Class Members Will Suffer Irreparable Injury Absent Issuance of an Injunction Because They Will Improperly Lose Their Right to Have Their Asylum Claims Decided on the Merits. ................................................... 9

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their Underlying Claims Challenging the Government's Metering Policy and Individual Turnbacks ...................................... 13

    C.    The Balance of Equities Tips Sharply in Provisional Class Members' Favor and an Injunction Is in the Public Interest. ........... 21

II.    THE ALL WRITS ACT INDEPENDENTLY AUTHORIZES THE COURT TO PREVENT THE GOVERNMENT FROM PREMATURELY EXTINGUISHING PROVISIONAL CLASS MEMBERS' CLAIMS THROUGH THE ASYLUM BAN. ....................... 23

III.    CONCLUSION ................................................................... 24

ER 00812

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke*,
280 F. Supp. 3d 373 (W.D.N.Y. 2017) .............................................................. 10

*Adams v. United States*,
317 U.S. 269 (1942) .......................................................................................... 23

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011).......................................................... 8, 14, 20, 24

*Apotex, Inc. v. FDA*,
2006 WL 1030151 (D.D.C. Apr. 19, 2006) ...................................................... 10

*Arctic Zero, Inc. v. Aspen Hills, Inc.*,
2018 WL 2018115 (S.D. Cal. May 1, 2018) ..................................................... 23

*Arizona Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014)......................................................................... 8, 9

*Astrazeneca Pharm. LP v. Burwell*,
197 F. Supp. 3d 53 (D.D.C. 2016) .................................................................... 24

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins.
Litig.)*,
770 F.2d 328 (2d Cir. 1985) .............................................................................. 24

*Barr v. E. Bay Sanctuary Covenant*,
Case No. 19A230, 588 U.S. ___, 2019 WL 4292781 (2019) ............................. 2

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*,
179 F.3d 725 (9th Cir. 1999) ............................................................................... 9

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................................................................................... 20

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016)............................................................................. 9

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018)............................................................................... 9

*California v. M&P Investments*,
46 F. App'x 876 (9th Cir. 2002)........................................................................ 23

*Capital Area Immigrants' Rights Coalition v. Trump*,
No. 1:19-cv-02117-TJK, 2019 WL 3436501 (D.D.C. 2019)............................... 2

*Cazun v. Attorney Gen. United States*,
856 F.3d 249 (3d Cir. 2017) ............................................................................. 11

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014)...........................................................8

2

3

*E. Bay Sanctuary Covenant v. Barr*,
    385 F. Supp. 3d 922 (N.D. Cal. 2019), *order reinstated*, 391 F.
    Supp. 3d 974 (N.D. Cal. 2019)........................................................5

4

5

*E. Bay Sanctuary Covenant v. Barr*,
    391 F. Supp. 3d 974 (N.D. Cal. 2019) ............................................5

6

*E. Bay Sanctuary Covenant v. Barr*,
    934 F.3d 1026 (9th Cir. 2019).........................................................5

7

8

*E. Bay Sanctuary Covenant v. Trump*,
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ..........................................11

9

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018).........................................................22

10

11

*F.T.C. v. Dean Foods Co.*,
    384 U.S. 597 (1966) ......................................................................23

12

*Graham v. Fed. Emergency Mgmt. Agency*,
    149 F.3d 997 (9th Cir. 1998).........................................................20

13

14

*Hamilton v. Nakai*,
    453 F.2d 152 (9th Cir. 1972).........................................................23

15

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017).................................................10, 11

16

17

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) ......................................................................11

18

*INS v. Stevic*,
    467 U.S. 407 (1984) ......................................................................11

19

20

*Kirwa v. Dep't of Defense*,
    285 F. Supp. 3d 21 (D.D.C. 2007) ................................................10

21

*Klay v. United Healthgroup, Inc.*,
    376 F.3d 1092 (11th Cir. 2004).....................................................23

22

23

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011).........................................................11

24

*Michael v. INS*,
    48 F.3d 657 (2d Cir. 1995) ............................................................24

25

26

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................22

27

*Partington v. Norris*,
    28 F.3d 107 (9th Cir. 1994)..............................................................9

28

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

*Ramirez v. U.S. Immigration & Customs Enf't*,
310 F. Supp. 3d 7 (D.C. Cir. 2018) .................................................. 22

*Saravia for A.H. v. Sessions*,
905 F.3d 1137 (9th Cir. 2018) ........................................................ 8

*Securities and Exch. Comm'n v. G.C. George Sec., Inc.*
637 F.2d 685 (9th Cir. 1981) ......................................................... 24

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) ......................................................... 9

*Singleton v. Kernan*,
2017 WL 4922849 (S.D. Cal. 2017) ............................................... 9

*Small v. Avanti Health Sys., LLC*,
661 F.3d 1180 (9th Cir. 2011) ....................................................... 22

*Sy v. Holder*,
337 F. App'x 487 (6th Cir. 2009) .................................................. 11

*Textile Unlimited, Inc. v. A. BMH and Co.*,
240 F.3d 781 (9th Cir. 2001) ......................................................... 8

*Villanueva-Bustillos v. Marin*,
370 F. Supp. 3d 1083 (C.D. Cal. 2018) ......................................... 11

*Wagner v. Taylor*,
836 F.2d 566 (D.C. Cir. 1987) ...................................................... 23

*Wakkary v. Holder*,
558 F.3d 1049 (9th Cir. 2009) ....................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................... 8, 9, 21, 24

**Statutes**

5 U.S.C. § 701 ................................................................................. 13

5 U.S.C. § 706 ................................................................................. 19

8 U.S.C. § 1158 .......................................................................*passim*

8 U.S.C. § 1225 ..................................................................... 7, 14, 19

8 U.S.C. § 1231 ............................................................................... 11

28 U.S.C. § 1651 ................................................................... 2, 23, 24

Administrative Procedure Act ...................................... 13, 14, 19, 20

**Other Authorities**

8 C.F.R. § 208.13 .............................................................................. 4

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

iv

ER 00815

8 C.F.R. § 274a.12 ...........................................................................................11

8 C.F.R. § 1240.10 ..........................................................................................11

84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. §
208.13(c)(4) ..........................................................................................*passim*

1465 U.N.T.S. 85 (1984) ....................................................................................4

1967 Refugee Protocol, and the Convention Against Torture. 189
U.N.T.S. 137 (1951) ....................................................................................4

606 U.N.T.S. 267 (1967) ....................................................................................4

Lindsay M. Harris, *Withholding Protection*, 50 COLUM. HUM. RTS. L.
REV. 1, 77 n.147 (2019) ...............................................................................11

11A Wright & Miller, FED. PRAC. & PROC. § 2948.1 (3d ed.) ...........................9

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

v

ER 00816

**INTRODUCTION**

After adopting a metering policy[2] that forces destitute asylum seekers to wait for protracted periods in dangerous Mexican border towns, the Government has taken yet another step to deny them access to the U.S. asylum process. Specifically, Defendants have attempted to pull the rug out from underneath law-abiding asylum seekers at the southern border by promulgating a new interim final rule (the "Asylum Ban," defined below), through which the Government effectively denies access to the U.S. asylum process to virtually all metered asylum seekers from countries other than Mexico. Critically, the very reason the provisional class members face application of the categorical prohibition in the Asylum Ban is the unlawful metering policy which forced them to wait in Mexico. These class members would have had their asylum claims heard under pre-existing law but for the illegal metering policy that is challenged in this case. Yet application of the Asylum Ban—and return to a class member's country of origin to face persecution—would effectively foreclose Plaintiffs' ability to challenge the metering policy. Plaintiffs seek a preliminary injunction to preserve the status quo and permit adjudication of their existing claims, by barring Defendants from applying the Asylum Ban to provisional class members, who were metered prior to the effective date of the Asylum Ban.

Provisional class members will suffer serious, irreparable injury if the Asylum Ban is applied to them. Once they become ineligible for asylum pursuant to the Asylum Ban, their ability to obtain relief in this case will be extinguished, depriving them of their continued right to litigate these pending claims and access the asylum

---

[2] Plaintiffs allege that CBP's metering of asylum seekers at the southern border, referred to in this brief as the "metering policy," is part of a broader Turnback Policy that is aimed at restricting the number of asylum seekers inspected and processed at ports of entry. Turnbacks occur through metering as well as other tactics, such as use of physical force and coerced withdrawal of a claim of fear at a port of entry ("POE"). For purposes of the preliminary relief sought in this motion, Plaintiffs' allegations focus only on metering. Plaintiffs do not, however, concede that the Turnback Policy referenced in their Second Amended Complaint is limited to metering.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

process. The balance of the equities tips sharply in favor of these class members, who attempted to follow the rules despite their fear and desperation, and sharply against the government, which illegally denied them access to the asylum process under the old rules. Finally, an injunction preventing application of the Asylum Ban to these class members is in the public interest.

To be clear, Plaintiffs are not challenging the Asylum Ban itself as part of this motion or in this case; those challenges are in active litigation already. *See Barr v. E. Bay Sanctuary Covenant*, Case No. 19A230, 588 U.S. ___, 2019 WL 4292781 (2019) ("Asylum Ban Order"); *Capital Area Immigrants' Rights Coalition v. Trump*, No. 1:19-cv-02117-TJK, 2019 WL 3436501 (D.D.C. 2019). Nor did Plaintiffs file this motion to seek a specific outcome in provisional class members' asylum cases. Rather, Plaintiffs seek to preserve the status quo through a prohibitory preliminary injunction or, in the alternative, via the Court's broad equitable power conferred by the All Writs Act, 28 U.S.C. § 1651(a), in order to preserve access to the asylum *process* for provisional class members pending this Court's determination on the merits of their claims challenging the Government's use of metering. Absent such modest judicial intervention, provisional class members are likely to be deemed categorically ineligible for asylum if they crossed into the United States after the Ban went into effect, even if they were illegally metered at a port of entry ("POE") before that date. That result would improperly extinguish meaningful relief on the claims challenging the metering policy that are under consideration by this Court.

## BACKGROUND

### A. Defendants' Illegal Metering Policy

For at least the past year and a half, CBP officials have been "metering," or screening out asylum seekers approaching official POEs before they physically cross the U.S.-Mexico border. Ex. 1; Ex. 2 at 5-7; *see also* Am. Order Granting in Part and Den. in Part Defs.' Mot. to Dismiss the Second Am. Compl., Dkt. 280 ("Second Mot. to Dismiss Order"); Defs.' Ans. to Pls.' Second Am. Compl., Dkt. 283, at ¶¶ 3,

7, 54, 65, 67–69, 79, 83, 85, 226, 258, 272, 273.[3] This policy has led to a massive increase of migrants in Mexican border towns seeking to access the U.S. asylum process but prevented from doing so *by the U.S. government itself*. Ex. 3 ¶¶ 6-7.

Instead of inspecting and processing asylum seekers when they present themselves at POEs, as the law requires, Second Mot. to Dismiss Order, Dkt. No. 280, at 38-40, 42, 44-47 (explaining that the INA, 8 U.S.C. §§ 1158, 1225, requires that individuals "in the process of arriving in the United States" be inspected and processed and have the right to apply for asylum), under the metering policy Defendants block asylum seekers—and only asylum seekers—from crossing the international boundary line on the pathway to inspection stations at POEs. Ex. 2 at 5-7; Ex. 4 ¶¶ 3-8; Ex. 5 ¶¶ 4-5. Defendants inspect and process asylum seekers at POEs only sporadically, and generally based on their positions on lists maintained by third parties in Mexico. Ex. 2 at 6-7; Ex. 3 ¶¶ 5-6; Ex. 4 ¶¶ 6-11; Ex. 5 ¶ 5; Ex. 6 ¶ 19; Ex. 7 ¶ 18. Thus, any asylum seeker trying to enter the United States the "right way" must travel to the place in a Mexican border town where "the list" is maintained; put her name on the list; and then wait for weeks or months—vulnerable to kidnapping, trafficking, extortion, and violence—until CBP unilaterally decides it will inspect and process her. Ex. 3 ¶¶ 5-7; Ex. 6 ¶¶ 15-17, 19-20; Ex. 7 ¶¶ 15-18; Ex. 8 ¶¶ 5, 7, 9; Ex. 9 ¶¶ 8-9; Ex. 10 ¶¶ 10-11, 15-17; Ex. 11 ¶¶ 9-11, 17; Ex. 12 ¶¶ 10-11; Ex. 13 at 1; Ex. 14 ¶¶ 9-11, 13, 16; Ex. 15 ¶¶ 9-10; Ex. 16 ¶¶ 7-8, 12; Ex. 17 ¶¶ 8-10; Ex. 18 ¶¶ 6-9; Ex. 19 ¶¶ 6-8, 19-21; Ex. 20 ¶¶ 8-10; Ex. 21 ¶¶ 9-11; Ex. 22 ¶¶ 7-10; Ex. 23 at 2-5; Ex. 47 ¶¶ 7-10. When an asylum seeker tries to present herself at a POE without enrolling on the list—for example, if the person does not know about the list, has been denied access to the list,[4] or is simply desperate to

---

[3] "Ex." refers to the exhibits to the Declaration of Melissa Crow ("Crow Decl."), which are filed concurrently with this motion.

[4] The lists are generally the best and only option for asylum seekers in border towns who want to enter the United States legally. However, they are not without flaws;

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

ER 00819

reach safety and cannot wait—CBP officers routinely turn her back to Mexico. *See, e.g.*, Ex. 4 ¶¶ 9-10; Ex. 6 ¶ 15; Ex. 7 ¶ 16; Ex. 15 ¶¶ 9; Ex. 22 ¶ 8; Ex. 48 ¶ 5.

## B. The Asylum Ban and Its Legal Challenges

On July 16, 2019, the Departments of Justice and Homeland Security issued a joint interim final rule, "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) ("Asylum Ban"), *codified at* 8 C.F.R. § 208.13(c)(4), that "forbids almost all Central Americans—even unaccompanied children—to apply for asylum in the United States if they enter or seek to enter through the southern border, unless they were first denied asylum in Mexico or another third country." 2019 Asylum Ban Order (Sotomayor, J., dissenting).

Beyond the Central Americans that Justice Sotomayor mentioned in her dissent, the new Asylum Ban bars all non-Mexicans "who enter[], attempt[] to enter, or arrive[] in the United States across the southern land border on or after July 16, 2019" from eligibility for asylum in the United States unless they previously applied for and received a final judgment denying them protection from persecution or torture in a transit country or were subject to trafficking.[5] 8 C.F.R. §§ 208.13(c)(4)(i), (ii). That includes people fleeing persecution from countries all over the world, including Cuba, Venezuela, Haiti, Nicaragua, Cameroon, Russia, and India. The Ban fails to consider the conditions or purpose of an individual's journey through a third country, or her prospects for protection, rights or permanent

---

because the lists are maintained by third parties (either Mexican government entities or private individuals), they are subject to abuse and corruption. Ex. 15 ¶ 7; Ex. 16 ¶ 10. For example, it is often possible to pay the list-keeper for a better spot on the list or for the ability to bypass the list altogether. Some list-keepers demand sexual favors in exchange for a place on the list. Ex. 4 ¶ 11. Others deny certain groups of people, such as unaccompanied minors or black asylum seekers, access to the list altogether. Ex. 4 ¶¶ 9-10.

[5] The Ban also makes an exception for individuals who transited through countries that are not parties to the 1951 Refugee Convention, the 1967 Refugee Protocol, or the Convention Against Torture. 8 C.F.R. 208.13(c)(4)(iii). However, Mexico, the only country adjoining the southern border of the United States, is a party to the 1951 Refugee Convention, the 1967 Refugee Protocol, and the Convention Against Torture. 189 U.N.T.S. 137 (1951), http://bit.ly/2kY1NKI; 606 U.N.T.S. 267 (1967), http://bit.ly/2mge8Kc; 1465 U.N.T.S. 85 (1984), http://bit.ly/2mfxEXy.

legal status there.

On the day the Asylum Ban was implemented, four immigration legal and social service organizations challenged the Ban in the U.S. District Court for the Northern District of California and moved for a temporary restraining order seeking to prevent implementation of the Asylum Ban nationwide. By consent of the parties, the motion was converted to one for a preliminary injunction, which was granted on July 24. *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922 (N.D. Cal. 2019), *order reinstated*, 391 F. Supp. 3d 974 (N.D. Cal. 2019). The Ninth Circuit subsequently stayed the injunction as to all jurisdictions other than its own, but indicated that the district court retained jurisdiction to further develop the record in support of a broader injunction. *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019). Following supplemental briefing, the district court restored the nationwide scope of the injunction on September 9. *E. Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974 (N.D. Cal. 2019). On September 11, 2019, the Supreme Court stayed both the district court's July 24 and September 9 orders pending disposition of the government's appeal in the Ninth Circuit and disposition of the government's petition for a writ of certiorari, if sought. Asylum Ban Order. In light of the Supreme Court's action, the Asylum Ban recently went into effect nationwide with respect to all noncitizens who "enter[], attempt[] to enter, or arrive[] in" the United States via the southern border on or after July 16, 2019. 8 C.F.R. § 208.13(c)(4).

The Asylum Ban should not apply to Individual Plaintiffs and the provisional class members they seek to represent—those subject to the metering policy before July 16, 2019—given the text of the Ban and this Court's previous Order on Defendants' Motion to Dismiss the Second Amended Complaint. The Ban targets any noncitizen "who enters, attempts to enter, or *arrives in* the United States across the southern land border on or after July 16, 2019." 8 C.F.R. § 208.13(c)(4) (emphasis added). This Court has already held that the use of the present tense verb

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

"arrives in" is significant and "plainly covers an alien who may not yet be in the United States, but who is in the process of arriving in the United States through a POE." Second Mot. to Dismiss Order, Dkt. No. 280, at 38 (discussing 8 U.S.C. § 1158(a)(1)). Applying the Court's logic to the text of the Asylum Ban, the provisional class members who were metered at POEs prior to July 16, 2019 were in the process of "arriv[ing] in the United States" when they were turned back. The Asylum Ban should not apply to them, as they met the cut-off date for "arriv[ing]."

However, Plaintiffs understand that the Government does not accept the logic of this Court's ruling on the meaning of "arrives in," and presume that the Government will apply the Asylum Ban to provisional class members who physically enter the United States after July 16, even if they were previously turned back by metering before the Ban's effective date. *See* Ex. 25. Therefore, while Plaintiffs do not concede that the Asylum Ban *should* apply to the provisional class members, Plaintiffs file this Motion on the understanding that the Government *will* apply the Asylum Ban to them nonetheless.

## C. Because of the Illegal Metering Policy, Provisional Class Members Have Been Deprived of Access to the Asylum Process Through Operation of the Asylum Ban

Based on the Government's presumed application of the Asylum Ban to thousands of migrants who arrived at the U.S.-Mexico border before July 16, 2019 and were illegally metered, provisional class members are now, as a result of metering, harmed by the Ban. The U.S. government, including Defendants in this case, has engaged in a cruel bait and switch to deny these migrants access to the asylum process. Prior to July 16, 2019, the official message from the U.S. government was that asylum seekers should enter the United States "the right way," by going to a POE on the southern border, instead of crossing without authorization through the desert or across the river. *See, e.g.*, Ex. 26 (quoting then-DHS Secretary Kirstjen Nielsen at a press conference: "As I said before, if you are seeking asylum,

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

go to a port of entry. You do not need to break the law of the United States to seek asylum."); *see also* Ex. 17 ¶ 16 ("I decided to keep waiting for our turn to cross because I wanted to do things the right way and follow the law."); Ex. 22 ¶ 9 ("We put our names on the list because we believed in the process."). But at the same time, and as Plaintiffs have alleged in detail, Defendants have been choking off access to POEs and illegally preventing asylum seekers from entering the United States to access the asylum process, as explained above. *See* Ex. 2 at 5-7.

The Asylum Ban applies to any noncitizen who "enters, attempts to enter, or arrives in the United States . . . on or after July 16, 2019." 8 C.F.R. § 208.13(c)(4). Thus, if an asylum seeker had presented herself at a POE before July 16, 2019, and CBP had complied with its mandatory duty to inspect and process her pursuant to 8 U.S.C. § 1225, the Asylum Ban would not apply to her today because she would have "enter[ed]" before the cut-off date.

Based on Defendants' acknowledgement that they engage in metering on a border-wide basis, Dkt. 283 at ¶¶ 3, 7, 54, 65, 67–69, 79, 83, 85, 226, 258, 272, 273; Ex. 1; Ex. 2 at 5-7, it is clear that a subset of non-Mexican class members—who are now ineligible for asylum under the Asylum Ban—were subjected to the metering policy *before* the Asylum Ban went into effect on July 16, 2019, and but for the metering policy, would have entered the United States before that date. These individuals are the members of the provisional class the Individual Plaintiffs seek to represent for purposes of this motion.[6] If the Asylum Ban is applied to this subset of class members before the Court's ultimate decision in this case, then those class members will be denied any chance to obtain effective relief. This motion seeks

---

[6] Some of these individuals have already crossed into the United States and have received some sort of process—whether they were subject to the Migrant Protection Protocols and returned to Mexico to await their hearings, detained pending resolution of their immigration cases, or released. *E.g.*, Ex. 21 ¶ 16; Ex. 22 ¶ 13; Ex. 48 ¶ 11. Plaintiffs contend that such individuals remain part of their provisional class, even though they have already reached the United States and are in immigration proceedings, because they have been denied access to the asylum process through application of the metering policy, in combination with the Asylum Ban. Dkt. 189 ¶ 236.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

injunctive relief to preserve those class members' eligibility for asylum, given that the Asylum Ban would not have affected them but for Defendants' illegal use of metering, which forced them to stay in Mexico longer than they otherwise would have.

### LEGAL STANDARD

By this motion, Plaintiffs seek a preliminary injunction to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits. *Textile Unlimited, Inc. v. A. BMH and Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Specifically, they seek an order preventing the government from applying the categorical Asylum Ban to provisional class members, who would have arrived in the United States prior to July 16, 2019, but for Defendants' illegal metering policy.

When moving for a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A preliminary injunction may also issue where the plaintiff raises "serious questions going to the merits . . . and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In contrast to a mandatory injunction requiring a defendant to take affirmative steps, Plaintiffs here face a lower burden in obtaining this *prohibitory* injunction, grounded in the equitable powers of the court to preserve the status quo. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014). Courts have ample power to adjudicate the merits of a prohibitory preliminary injunction – and restore the status quo ante – when necessary to correct an injury already inflicted, and despite a defendant's attempt to subsequently foreclose relief on a plaintiff's

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

claims. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir. 1999) ("The function of a preliminary injunction is to preserve the status quo *ante litem,* which is defined as the last, uncontested status which preceded the pending controversy.") (quotations omitted); *Partington v. Norris*, 28 F.3d 107 (9th Cir. 1994). If the Court has power to correct an injury *already* inflicted and adjudicate claims the defendant attempted to foreclose, *a fortiori*, the Court has power to *prevent* the government from limiting provisional class members' access to the full range of relief for which they would be eligible subject to a favorable ruling on the merits in this case. *See Arizona Dream Act*, 757 F.3d at 1069 (restoring to status quo ante DACA recipients' federal entitlement to drivers' licenses, putatively denied by application of Defendant-Governor's policy).

## ARGUMENT

**I.   Because Provisional Class Members Will Suffer Irreparable Injury and Are Likely to Succeed on the Merits, A Preliminary Injunction is Warranted.**

    **A.   Provisional Class Members Will Suffer Irreparable Injury Absent Issuance of an Injunction Because They Will Improperly Lose Their Right to Have Their Asylum Claims Decided on the Merits.**

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Singleton v. Kernan*, 2017 WL 4922849, at *3 (S.D. Cal. 2017) (quoting 11A Wright & Miller, FED. PRAC. & PROC. § 2948.1 (3d ed.). The irreparable harm "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (*quoting Winter*, 555 U.S. at 22). The provisional class members plainly

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1  satisfy the irreparable harm prong.

2       To begin, absent the judicial relief requested, provisional class members will

3  be deprived of their present entitlement to challenge the legality of the metering

4  policy—under the INA and the Due Process Clause—presently before the Court.

5  The loss of such a procedural right constitutes irreparable harm.  *See Hernandez v.*

6  *Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (citation omitted); *Abdi v. Duke*, 280 F.

7  Supp. 3d 373, 404–06 (W.D.N.Y. 2017) (irreparable harm established where "full

8  and fair process afforded to them under the law" was denied); *cf. Kirwa v. Dep't of*

9  *Defense*, 285 F. Supp. 3d 21, 43 (D.D.C. 2007) (irreparable harm where government

10  "block[s] access to an existing legal avenue for avoiding removal"); *Apotex, Inc. v.*

11  *FDA*, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (irreparable harm where

12  government takes away "a statutory entitlement").  Only preservation of the status

13  quo would obviate that serious procedural injury.

14       In addition, provisional class members are asylum-seeking adults, children,

15  and families who have fled persecution in their home countries. *E.g.*, Ex. 5 ¶¶ 2-3;

16  Ex. 6 ¶¶ 2, 5, 12, 21; Ex. 7 ¶¶ 2, 4-5, 11-13, 20-22; Ex. 8 ¶¶ 3-4, 7, 9; Ex. 9 ¶ 4;

17  Ex. 10 ¶¶ 4-8, 15-18; Ex. 11 ¶¶ 5-7; Ex. 12 ¶¶ 2-6, 16; Ex. 13 at 1; Ex. 14 ¶¶ 3-7, 11; Ex.

18  15 ¶¶ 2-3, 11; Ex. 16 ¶¶ 2-6, 10, 13; Ex. 17 ¶¶ 2, 4-6, 15; Ex. 18 ¶¶ 2, 4, 10, 13; Ex.

19  19 ¶¶ 2, 4-5; Ex. 20 ¶¶ 2, 4-7; Ex. 21 ¶¶ 2, 5-8; Ex. 22 ¶¶ 2, 4, 11-12; Ex. 47 ¶¶ 7-

20  10; Ex. 48 ¶¶ 2-4, 12; Ex. 49 ¶¶ 2-6, 14. They offer harrowing portraits of the grave

21  dangers they fled, the fraught and extended journeys they undertook to reach the

22  U.S.-Mexico border, and the peril that awaits them now. *Id.* Without the requested,

23  immediate injunctive relief, provisional class members risk persecution, torture and

24  death if they are deported to their countries of origin without having their claims for

25  asylum considered on the merits.[7] *Id.* The loss of the right to seek asylum constitutes

26

27  [7] As discussed above, Plaintiffs understand that the Government will apply the
   Asylum Ban to the provisional class members they seek to represent, but Plaintiffs
28  do not concede that the plain language of the Asylum Ban actually does apply to
   them.  *See supra* at 5-6.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1   irreparable harm, *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864

2   (N.D. Cal. 2018), as do persecution, torture and death. *Hernandez v. Sessions*, 872

3   F.3d 976, 994 (9th Cir. 2017) ("any deprivation of constitutional rights

4   'unquestionably constitutes irreparable injury'") (citation omitted); *Leiva-Perez v.*

5   *Holder*, 640 F.3d 962, 970-71 (9th Cir. 2011) (holding that persecution on account

6   of political opinion, in the form of extortion and beatings, "would certainly constitute

7   irreparable harm"); *see also Villanueva-Bustillos v. Marin*, 370 F. Supp. 3d 1083,

8   1090 (C.D. Cal. 2018) (torture and death are irreparable harm).

9        Nor does the fact that the Asylum Ban allows two lesser forms of removal

10  relief—withholding of removal and relief under the Convention Against Torture

11  ("CAT")—negate a finding of irreparable injury, as both these forms of relief require

12  a much higher quantum of proof than asylum and offer significantly fewer

13  protections.[8] Unlike asylees, individuals granted withholding and CAT relief lack

14  any pathway to permanent residency or citizenship and cannot petition for

15  immediate family members to join them in the United States. *Cazun v. Attorney Gen.*

16  *United States*, 856 F.3d 249, 252 n.3 (3d Cir. 2017) (citing *INS v. Cardoza-Fonseca*,

17  480 U.S. 421, 428 n.6 (1987)). Although such individuals cannot be deported to the

18  country where they fear persecution, they can be deported to another country. *See* 8

19  U.S.C. § 1231(b); 8 C.F.R. § 1240.10(f). In addition, they may not travel outside the

20  United States, may be detained, and must pay a yearly renewal fee for an

21  employment authorization document in order to maintain the right to work in the

22  United States. *See* 8 C.F.R. § 274a.12(a)(10); Lindsay M. Harris, *Withholding*

23  *Protection*, 50 COLUM. HUM. RTS. L. REV. 1, 77 n.147 (2019). In essence, even those

24

25  ───────────────
    [8] To obtain withholding or CAT protection, a person must show a "reasonable
26  possibility" of persecution, *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), or a
    "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407 (1984). In practice,
27  that means that whereas an individual must demonstrate only a 10% chance of
    persecution in his or her home country to obtain asylum, *Wakkary v. Holder*, 558
    F.3d 1049, 1064 (9th Cir. 2009), for withholding and CAT, that figure jumps to 51%,
28  *Stevic*, 467 U.S. at 412. *See Sy v. Holder*, 337 F. App'x 487, 492 (6th Cir. 2009).

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

individuals who succeed in meeting the higher burden of proof for withholding of removal and CAT relief are subject to substantial restrictions not applicable to asylees. Yet the only reason provisional class members are limited to seeking these inferior forms of protection is that they were subject to metering.

Neither can provisional class members satisfy the Asylum Ban's limited exceptions by applying for asylum in Mexico and waiting for a final judgment. First, provisional class members who were metered before July 16, 2019, by definition, have been in Mexico longer than a month, and are now barred from applying for asylum *in Mexico* by that country's 30-day bar on asylum applications. See Ex. 27 ¶¶ 34-37; Ex. 28, ¶ 22. Although it is possible to seek a waiver of the 30-day bar, it is nearly impossible to do so without legal counsel, which is expensive. Ex. 27 ¶¶ 35-36. For all intents and purposes, nearly all provisional class members are barred from even applying for asylum in Mexico.

Those class members who manage to file an asylum application in Mexico face delays of over two years caused by the chronic underfunding and understaffing of Mexico's Commission for Refugee Assistance ("COMAR"), the agency charged with adjudicating asylum applications. *Id.* ¶¶ 21-29. There is only one COMAR office on the U.S.-Mexico border, in Tijuana, with just two staff members who are not authorized to decide cases on their own. *Id.* ¶¶ 26-27. Although class members can apply for asylum at National Institute for Migration ("INM") offices in other border cities, those offices have little to no staff with specialized training in asylum or humanitarian protection. *Id.* ¶ 28. While their applications are pending, migrants are not allowed to leave the Mexican state where they filed their applications, and have to check in regularly with COMAR or INM to avoid "abandonment" of their applications, which could lead to deportation. *Id.* ¶ 32; Ex. 28 ¶¶ 24-28. Those class members who manage to apply for asylum in Mexico, who are fleeing horrific violence and threats to their lives, cannot wait years for a final judgment in Mexico before even being allowed to wait for asylum in the United States.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1    If this Court finds for the provisional class members on the merits of their

2   claims, appropriate injunctive relief would include an order directing that those class

3   members who would have crossed the southern border prior to July 16 but for

4   Defendants' illegal conduct should have their asylum claims adjudicated based on

5   the law that was then in place. Such an order would be necessary to place those

6   individuals in the same position they would have been in had Defendants not

7   engaged in illegal metering. However, absent preliminary injunctive relief, the

8   Asylum Ban would deprive provisional class members of access to the asylum

9   process even if this Court ultimately rules in Plaintiffs' favor on the illegality of the

10  Government's metering policy. Once they lose the right to seek asylum based on the

11  law that existed at the time they arrived at a POE, it cannot effectively be restored.

12  That is clearly irreparable harm.

13    **B.    Plaintiffs Are Likely to Succeed on the Merits of Their Underlying**

14        **Claims Challenging the Government's Metering Policy and**

15        **Individual Turnbacks**

16    This Court's past decisions suggest that Plaintiffs have a strong likelihood of

17  success of the merits in this case. But such a victory would be hollow for provisional

18  class members if, in the interim, they are barred from asylum by the Asylum Ban,

19  despite the fact that they would have "enter[ed]" the United States before the Ban

20  went into effect *but for* Defendants' illegal actions. *See* 8 C.F.R. § 208.13(c)(4). In

21  its past orders granting in part and denying in part Defendants' motions to dismiss,

22  this Court already concluded that the political question doctrine does not bar review

23  of Plaintiffs' claims; that the challenged action is reviewable under 5 U.S.C.

24  § 701(a)(2) because it is not committed to agency discretion by law; and that

25  assuming the truth of the facts alleged in the Second Amended Complaint, Plaintiffs

26  have adequately pleaded violations of the Immigration and Nationality Act ("INA"),

27  the Administrative Procedure Act ("APA"), and the Due Process Clause. Second

28  Mot. to Dismiss Order, Dkt. No. 280 at 21-25, 47, 54-58, 65, 77. Plaintiffs are

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1    gathering the evidence necessary to prove their claims, and they are likely to succeed

2    on the merits. At the very least, under the *Cottrell* standard, Plaintiffs have raised

3    serious questions going to the merits of their underlying claims.

4    **1.    Each Individual Turnback of an Asylum Seeker Violates**

5    **the INA and Section 706(1) of the APA.**

6    The Court has already made clear that it "agrees" with Plaintiffs'

7    understanding of Defendants' legal obligations under the INA. Dkt. 280 at 38. The

8    INA guarantees a right to apply for asylum to noncitizens who are "in the process of

9    arriving in the United States." *Id.* at 38-40 (citing 8 U.S.C. § 1158). The INA also

10   requires Defendants to inspect all noncitizens who are "arriving in the United States"

11   at a POE, even if they "may not yet be in the territorial United States." *Id.* at 44-46

12   (citing 8 U.S.C. § 1225). It further requires Defendants to refer for an interview with

13   an asylum officer all arriving noncitizens who indicate an intent to apply for asylum

14   or a fear of persecution. *Id.* at 46-47. Every failure to carry out their statutory

15   inspection and processing duties—what Plaintiffs have called a "turnback"—is

16   reviewable and actionable under Section 706(1) of the APA. *Id.* at 28.

17   Plaintiffs already have evidence to support their legal arguments and are in

18   the process of gathering more in discovery, which is currently underway. *Cf.* Dkts.

19   269, 275 (noting continued concerns with the pace of the Government's document

20   production; Dkt. 288 (granting motion to compel the Government's timely

21   production of documents). Most importantly, Defendants acknowledge that they are

22   "metering," or artificially limiting the numbers of asylum seekers they allow into

23   POEs along the southern border, and have been doing so since at least April 2018.

24   *See* Ex. 2 at 5-7 (discussing and describing metering practices); Ex. 1; Ex. 29

25   (indicating that a border-wide metering policy was authorized at the highest levels

26   of CBP in November 2016); Dkt. 283 at ¶¶ 3, 7, 54, 65, 67–69, 79, 83, 85, 226, 258,

27   272, 273. There has been significant press coverage of the existence and

28   consequences of metering. *See*, *e.g.*, Ex. 30-33. And Defendants' own public

14

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

statistics demonstrate that they have been limiting the number of "inadmissibles," or noncitizens "presenting themselves to seek humanitarian protection under our laws," to around 10,000 per month for at least the past year. *See* Ex. 34 (illustrating that the number of "inadmissibles" has fluctuated around 10,000 per month since October 2018, with two unexplained increases in May and August 2019).

Plaintiffs are also likely to succeed on their claim that the metering policy was adopted based on a desire to deter asylum seekers and artificially limit the number of asylum seekers inspected at POEs, as well as the related allegation that Defendants' claim of lack of capacity is pretextual. First, Defendants' own words, and those of others in the Trump administration, indicate an undeniable disdain for asylum seekers. For instance, at a December 6, 2018 Congressional staff briefing concerning metering at POEs on the U.S.-Mexico border, Judson W. Murdock, II, the Acting Assistant Commissioner of CBP, justified the policy by stating, "[t]he more we process, the more will come." Ex. 35 at 1. Similarly, in a July 26, 2019 email, one of President Trump's chief immigration advisors, Stephen Miller, stated, "My mantra has persistently been presenting aliens with multiple unavoidable dilemmas to impact their calculus for choosing to make the arduous journey to begin with." Ex. 36 at 2. Mr. Miller has been even more direct about his intentions, stating that he "would be happy if not a single refugee foot ever again touched America's soil." Ex. 37 at 6. President Trump has been more prosaic, explaining, "They have to get rid of the whole asylum system because it doesn't work. And, frankly, we should get rid of judges. You can't have a court case every time somebody steps foot on our ground." Ex. 38 at 3; *see also* Ex. 39 at 24 ("Asylum is a ridiculous situation. . . . It's a big con job. That's what it is."); Ex. 40 at 24 ("How stupid can we be to put up with this? How stupid can we be? . . . [T]he asylum program is a scam."). In accordance with these statements, the administration has focused significant efforts on overhauling Defendants' border policies to make U.S. asylum law a dead letter. The metering policy is one such effort by Defendants to end asylum—in this case,

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

by shirking their statutory duties to inspect and process asylum seekers at POEs.

Second, publicly available data and the limited discovery produced strongly support Plaintiffs' claim that Defendants' explanation of metering is pretextual. Defendants have used metering to drastically cut the number of asylum seekers processed at ports of entry. *See* Ex. 3 at 1, 4-12; Ex. 4 ¶ 12. These processing levels cannot be justified by the capacity of particular ports of entry. The Government's metering policy has a border-wide, systematic effect on asylum seekers. Prior to the formalization of the metering policy, on November 27, 2017, CBP created a "Migrant Crisis Action Team," known by the acronym MCAT. *See* Ex. 41 at 12000. The purpose of the MCAT is to "monitor and work closely with CBP field personnel and assist in managing issues with migration flow at and between ports of entry along the [Mexican] border." *Id.* The MCAT tracks and facilitates metering at POEs. The MCAT disseminates daily "Queue Management" reports tracking CBP's progress in illegally restricting the number of asylum seekers who can present themselves at POEs on the U.S.-Mexico border. A January 2019 Queue Management report shows that the Laredo Field Office cut the year-to-date number of asylum seekers processed at POEs by 55%, the El Paso Field Office cut asylum seekers by 26%, the Tucson Field Office cut asylum seekers by 20%, and the San Diego Field Office cut asylum seekers by 43%. *See* Ex. 42 at 12012-13.

For example, CBP's *Laredo Field Office Contingency Plan* for addressing "[i]ncreases in persons and family units . . . claiming 'credible fear'," Ex. 43 at 11124, states that the Brownsville POE "has a capacity to process approximately 300 cases every 24 hours." *Id.* at 11135. However, daily data compiled and kept by CBP's MCAT concerning the number of asylum seekers processed at particular POEs shows that the Brownsville POE was processing far fewer than 300 asylum seekers per day in the first quarter of 2019.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION



**Brownsville POE:** Percentage of Asylum Processing Capacity Used

Summary: 1/22 – 3/14/19

**463** cases processed
**10,500** case capacity
**4.4%** utilization

SOURCES: AOL-DEF-00012012; AOL-DEF-00012022; AOL-DEF-00012033; AOL-DEF-00012051; AOL-DEF-00012061; AOL-DEF-00012071; AOL-DEF-00012081; AOL-DEF-00012099; AOL-DEF-00012119; AOL-DEF-00012129; AOL-DEF-00012144; AOL-DEF-00012154; AOL-DEF-00012164; AOL-DEF-00012175; AOL-DEF-00012186; AOL-DEF-00012196; AOL-DEF-00012206; AOL-DEF-00012217; AOL-DEF-00012236; AOL-DEF-00012246; AOL-DEF-00012256; AOL-DEF-00012266; AOL-DEF-00012284; AOL-DEF-00012307; AOL-DEF-00012317; AOL-DEF-00012335; AOL-DEF-00012345; AOL-DEF-00012355; AOL-DEF-00012365; AOL-DEF-00012376; AOL-DEF-00012394; AOL-DEF-00012404; AOL-DEF-00011024

As shown above, between January 22, 2019 and March 14, 2019 (the only period for which the Government has produced MCAT reports), CBP utilized only 4.4% of its available capacity at the Brownsville POE to process asylum seekers. Even when accounting for such factors as the need to house vulnerable migrant populations (such as juveniles) separately from other migrants, the Government has offered no valid justification for its decision to process fewer than 30 asylum seekers per day at the Brownsville POE.

The same trend can be seen border-wide. CBP's own statistics show that the Government has far more capacity to process asylum seekers than it is currently using. Between July 2015 and January 2017, before the Government implemented its border-wide metering policy, CBP processed 12,651 undocumented migrants per month. Ex. 23 at ¶ 6(a). Between June 2018 and July 2019, CBP processed only 9,904 undocumented migrants per month, a 28% decrease. Ex. 23 at ¶ 6(b)-(c). This reduction in migrant processing cannot be explained by other factors. From 2015 to 2019 CBP's budget increased from $12.8 billion to $14.7 billion. Ex. 44 at fig. 2. In 2017 and 2018, the number of "frontline" CBP officers increased. Ex. 45 at 6.

Moreover, in 2019, CBP is scheduled to complete a $741 million expansion of the San Ysidro POE, which includes an expansion of the secondary inspection and detention capabilities of the POE. Ex. 46 at 2.



**Undocumented Migrants Processed at Ports of Entry, October 2011-Present**

Third, circumstantial evidence, including the observations of human rights advocates and DHS monitors, further bolsters Plaintiffs' claim of pretext. Ex. 23 at 5; Ex. 24 at 15 (Amnesty International report of an interview with high-level CBP officials in California, in which they stated that "CBP has only actually reached its detention capacity a couple times per year and during 'a very short period' in 2017"); *id.* at 23 (noting that in a conversation with Amnesty International, an INM [the Mexican immigration agency] delegate in Baja California expressed doubt about CBP's claims of capacity constraints); Ex. 2 at 8 ("[T]he OIG team did not observe severe overcrowding at the ports of entry it visited."). Under Defendants' illegal metering policy, only asylum seekers are screened out of the line of noncitizens awaiting inspection at ports of entry. Thus, by design, metering targets only asylum seekers and deprives them—and no other "applicants for admission"—of the statutorily-required inspection process. Ex. 2 at 6; Ex. 4 ¶¶ 5-8; Ex. 15 ¶ 9; Ex. 22

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1    ¶ 8; *see also* Dkt. 280 at 61.

2          Every individual who was metered over the past year and a half—*i.e.*, denied

3    the inspection and processing the INA requires—experienced an individual

4    "turnback" in violation of CBP's mandatory inspection and processing duties under

5    the INA, which is actionable under the APA § 706(1). Given Defendants'

6    acknowledgement that they are metering at POEs along the southern border, and the

7    likelihood that Plaintiffs will ultimately prove that Defendants' capacity excuse is

8    pretextual, Plaintiffs easily meet the standard of showing that they are likely to

9    succeed on the merits of their INA and APA claims related to individual turnbacks.

10         **2.      The Metering Policy Violates the INA and APA**

11                 **Section 706(2).**

12         In its recent order, this Court signaled likely agreement with Plaintiffs' claim

13   that the metering policy violates the INA and the APA, 5 U.S.C. § 706(2), because

14   it is a final agency action that exceeds Defendants' statutory authority and is without

15   observance of procedure required by law. Second Mot. to Dismiss Order, Dkt. No.

16   280, at 49-53 (final agency action), 58-65 (APA violation analysis). As explained

17   above, the Court agreed that the INA, 8 U.S.C. § 1225, requires CBP to inspect and

18   process all noncitizens "in the process of arriving" in the United States. *Id.* at 38, 45-

19   46, 59. Therefore, Plaintiffs are likely to succeed on the merits of their claim that a

20   policy setting out a different process across the entire border—particularly one that

21   blatantly undermines the humanitarian purpose of the statutory asylum scheme—is

22   incompatible with the INA's specific inspection mandate, and that it exceeds

23   Defendants' general authority to implement the statute and manage ports of entry.

24   In addition, the Court agreed with Plaintiffs that Defendants lack authority to adopt

25   and implement such a policy for the purpose of deterring asylum seekers and

26   intentionally limiting the number of asylum seekers who are inspected. *Id.* at 60-65.

27         Furthermore, even with the limited discovery completed to date, it is likely

28   that Plaintiffs will succeed in substantiating their core factual allegations regarding

19

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

the metering policy. As detailed above, Defendants concede that they have a border-wide practice called "metering" that is memorialized in guidance distributed to all ports. *See supra* section A. They have implemented this guidance and they are in fact metering on a border-wide basis. Ex. 3 ¶ 6; Ex. 4 ¶¶ 6-8; Ex. 5 ¶ 4 (Hidalgo); Ex. 7 ¶ 14 (El Paso); Ex. 8 ¶ 5 (San Diego); Ex. 14 ¶ 10 (Brownsville); Ex. 22 ¶ 7 (Laredo); Ex. 23 at 2-5; Ex. 24 at 11, 15-22; Ex. 47 ¶ 8 (Calexico). Moreover, Defendants' guidance is written proof of a policy that, at a minimum, encompasses metering, and that satisfies the statutory definition of a "final agency action." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (defining "final agency action.") And lastly, as described in detail above, *supra* section A, Plaintiffs are likely to succeed in demonstrating that Defendants' claims of lack of capacity are pretextual and that the metering policy is based on the unlawful goal of deterring and restricting the number of asylum seekers who present themselves at POEs.

### 3. The Metering Policy Violates the Due Process Clause.

Because Plaintiffs have statutory rights under the INA and Sections 706(1) and 706(2) of the APA, Dkt. 280 at 76, they cannot be deprived of those rights without due process, which this Court has already held protects them. As with the statutory claims, the Court has made clear that it agrees with Plaintiffs' understanding of the law underlying their constitutional claims. *Id.* at 69-77. If Plaintiffs show that Defendants "failed to discharge their mandatory duties under the relevant [statutory] provisions," Plaintiffs simultaneously prove a due process violation. *Id.* at 77. Plaintiffs have already established a likelihood of success on the merits of their statutory claims, thereby also establishing a likelihood of success on the merits of their due process claim.[9]

---

[9] If the Court concludes that Plaintiffs have not established a likelihood of success on the merits of their INA and APA claims, but that they have raised serious questions going to the merits of those claims under the *Cottrell* standard, then that finding should apply equally to the Plaintiffs' due process claims, which are grounded in the alleged statutory violations. *See* Dkt. 280, at 76 (citing *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1001 & n.2 (9th Cir. 1998)).

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

**C.    The Balance of Equities Tips Sharply in Provisional Class Members' Favor and an Injunction Is in the Public Interest.**

In evaluating the final preliminary injunction factors—the balance of the equities and the public interest—a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the request for relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 376-77.

The effect on Defendants of granting this injunction is minimal. It would require the government simply to ensure that provisional class members remain eligible for asylum, which would have been the case had they not been subject to Defendants' illegal metering policy. It is hard to envision how requiring the Government to apply decades-old law to an identified group of people who relied on it entails any meaningful injury.

On the other hand, the effect on provisional class members of *not* granting this injunction would be severe and immediate. While Plaintiffs believe that the Asylum Ban, by its terms, should not apply to provisional class members because, in accordance with this Court's prior opinions, they "attempt[ed] to enter, or arrive[d] in the United States" at the time that they were subject to turnbacks, the Government does not appear to interpret the Ban in this way. Ex. 25. If, as expected, the Government were to apply the Asylum Ban to members of the provisional class because they did not cross the southern border prior to July 16, 2019, then all provisional class members would be ineligible for asylum. *Id.* Absent the requested injunction, provisional class members who are inspected and processed will be ineligible for asylum under the Ban, although the only reason they are deemed subject to the Ban is the Government's illegal use of metering. They face deportation to countries where they fear grave harm. *See supra*, Part I; *see also* Ex. 5 ¶¶ 2-3; Ex. 6 ¶¶ 2, 5, 12, 21; Ex. 7 ¶¶ 2, 4-5, 11-13, 20-22; Ex. 8 ¶¶ 3-4, 7, 9; Ex. 9 ¶ 4; Ex. 10 ¶¶ 4-8, 15-18; Ex. 11 ¶¶ 5-7; Ex. 12 ¶¶ 2-6, 16; Ex. 13 at 1; Ex. 14 ¶¶ 3-7, 11; Ex.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

15 ¶¶ 2-3, 11; Ex. 16 ¶¶ 2-6, 10, 13; Ex. 17 ¶¶ 2, 4-6, 15; Ex. 18 ¶¶ 2, 4, 10, 13; Ex. 19 ¶¶ 2, 4-5; Ex. 20 ¶¶ 2, 4-7; Ex. 21 ¶¶ 2, 5-8; Ex. 22 ¶¶ 2, 4, 11-12; Ex. 48 ¶ 12.

Moreover, it is in the public interest to "ensur[e] that 'statutes enacted by [their] representatives' are not imperiled by executive fiat," or a combination of fiats, as in this case. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (citation omitted); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) ("[T]he public interest favors applying federal law correctly."); *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.C. Cir. 2018) (finding that where agency discretion "has been clearly constrained by Congress[,] [t]he public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate").

As this Court recognized in its Second Motion to Dismiss Order, the government is required by statute to provide asylum seekers access to the U.S. asylum process. *See* 8 U.S.C. § 1158(a)(1) ("*Any* [noncitizen] who is physically present in the United States or who *arrives in* the United States . . . , irrespective of such [noncitizen's] status, may apply for asylum[.]") (emphasis added). To the extent Defendants' metering policy forecloses access to that statutorily guaranteed process through newly determined ineligibility criteria that affect provisional class members, the public interest is served by issuing a preliminary injunction that preserves their eligibility for asylum pending a determination on the merits of the metering policy. Finally, "preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm," clearly is in the public interest. *Nken v. Holder*, 556 U.S. 418, 436 (2009).

Thus, the balance of the equities and the public interest strongly favor granting preliminary injunctive relief to provisional class members.

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

II.     **The All Writs Act Independently Authorizes the Court to Prevent the Government from Prematurely Extinguishing Provisional Class Members' Claims Through the Asylum Ban.**

The All Writs Act ("AWA") separately authorizes the limited relief Plaintiffs seek, in order to preserve the court's jurisdiction to adjudicate the claims before it despite the government's attempt to extinguish them. See 28 U.S.C. § 1651(a) (authorizing courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"). The Act encompasses a federal court's power "to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966), and it "should be broadly construed," *Hamilton v. Nakai,* 453 F.2d 152, 157 (9th Cir. 1972) to "achieve all rational ends of law," *California v. M&P Investments*, 46 F. App'x 876, 878 (9th Cir. 2002) (quoting *Adams v. United States,* 317 U.S. 269, 273 (1942)).

Whereas a "traditional" injunction requires a party to state a claim, an AWA injunction requires only that a party point to a threat to the integrity of some ongoing or prospective proceeding, or of some past order or judgment. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) (a court may enjoin almost any conduct "which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion."). Thus, to issue an AWA injunction—simply preserving the court's jurisdiction over the pending metering-related claims—the Court need not satisfy itself that there is a likelihood of success on the merits on those claims. *See Wagner v. Taylor*, 836 F.2d 566, 571-72 (D.C. Cir. 1987) (showing of irreparable injury suffices); *Arctic Zero, Inc. v. Aspen Hills, Inc.*, 2018 WL 2018115, at *5 (S.D. Cal. May 1, 2018) (distinguishing AWA injunction from traditional preliminary injunction).

Accordingly, the Ninth Circuit has explicitly permitted courts to enjoin proceedings commenced after the federal court's assertion of jurisdiction, to ensure

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

adequate judicial review. *See Securities and Exch. Comm'n v. G.C. George Sec., Inc.* 637 F.2d 685, 687–88 (9th Cir. 1981) (AWA authorized district court to stay administrative proceeding involving issues related to a settlement over which the district court retained jurisdiction). The AWA is so broad as to authorize a district court to enjoin parties from bringing parallel litigation if it would disrupt the proper adjudication of pending cases before the court. *See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328 , 333 (2d Cir. 1985)[10] And, it unambiguously applies in the immigration context. The Second Circuit has used the All Writs Act to stay an order of deportation "in order to safeguard the court's appellate jurisdiction," in order to preserve its ability to hear subsequent appeals by the Petitioner. *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995).

Thus, the Court is authorized under the AWA to issue the limited injunction Plaintiffs seek merely to preserve its jurisdiction over the claims that have been pending before the court for over three years, and to prevent the government from unfairly and prematurely extinguishing those plausibly pled claims.

## III. CONCLUSION

Absent an injunction pursuant to either *Winter* or *Cottrell*, or an order pursuant to the All Writs Act that preserves the status quo, provisional class members will suffer irreparable harm. The court should issue an order preventing Defendants from applying the Asylum Ban to provisional class members because they were illegally metered before the effective date of the Asylum Ban.

WHEREFORE, Plaintiffs respectfully ask this Court to enter an injunction preventing Defendants from applying the Asylum Ban to provisional class members

---

[10] Indeed, equitable powers under the AWA are so broad so as to authorize preservation of the status quo, even while the predicate assertion of federal jurisdiction is contested, let alone as here, where it is undisputed. *See Astrazeneca Pharm. LP v. Burwell*, 197 F. Supp. 3d 53 (D.D.C. 2016) ("If the court may eventually have jurisdiction of the substantive claim, the court's incidental equitable jurisdiction . . . gives the court authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review.").

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1  who were metered prior to July 16, 2019.

2  Dated: September 26, 2019                    MAYER BROWN LLP
3                                                     Matthew H. Marmolejo
                                                      Ori Lev
4                                                     Stephen S. Medlock

5                                                SOUTHERN POVERTY LAW
6                                                CENTER
                                                      Melissa Crow
7                                                     Mary Bauer
                                                      Sarah Rich
8                                                     Rebecca Cassler

9
                                                 CENTER FOR CONSTITUTIONAL
10                                               RIGHTS
11                                                    Baher Azmy
                                                      Ghita Schwarz
12                                                    Angelo Guisado

13
                                                 AMERICAN IMMIGRATION
14                                               COUNCIL
                                                      Karolina Walters
15

16
                                                 By: */s/ Stephen M. Medlock*
17                                                    Stephen M. Medlock

18                                               *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION

1

**CERTIFICATE OF SERVICE**

2      I certify that I caused a copy of the foregoing document to be served on all

3   counsel via the Court's CM/ECF system.

4   Dated:  September 26, 2019                    MAYER BROWN LLP

5

6                                                By  */s/ Stephen M. Medlock*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF P. & A. IN SUPP. OF MOT. FOR
PRELIMINARY INJUNCTION.

ER 00842

1  MAYER BROWN LLP
    Matthew H. Marmolejo (CA Bar No. 242964)
2     *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3  25th Floor
   Los Angeles, CA 90071-1503
4     Ori Lev (DC Bar No. 452565)
      (*pro hac vice*)
5     *olev@mayerbrown.com*
      Stephen M. Medlock (VA Bar No. 78819)
6     (*pro hac vice*)
      *smedlock@mayerbrown.com*
7  1999 K Street, N.W.
   Washington, D.C. 20006
8  Telephone:  +1.202.263.3000
   Facsimile:  +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10    Melissa Crow (DC Bar No. 453487)
      (*pro hac vice*)
11    *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   |---|---|
19 |             Plaintiffs, | |
   | | **EXHIBIT 41 TO MOTION FOR** |
20 |        v. | **PRELIMINARY INJUNCTION** |
21 | Kevin K. McAleenan,[1] *et al.*, | ***FILED UNDER SEAL*** |
22 |             Defendants. | |
23

24

25

26

27 _____

28 [1]  Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
　Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
　*bazmy@ccrjustice.org*
　Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
　*gschwarz@ccrjustice.org*
　Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
　*aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
　Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
　*mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
　Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
　*sarah.rich@splcenter.org*
　Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
　*rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
　Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
　*kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

| | |
|---|---|
| **From:** | CBP-CAT |
| **Sent:** | Sunday, February 25, 2018 11:10 AM |
| **To:** | CBP-CAT; CAMPBELL, CARL S; CHAVEZ, GLORIA I; FLANAGAN, PATRICK S; FRIEL, MICHAEL J; HOFFMAN, TODD A; HUTTON, JAMES R; KOLBE, KATHRYN; KOUMANS, MARK; LANDFRIED, PHIL A; LUCK, SCOTT A (USBP); MCALEENAN, KEVIN K; MILLER, TROY A; NUTZHORN, JOSHUA B; Owen, Todd C (AC OFO); PROVOST, CARLA (USBP); SALAZAR, JAIME; SANCHEZ1, EDUARDO; SCHORR, STEPHEN; SMITH, BRENDA BROCKMAN; VISCONTI, JAY; VITIELLO, RONALD D (USBP); WAGNER, JOHN P; Miller, Philip T; MODESTO, ALYCE M; HARDIMAN, TARA; COMMISSIONER BRIEF TEAM; MCCULLY, SHANNON; WATCH CBP INTEL; LEY, JENNIFER E.; EANES, TY; PEREZ, ROBERT E; MANDRYCK, JAMES R; SAUNDERS, IAN C.; Asher, Nathalie R; MORENO, MARCOS; LEY, JENNIFER E.; HOWE, RANDY J; PETERLIN, MEGHANN K; PAULS, TAMARA (OCC); GOLDHAMER, SANDI I; CORE, JERRIE L; HIGGINS, CHRIS A; DRAGANAC, JOSEPH; MIRANDA, EDWARD; FLORES, PETE ROMERO; Sifuentez, Joe M; ARELLANO, BONNIE J; FLANAGAN, PATRICK S; PEREZ, EFRAIN A; BP Field Chiefs; BP Field Deputies; BEESON, PAUL A; Ayala, Janice; Schultz, Karl VADM; DIRECTORS FIELD OPS; BORDER SECURITY ASST DIRECTORS; Asher, Nathalie R; HASTINGS, BRIAN S; Homan, Thomas; Edge, Peter T; Blank, Thomas; Laws, Joseph P; Brown, Erin; Baker, Nikita M; White, Jonathan (ACF); Valverde, Michael; Gnipp, Gregg (ACF); scott.lloyd[ LE ]CARTER III, WILLIAM J; WILLIAMS, MARC; FABRE, JOSE M; lora.reis@uscis.dhs.gov; LEE.F.CISSNA[ LE ]AMOS, ASHLEY N; DHS JTF-W J3; NIEVES, JOHN M; Drew.W.Cramer2@omb.eop.gov; Littlepage, Eric; Anderson, John; Novelliere, Alexander |
| **Cc:** | OFO-Incident-Management; TWYMAN, GREGORY P; MUMMERT, JOHN E; Urbine, Brandy; BOYER, STEPHEN A; Nicorvo, Richard H; JACKSON, JD; SHAFFER, KELLY A.; Johnson, Michael P.; MONCAYO, ERIK E; CBT (CBP); Johnson, Tae D; CARBERRY, JOHN B; BEALS, ALTA R.; SCHROEDER, DANIEL W; LOWRY, KIM M; HETLAGE, DANIEL; Slocum, Louisa (OCC); KOLLER, JULIE (OCC); HARRIS, RODNEY H; Seemiller, Denice; WATSON, STEPHANIE E; Patel, Visvas; MORENO, MARCOS; BLANKS, LISSETTE; Bauer, Rayna; PEREZ, EFRAIN A; CBP-MCAT-TEAM; Bible, Daniel; GILCHRIST, CHAD L; GALLEGOS, JOSE A; TREJO, JOSE L; BRODSKY, MARCY |
| **Subject:** | CBP_MCAT_REPORT for February 25, 2018 |
| **Attachments:** | 20180225 MCAT Daily Brief.pdf |

### U.S. Customs and Border Protection
### February 25, 2018

**Executive Summary:**

The CBP Migration Crisis Action Team (MCAT) was activated November 27, 2017 to monitor and work closely with CBP field personnel and assist in managing issues with migration flow at and between the ports of entry along the Southwest border. The MCAT's objective is to increase and sustain CBP's senior level situational awareness as it relates to migration, holding, and detention issues and possible courses of action to mitigate such issues across the Southwest Border. The attached MCAT report is intended to provide situational awareness on the CBP operational tempo across the Southwest border. For any questions, please contact the MCAT at 202-325-3525.

**Details:**

1

Highly Confidential/Attorneys' Eyes Only

| Total | Demographic | App's / Inadmissibles (Previous Day) | Currently in Custody | Processed and Ready for Transfer |
|---|---|---|---|---|
| CBP Southwest Border | UAC | 82 | 107 | 54 |
| | FMUA | 234 | 748 | 345 |
| | Single Adults | 748 | 1,171 | 408 |
| | Total App's | 1,064 | 2,026 | 807 |

| Total | Demographic | Apprehensions (Previous Day) | Currently in Custody | Process Comple |
|---|---|---|---|---|
| USBP Southwest Border | UAC | 56 | 83 | 43 |
| | FMUA | 112 | 510 | 240 |
| | Single Adults | 534 | 946 | 337 |
| | Total App's | 702 | 1,539 | 620 |

| Total | Demographic | Inadmissibles (Previous Day) | Currently in Custody | Process Comple |
|---|---|---|---|---|
| OFO Southwest Border | UAC | 26 | 24 | 11 |
| | FMUA | 122 | 238 | 105 |
| | Singles | 214 | 225 | 71 |
| | Total Subjects | 362 | 487 | 187 |

WARNING: This document is designated UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES). It may contain information that is exempt from public release under the Freedom of Information Act (5USC552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information, and is not to be released to the public or to personnel who do not have a valid need to know **and** without prior approval from CBP.

2

Highly Confidential/Attorneys' Eyes Only

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:  +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>Kevin K. McAleenan,[1] *et al.*,<br><br>            Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 42 TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>***FILED UNDER SEAL*** |

---

[1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
  *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

**From:** CBP-MCAT-TEAM
**Sent:** Tuesday, January 22, 2019 3:19 PM
**Cc:** CBP-MCAT-TEAM
**Subject:** Field Office Queue Management Report 1.22.2018
**Attachments:** Field Queue Management Report 1.22.19.pdf

Good Afternoon All,

Please see attached spreadsheet with updated numbers for each field office.

January 22, 2019

### Laredo Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexican side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18 | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brownsville | 22 | 33% | 0 | No. | 899,056 | 3,020,375 | 11 | 10 | 1298 | 1945 | 1 |
| Progreso | 0 | 0% | 0 | Redirecting to Brownsville as necessary | 298,120 | 994,234 | 0 | 1 | 57 | 131 | 0 |
| Hidalgo | 18 | 43% | 0 | No. | 708,904 | 2,519,926 | 11 | 11 | 1218 | 4755 | 5 |
| Rio Grande | 4 | 25% | 0 | Redirecting to Hidalgo as necessary | 12,681 | 53,122 | 1 | 0 | 85 | 195 | 0 |
| Roma | 1 | 6% | 0 | Redirecting to Hidalgo as necessary | 78,193 | 231,725 | 2 | 1 | 101 | 1061 | 0 |
| Laredo | 41 | 33% | 26 | No. | 1,337,765 | 4,919,133 | 16 | 25 | 2778 | 5775 | 0 |
| Eagle Pass | 16 | 114% | 0 | No. | 242,804 | 1,061,667 | 9 | 9 | 965 | 1595 | 21 |
| Del Rio | 22 | 79% | 0 | No. | 28,690 | 115,292 | 11 | 6 | 524 | 547 | 1 |
| Total/Average | 124 | 41% | 26 | | 3,603,563 | 12,916,850 | 61 | 63 | 6,921 | 15,104 | 29 |
| Percentages compared to FY 2018 | | | | | 27.99% | | | | | 45.83% | |

### El Paso Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexican side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18 | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Port of El Paso | 105 | 91% | 30 | No | 2,284,464 | 7,319,480 | 16 | 46 | 4422 | 5851 | 50 |
| Santa Teresa | 0 | 0% | 0 | No | 23,367 | 147,145 | 5 | 3 | 406 | 768 | 3 |
| Columbus | 0 | 0% | 0 | No | 81,543 | 282,686 | 0 | 0 | 79 | 83 | 0 |
| Tornillo | 0 | 0% | 0 | No | 11,961 | 38,438 | 0 | 0 | 19 | 82 | 1 |
| Presidio | 1 | 8% | 0 | No | 46,840 | 241,536 | 0 | 2 | 149 | 148 | 0 |
| Total/Average | 106 | 20% | 30 | | 2,452,115 | 8,029,294 | 22 | 51 | 5,075 | 6,832 | 54 |
| Percentages compared to FY 2018 | | | | | 30.54% | | | | | 74.28% | |

1

Confidential

ER 00849

## Tucson Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18 | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | 0 | 0% | 0 | No | 272,446 | 320,518 | 0 | 3 | 341 | 202 | 2 |
| Lukeville | 0 | 0% | 0 | No | 13,792 | 69,086 | 0 | 0 | 9 | 16 | 0 |
| Naco | 0 | 0% | 0 | No | 7,334 | 53,576 | 0 | 0 | 16 | 4 | 0 |
| Nogales | 24 | 42% | 0 | No | 932,748 | 3,554,943 | 24 | 18 | 2,183 | 2808 | 18 |
| San Luis | 11 | 58% | 0 | No | 847,805 | 3,539,266 | 3 | 4 | 590 | 890 | 6 |
| Total/Average | 35 | 22% | 0 | | 2,074,145 | 7,237,389 | 27 | 25 | 3,139 | 3,920 | 26 |
| Percentages compared to FY 2018 | | | | | 29.10% | | | | 80.08% | | |

## San Diego Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18 | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| San Ysidro | 297 | 99% | 2500 | No | 3,042,388 | 8,981,830 | 47 | 56 | 5998 | 9821 | 31 |
| Otay Mesa | 0 | 0% | 0 | Referred to San Ysidro | 1,106,699 | 3,717,617 | 0 | 2 | 155 | 581 | 0 |
| Tecate | 0 | 0% | 0 | Referred to San Ysidro | 266,489 | 815,259 | 0 | 0 | 23 | 24 | 0 |
| Calexico West | 43 | 64% | 196 | No | 1,252,092 | 4,388,192 | 0 | 8 | 901 | 1719 | 7 |
| Calexico East | 0 | 0% | 0 | If encountered they will be referred to Calexico West | 148,839 | 494,845 | 2 | 0 | 32 | 267 | 0 |
| Andrade | 0 | 0% | 0 | If encountered they will be referred to Calexico West | 306,850 | 910,895 | 0 | 0 | 7 | 21 | 0 |
| Total/Average | 340 | 27% | 2,696 | | 6,123,557 | 19,308,738 | 55 | 66 | 7,116 | 12,433 | 38 |
| Percentages compared to FY 2018 | | | | | 31.71% | | | | 57.23% | | |

## OFO SWB

| Port of Entry | Total in Custody | % of Capacity | | | Total number of pedestrian traffic for FY19 YTD | Total number of pedestrian traffic for FY18 | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total/Average | 605 | 27% | 2,662 | | 14,253,380 | 47,302,271 | 165 | 205 | 32,251 | 38,289 | 337 |
| Percentages compared to FY 2018 | | | | | 30.08% | | | | 58.12% | | |

U.S. Customs and Border Protection
Migrant Crisis Action Team (M-CAT)

2

Confidential

**January 22, 2019**

**Laredo Field Office**

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Brownsville** | 22 | 32% | 0 | No. | 899,056 | 3,020,375 | 11 | 10 | 1193 | 1945 | 2 |
| **Progreso** | 0 | 0% | 0 | Redirecting to Brownsville as necessary. | 298,120 | 994,234 | 0 | 1 | 57 | 131 | 0 |
| **Hidalgo** | 18 | 43% | 0 | No. | 708,904 | 2,519,926 | 11 | 11 | 1218 | 4255 | 5 |
| **Rio Grande** | 4 | 25% | 0 | Redirecting to Hidalgo as necessary. | 12,031 | 53,122 | 1 | 0 | 65 | 195 | 0 |
| **Roma** | 1 | 6% | 0 | Redirecting to Hidalgo as necessary. | 76,193 | 231,723 | 2 | 1 | 101 | 1061 | 0 |
| **Laredo** | 41 | 33% | 26 | No | 1,337,765 | 4,919,511 | 16 | 25 | 2778 | 5775 | 0 |
| **Eagle Pass** | 16 | 114% | 0 | No | 242,804 | 1,062,667 | 9 | 9 | 985 | 1595 | 11 |
| **Del Rio** | 22 | 79% | 0 | No | 28,690 | 115,292 | 11 | 6 | 524 | 147 | 1 |
| **Total/Average** | 124 | 41% | 26 | | 3,603,563 | 12,916,850 | 61 | 63 | 6,921 | 15,104 | 19 |
| **Percentages compared to FY 2018** | | | | | | 27.90% | | | | 45.82% | |

Confidential

| El Paso Field Office | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Port of El Paso** | 105 | 91% | 30 | No | 2,288,404 | 7,319,489 | 16 | 46 | 4422 | 5851 | 50 |
| **Santa Teresa** | 0 | 0% | 0 | No | 23,367 | 147,145 | 6 | 3 | 406 | 768 | 3 |
| **Columbus** | 0 | 0% | 0 | No | 81,543 | 282,686 | 0 | 0 | 79 | 33 | 0 |
| **Tornillo** | 0 | 0% | 0 | No | 11,961 | 38,438 | 0 | 0 | 19 | 32 | 1 |
| **Presidio** | 1 | 8% | 0 | No | 46,840 | 241,536 | 0 | 2 | 149 | 148 | 0 |
| **Total/Average** | 106 | 20% | 30 | | 2,452,115 | 8,029,294 | 22 | 51 | 5,075 | 6,832 | 54 |
| **Percentages compared to FY 2018** | | | | | 30.54% | | | | 74.28% | | |

Confidential

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Tucson Field Office** | | | | | | | |
| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
| Douglas | 0 | 0% | 0 | No | 272,446 | 820,518 | 0 | 3 | 341 | 202 | 2 |
| Lukeville | 0 | 0% | 0 | No | 13,792 | 69,086 | 0 | 0 | 9 | 16 | 0 |
| Naco | 0 | 0% | 0 | No | 7,354 | 53,576 | 0 | 0 | 16 | 4 | 0 |
| Nogales | 24 | 47% | 0 | No | 932,748 | 3,554,943 | 24 | 18 | 2183 | 2808 | 18 |
| San Luis | 11 | 58% | 0 | No | 847,805 | 2,629,266 | 3 | 4 | 590 | 890 | 6 |
| Total/Average | 35 | 21% | 0 | | 2,074,145 | 7,127,389 | 27 | 25 | 3,139 | 3,920 | 26 |
| Percentages compared to FY 2018 | | | | | 29.10% | | | | 80.08% | | |

Confidential

## San Diego Field Office

| Port of Entry | Total in Custody | % of Capacity | Do you have any UDAs in line waiting on the Mexico side? If yes, how many? | Are you directing UDAs to other Ports of Entry? If yes, which Port of Entry? | Total number of pedestrian traffic for FY19 YTD. | Total number of pedestrian traffic for FY18. | Number of asylum seekers processed the previous day | 30 day average of asylum seekers processed | FY 2019 asylum seekers | FY 2018 asylum seekers | Number of aliens picked up by ICE/ERO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| San Ysidro | 297 | 99% | 2500 | No. | 3,042,388 | 8,981,830 | 47 | 56 | 5998 | 9821 | 31 |
| Otay Mesa | 0 | 0% | 0 | Referred to San Ysidro. | 1,106,699 | 3,717,617 | 0 | 2 | 155 | 581 | 0 |
| Tecate | 0 | 0% | 0 | Referred to San Ysidro. | 266,689 | 815,259 | 6 | 0 | 23 | 24 | 0 |
| Calexico West | 43 | 64% | 106 | No. | 1,252,092 | 4,388,192 | 0 | 8 | 901 | 1719 | 7 |
| Calexico East | 0 | 0% | 0 | If encountered they will be referred to Calexico West. | 148,839 | 494,945 | 2 | 0 | 32 | 267 | 0 |
| Andrade | 0 | 0% | 0 | If encountered they will be referred to Calexico West. | 306,850 | 910,895 | 0 | 0 | 7 | 21 | 0 |
| **Total/Average** | 340 | 27% | 2,606 | | 6,123,557 | 19,308,738 | 55 | 66 | 7,116 | 12,433 | 38 |
| **Percentages compared to FY 2018** | | | | | 31.71% | | | | 57.23% | | |

## OFO SWB

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total/Average** | 605 | 27% | 2,662 | | 14,253,380 | 47,382,271 | 165 | 205 | 22,251 | 38,289 | 137 |
| **Percentages compared to FY 2018** | | | | | 30.08% | | | | 58.11% | | |

1 MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
2   *mmarmolejo@mayerbrown.com*
   350 S. Grand Avenue
3 25th Floor
   Los Angeles, CA 90071-1503
4   Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
5   *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
6   (*pro hac vice*)
   *smedlock@mayerbrown.com*
7 1999 K Street, N.W.
   Washington, D.C. 20006
8 Telephone:  +1.202.263.3000
   Facsimile:  +1.202.263.3300
9
   SOUTHERN POVERTY LAW CENTER
10   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
11   *melissa.crow@splcenter.org*
   1101 17th Street, N.W., Suite 705
12 Washington, D.C. 20036
   Telephone: +1.202.355.4471
13 Facsimile: +1.404.221.5857

14 *Additional counsel listed on next page*
   *Attorneys for Plaintiffs*
15
                **UNITED STATES DISTRICT COURT**
16
              **SOUTHERN DISTRICT OF CALIFORNIA**
17

18 | Al Otro Lado, Inc., *et al.*, | Case No.:  17-cv-02366-BAS-KSC |
   | | |
19 |               Plaintiffs, | |
   | | **EXHIBIT 43 TO MOTION FOR** |
20 |       v. | **PRELIMINARY INJUNCTION** |
   | | |
21 | Kevin K. McAleenan,[1] *et al.*, | ***FILED UNDER SEAL*** |
   | | |
22 |               Defendants. | |
   | | |
23 | | |

24

25

26

27 _____

28 [1] Acting Secretary McAleenan is automatically substituted for former Secretary Nielsen pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
  Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
  *bazmy@ccrjustice.org*
  Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
  *gschwarz@ccrjustice.org*
  Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
  *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
  Mary Bauer (VA Bar No. 31388) (*pro hac vice*)
  *mary.bauer@splcenter.org*
1000 Preston Ave.
Charlottesville, VA
  Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
  *sarah.rich@splcenter.org*
  Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
  *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030

AMERICAN IMMIGRATION COUNCIL
  Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
  *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.56

# LAREDO FIELD OFFICE CONTIGENCY PLAN

To ensure port management is provided the necessary resources to address the influx of unaccompanied alien children, family units, or other alien populations expressing fear of returning to Mexico and/or country of origin and minimize the impact to legitimate trade and travel.

*Mass Migration – Influx of Unaccompanied Alien Children, Family Units, or Other Alien Populations*

AOL-DEF-00011122

ER 00857

**Laredo Field Office**
**Mass Migration Contingency Plan**
**Updated:  August 31, 2017**

## I.   SITUATION

The number of unaccompanied alien children (UACs) processed by Laredo Field Office (LFO) ports of entry has increased significantly in recent years.  From fiscal year (FY) 2011 to 2016 the LFO logged a 1,036% increase in UAC encounters.  In comparison to the LFO's previous high-water mark year, FY2014, UAC encounters were up 153% in FY2016.  And over the most recent FYs for which complete data is available, 2015-2016, the LFO noted an increase of 360%.



Unaccompanied Alien Children

| | Brownsville | Del Rio | Eagle Pass | Hidalgo | Laredo | Progreso | Rio Grande City | Roma | Laredo Field Office |
|---|---|---|---|---|---|---|---|---|---|
| FY 11 | 70 | 9 | 25 | 60 | 99 | 10 | 2 | 5 | 280 |
| FY 12 | 111 | 7 | 55 | 102 | 163 | 15 | 14 | 6 | 445 |
| FY 13 | 114 | 12 | 52 | 214 | 301 | 12 | 1 | 7 | 693 |
| FY 14 | 293 | 3 | 129 | 285 | 506 | 5 | 12 | 20 | 1257 |
| FY 15 | 124 | 18 | 78 | 236 | 206 | 5 | 3 | 17 | 691 |
| FY 16 | 303 | 15 | 130 | 2224 | 375 | 24 | 7 | 97 | 3.90 |

Due to significant increases in UAC encounters at LFO ports of entry, and apprehensions by the United States Border Patrol (USBP) in the LFO area of responsibility (Del Rio, Laredo, and Rio Grande Valley Border Patrol Sectors), delays in obtaining placement with the U.S. Department of Health and Human Services – Office of Refugee Resettlement (ORR) have increased as well, causing operational challenges as the ports must maintain custodial care of the UACs for longer periods of time.

Highly Confidential/Attorneys' Eyes Only                                        AOL-DEF-00011123
ER 00858

Increases in persons and family units (FMUs) claiming "credible fear" are correlated to increases in UAC numbers. From FY2011 to FY2016 the LFO saw a 1,330% increase in fear claims. From FY2014 to FY2016 the LFO experienced a 100% increase, and during the most recent years for which complete data is available, FY2015 to FY2016, the LFO logged an increase of 138%.



**Expedited Removal with Credible Fear**

| | BROWNSVILLE | DEL RIO | EAGLE PASS | HIDALGO | LAREDO | PROGRESO | RIO GRANDE CITY | ROMA | LAREDO FIELD OFFICE |
|---|---|---|---|---|---|---|---|---|---|
| | Brownsville | Del Rio | Eagle Pass | Hidalgo | Laredo | Progreso | Rio Grande City | Roma | Laredo Field Office |
| FY 11 | 64 | 18 | 10 | 305 | 46 | 5 | 2 | 36 | 486 |
| FY 12 | 125 | 8 | 9 | 328 | 46 | 5 | 2 | 14 | 565 |
| FY 13 | 294 | 19 | 17 | 544 | 237 | 4 | 5 | 38 | 1747 |
| FY 14 | 1410 | 19 | 543 | 937 | 595 | 43 | 25 | 200 | 3260 |
| FY 15 | 825 | 12 | 210 | 1059 | 456 | 107 | 3 | 55 | 2738 |
| FY 16 | 1350 | 43 | 445 | 3459 | 861 | 71 | 38 | 252 | 6519 |

The UACs and FMUs originate primarily from three Other-Than-Mexico (OTM) countries: El Salvador, Guatemala and Honduras.

LFO ports of entry do not have adequate facilities, infrastructure, equipment or staffing to accommodate the large number of arriving UACs and family units claiming fear of returning to Mexico or their country of origin.

## II. MISSION

The Director Field Operations (DFO), Laredo will ensure undocumented aliens, specifically UACs and FMUs expressing fear of returning to Mexico and/or their country of origin or last residence are processed in accordance with existing laws and policy, and are treated with respect and concern. The provisions of CBP Directive No. 3340-043, *The Exercise of Discretionary Authority* and CBP Directive No. 3340-030B, *Secure Detention, Transport and Escort Procedures at Ports of Entry* will be strictly adhered to. The DFO will also ensure that lines of communication remain constant at all levels to minimize the time UACs and family units spend at LFO ports of entry, and port managers

---

Highly Confidential/Attorneys' Eyes Only     AOL-DEF-00011124

ER 00859

are provided the resources necessary to address the influx of UACs and family units, and minimize the impact to legitimate trade and travel.

### III. EXECUTION

A. The DFO will:

1. Exercise the responsibility to control the flow of people across our borders.

2. Ensure terrorists, terrorist weapons; narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

3. Ensure that the security of the inspectional process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

4. Ensure that bona fide applicants for admission are processed expeditiously.

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Require port directors to identify port detention capacities, operational thresholds, and specific trigger points necessitating outside assistance.

See Annex A through H.

B. The DFO will implement a phased approach to manage the mass migration.

1. Phase I – Organic Capabilities Sustained

   i. Mass migration does not exceed the operational capabilities of affected POEs.

   ii. Affected POEs will detain and process migrants under standard operational procedures.

2. Phase II – Organic Capabilities Strained

   i. Mass migration exceeds the capacity of at least one POE, as identified in port-specific annexes.

   ii. With DFO concurrence, Port Director of affected POE will coordinate with neighboring POEs for assistance.

---

Highly Confidential/Attorneys' Eyes Only  

ER 00860

    iii. With DFO concurrence, Port Director of affected POE will coordinate with neighboring USBP stations for assistance.

    iv. Port Director of affected POE will activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

    v. DFO will begin coordination with ORR, ERO, and the STC, to prepare for potential event expansion.

    vi. Port Directors will establish communication with Government of Mexico (GoM) to elicit information about mass migration.

    vii. DFO will place processing jump teams on hot standby.

    viii. LFO Special Response Team (SRT) members will be placed on hot standby.

3. Phase III – Organic Capabilities Exceeded

    i. Mass migration exceeds the capacity of multiple POEs.

    ii. LFO SRT will be activated.

    iii. LFO processing jump teams will be activated.

    iv. Port Directors coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

    v. DFO staffs non-24/7 international crossings after hours for processing.

    vi. DFO requests assistance from South Texas Corridor (STC) Commander.

    vii. DFO requests TDY personnel from outside the South Texas corridor.

4. Phase IV – Organic Capabilities Overwhelmed

    i. Mass migration overwhelms the processing, transportation, and detention capacities of CBP components in South Texas (OFO and USBP).

    ii. DFO, in conjunction with OFO headquarters, explores alternative admissibility processing measures.

---

Highly Confidential/Attorneys' Eyes Only      AOL-DEF-00011126

ER 00861

iii. DFO, in conjunction with STC Commander, requests DHS assistance through CBP headquarters.

## IV. ADMINISTRATION

### A. Cost Estimates/Funding Issues:

1. Supplemental overtime funding will be required to support issues outside normal daily operations.

2. Affected ports will assess overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) contingent on surge events.

3. As needed, DFO will request overtime cap waivers.

4. Supplemental OIT support will be required.

### B. Travel:

1. Travel and per diem expenses may be required.

2. Specific TDY support will be event-dependent and assessed by the affected port directors.

### C. Lodging:

1. Lodging expenses may be required.

2. Specific lodging requirements will be event-dependent and assessed by the affected port directors.

### D. Reception of Detailed Personnel:

Port Directors will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, etc.

### E. Uniform and Equipment:

1. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

2. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued

Highly Confidential/Attorneys' Eyes Only                    AOL-DEF-00011127

ER 00862

CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

3. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

**F. Special Equipment:**

All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

**G. Alien Processing:**

All undocumented aliens to include unaccompanied alien children will be processed in accordance with established procedures and at designated locations. Port Directors will coordinate with the Assistant United States Attorney's (AUSA) Office if prosecution is deemed necessary.

**H. Medical:**

1. In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

2. All medical emergencies will be transported to the nearest medical facility. Port Directors will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility.

**I. Detention / Transportation:**

Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Directors will provide detailed instructions to assigned personnel on detention and transportation policies.

**J. Vehicles:**

GOVs will be fueled as per existing port and field office policies.

Highly Confidential/Attorneys' Eyes Only                AOL-DEF-00011128

ER 00863

## V. COMMAND/CONTROL/COMMUNICATION

### A. Chain of Command:

1. David P. Higgerson, Director Field Operations, Laredo

2. Frank S. Longoria, Assistant Director Field Operations – Border Security

### B. Unit Command:

Port Directors will maintain tactical control and coordinate all day-to-day assignments and schedule the appropriate manpower for field operations.

### C. Communications Details:

The primary means of communication will be via telephone.

### D. Map Coordinates:

Not Applicable

### E. Media Plan:

The LFO Public Affairs Officer (PAO), in coordination with CBP Office of Public Affairs (OPA), will coordinate responses to media inquiries and other media and public messaging.

### F. Air Plan:

The LFO will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

### G. Health and Safety Annex:

The DFO will ensure that the Laredo Field Office Standard Operating Procedures for Serious Communicable and Quarantinable Diseases are followed by all CBP employees.

### H. Legal Advisement:

The LFO and ports of entry will refer all legal matters to their local Office of Chief Counsel.

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011129

ER 00864

**Annexes**

A.     Port of Brownsville Port Specific Plan
B.     Port of Del Rio Port Specific Plan
C.     Port of Eagle Pass Port Specific Plan
D.     Port of Laredo Port Specific Plan
E.     Port of Hidalgo/Pharr/Anzalduas Port Specific Plan
F.     Port of Rio Grande City Port Specific Plan
G.     Port of Progreso Port Specific Plan
H.     Port of Roma Port Specific Plan
I.     Standard Operating Procedures – Serious Communicable and Quarantinable Diseases
J.     Temporary Holding Cell Capacities
K.     UAC Statistics
L.     Expedited Removal Credible Fear (ERCF) Statistics
M.     Laredo Field Office International Crossings (Types and Hours of Operation)

Highly Confidential/Attorneys' Eyes Only      AOL-DEF-00011130

ER 00865

**Annex A**
**Port of Brownsville, Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I.   **Situation:**

    A.  During FY2016 the Port of Brownsville saw an approximate 50% increase in applicants seeking entry into the United States without lawful entry documentation. The port is anticipating a continued increase from FY17 to FY18.

    B.  Most of the applicants that are seeking asylum in the United States, are expressing a fear (Credible Fear/CF) of returning to their home country, and/or want to reunite with a parent/family member in the United States.

    C.  Applicants the Port of Brownsville are encountering, are from Caribbean basin (i.e. Cuba, Haiti), Central & South America (i.e. Brazil, El Salvador, Guatemala, and Honduras), and the African Continent (i.e. Somalia, Eritrea, Guinea, Mali). In the past two months, the Port of Brownsville has encountered a new trend of Romanian Families (one parent and child/children with the other parent and other child/children following later).

    D.  A significant number of the applicants are other than Mexican (OTM).

    E.  The current influx impacts port operations, i.e. long term detention duties, medical escorts, security duties, personal hygiene, feeding, laundry duties, and transportation (airports, shelters, way stations, detention centers, etc.).

    F.  For cases that are completed, the Port of Brownsville relies upon ICE/ERO or ORR to allocate space in long-term detention facilities. The current volume of detainees is placing a significant strain on ICE/ERO and ORR detention capacity.

    G.  The Port of Brownsville does not have the facilities, infrastructure, equipment, or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

II.  **Mission:**

    A.  The Port of Brownsville will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

    B.  The mass migration will be managed while maintaining continuity of operations (COOP).

    C.  The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays. These incident management strategies are designed to facilitate CBP's ability to mitigate against, prepare for, and respond to the impact of such events under extreme circumstances.

Highly Confidential/Attorneys' Eyes Only

D. Minimize UAC and OTM time in CBP custody.

E. The Brownsville port of entry has established a secondary organic overflow avenue for processing and staging.

**III.  Execution:**

A. The Port Director will:

1. Exercise the responsibility to control the flow of people across our borders.

2. Ensure terrorists, terrorist weapons, narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

3. Ensure that the security of the inspection process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

4. Ensure that bona fide applicants for admission are processed expeditiously.

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

B. The Port Director will implement a phased approach to manage the mass migration.

1. Phase I – Organic Capabilities Sustained

   i. Mass migration does not exceed the operational capabilities of the Port of Brownsville.

   ii. The Port of Brownsville will detain and process migrants under standard operational procedures.

2. Phase II – Organic Capabilities Strained

   i. Mass migration exceeds the capacity of the Port of Brownsville.

   ii. Port Director and/or designee will:

      a. Coordinate with the Ports of [LE] [LE] for assistance.

      b. Coordinate with [LE] USBP stations for assistance.

      c. Activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

      d. Begin coordination with ORR, ERO, and the STC, to prepare for potential event expansion.

      e. Establish communication with the Government of Mexico (GoM) to elicit information about mass migration.

      f. Test overflow processing work stations in anticipation of LFO jump team deployment.

3. Phase III – Organic Capabilities Exceeded

    i. Mass migration exceeds the capacity of port facilities.

    ii. Port Director will coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

    iii. Port Director will staff non-24/7 international crossings after hours for processing.

    iv. Port Director will assign deployed jump teams to appropriate port locations.

    v. Port Director will initiate Secondary Processing and Detention facility at Los Indios Trade Office, dock space, and warehouse.

    vi. Port Director will coordinate with ORR and ERO for assistance with transporting aliens out of the area.

4. Encounter

    i. Staging

      a. The Port has established pre-staging/staging wait areas at each land border crossings under area of responsibility.

    ii. Triage/Categorizing

      a. UACs

      b. Family Units

      c. Adults

    iii. Initial Medical Screening

      a. Pregnant

      b. Communicable Diseases

Highly Confidential/Attorneys' Eyes Only

    c.  Special Needs (i.e. Physically Handicapped or Mentally Disabled)

5. Processing

   i.  Holding Areas

      a.  The port has the following holding cells available:

         i.  Gateway Bridge has two (2) cells in Passport Control Secondary with a total capacity of 15 detainees. In addition, Gateway Bridge has one cell in the Vehicle Secondary Building with a capacity of seven (7) detainees; and two (2) cells in Pedestrian Processing with a capacity of 11 detainees.

        ii.  B&M Bridge has two (2) cells in Passport Control Secondary with a total capacity of 20 detainees. In addition, B&M Bridge has one (1) cell in the Vehicle Secondary Building with a capacity of three (3) detainees); and two cells in Pedestrian Processing with a capacity of 13 detainees.

       iii.  Veterans Bridge has two (2) cells in Passport Control Secondary with a total capacity of 15 detainees. In addition, Veterans Bridge has one (1) cell in the Vehicle Secondary Building with a capacity of two (2) detainees; and two (2) cells in Pedestrian Processing with a capacity of 12 detainees.

        iv.  Los Indios Bridge has two (2) cells in Passport Control Secondary with a total capacity of 19 detainees. In addition, Los Indios Bridge has one (1) cell in the Vehicle Secondary Building with a capacity of five (5) detainees; and two (2) cells in Pedestrian Processing with a capacity of 15 detainees.

      b.  In addition to the holding cells, the port currently has the capacity to stage approximately 239 persons in the passport control lobby areas (Gateway-88, Brownsville & Matamoros Bridge-51, Veteran's-52, and Los Indios-48). These figures are based on formulas used by GSA fire code for the maximum amount of persons per square foot for the purposes of staging. An additional overflow processing area has been designated at the Los Indios Trade Office for processing. The maximum capacity of the overflow

processing area is approximately 300 persons. This area will only be used when the port has reached the maximum occupancy levels listed above for all bridges.

ii. Processing Capacity: The port currently has twenty-eight work stations with the capacity to process cases. (Gateway PCS 4 and 5 counters, Brownsville and Matamoros Bridge PCS 3 and 5 counters, Veteran's PCS 4 and 4 counters, and Los Indios PCS 3 and 5 counters). The number of workstations available may be affected if interview rooms are used to house unaccompanied alien children (UACs). In addition to these areas, an additional area has been designated at Los Indios Trade facility for an additional 17 processing stations to include  **LE** The holding area has an approximate capacity to stage 300 people.

iii. Processing Times: Based on the workstations available and absent any language barriers (i.e. other than English or Spanish), the port has a capacity to process approximately 300 cases every 24 hours with an average processing time of 2.5 hours per terminal.

6. Transportation

i. Detention before Transportation- The port has the capacity to accommodate 41 UACs and securely detain 48 adults within its interview rooms and detention cells.

ii. G4S will be contacted for transport after placement has been authorized by ERO.

iii. Organic resources will be utilized for transport after placement has been authorized by ERO.

iv. OBP will be contacted for assistance in the transportation of detainees to ERO.

IV. **Administration:**

A. The Brownsville Operations Center will be fully staffed and operational.

1. Contact Numbers for the Brownsville Operations Center:

i. **LE**

2. All reporting will be consolidated at the LFO and forwarded to appropriate higher commands.

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

C. Resource requirements will be identified and relayed to the LFO:

1. Cost Estimates / Funding Issues

    i. Supplemental overtime funding and/or other funding issues outside normal operations will be required.

    ii. Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by Port Director.

    iii. Port Director will request overtime cap waivers for appropriate port personnel.

    iv. Supplemental OIT support will be required.

2. Travel

    i. Travel and per diem expenses may be required.

    ii. Specific TDY support will be event-dependent and assessed by the Port Director.

3. Lodging

    i. Lodging expenses may be required.

    ii. Specific lodging requirements will be event-dependent and assessed by the Port Director.

4. Reception of Detailed Personnel

    i. Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, granting system accesses, etc.

5. Uniform and Equipment

    i. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

    ii. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

    iii. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

6. Special Equipment

    i. All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

7. Alien Processing

    i. All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

8. Medical

    i. In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

    ii. All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility.

    iii. In those cases where detainees require medical clearance (non-emergency) prior to acceptance for placement by ICE/ERO or ORR, the detainee will be taken to the nearest medical facility and escorted in accordance with CBP policy.

9. Detention / Transportation

    i. Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

10. Vehicles

    i. GOVs will be fueled as per existing port and field office policies.

## V. Command / Control / Communications:

A. The Port Director or his designee will act as the incident commander.

B. The Port Director will coordinate with the STC, LFO, OFO headquarters, and the Government of Mexico (GoM) as necessary.

C. Port Director, or his/her designee, will have operational/tactical control and command authority over respective CBP components involving, organizing, and

employing commands, assigning tasks, designating objectives and giving authoritative direction necessary to accomplish area objectives while maintaining tactical and operational control of their assets.

D. Communication will occur throughout the LFO under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

E. Point of Contact

1. Petra Horne, Port Director

   Office: (956) 983-5801

   Cell: (956) 703-3583

2. Bob Parker, Deputy Port Director

   Office: (956) 983-5628

   Cell: (956) 223-3477

3. Adriana Gonzalez, Assistant Port Director – Border Security

   Office: (956) 548-2540, ext. 1501

   Cell: (956) 592-4221

4. Jose Aguilar, Assistant Port Director – Border Security

   Office: (956) 983-5706

   Cell: (956) 465-8389

5. Watch Commanders

   Sylvia Gutierrez

   Cell: (956) 285-4840

   Chris Kishore

   Cell: (956) 284-7054

   Maria L. Kishore

   Cell: (956) 204-4400

   Michael Martinez

   Cell: (956) 459-9370

Highly Confidential/Attorneys' Eyes Only

Laura Rohrbough

Cell: (956) 443-8467

Highly Confidential/Attorneys' Eyes Only
AOL-DEF-00011139

**Appendices**

**Media Plan:**

The LFO Public Affairs Officer (PAO), in coordination with CBP Office of Public Affairs (OPA), will coordinate responses to media inquiries and other media and public messaging.

| | | |
|---|---|---|
| Primary Local PAL | Elias Rodriguez (BRO) | (956) 455-0490 |
| Secondary Local PAL | Jacqueline Bruce (BRO) | (956) 465-6874 |
| LFO PAO | Mucia Dovalina | (956) 753-1703 |
| CBP OPA PAO | Rick Pauza | (956) 764-3425 |

**Air Plan:**

The LFO will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

**Health and Safety Annex:**

The Port Director will ensure that the Laredo Field Office Standard Operating Procedures for Serious Communicable and Quarantine Diseases are followed by all CBP employees.

**Contacts:**

**Law Enforcement:**

- Brownsville Police Dept.     956-548-7000
  - Liaison: J.J. Trevino     956-548-7121
- Cameron County Sheriff's Office     956-544-0860
  - Liaison: "Norma"     956-544-6700
- Cameron County     956-547-7000
  - Liaison: Tom Hushen     956-547-7000
- Texas Department of Public Safety     956-565-7500/7600
  - Liaison: Tony Pena     956-270-0728/565-7120
- University of Texas/Brownsville     956-882-2222/882-7788
  - Liaison: Raul Munquia     956-882-2222/882-7788
- OBP RGV Sector     956-289-4800
  - Liaison: Evan Adamson     956-289-5621
  - Liaison: Marlene Castro     956-289-4993
- OBP Ft. Brown     956-983-7183
  - Liaison: Sup. Oscar Garcia III     956-983-7126
- OBP Brownsville     956-983-7183
  - Liaison: Duty Supervisor     956-983-983-7183
- OBP Harlingen     956-366-3154/3051
  - Liaison: Orlando Sierra     956-366-3154/3051

Highly Confidential/Attorneys' Eyes Only

- OBP BORTAC Liaison      956-592-6060
  - o Liaison: Omar Escalan    956-592-6060
- OAM Liaison      956-972-6350
  - o Liaison: Asst. Dept. Mario Sanchez  956-972-6350
- HSI Liaison      956-542-7831
  - o Liaison: Adelina Pruneda  210-321-2811/889-5204
  - o Liaison: Sector  1-800-973-2867

**EMS/Hospitals:**

Valley Baptist Medical Center/Brownsville
1040 W Jefferson St
Brownsville TX
(956) 698-5400

Valley Regional Medical Center
100 E. Alton Gloor Blvd.
Brownsville, Texas 78526
(956) 350-7000

Valley Baptist Medical Center-Harlingen
2101 Pease St.
Harlingen, Texas 78520
(956) 389-1100

Weslaco Knapp Medical Center
1401 E. 8th St.
Weslaco, Texas
(956) 968-8567

McAllen Medical Center
301 W. Expressway 83
McAllen, Texas
(956) 632-4000

Mission Regional Medical Center
900 S. Bryan
Mission, Texas
(956) 323-9000

Rio Grande Regional
101 E. Ridge Rd.
McAllen, Texas
(956) 632-6000

Valley Day and Night Clinic
3302 Boca Chica Blvd.

Brownsville, Texas
(956)-982-1001

Valley Day and Night Clinic
1755 W. Price Rd.
Brownsville, Texas
(956) 546-1000

**Government of Mexico**

- CISEN :                          (011) 52 1868 828-2159
- Mexican Customs:           (011) 52 868 191-0574/(011) 52 165 110-03295
- Mexican Immigration:     (011) 52 868 812-0251
- Mexican Consul:             956-459-8467

Highly Confidential/Attorneys' Eyes Only

**Annex B**
**Port of Del Rio, Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I.   **Situation:**

    A.  During FY17 the Port of Del Rio has encountered applicants seeking entry into the United States without lawful entry documentation seeking asylum in the United States, expressing a fear (Credible Fear/CF) of returning to their home country, and/or wanting to reunite with a parent/family member in the United States.

    B.  A significant number of the applicants are other than Mexicans (OTMs) and arriving as unaccompanied alien children (UACs) and family units.

    C.  The Port of Del Rio does not have the facilities, infrastructure, equipment or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

II.  **Mission:**

    A.  The Port of Del Rio will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

    B.  The mass migration will be managed while maintaining continuity of operations (COOP).

    C.  The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays.

    D.  Minimize UAC and OTM time in CBP custody.

III. **Execution:**

    A.  The Port Director will:

        1.  Exercise the responsibility to control the flow of people across our borders.

        2.  Ensure terrorists, weapons of terror, narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

        3.  Ensure that the security of the inspection process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

        4.  Ensure that bona fide applicants for admission are processed expeditiously.

Highly Confidential/Attorneys' Eyes Only

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

B. The Port Director will implement a phased approach to manage the mass migration.

　　1. Tier I -- Sustained Operational Capabilities

　　　　i. Mass migration does not exceed the operational capabilities of the Port of Del Rio.

　　　　ii. The Port of Del Rio will detain and process migrants under local standard operational procedures.

　　2. Tier II -- Strained Operational Capabilities

　　　　i. Mass migration exceeds the capacity of the Port of Del Rio.

　　　　ii. Port Director and/or designee will:

　　　　　　a. Coordinate with the Ports of ⟦ LE ⟧ for assistance.

　　　　　　b. Coordinate with U.S. Border Patrol Sector Del Rio to request assistance from ⟦ LE ⟧ stations.

　　　　　　c. Activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

　　　　　　d. Begin coordination efforts with local ERO, ORR, and the STC Del Rio Area Team, to prepare for potential event expansion.

　　　　　　e. Establish communication with the Government of Mexico (GoM) to elicit information about mass migration.

　　　　　　f. Utilize G4S assets for Facilities Guard to conduct detention log checks, provide meals, and escort individuals from processing locations to detention cells.

　　3. Phase III -- Organic Capabilities Exceeded

　　　　i. Mass migration exceeds the capacity of port facilities.

　　　　ii. Port Director will coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

iii. Port Director will assign deployed jump teams to appropriate port locations.

iv. Port Director will initiate Secondary Processing and Detention facility with USBP stations.

v. Port Director will coordinate with ORR, ERO, USBP, and G4S for assistance with transporting aliens out of the area

4. Encounter

    i. Staging

        a. The Port has established pre-staging/staging wait areas at each land border crossings under area of responsibility.

    ii. Triage/Categorizing

        a. UACs

        b. Family Units

        c. Adults

    iii. Initial Medical Screening

        a. Pregnant

        b. Communicable Diseases

        c. Special Medical Needs (Physically Handicapped or Mentally disabled)

5. Processing

    i. Holding Areas – The Del Rio Port of Entry currently has the capacity to stage approximately sixty-three (63) persons (seated) in the passport control lobby, a controlled area. The maximum capacity of the overflow processing area is forty-nine (49) persons. The overflow of these 49 persons would be in the 12 holding cells (10 cells may hold up to 4 persons and 2 cells are family unit cells; 1 can hold a family of 6-8 persons, the other can hold a family of 4 and the 1 cell in cargo can hold 3 persons). The cells are located in the secure area of the Admin building, the Headhouse, Cargo area, and at ADT.

    ii. Processing Capacity – The passport control area currently has eight (8) workstations that may be used for processing in case there is an influx of cases. There are five (5) interview rooms with one (1) workstation each. Four (4) are in the secure area of

the Admin building and one (1) is in the Headhouse. Total workstations are 13.

    iii.   Processing Times – Based on the workstations available and absent any language barriers (e.g. Other than English or Spanish), the port, "ideally", has the capacity to process no more than 104 Expedited Removal/Credible Fear cases within a 24 hour period.



6. Transportation

    i.   Detention before Transportation – The port has the capacity to accommodate thirty-eight (38) persons (adults/minors) and securely detain them in the detention cells.

    ii.   G4S will be contacted for transport after placement has been authorized by ERO. If G4S is not available, the POE will use its available resources for transportation.

    iii.   Organic resources will be utilized for transport after placement has been authorized by ERO.

    iv.   OBP will be contacted for assistance in the transportation of detainees to ERO.

## IV. Administration:

A. The port's command center will be activated at the Port Director's discretion.

    1.   Contact Numbers upon activation of Command Center:

        i.   

    2.   All reporting will be consolidated at the Laredo Operations Center and forwarded through appropriate chain-of-command.

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

C. Resource requirements will be identified and relayed to the LFO:

    1.   Cost Estimates / Funding Issues

        i.   Supplemental overtime funding and/or other funding issues outside normal operations will be required.

Highly Confidential/Attorneys' Eyes Only

      ii. Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by Port Director.

      iii. Port Director will request overtime cap waivers for appropriate port personnel.

      iv. Supplemental OIT support will be required.

2. Travel

      i. Travel and per diem expenses may be required.

      ii. Specific TDY support will be event-dependent and assessed by the port director.

      iii. Request will be made for non-per diem volunteers of officers residing in Del Rio, but stationed at other ports (e.g. Eagle Pass, Laredo, and RGV).

3. Lodging

      i. Lodging expenses may be required.

      ii. Specific lodging requirements will be event-dependent and assessed by the port director.

      iii. Request will be made for non-per diem volunteers of officers residing in Del Rio, but stationed at other ports (e.g. Eagle Pass, Laredo, and RGV).

4. Reception of Detailed Personnel

      i. Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, granting system accesses, etc.

5. Uniform and Equipment

      i. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

      ii. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

Highly Confidential/Attorneys' Eyes Only

          iii. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

6. Special Equipment

          i. All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

7. Alien Processing

          i. All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

8. Medical

          i. In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

          ii. All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility.

9. Detention / Transportation

          i. Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

10. Vehicles

          i. GOVs will be fueled as per existing port and field office policies.

**V.   Command / Control / Communications:**

A. The Port Director or his/her designee will act as the incident commander.

B. The Port Director or his/her designee will coordinate with the STC, OFO headquarters, and the Government of Mexico (GoM) as necessary.

C. Port Director, or his/her designee, will have operational control and command authority over respective CBP components involving, organizing, and employing commands, assigning tasks, designating objectives and giving authoritative

Highly Confidential/Attorneys' Eyes Only

direction necessary to accomplish area objectives will maintain tactical and operational control of their assets.

D. Communication will occur throughout the LFO under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

E. Point of Contact

 1. Alberto D. Perez, Port Director

  Office: (830) 306-4301

  Cell: (830) 968-7163

 2. Narcisco Gonzalez, Asst. Port Director – Mission Support

  Office: (830) 306-4304

  Cell: (830) 313-1249

 3. David W. Green , Asst Port Director, Cargo & Conveyance Operations

  Office: (830) 306-4360

  Cell: (830) 719-3390

 4. Gilbert Calderon, Chief CBPO – Tactical Operations

  Office: (830) 306-4382

  Cell: (830) 719-9496

 5. Barbara Calderon, Chief CBPO – Passenger Operations

  Office: (830) 306-4384

  Cell: (830) 719-5950

## Appendices

**Media Plan:**

The LFO Public Affairs Officer (PAO), in coordination with CBP Office of Public Affairs (OPA), will coordinate responses to media inquiries and other media and public messaging.

| | | |
|---|---|---|
| Primary Local PAL | Dennis Smith | (830) 719-1237 |
| Laredo Field Office PAO | Mucia Dovalina | (956) 753-1703 |

**Air Plan:**

The LFO will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

**Health and Safety Annex:**

The Port Director will ensure that the Laredo Field Office Standard Operating Procedures for Serious Communicable and Quarantinable Diseases are followed by all CBP employees.

**Contacts:**

**Law Enforcement:**

- Del Rio Police Dept.                         (830) 774-8718
- Val Verde County Sheriff's Office            (830) 774-7513
- Texas Department of Public Safety            (830) 703-1225
- USBP Del Rio Sector                          (830) 778-7000
- USBP Del Rio Station                         (830) 778-3000
- USBP Comstock Station                        (432) 292-4450
- USBP Bracketville Station                    (830) 563-6000
- HSI Del Rio Resident Office                  (830) 703-2000

**EMS/Hospitals:**

Val Verde Regional Medical Center
801 N. Bedell Avenue
Del Rio, Texas 78840
(830) 775-8566

**Government of Mexico**

- Mexican Customs:        (877) 101-0645
- Mexican Immigration:    (877) 772-1052
- Mexican Consul:         (830) 775-2352

Highly Confidential/Attorneys' Eyes Only

**Annex C**
**Port of Eagle Pass, Texas, Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I. **Situation:**

    A. During FY16 the Port of Eagle Pass saw a dramatic increase in applicants seeking entry into the United States. These applicants are not in possession of lawful entry documentation.

    B. Most of the applicants are seeking asylum in the United States, are expressing a fear (Credible Fear/CF) of returning to their home country, and/or want to reunite with a parent/family member in the United States.

    C. A significant number of the applicants are other than Mexicans (OTMs).

    D. A multitude of the applicants are arriving as unaccompanied alien children (UACs) and family units.

    E. Due to a significant increase in apprehensions by United States Border Patrol (USBP) in the LFO area of responsibility (Del Rio, Laredo, and Rio Grande Valley Border Patrol Sectors), the delay in obtaining detention space from the Office of Refugee Resettlement (ORR) and Immigration and Customs These delays have impacted port operations as port resources are used to conduct long term detention duties -- medical escorts, security duties, personal hygiene, feeding, laundry duties, and transportation (airports, shelters, way stations, detention centers, etc.).

    F. The Eagle Pass Port of Entry does not have the facilities, infrastructure, equipment or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

    G. Eagle Pass will often experience delays in the area of 7-14 days before placement is secured.

II. **Mission:**

    A. The Eagle Pass Port of Entry will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

    B. The mass migration will be managed while maintaining continuity of operations (COOP).

    C. The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays. These incident management strategies are designed to facilitate CBP's ability to mitigate against, prepare for, and respond to the impact of such events under extreme circumstances. Stressing that Officer safety is paramount in all occasions.

Highly Confidential/Attorneys' Eyes Only

D. Minimize UAC and OTM time in CBP custody.

E. The Eagle Pass Port of entry has establish a secondary alternative with OBP South Station as an overflow avenue for processing and staging.

**III.   Execution:**

A. The Port Director will:

1. Exercise the responsibility to control the flow of people across our borders.

2. Ensure terrorists, terrorist weapons, narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

3. Ensure that the security of the inspection process is sufficient to identify fraudulent applications for admission or discretion.

4. Ensure that bona fide applicants for admission are processed expeditiously and maintaining inspectional integrity.

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

B. The Port Director will implement a phased approach to manage the mass migration.

1. Phase I – Organic Capabilities Sustained

   i.  Mass migration does not exceed the operational capabilities of the Pass Port of Entry.

   ii. The Eagle Pass Port of Entry will detain and process migrants under standard operational procedures currently in place.

2. Phase II – Organic Capabilities Strained

   i.  Mass migration exceeds the capacity of the Eagle Pass Port of Entry.

   ii. Port Director and/or designee will:

       a. Coordinate with the ⌐ ‾ ‾ ‾ ‾ ‾ ‾ ‾ LE ‾ ‾ ‾ ‾ ‾ ‾ ‾ ¬
          ⌐ LE ¬ for assistance.

       b. Activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

     c. Begin coordination with ORR, ERO, and the STC, to prepare for potential event expansion.

     d. Establish communication with the Government of Mexico (GoM0 to elicit information about mass migration.

3. Phase III – Organic Capabilities Exceeded

     i. Mass migration exceeds the capacity of port facilities.

     ii. Port Director will coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

     iii. Port Director will staff non-24/7 international crossings after hours for processing.

     iv. Port Director will assign deployed jump teams to appropriate port locations.

     v. Port Director will coordinate with ORR and ERO for assistance with transporting aliens out of the area.

4. Encounter

     i. Staging

          a. The Port has established pre-staging/staging wait areas at each land border crossings under area of responsibility.

     ii. Triage/Categorizing

          a. UACs

          b. Family Units

          c. Adults

     iii. Initial Medical Screening

          a. Pregnant

          b. Communicable Diseases

          c. Special Medical Needs (Physically Handicapped or Mentally disabled)

5. Processing

     i. Holding Areas – The port currently has the capacity to stage approximately 100 persons in the passport control lobby and Secondary areas of the Camino Real International Bridge, and 80

at the Eagle Pass International Bridge. Additional overflow processing areas have been designated at the Camino Real International Bridge (training room) and the multi-purpose meeting room at Eagle Pass International (50-60 person additional capacity).

    a. Camino Real has four holding cells.

    b. Eagle Pass has three holding cells.

  ii. Processing Capacity – The port currently has eight work stations at the Camino Real International Bridge with the capacity to process cases. The port has seven at the Eagle Pass International Bridge that can be used as work stations. The number of workstations available may be affected if interview rooms are used to house unaccompanied alien children (UACs).

6. Transportation

  i. G4S will be contacted for transport after placement has been authorized by ERO.

  ii. Organic resources will be utilized for transport after placement has been authorized by ERO.

  iii. OBP will be contacted for assistance in the transportation of detainees to ERO.

## IV. Administration:

A. The port's command center will be activated at the Port Director's discretion.

1. Contact Numbers upon activation of Command Center:

  i. 
LE

2. All reporting will be consolidated at the LFO and forwarded to appropriate higher commands.

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

C. Resource requirements will be identified and relayed to the LFO:

1. Cost Estimates / Funding Issues

  i. Supplemental overtime funding and/or other funding issues outside normal operations will be required.

      ii.  Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by Port Director.

      iii.  Port Director will request overtime cap waivers for appropriate port personnel.

      iv.  Supplemental OIT support will be required.

2. Travel

      i.  Travel and per diem expenses may be required.

      ii.  Specific TDY support will be event-dependent and assessed by the port director.

3. Lodging

      i.  Lodging expenses may be required.

      ii.  Specific lodging requirements will be event-dependent and assessed by the port director.

4. Reception of Detailed Personnel

      i.  Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, granting system accesses, etc.

5. Uniform and Equipment

      i.  All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

      ii.  CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

      iii.  Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

6. Special Equipment

      i.  All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

7. Alien Processing

Highly Confidential/Attorneys' Eyes Only

      i.  All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

8. Medical

      i.  In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

      ii.  All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility.

9. Detention / Transportation

      i.  Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

10. Vehicles

      i.  GOVs will be fueled as per existing port and field office policies.

**V.   Command / Control / Communications:**

A. The Port Director or his designee will act as the incident commander.

B. The Port Director will coordinate with the STC, OFO headquarters, and the Government of Mexico (GoM) as necessary.

C. Port Director, or his/her designee, will have operational control and command authority over respective CBP components involving, organizing, and employing commands, assigning tasks, designating objectives and giving authoritative direction necessary to accomplish area objectives will maintain tactical and operational control of their assets.

D. Communication will occur throughout the LFO under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

E. Points of Contact

1. John Brandt, Port Director

Office: (830) 752-3160

Cell: (830) 776-3598

2. Pete Macias, Assistant Port Director, Passenger Operations

   Office: (830) 752-3568

   Cell: (830) 352-3734

3. Gilbert Sepulveda, Assistant Port Director, Trade Operations

   Office: (830) 752-3593

   Cell: (830) 776-3593

4. John Alanis, Administration Chief

   Office: (830) 752-3159

   Cell: (830) 421-2770

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011157

## Appendices

**Media Plan:**

The LFO Public Affairs Officer (PAO), in coordination with CBP Office of Public Affairs (OPA), will coordinate responses to media inquiries and other media and public messaging.

| | | |
|---|---|---|
| Primary Local PAO | Dennis Smith | (830) 830-719-1237 |
| Laredo LFO PAO | Mucia Dovalina | (956) 753-1703 |

**Air Plan:**

The LFO will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

**Health and Safety Annex:**

The Port Director will ensure that the Laredo Field Office Standard Operating Procedures for Serious Communicable and Quarantinable Diseases are followed by all CBP employees.

**Contacts:**

**Law Enforcement:**

- Eagle Pass Police Dept.                    830-773-9044
- Maverick County Sheriff's Office          830-773-2321
- Texas Department of Public Safety         830-773-5050
- OBP DLR Sector                            830-778-7000
- OBP Eagle Pass North                      830-758-4000
- OBP Eagle Pass South                      830-752-3300
- OBP Del Rio Station                       830-778-3000
- OBP BORTAC Liaison
- Patrol Agent in Charge Del Rio Sector     830-734-3854
  BORTAC Commander                          830-719-3856
  BORSTAR Commander                         830-279-6007
- HSI                                       800-973-2867

**EMS/Hospitals:**

Fort Duncan Regional Medical Center
3333 N Foster Maldonado Blvd
Eagle Pass, TX
(830) 773-5321

Val Verde Regional Medical Center

Highly Confidential/Attorneys' Eyes Only

801 N Bedell Ave, Del Rio, TX 78840
(830) 775-8566

Uvalde Memorial Hospital
1025 Garner Field Rd, Uvalde, TX 78801
(830) 278-6251

**Government of Mexico**

- CISEN :                    0115218688282159
- Mexican Aduana PD          0115213141030384
  - Asst to PD               0115213141338008

- Mexican Immigration        0115218441214185
- Mexican Consul:            830-773-9255

**Annex D**
**Port of Laredo, Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I.   **Situation:**

    A.   During FY16 the Port of Laredo saw a dramatic increase in applicants seeking entry into the United States without lawful entry documentation.

    B.   Most of the applicants are seeking asylum in the United States, are expressing a fear (Credible Fear/CF) of returning to their home country, and/or want to reunite with a parent/family member in the United States.

    C.   A significant number of the applicants are other than Mexicans (OTMs).

    D.   Most of the applicants are arriving as unaccompanied alien children (UACs) and family units.

    E.   Due to a significant increase in apprehensions by United States Border Patrol (USBP) in the LFO area of responsibility (Del Rio, Laredo, and Rio Grande Valley Border Patrol Sectors), the delay in obtaining detention space from the Office of Refugee Resettlement (ORR) and Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO) has increased from an average of 24-48 hours, to five days or more. These delays have impacted port operations as port resources are used to conduct long term detention duties – medical escorts, security duties, personal hygiene, feeding, and transportation (airports, shelters, way stations, detention centers, etc.).

    F.   The Port of Laredo does not have the facilities, infrastructure, equipment or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

II.  **Mission:**

    A.   The Port of Laredo will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

    B.   The mass migration will be managed while maintaining continuity of operations (COOP).

    C.   The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays. These incident management strategies are designed to facilitate CBP's ability to mitigate against, prepare for, and respond to the impact of such events under extreme circumstances.

    D.   Minimize UAC, Family Units and OTM time in CBP custody.

### III. Execution:

A. The Port Director will:

1. Exercise the responsibility to control the flow of people across our borders.

2. Ensure terrorists, terrorist weapons, narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

3. Ensure that the security of the inspection process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

4. Ensure that bona fide applicants for admission are processed expeditiously.

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

B. The Port Director will implement a phased approach to manage the mass migration.

1. Phase I – Organic Capabilities Sustained

   i. Mass migration contained within normal working conditions.

   ii. Port Director will ensure mass migration within normal working conditions does not affect day to day operations.

2. Phase II – Organic Capabilities Strained

   i. Mass migration exceeds the capacity of at least one international crossing within the port of entry.

   ii. Port Director will coordinate with other international crossings within the port of entry for assistance.

   iii. Port Director will begin coordination with ORR, ERO, and the STC, to prepare for potential event expansion.

   iv. Port Director will establish communication with Government of Mexico (GoM) to elicit information about mass migration.

   v. Port Director will test overflow processing work stations in anticipation of expanding additional resources.

Highly Confidential/Attorneys' Eyes Only

     vi. Port Director will ensure sufficient supplies i.e., empty A file jackets, personal hygiene, etc.

3. Phase III – Organic Capabilities Exceeded

     i. Mass migration exceeds the capacity of port facilities.

     ii. Port Director will activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

     iii. Port Director will coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

     iv. Port Director will staff non-24/7 international crossings after hours for processing.

     v. Port Director will assign additional personnel and/or request assistance for jump teams for all available resources at each location as appropriate.

     vi. Port Director will coordinate with ORR and ERO for assistance obtaining detention space and with transporting aliens out of the area.

     vii. Port Director will identify additional locations within the port of entry for the staging and housing of detainees.

4. Encounter

     i. Staging

          a. Upon arriving at the port of entry U.S. Customs and Border Protection Officers (CBPOs) will identify a secure and proper location for all individuals as part of a mass migration seeking admission without proper entry documents.

          b. CBP will establish a pre-staging area for inadmissible migrants.

          c. Once organic detention areas have been exhausted within the port of entry, Port Director will ensure additional locations for detention have proper resources, i.e. tents with a cooling system, access to restrooms, personal hygiene and food/water.

          d. Port Director will utilize TEOs and coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law

Highly Confidential/Attorneys' Eyes Only

enforcement agencies (LEAs) to assist in securing perimeter security and safe guarding detainees.

    e. Port Director will ensure sufficient transport vehicles are on hand and ready for transporting.

ii. Triage / Categorizing

    a. Upon arrival of the migrants CBP will:

        i. Identify the travelers applying for admission that are part of the mass migration group.

        ii. Determine admissibility of each applicant.

        iii. If the applicant is determined to be admissible, the applicant will be admitted and released to depart the Federal Inspection Site (FIS).

        iv. If the applicant is determined to be inadmissible, he or she will be referred and escorted to a pre-staging area as determined by CBP.

        v. Once in the pre-staging area, the migrant will be separated by category.

    b. UAC

        i. Unaccompanied Alien Child under the age of 18 years old.

    c. Family Units

        i. Parent/Legal Guardian and minor child/children.

    d. Adults

        i. Any individual 18 years old and above.

iii. Initial Medical Screening

    a. CBPO will look for any outward signs of health concerns and inquire for any possible health issues, such as:

        i. Prescribed medication

        ii. Pregnancy

        iii. Rashes

        iv. Lice, etc.

Highly Confidential/Attorneys' Eyes Only

       b. Identify immediate health concerns and if required transport individual to the nearest medical facility.

5. Processing

    i. Holding Areas

        a. The port of entry has four international crossings with facilities to hold detainees.

            i. Gateway to the Americas Bridge

                1. Secondary processing area currently has two detention rooms and two detention cells.

            ii. Lincoln Juarez Bridge

                1. Secondary processing area has two detention rooms and four detention cells.

            iii. World Trade Bridge

                1. Secondary processing area has one detention room and four detention cells.

            iv. Colombia Solidarity Bridge

                1. Secondary processing area has two detention cells.

        b. Once the organic resources of these international crossing facilities have been exhausted, the old import lot will be used as a temporary staging area to contain the overflow of migrants at the port of entry.

    ii. Processing Capacity

        a. Gateway to the Americas Bridge

            i. Privately owned vehicles and pedestrians.

                1. Closed to privately owned vehicles for bridge remodel and construction.

            ii. Open 24 hours, 7 days a week.

            iii. Total of 7 workstations available for processing.

        b. Lincoln Juarez Bridge

            i. Privately owned vehicles and commercial buses.

      i. Commercial buses are routed to Old Import Lot for inspection due to remodel and construction.

    ii. Open 24 hours, 7 days a week.

    iii. Total of 6 workstations available for processing.

c. Old Import Lot

    i. Commercial buses routed downstairs for inspection due to construction at Lincoln Juarez Bridge.

    ii. Privately owned vehicles inspected only during high volume special holiday traffic and when no buses are referred downstairs for inspection.

    iii. Total of 13 workstations available for processing.

d. World Trade Bridge

    i. Commercial conveyances only.

    ii. Open 0800 hours to 2400 hours Monday – Friday, open 0800 hours to 1600 hours Saturday and open 1000 hours to 1400 hours Sunday.

    iii. Total of 5 workstations available for processing.

e. Colombia Solidarity Bridge

    i. Commercial conveyances, privately owned vehicles and pedestrians.

    ii. Open 0800 hours to 2400 hours, 7 days a week.

    iii. Total of 4 workstations available for processing.

iii. Processing

a. Pat down searches will be conducted on all individuals, and their personal belongings will be bagged and tagged.

b. 

c. Applicant will be processed according to HQ, OFO and LFO policy.

d. Detention space request.

Highly Confidential/Attorneys' Eyes Only

        iv. Outside counsel with a properly executed Form G-28 will be allowed to wait in the lobby area, room permitting.

            a. The Laredo Office of Chief Counsel will have a representative on site to assist as may be required.

        v. Any activists and/or advocacy groups on site will be limited to an area outside the FIS as designated by local officials.

    6. Transportation

        i. Transportation arrangements will be made by CBP once placement is secured by ORR or ERO.

        ii. It is the responsibility of CBP to provide transportation of detainees from the port of entry to designated locations, i.e. ERO facilities, airport, way stations for consolidated transports, shelters, etc.

        iii. Coordination with USBP and contract transportation services will be made once placement is secured for possible consolidation of transports.

## IV. Administration:

A. All reporting will be consolidated and forwarded to appropriate higher chain of command from the command center.

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

C. Resource requirements will be identified and relayed to the LFO:

    1. Cost Estimates / Funding Issues

        i. Supplemental overtime funding and/or other funding issues outside normal operations will be required.

        ii. Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by Port Director.

        iii. Port Director will request overtime cap waivers for appropriate port personnel.

        iv. Supplemental OIT support will be required.

    2. Travel

        i. Travel and per diem expenses may be required if outside assistance is requested.

Highly Confidential/Attorneys' Eyes Only

      ii. Specific TDY support will be event-dependent and assessed by the port director.

3. Lodging

      i. Lodging expenses may be required if outside assistance is requested.

      ii. Specific lodging requirements will be event-dependent and assessed by the Port Director.

4. Reception of Detailed Personnel

      i. Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, etc.

5. Uniform and Equipment

      i. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

      ii. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons, and will comply with all CBP use of force policies and regulations.

      iii. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

6. Special Equipment

      i. All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

7. Alien Processing

      i. All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

8. Medical

      i. In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

      ii. All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses,

Highly Confidential/Attorneys' Eyes Only

phone numbers and trauma levels of hospitals in their area of responsibility.

    iii. The City of Laredo Health Department will be notified on all possible communicable diseases.

9. Detention / Transportation

    i. Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

10. Vehicles

    i. GOVs will be fueled as per existing port and field office policies.

## V. Command / Control / Communications:

A. The Port Director will designate an incident commander.

B. The Port Director will coordinate with the STC, OFO headquarters, and the Government of Mexico (GoM), as necessary.

C. Port Director, or his/her designee, will have operational control and command authority over respective CBP components involving, organizing, and employing commands, assigning tasks, designating objectives and giving authoritative direction necessary to accomplish area objectives and will maintain tactical and operational control of their assets.

D. Communication will occur throughout the port of entry under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

E. Points of Contact

1. Gregorio Alvarez, Port Director

   Office: (956) 523-7314

   Cell: (956) 367-6202

2. Albert Flores, Deputy Port Director

   Office: (956) 794-9495

   Cell: (956) 237-1920

3. Francisco Garcia, Assistant Port Director, Passenger Operations

Office: (956) 523-7306

Cell: (956) 237-9203

4. Watch Commanders

William Trevino

Cell: (956) 206-6907

Leobardo Benavidez

Cell: (956) 242-9474

Cynthia Rodriguez

Cell: (956) 740-1885

Javier Vazquez

(956) 251-3770

Jesus Barrera

(956) 334-6099

Juan Chavez

(956) 237-3826

Highly Confidential/Attorneys' Eyes Only

**Appendices**

**Media Plan:**

The LFO Public Affairs Officer (PAO), in coordination with CBP Office of Public Affairs (OPA), will coordinate responses to media inquiries and other media and public messaging.

| | | |
|---|---|---|
| Primary Local PAL | Diego Hernandez | (956) 251-2977 |
| Laredo LFO PAO | Mucia Dovalina | (956) 753-1703 |
| CBP OPA PAO | Rick Pauza | (956) 764-3425 |

**Air Plan:**

The LFO will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

**Health and Safety Annex:**

The Port Director will ensure that the Laredo Field Office Standard Operating Procedures for Serious Communicable and Quarantinable Diseases are followed by all CBP employees.

A. In the event of any medical emergency, 911 will be called.

B. If necessary the local fire department or hospital can be contacted to directly dispatch EMS.

C. A marked law enforcement unit, driving in a safe manner, with emergency lights and siren activated, can drive to any of the below listed medical facilities within 10 minutes.

D. All medical emergencies will be transported to the nearest medical facility.

E. Laredo area of responsibility:

    a. Doctor's Hospital
    Trauma level III
    10700 McPherson Rd
    Laredo, Texas 78045
    (956) 523-2000

    b. Laredo Medical Center
    Trauma level III
    1700 E. Sanders
    Laredo, Texas 78041
    (956) 796-2000

Highly Confidential/Attorneys' Eyes Only

c. City of Laredo Health Department
   2600 Cedar
   Laredo, Texas 78041
   (956) 795-4921

d. Trauma III Facility

   i. The hospital provides initial evaluation and stabilization to the trauma patient. Comprehensive medical and surgical impatient services are available to those patients who can be maintained in a stable or improving condition without specialized care. Emergency physicians and nurses are immediately available. Surgeons are able to within 20 minutes to assess, resuscitate, stabilize, and initiate transfer as necessary to a higher level trauma care center.

**Contacts:**

**Points of Contact:**

- OBP POC – Narciso Ramos                    (956) 763-1844
- ERO POC – Robert Cerna                     (956) 237-0784
- CIS POC – Martin Hernandez                 (210) 564-3607
- ASYLUM POC – Ashlyn/Gadson                 (281) 931-2139
- FPS POC – Carlos Guardiola                 (956) 718-4115
- Bridge Director POC – Mario Maldonado      (956) 791-2200
- Laredo PD POC –Joe Baeza                   (956) 285-0579

**General Law Enforcement Contact Information:**

- Laredo Police Department                   (956) 795-2800
  - Liaison: Duty Watch Commander          (956) 795-3134, 3135, 3136, 3023
- Webb County Sheriff's Office               (956) 523-4500, 4408, 4465
  - Liaison: Lt. Ricardo Garcia            (956) 718-8084
- Laredo Border Patrol Sector (LRT)          (956) 764-3200, 3232
  - Liaison: Border Intel Center (BIC)     (956) 764-3091
- LRT BORTAC                                 (956) 417-7864
  - Liaison: PAIC Jerry Doyle              (956) 417-5822
- Office of Air & Marine (OAM)               (956) 726-5100
  - Liaison: Supervisor Vidaurri           (956) 726-5100, Option #1
- Texas Department of Public Safety          (956) 728-2201
  - Liaison: Sgt. Conrad Hine              (956) 489-9403
- Texas A&M International Police Dept.        (956) 326 2100
  - Liaison: Sup. Cindy Garcia             (956) 326-2100
- Federal Protective Services (Mega Center)  (800) 767-2756

Highly Confidential/Attorneys' Eyes Only

     o  Liaison:  Carlos Guardiola      (956) 202-1996
- HSI Duty Agent                 (800) 973-2867

**Government of Mexico Contact Information:**

- **MX Consulate Office (Laredo, Texas)**

  Office: 956-723-0990
  Consul Carolina Zaragoza Flores
  Emergency Contact Number:  (956) 251-9096

- **CISEN**

  Office: 011-52-867-719-0010
  Alternate Number: 011-52-867-719-2332

- **C4**

  Office: 011-52-867-711-2552
  Nextel: 72*609937*2

- **Mexican Customs**

| | |
|---|---|
| Administration: | 011-52-867-711-0263 (0900-2000 hrs). |
| Bridge 1: | 011-52-867-711-0265 / 3238 |
| Bridge 2: | 011-52-867-711-0265 / 3238 |
| Railroad: | 011-52-867-711-3200 (Ext. 71561) |
| WTB: | 011-52-867-711-3204 |
| Colombia: | 011-52-867-734-5101 (0900-2200 hrs. M-F) (1000-1400 hrs. Sat.) |

- **Mexican Immigration**

| | |
|---|---|
| Administration: | 011-52-867-711-0263 (0900-2000 hrs.) |
| Bridge 1: | 011-52-867-718-1177 (#8) |
| Bridge 2: | 011-52-867-712-7245 |
| Railroad: | 011-52-867-718-1177 (#8) |
| WTB: | 011-52-867-711-3200 (Ext. 73204) |
| Colombia: | 011-52-867-734-5101 (0900-2200 hrs. M-F) (1000-1400 hrs. Sat.) |

Highly Confidential/Attorneys' Eyes Only

**Annex E**
**Port of Hidalgo, Texas, Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I.  **Situation:**

    A.  Since FY2014 the Port of Hidalgo, Texas has seen an increase in arriving aliens seeking entry into the United States without lawful entry documentation.

    B.  Most of the applicants are economic migrants seeking employment through the asylum process and/or requesting reunification with family members who are unlawfully present in the US.

    C.  A significant number of the applicants are other than Mexicans (OTMs), to include Special Interest Aliens (SIAs).

    D.  Most of the applicants are arriving as unaccompanied alien children (UACs) and family units.

    E.  Due to a significant increase in apprehensions in the Rio Grande Valley (RGV), Office of Field Operations (OFO) and United States Border Patrol (USBP) experience delays in obtaining detention space from the Office of Refugee Resettlement (ORR) and Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO), from an average of 24-48 hours, to five days or more. These delays have impacted port operations as port resources are used to conduct long term detention duties – medical escorts, security duties, personal hygiene, feeding, and transportation (airports, shelters, way stations, detention centers, etc.).

    F.  The Rio Grande Valley Central Processing Center (CPC) assists with the temporary holding of OFO processed family units and unaccompanied alien children. These aliens remain in the responsibility of OFO until ICE/ERO or ORR take physical custody of them.

    G.  The Port of Hidalgo, Texas does not have the facilities, infrastructure, equipment or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

II.  **Mission:**

    A.  The Port of Hidalgo, Texas will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

    B.  The mass migration will be managed while maintaining continuity of operations (COOP).

    C.  The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays. These incident

management strategies are designed to facilitate CBP's ability to mitigate against, prepare for, and respond to the impact of such events under extreme circumstances.

D. Minimize UAC and OTM time in CBP custody.

III.   **Execution:**

A. The Port Director will:

1. Exercise the responsibility to control the flow of people across our borders.

2. Ensure terrorists, terrorist weapons, narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

3. Ensure that the security of the inspection process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

4. Ensure that bona fide applicants for admission are processed expeditiously.

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

B. The Port Director will implement a phased approach to manage the mass migration contingent on the number of arriving aliens.

1. Phase I – Organic Capabilities Sustained

   i. Mass migration does not exceed the operational capabilities of the Hidalgo, Texas Port of Entry.

   ii. The Hidalgo, Texas Port of entry will detain, process, and transport migrants commensurate with Port policies and procedures.

2. Phase II – Organic Capabilities Strained

   i. Mass migration exceeds the capacity of at least one port facility, as identified in port-specific annexes.

   ii. Port Director and/or designee will do the following:

      a. Will coordinate with neighboring POEs ( LE
         LE ) for assistance.

b. Will coordinate with neighboring USBP stations ( LE LE ) for assistance.

c. Will activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

d. Will begin coordination with ORR, ERO, STC, other local federal/state law enforcement agencies (LEAs), and local government officials to prepare for potential event expansion. (Appendix 1)

e. Will establish communications with Government of Mexico (GoM) to elicit information about mass migration. (Appendix 2)

f. Will test overflow processing work stations in anticipation of LFO jump team deployment.

3. Phase III – Organic Capabilities Exceeded

   i. Mass migration exceeds the capacity of port facilities.

   ii. Port Director and/or designee will do the following:

      a. Will coordinate with FPS, USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

      b. Will staff non-24/7 international crossings after hours for processing with DFO concurrence.

      c. Will assign deployed jump teams to appropriate port locations.

      d. Will coordinate with ORR and ERO for assistance with transporting aliens out of the area.

C. Encounter

   1. Triage / Categorizing

      i. The Port has established pre-staging/staging wait areas

      ii. Assigned Officers will separate migrants into the following groups and processed in this order:

         a.

         b.    

         c.

d. 

e.

D. Staging

1. UAC and Family Unit *1 will be escorted to the PCS lobby.

2. Family Unit *2, adult females, and adult males will be escorted to the "OLD IMPORT LOT" and staged according to grouping underneath the existing canopy.

3. Once processing is complete and space requests sent, migrants will be escorted to the "OLD IMPORT LOT" and staged according to grouping underneath the existing canopy so the next group of migrants can be processed.

4. Migrants will be monitored at all times regardless of staging location by designated security officers/agents

**NOTE:** Processing is event-dependent; as such the Port will adjust and make appropriate decisions concerning staging based upon influx.

E. Initial Medical Screening

1. Officers will canvas migrants to determine if a medical emergency/issue exists.

2. In the event of a medical emergency/issue, all emergency medical protocols will be initiated by CBP personnel on scene.

3. An improvised isolation area has been designated for migrants deemed to pose a health and safety risk (contagious disease).

F. Processing

1. See Administration section (IV)(C)(6) for processing capacity specifics

2. Approximate processing times:

   i.   Family Unit      2-4 hours

   ii.  UAC              1-2 hours

   iii. ER/CF            2-3 hours

   iv.  NTA/Detain       2-3 hours

3. The appropriate office will be contacted upon processing completion to request placement.

Highly Confidential/Attorneys' Eyes Only

G. Transportation

1. G4S will be used to the greatest extent possible

2. If G4S is unable to transport, the Port of Hidalgo, Texas will use organic/TDY resources

## IV. Administration:

A. The Port's command center will be activated at the Port Director's discretion.

1. All reporting will be consolidated at the LFO and forwarded to appropriate higher commands.

2. Port's operational chain of command:

    i. Incident Commander      Port Director or designee

    ii. Operations Officer      Watch Commander on duty

    iii. Security Officer      AT-CET Supervisor on duty

    iv. Intelligence Officer      TAU Supervisor/Officer on duty

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

1. CBP Officers (Series 1895)      426

2. CBP Canine Enforcement Officers (Series 1895)      29

3. CBP Agriculture Specialists (Series 401)      45

4. CBP Agriculture Canine Specialist (Series 401)      3

C. Resource requirements will be identified and relayed to the LFO:

1. Cost Estimates / Funding Issues

    i. Supplemental overtime funding and/or other funding issues outside normal operations will be required.

    ii. Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by port director.

    iii. Port Director will request overtime cap waivers for appropriate port personnel.

    iv. Supplemental OIT support will be required.

Highly Confidential/Attorneys' Eyes Only

2. Travel

    i. Travel and per diem expenses may be required.

    ii. Specific TDY support will be event-dependent and assessed by the port director.

3. Lodging

    i. Lodging expenses may be required.

    ii. Specific lodging requirements will be event-dependent and assessed by the port director.

4. Reception of Detailed Personnel

    i. Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, etc.

5. Uniform and Equipment

    i. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

    ii. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

    iii. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

    iv. All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

6. Alien Processing

    i. All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

    ii. Operational Areas:

        a. Hidalgo International Crossing

            i. Passenger Operations: 24 hours / 7 days a week

Highly Confidential/Attorneys' Eyes Only

        ii. 18 available processing stations (12 inside secondary/6 at counter)

        iii. 4 detention cells (2 wet / 2 dry) with the capacity to house 24 migrants (approximate)

        iv. 2 dedicated processing hold rooms that can accommodate 10 (approximate)

        v. Lobby area capacity is 105 (approximate)

    b. Pharr International Crossing

        i. Passenger Operations: 0600 – 0000 / 7 days a week

        ii. 6 available processing stations (2 inside secondary / 4 at counter)

        iii. 3 detention cells (2 wet / 1 dry) with the capacity to house 14 migrants (approximate)

        iv. Lobby area capacity is 30 (approximate)

    c. Anzalduas International Crossing

        i. Passenger Operations: 0600 – 2200 / 7 days a week

        ii. 2 available processing stations (6 if utilizing SENTRI stations)

        iii. 16 detention cells (9 wet / 7 dry) with the capacity to house 50 migrants (approximate)

        iv. Lobby area capacity is 15 (35 if utilizing SENTRI area) (approximate)

7. Medical

    i. In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

    ii. All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility. (Appendix 3)

    iii. The Port Director will ensure that appropriate Personal Protective Equipment (PPE) is available.

Highly Confidential/Attorneys' Eyes Only

8. Detention / Transportation

    i. Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

9. Vehicles

    i. GOVs will be fueled as per existing port and field office policies.

    ii. The Port will utilize the two assigned vans for transportation related functions (13 person capacity per van).

## V. Command / Control / Communications:

A. The Port Director will designate an incident commander.

B. The Port Director will coordinate with the LFO, and the Government of Mexico (GoM) as necessary.

C. Port Director, or his/her designee, will have operational control and command authority over respective CBP components involving, organizing, and employing commands, assigning tasks, designating objectives and giving authoritative direction necessary to accomplish area objectives will maintain tactical and operational control of their assets.

D. Communication will occur throughout the LFO under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

## Media Plan:

All media inquiries will be referred to the CBP Office of Public Affairs (OPA)

A. Maribel Saenz (HID)       (956) 223-6155

B. Esteban Garcia (HID)       (956) 454-8021

C. Elias Rodriguez (BRO)     (956) 455-0490

D. Rick Pauza (LFO)         (956) 359-5079

E. Mucia Dovalina (LFO)      (956) 286-7289

**Air Plan:**

The Port of Hidalgo, Texas will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011181

ER 00916

**Appendix 1 – Coordination with U.S. Partners**

**Points of Contact:**

- OBP POC – Ramiro Garza Jr              (956) 460-7394
- ERO POC – Homero Salinas              (956) 547-1837
- CIS POC – Arcelia Adriano
- ASYLUM POC – Ashlyn/Gadson          (281) 931-2139
- FPS POC – Mitch Sisler                    (956) 367-5790
- Bridge Director POC – Juan Olaguibel    (956) 802-9271
- Hidalgo PD POC – Lt. C. Vargas         (956) 537-5007 **(Will notify Hidalgo EMS)**

**General Contact Information:**

- McAllen Police Department            (956) 682-4321
- Hidalgo Police Department            (956) 843-2737
- Pharr Police Department              (956) 784-7700
- Mission Police Department            (956) 584-5000
- Hidalgo County SO                    (956) 383-8114
- OBP RGV Sector                       (956) 289-4800
- OBP Weslaco Station                  (956) 968-0602
- OBP McAllen Station TOC              (956) 217-3827
- OBP McAllen    Station               (956) 217-3700
- OBP BORTAC Liaison                   (956) 532-7872
- OAM Liaison                          (956) 972-6350
- Texas Department of Public Safety    (956) 279-0956
- Federal Protective Services          (956) 367-5790
- HSI Duty Agent                       (800) 973-2867

Highly Confidential/Attorneys' Eyes Only

**Appendix 2 – Coordination with Government of Mexico Partners**

| | |
|---|---|
| CISEN – Francisco Casas | 011-521-899-122-5778 |
| CISEN (Office) | 011-52-555-449-1518 |
| Mexican Customs/Immigration (HID) | 011-521-89-99-22-1312 |
| Mexican Customs/Immigration (PPR) | 011-521-89-99-44-1510 |
| Mexican Customs/Immigration (ANZ) | 011-521-89-99-44-1508 |

Highly Confidential/Attorneys' Eyes Only

## Appendix 3 – Medical Centers

McAllen Medical Center
311 W Expressway 83
McAllen TX
(956) 632-4100

Rio Grande Regional
101 E Ridge Rd
McAllen TX
(956) 632-6000

Mission Regional Medical Center
900 S. Bryan
Mission TX
(956) 323-9000

Weslaco Knapp Medical Center
1401 E 8th St
Weslaco TX
(956) 968-8567

Harlingen Valley Baptist Medical Center
2101 Pease St
Harlingen TX
(956) 389-1100

Valley Baptist Medical Center
1040 W Jefferson St
Brownsville TX
(956) 698-5400

Valley Regional Medical Center
100 E Alton Gloor Blvd
Brownsville TX 78526
(956) 350-7000

Starr County Memorial Hospital
1861 US 83
Roma, TX
(956) 487-5561

On Standby:
Dr. Leonel Moreno
Family Physicians Clinic
(956) 682- 4515

**Annex F**
**Port of Rio Grande City, Texas, Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I.   **Situation:**

   A.   During FY2017 the Port of Rio Grande City, Texas has seen a dramatic decrease in applicants seeking entry into the United States without lawful entry documentation.

   B.   Most of the applicants who seek asylum in the United States are expressing a fear (Credible Fear/CF) of returning to their home country, and/or want to reunite with a parent/family member in the United States.

   C.   Most of the applicants are arriving as unaccompanied alien children (UACs) and family units.

   D.   Additionally, the Port of Rio Grande City has seen a dramatic decrease in Cuban nationals applying for entry under the Cuban Refugee Adjustment Act (CRAA).

   E.   The Port of Rio Grande City, Texas does not have the facilities, infrastructure, equipment or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

II.  **Mission:**

   A.   The Port of Rio Grande City, Texas will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

   B.   The mass migration will be managed while maintaining continuity of operations (COOP).

   C.   The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays. These incident management strategies are designed to facilitate CBP's ability to mitigate against, prepare for, and respond to the impact of such events under extreme circumstances.

   D.   Minimize UAC and OTM time in CBP custody.

III. **Execution:**

   A.   The Port Director will:

      1.   Exercise the responsibility to control the flow of people across our Port of Entry.

2. Ensure terrorists, weapons, narcotics, criminal aliens, prohibited goods, and other illegal merchandise is prevented from entering through the Port of Entry.

3. Ensure that the security of the inspection process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

4. Ensure that bona fide applicants for admission are processed expeditiously.

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

B. The Port Director will implement a phased approach to manage the mass migration.

1. Phase I – Organic Capabilities Sustained

   i. Mass migration does not exceed the operational capabilities of the Rio Grande City, Texas Port of Entry.

   ii. The Rio Grande City, Texas Port of entry will detain, process, and transport migrants commensurate with Port policies and procedures.

2. Phase II – Organic Capabilities Strained

   i. Mass migration exceeds the capacity of at least one port facility, as identified in port-specific annexes.

   ii. Port Director and/or designee will do the following:

      a. Will coordinate with neighboring POEs ( LE  LE and other ports within the Laredo Field Office as needed) for assistance.

      b. Will coordinate with neighboring USBP stations (McAllen, and Rio Grande City) for assistance.

      c. Will activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

      d. Will begin coordination with ORR, ERO, STC, other local federal/state law enforcement agencies (LEAs), and local government officials to prepare for potential event expansion. (Appendix 1)

Highly Confidential/Attorneys' Eyes Only

e. Will establish communications with Government of Mexico (GoM) to elicit information about mass migration. (Appendix 2)

f. Will test overflow processing work stations in anticipation of LFO jump team deployment.

3. Phase III – Organic Capabilities Exceeded

    i. Mass migration exceeds the capacity of port facilities.

    ii. Port Director and/or designee will do the following:

        a. Will coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

        b. Will staff non-24/7 international crossings after hours for processing with DFO concurrence.

        c. Will assign deployed jump teams to appropriate port locations.

        d. Will coordinate with ORR and ERO for assistance with transporting aliens out of the area.

4. Phase IV- Organic Capabilities Overwhelmed

    i. Mass migration overwhelms the processing, transportation, and detention capacities of CBP components in South Texas (OFO and USBP).

    ii. Port Director, in conjunction with DFO will explore alternative admissibility processing measures.

    iii. DFO, in conjunction with the STC Commander, requests DHS assistance through CBP headquarters.

## IV. Administration:

A. The Port's command center will be activated at the Port Director's discretion.

1. All reporting will be consolidated at the LFO and forwarded to appropriate higher commands.

2. Port's operational chain of command:

    i. Incident Commander    Port Director or designee

    ii. Operations Officer    Supervisor on duty

    iii. Intelligence Officer    TAU Supervisor/Officer on duty

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

    1. CBP Managers                              12

    2. CBP Officers (Series 1895)           49

    3. CBP Canine Enforcement Officers (Series 1895)   4

    4. CBP Agriculture Specialists (Series 401)        4

C. Resource requirements will be identified and relayed to the LFO:

    1. Cost Estimates / Funding Issues

        i. Supplemental overtime funding and/or other funding issues outside normal operations will be required.

        ii. Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by port director.

        iii. Port Director will request overtime cap waivers for appropriate port personnel.

        iv. Supplemental OIT support will be required.

    2. Travel

        i. Travel and per diem expenses may be required.

        ii. Specific TDY support will be event-dependent and assessed by the port director.

    3. Lodging

        i. Lodging expenses may be required.

        ii. Specific lodging requirements will be event-dependent and assessed by the port director.

    4. Reception of Detailed Personnel

        i. Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, etc.

    5. Uniform and Equipment

        i. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

Highly Confidential/Attorneys' Eyes Only

    ii. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

    iii. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

6. Special Equipment

    i. All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

7. Alien Processing

    i. All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

    ii. Operational Areas:

        a. Rio Grande City

            i. Passenger Operations: 17 hours / 7 days a week

            ii. 4 available processing stations (2 inside secondary/2 at counter)

            iii. 2 detention cells with the capacity to house 14 migrants (approximate)

            iv. Lobby area capacity is 15 (approximate)

        b. Los Ebanos

            i. Passenger Operations: 8 hours / 7 days a week depending on the weather.

            ii. 2 available processing stations (1 inside secondary / 1 at the counter.

            iii. 2 detention cells with the capacity to house 12 migrants (approximate).

    iii. Processing Times

        a. Rio Grande City

Highly Confidential/Attorneys' Eyes Only

Based on the workstations available and absent any language barriers, the port has the capacity to process no more than 24 Expedited Removal Credible Fear cases every 24 hours.

b.    Los Ebanos

Based on the workstations available and absent any language barriers, the port has the capacity to process no more than 12 Expedited Removal Credible Fear cases every 24 hours.

8. Medical

    i.   In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

    ii.   All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility. (Appendix 3)

9. Detention / Transportation

    i.   Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

10. Vehicles

    i.   GOVs will be fueled as per existing port and field office policies.

    ii.   The Port will utilize the one assigned van for transportation related functions (13 person capacity per van).

    iii.   The port may also utilize two pursuit vehicles that can transport two additional passengers (each).

**V.    Command / Control / Communications:**

A. The Port Director will designate an incident commander.

B. The Port Director will coordinate with the LFO, and the Government of Mexico (GoM) as necessary.

C. Port Director, or his/her designee, will have operational control and command authority over respective CBP components involving, organizing, and employing commands, assigning tasks, designating objectives and giving authoritative

direction necessary to accomplish area objectives will maintain tactical and operational control of their assets.

D. Communication will occur throughout the LFO under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

E. Point of Contacts

    1. David J. Gonzalez, Port Director
       Office: (956) 487-1655
       Cell:   (956) 227-3327

    2. Imelda Recio, Assistant Port Director, Passenger/Trade Processing
       Office: (956) 487-1662
       Cell:   (956) 342-5492

    3. Hernando Cardenas, Chief CBPO, Tactical Operations
       Office: (956) 487-1663
       Cell:   (956) 371-4050

Highly Confidential/Attorneys' Eyes Only

**Appendices**

**Media Plan:**

All media inquiries will be referred to the CBP Office of Public Affairs (OPA)

  A. Hector Ramirez (RGC)  (956) 487-1650

  B. Maribel Saenz (HID)  (956) 223-6155

  C. Mucia Dovalina (LFO)  (956) 753-1703

**Air Plan:**

The Port of Rio Grande City, Texas will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

**Contacts:**

**Points of Contact:**

- OBP POC – Ryan Landrum  (956) 487-8997
- ERO POC – Jacob Castro  (956) 463-3678
- ASYLUM POC – Ashlyn/Gadson  (281) 931-2139
- Bridge POC – Sam Vale  (956) 487-5606
- Rio Grande PD POC – N. Castillo  (956) 487-8892
- DPS POC – Brent Akin  (956) 716-3600

**General Contact Information:**

- McAllen Police Department  (956) 682-4321
- Mission Police Department  (956) 584-5000
- Hidalgo County SO  (956) 383-8114
- La Joya Police Department  (956) 585-4855
- Starr County Sheriff's Office  (956) 487-5571
- OBP RGV Sector  (956) 289-4800
- OBP McAllen Station TOC  (956) 217-3827
- OBP McAllen  Station  (956) 217-3700
- OBP BORTAC Liaison  (956) 532-7872
- OBP Rio Grande City  (956) 487-1044
- Texas Department of Public Safety  (956) 716-3600
- HSI Duty Agent  (800) 973-2867
- Starr EMS  (956) 487-5561

**Government of Mexico Partners**

- CISEN                                     011-52-899-953-2200
- C4                                        011-52-899-921-8250
- CAPUFE                                    011-52-891-974-0762
- Mexican Customs (RIO & LSE) (PD)          011-52-891-974-3568
- Mexican Customs (RIO & LSE)               011-52-891-974-3551
- Mexican Immigration                       011-52-891-974-0036
- UASF                                      877-367-7710

**Medical Centers**

Starr County Memorial Hospital
1861 US 83
Rio Grande City, TX
(956) 487-5561

McAllen Medical Center
311 W Expressway 83
McAllen TX
(956) 632-4100

Rio Grande Regional
101 E Ridge Rd
McAllen TX
(956) 632-6000

Mission Regional Medical Center
900 S. Bryan
Mission TX
(956) 323-9000

Starr County Emergency Operations Center
(956) 487-5571

Edinburg Children's Hospital
1102 W Trenton
Edinburg, TX
(956) 388-6000

Doctor's Hospital Renaissance
5321 S McColl Rd
Edinburg, TX
(956) 631-4515

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011193

McAllen Heart Hospital
1900 S. D St
McAllen, TX
(956)994-2000

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011194

**Annex G**
**Port of Progreso, Texas Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I. **Situation:**

   A. During FY16 the Port of Progreso saw a dramatic increase in applicants seeking entry into the United States without lawful entry documentation.

   B. Most of the applicants are seeking asylum in the United States, are expressing a fear (Credible Fear/CF) of returning to their home country, and/or want to reunite with a parent/family member in the United States.

   C. A significant number of the applicants are other than Mexicans (OTMs).

   D. Most of the applicants are arriving as unaccompanied alien children (UACs) and family units.

   E. Due to a significant increase in apprehensions by United States Border Patrol (USBP) in the LFO area of responsibility (Del Rio, Laredo, and Rio Grande Valley Border Patrol Sectors), the delay in obtaining detention space from the Office of Refugee Resettlement (ORR) and Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO) has increased from an average of 24-48 hours, to five days or more. These delays have impacted port operations as port resources are used to conduct long term detention duties – medical escorts, security duties, personal hygiene, feeding, laundry duties, and transportation (airports, shelters, way stations, detention centers, etc.).

   F. The Port of Progreso does not have the facilities, infrastructure, equipment or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

II. **Mission:**

   A. The Port of Progreso will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

   B. The mass migration will be managed while maintaining continuity of operations (COOP).

   C. The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays. These incident management strategies are designed to facilitate CBP's ability to mitigate against, prepare for, and respond to the impact of such events under extreme circumstances.

   D. Minimize UAC and OTM time in CBP custody.

**III.    Execution:**

    A. The Port Director will:

        1. Exercise the responsibility to control the flow of people across our borders.

        2. Ensure terrorists, terrorist weapons, narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

        3. Ensure that the security of the inspection process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

        4. Ensure that bona fide applicants for admission are processed expeditiously.

        5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

        6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

    B. The Port Director will implement a phased approach to manage the mass migration.

        1. Phase I – Organic Capabilities Sustained

            i. Mass migration does not exceed the operational capabilities of the Port of Progreso.

            ii. The Port of Progreso will detain and process migrants under standard operational procedures.

        2. Phase II – Organic Capabilities Strained

            i. Mass migration exceeds the capacity of the Port of Progreso.

            ii. Port Director will coordinate with the Ports of [LE] [LE] for assistance...

            iii. Port Director will coordinate with [LE] Border Patrol station for assistance.

            iv. Port Director will activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

            v. Port Director will begin coordination with ORR, ERO, and the STC, to prepare for potential event expansion.

    vi. Port Director will establish communication with Government of Mexico (GoM) to elicit information about mass migration.

    vii. Port Director will test overflow processing work stations in anticipation of LFO jump team deployment.

3. Phase III – Organic Capabilities Exceeded

    i.   Mass migration exceeds the capacity of port facilities.

    ii. Port Director will coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

    iii. Port Director will staff the Donna International Crossings after hours for processing.

    iv. Port Director will assign local jump teams to appropriate port locations.

    v.  Port Director will initiate Secondary Processing and Detention facility at the Donna International Crossing main building.

    vi.  Port Director will coordinate with ORR and ERO for assistance with transporting aliens out of the area.

4. Encounter

    Triage / Categorizing

    i.   The Port has established pre-staging/staging wait areas

    ii. Assigned Officers will separate migrants into the following groups and processed in this order:

        a.
        b.
        c.
        d.



5. Staging

    i.   UAC and Family Units will be escorted to the Passport Control Secondary interview rooms.

    ii. Adult females, and adult males will be escorted to the Passport Control Secondary lobby.

Highly Confidential/Attorneys' Eyes Only

      iii. Migrants will be monitored at all times regardless of staging location by designated security officers/agents.

6. Initial Medical Screening

      i. Officers will canvas migrants to determine if a medical emergency/issue exists.

      ii. In the event of a medical emergency/issue, all emergency medical protocols will be initiated by CBP personnel on scene.

      iii. An improvised isolation area has been designated for migrants deemed to pose a health and safety risk (contagious disease).

7. Processing

See Administration section (IV) (C) (6) for processing capacity specifics

Approximate processing times:

      i. UAC (1)           2-4 hours

      ii. ER/CF (1)         2-4 hours

      iii. NTA/Detain (1)     2-4 hours

8. The appropriate office will be contacted upon processing completion to request placement.

C. Transportation

1. G4S will be used to the greatest extent possible

2. If G4S is unable to transport, the Port of Progreso, Texas will use organic resources

## IV. Administration:

A. The port's command center will be activated at the Port Director's discretion.

1. All reporting will be consolidated at the LFO and forwarded to appropriate higher commands.

2. Port's operational chain of command:

      i. Incident Commander      Port Director or designee

      ii. Operations Officer       Chief Officer/APD

      iii. Security Officer        Supervisor on duty

      iv. Intelligence Officer      TAU Officer/Supervisor on duty

Highly Confidential/Attorneys' Eyes Only

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

   1. CBP Officers (Series 1895)                 84

   2. CBP Canine Enforcement Officers (Series 1895)   6

   3. CBP Agriculture Specialists (Series 401)      5

C. Resource requirements will be identified and relayed to the LFO:

   1. Cost Estimates / Funding Issues

      i. Supplemental overtime funding and/or other funding issues outside normal operations will be required.

      ii. Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by port director.

      iii. Port Director will request overtime cap waivers for appropriate port personnel.

      iv. Supplemental OIT support will be required.

   2. Travel

      i. Travel and per diem expenses may be required.

      ii. Specific TDY support will be event-dependent and assessed by the port director.

   3. Lodging

      i. Lodging expenses may be required.

      ii. Specific lodging requirements will be event-dependent and assessed by the port director.

   4. Reception of Detailed Personnel

      i. Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, etc.

   5. Uniform and Equipment

      i. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

ii. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

iii. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

iv. All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

6. Alien Processing

i. All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

ii. Operational Areas:

a. Progreso Port of Entry

i. Passenger Operations: 24 hours / 7 days a week

ii. 4 available processing stations (4 inside secondary)

iii. 4 detention cells (3 wet / 1 dry) with the capacity to house 14 migrants (approximate)

iv. 1 dedicated holding room that can accommodate family unit of 4 (approximate)

v. Lobby area capacity is 25 (approximate)

b. Donna International Crossing

i. Passenger Operations: 0600 – 2200 / 7 days a week

ii. Admin Building: 7 available processing stations (3 in interview rooms / 4 at counter); 5 detention wet cells; 3 hard interview rooms with the capacity to house 20 migrants (approximate)

iii. Secondary Building: 4 available processing stations (2 in interview rooms); 2 detention wet cells and 1 dry cell with the capacity to house 12 migrants (approximate)

iv. Lobby area capacity is 30 (approximate)

AOL-DEF-00011200

7. Medical

    i. In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

    ii. All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility.

    iii. The Port Director will ensure that appropriate Personal Protective Equipment (PPE) is available.

    iv. The Port Director has made arrangements with Knapp Medical Center in Weslaco, Texas for medical triage in the event of a mass migration.

8. Detention / Transportation

    i. Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

9. Vehicles

    i. GOVs will be fueled as per existing port and field office policies.

    ii. The Port will utilize the two assigned vans for transportation related functions (13 person capacity per van).

## V. Command / Control / Communications:

A. The Port Director will designate an incident commander.

B. The Port Director will coordinate with the LFO, and the Government of Mexico (GoM) as necessary.

C. Port Director, or his/her designee, will have operational control and command authority over respective CBP components involving, organizing, and employing commands, assigning tasks, designating objectives and giving authoritative direction necessary to accomplish area objectives will maintain tactical and operational control of their assets.

D. Communication will occur throughout the LFO under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

**Appendices**

**Media Plan:**

All media inquiries will be referred to the CBP Office of Public Affairs (OPA)

      D.  Sandra Cavazos (PGR)      (956) 708-9909

      E.  Mucia Dovalina (LFO)     (956) 753-1703

**Air Plan:**

The Progreso Port of Entry will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

**Contacts:**

**Points of Contact:**

- Ursula – OIC                          (956) 632-8005
- ERO, Harlingen – OIC           (210) 389-7051
- PIDC – OIC                     (956) 547-1711
- PGR Bridge Director – Julie Ramirez    (956) 565-6361
- Donna Bridge Director – Josh Garcia    (956) 650-7967
- Donna GSA/ Manager – Amy Mendoza   (956) 252-6057
- Progreso GSA/ Manager – Rudy Sanchez  (956) 322-9967

**General Contact Information:**

- Hidalgo County SO             (956) 383-8114
- WESLACO BP                 (956) 647-8800
- WESLACO PD                 (956) 968-8591
- DONNA PD                   (956) 464-4423
- OBP RGV Sector              (956) 289-4800
- OBP Weslaco Station          (956) 968-0602
- OBP McAllen Station TOC     (956) 217-3827
- OBP McAllen Station        (956) 217-3700
- OBP BORTAC Liaison        (956) 532-7872
- OAM Liaison                 (956) 972-6350
- Texas Department of Public Safety   (956) 565-7600
- HSI Duty Agent                (800) 973-2867

**Government of Mexico Partners**

- CISEN                                                        011-521-899-101-0751
- UASIF  (Office)                                              1-877-367-7710
- Mexico Federal Police                                       011-52-899-909-0000
- Administrator, Mexico Customs, Jaime Nova      011-52-899-921-0262
                                                              011-521-552-909-1803
- Operations, Mexico Customs, Alejandro Garcia 011-52-899-921-0255
                                                              011-521-899-308-4673
- Tactical, Mexico Customs, Lucio Coronel           011-52-899-921-0223
                                                              011-521-554-331-7215
- Mexican Customs/Immigration (PGR)              011-52-899-937-0580
- Sat (PGR) – Christian Rodriguez                     011-52-899-921-0209
                                                              011-521-626-106-8247
- Federal Tolls – Nuevo Progreso (PGR)             011-52-899-937-0058

**Medical Centers**

Weslaco Knapp Medical Center
1401 E 8th St
Weslaco, TX
(956) 968-8567          (7.5 Miles)

South Texas HS ER
330 West Expressway 83
Weslaco, TX
(956) 975-2300          (9.5 miles)

Rio Grande Regional
101 E Ridge Rd
McAllen, TX
(956) 632-6000          (21.9 Miles)

McAllen Medical Center
311 W Expressway 83
McAllen, TX
(956) 632-4100          (22.8 Miles)

Harlingen Valley Baptist Medical Center
2101 Pease St
Harlingen, TX
(956) 389-1100          (24.2 Miles)

Mission Regional Medical Center
900 S. Bryan
Mission, TX

Highly Confidential/Attorneys' Eyes Only

(956) 323-9000        (27.7 Miles)

Valley Baptist Medical Center
1040 W Jefferson St
Brownsville, TX
(956) 698-5400        (34.7 Miles)

Valley Regional Medical Center
100 E Alton Gloor Blvd
Brownsville, TX
(956) 350-7000        (39.9 Miles)

Starr County Memorial Hospital
1861 US 83
Roma, TX
(956) 487-5561        (65.6 Miles)

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011204

**Annex H**
**Port of Roma, Laredo Field Office (LFO)**
**Contingency Plan Addressing Possible Mass Migration Influxes**

I. **Situation:**

    A. During FY16 the Port of Roma saw a dramatic increase in applicants seeking entry into the United States without lawful entry documentation.

    B. Most of the applicants are seeking asylum in the United States, are expressing a fear (Credible Fear/CF) of returning to their home country, and/or want to reunite with a parent/family member in the United States.

    C. A significant number of the applicants are other than Mexicans (OTMs) and Cuban nationals.

    D. Most of the applicants are arriving as unaccompanied alien children (UACs) and family units, while most Cuban arrivals are adults.

    E. Due to a significant increase in apprehensions by United States Border Patrol (USBP) in the LFO area of responsibility (Del Rio, Laredo, and Rio Grande Valley Border Patrol Sectors), the delay in obtaining detention space from the Office of Refugee Resettlement (ORR) and Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO) has increased from an average of 24-48 hours, to five days or more. These delays have impacted port operations as port resources are used to conduct long term detention duties -- medical escorts, security duties, personal hygiene, feeding, laundry duties, and transportation (airports, shelters, way stations, detention centers, etc.).

    F. The Port of Roma does not have the facilities, infrastructure, equipment or personnel necessary to accommodate a large number of arriving aliens for extended detention periods.

II. **Mission:**

    A. The Port of Roma will effectively manage a mass migration event and/or a sustained migration occurring at the port of entry.

    B. The mass migration will be managed while maintaining continuity of operations (COOP).

    C. The purpose of this plan is to mitigate the risk to life from a mass migration event, and to ensure that the borders are secured while ensuring that legitimate trade and travelers continue to cross our borders without significant delays. These incident management strategies are designed to facilitate CBP's ability to mitigate against, prepare for, and respond to the impact of such events under extreme circumstances.

    D. Minimize UAC and OTM time in CBP custody.

Highly Confidential/Attorneys' Eyes Only

### III. Execution:

A. The Port Director will:

1. Exercise the responsibility to control the flow of people across our borders.

2. Ensure terrorists, terrorist weapons, narcotics, criminal aliens, prohibited goods, and other illegal merchandise are prevented from entering the United States.

3. Ensure that the security of the inspection process is sufficient to identify frivolous or fraudulent applications for admission or discretion.

4. Ensure that bona fide applicants for admission are processed expeditiously.

5. Guarantee humane treatment of migrants and ensure due process under the Immigration and Nationality Act (INA).

6. Identify the port's detention capacities, operational thresholds, and specific trigger points requiring outside assistance.

B. The Port Director will implement a phased approach to manage the mass migration.

1. Phase I – Organic Capabilities Sustained

   i. Mass migration does not exceed the operational capability of the Roma POE.

   ii. Roma POE local protocols and SOPs will be followed and the processing of aliens will continue.

2. Phase II – Organic Capabilities Strained

   i. Mass migration exceeds the capacity of at least one port facility, as identified in port-specific annexes.

   ii. Port Director will coordinate with neighboring POEs for assistance. (‑ LE ‑ LE ‑

   iii. Port Director will coordinate with the ‑ LE ‑ USBP stations for assistance.

   iv. Port Director will activate Tactical Enforcement Officers (TEOs) and increase port's security posture.

   v. Port Director will begin coordination with ORR, ERO, and the STC, to prepare for potential event expansion.

      vi. Port Director will establish communication with Government of Mexico (GoM) to elicit information about mass migration.

      vii. Port Director will test overflow processing work stations in anticipation of LFO jump team deployment.

3. Phase III – Organic Capabilities Exceeded

      i.   Mass migration exceeds the capacity of port facilities.

      ii. Port Director will coordinate with USBP, CBP Office of Air and Marine (OAM), and other local law enforcement agencies (LEAs) to help maintain port security.

      iii. Port Director will staff the Falcon Dam POE after hours for processing.

      iv. Port Director will assign deployed jump teams to appropriate port locations.

      v.   Port Director will coordinate with ORR and ERO for assistance with transporting aliens out of the area.

4. Encounter

      i.   Staging

      ii.  Triage / Categorizing

            a.  UACs

            b.  Family Units

            c.  Adults

      iii. Initial Medical Screening

            a.  Pregnant

            b.  Communicable Diseases

            c.  Disabilities/Special Needs

5. Processing

      i.   Holding Areas:  The Roma POE currently has the capacity to stage approximately 54 persons in the passport control lobby and secondary areas (32 in the lobby, 6 in hard secondary, 12 in the conference room and 4 in the holding cells).  The Falcon Dam POE currently has the capacity to stage approximately 22 persons in the passport control lobby and secondary areas (16 in the lobby, 2 in hard secondary and 4 in the holding cells).  The training room

has been identified as an area that could potentially hold an additional 20 aliens if the proper resources are allotted.

    a. All UAC and family unit encounter will be safeguarded in the passport control interview rooms, processing area and possibly the POE's conference room in order to provide the least restrictive detention.

    b. All family units will placed in the passport control area.

    c. All other adults beginning with males will be placed in the holding cells (4 total/2 wet-2 dry)

    d. The Falcon Dam POE would follow the same protocol except that the Falcon POE has 4 wet cells.

ii. Processing Capacity

    a. The Roma POE has three interview rooms equipped with [LE] plus an additional 6 processing stations. Additional resources would need to be provided to be able to optimize the processing capacity.

    b. The Falcon POE has one processing station equipped with [LE] plus 4 other stations which can easily be utilized to process additional aliens.

iii. Processing Times: Based in the workstations available and absent any language barriers (i.e. other than English or Spanish), the Port of Roma has the capacity to process no more than 108 cases in a 24-hour period. The Port of Falcon has the capacity to process no more than 60 cases in a 24-hour period.

Note: Hard secondary CBPOs do continue servicing the soft secondary counter while processing cases requiring additional resources be assigned to the PCS area. In addition, the Falcon POE is operational for 14 hours only and would require and extensive addition of resources in order to operate 24 hours per day   Times noted below are per case and type.

    a. Cubans        1-2 hours

    b. UAC           6-8 hours

    c. ER/CF        4-5 hours

    d. NTA/Detain    6-8 hours

Highly Confidential/Attorneys' Eyes Only

6. Transportation

    i.  G4S services will be utilized to the greatest extent possible.

    ii.  In the event that G4S is unable to assist, organic resources from the Roma POE will be utilized.

## IV. Administration:

A. The port's command center will be activated at the Port Director's discretion.

    1.  All reporting will be consolidated at the LFO and forwarded to appropriate higher commands.

    2.  Roma POE's command structure

| | | |
|---|---|---|
| i. | Incident Commander | Port Director or designee |
| ii. | Operations Officer | APD/Chief SCBPO |
| iii. | Security Officer | On-duty SCBPO |
| iv. | Intelligence Officer | TAU CBPO/A-TCET |

B. To the extent possible, operations will be executed utilizing organic port resources and personnel.

    1.  CBP Officers (1895 series)      101

C. Resource requirements will be identified and relayed to the LFO:

    1.  Cost Estimates / Funding Issues

        i.  Supplemental overtime funding and/or other funding issues outside normal operations will be required.

        ii.  Specific overtime and resource requirements (food, hygiene supplies, sanitation contracts, etc.) will be event-dependent and assessed by port director.

        iii.  Port Director will request overtime cap waivers for appropriate port personnel.

        iv.  Supplemental OIT support will be required.

    2.  Travel

        i.  Travel and per diem expenses may be required.

        ii.  Specific TDY support will be event-dependent and assessed by the port director.

Highly Confidential/Attorneys' Eyes Only

3. Lodging

    i. Lodging expenses may be required.

    ii. Specific lodging requirements will be event-dependent and assessed by the port director.

4. Reception of Detailed Personnel

    i. Port Director will be responsible for receiving detailed personnel, providing operational briefing, providing work assignments, etc.

5. Uniform and Equipment

    i. All CBP personnel will wear approved uniform and will be equipped in accordance with existing protocol and policy. All specialty units will wear authorized uniforms utilized by their respective units.

    ii. CBP personnel will be required to follow all established DHS/CBP policy and guidelines. All armed CBP personnel will carry the standard issued CBP sidearm and approved intermediate force weapons and will comply with all CBP use of force policies and regulations.

    iii. Utilization of body armor and the carrying of long-arms are encouraged for officer safety.

6. Special Equipment

    i. All personnel detailed to this operation will be equipped by their duty station with CBP approved equipment.

7. Alien Processing

    i. All illegal aliens apprehended within the POEs will be processed in accordance with established procedures and at designated locations. Port Director will coordinate with the United States Attorney's Office (USAO) if prosecution is deemed necessary.

    ii. Operational Logistics

        a. Roma Port of Entry

            i. Passenger Operations: 24hours/7 days a week

            ii. 3 interview rooms with 6 additional processing stations

            iii. 4 Detention cells (2 wet/ 2 dry) with a capacity of 4 each

      iv.  1 Passport control lobby with a capacity of 32

      v.  3 Interview rooms with a capacity of 3 each (UACs)

      vi.  1 Conference room with capacity of 12

      vii.  TOTAL CAPACITY = 54

    b.  Falcon Dam Port of Entry

      i.  Passenger Operations: 14 hours/7 days a week

      ii.  1 Processing station

      iii.  4 Detention cells (4 wet) with a capacity of 1 (each)

      iv.  1 Passport control lobby with a capacity of 16

      v.  2 Interview rooms with a capacity of 3 each (UACs)

      vi.  1 Training room with a capacity of 20

      vii.  TOTAL CAPACITY = 22 (with an option of an additional 20 staged in the training room)

8. Medical

    i.  In the event of a medical emergency, all emergency medical protocols will be initiated by CBP personnel on scene.

    ii.  All medical emergencies will be transported to the nearest medical facility. Port Director will maintain an updated list of addresses, phone numbers and trauma levels of hospitals in their area of responsibility.

    iii.  Personal Protective Equipment will be made available by Port Management.

9. Detention / Transportation

    i.  Detention and transportation responsibilities will be conducted in accordance with existing CBP policy. All detained subjects will be detained and transported in relation to the category in which they were processed under. Port Director will provide detailed instructions to assigned personnel on detention and transportation policies.

10. Vehicles

    i.  GOVs will be fueled as per existing port and field office policies.

Highly Confidential/Attorneys' Eyes Only

      ii. Transports will be carried out using the designated transport van and following established policies and SOPs.

**V. Command / Control / Communications:**

A. The Port Director will designate an incident commander.

B. The Port Director will coordinate with the STC, OFO headquarters, and the Government of Mexico (GoM) as necessary.

C. Port Director, or his/her designee, will have operational control and command authority over respective CBP components involving, organizing, and employing commands, assigning tasks, designating objectives and giving authoritative direction necessary to accomplish area objectives will maintain tactical and operational control of their assets.

D. Communication will occur throughout the LFO under the purview of existing policy and capabilities. All communications will be carried out in the encrypted mode.

## Appendices

**Media Plan:**

The LFO Public Affairs Officer (PAO), in coordination with CBP Office of Public Affairs (OPA), will coordinate responses to media inquiries and other media and public messaging.

    A.  Mucia Dovalina (LFO)          (956) 753-1703

    B.  Rick Pauza (CBP)             (956) 359-5079

**Air Plan:**

The Port Director will communicate with the LFO who in turn will coordinate with local OAM branches to secure operational support such as aerial observation of the POEs and surrounding areas, aerial reconnaissance of routes of ingress, transportation of SRT, etc.

**Health and Safety Annex:**

The Port Director will ensure that the Laredo Field Office Standard Operating Procedures for Serious Communicable and Quarantinable Diseases are followed by all CBP employees.

**Phone Tree:**

- OBP RGC      Ryan Landrum      (956) 487-1044
- ERO POC      Jacob Castro      (956) 463-3678
- Asylum POC      Daniel Phillips      (281) 931-2113
- Starr County Bridge      Roy Pena      (956) 849-7371
- GSA      Lisa Langham      (956) 821-0244
- Starr County S.O.      Rene Fuentes      (956) 487-5571
- Roma P.D.      Jose H. Garcia      (956) 849-2231
- Zapata S.O.      Alonzo Lopez      (956) 765-9960
- H.S.I.      Louis Gomez      (956) 848-5244
- D.P.S.      J Simpson      (956) 565-7600

**Government of Mexico Counterparts:**

- MX Customs      Luis Almaguer      011528971059001
- MX Immigration      Onecimo Lopez      011528979720001
- CISEN      Carlos Mata      0115218677271961
- UASIF                        1-877-367-7710

**Medical Centers:**

Starr County Memorial Hospital
1861 US 83
Roma, TX            (11 Miles)
(956) 487-5561

Rio Grande Regional
101 E Ridge Rd
McAllen TX
(956) 632-6000       (53.5 Miles)

McAllen Medical Center
311 W Expressway 83
McAllen TX
(956) 632-4100       (53.5 Miles)

Mission Regional Medical Center
900 S. Bryan
Mission TX
(956) 323-9000       (48.3 Miles)

Highly Confidential/Attorneys' Eyes Only

**Annex I**
**Land Border Environment**
**Standard Operating Procedures**

**Laredo Field Office**
**Continuity of Operations Plan (COOP) Appendix**

**Function:** Serious Communicable/Quarantinable Disease Risk   **Date:** August 12, 2014
**Reviewed:** July 11, 2017

**Location:** Laredo Field Office

**Background:**

U.S. Customs and Border Protection (CBP) has received guidance from the Centers for Disease Control and Prevention (CDC) and Public Health concerning safety measures for encounters with travelers arriving at land border locations who exhibit symptoms of a serious communicable or quarantinable disease. CBP, Field Operations, is directing Field Offices and Port locations to utilize the information and guidance contained herein as Standard Operating Procedures (SOP) for encounters with land border crossers exhibiting symptoms of a serious communicable or quarantinable disease.

The SOP below is issued to reinforce CBP directives, training and musters relative to CBP land border processing, as well as encounters with and processing of individuals who may present public health threat.

**Related Directives and Memorandum of Understanding:**

- CBP Directive No. 3340-040A, Primary Processing of Travelers and Vehicles Seeking Entry to the United States at Land Ports of Entry
- CBP Directive No. 3340-030B, Secure Detention, Transport and Escort Procedures at Ports of Entry
- CBP Directive No. 5290-007A, Land Border Inspectional Safety Policy
- CBP Directive 4510-026A, Controlled Tire Deflation Directive
- Memorandum of Understanding between the Department of Health and Human Services and Homeland Security (October 2005)

**Information Sharing and Collection:**

- In accordance with Headquarters memorandum dated May 22, 2009, and titled "CBP Guidance for Processing Local Requests for Assistance or Information from the Centers for Disease Control, CBP will share information with the Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC).

- All information sharing requests will be managed in accordance with current CBP Guidance for Processing Local Requests for Assistance or Information.

**Travelers' Health and Medical Surveillance:**

- Field Office and Port locations will take note of those travelers that exhibit symptoms consistent with a serious communicable or quarantinable disease during normal processing activities (i.e., watching for Illness) based on specific CBP Headquarters guidance.

  - **Watching for Illness:**
    The recognition and reporting of overt visible signs of illness, provided in the course of routine interactions with detainees of travelers. "Watching for Illness" does not involve the eliciting of a medical history or performance of a medical exam.

  - **Active Surveillance:**
    At the CDC's request, and as specifically directed by CBP headquarters, CBP officer and Agriculture Specialists may assist in performing active surveillance. Active surveillance is to identify ill persons suspected of possible infection with, or exposure to, pandemic influenza. Active measures are risk-based, can be varied, and will depend on location and extent of the pandemic outbreak. It may consist of a number of CDC-approved and imposed methods to assess risk that peopled entering the U.S. from affected countries or regions are carrying a quarantinable disease. These measures may be implemented at heightened time of operations during a declared pandemic.

CBP officers must be vigilant while performing inspectional duties. This includes observing border crossers for signs or symptoms of public health targeted illnesses, and reviewing itineraries, public health lookouts, and information from the CDC that may indicate certain individuals and/or diseases are a potential public health threat.

- Port locations will develop/identify procedures to ensure travelers exhibiting symptoms associated with a serious communicable or quarantinable disease are not able to exit the CBP area prior to consultation with the CDC or other appropriate health authorities. In addition, all primary booths and secondary officers will have appropriate Personal Protective Equipment (PPE). N-95 Respiratory face masks, surgical masks, and latex or nitrile gloves will be available at all ports of entry. Surgical masks will be for the use by any person suspected of being infected with a serious or communicable disease identified as a potential public health threat and N-95 masks will be for CBP officers' immediate use as appropriate.

- Leather or neoprene search/work gloves should not be worn for routine document inspections due to the inherent risk of contamination to the glove surfaces. CBP officers who choose to wear gloves for added protection will wear them under a pair of nitrile or latex gloves. CBP officers will wash their hands thoroughly with soap and water or alcohol-based hand gel in accordance with CDC and CBP guidance.

- 

**<u>Encountering and Securing a Public Health Threat:</u>**

- All CBP officers who encounter and interact with ill travelers will utilize PPE commensurate with the level of risk and severity of symptoms; this should include the wearing of nitrile gloves and an N-95 mask, per CBP guidance, but may also include disposable goggles or TYVEK suits as may be required.

- In cases where CDC has prepared Traveler Alert Notices (T-HANS) or severe communicable/quarantinable disease information for dissemination, CBP personnel will provide the approved written information/guidance to arriving passengers at the primary booths or at passport control processing stations for those locations that lack a fully equipped FIS style facility.

**Passenger/Commercial Vehicle or Pedestrian:**

- CBP officers encountering individuals traveling via passenger (car, motorcycle, etc.) or commercial vehicle (truck), or pedestrian lane(s) who, during processing, display or declare obvious signs or symptoms of a serious communicable or quarantinable disease, or are a public health lookout, must take the following actions:





**Passenger Train or Bus:**

- CBP officers encountering individuals traveling via train or bus who, during processing, display or declare obvious signs or symptoms of a serious communicable or quarantinable disease, or are a public health lookout, must take the following actions:



Highly Confidential/Attorneys' Eyes Only



**<u>Refusals:</u>**

- 
- 



Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011219

**Custodial Care of Ill or Informed Persons in CBP Custody:**

- Persons encountered who are suspected of having or declare that they have a serious communicable or quarantinable disease, or who are identified as a potential public health threat, and who are also the subject of an enforcement action and CBP detention, shall be detained and monitored in accordance with CBP Directive 3340-030B, Secure Detention, Transport and Escort Procedures at Ports of Entry.

- **Individual Caution Sheet: An** Individual Caution Sheet (copy attached) will be generated and posted near the entrance to the detention cell or in the secure area for those detainees who pose a special risk or who have particular needs, e.g. diabetic requiring injections or possible suicide risk. The sheet should not be posted in an area easily viewed by the public.

- The fact that there is a person detained with an Individual Caution Sheet will be communicated to all CBP officers on site during shift change briefings/musters.

- The Individual Caution Sheet will contain, at minimum, the following information regarding the person's special risk factor(s):

    (a) Name and DOB
    (b) Medical condition - requires prescribed medication
    (c) Hostile or uncooperative
    (d) Depression or suicidal
    (e) Asylum Claimant
    (f) Juvenile
    (g) Communicable Disease
    (h) Other

- The sheet will be maintained until the person is no longer in CBP custody.

- The Individual Caution Sheet must accompany an alien transferred to a formal detention center. After the person is released or transferred to another agency or facility, a copy of the Individual Caution Sheet will be retained locally for two years and three months, (see CBP Directive 3340-030B, Secure Detention, Transport and Escort Procedures at Ports of Entry.

- **Medical Monitoring: An** Individual Caution Sheet will be generated whenever a CBP officer suspects or receives information that a traveler detained for an independent law enforcement reason may have a serious communicable or quarantinable disease identified as a public health threat (such as TB, Severe Acute Respiratory Syndrome **(SARS),** Avian Influenza or H1N1 Influenza).

    o All persons placed in a secure area at a CBP facility will be asked whether they have a medical problem or condition that may require some attention. If they are currently taking any prescribed medications the CBP officers will attempt to identify the type of prescribed medication, when it was last taken, and when the next dosage is needed.

- *An individual in CBP custody arrived from Mexico with prescription medication in his/her possession.* CBP officers shall not administer the medication without consulting with a health care provider in the U.S.

- *An individual in CBP custody is prescribed medication by a health care provider in the U.S.* Accordingly, in this case, we believe it is permissible for the Agency to administer the medication. The medicine is to be administered at a level no lower than a second-line supervisor.

  o Administration of prescribed medication, medical assistance, or refusal of the same, will be noted on the Individual Caution Sheet.

**Medical Emergencies – Arrival by Land:**

- All declared or apparent medical emergencies arriving at a port of entry, or other location where inspectional services are provided, shall be treated as a bona fide emergency unless refuted by evidence to the contrary.

- Persons seeking admission into the United States with a medical emergency will only be delayed for such time as to validate their claim of an emergency, ascertain their intended destination, obtain a declaration of citizenship and their immigration status (visitor, LPR, student visa, etc.).

- When arriving via private vehicle, in most cases, the prudent action will be to summon Emergency Medical Services (EMS) providers to the Port of Entry location and begin to render aid and assistance as may be required. Any remaining inspectional requirements for those persons proceeding inland via ambulance will be accomplished after the medical emergency has been resolved, which may include escort to a medical facility in the United States. CBP employees must exercise sound judgment and remain professional when handling such emergencies.

- CBP officers are reminded their personal health and safety, and that of the traveling public around them, is of paramount importance. CBP officers encountering declared emergencies in private or commercial vehicles or pedestrian traffic will notify, telephonically or via portable radio, a shift supervisor regarding the location and nature of the emergency. This will include any subsequent action initiated or requested such as the rendering of first aid care, the wearing of PPE, and the notification of local emergency services, via 9 1 1, where applicable.

**Cross-Border Ambulance Processing Procedures – Land Border Ports of Entry:**

- In an effort to standardize operating procedures, the steps below will be taken to ensure the effective processing of ambulance traffic.

- Ports must meet with and provide local EMS Ambulance companies a copy of this specific section dealing with Cross Border Ambulance Processing procedures ONLY, as well as, the telephone numbers to land border bridge authorities and the respective CBP port of entry.

- Whenever it is anticipated that an ambulance will be crossing the border from Canada or Mexico, the ambulance company's dispatch should expeditiously telephone the respective bridge or port authority and/or CBP office, and provide the following information:

    (a) Ambulance starting point and final destination.
    (b) Number of ambulance crew on board.
    (c) Patients name, citizenship, date of birth, country of residence and current status in Canada or Mexico.
    (d) Nature of the transport process (e.g. hospital to hospital transport, accident victim, possible treatment/quarantine for a serious communicable or quarantinable illness).
    (e) Priority of Response (routine or urgent).
    (f) Estimated time of arrival at the border.

- The ambulance dispatch center may receive specific direction from CBP or the bridge authority as to what traffic lane or booth to use.

- The ambulance vehicle operator will make every attempt to follow these directions to the best of their ability. In all cases, the ambulance staff will follow the procedures as outlined below:

    (a) Under no circumstances will any ambulance or staff member fail to stop at CBP inspectional lanes.
    (b) All ambulance auditory warning devices will be switched off prior to entering the primary inspection lane.
    (c) The driver of the ambulance will come to a full stop to inform the inspecting CBP officer of their destination and patient information.
    (d) Ambulances engaged in routine transport (non-emergency cases), where the staff and patient are able to communicate verbally with inspecting CBP officers without compromising the medical care of the patient, will stop and complete CBP's primary inspectional process.
    (e) If the CBP officer does not observe any abnormalities or receive conflicting information, the ambulance will be allowed to proceed inland or to secondary to transfer the patient to a U.S. based EMS ambulance.
    (f) If questions or concerns regarding citizenship or legal status arise during a medical emergency, the ambulance will be allowed to proceed and CBP officers will follow the ambulance to the medical care facility for completion of any remaining border inspectional requirements.

(g) If the intended medical facility is changed en-route, but after release from the land port of entry, the ambulance dispatch center must telephone CBP immediately to provide the change of destination.

**Transportation:**

- In the event a symptomatic traveler is directed by the CDC to be transported to a medical facility for further testing and/or evaluation, local EMS will be contacted to transport the individual@) to the medical facility. CBP port managers will coordinate transportation with CDC and EMS officials to identify transportation needs and transportation safety guidance for CBP Officers that may be required to assist with the transport of a symptomatic passenger.

- If it is determined that an alien must be transported to a medical facility or other designated quarantine facility for further examination or isolation before a determination of admissibility can be made, CBP, wherever practicable, may parole the traveler into the United States on a temporary basis for medical treatment.

**Employee Health and Worker Protection and Countermeasures:**

- An IOIL will be created for all encounters with a public health threat.

- CBP management personnel will document all CBP personnel who have been exposed to a suspected public health threat utilizing a CA-2.

- If a CBP employee is exposed to a potentially contagious border crosser, CDC personnel will be provided with CBP Supervisory contact names and telephone numbers so that CDC may advise them appropriately.

- Supervisors (Managers, Management) should inform an employee of any instance in which a traveler whom the employee has cleared is confirmed to have a known serious communicable or quarantinable disease. Supervisors (Managers, Management) should tell the employee that there is a chance he/she has been exposed to a serious communicable or quarantinable disease and should recommend that the employee obtain an evaluation of his/her health status from a medical professional.

**CBP Internal Reporting Requirements**

- In all cases when CBP encounters an ill traveler or multiple travelers, the duty Supervisor will follow the port chain of command protocols until the Director, Field Operations and appropriate Field Office staff is notified as soon as possible. The duty Supervisor will also provide updates as appropriate.

- Directors, Field Operations will ensure that notification is provided as soon as possible to the Assistant the Assistant Commissioner, Field Operations of the situation along with providing appropriate updated information until the situation is resolved.

- The duty Supervisor will report to the Commissioner's Situation Room in accordance with CBP Directive 3340-025C Commissioner's Situation Room Reporting.

**Media Inquiries:**

- All media requests for information/interviews will be coordinated in advance through the Field Office Public Affairs Officer to ensure the most current public affairs guidance is utilized.

- Field Office Public Affairs Officers will disseminate, as appropriate, the most current Public Affairs Guidance issued by CBP Headquarters.

**Use of Force:**

- As in all other enforcement circumstances, CBPOs are authorized to employ reasonable and necessary force commensurate with the circumstances presented. CBPOs must follow existing policy on the use of force continuum. To help avoid use of force situations, it is recommended that CBPOs focus efforts on gaining cooperation and consent from individuals who demonstrate signs and symptoms of infection, or who provide information that may suggest potential infection.

- CBPOs should be advised that individuals who are infected with a serious communicable or quarantinable disease and who do not consent, who are uncooperative, or who attempt to flee an area in contravention of a CBP request or direction to move to another area for further inquiry and/or examination, are not deemed to pose an imminent threat of death or serious bodily injury to employees or others, and such actions do not justify the use of deadly force under current DHS and CBP guidelines and policies.

Highly Confidential/Attorneys' Eyes Only

**Annex J**
**Temporary Holding Cell Capacities**

### TEMPORARY HOLDING CELL CAPACITY
### BROWNSVILLE POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Total Capacity |
|---|---|---|---|---|
| GATEWAY | 2 | 8 | 7 | 15 |
| B&M | 2 | 10 | 10 | 20 |
| VETERANS | 2 | 8 | 7 | 15 |
| LOS INDIOS | 2 | 10 | 9 | 19 |
| **TOTALS:** | **8** | **36** | **33** | **69** |

| Location | Cell in Secondary Area | | Cell Capacity | | | Total Capacity | |
|---|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian (1) | Pedestrian (2) | Vehicle | Pedestrian | Vehicle |
| GATEWAY | 2 | 1 | 5 | 6 | 7 | 11 | 7 |
| B&M | 2 | 1 | 6 | 7 | 3 | 13 | 3 |
| VETERANS | 2 | 1 | 6 | 6 | 2 | 12 | 2 |
| LOS INDIOS | 2 | 1 | 6 | 9 | 5 | 15 | 5 |
| **TOTALS:** | **8** | **4** | **23** | **28** | **17** | **51** | **17** |

| | |
|---|---|
| **Grand Total of Cells:** | **20** |
| **Grand Total of Temporary Detention Capacity:** | **137** |

### TEMPORARY HOLDING CELL CAPACITY
### DEL RIO POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Total Capacity |
|---|---|---|---|---|
| DEL RIO | 8 | 22 | 12 | 34 |
| ADT | 2 | 4 | 4 | 8 |
| CARGO | 1 | 3 | 0 | 3 |
| HEADHOUSE | 1 | 4 | 4 | 4 |
| **TOTALS:** | **12** | **33** | **20** | **49** |

| Location | Cell in Secondary Area | | Cell Capacity | | | Total Capacity | |
|---|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian (1) | Pedestrian (2) | Vehicle | Pedestrian | Vehicle |
| DEL RIO | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ADT | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARGO | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HEADHOUSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTALS:** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

| | |
|---|---|
| **Grand Total of Cells:** | **12** |
| **Grand Total of Temporary Detention Capacity:** | **49** |

Highly Confidential/Attorneys' Eyes Only

## TEMPORARY HOLDING CELL CAPACITY
### EAGLE PASS POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Total Capacity |
|---|---|---|---|---|
| Eagle Pass Intl. | 1 | 2 | | 2 |
| Camino Real | 2 | 4 | 4 | 8 |
| **TOTALS:** | **3** | **6** | **4** | **10** |

| Location | Cell in Secondary Area | | Cell Capacity | | | Total Capacity | |
|---|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian | Vehicle (1) | Vehicle (2) | Pedestrian | Vehicle |
| Eagle Pass Intl. | | 2 | | 1 | 1 | | 2 |
| Camino Real | | 2 | | 1 | 1 | | 2 |
| Railroad | | 1 | | 2 | | | 2 |
| **TOTALS:** | **0** | **5** | **0** | **4** | **2** | **0** | **6** |

| | |
|---|---|
| **Grand Total of Cells:** | **8** |
| **Grand Total of Temporary Detention Capacity:** | **16** |

## TEMPORARY HOLDING CELL CAPACITY
### LAREDO POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Total Capacity |
|---|---|---|---|---|
| Gateway to the Americas | 2 | 6 | 6 | 12 |
| Colombia | 2 | 6 | 6 | 12 |
| **TOTALS:** | **4** | **12** | **12** | **24** |

| Location | Cell in Secondary Area | | Cell Capacity | | Total Capacity | |
|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian | Vehicle | Pedestrian | Vehicle |
| Lincoln Juarez | 0 | 2 | 0 | 12 | 0 | 12 |
| Colombia(Cargo) | 0 | 2 | 0 | 12 | 0 | 12 |
| World Trade | 2 | 2 | 12 | 12 | 12 | 12 |
| Airport | 0 | 2 | 0 | 12 | 0 | 12 |
| Railroad | 0 | 1 | 0 | 6 | 0 | 6 |
| **TOTALS:** | **2** | **9** | **12** | **54** | **12** | **54** |

| | |
|---|---|
| **Grand Total of Cells:** | **15** |
| **Grand Total of Temporary Detention Capacity:** | **90** |

## TEMPORARY HOLDING CELL CAPACITY
### HIDALGO POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Total Capacity |
|---|---|---|---|---|
| HIDALGO | 2 | 6 | 6 | 12 |
| PHAR | 2 | 6 | 6 | 12 |
| ANZALDUAS | 2 | 6 | 6 | 12 |
| TOTALS: | 6 | 18 | 18 | 36 |

| Location | Cell in Secondary Area | | Cell Capacity | | | Total Capacity | |
|---|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian | Vehicle (1) | Vehicle (2) | Pedestrian | Vehicle |
| HIDALGO | 0 | 2 | 0 | 6 | 6 | 0 | 12 |
| PHAR | 0 | 1 | 0 | 6 | 0 | 0 | 6 |
| ANZALDUAS | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTALS: | 0 | 3 | 0 | 12 | 6 | 0 | 18 |

| | |
|---|---|
| Grand Total of Cells: | 9 |
| Grand Total of Temporary Detention Capacity: | 54 |

## TEMPORARY HOLDING CELL CAPACITY
### RIO GRANDE CITY/LOS EBANOS POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Total Capacity |
|---|---|---|---|---|
| RGC POE | 2 | 8 | 6 | 14 |
| LOS EBANOS | 2 | 6 | 6 | 12 |
| | | | | |
| | | | | |
| TOTALS: | 4 | 14 | 12 | 26 |

| Location | Cell in Secondary Area | | Cell Capacity | | | Total Capacity | |
|---|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian (1) | Pedestrian (2) | Vehicle | Pedestrian | Vehicle |
| RGC POE OUTBOUND | 0 | 1 | 0 | 0 | 4 | 0 | 4 |
| LOS EBANOS | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| | | | | | | | |
| TOTALS: | 0 | 1 | 0 | 0 | 4 | 0 | 4 |

| | |
|---|---|
| Grand Total of Cells: | 5 |
| Grand Total of Temporary Detention Capacity: | 30 |

Highly Confidential/Attorneys' Eyes Only

AOL-DEF-00011227

## TEMPORARY HOLDING CELL CAPACITY
### PROGRESO POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Cell (3) Capacity | Cell (4) Capacity | Cell (5) Capacity | Total Capacity |
|---|---|---|---|---|---|---|---|
| Progreso | 2 | 8 | 6 | | | | 14 |
| Donna | 5 | 4 | 4 | 4 | 4 | 4 | 20 |
| TOTALS: | 7 | 12 | 10 | 4 | 4 | 4 | 34 |

| Location | Cell in Secondary Area | | Cell Capacity | | | | Total Capacity | |
|---|---|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian | Vehicle (1) | Vehicle (2) | Vehicle (3) | Pedestrian | Vehicle |
| Progreso | 2 | | 6 | | | | 6 | |
| Donna | | 5 | | 4 | 4 | 4 | | 12 |
| TOTALS: | 2 | 5 | 6 | 4 | 4 | 4 | 6 | 12 |

| | |
|---|---|
| Grand Total of Cells: | 12 |
| Grand Total of Temporary Detention Capacity: | 52 |

## TEMPORARY HOLDING CELL CAPACITY
### Roma POE

| Location | Cell in Admissibility Processing Area | Cell (1) Capacity | Cell (2) Capacity | Total Capacity |
|---|---|---|---|---|
| Roma | 2 | 4 | 4 | 8 |
| Falcon Dam | 2 | 4 | 4 | 8 |
| TOTALS: | 4 | 8 | 8 | 16 |

| Location | Cell in Secondary Area | | Cell Capacity | | Total Capacity | |
|---|---|---|---|---|---|---|
| | Pedestrian | Vehicle | Pedestrian | Vehicle (1) | Vehicle (2) | Vehicle |
| Roma | 0 | 2 | 0 | 4 | 4 | 4 |
| Falcon Dam | 0 | 2 | 0 | 4 | 4 | 4 |
| | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTALS: | 0 | 4 | 0 | 8 | 8 | 8 |

| | |
|---|---|
| Grand Total of Cells: | 8 |
| Grand Total of Temporary Detention Capacity: | 32 |

AOL-DEF-00011228

## Annex K
## UAC Statistics

### Unaccompanied Alien Children



| | Brownsville | Del Rio | Eagle Pass | Hidalgo | Laredo | Progreso | Rio Grande City | Roma | Laredo Field Office |
|---|---|---|---|---|---|---|---|---|---|
| FY 11 | 70 | 9 | 25 | 60 | 99 | 10 | 2 | 5 | 280 |
| FY 12 | 111 | 7 | 25 | 102 | 163 | 15 | 14 | 6 | 443 |
| FY 13 | 114 | 12 | 32 | 214 | 301 | 12 | 1 | 7 | 698 |
| FY 14 | 293 | 3 | 129 | 285 | 506 | 9 | 12 | 20 | 1257 |
| FY 15 | 124 | 18 | 78 | 236 | 206 | 9 | 9 | 17 | 691 |
| FY 16 | 308 | 15 | 130 | 2224 | 375 | 24 | 7 | 97 | 3180 |

Highly Confidential/Attorneys' Eyes Only

**Annex L**
**ERCF Statistics**
**Expedited Removal with Credible Fear**

| | Brownsville | Del Rio | Eagle Pass | Hidalgo | Laredo | Progreso | Rio Grande City | Roma | Laredo Field Office |
|---|---|---|---|---|---|---|---|---|---|
| FY 11 | 64 | 10 | 10 | 305 | 46 | 0 | 1 | 20 | 456 |
| FY 12 | 123 | 8 | 9 | 328 | 46 | 5 | 2 | 14 | 535 |
| FY 13 | 294 | 19 | 27 | 544 | 237 | 4 | 0 | 38 | 1163 |
| FY 14 | 1410 | 10 | 145 | 937 | 595 | 43 | 23 | 100 | 3261 |
| FY 15 | 625 | 17 | 210 | 1059 | 456 | 107 | 9 | 55 | 2738 |
| FY 16 | 1350 | 43 | 445 | 3459 | 861 | 71 | 38 | 252 | 6519 |

Highly Confidential/Attorneys' Eyes Only

ER 00965

**Annex M**
**Laredo Field Office International Crossings (Types and Hours of Operation)**

| Port | Office / Crossing | Crossing Type | Days of Operation | Hours of Operation |
|------|-------------------|---------------|-------------------|--------------------|
| Brownsville | Port of Brownsville | Port Office | Monday - Friday | 0800 - 1600 |
| | Gateway Bridge | Land | 7 Days a Week | 24 x 7 |
| | Brownsville & Matamoros Bridge | Land | 7 Days a Week | 24 x 7 |
| | Los Indios International Bridge | Land | 7 Days a Week | 0600 - 2400 |
| | Veterans International Bridge | Land | 7 Days a Week | 0600 - 2400 |
| | Brownsville Seaport | Seaport | Monday - Friday | 0800 - 1600 |
| | South Padre Island International Airport | Airport | 7 Days a Week | 0600 - 2200 |
| | West Rail Bridge | Rail | 7 Days a Week | Mon-Sat: 0800 - 2200 Sun: 0800 - 1600 |
| Del Rio | Port of Del Rio | Port Office | Monday - Friday | 0800 - 1600 |
| | Del Rio International Airport | Airport | 7 Days a Week | As Needed |
| | Del Rio International Bridge | Land | 7 Days a Week | 24 x 7 |
| | Lake Amistad Dam | Land | 7 Days a Week | 1000 - 1800 |
| Eagle Pass | Port of Eagle Pass | Port Office | Monday - Friday | 0800 - 1600 |
| | Camino Real International Bridge | Land | 7 Days a Week | 24 x 7 |
| | Union Pacific International Bridge | Rail | 7 Days a Week | 24 x 7 |
| | Eagle Pass International Bridge I | Land | 7 Days a Week | 0700 - 2300 |
| | Maverick Memorial International Airport | Airport | As Needed | As Needed |
| Laredo | Port of Laredo | Port Office | Monday - Friday | 0800 - 1700 |
| | Juarez-Lincoln International Bridge | Land | 7 Days a Week | 24 x 7 |
| | Gateway to the Americas Bridge | Land | 7 Days a Week | 24 x 7 |
| | KCS International Railroad Bridge | Rail | 7 Days a Week | 24 x 7 |

Highly Confidential/Attorneys' Eyes Only

ER 00966

| Port | Office / Crossing | Crossing Type | Days of Operation | Hours of Operation |
|------|-------------------|---------------|-------------------|--------------------|
| | Colombia Solidarity Bridge | Land | 7 Days a Week | Pax: 0800 - 2400<br>Cargo:<br>M-F: 0800 - 2400<br>Sat: 0800 - 1600<br>Sun: 1000 - 1400 |
| | World Trade Bridge | Land | 7 Days a Week | M-F: 0700 - 2400<br>Sat: 0800 - 1600<br>Sun: 1000 - 1400 |
| | Laredo International Airport | Airport | 7 Days a Week | 24 x 7 |
| Hidalgo | Port of Hidalgo | Port Office | Monday - Friday | 0800 - 1630 |
| | Anzalduas International Bridge | Land | 7 Days a Week | 0600 - 2200 |
| | Hidalgo International Bridge | Land | 7 Days a Week | 24 x 7 |
| | Pharr International Bridge | Land | 7 Days a Week | 0600 - 2400 |
| | McAllen-Miller International Airport | Airport | 7 Days a Week | 0800 - 2400 |
| | Edinburg User Fee Airport | Airport | Monday - Friday | 0800 - 1600 |
| Progreso | Port of Progreso | Port Office | Monday - Friday | 0800 - 1630 |
| | Donna International Bridge | Land | 7 Days a Week | 0600 - 2200 |
| | Progreso International Bridge | Land | 7 Days a Week | 24 x 7 |
| | Valley User Fee Airport | Airport | Monday - Friday | 0600 - 2200 |
| | Weslaco/Mid Valley Landing Rights Airport | Airport | Monday  - Saturday | 0800 - 1700 |
| Roma | Port of Roma | Port Office | Monday - Friday | 0800 - 1630 |
| | Falcon Lake Dam | Land | 7 Days a Week | 0700 - 2100 |
| | Roma International Bridge | Land | 7 Days a Week | 24 x 7 |
| Rio Grande City | Port of Rio Grande City | Port Office | Monday - Friday | 0800 - 1630 |
| | Rio Grande City International Bridge | Land | 7 Days a Week | 0700 - 2400 |
| | Los Ebanos Ferry Crossing | Ferry | 7 Days a Week | 0800 - 1600 |

Highly Confidential/Attorneys' Eyes Only

ER 00967

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 19-56417

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Volume 4 of Supplemental Excerpts of Record, containing (a) Appellees' Unredacted Preliminary Injunction Reply with exhibits 1-6; and (b) Appellees' Unredacted Preliminary Injunction Opening Brief, with exhibits 41-43.

**Signature** | s/Ori Lev | **Date** | December 23, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*