No. 19-56417

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

AL OTRO LADO, INC., *et al.*,
*Appellees*,

v.

CHAD WOLF, Acting Secretary of Homeland Security, *et al.*,
*Appellants*.

———————————

APPEAL FROM DECISION OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA
No. 17-cv-02366-BAS-KSC

———————————

## APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD IN
## SUPPORT OF OPPOSITION TO MOTION FOR STAY PENDING
## APPEAL

## VOLUME 5
## PROVISIONALLY FILED UNDER SEAL

Melissa Crow
SOUTHERN POVERTY LAW CENTER
1101 17th Street, N.W., Suite 705
Washington, DC 20036
(202) 355-4471

Baher Azmy
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Matthew H. Marmolejo
Mayer Brown LLP
350 S. Grand St., 25th Floor
Los Angeles, CA 90071
(213) 621-9483

Ori Lev
Stephen M. Medlock
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3270

Sarah Rich
Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
(404)-521-6700

Karolina Walters
AMERICAN IMMIGRATION COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005
(202) 507-7523

*Counsel for Appellees*

## TABLE OF CONTENTS

**Page**

Expert Report of Stephanie Leutert (Dec. 10, 2019)  ER 968

Transcript of Deposition of Todd Owen (Dec. 13, 2019)  ER 1090

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | |
| Chad Wolf, *et al.*, | |
| Defendants. | |

**EXPERT REPORT OF STEPHANIE LEUTERT**

1

## I.     Introduction and Qualifications

1.     My name is Stephanie Leutert. I am the Director of the Central America & Mexico Policy Initiative ("CAMPI") at the Strauss Center for International Security and Law at the University of Texas. In this role, I lead the development and programming for CAMPI and conduct original research on the U.S.-Mexico border and Central American migration.

2.     I previously submitted declarations in connection with the Plaintiffs' September 26, 2019 motions for provisional class certification and preliminary injunction.[1]

3.     I am an expert on the practices of U.S. Customs and Border Protection ("CBP") officers and supervisors with respect to arriving asylum seekers at ports of entry ("POEs") on the U.S.-Mexico border from 2016 to the present. I am the lead author of the first-ever border-wide report on the U.S. Customs and Border Protection's ("CBP's") metering policy and the related asylum waitlists in Mexican border cities.

4.     I have also led the publication of four subsequent metering updates that document CBP's practices and the conditions faced by asylum seekers waiting in Mexican border cities.

---

[1] ECF Nos. 293-8, 294-5.

5.     In addition to this work, I teach a graduate level course on Mexico's migration policy at the Lyndon B. Johnson School of Public Affairs at the University of Texas.

6.     Through my work at CAMPI, I have directly observed CBP's implementation of its turn-back policy at ports of entry ("POEs") on the U.S.-Mexico border. Since October 2018, I have personally conducted fieldwork in eight Mexican border cities[2] where asylum seekers affected by CBP's metering policy are forced to wait. In these cities, I have spoken directly with affected asylum seekers, along with migrant shelter staff, members of civil society organizations, and Mexican federal and local government officials. I have interviewed affected asylum seekers who were waiting on international bridges, affected asylum seekers who were sleeping in encampments near the international bridges, and affected asylum seekers waiting in migrant shelters. I have watched firsthand as asylum seekers arrived at the United States - Mexico international line and were turned back by CBP officers. I have seen copies of asylum waitlists in six Mexican border cities[3] and

---

[2] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Nogales, Sonora.

[3] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Ciudad Juárez, Chihuahua.

3

have spoken to eight individuals in charge of running these lists.[4] I have also partnered with colleagues who conducted similar fieldwork in five additional Mexican border cities.[5]

7.      A copy of my current curriculum vitae, which includes a list of all publications that I have authored in the prior 10 years, is attached as **Exhibit A** to this report.

8.      My typical consulting rate is $300 an hour. I have elected to waive that fee in this case and will receive no compensation for my work in this litigation.

9.      I understand from Plaintiffs' counsel that I have been retained to offer opinions on issues related to class certification in this litigation. This report contains a complete statement of all of my opinions related to class certification and reasons for them. It also contains all of the exhibits that will be used to summarize or support those opinions. I understand that some depositions and document productions will occur after my report is submitted.  I reserve the right to amend and revise this report and the exhibits to it if I should be made aware of information relevant to my

---

[4] These list managers were in the cities of Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; and Ciudad Acuña, Coahuila (two list managers: individuals and families).

[5] Those cities are Ciudad Juárez, Chihuahua; Agua Prieta, Sonora; San Luís Rio Coloardo, Sonora; Mexicali, Baja California; and Tijuana, Baja California.

opinions.[6]

## II.    Materials Considered

10.    I considered the following facts and data when forming the opinions expressed in this report.

11.    Since December 2018, CAMPI has published regular reports on CBP's metering practices and the conditions for asylum seekers in Mexican border cities (the "Reports"). These reports include: (a) *Asylum Processing and Waitlists at the U.S.-Mexico Border* (December 2018), (b) *Metering Update* (February 2019), (c) *Metering Update* (May 2019), (d) *Metering Update* (August 2019), (e) *Metering Update* (November 2019).

12.    The Reports are based on information that I, other members of CAMPI, and colleagues from the University of California San Diego and the Migration Policy Centre, have collected directly from field and phone interviews and direct observation on visits to Mexican border cities. These Reports are cited throughout this report.

13.    This expert report also references documents produced by the defendants in this litigation during discovery.[7] I considered over 1,500 documents

---

[6] This is the only case in which I have testified in the previous four years as an expert at trial or by deposition.

[7] I understand from plaintiffs' counsel that the current defendants in this litigation

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that were produced by the defendants in this litigation when forming my opinions in this case. These documents were provided to me at my request by Plaintiffs' counsel. Plaintiffs' counsel did not refuse to produce any documents or data that I requested.

14.     In particular, to form the opinions expressed in this report and the reasons for them, I considered CBP's Southwest Border Daily Operations Reports, Migrant Action Crisis Team ("MCAT") Daily Reports, Queue Management Reports, and Admissibility Reports from CBP's San Diego Field Office. All of these documents provided information regarding the number of individuals being held in CBP custody at POEs. The MCAT Daily Reports and the Queue Management Reports also documented the available capacity at each port of entry.[8]

15.     Additionally, I considered CBP's Mass Migration Contingency Plans for the Laredo and San Diego Field Offices, CBP emails regarding port of entry capacity and its metering policy, and other internal CBP memos.

16.     When forming the opinions and analysis disclosed in this report, I also

---

are Chad Wolf, Acting Secretary of Homeland Security; Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection; and Todd C. Owen, Executive Assistant Commissioner of the Office of Field Operations of U.S. Customs and Border Protection.

[8] There were inconsistencies across the data, with different numbers being reported for the same day across the MCAT Daily Reports and the Queue Management Reports. However, both sources reported similar overall port capacity numbers and followed the same general trends. Given these differences, each type of material was treated separately and there were no efforts to combine them.

6

considered the transcripts of depositions of CBP officers and officials that have been taken in this litigation. I understand from Plaintiffs' counsel that one deposition has been taken by Plaintiffs thus far in this litigation.

17.     When forming the opinions expressed in this report, I also considered various open-source materials, including newspaper articles, reports from non-governmental organizations, and published legal documents. I did not accept the truth of these documents uncritically.  Rather, I used my experience and observations on the ground to determine whether these open source materials were accurate.

18.     Finally, when forming the opinions in this report and the reasons for them, I relied upon my direct observation of how the turn back policy is implemented at the U.S.-Mexico border.

## III.    Methodology

19.     This expert report builds on fieldwork and research that I have conducted across the U.S.-Mexico border, both alone and in close collaboration with other researchers who also document turn-backs at POEs on the U.S.-Mexico border. During this fieldwork, I engaged in original data collection and relied on semi-structured interviews, observations, and a review of primary source materials. The opinions expressed in this report draw on recognized standards from the disciplines of political science and public policy. The findings from this fieldwork have been recognized and used in official publications by Mexico's Secretary of Foreign

7

Relations and the Inter-American Human Rights Commission.

20.     Specifically, the opinions listed in this report are based on the following methods and techniques. First, I received questions from Plaintiffs' counsel that I was told to address. Second, I formed preliminary opinions regarding these questions based on my published fieldworks and research. Third, I analyzed documents and data produced in this litigation, depositions, and open source materials from the time period 2016 to the present to confirm the accuracy of my preliminary opinions.

21.     In the course of forming my opinions, I analyzed MCAT Daily Reports and Queue Management Reports produced by the defendants in this case. These reports include daily custody and capacity numbers, which I compiled into an excel spreadsheet for further analysis. The results from this analysis are included in the report and in the Appendix to this report.[9]

## IV.   Summary of Opinions

22.     Plaintiffs' counsel have asked me to address whether, between 2016 and the present, the United States government engaged in a systemic practice of denying non-citizens access to the asylum process at ports of entry on the U.S.-Mexico border.[10]

---

[9] I also understand that a copy of the work papers that I used to complete these analyses will be turned over to the defendants along with this report.

[10] I have only been asked to opine on turn-backs as described in Second Amended

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

23.     Based on my analysis to date, I have reached the following opinions:

a.     Beginning in 2016, U.S. Customs and Border Protection ("CBP") adopted a policy and practice of turning back asylum seekers that were arriving at ports of entry on the U.S.-Mexico border. Initially, turn-backs occurred at the San Ysidro port of entry, amid an increase in the number of Haitian and other asylum seekers.

b.     Between 2016 and April 2018, turn-backs were observed at numerous ports of entry on the U.S.-Mexico border, including in San Ysidro, Tecate, El Paso, Eagle Pass, Laredo, McAllen, and Brownsville.

c.     On April 27, 2018, CBP adopted a written "metering" policy that was distributed to all ports of entry on the U.S.-Mexico border. This policy states that the four directors of field operations on the U.S.-Mexico border may decide to meter the flow of asylum seekers processed and inspected at ports of entry on the U.S.-Mexico border. When engaging in metering, CBP officers were instructed to "inform the travelers that processing at the port of entry [was] currently at capacity and CBP is permitting travelers to enter the

_____

Complaint. I offer no opinion on other U.S. government policies toward asylum seekers, such as the Migrant Protection Protocols or the regulations purporting to ban asylum for those who entered the United States without inspection or transited through a third country en route to the United States.

9

port once there is sufficient space and resources to process them."[11] This policy was disseminated to CBP officers at POEs via written and oral musters and standard operating procedures.[12]

d.      Since April 27, 2018, all ports of entry on the U.S.-Mexico border that accept pedestrian traffic have engaged in turn-backs or metering. This turn back policy has three prongs. First, the U.S. government has encouraged asylum seekers to arrive at POEs on the U.S.-Mexico border instead of entering the United States without inspection between POEs. Second, some smaller POEs redirected asylum seekers to larger POEs despite the fact that these smaller POEs were able to process and inspect asylum seekers. Third, larger POEs engaged in metering—i.e., turning arriving asylum seekers back to Mexico citing capacity constraints.

e.      I understand from prior filings in this case that the defendants argue that there may be "legitimate factors" that caused CBP to engage in turn-backs.[13]  More specifically, the defendants argue that the capacity of a POE is not knowable because it varies on a day-to-day basis based on several

---

[11] ECF No. 283-1 (hereinafter, "Metering Policy").

[12] Gibbons, Deposition, November 21, 2019.

[13] ECF No. 308 at 19.

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

factors.[14] Due to these factors, defendants assert that there is no common method for determining whether the capacity utilization of a port of entry justified turning asylum seekers back to Mexico.[15] This is not the case.

f.     Tracking the capacity utilization and daily capacities of POEs was operationally important to CBP.[16] In daily MCAT and Queue Management reports, CBP tracked factors including the capacity utilization of POEs, whether the number of arriving asylum seekers was affecting port operations, and how many people were waiting to be processed at the port. Compiling and analyzing these reports provides a common method for analyzing whether the capacity of a POE might justify turning back asylum seekers.[17]

g.     Furthermore, ports of entry and CBP field offices create contingency plans that explain in detail how POEs can temporarily increase their capacity in response to an increased number of asylum seekers.

---

[14] Ibid.

[15] Ibid.

[16] Gibbons, Deposition, November 21, 2019.

[17] I understand from Plaintiffs' counsel that they argue that every turn-back of an asylum seeker at a port of entry on the U.S.-Mexico border is illegal regardless of whether it is justified by the capacity utilization of a port of entry. I express no opinion on this legal theory.

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Comparing these contingency plans to the actual operation of POEs documented in MCAT and Queue Management reports offers a common method for determining whether POEs utilized the capacity available to them under these contingency plans when faced with increased migration numbers.

h. When analyzed using this common methodology, the defendants' justifications of capacity are less convincing. From 2016 to 2019, most ports of entry consistently reported that they were below capacity. Further still, some ports of entry reported being consistently below 50 percent capacity. Similarly, smaller ports of entry also redirected asylum seekers to larger ports, including when they had the capacity to accept and process arriving asylum seekers. According to CBP's own analysis of the Queue Management data, 80 percent of the times when these ports of entry were redirecting asylum seekers, their facilities were completely empty (June 20, 2018 through November 8, 2018).[18] Finally, despite putting in place metering practices in ports of entry along the entire U.S. border, it does not appear that any port of entry activated a contingency plan related to the arrival of large numbers of asylum seekers.[19]

---

[18] AOL-DEF-00210504.

[19] There is at least one example of OFO working with Border Patrol to process a large number of asylum seekers that ran through the port's vehicle lanes. However,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

24.     This report will cover the first incidents of metering in 2016, the policy's evolution over the past four years, and how it relates to CBP's capacity levels at ports of entry. Overall, this report will seek to illustrate how the metering policy has systematically denied non-citizens access to the asylum process when they arrive to the border. Those subjected to metering are often denied access to the asylum process for months, and, for a smaller subset of asylum seekers, metering has resulted in permanent denial.

## V.     Reasons for Opinions

### A.     Key Terminology

25.     This report references several terms that are endemic to the U.S.-Mexico border.  Below I define those terms.

26.     "OFO" refers to CBP's Office of Field Operations, the organization that is directly responsible for the operations of ports of entry.

27.     "Class A" POEs are ports of entry that are designated to "process all aliens applying for admission into the United States," including asylum seekers that arrive on foot.[20]

28.     "Limit line" positions are located at or near the boundary line between

---

this does not appear to represent the activation of a contingency plan. AOL-DEF-00088390.

[20] *See* https://www.cbp.gov/sites/default/files/documents/Vol_49_No_50_Title.pdf.

ER 00980

the United States and Mexico. CBP officers stationed at the limit line are tasked with screening arriving pedestrian's travel documents before they can enter U.S. territory.[21]

29.    "Control stations" are the physical access controls located at the limit line.

30.    "Redirecting" is the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum.

31.    "Circumventors" are individuals, frequently asylum seekers, that enter U.S. territory through the vehicle lanes, instead of through the established pedestrian walkways.

**B.    Ports of Entry**

32.    Along the U.S.-Mexico border, each U.S. port of entry has a different architectural design but follows the same general layout. For the portion of the U.S.-Mexico border that is delineated by the Rio Grande river (from Brownsville to El Paso), U.S. ports of entry are located at the north end of an international bridge. The

---

[21] The limit line position is not always located on the exact U.S.-Mexico border. For example, the limit line in Tecate is located roughly 10 feet into U.S. territory. "Investigation of Alleged Violations of immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel, U.S. Department of Homeland Security, Office of the Inspector General, September 26, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-10/OIG-19-65-Sep19_0.pdf.

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

U.S.-Mexico border is located at the midpoint of the Rio Grande, generally marked by a commemorative plaque on the bridge. By contrast, ports of entry that are located along land portions of the U.S.-Mexico border often place turnstiles at or near the actual border line, marking the entry into U.S. territory.

33.    At Class A POEs—the POES that allow for pedestrian traffic—non-asylum-seekers move freely across the U.S.-Mexico international dividing line and into the United States, either by walking across the bridge midpoints or by passing through a turnstile. These pedestrians then enter the port of entry's arrival hall, where they encounter a CBP officer at one of several desks. The CBP officer reviews their travel documents—a process known as "primary inspection"—and may admit the pedestrian into the United States or send the pedestrian to secondary inspection for further review.

34.    POEs are staffed by CBP officers and supervisors, including Port Directors, Assistant Port Directors, and first and second-level supervisors.[22]  Larger POEs also have Admissibility Enforcement Units, or AEUs, that are designed to hold non-citizens requiring additional processing for a short period of time. Some POEs also have Criminal Enforcement Units, or CEUs, that investigate cases of

---

[22] Gibbons, Deposition, November 21, 2019.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

trafficking and the use of fraudulent entry documents.[23]

35.  Front-line CBP officers work in shifts at a POE.[24]  These officers are assigned to duty stations, including at primary inspection, secondary inspection, and at "limit line" positions at or near the boundary line between the United States and Mexico.[25]  From time to time, these officers receive written or oral instructions on how to execute their jobs, known as "musters" or "standard operating procedures."[26]

36.  Prior to CBP's use of turn-backs or metering, asylum seekers approaching CBP's ports of entry would pass into U.S. territory, walk into the POE's arrival hall, approach a CBP officer at one of their desks, and request asylum. CBP officers would then send these asylum seekers to the secondary inspection area, where they would then be processed.[27]

---

[23] Gibbons, Deposition, November 21, 2019.

[24] Gibbons, Deposition, November 21, 2019.

[25] Gibbons, Deposition, November 21, 2019.

[26] Gibbons, Deposition, November 21, 2019.

[27] OFO processes an asylum seeker by entering them into expedited removal proceedings, after the asylum seeker has been found inadmissible and has claimed credible fear. OFO takes a sworn statement regarding the fear that the asylum seeker has of returning to his or her home country and then refers the person for an interview to UCSIS. This is different than being "inspected", which is OFO's process for determining the nationality and identity of an individual, along with their admissibility based on the requirements of U.S. immigration law.

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

37.     There is one deviation from this general processing procedure. By March 2016, CBP officers in the San Ysidro port in San Diego had created a separate line for asylum seekers, who had to wait in the line until it was their turn to be processed.[28] This dual line structure would soon become part of the San Diego port of entry's first metering system.

### C.     Initial Metering Practices

38.     On May 26, 2016, CBP implemented the first iteration of its metering system in the San Ysidro Port of Entry in San Diego. On this date, CBP reported that its facility was at capacity amid an increase in the number of Haitians and other asylum seekers arriving at the port of entry. At the time, local news outlets reported that there were more than 200 asylum seekers waiting in line inside U.S. territory in the port of entry's pedestrian entrance and another dozen on the Mexican side of the turnstile.[29] In response, CBP officers worked with their counterparts at the National Migration Institute (*Instituto Nacional de Migración*, INM) to take the waiting

---

[28] "Re: Denial of Food to Asylum Seekers Awaiting Processing at San Ysidro Port of Entry," American Civil Liberties Union, March 23, 2016, https://www.aclusandiego.org/wp-content/uploads/2016/03/2016-03-23-Ltr-re-Denial-of-Food-at-SYS-POE-FINAL.pdf.

[29] Sandra Dibble, "Surge of Haitians at San Ysidro Port of Entry," *The San Diego Union – Tribune*, May 26, 2016, https://www.sandiegouniontribune.com/news/border-baja-california/sdut-haitians-flood-san-ysidro-port-entry-2016may26-story.html.

ER 00984

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

asylum seekers to Tijuana migrant shelters. Asylum seekers were told to return at a certain time for appointments.

39.     In the following months, CBP officers continued this process and began streamlining the system. First CBP undertook measures to ensure that asylum seekers stayed in Mexico while they waited. On June 27, 2016, the San Ysidro Port of Entry watch commander wrote in an email "It's even more important that when traffic is free flowing that the limit line officers ask for and check documents to ensure that groups that may be seeking asylum are directed to remain in the waiting area on the Mexican side."[30] Second, CBP also outlined and formalized its metering procedures. A document issued after July 2016 notes that "In coordination with the GoM [Government of Mexico] we have identified two (2) periods throughout the day to intake asylum claims into our custody (8am and 4 pm). At each period, we intake approximately [redacted] applicants, with a daily intake total of approximately [redacted] applicants. If an applicant does not meet these intake time periods, they are requested to remain in-line in Mexico until the next intake period."[31]

40.     As CBP officers in San Diego implemented this first metering system,

---

[30] CBPALORT000114.

[31] CBPALORT000103 to 106.

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

individuals arriving at the San Ysidro and Otay Mesa ports of entry began to report being turned back to Mexico. At the Ped-West crossing—a pedestrian crossing for northbound travelers in the San Ysidro port of entry—asylum seekers were told that they had to speak with Mexican immigration officials before their asylum claims could be processed in the United States.[32] In July 2016, the American Immigration Council documented the case of a Mexican man being returned to Tijuana, and the following month another three teenage Guatemalans and a 21 year old Guatemalan man were also turned back.[33]

41.    The San Diego metering system soon spread across the border. It first spread to nearby cities, such as Calexico (in the San Diego sector) and Nogales (in the Tucson sector), where metering systems were put in place after the arrival of a large number of Haitian asylum seekers in a short period of time. In September 2016, large numbers of Haitians arrived in Mexicali (across the border from Calexico) and Grupo Beta, the humanitarian agency inside Mexico's National Migration Institute, began organizing a list for the waiting Haitians as well as providing them with dates

---

[32] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[33] Ibid.

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for when they should show up at the U.S. port of entry.[34] By October 19, 2016, a line of Haitian asylum seekers was also waiting at the Nogales port of entry. In Nogales, Sonora (across the border from Nogales, Arizona), the municipal government created a waitlist for the asylum seekers.[35] Yet, by December 2016 the list had dissolved, as CBP officers processed the waiting Haitians in the city and stopped metering.

42.    Around the same time, metering also expanded to the other end of the border. It first spread to the Laredo sector, which was experiencing an increase in the number of Cubans arriving to Nuevo Laredo in the final months of 2016.[36] On November 12, 2016, the Assistant Director of Field Operations for the Laredo Field Office wrote an email to all Laredo sector port directors,[37] asking them to meet with

---

[34] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for International Security and Law, Center for U.S.-Mexican Studies, & Migration Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-19/MSI/AsylumReport_190308.pdf; "Mexicans Respond To Haitians, Africans With Unusual Hospitality," September 22, 2016, https://www.youtube.com/watch?v=UzaCrd8R_LA.

[35] Curt Prendergast, "Haitians hoping for US asylum gather at Nogales border crossing," *Arizona Daily Star*, October 26, 2016 https://tucson.com/news/local/border/haitians-hoping-for-us-asylum-gather-at-nogales-border-crossing/article_7c401363-f48e-540b-9cf8-4390b1ce7b55.html.

[36] "Southwest Border Inadmissibles by Field Office FY2017," U.S. Customs and Border Protection, accessed December 6, 2019, https://www.cbp.gov/newsroom/stats/ofo-sw-border-inadmissibles-fy2017.

[37] This includes port directors in Brownsville, Del Rio, Eagle Pass, Hidalgo, Laredo,

ER 00987

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

their INM counterparts and request that INM "control the flow of aliens to the port of entry."[38] It added that "if INM cannot or will not control the flow, your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return then [sic] to Mexico. This is similar to what San Diego is doing."[39] This was followed up by additional internal CBP emails discussing this metering guidance. For example, on November 22, 2016, an internal email noted that the instructions from the Laredo Field Office is that "we will only accept 'what we can handle/process. All others will be turned back to Mexico with an appointment date/time if possible."[40]

43.     Soon after these emails circulated in CBP, there was an increase in the number of reported turn-backs in the Laredo sector. On November 24, 2016, a Salvadoran woman and her three year old son reported that they were turned back at the Hidalgo port of entry,[41] while on November 30, 2016, a Honduran woman and

---

Progreso, Rio Grande, and Roma.

[38] CBPALORT000034.

[39] CBPALORT000034.

[40] CBPALORT000017.

[41] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

her four year old daughter reported that they were turned back in Laredo.[42]
Additional turn-back reports also began to emerge around this time, including in the
El Paso sector on November 20, 2016, expanding the practice of turn-backs into all
four Customs and Border Protection sectors.[43] A September 2019 DHS Office of the
Inspector General (OIG) Report also notes an interview in which a witness stated
that CBP's turn-backs of asylum seekers began in Tecate (in the San Diego sector)
in 2016.[44] However, the OIG did not discover any documentation of turn-backs at
Tecate until February 2017. None of the asylum seekers turned back from these ports
of entry were provided with appointments.

44.     During these initial turn-backs, asylum seekers arriving at U.S. ports of
entry would generally cross into U.S. territory before CBP officers told them that
they had to return to Mexico. According to turned back asylum seekers' testimony,
they were generally intercepted by CBP officers while already walking on the U.S.

---

cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[42] Ibid.

[43] Ibid.

[44] "Investigation of Alleged Violations of immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel, U.S. Department of Homeland Security, Office of the Inspector General, September 26, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-10/OIG-19-65-Sep19_0.pdf.

ER 00989

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

side of the bridge or sent back to Mexico after approaching CBP officers at their desks in the port of entry's main hall. In December 2016, large groups of Cubans arrived to the Brownsville and Hidalgo ports of entry and spent several days waiting on or near the bridge before CBP processed the groups. Photos and video footage show the Cubans entering and lining up in U.S. territory on the Hidalgo international bridge.[45] A review of some of the first publicly recorded turn-backs confirms these initial locations.

**Table 1: Data and Location of First Publicly Recorded Turn-back (by Port of Entry)**

| Cities | Date of First Publicly Recorded Turn-back | Location of Turn-back |
|---|---|---|
| San Ysidro | July 11, 2016[46] | POE Entry Hall |

[45] Daniela Reyes, "Más de 50 cubanos se encuentran varados en elpuente de Reynosa," *Cuba en Miami*, December 5, 2016, https://www.cubaenmiami.com/mas-de-50-cubanos-se-encuentran-varados-en-el-puente-de-reynosa/; Marco Rodríguez, "Logran acceder a territorio estadounidense cubanos varados en Matamoros," *Hoy Tamaulipas*, December 14, 2016, https://www.hoytamaulipas.net/notas/273750/Logran-acceder-a-territorio-estadounidense-cubanos-varados-en-Matamoros.html. "Cubanos están 'atrapados' en el Puente Reynosa-Hidalgo," *Posta*, December 5, 2016, https://www.posta.com.mx/tamaulipas/cubanos-estan-atrapados-en-el-puente-reynosa-hidalgo.

[46] There were prior accusations of Mexican asylum seekers being returned to Mexico. However, this appears to be a separate issue from CBP metering. "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

ER 00990

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| El Paso | November 20, 2016[47] | U.S. side of the International Bridge |
| Hidalgo | November 24, 2016[48] | POE Entry Hall |
| Otay Mesa | February 2017[49] | U.S. territory |
| Hidalgo | March 2017[50] | POE Entry Hall |

45.     The turn-backs were often paired with language explaining why the individual was not going to be allowed to seek asylum into the United States. These explanations were not standardized and included descriptions such as "We're not accepting any more people"[51] and "[CBP wasn't] receiving people from Honduras."[52] Despite turn-backs occurring now across the length of the U.S.-Mexico border, CBP officials were not using a uniform explanation for why they were taking

---

[47] Ibid.

[48] Ibid.

[49] "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human Rights First, May 2017, https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

[50] Ibid.

[51] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[52] Ibid.

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

place.

46.    On January 13, 2017, a memorandum from the Laredo Field Office formalized the sector's metering policy, stating that officers could conduct metering "at the middle of the bridge" and that "all foreign nationals seeking a benefit are given an appointment window to return for processing."[53] However, no appointments were ever provided to arriving asylum seekers and it does not appear that CBP officers were regularly stationed at the middle of the bridge. Rather, some asylum seekers continued to be turned back to Mexico after entering the United States throughout 2017 and through the early part of 2018.[54] These turn-backs continued in spite of CBP experiencing "historic lows in illegal immigration," according to a May 19, 2017 CBP Memorandum.[55] CBP's publicly available statistics on apprehensions and inadmissibles also reflect the fewer migrants and asylum seekers arriving to the U.S.-Mexico border during this period of continued

---

[53] CBPALORT000003.

[54] In December 2017, a line of asylum seekers once again formed in Tijuana. This line would morph into the notebook waitlist in April 2018. Kate Morrisey, "One year after notebook appears in Tijuana, confusion and anxiety continue in asylum line," *The San Diego Union Tribune*, April 28, 2019, https://www.sandiegouniontribune.com/news/immigration/story/2019-04-26/one-year-after-notebook-appears-in-tijuana-confusion-and-anxiety-continue-in-asylum-line.

[55] AOL-DEF-00090108.

25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

turn-backs  (see Graph 1).

**Graph 1: CBP Apprehensions and Inadmissibles at the Southwest Border**[56]



47.     While metering was not standardized during this timeframe, there were continued cases of metering in San Ysidro. A May 2017 Human Rights First report noted that the metering system in San Ysidro continued through early 2017 and that in April 2017 CBP officers at the port of entry were continuing to tell arriving asylum seekers to first go to Grupo Beta for an appointment.[57] A CBP email from December 8, 2017 noted that in the San Diego sector, "we have been metering on and off the

---

[56] Data comes from apprehensions and inadmissibles: "Southwest Border Migration FY 2020," U.S. Customs and Border Protection, accessed December 6, 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration.

[57] "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human Rights First, May 2017, https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

past couple days based on our numbers hitting capacity."[58]

### D.  Current Metering Practices

48.    On April 27, 2018, the Executive Assistant Commissioner of the Office of Field Operations issued a "Metering Guidance" memo to the agency's four Field Office Directors on the U.S.-Mexico border. The guidance allowed directors to "meter the flow of travelers at the land border," and said that they could "establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible."[59] While the memo noted that CBP could not create a separate line for asylum seekers, it does allow for "lines for those with appropriate travel documents and those without such documents," which operationally creates the same outcome. It also noted that ports should "inform the waiting travelers that processing at the port is currently at capacity," finally providing CBP officers with a standardized explanation.[60] However, there appears to be widespread acknowledgement among CBP officers that this guidance was aimed to specifically target asylum seekers.[61]

---

[58] AOL-DEF-00071011.

[59] "Metering Guidance," Office of Field Operations, April 27, 2018. AOL-DEF-00196460.

[60] Ibid.

[61] Gibbons, Deposition, November 21, 2019.

49.     The context surrounding the timing of the Metering Guidance memo is relevant to understanding its purpose. The memo was introduced as a caravan of hundreds[62] of asylum seekers traveled through Mexico to the United States border and was sent to port directors with the written message that it served as "processing guidance during surge events."[63] However, in the weeks following the Metering Guidance memo's issuance, CBP began implementing the guidance across the entire U.S.-Mexico border, and not only at the San Ysidro and Calexico port of entries (which had been designated as OFO's "processing hubs for caravan aliens").[64] This was different from the previous metering instances, which were geographically limited and generally appeared to be responding to a sudden increase in migration numbers.

50.     During the summer months of 2018, CBP officers set up control stations[65] at or near the limit line in ports of entry. While other pedestrians could still travel freely over the international line or through the turnstiles with their travel

---

[62] The caravan reached a size of 1,450 to 1,550 participants from March 31, 2018 to April 1, 2018. It then splintered into smaller groups of several hundred individuals. AOL-DEF-00196741.

[63] CBP email correspondence. AOL-DEF-00011883.

[64] AOL-DEF-00196723.

[65] In these controls, CBP officers are generally stationed in pairs at the midpoint and they may have additional mobile infrastructure, such as fans or something to cover them from the sun.

documents in hand, CBP began systematically blocking asylum seekers from ever reaching the U.S. side of the bridge or the port of entry's entrance hall.

51.     When a pedestrian approaches the U.S.-Mexico dividing line, CBP officers stand at the "control stations" on the international line or right behind it and ask for the individual's migration paperwork. If the pedestrian does not have a U.S. passport or visa to enter the United States, CBP officers often physically block their passage into U.S. territory by standing in the center of the pedestrian walkway. CBP officers then tell arriving asylum seekers[66] that there is no capacity at the port of entry and the asylum seekers cannot currently be processed, which is also the explanation laid out in the "Metering Guidance." At times, these stationed CBP officers may also instruct the arriving asylum seekers to contact officials on the Mexican side of the border, to go to local Mexican shelters, or to first get on an asylum waitlist.

52.     After being turned away from the U.S. port of entry, asylum seekers must figure out where to stay in the Mexican border city and how to get in line to ask for asylum in the United States. In the weeks and months after the "Metering Guidance" memo, asylum seekers generally held their place in line by waiting in

---

[66] The CBP officers know that the person is an asylum seeker based on their lack of appropriate migratory documents or if they preemptively announce that they would like to seek asylum to the CBP officers stationed at the limit line.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

physical lines on international bridges or outside the ports of entry. These initial lines were reported on the bridges outside ports of entry in Brownsville[67], Hidalgo[68],

---

[67] Aurora Orozco, "Familias de inmigrantes esperan bajo inclmencias en puentes internacionales," *El Nuevo Herald*, June 19, 2018, http://www.elnuevoheraldo.com/el_valle/noticias_locales/familias-de-inmigrantes-esperan-bajo-inclemencias-en-puentes-internacionales/article_69abbd70-73dc-11e8-aa87-4b8d72916648.html.

[68] Sandra Tovar, "'Toman' migrantes Puente en busca de asilo en EU," *El Mañana*, May 22, 2018, https://www.elmanana.com/toman-migrantes-puente-busca-asilo-eu-puente-internacional-migrantes-asilo-politico/4415659.

ER 00997

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Roma[69], Laredo[70], Eagle Pass[71], Nogales[72], El Paso[73], and San Diego[74]. In the following months, due to local residents' concerns, hygiene issues, inclement weather, or disputes regarding fairness, Mexican officials, non-governmental organizations, or asylum seekers themselves began waitlists to allow people to hold their place in line with their name instead of physical presence. These asylum

---

[69] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php.

[70] Meredith Hoffman, "The Horrible Conditions Endured by Migrants Hoping to Enter the US Legally," *Vice News*, July 3, 2018, https://www.vice.com/en_us/article/59qny3/migrants-hoping-to-get-us-asylum-forced-to-wait-on-bridge.

[71] "Incomoda a automovilistas y peatones presencia de migrantes en puentes internacionales de Piedras Negras," La Rancherita del Aire, July 26, 2018, https://www.rancherita.com.mx/noticias/detalles/53790/incomoda-a-automovilistas-y-peatones-presencia-de-migrantes-en-puentes-internacionales-de-piedras-negras.html#.XcjjtudKjGJ.

[72] "Simon Romero & Miriam Jordan, "On the Border, a Discouraging New Message for Asylum Seekers: Wait," *New York Times*, June 12, 2018, https://www.nytimes.com/2018/06/12/us/asylum-seekers-mexico-border.html.

[73] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express-News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php#photo-15680354.

[74] "Asylum seekers wait days and weeks at U.S.-Mexico border," *Associated Press*, June 7, 2018, https://www.cbsnews.com/news/asylum-seekers-wait-days-and-weeks-at-u-s-mexico-border/.

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

waitlists have no standardized procedure or structure. These waitlists are still in place in every city with waiting asylum seekers, and may be managed by the asylum seekers themselves, Mexican government officials, or humanitarian workers.

**Table 2: Groups that Run the Asylum Waitlist (November 2019)[75]**

| List Managers | Number of Lists | Lists by City |
|---|---|---|
| Non-governmental organization | 9 | Nuevo Laredo (6), Reynosa, Agua Prieta, San Luis Río Colorado |
| Grupo Beta | 3 | Tijuana, Mexicali, Ciudad Acuña |
| Asylum Seekers | 5 | Ciudad Juárez (3), Brownsville (2) |
| National Migration Institute | 1 | Brownsville |
| Civil Protection | 2 | Ciudad Acuña, Nogales |
| State Population Agency | 1 | Ciudad Juárez |
| Municipal Government | 1 | Piedras Negras |

53.     Similarly, there is no standardized Mexican or U.S. regulation of the asylum waitlists nor their managers.[76] There are also no controls to guarantee that these waitlists are being run transparently or without corruption. Due to this lack of oversight, asylum seekers and civil society organizations have alleged that some list managers charge asylum seekers to get on the asylum waitlist, including in Piedras

---

[75] Cities may be listed in multiple categories if the city contains multiple waitlists. For example, in Ciudad Juárez, there are currently three Mexican asylum waitlists (one at each international bridge) and a non-Mexican asylum waitlist.

[76] Despite Mexican government entities managing the lists in certain cities, there does not appear to be any standardized guidance. This is evidenced by the different list formats and processes in different cities even when the same federal government agency is running the asylum waitlist.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Negras[77], Reynosa[78], and Matamoros[79]. This makes seeking asylum at a U.S. port of entry dependent on whether asylum seekers and their loved ones can pay hundreds or thousands of dollars.

54. Additionally, the lack of regulations means that some cities can stop asylum seekers from joining waitlists altogether. For example, in Ciudad Acuña—opposite from Del Rio, Texas—the asylum waitlists for both individuals and families have been "closed" since March 2019.[80] This means that list managers (Civil

---

[77] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[78] Emily Green, "Mexican officials are extorting thousands of dollars from migrants applying for asylum," *Vice News*, May 13, 2019, https://www.vice.com/en_us/article/kzdy4e/exclusive-mexican-officials-are-extorting-thousands-of-dollars-from-migrants-to-apply-for-asylum; Carolina Garza, "Cubanos denuncian a INM de corrupción en trámite de asilo humanitario," *Milenio*, June 5, 2019, https://www.milenio.com/politica/cubanos-denuncian-inm-corrupcion-tramite-asilo-humanitario.

[79] Molly Hennessy-Fiske, "Asylum seeker blocked at Texas border bridges say Mexican officials are demanding money to let them pass," *Los Angeles Times*, November 22, 2018, https://www.latimes.com/nation/la-fg-asylum-list-border-2018-story.html.

[80] There were also reports that the Piedras Negras was periodically closed throughout 2019. "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

33

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Protection for adults and Grupo Beta for families) are not accepting any additional asylum seekers onto the waitlists. While CBP officers are not involved in managing these lists, in certain cities such as Reynosa[81], Piedras Negras[82], and Mexicali[83], the list managers reportedly share asylum seekers' information with CBP officers before the asylum seekers return to the U.S. border to seek asylum.

55.     Once asylum seekers get on a waitlist, they have to wait until their number is called. Every day, a CBP official communicates the number of people that they will receive that day to an individual in Mexico. This exact process depends on the port of entry and the waitlist structure in each Mexican city. According to list managers in cities such as Ciudad Juárez, Ciudad Acuña, and Piedras Negras, CBP officers directly call the Mexican individuals who manage the lists.[84] In other cities,

---

[81] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[82] "Barred at the Border," Human Rights First, April 2019, https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf.

[83] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for International Security and Law, Center for U.S.-Mexican Studies, & Migration Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-19/MSI/AsylumReport_190308.pdf.

[84] In Ciudad Juárez, the list manager is a representative from the State Population Council (*Consejo Estatal de Población*, COESPO); in Ciudad Acuña, it is a representative from the city's Civil Protection agency (Protección Civil); and in

34

CBP officers provide their numbers directly to waiting asylum seekers. This was the case in the Roma and Progreso ports of entry, where asylum seekers waited on the international bridges because those Mexican cities do not have any migrant shelters. (As of November 2019, there were no longer asylum seekers waiting at these two ports of entry.) More recently, Mexican asylum seekers have also created their own lists in Matamoros and Ciudad Juárez and communicate directly with CBP officers stationed at the international line.

56.    In specific circumstances, there are cases of asylum seekers who are able to circumvent the official list. These include unaccompanied minors and individuals who were able to pay a bribe to corrupt list managers. There are also a small number of asylum seekers who are able to avoid metering by appearing at the limit line with a severe medical need or after being accompanied by an advocate. Similarly, a small number of asylum seekers have made it past the limit line and into U.S. territory by evading stationed CBP officers' detection or by running into U.S. territory through the port of entry's vehicle lanes. However, most asylum seekers are forced to put their names on an asylum waitlist and wait until their number is called.

57.    Asylum seekers may have to wait for months on asylum waitlists. Over the last year, the Reports have documented the wait times on asylum waitlists. From

---

Piedras Negras, it is a representative of the municipal government.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

December to August 2019, wait times continuously increased, and most of these lists

reached their peak levels around August 2019 (as seen in Table 3). However, as of

November 2019, asylum seekers were still waiting for months in Mexican cities to

cross at the ports of entry in Brownsville, Eagle Pass, El Paso, Douglas, Nogales,

Yuma, Calexico, and San Diego.

**Table 3: Peak Wait Times (August 2019)**

| Ports of Entry | Average Wait Time |
|---|---|
| Brownsville | 1 to 2 months |
| Hidalgo | 2 to 3 months |
| Roma | 9 days |
| Laredo | 1 month |
| Eagle Pass | 2 months |
| Del Rio | 4 months (adults) / 2 months (families) |
| El Paso | 3.5 to 6 months |
| Douglas | 2 months |
| Nogales | 2 to 3 months |
| San Luis | 3 months |
| Calexico | 6 to 12 months |
| San Ysidro | 6 to 9 months |

58.     To skip these wait times, some individuals or groups of asylum seekers

have sought alternative ways to enter U.S. territory. Some asylum seekers cross

between ports of entry[85] and others enter U.S. territory by running down the vehicle

lanes at ports of entry (as previously referenced). CBP refers to the individuals who

---

[85] "Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Department of Homeland Security, Office of the Inspector General, September 27, 2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

36

run through vehicle lanes as "circumventors," and they are processed for expedited removal and as individuals who entered without inspection (EWI).[86] There are published reports of circumventors in multiple ports of entry, including in Rio Grande City[87], Tecate[88], Eagle Pass[89], Nogales[90], and Hidalgo[91]. These actions are a direct result of turn-backs and metering.

59.    On November 8, 2018, CBP operated controls at or near the midpoint of international bridges and turnstiles in at least 24 ports of entry along the U.S.-

---

[86] Gibbons, Deposition, November 21, 2019.

[87] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[88] Gibbons, Deposition, November 21, 2019.

[89] "Podrían cerrar puentes internacionales, si migrantes intentan cruzar de forma irregular a EU: Enlace municipal," *La Rancherita del Aire*, May 13, 2019, https://rancherita.com.mx/noticias/detalles/66407/podrian-cerrar-puentes-internacionales-si-migrantes-intentan-cruzar-de-forma-irregular-a-eu-enlace-municipal.html#.Xef45TJKjGI.

[90] Astrid Galvan, "Asylum seekers jam US border crossings to evade Trump policy," *Associated Press*, December 3, 2019, https://www.washingtonpost.com/business/asylum-seekers-jam-us-border-crossings-to-evade-trump-policy/2019/12/03/24d6d30c-160f-11ea-80d6-d0ca7007273f_story.html.

[91] AOL-DEF-00088390.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Mexico border that allow for pedestrian traffic.[92] One year later, in early November 2019, the November Metering Update report confirmed that these controls remained in place at every port of entry covered in the report (totaling 14 ports of entry).

60. The presence of these controls is constant, regardless of the numbers of asylum seekers waiting at the international line or arriving at the port. For example, in November 2019, asylum seekers arriving in Reynosa, Tamaulipas—which had a low number of waiting asylum seekers—still had to first go to the local migrant shelter to put their name on the asylum waitlist instead of traveling directly to the Hidalgo port of entry to ask for asylum.[93] Other ports of entry such as Progreso and Roma no longer have any asylum seekers waiting on the international bridges (and have not for months), but CBP officials remain stationed at the midpoint. While the email introducing CBP's metering guidelines to port directors describes the limit line position and metering as a response to "surge events"[94], the policy has remained in place even when there are no waiting asylum seekers.

---

[92] AOL-DEF-00210508.

[93] Given the low numbers, shelter staff noted that most arriving asylum seekers were processed the following day (after the shelter registered them and sent their information to CBP). "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[94] AOL-DEF-00196458.

38

**E.     CBP's MCAT and Queue Management Reports Provide a Common Method For Analyzing Defendants' Capacity Explanation**

61.     Since May 2016, CBP has justified its turn-back and metering policy as necessary due to a lack of capacity within ports of entry. Port capacity is a fluid number, both since CBP could allocate more personnel and other resources to process asylum seekers and thereby increase capacity,[95] and since other incidents at the port could pull some of these resources away from asylum processing. Changes to port infrastructure may also increase or decrease capacity, and certain groups of asylum seekers or other individuals may need to be held in distinct areas, limiting capacity. Indeed, within MCAT Reports, the stated capacity levels for ports of entry shifted multiple times from 2016 through 2019. (See Table 8 in the Appendix.)

62.     However, despite this fluidity, there is a common method for analyzing whether the capacity of a port of entry might justify turning back asylum seekers. CBP's MCAT and Queue Management Reports[96] were compiled daily to measure capacity at ports of entry along the border. These reports record operationally important information, such as the number of people in custody, the percent capacity

---

[95] This is discussed is noted in CBP's Mass Migration Contingency documents and in additional CBP documents. *See* AOL-DEF-00196723; AOL-DEF-00057105.

[96] The requirement to submit daily Queue Management Reports began on June 18, 2018. *See* AOL-DEF-00053604.

39

being utilized at of each port of entry, and the number of people waiting to enter the port of entry. Using this data, it is possible to see a port of entry's capacity levels over time and to track whether this capacity might justify turning back asylum seekers.

63.     The first finding from reviewing CBP's MCAT and Queue Management Reports is that most ports of entry consistently reported that they were below capacity from 2016 to 2019. Further still, some ports of entry reported being consistently below 50 percent capacity. For example, from June 18, 2018 to July 15, 2019,[97] Queue Management Reports showed that 18 of the 24 ports of entry were at or below 50 percent capacity for more than half of the days for which there was data. Cities such as Otay Mesa, Tecate, Calexico East, and Andrade all reported that the ports of entry were at or below 50 percent capacity for every single day with available data.[98]

64.     The second finding was that there is a wide variation in utilized capacity levels among ports of entry. While in 2019, there was a group of ports of entry that were consistently at or below 50 percent capacity, there was also a smaller number

---

[97] June 18, 2018 is the first day with available data. July 15, 2019 is the last day with available data.

[98] I reviewed the MCAT and Queue Management Reports that were provided to me. Table 4 provides the total number with relevant data by port of entry.

of ports of entry that were often near or above capacity. According to the Queue Management Data, the ports of entry in Eagle Pass, El Paso, Hidalgo, and Douglas were most frequently at or above capacity.[99] Both Eagle Pass and Douglas are non-redirecting small ports of entry with capacities of 16 and 4, respectively. However, the El Paso and Hidalgo ports of entry are larger.

65.     El Paso' high utilized capacity numbers in 2018 and 2019 appear to be related to the port of entry's varying total capacity levels. From November 30, 2016 through July 13, 2019, MCAT Reports listed three different capacity numbers for El Paso: 226 (November 30, 2016 – April 27, 2018), 306 (May 4, 2018 – June 10, 2018, and 115 (June 5, 2018 – July 13, 2019). The majority of the days where the El Paso port of entry's capacity exceeded 100 percent took place after the stated capacity numbers decreased to 115. For example, on May 15, 2018, El Paso OFO reported that 170 people were in custody, which totaled a 56 percent utilized capacity.[100] A little more than a year later, on June 17, 2019, El Paso OFO also reported that 170

---

[99] In June 2018, CBP in Eagle Pass specified a reason why metering was affecting port capacity in the Queue Management Reports, writing: "Recurring Issue: EGP is now staffing queue management point at POE#1 during non-operational hours (2300-700hrs) to prevent additional groups claiming CF [credible fear] from entering the US. This has caused additional staffing/OT expenditures for EGP. Staffing requires 2 CBPO officer / 1 CBP vehicle." AOL-DEF-00095740.

[100] AOL-DEF-00102654.

41

people were in custody, but this time it reported that it was at 148 percent capacity.[101]

**Graph 2: El Paso's Total Capacity Levels and Number of Persons in OFO Custody (November 2016 – July 2019)**



66.     At the Hidalgo port of entry, it is possible that the high utilized capacity numbers are related to an increase in circumventors entering U.S. territory via the port's vehicle lanes, given that the port of entry's numbers peaked from March 2019 to July 2019 (in the available data), and CBP emails confirm that there were large numbers of circumventors entering the port of entry during that time period.[102]

**Graph 3: Number of People in Custody in the Hidalgo Port of Entry (MCAT)**

---

[101] AOL-DEF-00082489.

[102] This was discussed as a contributing factor for high capacity numbers in a March 2019 CBP email. AOL-DEF-00088390.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



67.    Table 4 shows the capacity levels at each port of entry, using Queue Management Reports from June 2018 to July 2019. (MCAT data from 2016 through 2019 is in the Appendix).

**Table 4: Field Queue Management Reports (2018-2019)**

| Sector | Port of Entry | Days with Data | 0-50% Capacity | 51-100% Capacity | >100% Capacity |
|--------|---------------|----------------|----------------|------------------|----------------|
| Laredo | Brownsville | 314 | 86% | 14% | 0% |
| | Progreso | 314 | 93% | 6% | 1% |
| | Hidalgo | 314 | 46% | 26% | 28% |
| | Rio Grande | 314 | 96% | 4% | 0% |
| | Roma | 314 | 88% | 12% | 0% |
| | Laredo | 314 | 89% | 11% | 0% |
| | Eagle Pass | 314 | 9% | 47% | 44% |
| | Del Rio | 312 | 82% | 17% | 0% |
| El Paso | Port of El Paso | 213 | 6% | 66% | 28% |
| | Santa Teresa | 213 | 74% | 20% | 6% |
| | Columbus | 212 | 97% | 3% | 0% |
| | Tornillo | 213 | 99% | 1% | 0% |
| | Presidia | 213 | 91% | 8% | 1% |
| Tucson | Douglas | 213 | 60% | 19% | 21% |

43

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

|  | Lukerville | 213 | 80% | 9% | 11% |
|---|---|---|---|---|---|
|  | Naco | 213 | 92% | 4% | 4% |
|  | Nogales | 213 | 25% | 61% | 14% |
|  | San Luis | 214 | 62% | 38% | 0% |
| San Diego | San Ysidro | 219 | 5% | 89% | 5% |
|  | Otay Mesa | 219 | 100% | 0% | 0% |
|  | Tecate | 219 | 100% | 0% | 0% |
|  | Calexico West | 219 | 29% | 69% | 1% |
|  | Calexico East | 218 | 100% | 0% | 0% |
|  | Andrade | 219 | 100% | 0% | 0% |

*Total percent may not equal 100% due to rounding.*

68.    This finding is consistent with CBP's own evaluation of its Queue Management data from June 2018 through November 2018. In this evaluation, CBP followed a similar methodology to the one that was used to create this expert report: CBP extracted its Queue Management Reports from emails within senior CBP personnel's official email accounts and entered the data into an excel spreadsheet.[103] Using this methodology, CBP's first conclusion was also that there exists a large deviation among the ports of entry, writing that "some ports are never close to capacity but still have aliens waiting and a few other ports (Eagle Pass, El Paso, and

---

[103] Also, similar to CBP, I also calculated the POE capacity based on the stated percent at capacity of each port of entry and using MCAT's reported capacity numbers. Similar to CBP, I also discovered multiple errors in CBP's capacity percentages, which often stated 100 percent capacity despite reporting low numbers of individuals in custody. I did not attempt to fix these errors in my calculations. AOL-DEF-00210504.

44

Santa Teresa[104]) routinely exceed capacity."[105]

69.     The Queue Management Reports also include the number of people waiting at the "limit line," which is at or near the international boundary. This number serves to show that CBP was aware that asylum seekers were waiting in Mexican border cities. However, despite this recognition, multiple ports of entry continued to operate with capacity levels at or below 50 percent. For example, in the 313 Queue Management Reports from June 18, 2018 through July 15, 2019 that provide data for the Laredo port of entry, 227 of them noted that CBP was aware that there was a line of asylum seekers waiting in Nuevo Laredo. However, in 201 of those days (89 percent), the Laredo port of entry both reported that it had a line of asylum seekers waiting to enter the United States and that its utilized port capacity was at or below 50 percent. Table 5 contains the information for each port of entry. (Table 9 in the Appendix contains the percent of days at each port of entry where there was a reported line and the port capacity was at or below 75 percent).

**Table 5: Days with Reported Queues at the Limit Line and Port of Entry Capacity Levels Below 50 Percent**

---

[104] In the reviewed data, CBP calculated that Santa Teresa's average capacity was 48 percent for the period in question. Its data shows that Santa Teresa exceeded full capacity (defined as greater than 100 percent) in 10 out of the 95 days. This means that the Santa Teresa POE exceeded its capacity 10.5 percent of the time. By comparison, the Eagle Pass port of entry exceeded capacity 42.1 percent of the time and the El Paso port of entry exceeded capacity 22 percent of the time.

[105] AOL-DEF-00210504.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| City | # of Days with Data | # of Days with Reported Line | # of Days with Reported Line & Port Capacity at or Below 50% | Percent of Days with Reported Line Where Port Capacity at or Below 50% |
|---|---|---|---|---|
| Laredo | 313 | 227 | 201 | 89% |
| Rio Grande | 312 | 17 | 15 | 88% |
| Progreso | 313 | 105 | 90 | 86% |
| Brownsville | 313 | 247 | 207 | 84% |
| Roma | 313 | 95 | 65 | 68% |
| Del Rio | 312 | 92 | 48 | 52% |
| Nogales | 214 | 76 | 24 | 32% |
| Douglas | 214 | 13 | 4 | 31% |
| Eagle Pass | 313 | 145 | 13 | 9% |
| Hidalgo | 313 | 117 | 10 | 9% |
| El Paso | 214 | 123 | 7 | 6% |

70.     Additionally, despite uniformly implementing turn-backs and metering, no port of entry appears to have activated a contingency plan for addressing mass migration or used OFO triggers to process additional people.[106] These contingency plans exist to provide roadmaps for ports of entry when they experience larger than normal migration numbers, allowing the ports to be flexible in their capacity and response.

---

[106] In an April 18, 2018 email, an Assistant Port Director in the San Diego Field Office sent an email outlining San Ysidro's Mass Migration Plan and the triggers in place to double OFO's daily processing capacity from 70 to 140. It appears that on April 18, 2018, this plan was beginning to be put in place, with the first trigger of eight people being reshuffled within the port to increase capacity after 307 asylum seekers arrived at the port of entry. After the Metering Guidance issuance, there were no additional documents discussing measures to increase capacity. AOL-DEF-00196691; AOL-DEF-00196695; AOL-DEF-00196745.

ER 01013

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

71.     For example, the April 5, 2018 DHS Integrated Concept of Operations report—which is a document that was created for the Southern California Region to lay out a plan for addressing an arriving refugee caravan—notes that in an "ideal implementation, processing (2) maintains sufficient throughput to match the input of arrival and interdiction (1). Similarly, transfer (4) from CBP custody maintains sufficient throughput to manage established CBP detention tolerances (3)."[107] In other words, the DHS Integrated Concept of Operations report was created to allow processing capacities to accelerate and match higher than normal migration numbers.

72.     To accomplish this objective, the document lays out a series of stages: arrival, processing, detention and transportation, and transfer. For the arrival, the Integrated Concept of Operations notes that local OFO offices and OFO within Imperial and San Diego counties would shift, assign, and/or combine local or regional resources in response to arrivals. Regarding processing numbers, the document states that "if processing capacities at any given Border Patrol Station or OFO Processing Hub are exceeded, caravan aliens will be dispersed to CBP facilities in the local area to increase processing capacity."[108] If that did not work, the Concept

---

[107] AOL-DEF-00196723.

[108] AOL-DEF-00196723.

of Operations noted that "caravan aliens would be dispersed to CBP facilities within the region and/or regional virtual processing capabilities will be utilized to increase processing capacity." And lastly, if even that was not enough, "national virtual processing capacities will be requested."[109] These measures show that CBP has the structures in place to increase capacity at a port of entry or across all ports of entry to allow for additional processing if necessary. These measures were never activated.[110]

73.     Instead, it appears that there were conscious decisions at times to not expand capacity at ports of entry. On April 21, 2018, the Executive Director for Operations in the Office of Field Operations wrote an email regarding "high capacity in Laredo."[111] On that day the MCAT Reports noted that there were 119 people in custody, putting the port of entry at 132 percent capacity according to CBP's measurements.[112] However, the Laredo Field Office did not activate its Contingency

---

[109] AOL-DEF-00196723.

[110] There are isolated examples in the CBP documents that show OFO cooperating with Border Patrol to create space. However, these do not appear to be part of a larger activation of a contingency plan. AOL-DEF-00088390.

[111] AOL-DEF-00196623.

[112] AOL-DEF-00196624.

ER 01015

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Plan[113] to increase capacity.[114] Instead, the Executive Director noted, "Remember that we should not convert space to accommodate … and should hold at the line if necessary."[115]

74. Lastly, the third finding was that certain ports of entry in the Laredo and San Diego sectors appear to have redirected or to be currently redirecting asylum seekers to nearby larger ports. According to the Queue Management Reports, these ports of entry include the Progreso, Rio Grande, and Roma ports in the Laredo sector and the Otay Mesa, Tecate, Calexico East, and Andrade ports of entry in the San Diego sector. Some of this redirecting appears to have been outlined in musters. For example, a September 4, 2018 muster in Tecate formalized this practice, noting "Due to the facility and operating hour limitations, this necessitates that we redirect asylum seekers to our processing hubs in Calexico West or San Ysidro PedWest."[116]

75. The POEs engaging in redirecting and the recipient POEs are listed in Table 6. The date ranges are based on the availability of written confirmation of the

---

[113] AOL-DEF-00011011.

[114] The email from the Executive Director did ask if the Laredo port of entry was able to use Border Patrol space, which is listed in the Laredo Contingency Plan as a step to take when the port's capacity is strained. It does not appear that any other part of the Contingency Plan was activated.

[115] AOL-DEF-00196623.

[116] Gibbons, Deposition, November 21, 2019.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

redirecting practice—generally from Queue Management Reports—and should not be viewed as the exact dates that redirecting occurred. For example, despite Queue Management Reports from June 22, 2019 through July 15, 2019[117] that noted that no ports of entry were redirecting asylum seekers, the Otay Mesa, Tecate, Calexico East, and Andrade ports of entry all continued to report that they had zero individuals in custody. Similarly, the September 2019 DHS Office of the Inspector General Report and Gibbons' deposition both affirm that the redirecting practice continued in Tecate through September 2019 and December 2019, respectively.[118]

**Table 6: Redirecting Ports of Entry and their Recipient Ports of Entry**

| Date[119] | Redirecting POE | Recipient POE |
|---|---|---|
| June 20, 2018 – May 8, 2019 | Progreso | Brownsville |
| June 20, 2018 – May 8, 2019 | Rio Grande | Hidalgo |
| June 20, 2018 – May 8, 2019 | Roma | Hidalgo |
| June 20, 2018 – June 21, 2019 | Otay Mesa | San Ysidro |
| July 9, 2019 – June 21, 2019 | Tecate | San Ysidro or Calexico West |
| June 20, 2018 – June 21, 2019 | Calexico East | Calexico West |
| June 20, 2018 – June 21, 2019 | Andrade | Calexico West |

76.     However, there is variation among the redirecting ports of entry. In the

---

[117] The July 15, 2019 report was the latest available report.

[118] Gibbons, Deposition, November 21, 2019.

[119] The start dates are from AOL-DEF-00210508 and the end dates are from Queue Management Reports. May 8, 2019: AOL-DEF-00087047 and June 21, 2019: AOL-DEF-00086326.

50

Laredo sector, the Queue Management Reports from June 20, 2018 through May 8, 2019 noted that the redirecting ports continued to accept asylum seekers and noted that they redirected "when necessary." By comparison, the ports of entry in the San Diego sector continuously reported that they had zero intakes of asylum seekers. According to CBP's own analysis of the Queue Management Reports, between June 20, 2018 and November 8, 2018, the redirecting ports continuously turned away arriving asylum seekers despite their detention facilities being completely empty on 80 percent of the days.[120] This finding corresponds with Gibbons' deposition, where he confirmed that CBP officers in Tecate were instructed to tell arriving asylum seekers that the port of entry was at capacity even when they were aware that the port had sufficient capacity to process asylum seekers.[121]

### F.  Scope of Population Affected by Turn-backs and Metering

77.    From May 2016 through April 2018, asylum seekers were metered at the San Diego port of entry, and periodically at ports of entry along the entire border. However, since April 2018, turn-backs and metering have applied to the vast majority of asylum seekers arriving at the U.S.-Mexico border without a visa to enter

---

[120] AOL-DEF-00210504.

[121] Gibbons, Deposition, November 21, 2019.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the United States.[122]

78.     It is not possible to provide a precise figure regarding the total number of people who have been turned back and metered since the policy began. CBP does not document when it turns people away from ports of entry or when it tells them that the port of entry is at capacity. However, it is possible to provide rough estimates for certain cities in specific time frames. For example, from October 2018 through November 26, 2019, at least 22,000 people signed up on asylum waitlists in Ciudad Juárez.[123] From April 2018 through December 6, 2019, 35,640 people had been processed through the Tijuana waiting list.[124]

79.     The Reports also document periodic snapshots of the number of people

---

[122] The exemptions include unaccompanied minors, individuals who were able to pay a bribe to corrupt list managers and circumvent the asylum waitlist, or asylum seekers who are able to avoid metering by appearing at the limit line with a severe medical need or after being accompanied by an advocate.

[123] 19,180 people have signed up on the asylum waitlists in Ciudad Juárez, and 3,000 Mexicans in the city created their own waitlists at each international bridge. Hérika Martínez Prado, "No se presentan a llamado de EU," *El Diario de Juárez*, December 2, 2019, https://diario.mx/juarez/no-se-presentan-a-llamado-de-eu-20191201-1594784.html; "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[124] The latest list number in Tijuana is published on "elnumerodelalista.com". On Friday, December 6, 2019, the latest number was 3,564. There are 10 people for each number, totaling 35,640. The total number of people on the list is even larger. http://www.elnumerodelalista.com/.

ER 01019

who had been metered and were waiting on asylum waiting lists at the time of each Report's publication. The November 2018 report counted 6,000 people[125] on metering waitlists in 6 cities; the February 2019 update counted 4,800 people[126] in 8 cities; the May 2019 update counted 19,000 people[127] in 13 cities, the August 2019 update counted 26,000[128] in 12 cities, and the November report counted 21,400 people[129] in 11 cities. This creates a combined total of 77,200 people counted on asylum waitlists, although these numbers only capture snapshots of various lists and do not cover all ports of entry. Additionally, the number is further complicated since

---

[125] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for International Security and Law, Center for U.S.-Mexican Studies, & Migration Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-19/MSI/AsylumReport_190308.pdf.

[126] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, February 2019, https://www.strausscenter.org/images/MSI/MeteringUpdate_190808.pdf.

[127] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, May 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/Metering-Report-May-2019-MSI_5.20.pdf.

[128] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, August 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MSI_MeteringUpdate_190215.pdf.

[129] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

53

some of these individuals may be repeated in multiple updates, given the long wait times. Overall, it's clear that tens of thousands of people have been metered along the U.S.-Mexico border.

**Graph 4: Number of People on Asylum Waitlists (November 2018 – November 2019)**



*Data from the Reports.*

80.    Additionally, the asylum waitlists and the Reports' counts of individuals waiting in Mexico only include the asylum seekers who signed up on a waitlist. They do not count unaccompanied minors, who are often excluded from waitlists and are at times allowed to bypass CBP's metering policy. They also do not include asylum seekers who were turned back to Mexico after seeking asylum at port of entry and never joined a list.

81.    Some of these individuals crossed between ports of entry. In January 2017, the American Immigration Council provided three examples from 2016 of

54

turn-backs that led to asylum seekers crossing into the United States between ports of entry near Laredo, Reynosa, and El Paso (during that time period, there were no asylum waitlists in the corresponding Mexican cities).[130] And the Department of Homeland Security's Office of the Inspector General published a report in September 2018 that covered metering, writing "OIG saw evidence that limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally."[131] These asylum seekers' experiences with turn-backs and metering are not recorded, and their number is unknown. Similarly, there have been allegations in Tijuana that black asylum seekers were at times excluded from waitlists, and as such would not be counted.

### G. Systematic Denial

82. Metering serves as a denial of access to the United States' asylum process at the moment that an asylum seeker is sent back to Mexico. This initial

---

[130] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[131] "Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Department of Homeland Security, Office of the Inspector General, September 27, 2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

denial can become permanent. As mentioned earlier, in order to be gain access to the U.S. asylum process, asylum seekers in many Mexican cities must join asylum waitlists that are run by unregulated list managers. At least two of these lists have been "closed" since March 2019 and have not allowed arriving asylum seekers to join.[132] Other lists have required the payment of hundreds or thousands of dollars for asylum seekers to access them. This means that accessing the U.S. asylum process in these locations has become dependent on the structure of an unregulated list system in Mexico or the ability to pay large sums of money to a third party.

83.     Second, due to metering, asylum seekers are now waiting weeks or months in precarious or dangerous conditions before even having a chance to ask for asylum. The cities of Matamoros, Nuevo Progreso, Reynosa, Ciudad Miguel Alemán, and Nuevo Laredo are all located in the Mexican state of Tamaulipas, which the U.S. State Department has given a Level 4 advisory of "Do Not Travel." The U.S. travel advisory warns that in Tamaulipas "Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common."[133] Three

---

[132] These include the individual and family lists in Ciudad Acuña. There have been reports that the Piedras Negras list was periodically closed in 2019.

[133] It also notes that "Gang activity, including gun battles and blockades, is widespread. Armed criminal groups target public and private passenger buses as well as private automobiles traveling through Tamaulipas, often taking passengers hostage and demanding ransom payments. Federal and state security forces have limited capability to respond to violence in many parts of the state." "Mexico Travel

ER 01023

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

other Mexican border states—Coahuila, Chihuahua, and Sonora—have a Level 3 State Department travel advisory of "Reconsider Travel."[134] Baja California has a Level 2 travel advisory of "Exercise Increased Caution."[135]

84.     While asylum seekers wait in Mexican border cities, some have been targeted for crimes, such as robberies, assault, and frequently kidnappings. In 2019, Human Rights First documented a case in Nuevo Laredo where a Guatemalan man on the asylum waitlist was kidnapped after leaving a migrant shelter to search for temporary employment.[136] In January 2019, I also documented a case where a Salvadoran family was kidnapped in Piedras Negras in July 2018 while waiting for their number to be called on the waitlist. When this family was released by Coahuila State Police, they were sent to the National Migration Institute, which began

---

Advisory," U.S. State Department, accessed November 11, 2019, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

[134] The ports of entry in Coahuila are Eagle Pass and Del Rio. The ports of entry in Chihuahua are El Paso, Santa Teresa, Tornillo, and Columbus. The ports of entry in Sonora are Douglas, Lukeville, Naco, Nogales, and San Luis.

[135] The ports of entry in Baja Californa are Andrade, Calexico East, Calexico West, Tecate, Otay Mesa, and San Ysidro.

[136] "Barred at the Border," Human Rights First, April 2019, https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

deportation proceedings to send them back to El Salvador.[137]

85.     Given that Mexican law enforcement are legally mandated to channel anyone in the country without migratory paperwork to the National Migration Institute (regardless of whether or not they are waiting on an asylum waitlist), there are surely other cases where kidnapped asylum seekers were channeled into deportation proceedings.[138] Additionally, asylum seekers waiting on metering lists are not provided any legal documents to remain in Mexico, and, according to Article 98 of Mexico's 2011 Migratory Law, any foreigner detected that does not have the documents accrediting their regular migratory status in the country will be subject to apprehension.[139]

86.     Third, there are also cases of turn-backs and metering that have led to

---

[137] Stephanie Leutert and Shaw Drake, "'We are Full': What Asylum Seekers Are Told," *The New York Times*, January 28, 2019, https://www.nytimes.com/2019/01/28/opinion/asylum-border-immigrants-trump-.html.

[138] Only the National Migration Institute is authorized to check an individual's migratory paperwork. The 2011 Migratory Law outlines that the Federal Police (and now the National Guard) can assist the National Migration Institute in its migration enforcement efforts when their assistance is requested. However, unauthorized migrants that are discovered during routine law enforcement work are generally channeled to the National Migration Institute.

[139] Ley de Migración, Congreso General de los Estados Unidos Mexicanos, May 2011, http://www.diputados.gob.mx/LeyesBiblio/ref/lmigra/LMigra_orig_25may11.pdf.

ER 01025

an effective end to asylum seekers' claims, and even their lives. In June 25, 2019, Oscar and Valerie Martinez made headlines when they drowned in the Rio Grande river in Matamoros. The family had been living in a camp of asylum seekers near the international bridge, waiting for their asylum numbers to be called.[140] After a month of waiting, they grew discouraged and decided to cross the river to ask for asylum from Border Patrol agents, which is when they drowned in the swift current. Similarly, a Honduran woman and her two year old son also drowned in the Rio Grande near Ciudad Acuña after waiting in a tent camp in that city and then attempting to cross.[141] There are additional cases of individuals and children dying after being metered.[142] These asylum seekers were unable to access the U.S. asylum process in the moment when they arrived to the U.S.-Mexico border, and died before ever being able to access it.

---

[140] Julia Le Duc, "Migrante salvadoreño y su hija mueren en el intent de cruzar a EU," La Jornada, June 25, 2019, https://www.jornada.com.mx/sin-fronteras/2019/06/24/migrante-salvadoreno-y-su-hija-mueren-en-el-intento-de-cruzar-a-eu-9107.html.

[141] Andy Torres, "Honduran migrant and her two year old son drown while attempting to swim across the Rio Grande from Mexico to reunite with her husband and two daughters in the US," *Daily Mail*, September 17, 2019, https://www.dailymail.co.uk/news/article-7473969/Honduran-migrant-two-year-old-son-drown-attempting-swim-Mexico.html.

[142] Riane Roldan, "Border Patrol searches for missing 2-year-old girl in Rio Grande," Texas Tribune, July 3, 2019, https://www.texastribune.org/2019/07/03/border-patrol-searches-missing-2-year-old-girl-rio-grande/.

ER 01026

87.     Finally, CBP has increasingly denied access to the U.S. asylum process for Mexican nationals. CBP's April 2018 Metering Guidance explicitly names Mexican nationals as a group that should not be stopped from entering U.S. territory, writing "DFOs should be particularly aware of any INAMI controls that are preventing U.S. citizens, LPRs, or Mexican nationals (some of whom may intend to claim fear) from entering the United States."[143] However, the November 2019 Metering Report Update counted 11,040 Mexicans who had been turned back from U.S. ports of entry and were waiting at the U.S.-Mexico border, making up 52 percent of people then on asylum waitlists.[144] These asylum seekers were forced to wait in the very country that they are attempting to flee. In Ciudad Juárez and Matamoros, these asylum seekers have created their own separate waitlists, so as not to be in contact with Mexican government officials.[145]

## VI.     Conclusion

88.     Beginning in May 2016, the U.S. government began turning back asylum seekers who were arriving at ports of entry on the U.S.-Mexico border. This

---

[143] AOL-DEF-00196460.

[144] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[145] In Matamoros, the National Migration Institute runs the asylum waitlist at the Gateway Bridge. In El Paso, the State Population Council runs the asylum waitlist.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

practice began at the San Ysidro port of entry and spread relatively rapidly to the rest of the U.S.-Mexico border. By April 2018, CBP formally established this policy in a formal Metering Guidance memo that was then disseminated to CBP officers via a series of written and oral musters and standard operating procedures. Today, turn-backs on the U.S.-Mexico border are ubiquitous and systemic. Smaller ports of entry redirect asylum seekers to larger ports of entry, even though the smaller ports of entry have the ability to process asylum seekers. Larger ports of entry turn back asylum seekers, directing them to shelters and waitlists maintained on the Mexican side of the border.

89.     Due to these turn-backs, asylum seekers wait for weeks, if not months, to access the U.S. asylum process, often times in dangerous conditions. CBP's MCAT and Queue Management Reports offer a common method for determining whether capacity constraints prevented a port of entry from inspecting and processing an asylum seeker without resorting to turn-backs. Using this method, I have determined that the standardized use of turn-backs cannot be justified by capacity constraints at the majority of ports of entry.

90.     The data includes many instances when ports of entry reach capacity but since April 2018, these ports of entry have never used their previously-approved contingency plans that would have temporarily expanded capacity within the port of entry during times of increased migration. Additionally, metering practices and turn-

61

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

backs have remained in place regardless of the migration level at the port of entry.

91.     If metering and turn-backs were only a response to greater numbers of arriving asylum seekers, then we could expect that the limit line positions, turn-backs, and metering processes would disappear in ports of entry that were experiencing low migration numbers or had no individuals waiting in Mexico to seek entry. Yet, CBP's documents, extensive fieldwork, the September 2019 OIG report regarding Tecate, and Gibbons testimony all illustrate that these policies continue to be in place at pedestrian ports of entry along the entire U.S. border, unchanged by the ebbs and flows of migration numbers.

Signed this 10th day of December, 2019:

_____  _____
Stephanie Leutert

62

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Exhibits/Attachments/Figures**

**Table 7: CBP Documents Containing Data on Capacity**

| Report Name | Number of Reports | Date Range |
|---|---|---|
| MCAT Daily Reports | 547 | 11/30/2016 – 7/13/2019 |
| Field Queue Management Reports | 314 | 6/18/2018 – 7/15/2019 |

63

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table 8: Port Capacity Over Time (MCAT Reports)**

| City | Date Range | | | | |
|---|---|---|---|---|---|
| | 11/30/2016 - 3/23/2018 | 4/2/2018 – 4/27/2018 | 5/4/2018 – 6/4/2018 | 6/5/2018 – 7/13/2019 | 7/7/2019 – 7/13/09 |
| Brownsville | 137 | 137 | 137 | 69 | 69 |
| Hidalgo | 54[146] | 54 | 54 | 42 | 42 |
| Roma | | | | 16 | 16 |
| Laredo | 90 | 90 | 90 | 125 | 125 |
| Eagle Pass | | | | 14 | 28 |
| El Paso | 226 | 226 | 306 | 306 / 115[147] | 115 |
| Tornillo | | 70 | 85 | 85 | 85 |
| Nogales | 74 | 66 | 66 | 66 | 66 |
| San Luis | 48 | 48 | 48 | 48 / 35[148] | 35 |
| Calexico | 66 | 121 | 121 | 121 / 67[149] | 67 |
| San Ysidro | 316 | 316 | 316 | 316 | 316 |
| Otay Mesa | . | 51 | 51 | 51 | 51 |

---

[146] The capacity drops to 32 on March 23, 2018. Since this only occurs for one day, it could be an error.

[147] The capacity switched from to 115 on July 30, 2018.

[148] The capacity switched from 48 to 35 on October 31, 2018.

[149] The capacity switched from 121 to 67 on June 19, 2018.

64

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table 9: Days with Reported Queues at the Limit Line and Port of Entry Capacity Levels at or Below 75 Percent**

| City | # of Days with Data | # of Days with Reported Line | # of Days with Reported Line & Port Capacity at or Below 75% | Percent of Days with Reported Line & Port Capacity at or Below 75% |
|---|---|---|---|---|
| Laredo | 313 | 227 | 226 | 100% |
| Rio Grande | 312 | 17 | 17 | 100% |
| Brownsville | 313 | 247 | 244 | 99% |
| Roma | 313 | 95 | 94 | 99% |
| Progreso | 313 | 105 | 99 | 94% |
| Del Rio | 312 | 92 | 77 | 84% |
| Nogales | 214 | 76 | 47 | 62% |
| Douglas | 214 | 13 | 7 | 54% |
| Hidalgo | 313 | 117 | 45 | 38% |
| Port of El Paso | 214 | 123 | 40 | 33% |
| Eagle Pass | 313 | 145 | 30 | 21% |

ER 01032

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table 10: MCAT Capacity Data (November 30, 2016 – July 19, 2019)**

| | Days with Data | 0-50% Capacity | 51-100% Capacity | >100% Capacity |
|---|---|---|---|---|
| Brownsville | 483 | 92% | 7% | 1% |
| Calexico, CA | 536 | 61% | 34% | 5% |
| El Paso | 537 | 52% | 27% | 21% |
| Hidalgo | 521 | 66% | 17% | 17% |
| Laredo | 530 | 93% | 7% | 0% |
| Nogales | 530 | 55% | 41% | 4% |
| San Luis | 497 | 87% | 13% | 0% |
| San Ysidro | 537 | 44% | 53% | 3% |
| Eagle Pass | 220 | 5% | 38% | 57% |
| Otay Mesa | 265 | 87% | 11% | 2% |
| Roma | 220 | 73% | 26% | 0% |
| Tornillo | 232 | 96% | 3% | 1% |

*Total percent may not equal 100% due to rounding.*

ER 01033

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit A: Current Curriculum Vitae**

ER 01034

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# STEPHANIE LEUTERT
stephanie.leutert@utexas.edu | 239.595.1726

| | |
|---|---|
| **YALE UNIVERSITY** | **New Haven, CT** |
| MA Global Affairs | 2016 |
| **SKIDMORE COLLEGE** | **Saratoga Springs, NY** |
| BA International Affairs | Spanish Literature | 2011 |

| | |
|---|---|
| **STRAUSS CENTER FOR INTERNATIONAL SECURITY AND LAW** | **Austin, TX** |
| *Director, Central America & Mexico Policy Initiative (CAMPI)* | 2017-2019 |

- Lead the development and programming for CAMPI and conduct original research on the U.S.-Mexico border and Central American migration.
- Head author for the first-ever border-wide report on the U.S. Customs and Border Protection's (CBP) metering policy and asylum waitlists. Co-author on subsequent metering updates that document CBP metering practices and conditions for asylum seekers waiting in 13 Mexican border cities.
- Head researcher for a joint project with the Brooks County Sheriff's Office in South Texas that documents migrant deaths in the area and aims to improve rescue and recovery operations for migrants who become ill or pass away while attempting to circumvent the county's CBP checkpoint.
- Conducted original research on migrant smuggling along Mexico's highway system and migrant kidnapping in Mexico, both of which were presented to the United Nations Office of Drugs and Crime.
- Developed a year-long research partnership with five members of Mexico's National Security Commission about regulating Mexico's private security sector. The results were published and presented in May 2018.
- Instructor for a MA Policy Research Project (PRP) course on Mexico's migratory policy at the Lyndon B. Johnson School of Public Affairs. Client for 2018-2019 and 2019-2020 courses: FM4 migrant shelter in Guadalajara, Jalisco; Clients for 2017-2018 course: Sin Fronteras and the Mexican Federal Police.

| | |
|---|---|
| *Fellow, Mexico Security Initiative* | 2016-2017 |

- Co-instructor for a year-long PRP class on Mexico's security policy; organized a trip to Mexico City for MA students to visit and interview government officials, civil society organizations, and journalists.
- Principal writer for "Beyond the Border" on the *Lawfare Blog*, covering migration and security policies in Mexico and Central America.

| | |
|---|---|
| **HILLARY FOR AMERICA** | **Austin, TX** |
| *Administrator, Latin America Policy Working Group* | 2015-2016 |

- Coordinated more than 80 working group members on talking points, memos, and briefings related to political and economic developments in Latin America, U.S.-Latin America relations, and Central American migration.
- Wrote talking points, policy memos, and social media posts on current events and long-term social, economic, and political trends in Latin America and potential campaign responses.
- Gathered information on Latin America and Caribbean diaspora communities for targeted messaging.

| | |
|---|---|
| **YALE UNIVERSITY** | **New Haven, CT** |
| *Teaching Fellow* | 2015 |

- Head Teaching Fellow for International Challenges in the Twenty-First Century with Dr. Jolyon Howorth in the Political Science department. Taught one section of eighteen students (Fall 2015).
- American Economic History in the Economics department with Dr. Eric Hilt. Taught two sections of fourteen students (Spring 2015).
- International Challenges in the Twenty-First Century with Dr. Jolyon Howorth in the Political Science department. Taught two sections of nineteen students (Fall 2014).

| | |
|---|---|
| **COCA-COLA WORLD FUND** | **Estado de Mexico, Mexico | Chihuahua, Mexico | Sonora, Mexico** |

68

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

*Fellow*                                                                                                                                    2015
- Conducted independent field research across Estado de Mexico, Chihuahua, and Sonora on the development of Mexico's automotive industry, supplier networks, and the ties to the United States.
- Interviewed automotive sector participants from multinational companies, suppliers, industry associations, university programs, and state governments.


**UKRAINIAN PARLIAMENT**                                                                              **Kyiv, Ukraine**
*Legislative Assistant to MP Olga Bielkova, Deputy Head of the Energy Committee*                        2015
- Conducted over 20 interviews on production sharing agreements (PSAs) in Ukraine's natural gas sector as part of the country's ongoing energy reform.
- Wrote a policy memo that formed the basis of a Ukrainian congressional review of PSAs.
- Served as the representative of the Ukrainian Parliament's Energy Committee in the U.S. Winter Action Plan meetings and reported the developments to high-ranking members of Parliament.

**FREELANCE**                                                              **Mexico City, Mexico | New Haven, CT**
*Writer & Researcher*                                                                                         2014-2017
- Writer for op-eds and briefings on energy, economic development, and rule of law in Latin America.
- Researcher for projects related to Mexico's 2013 energy reform for a U.S.-based boutique consulting firm.
- Conducted five weeks of independent research in Querétaro and Guanajuato on Mexico's aerospace industry in July-August 2014.

**COUNCIL ON FOREIGN RELATIONS (CFR)**                                                      **New York, NY**
*Research Associate, Latin America Studies Program*                                                         2012-2014
- Researched and drafted publications on security, energy, economic, and political issues in North America and Latin America.
- Acted as the lead researcher for the 2014 CFR Task Force on North America, chaired by Ambassador Robert Zoellick and General David Petraeus. Participated in five-person research trips to Ottawa and Mexico City.
- Managed programmatic responsibilities for the Latin America Studies Program.

**ASYLUM ACCESS ECUADOR**                                                                      **Quito, Ecuador**
    *Visiting Researcher*                                                                                          2011
- Led a three-month research project on Ecuador's evolving refugee policy amid tensions with Colombia.
- Organized a three-day conference in partnership with Asylum Access Ecuador, the Norwegian Refugee Council, and the UNHCR, for Colombian refugee women who experienced gender-based violence.

**VERITÉ**                                                                                      **Amherst, MA**
*Research Intern, International Labor Law*                                                                      2010
- Researched and wrote reports on workers' rights, labor law, and contract labor issues in Mexico, Peru, Chile, Colombia, Morocco, and Thailand.

**AFRICAN CENTER FOR TREATMENT OF TORTURE VICTIMS (ACTV)**                            **Gulu, Uganda**
*Affiliated Researcher*                                                                                         2009
- Independently designed and conducted field research on war torture perpetrated by the Ugandan military and the Lord's Resistance Army (LRA) through interviews with NGOs and torture victims.

**CONFERENCES & MEDIA**

- Panelist, "Dying to Be Here," Texas Tribune Festival, September 28, 2019.
- Briefer, "Visit to the Southern Border," Inter-American Commission on Human Rights, Laredo, August 22, 2019.
- Podcast, "Understanding Mexico in the Migration Crisis," *Trumpcast, Slate*, June 25, 2019.

69

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- Speaker, "The Migration Disconnect," Wichita Committee on Foreign Relations, Wichita, March 2019.
- Panelist, "Conversatorio: Rumbo a una Politica Migratoria de Estado en México," Guadalajara, Jalisco, December 2018.
- Podcast, "The Migrant Caravan and Its Dissenters," *Lawfare Podcast*, October 27, 2018.
- Panelist, "U.S. Immigration Policy and Family Separation," RAICES, San Antonio, July 2018.
- Podcast, "The Other Southern Border," *Lawfare Podcast*, June 26, 2018.
- Presenter, "Regulating Private Security in Mexico," University of Texas at Austin, May 9, 2018.
- Presenter, "Migrant Smuggling along Mexico's Highways," UNODC, Florence, October 2017.
- Panelist, "Violence and Migration in Mexico," University of Texas at Austin, September 25, 2017.
- Speaker, "Seminario Sobre Seguridad, Ciudadanía y Violencia en América Latina," ITAM, Mexico City, April 21, 2017.
- Panelist, "Social Innovation and Humanitarian Responses," Yale University, February 22, 2017.
- Editor in Chief, *Yale Journal of International Affairs* (2015-2016).

**PUBLICATIONS**

- Stephanie Leutert, et al. "Metering Update: November," Strauss Center, November 2019.
- Stephanie Leutert, "In the Brush in Brooks County: Who's Dying in South Texas?" *Lawfare Blog*, September 2019.
- Stephanie Leutert, "One County, 650 Migrant Deaths: An Introduction," *Lawfare Blog*, September 2019.
- Stephanie Leutert, "What 'Metering' Really Looks Like in South Texas," *Lawfare Blog*, July 2019.
- Stephanie Leutert, et al. "Metering Update: May," Strauss Center, May 2019.
- Stephanie Leutert, "How Many Central Americans are Traveling North?" *Lawfare Blog*, March 2019.
- Stephanie Leutert, et al. "Metering Update: February," Strauss Center, February 2019.
- Stephanie Leutert & Shaw Drake, "What Asylum Seekers Are Told," *New York Times*, January 2019.
- Stephanie Leutert, et al. "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center, December 2018.
- Stephanie Leutert "The Migration Disconnect," *Foreign Affairs,* November 2018.
- Stephanie Leutert, "Many Migrants are Victims of Crime," *New York Times*, September 2018.
- Stephanie Leutert, "How Climate Change is Affecting Rural Hondurans," *Washington Post,* November 2018.
- Stephanie Leutert, "Why Are So Many Migrants Leaving Guatemala? A Crisis in the Coffee Industry is One Reason," *Time Magazine,* July 2018.
- Stephanie Leutert & Caitlyn Yates, "Migrant Kidnapping in Mexico: Regional Differences," Strauss Center, October 2018.
- Stephanie Leutert, "The Invisible Caravans," *Lawfare Blog*, October 2018.
- Stephanie Leutert, "Who's Really Crossing the U.S. Border, and Why They're Coming," *Lawfare Blog*, July 1, 2018.
- Mexico Security Initiative and La Comisión Nacional de Seguridad de México, "Regulating the Private Security Sector in Mexico," Strauss Center, April 2018.
- Stephanie Leutert, "The Current State of U.S.-Mexico Security Cooperation," Strauss Center, February 2018.
- Stephanie Leutert and Caitlyn Yates, "Migrant Smuggling along Mexico's Highway System," Strauss Center, November 2017.
- Stephanie Leutert, "Fleeing the Storms," Berkeley Review of Latin America Studies, Fall 2017.
- Stephanie Leutert, "Climate Change Induced Migration from Central America," *Lawfare Blog*, June 21, 2017.
- Stephanie Leutert, "Border Ambassador: Rebeca Vargas," *Americas Quarterly*, Summer 2017.
- Stephanie Leutert, "Building the Border Wall: An Update," *Lawfare Blog*, April 19, 2017.
- Stephanie Leutert & Savitri Arvey, "Mexico's Next Move," *Lawfare Blog*, February 7, 2017.
- Stephanie Leutert & Savitri Arvey, "What Comes Next for Trump's Border Wall," *Lawfare Blog*, January 26, 2017.
- Stephanie Leutert & Antonio Garza, "Opioid-Stoked Mexican Drug Violence Again Flares Alarmingly," *Dallas Morning News*, December 22, 2016.

70

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- Stephanie Leutert, "Donald Trump and the Non-Existent Two Million Criminal Immigrants," *Lawfare Blog*, November 22, 2016.
- Stephanie Leutert, "The Migrant Kidnapping Epidemic Next Door," *Lawfare Blog*, November 30, 2016.
- Stephanie Leutert, "Donald Trump and the Non-Existent Two Million Criminal Immigrants," *Lawfare Blog*, November 22, 2016.
- Stephanie Leutert, "Fewer Drugs Doesn't Necessarily Mean Less Violence," *Lawfare Blog*, October 20, 2016.
- Stephanie Leutert, "Colombia's Brexit Vote," *Lawfare Blog*, October 4, 2016.
- Stephanie Leutert, "Why Central Americans Keep Coming," *Lawfare Blog*, September 13, 2016.
- Stephanie Leutert, "Mexico's Resurging Violence," *Lawfare Blog*, August 29, 2016.
- Stephanie Leutert, "Homicides in Mexico: What Goes Up Does Not Necessarily Come Down," *Lawfare Blog*, August 4, 2016.
- Stephanie Leutert, "Who's Killing Whom in Mexico and Central America," *Lawfare Blog*, July 27, 2016.
- Stephanie Leutert, "What is Beyond the Border," *Lawfare Blog*, July 20, 2016.
- Stephanie Leutert, "Kyiv Dispatch: Ukraine's Volunteer Battalions," *Lawfare Blog*, September 1, 2015.
- Stephanie Leutert, "Kyiv Dispatch: Displaced!" *Lawfare Blog*, August 3, 2015.
- Stephanie Leutert, "Kyiv Dispatch: The View from Ukraine," *Lawfare Blog*, July 13, 2015.
- Stephanie Leutert, "Undocumented in the Ivy League," *Americas Quarterly*, May 2015.
- Stephanie Leutert and Alfredo Corchado, "Open Season," *Audubon*, February 2015.
- Stephanie Leutert, "Deported or Supported," *Princeton Journal of Public and International Affairs*, 2015.
- Stephanie Leutert, "How Many People Are We Really Deporting," *Lawfare Blog*, January 20, 2015.
- Stephanie Leutert, "Mexico's Aerospace Sector Takes Flight," *CFR.org*, August 2014.
- Stephanie Leutert, "U.S. Students Are Heading to Latin America, Just Not to Mexico," *CFR.org*, February 10, 2014.
- Stephanie Leutert & Benjamin Wittes, "On Wikipedia, Lawfare, Blogs, and Sources," *Harvard Law School National Security Journal*, May 12, 2013.
- Stephanie Leutert, "Negotiating Peace for Displaced Persons in Colombia," *Americas Quarterly Blog*, February 14, 2013.
- Stephanie Leutert, "Rafael Correa's Smooth Road to Victory," *CFR.org*, January 24, 2013.
- Stephanie Leutert, "Correa is No Chávez," *GPS CNN*, July 31, 2012.
    Stephanie Leutert, "Ecuador's Invisible Refugee Population," *Americas Quarterly*, February 2012.

ER 01038

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Exhibit B: Prior testimony

In the last four years, I have not testified as an expert at trial or deposition.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Exhibit C: Materials Considered

In addition to the materials cited in the body of my report, I considered the following materials when forming the opinions expressed in my report.

**Pleadings**
- Plaintiffs' Second Amended Complaint
- Defendants' Answer to Second Amended Complaint
- Exhibit 1 to Defendants' Answer to Second Amended Complaint

**Court Orders**
- Order Denying in Part and Granting in Part Defendants' Motion to Dismiss Second Amended Complaint
- Amended Order Denying in Part and Granting in Part Defendants' Motion to Dismiss Second Amended Complaint

**Discovery Requests**
- Plaintiffs' First Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Production
- Plaintiffs' Second Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Second Set of Requests for Production
- Plaintiffs' Third Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Third Set of Requests for Production
- Plaintiffs' Fourth Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Fourth Set of Requests for Production
- Plaintiffs' Fifth Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Fifth Set of Requests for Production
- Plaintiffs' First Set of Interrogatories
- Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories
- Plaintiffs' Second Set of Interrogatories
- Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories
- Plaintiffs' First Deposition Notice

- Plaintiffs' Rule 30(b)(6) Deposition Notice to CBP

**Briefs**
- Plaintiffs' Motion for Preliminary Injunction, Brief, and Supporting Exhibits
- Defendants' Opposition to Motion for Preliminary Injunction and Supporting Exhibits
- Plaintiffs Reply in Support of their Motion for Preliminary Injunction and Supporting Exhibits
- Plaintiffs' Motion for Provisional Class Certification, Brief, and Supporting Exhibits
- Defendants' Opposition to Motion for Provisional Class Certification and Supporting Exhibits
- Plaintiffs' Reply in Support of their Motion for Provisional Class Certification and Supporting Exhibits

**Depositions and Exhibits to Depositions**
- Brandon Gibbons, November 21, 2019

**Documents**
- AOL-DEF-00010309
- AOL-DEF-00010580
- AOL-DEF-00010628
- AOL-DEF-00010630
- AOL-DEF-00010632
- AOL-DEF-00010634
- AOL-DEF-00010637
- AOL-DEF-00010640
- AOL-DEF-00010764
- AOL-DEF-00011011
- AOL-DEF-00011235
- AOL-DEF-00011371
- AOL-DEF-00011376
- AOL-DEF-00011372
- AOL-DEF-00011876
- AOL-DEF-00011883
- AOL-DEF-00012000
- AOL-DEF-00012012
- AOL-DEF-00012014

74

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00012018
- AOL-DEF-00012019
- AOL-DEF-00012020
- AOL-DEF-00012021
- AOL-DEF-00012022
- AOL-DEF-00012032
- AOL-DEF-00012033
- AOL-DEF-00012041
- AOL-DEF-00012061
- AOL-DEF-00012071
- AOL-DEF-00012081
- AOL-DEF-00012099
- AOL-DEF-00012109
- AOL-DEF-00012119
- AOL-DEF-00012129
- AOL-DEF-00012144
- AOL-DEF-00012154
- AOL-DEF-00012164
- AOL-DEF-00012175
- AOL-DEF-00012186
- AOL-DEF-00012196
- AOL-DEF-00012206
- AOL-DEF-00012217
- AOL-DEF-00012227
- AOL-DEF-00012236
- AOL-DEF-00012246
- AOL-DEF-00012256
- AOL-DEF-00012266
- AOL-DEF-00012284
- AOL-DEF-00012307
- AOL-DEF-00012317
- AOL-DEF-00012335
- AOL-DEF-00012345
- AOL-DEF-00012355
- AOL-DEF-00012365
- AOL-DEF-00012376
- AOL-DEF-00012394

ER 01042

- AOL-DEF-00012419
- AOL-DEF-00012433
- AOL-DEF-00012445
- AOL-DEF-00012457
- AOL-DEF-00012469
- AOL-DEF-00012483
- AOL-DEF-00012495
- AOL-DEF-00012506
- AOL-DEF-00012517
- AOL-DEF-00012527
- AOL-DEF-00012537
- AOL-DEF-00012548
- AOL-DEF-00012560
- AOL-DEF-00012572
- AOL-DEF-00012583
- AOL-DEF-00012594
- AOL-DEF-00012606
- AOL-DEF-00012617
- AOL-DEF-00012633
- AOL-DEF-00012643
- AOL-DEF-00012653
- AOL-DEF-00012666
- AOL-DEF-00012676
- AOL-DEF-00012685
- AOL-DEF-00012694
- AOL-DEF-00012703
- AOL-DEF-00012712
- AOL-DEF-00012721
- AOL-DEF-00012978
- AOL-DEF-00012987
- AOL-DEF-00012996
- AOL-DEF-00013005
- AOL-DEF-00013014
- AOL-DEF-00013023
- AOL-DEF-00013023
- AOL-DEF-00013041
- AOL-DEF-00013049

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00013052
- AOL-DEF-00013059
- AOL-DEF-00013071
- AOL-DEF-00013075
- AOL-DEF-00013085
- AOL-DEF-00013090
- AOL-DEF-00013103
- AOL-DEF-00013107
- AOL-DEF-00013110
- AOL-DEF-00013116
- AOL-DEF-00013122
- AOL-DEF-00013128
- AOL-DEF-00013141
- AOL-DEF-00013155
- AOL-DEF-00013160
- AOL-DEF-00013164
- AOL-DEF-00013168
- AOL-DEF-00013179
- AOL-DEF-00013189
- AOL-DEF-00013194
- AOL-DEF-00013209
- AOL-DEF-00013215
- AOL-DEF-00013229
- AOL-DEF-00013232
- AOL-DEF-00013235
- AOL-DEF-00013238
- AOL-DEF-00013241
- AOL-DEF-00013244
- AOL-DEF-00013869
- AOL-DEF-00013871
- AOL-DEF-00013889
- AOL-DEF-00013906
- AOL-DEF-00013908
- AOL-DEF-00013924
- AOL-DEF-00013926
- AOL-DEF-00013930
- AOL-DEF-00013932

ER 01044

- AOL-DEF-00014010
- AOL-DEF-00014030
- AOL-DEF-00014033
- AOL-DEF-00014038
- AOL-DEF-00014041
- AOL-DEF-00014136
- AOL-DEF-00014173
- AOL-DEF-00014547
- AOL-DEF-00014659
- AOL-DEF-00014669
- AOL-DEF-00014682
- AOL-DEF-00014717
- AOL-DEF-00014720
- AOL-DEF-00014724
- AOL-DEF-00014762
- AOL-DEF-00014832
- AOL-DEF-00014854
- AOL-DEF-00014870
- AOL-DEF-00014875
- AOL-DEF-00014878
- AOL-DEF-00014881
- AOL-DEF-00014893
- AOL-DEF-00014895
- AOL-DEF-00014909
- AOL-DEF-00014922
- AOL-DEF-00014925
- AOL-DEF-00014942
- AOL-DEF-00014963
- AOL-DEF-00014977
- AOL-DEF-00014996
- AOL-DEF-00015339
- AOL-DEF-00016004
- AOL-DEF-00016564
- AOL-DEF-00016577
- AOL-DEF-00016589
- AOL-DEF-00016601
- AOL-DEF-00016631

ER 01045

- AOL-DEF-00016643
- AOL-DEF-00016653
- AOL-DEF-00016665
- AOL-DEF-00016672
- AOL-DEF-00016683
- AOL-DEF-00016691
- AOL-DEF-00016705
- AOL-DEF-00016715
- AOL-DEF-00016723
- AOL-DEF-00016733
- AOL-DEF-00016735
- AOL-DEF-00016773
- AOL-DEF-00016774
- AOL-DEF-00016777
- AOL-DEF-00016779
- AOL-DEF-00016780
- AOL-DEF-00016781
- AOL-DEF-00016782
- AOL-DEF-00016813
- AOL-DEF-00016820
- AOL-DEF-00016823
- AOL-DEF-00016828
- AOL-DEF-00016831
- AOL-DEF-00016836
- AOL-DEF-00016839
- AOL-DEF-00016844
- AOL-DEF-00016847
- AOL-DEF-00016852
- AOL-DEF-00016855
- AOL-DEF-00016860
- AOL-DEF-00016863
- AOL-DEF-00016870
- AOL-DEF-00016874
- AOL-DEF-00016875
- AOL-DEF-00016876
- AOL-DEF-00016877
- AOL-DEF-00016880

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00016888
- AOL-DEF-00016891
- AOL-DEF-00016896
- AOL-DEF-00016899
- AOL-DEF-00016923
- AOL-DEF-00016926
- AOL-DEF-00016931
- AOL-DEF-00016934
- AOL-DEF-00016939
- AOL-DEF-00016942
- AOL-DEF-00016947
- AOL-DEF-00016950
- AOL-DEF-00016960
- AOL-DEF-00016963
- AOL-DEF-00016974
- AOL-DEF-00016977
- AOL-DEF-00016992
- AOL-DEF-00016995
- AOL-DEF-00017000
- AOL-DEF-00017003
- AOL-DEF-00017008
- AOL-DEF-00017011
- AOL-DEF-00017016
- AOL-DEF-00017019
- AOL-DEF-00017099
- AOL-DEF-00017102
- AOL-DEF-00017163
- AOL-DEF-00017168
- AOL-DEF-00017175
- AOL-DEF-00017177
- AOL-DEF-00017208
- AOL-DEF-00017213
- AOL-DEF-00017241
- AOL-DEF-00017246
- AOL-DEF-00017355
- AOL-DEF-00017358
- AOL-DEF-00017365

ER 01047

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00017367
- AOL-DEF-00017374
- AOL-DEF-00017376
- AOL-DEF-00017383
- AOL-DEF-00017385
- AOL-DEF-00017392
- AOL-DEF-00017395
- AOL-DEF-00017400
- AOL-DEF-00017401
- AOL-DEF-00017402
- AOL-DEF-00017407
- AOL-DEF-00017414
- AOL-DEF-00017417
- AOL-DEF-00017424
- AOL-DEF-00017426
- AOL-DEF-00017434
- AOL-DEF-00017437
- AOL-DEF-00017444
- AOL-DEF-00017448
- AOL-DEF-00017455
- AOL-DEF-00017460
- AOL-DEF-00017467
- AOL-DEF-00017470
- AOL-DEF-00017517
- AOL-DEF-00017521
- AOL-DEF-00017528
- AOL-DEF-00017531
- AOL-DEF-00017539
- AOL-DEF-00017542
- AOL-DEF-00017551
- AOL-DEF-00017553
- AOL-DEF-00017568
- AOL-DEF-00017576
- AOL-DEF-00017581
- AOL-DEF-00017586
- AOL-DEF-00017588
- AOL-DEF-00017595

ER 01048

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00017600
- AOL-DEF-00017605
- AOL-DEF-00017610
- AOL-DEF-00017615
- AOL-DEF-00017620
- AOL-DEF-00017625
- AOL-DEF-00017630
- AOL-DEF-00017635
- AOL-DEF-00017641
- AOL-DEF-00017646
- AOL-DEF-00017652
- AOL-DEF-00017657
- AOL-DEF-00017662
- AOL-DEF-00017667
- AOL-DEF-00017672
- AOL-DEF-00017677
- AOL-DEF-00017682
- AOL-DEF-00017687
- AOL-DEF-00017692
- AOL-DEF-00017697
- AOL-DEF-00017702
- AOL-DEF-00017707
- AOL-DEF-00017712
- AOL-DEF-00017717
- AOL-DEF-00017722
- AOL-DEF-00017727
- AOL-DEF-00017732
- AOL-DEF-00017737
- AOL-DEF-00017742
- AOL-DEF-00017747
- AOL-DEF-00017751
- AOL-DEF-00017761
- AOL-DEF-00017766
- AOL-DEF-00017771
- AOL-DEF-00017776
- AOL-DEF-00017781
- AOL-DEF-00017786

ER 01049

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00017791
- AOL-DEF-00017796
- AOL-DEF-00017801
- AOL-DEF-00017807
- AOL-DEF-00017812
- AOL-DEF-00017817
- AOL-DEF-00017822
- AOL-DEF-00017827
- AOL-DEF-00017832
- AOL-DEF-00017837
- AOL-DEF-00017842
- AOL-DEF-00017847
- AOL-DEF-00017852
- AOL-DEF-00017857
- AOL-DEF-00017862
- AOL-DEF-00017867
- AOL-DEF-00017872
- AOL-DEF-00017877
- AOL-DEF-00017882
- AOL-DEF-00017887
- AOL-DEF-00017892
- AOL-DEF-00017897
- AOL-DEF-00017902
- AOL-DEF-00017907
- AOL-DEF-00017912
- AOL-DEF-00017917
- AOL-DEF-00017922
- AOL-DEF-00017927
- AOL-DEF-00017932
- AOL-DEF-00017937
- AOL-DEF-00017942
- AOL-DEF-00017947
- AOL-DEF-00017952
- AOL-DEF-00017957
- AOL-DEF-00017962
- AOL-DEF-00017967
- AOL-DEF-00017972

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00017977
- AOL-DEF-00017982
- AOL-DEF-00017987
- AOL-DEF-00017992
- AOL-DEF-00017997
- AOL-DEF-00018002
- AOL-DEF-00018009
- AOL-DEF-00018014
- AOL-DEF-00018019
- AOL-DEF-00018024
- AOL-DEF-00018029
- AOL-DEF-00018034
- AOL-DEF-00018039
- AOL-DEF-00018044
- AOL-DEF-00018049
- AOL-DEF-00018054
- AOL-DEF-00018059
- AOL-DEF-00018064
- AOL-DEF-00018069
- AOL-DEF-00018074
- AOL-DEF-00018079
- AOL-DEF-00018084
- AOL-DEF-00018087
- AOL-DEF-00018089
- AOL-DEF-00018094
- AOL-DEF-00018099
- AOL-DEF-00018104
- AOL-DEF-00018109
- AOL-DEF-00018114
- AOL-DEF-00018119
- AOL-DEF-00018124
- AOL-DEF-00018129
- AOL-DEF-00018134
- AOL-DEF-00018139
- AOL-DEF-00018144
- AOL-DEF-00018149
- AOL-DEF-00018154

ER 01051

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00018159
- AOL-DEF-00018164
- AOL-DEF-00018169
- AOL-DEF-00018174
- AOL-DEF-00018179
- AOL-DEF-00018184
- AOL-DEF-00018189
- AOL-DEF-00018194
- AOL-DEF-00018199
- AOL-DEF-00018204
- AOL-DEF-00018209
- AOL-DEF-00018212
- AOL-DEF-00018219
- AOL-DEF-00018224
- AOL-DEF-00018229
- AOL-DEF-00018234
- AOL-DEF-00018239
- AOL-DEF-00018244
- AOL-DEF-00018249
- AOL-DEF-00018254
- AOL-DEF-00018259
- AOL-DEF-00018264
- AOL-DEF-00018269
- AOL-DEF-00018276
- AOL-DEF-00018281
- AOL-DEF-00018286
- AOL-DEF-00018291
- AOL-DEF-00018296
- AOL-DEF-00018301
- AOL-DEF-00018306
- AOL-DEF-00018311
- AOL-DEF-00018313
- AOL-DEF-00018315
- AOL-DEF-00018317
- AOL-DEF-00018345
- AOL-DEF-00018347
- AOL-DEF-00018353

ER 01052

- AOL-DEF-00018355
- AOL-DEF-00018362
- AOL-DEF-00018364
- AOL-DEF-00018388
- AOL-DEF-00018399
- AOL-DEF-00018401
- AOL-DEF-00018406
- AOL-DEF-00018408
- AOL-DEF-00018414
- AOL-DEF-00019150
- AOL-DEF-00019162
- AOL-DEF-00019285
- AOL-DEF-00019307
- AOL-DEF-00019314
- AOL-DEF-00019375
- AOL-DEF-00019403
- AOL-DEF-00019435
- AOL-DEF-00019447
- AOL-DEF-00019452
- AOL-DEF-00019468
- AOL-DEF-00019495
- AOL-DEF-00019505
- AOL-DEF-00019524
- AOL-DEF-00019542
- AOL-DEF-00019571
- AOL-DEF-00019689
- AOL-DEF-00019876
- AOL-DEF-00019898
- AOL-DEF-00019923
- AOL-DEF-00019950
- AOL-DEF-00019965
- AOL-DEF-00020023
- AOL-DEF-00020113
- AOL-DEF-00020130
- AOL-DEF-00020147
- AOL-DEF-00020168
- AOL-DEF-00020196

ER 01053

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00020215
- AOL-DEF-00020254
- AOL-DEF-00020272
- AOL-DEF-00020290
- AOL-DEF-00020308
- AOL-DEF-00020326
- AOL-DEF-00020385
- AOL-DEF-00020406
- AOL-DEF-00020426
- AOL-DEF-00020445
- AOL-DEF-00020463
- AOL-DEF-00020481
- AOL-DEF-00020499
- AOL-DEF-00020520
- AOL-DEF-00020538
- AOL-DEF-00020557
- AOL-DEF-00020575
- AOL-DEF-00020594
- AOL-DEF-00020612
- AOL-DEF-00020630
- AOL-DEF-00020648
- AOL-DEF-00020666
- AOL-DEF-00020685
- AOL-DEF-00020704
- AOL-DEF-00020722
- AOL-DEF-00020740
- AOL-DEF-00020758
- AOL-DEF-00020776
- AOL-DEF-00020794
- AOL-DEF-00020812
- AOL-DEF-00020831
- AOL-DEF-00020849
- AOL-DEF-00020867
- AOL-DEF-00020885
- AOL-DEF-00020903
- AOL-DEF-00020921
- AOL-DEF-00020940

ER 01054

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00020959
- AOL-DEF-00020977
- AOL-DEF-00020995
- AOL-DEF-00021013
- AOL-DEF-00021031
- AOL-DEF-00021050
- AOL-DEF-00021068
- AOL-DEF-00021087
- AOL-DEF-00021105
- AOL-DEF-00021125
- AOL-DEF-00021144
- AOL-DEF-00021162
- AOL-DEF-00021181
- AOL-DEF-00021199
- AOL-DEF-00021219
- AOL-DEF-00021237
- AOL-DEF-00021255
- AOL-DEF-00021275
- AOL-DEF-00021293
- AOL-DEF-00021312
- AOL-DEF-00021331
- AOL-DEF-00021350
- AOL-DEF-00021369
- AOL-DEF-00021387
- AOL-DEF-00022783
- AOL-DEF-00023095
- AOL-DEF-00027364
- AOL-DEF-00027464
- AOL-DEF-00028451
- AOL-DEF-00028455
- AOL-DEF-00028457
- AOL-DEF-00032387
- AOL-DEF-00032389
- AOL-DEF-00034787
- AOL-DEF-00036001
- AOL-DEF-00036004
- AOL-DEF-00036343

ER 01055

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00036355
- AOL-DEF-00038275
- AOL-DEF-00038916
- AOL-DEF-00038921
- AOL-DEF-00038923
- AOL-DEF-00038925
- AOL-DEF-00038927
- AOL-DEF-00038929
- AOL-DEF-00038931
- AOL-DEF-00039125
- AOL-DEF-00039580
- AOL-DEF-00039582
- AOL-DEF-00040299
- AOL-DEF-00040302
- AOL-DEF-00040333
- AOL-DEF-00040336
- AOL-DEF-00041176
- AOL-DEF-00042399
- AOL-DEF-00042510
- AOL-DEF-00042648
- AOL-DEF-00042759
- AOL-DEF-00044050
- AOL-DEF-00050864
- AOL-DEF-00053043
- AOL-DEF-00053062
- AOL-DEF-00053073
- AOL-DEF-00053593
- AOL-DEF-00053604
- AOL-DEF-00053764
- AOL-DEF-00054004
- AOL-DEF-00054017
- AOL-DEF-00054227
- AOL-DEF-00054402
- AOL-DEF-00054409
- AOL-DEF-00054418
- AOL-DEF-00055146
- AOL-DEF-00055183

ER 01056

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00055211
- AOL-DEF-00055423
- AOL-DEF-00055468
- AOL-DEF-00055481
- AOL-DEF-00055496
- AOL-DEF-00056071
- AOL-DEF-00056080
- AOL-DEF-00056089
- AOL-DEF-00056098
- AOL-DEF-00056108
- AOL-DEF-00056224
- AOL-DEF-00056233
- AOL-DEF-00056293
- AOL-DEF-00056302
- AOL-DEF-00056328
- AOL-DEF-00056341
- AOL-DEF-00056574
- AOL-DEF-00056803
- AOL-DEF-00056823
- AOL-DEF-00056832
- AOL-DEF-00056858
- AOL-DEF-00057073
- AOL-DEF-00057083
- AOL-DEF-00057095
- AOL-DEF-00057105
- AOL-DEF-00057111
- AOL-DEF-00057127
- AOL-DEF-00057469
- AOL-DEF-00058870
- AOL-DEF-00058873
- AOL-DEF-00058897
- AOL-DEF-00058900
- AOL-DEF-00058927
- AOL-DEF-00058954
- AOL-DEF-00059045
- AOL-DEF-00059291
- AOL-DEF-00059330

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00059486
- AOL-DEF-00059496
- AOL-DEF-00059531
- AOL-DEF-00059808
- AOL-DEF-00059884
- AOL-DEF-00059886
- AOL-DEF-00060550
- AOL-DEF-00060618
- AOL-DEF-00060687
- AOL-DEF-00060695
- AOL-DEF-00060705
- AOL-DEF-00060742
- AOL-DEF-00060789
- AOL-DEF-00060799
- AOL-DEF-00060811
- AOL-DEF-00060821
- AOL-DEF-00060830
- AOL-DEF-00060839
- AOL-DEF-00060848
- AOL-DEF-00060857
- AOL-DEF-00060866
- AOL-DEF-00060875
- AOL-DEF-00060883
- AOL-DEF-00060901
- AOL-DEF-00060910
- AOL-DEF-00060919
- AOL-DEF-00060928
- AOL-DEF-00060971
- AOL-DEF-00060980
- AOL-DEF-00060989
- AOL-DEF-00060742
- AOL-DEF-00061006
- AOL-DEF-00061292
- AOL-DEF-00061301
- AOL-DEF-00061312
- AOL-DEF-00061327
- AOL-DEF-00061644

ER 01058

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00061655
- AOL-DEF-00061664
- AOL-DEF-00061678
- AOL-DEF-00061687
- AOL-DEF-00061696
- AOL-DEF-00061709
- AOL-DEF-00061734
- AOL-DEF-00061744
- AOL-DEF-00061754
- AOL-DEF-00061763
- AOL-DEF-00061788
- AOL-DEF-00061813
- AOL-DEF-00061822
- AOL-DEF-00061847
- AOL-DEF-00067434
- AOL-DEF-00068394
- AOL-DEF-00068969
- AOL-DEF-00069311
- AOL-DEF-00069317
- AOL-DEF-00069350
- AOL-DEF-00069370
- AOL-DEF-00069622
- AOL-DEF-00069799
- AOL-DEF-00069802
- AOL-DEF-00069817
- AOL-DEF-00069819
- AOL-DEF-00069838
- AOL-DEF-00069840
- AOL-DEF-00070496
- AOL-DEF-00070472
- AOL-DEF-00070511
- AOL-DEF-00070514
- AOL-DEF-00070558
- AOL-DEF-00070599
- AOL-DEF-00070606
- AOL-DEF-00070608
- AOL-DEF-00070622

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00070624
- AOL-DEF-00070663
- AOL-DEF-00070665
- AOL-DEF-00070679
- AOL-DEF-00070698
- AOL-DEF-00070700
- AOL-DEF-00070702
- AOL-DEF-00070768
- AOL-DEF-00070825
- AOL-DEF-00070982
- AOL-DEF-00070991
- AOL-DEF-00070995
- AOL-DEF-00070998
- AOL-DEF-00071011
- AOL-DEF-00071015
- AOL-DEF-00071136
- AOL-DEF-00071142
- AOL-DEF-00071149
- AOL-DEF-00071160
- AOL-DEF-00071202
- AOL-DEF-00071602
- AOL-DEF-00071651
- AOL-DEF-00073971
- AOL-DEF-00074023
- AOL-DEF-00074027
- AOL-DEF-00075871
- AOL-DEF-00075874
- AOL-DEF-00075901
- AOL-DEF-00075904
- AOL-DEF-00075931
- AOL-DEF-00075934
- AOL-DEF-00075959
- AOL-DEF-00075962
- AOL-DEF-00075989
- AOL-DEF-00075992
- AOL-DEF-00076017
- AOL-DEF-00076020

ER 01060

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00076045
- AOL-DEF-00076048
- AOL-DEF-00076074
- AOL-DEF-00076077
- AOL-DEF-00076105
- AOL-DEF-00076108
- AOL-DEF-00076133
- AOL-DEF-00076136
- AOL-DEF-00076164
- AOL-DEF-00076167
- AOL-DEF-00076193
- AOL-DEF-00076196
- AOL-DEF-00076221
- AOL-DEF-00076224
- AOL-DEF-00076247
- AOL-DEF-00076250
- AOL-DEF-00076274
- AOL-DEF-00076277
- AOL-DEF-00076301
- AOL-DEF-00076304
- AOL-DEF-00076315
- AOL-DEF-00076318
- AOL-DEF-00076331
- AOL-DEF-00076334
- AOL-DEF-00076361
- AOL-DEF-00076364
- AOL-DEF-00076390
- AOL-DEF-00076393
- AOL-DEF-00076416
- AOL-DEF-00076418
- AOL-DEF-00076441
- AOL-DEF-00076443
- AOL-DEF-00076466
- AOL-DEF-00076468
- AOL-DEF-00076491
- AOL-DEF-00076495
- AOL-DEF-00076523

ER 01061

- AOL-DEF-00076525
- AOL-DEF-00076551
- AOL-DEF-00076553
- AOL-DEF-00076579
- AOL-DEF-00076582
- AOL-DEF-00076606
- AOL-DEF-00076609
- AOL-DEF-00076633
- AOL-DEF-00076636
- AOL-DEF-00076660
- AOL-DEF-00076663
- AOL-DEF-00076687
- AOL-DEF-00076690
- AOL-DEF-00076714
- AOL-DEF-00076717
- AOL-DEF-00076741
- AOL-DEF-00076744
- AOL-DEF-00076768
- AOL-DEF-00076771
- AOL-DEF-00076795
- AOL-DEF-00076798
- AOL-DEF-00076822
- AOL-DEF-00076825
- AOL-DEF-00076850
- AOL-DEF-00076852
- AOL-DEF-00076867
- AOL-DEF-00076894
- AOL-DEF-00076925
- AOL-DEF-00076954
- AOL-DEF-00076981
- AOL-DEF-00076999
- AOL-DEF-00077002
- AOL-DEF-00077021
- AOL-DEF-00077048
- AOL-DEF-00077074
- AOL-DEF-00077090
- AOL-DEF-00077106

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00077138
- AOL-DEF-00078009
- AOL-DEF-00078076
- AOL-DEF-00078093
- AOL-DEF-00078111
- AOL-DEF-00078128
- AOL-DEF-00078145
- AOL-DEF-00078162
- AOL-DEF-00078179
- AOL-DEF-00078196
- AOL-DEF-00078213
- AOL-DEF-00078230
- AOL-DEF-00078247
- AOL-DEF-00078264
- AOL-DEF-00078282
- AOL-DEF-00078299
- AOL-DEF-00078315
- AOL-DEF-00078316
- AOL-DEF-00078332
- AOL-DEF-00078333
- AOL-DEF-00078351
- AOL-DEF-00078370
- AOL-DEF-00078390
- AOL-DEF-00078412
- AOL-DEF-00078434
- AOL-DEF-00078477
- AOL-DEF-00078500
- AOL-DEF-00078524
- AOL-DEF-00078547
- AOL-DEF-00078571
- AOL-DEF-00078591
- AOL-DEF-00078611
- AOL-DEF-00078631
- AOL-DEF-00078651
- AOL-DEF-00078671
- AOL-DEF-00078691
- AOL-DEF-00078714

ER 01063

- AOL-DEF-00078741
- AOL-DEF-00078769
- AOL-DEF-00078797
- AOL-DEF-00078825
- AOL-DEF-00078870
- AOL-DEF-00078915
- AOL-DEF-00078937
- AOL-DEF-00078959
- AOL-DEF-00078980
- AOL-DEF-00079003
- AOL-DEF-00079030
- AOL-DEF-00079079
- AOL-DEF-00079126
- AOL-DEF-00079157
- AOL-DEF-00079188
- AOL-DEF-00079219
- AOL-DEF-00079247
- AOL-DEF-00079276
- AOL-DEF-00079304
- AOL-DEF-00079395
- AOL-DEF-00079582
- AOL-DEF-00079642
- AOL-DEF-00079645
- AOL-DEF-00079707
- AOL-DEF-00079736
- AOL-DEF-00079754
- AOL-DEF-00079777
- AOL-DEF-00079795
- AOL-DEF-00079818
- AOL-DEF-00079853
- AOL-DEF-00079871
- AOL-DEF-00079889
- AOL-DEF-00079907
- AOL-DEF-00079925
- AOL-DEF-00079943
- AOL-DEF-00079961
- AOL-DEF-00079980

- AOL-DEF-00079999
- AOL-DEF-00080017
- AOL-DEF-00080035
- AOL-DEF-00080053
- AOL-DEF-00080071
- AOL-DEF-00080094
- AOL-DEF-00080111
- AOL-DEF-00080128
- AOL-DEF-00080145
- AOL-DEF-00080162
- AOL-DEF-00080179
- AOL-DEF-00080200
- AOL-DEF-00080217
- AOL-DEF-00080235
- AOL-DEF-00080254
- AOL-DEF-00080272
- AOL-DEF-00080290
- AOL-DEF-00080307
- AOL-DEF-00080324
- AOL-DEF-00080344
- AOL-DEF-00080362
- AOL-DEF-00080379
- AOL-DEF-00080396
- AOL-DEF-00080414
- AOL-DEF-00080433
- AOL-DEF-00080450
- AOL-DEF-00080472
- AOL-DEF-00080589
- AOL-DEF-00080608
- AOL-DEF-00080625
- AOL-DEF-00080642
- AOL-DEF-00080659
- AOL-DEF-00080676
- AOL-DEF-00080693
- AOL-DEF-00080710
- AOL-DEF-00080727
- AOL-DEF-00080744

ER 01065

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00080761
- AOL-DEF-00080778
- AOL-DEF-00080795
- AOL-DEF-00080813
- AOL-DEF-00080830
- AOL-DEF-00080847
- AOL-DEF-00080865
- AOL-DEF-00080882
- AOL-DEF-00080901
- AOL-DEF-00080922
- AOL-DEF-00080940
- AOL-DEF-00080959
- AOL-DEF-00080977
- AOL-DEF-00080997
- AOL-DEF-00081091
- AOL-DEF-00081104
- AOL-DEF-00081124
- AOL-DEF-00081164
- AOL-DEF-00081178
- AOL-DEF-00081210
- AOL-DEF-00081241
- AOL-DEF-00081418
- AOL-DEF-00081429
- AOL-DEF-00081536
- AOL-DEF-00081548
- AOL-DEF-00081557
- AOL-DEF-00081580
- AOL-DEF-00081589
- AOL-DEF-00081648
- AOL-DEF-00081677
- AOL-DEF-00081765
- AOL-DEF-00081774
- AOL-DEF-00081791
- AOL-DEF-00081843
- AOL-DEF-00081855
- AOL-DEF-00081864
- AOL-DEF-00081879

ER 01066

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00081894
- AOL-DEF-00081939
- AOL-DEF-00081948
- AOL-DEF-00081966
- AOL-DEF-00081975
- AOL-DEF-00081989
- AOL-DEF-00081998
- AOL-DEF-00082007
- AOL-DEF-00082022
- AOL-DEF-00082044
- AOL-DEF-00082063
- AOL-DEF-00082074
- AOL-DEF-00082085
- AOL-DEF-00082096
- AOL-DEF-00082107
- AOL-DEF-00082144
- AOL-DEF-00082230
- AOL-DEF-00082241
- AOL-DEF-00082263
- AOL-DEF-00082283
- AOL-DEF-00082294
- AOL-DEF-00082303
- AOL-DEF-00082316
- AOL-DEF-00082330
- AOL-DEF-00082361
- AOL-DEF-00082370
- AOL-DEF-00082384
- AOL-DEF-00082395
- AOL-DEF-00082407
- AOL-DEF-00082421
- AOL-DEF-00082430
- AOL-DEF-00082489
- AOL-DEF-00082504
- AOL-DEF-00082525
- AOL-DEF-00082549
- AOL-DEF-00082591
- AOL-DEF-00082640

ER 01067

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00082657
- AOL-DEF-00082674
- AOL-DEF-00082691
- AOL-DEF-00082697
- AOL-DEF-00082708
- AOL-DEF-00082723
- AOL-DEF-00082732
- AOL-DEF-00082741
- AOL-DEF-00082750
- AOL-DEF-00082771
- AOL-DEF-00082780
- AOL-DEF-00082789
- AOL-DEF-00082798
- AOL-DEF-00082807
- AOL-DEF-00082818
- AOL-DEF-00082841
- AOL-DEF-00082849
- AOL-DEF-00082852
- AOL-DEF-00082861
- AOL-DEF-00082867
- AOL-DEF-00082876
- AOL-DEF-00082885
- AOL-DEF-00082902
- AOL-DEF-00082911
- AOL-DEF-00082925
- AOL-DEF-00082938
- AOL-DEF-00082947
- AOL-DEF-00082956
- AOL-DEF-00082980
- AOL-DEF-00083005
- AOL-DEF-00083022
- AOL-DEF-00083041
- AOL-DEF-00083053
- AOL-DEF-00083065
- AOL-DEF-00083075
- AOL-DEF-00083084
- AOL-DEF-00083093

ER 01068

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00083126
- AOL-DEF-00083135
- AOL-DEF-00083144
- AOL-DEF-00083153
- AOL-DEF-00083162
- AOL-DEF-00083174
- AOL-DEF-00083196
- AOL-DEF-00084777
- AOL-DEF-00084791
- AOL-DEF-00084792
- AOL-DEF-00085652
- AOL-DEF-00085679
- AOL-DEF-00085682
- AOL-DEF-00085685
- AOL-DEF-00085700
- AOL-DEF-00085718
- AOL-DEF-00085738
- AOL-DEF-00085757
- AOL-DEF-00085767
- AOL-DEF-00085786
- AOL-DEF-00085820
- AOL-DEF-00085836
- AOL-DEF-00085865
- AOL-DEF-00085890
- AOL-DEF-00085906
- AOL-DEF-00085916
- AOL-DEF-00085929
- AOL-DEF-00085953
- AOL-DEF-00085977
- AOL-DEF-00086029
- AOL-DEF-00086046
- AOL-DEF-00086082
- AOL-DEF-00086117
- AOL-DEF-00086149
- AOL-DEF-00086162
- AOL-DEF-00086190
- AOL-DEF-00086222

ER 01069

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00086284
- AOL-DEF-00086297
- AOL-DEF-00086313
- AOL-DEF-00086326
- AOL-DEF-00086339
- AOL-DEF-00086353
- AOL-DEF-00086367
- AOL-DEF-00086382
- AOL-DEF-00086455
- AOL-DEF-00086468
- AOL-DEF-00086530
- AOL-DEF-00086596
- AOL-DEF-00086640
- AOL-DEF-00086662
- AOL-DEF-00086775
- AOL-DEF-00086807
- AOL-DEF-00086862
- AOL-DEF-00086887
- AOL-DEF-00086900
- AOL-DEF-00086969
- AOL-DEF-00087003
- AOL-DEF-00087013
- AOL-DEF-00087023
- AOL-DEF-00087047
- AOL-DEF-00087060
- AOL-DEF-00087124
- AOL-DEF-00087137
- AOL-DEF-00087160
- AOL-DEF-00087171
- AOL-DEF-00087181
- AOL-DEF-00087214
- AOL-DEF-00087254
- AOL-DEF-00087286
- AOL-DEF-00087303
- AOL-DEF-00087313
- AOL-DEF-00087386
- AOL-DEF-00087429

ER 01070

- AOL-DEF-00087449
- AOL-DEF-00087473
- AOL-DEF-00087531
- AOL-DEF-00087545
- AOL-DEF-00087550
- AOL-DEF-00087608
- AOL-DEF-00087623
- AOL-DEF-00087670
- AOL-DEF-00087710
- AOL-DEF-00087720
- AOL-DEF-00087744
- AOL-DEF-00087826
- AOL-DEF-00087855
- AOL-DEF-00087872
- AOL-DEF-00087916
- AOL-DEF-00087926
- AOL-DEF-00087950
- AOL-DEF-00087960
- AOL-DEF-00088147
- AOL-DEF-00088189
- AOL-DEF-00088202
- AOL-DEF-00088244
- AOL-DEF-00088261
- AOL-DEF-00088282
- AOL-DEF-00088299
- AOL-DEF-00088309
- AOL-DEF-00088325
- AOL-DEF-00088335
- AOL-DEF-00088345
- AOL-DEF-00088355
- AOL-DEF-00088373
- AOL-DEF-00088390
- AOL-DEF-00088393
- AOL-DEF-00088416
- AOL-DEF-00088443
- AOL-DEF-00088460
- AOL-DEF-00088501

ER 01071

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00089373
- AOL-DEF-00089377
- AOL-DEF-00089396
- AOL-DEF-00089408
- AOL-DEF-00089424
- AOL-DEF-00089440
- AOL-DEF-00089489
- AOL-DEF-00089966
- AOL-DEF-00089993
- AOL-DEF-00090040
- AOL-DEF-00090106
- AOL-DEF-00090108
- AOL-DEF-00090586
- AOL-DEF-00090904
- AOL-DEF-00091712
- AOL-DEF-00091858
- AOL-DEF-00091962
- AOL-DEF-00091965
- AOL-DEF-00095091
- AOL-DEF-00095092
- AOL-DEF-00095498
- AOL-DEF-00095672
- AOL-DEF-00095711
- AOL-DEF-00095714
- AOL-DEF-00095731
- AOL-DEF-00095734
- AOL-DEF-00095740
- AOL-DEF-00095743
- AOL-DEF-00095747
- AOL-DEF-00095749
- AOL-DEF-00095752
- AOL-DEF-00095756
- AOL-DEF-00095759
- AOL-DEF-00095762
- AOL-DEF-00095765
- AOL-DEF-00095768
- AOL-DEF-00095773

ER 01072

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00095776
- AOL-DEF-00095779
- AOL-DEF-00095782
- AOL-DEF-00095785
- AOL-DEF-00095788
- AOL-DEF-00095791
- AOL-DEF-00095794
- AOL-DEF-00095797
- AOL-DEF-00095801
- AOL-DEF-00095804
- AOL-DEF-00095807
- AOL-DEF-00095810
- AOL-DEF-00095813
- AOL-DEF-00095818
- AOL-DEF-00095821
- AOL-DEF-00095824
- AOL-DEF-00095829
- AOL-DEF-00095834
- AOL-DEF-00095837
- AOL-DEF-00095840
- AOL-DEF-00095842
- AOL-DEF-00095844
- AOL-DEF-00095847
- AOL-DEF-00095849
- AOL-DEF-00095851
- AOL-DEF-00095853
- AOL-DEF-00095855
- AOL-DEF-00095857
- AOL-DEF-00095859
- AOL-DEF-00095862
- AOL-DEF-00095865
- AOL-DEF-00095868
- AOL-DEF-00095871
- AOL-DEF-00095873
- AOL-DEF-00095876
- AOL-DEF-00095879
- AOL-DEF-00095882

ER 01073

- AOL-DEF-00095884
- AOL-DEF-00095887
- AOL-DEF-00095889
- AOL-DEF-00095892
- AOL-DEF-00095894
- AOL-DEF-00095896
- AOL-DEF-00095898
- AOL-DEF-00095900
- AOL-DEF-00095902
- AOL-DEF-00095904
- AOL-DEF-00095906
- AOL-DEF-00095908
- AOL-DEF-00095911
- AOL-DEF-00095913
- AOL-DEF-00095915
- AOL-DEF-00095917
- AOL-DEF-00095925
- AOL-DEF-00095927
- AOL-DEF-00095930
- AOL-DEF-00096079
- AOL-DEF-00096106
- AOL-DEF-00096133
- AOL-DEF-00096160
- AOL-DEF-00096186
- AOL-DEF-00096214
- AOL-DEF-00096255
- AOL-DEF-00096290
- AOL-DEF-00096334
- AOL-DEF-00096380
- AOL-DEF-00096410
- AOL-DEF-00096440
- AOL-DEF-00096478
- AOL-DEF-00096506
- AOL-DEF-00096534
- AOL-DEF-00096565
- AOL-DEF-00096593
- AOL-DEF-00096623

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00096653
- AOL-DEF-00096681
- AOL-DEF-00096712
- AOL-DEF-00096741
- AOL-DEF-00096770
- AOL-DEF-00096800
- AOL-DEF-00096828
- AOL-DEF-00096857
- AOL-DEF-00096883
- AOL-DEF-00096911
- AOL-DEF-00096939
- AOL-DEF-00096966
- AOL-DEF-00096991
- AOL-DEF-00097016
- AOL-DEF-00097044
- AOL-DEF-00097073
- AOL-DEF-00097099
- AOL-DEF-00097190
- AOL-DEF-00097193
- AOL-DEF-00097196
- AOL-DEF-00097199
- AOL-DEF-00097203
- AOL-DEF-00097461
- AOL-DEF-00097492
- AOL-DEF-00097518
- AOL-DEF-00097532
- AOL-DEF-00097548
- AOL-DEF-00097577
- AOL-DEF-00097592
- AOL-DEF-00097619
- AOL-DEF-00097650
- AOL-DEF-00097712
- AOL-DEF-00097738
- AOL-DEF-00097745
- AOL-DEF-00097772
- AOL-DEF-00097799
- AOL-DEF-00097809

ER 01075

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00097835
- AOL-DEF-00097889
- AOL-DEF-00098399
- AOL-DEF-00098415
- AOL-DEF-00098431
- AOL-DEF-00099188
- AOL-DEF-00100054
- AOL-DEF-00101036
- AOL-DEF-00101039
- AOL-DEF-00101042
- AOL-DEF-00101045
- AOL-DEF-00101048
- AOL-DEF-00101051
- AOL-DEF-00101054
- AOL-DEF-00101057
- AOL-DEF-00101060
- AOL-DEF-00101063
- AOL-DEF-00101066
- AOL-DEF-00101069
- AOL-DEF-00101072
- AOL-DEF-00101079
- AOL-DEF-00101087
- AOL-DEF-00101090
- AOL-DEF-00101093
- AOL-DEF-00101095
- AOL-DEF-00101098
- AOL-DEF-00101101
- AOL-DEF-00101104
- AOL-DEF-00101107
- AOL-DEF-00101117
- AOL-DEF-00101119
- AOL-DEF-00101122
- AOL-DEF-00101134
- AOL-DEF-00101137
- AOL-DEF-00101140
- AOL-DEF-00101143
- AOL-DEF-00101146

ER 01076

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00101149
- AOL-DEF-00101152
- AOL-DEF-00101155
- AOL-DEF-00101158
- AOL-DEF-00101161
- AOL-DEF-00101164
- AOL-DEF-00101167
- AOL-DEF-00101170
- AOL-DEF-00101173
- AOL-DEF-00101176
- AOL-DEF-00101179
- AOL-DEF-00101182
- AOL-DEF-00101185
- AOL-DEF-00101188
- AOL-DEF-00101190
- AOL-DEF-00101193
- AOL-DEF-00101196
- AOL-DEF-00101199
- AOL-DEF-00101201
- AOL-DEF-00101204
- AOL-DEF-00101207
- AOL-DEF-00101210
- AOL-DEF-00101213
- AOL-DEF-00101216
- AOL-DEF-00101218
- AOL-DEF-00101221
- AOL-DEF-00101224
- AOL-DEF-00101231
- AOL-DEF-00101233
- AOL-DEF-00101236
- AOL-DEF-00101238
- AOL-DEF-00101240
- AOL-DEF-00101243
- AOL-DEF-00101245
- AOL-DEF-00101248
- AOL-DEF-00101250
- AOL-DEF-00101254

ER 01077

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00101258
- AOL-DEF-00101261
- AOL-DEF-00101264
- AOL-DEF-00101266
- AOL-DEF-00101270
- AOL-DEF-00101272
- AOL-DEF-00101275
- AOL-DEF-00101278
- AOL-DEF-00101281
- AOL-DEF-00101284
- AOL-DEF-00101287
- AOL-DEF-00101290
- AOL-DEF-00101293
- AOL-DEF-00101296
- AOL-DEF-00101299
- AOL-DEF-00101302
- AOL-DEF-00101305
- AOL-DEF-00101308
- AOL-DEF-00101311
- AOL-DEF-00101314
- AOL-DEF-00101317
- AOL-DEF-00101320
- AOL-DEF-00101323
- AOL-DEF-00101326
- AOL-DEF-00101328
- AOL-DEF-00101331
- AOL-DEF-00101341
- AOL-DEF-00101344
- AOL-DEF-00101347
- AOL-DEF-00101350
- AOL-DEF-00101353
- AOL-DEF-00101356
- AOL-DEF-00101359
- AOL-DEF-00101362
- AOL-DEF-00101382
- AOL-DEF-00101717
- AOL-DEF-00101738

ER 01078

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00101755
- AOL-DEF-00101772
- AOL-DEF-00101789
- AOL-DEF-00101806
- AOL-DEF-00101823
- AOL-DEF-00101840
- AOL-DEF-00101860
- AOL-DEF-00101877
- AOL-DEF-00101894
- AOL-DEF-00101911
- AOL-DEF-00101928
- AOL-DEF-00101945
- AOL-DEF-00101962
- AOL-DEF-00101979
- AOL-DEF-00101996
- AOL-DEF-00102013
- AOL-DEF-00102030
- AOL-DEF-00102047
- AOL-DEF-00102064
- AOL-DEF-00102081
- AOL-DEF-00102098
- AOL-DEF-00102115
- AOL-DEF-00102132
- AOL-DEF-00102149
- AOL-DEF-00102166
- AOL-DEF-00102183
- AOL-DEF-00102200
- AOL-DEF-00102217
- AOL-DEF-00102234
- AOL-DEF-00102251
- AOL-DEF-00102268
- AOL-DEF-00102285
- AOL-DEF-00102302
- AOL-DEF-00102319
- AOL-DEF-00102336
- AOL-DEF-00102353
- AOL-DEF-00102370

ER 01079

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00102387
- AOL-DEF-00102404
- AOL-DEF-00102421
- AOL-DEF-00102438
- AOL-DEF-00102455
- AOL-DEF-00102472
- AOL-DEF-00102489
- AOL-DEF-00102506
- AOL-DEF-00102523
- AOL-DEF-00102540
- AOL-DEF-00102557
- AOL-DEF-00102574
- AOL-DEF-00102603
- AOL-DEF-00102620
- AOL-DEF-00102637
- AOL-DEF-00102654
- AOL-DEF-00102671
- AOL-DEF-00102688
- AOL-DEF-00102705
- AOL-DEF-00102722
- AOL-DEF-00102739
- AOL-DEF-00102756
- AOL-DEF-00102773
- AOL-DEF-00102790
- AOL-DEF-00102807
- AOL-DEF-00102824
- AOL-DEF-00102926
- AOL-DEF-00102943
- AOL-DEF-00102960
- AOL-DEF-00102977
- AOL-DEF-00102994
- AOL-DEF-00103011
- AOL-DEF-00103028
- AOL-DEF-00103045
- AOL-DEF-00103062
- AOL-DEF-00103079
- AOL-DEF-00103096

ER 01080

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00103113
- AOL-DEF-00103130
- AOL-DEF-00103147
- AOL-DEF-00103181
- AOL-DEF-00103198
- AOL-DEF-00103215
- AOL-DEF-00103232
- AOL-DEF-00103249
- AOL-DEF-00103266
- AOL-DEF-00103283
- AOL-DEF-00103300
- AOL-DEF-00103317
- AOL-DEF-00103347
- AOL-DEF-00103364
- AOL-DEF-00103381
- AOL-DEF-00103398
- AOL-DEF-00103415
- AOL-DEF-00103423
- AOL-DEF-00103449
- AOL-DEF-00103466
- AOL-DEF-00103483
- AOL-DEF-00103500
- AOL-DEF-00103517
- AOL-DEF-00103534
- AOL-DEF-00103551
- AOL-DEF-00103568
- AOL-DEF-00103585
- AOL-DEF-00103602
- AOL-DEF-00103619
- AOL-DEF-00103636
- AOL-DEF-00103653
- AOL-DEF-00103670
- AOL-DEF-00103687
- AOL-DEF-00103704
- AOL-DEF-00103721
- AOL-DEF-00103738
- AOL-DEF-00103755

ER 01081

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00103772
- AOL-DEF-00103789
- AOL-DEF-00103806
- AOL-DEF-00103823
- AOL-DEF-00103840
- AOL-DEF-00103857
- AOL-DEF-00103874
- AOL-DEF-00103891
- AOL-DEF-00103908
- AOL-DEF-00103925
- AOL-DEF-00103942
- AOL-DEF-00103959
- AOL-DEF-00103976
- AOL-DEF-00103993
- AOL-DEF-00104010
- AOL-DEF-00104027
- AOL-DEF-00104044
- AOL-DEF-00104061
- AOL-DEF-00104078
- AOL-DEF-00104095
- AOL-DEF-00104112
- AOL-DEF-00104129
- AOL-DEF-00104146
- AOL-DEF-00104163
- AOL-DEF-00104180
- AOL-DEF-00104197
- AOL-DEF-00104214
- AOL-DEF-00104231
- AOL-DEF-00104248
- AOL-DEF-00104265
- AOL-DEF-00104282
- AOL-DEF-00104299
- AOL-DEF-00104316
- AOL-DEF-00104333
- AOL-DEF-00104350
- AOL-DEF-00104367
- AOL-DEF-00104384

ER 01082

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00104401
- AOL-DEF-00104418
- AOL-DEF-00104435
- AOL-DEF-00104452
- AOL-DEF-00104469
- AOL-DEF-00104486
- AOL-DEF-00104503
- AOL-DEF-00104520
- AOL-DEF-00104537
- AOL-DEF-00104554
- AOL-DEF-00104571
- AOL-DEF-00104558
- AOL-DEF-00104605
- AOL-DEF-00104622
- AOL-DEF-00104639
- AOL-DEF-00104656
- AOL-DEF-00104673
- AOL-DEF-00104690
- AOL-DEF-00104707
- AOL-DEF-00104724
- AOL-DEF-00104741
- AOL-DEF-00104758
- AOL-DEF-00104775
- AOL-DEF-00104792
- AOL-DEF-00104809
- AOL-DEF-00104826
- AOL-DEF-00104843
- AOL-DEF-00104860
- AOL-DEF-00104877
- AOL-DEF-00104894
- AOL-DEF-00104911
- AOL-DEF-00104928
- AOL-DEF-00104945
- AOL-DEF-00104962
- AOL-DEF-00104979
- AOL-DEF-00104996
- AOL-DEF-00105013

ER 01083

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00105030
- AOL-DEF-00105047
- AOL-DEF-00105064
- AOL-DEF-00105081
- AOL-DEF-00105098
- AOL-DEF-00105111
- AOL-DEF-00105132
- AOL-DEF-00105149
- AOL-DEF-00105166
- AOL-DEF-00105183
- AOL-DEF-00105220
- AOL-DEF-00105217
- AOL-DEF-00105251
- AOL-DEF-00111082
- AOL-DEF-00111099
- AOL-DEF-00111116
- AOL-DEF-00190367
- AOL-DEF-00190370
- AOL-DEF-00193436
- AOL-DEF-00196241
- AOL-DEF-00196358
- AOL-DEF-00196359
- AOL-DEF-00196360
- AOL-DEF-00196362
- AOL-DEF-00196367
- AOL-DEF-00196368
- AOL-DEF-00196369
- AOL-DEF-00196370
- AOL-DEF-00196371
- AOL-DEF-00196372
- AOL-DEF-00196373
- AOL-DEF-00196374
- AOL-DEF-00196375
- AOL-DEF-00196376
- AOL-DEF-00196377
- AOL-DEF-00196378
- AOL-DEF-00196379

ER 01084

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00196380
- AOL-DEF-00196381
- AOL-DEF-00196382
- AOL-DEF-00196384
- AOL-DEF-00196386
- AOL-DEF-00196387
- AOL-DEF-00196388
- AOL-DEF-00196390
- AOL-DEF-00196391
- AOL-DEF-00196392
- AOL-DEF-00196393
- AOL-DEF-00196394
- AOL-DEF-00196395
- AOL-DEF-00196396
- AOL-DEF-00196397
- AOL-DEF-00196398
- AOL-DEF-00196399
- AOL-DEF-00196400
- AOL-DEF-00196401
- AOL-DEF-00196402
- AOL-DEF-00196404
- AOL-DEF-00196407
- AOL-DEF-00196408
- AOL-DEF-00196409
- AOL-DEF-00196413
- AOL-DEF-00196414
- AOL-DEF-00196416
- AOL-DEF-00196421
- AOL-DEF-00196422
- AOL-DEF-00196428
- AOL-DEF-00196430
- AOL-DEF-00196435
- AOL-DEF-00196436
- AOL-DEF-00196439
- AOL-DEF-00196444
- AOL-DEF-00196446
- AOL-DEF-00196451

118

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00196452
- AOL-DEF-00196457
- AOL-DEF-00196458
- AOL-DEF-00196460
- AOL-DEF-00196523
- AOL-DEF-00196525
- AOL-DEF-00196574
- AOL-DEF-00196578
- AOL-DEF-00196584
- AOL-DEF-00196586
- AOL-DEF-00196592
- AOL-DEF-00196594
- AOL-DEF-00196600
- AOL-DEF-00196602
- AOL-DEF-00196606
- AOL-DEF-00196608
- AOL-DEF-00196613
- AOL-DEF-00196616
- AOL-DEF-00196623
- AOL-DEF-00196624
- AOL-DEF-00196640
- AOL-DEF-00196559
- AOL-DEF-00196661
- AOL-DEF-00196662
- AOL-DEF-00196664
- AOL-DEF-00196682
- AOL-DEF-00196686
- AOL-DEF-00196691
- AOL-DEF-00196695
- AOL-DEF-00196701
- AOL-DEF-00196707
- AOL-DEF-00196713
- AOL-DEF-00196715
- AOL-DEF-00196723
- AOL-DEF-00196733
- AOL-DEF-00196741
- AOL-DEF-00196745

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00196750
- AOL-DEF-00196751
- AOL-DEF-00196754
- AOL-DEF-00196759
- AOL-DEF-00196771
- AOL-DEF-00196779
- AOL-DEF-00196783
- AOL-DEF-00196784
- AOL-DEF-00196785
- AOL-DEF-00196786
- AOL-DEF-00196787
- AOL-DEF-00196789
- AOL-DEF-00196797
- AOL-DEF-00196805
- AOL-DEF-00202665
- AOL-DEF-00204497
- AOL-DEF-00205051
- AOL-DEF-00205389
- AOL-DEF-00205672
- AOL-DEF-00206312
- AOL-DEF-00206515
- AOL-DEF-00210351
- AOL-DEF-00210364
- AOL-DEF-00210384
- AOL-DEF-00210444
- AOL-DEF-00210493
- AOL-DEF-00210504
- AOL-DEF-00210508
- AOL-DEF-00210521
- AOL-DEF-00210524
- AOL-DEF-00216886
- AOL-DEF-00216887
- AOL-DEF-00216916
- AOL-DEF-00217062
- AOL-DEF-00221968
- AOL-DEF-00257383
- AOL-DEF-00259212

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00259454
- AOL-DEF-00260202
- AOL-DEF-00269179
- AOL-DEF-00269193
- AOL-DEF-00269200
- AOL-DEF-00269837
- AOL-DEF-00272377
- AOL-DEF-00272378
- AOL-DEF-00273358
- AOL-DEF-00273364
- AOL-DEF-00276249
- AOL-DEF-00276251
- AOL-DEF-00277970
- AOL-DEF-00278195
- AOL-DEF-00278207
- AOL-DEF-00279055
- AOL-DEF-00279791
- AOL-DEF-00280804
- AOL-DEF-00284123
- AOL-DEF-00284127
- AOL-DEF-00284135
- AOL-DEF-00284282
- AOL-DEF-00284487
- AOL-DEF-00293018
- AOL-DEF-00293019
- AOL-DEF-00290016
- AOL-DEF-00296277
- AOL-DEF-00314355
- AOL-DEF-00328857
- AOL-DEF-00328861
- AOL-DEF-00336829
- AOL-DEF-00336833
- AOL-DEF-00336837
- AOL-DEF-00342510
- AOL-DEF-00361702
- AOL-DEF-00371158
- AOL-DEF-00373431

ER 01088

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00373490
- AOL-DEF-00377896
- AOL-DEF-00377901
- AOL-DEF-00379298
- AOL-DEF-00387778
- AOL-DEF-00387783
- AOL-DEF-00387787
- AOL-DEF-00387791
- AOL-DEF-00387795
- AOL-DEF-00387800
- AOL-DEF-00387804
- AOL-DEF-00527456
- AOL-DEF-00527486
- AOL-DEF-00527513
- AOL-DEF-00528388
- AOL-DEF-00529085
- AOL-DEF-00566881
- AOL-DEF-00702336

ER 01089

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--------------------------------x

AL OTRO LADO, INC., et al.,          :

          Plaintiffs,          : Case No.:

     vs.                        : 17-cv-02366-BAS-KSC

KEVIN K. MCALEENAN, et al.,          :

          Defendants.          :

--------------------------------x


DEPOSITION MARKED CONFIDENTIAL

DEPOSITION OF TODD OWEN

Washington, D.C.

Friday, December 13, 2019

9:40 a.m.


Job No.:  529549

Pages:  1 - 332

Reported by:  Elizabeth Mingione, RPR



## Page 2

1
2      Deposition of TODD OWEN, held at the offices
3  of Mayer Brown, LLP, 1999 K Sreet, Northwest,
4  Washington, D.C., commencing at 9:40 a.m., Friday,
5  December 13, 2019, and taken down stenographically by
6  Elizabeth Mingione, Registered Professional Reporter
7  and Notary Public for the Commonwealth of Virginia.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 3

1  A P P E A R A N C E S   O F   C O U N S E L :
2  ON BEHALF OF PLAINTIFFS:
3      MAYER BROWN, LLP
4      Stephen M. Medlock, Esquire
5      Ori Lev, Esquire
6      1999 K Street, Northwest
7      Washington, DC 20006
8      (202) 263-3000
9      Smedlock@mayerbrown.com
10
11  ON BEHALF OF DEFENDANTS:
12      U.S. DEPARTMENT OF JUSTICE
13      Katherine J. Shinners, Esquire
14      David White, Esquire
15      Ben Franklin Station
16      PO Box 868
17      Washington, DC 20044
18      (202) 598-8259
19      Katherine.J.Shinner@usdoj.gov
20
21  (Appearances, Continued)
22

## Page 4

1      A L S O   P R E S E N T
2      Louisa Slocum,  Esquire
3      Rameez Burney
4  Karolina Walters, American Immigration Council
5      Kristine King
6      Matthew Fenn (via phone, as indicated)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 5

1      C O N T E N T S
2      WITNESS:  TODD OWEN
3  EXAMINATION BY:                    PAGE
4  Mr. Medlock ...................................    9
5  Ms. Shinners .................................  312
6  Mr. Lev ........................................  322
7
8          *  *  *
9
10      DEPOSITION EXHIBITS
11      TODD OWEN
12  NUMBER        DESCRIPTION          PAGE
13  Exhibit 20  Notice of Deposition .............   19
14  Exhibit 21  Website Printout of Todd Owen
15      Description ..............................   49
16  Exhibit 22  U.S. Customs and Border Protection
17      Standard of Conduct, AOL-DEF-00669013 ....   51
18  Exhibit 23  Metering Guidance Memorandum, Date
19      Stamped April 27, 2018 ..................   63
20  Exhibit 24  E-mail from Randy Howe, June 19,
21      2018, AOL-DEF-00088501 ..................   81
22  (Exhibits Continued)



Page 6

NUMBER          DESCRIPTION          PAGE

1
2  Exhibit 25  E-mail from Robert Hood, August
3      2, 2017, AOL-DEF-00328857 ................ 100
4  Exhibit 26  E-mail from Todd Owen, May 25,
5      2016 AOL-DEF-00761338 .................... 104
6  Exhibit 27  E-mail Chain, Sept. 13, 2016,
7      AOL-DEF-00762746 ........................ 123
8  Exhibit 28  E-mail Chain from Todd Hoffman,
9      Sept. 16, 2016, AOL-DEF-00762523 ......... 132
10 Exhibit 29  E-mail from Katherine Stark, Sept. 7,
11     2016 AOL-DEF-00761290 .................... 135
12 Exhibit 30  E-mail Chain from Todd Owen, August
13     17, 2016, AOL-DEF-00761340 ................ 142
14 Exhibit 31  E-mail chain, Novemer 11, 2016,
15     AOL-DEF-00272936 .......................... 146
16 Exhibit 32  ***  Exhibit is removed ***
17 Exhibit 33  E-mail from Hector Mancha,
18     AOL-DEF-00081089 .......................... 162
19 Exhibit 34  E-mail from Beverly Good, Nov. 22,
20     2016, AOL-DEF-00032389 .................... 167
21 Exhibit 35  E-mail from Alberto Flores, November
22     14, 2016, AOL-DEF-00576607 ................ 174

Page 8

NUMBER          DESCRIPTION          PAGE

1
2  Exhibit 48  Five-Page Document, Annotations .. 248
3  Exhibit 49  E-mail from David Atkinson,
4      March 19, 2019, NTEU-000110 .............. 255
5  Exhibit 50  Photograph of Mother and Child ... 291
6  Exhibit 51  Photograph of Bodies in Water .... 292
7  Exhibit 52  E-mail Chain, March 19, 2019,
8      AOL-DEF-00269970 ........................ 293
9  Exhibit 53  E-mail Chain, March 19, 2019,
10     AOL-DEF-00270451 ........................ 296
11
12
13
14     (Exhibits Attached to Transcript,
15     Except for Nos. 32, 36, 37 TBD)
16
17
18
19
20
21
22

Page 7

NUMBER          DESCRIPTION          PAGE

1
2  Exhibit 36  ***  Exhibit is Removed ***
3  Exhibit 37  ***  Exhibit is Removed ***
4  Exhibit 38  E-mail from Valerie Boyd, June 5,
5      2018, AOL-DEF-00273293 .................. 196
6  Exhibit 39  Homeland Security Memo of June 5,
7      2018, AOL-DEF-00273294 .................. 199
8  Exhibit 40  Memo from Kevin McAleenan, August 1,
9      2018, AOL-DEF-00039620 .................. 213
10 Exhibit 41  Evaluation of Prioritization Queue
11     Management Pilot, AOL-DEF-00039621 ...... 213
12 Exhibit 42  Mark Morgan Memo, CBPALTR0000303 .. 213
13 Exhibit 43  Complaint for Declaratory and
14     Injunctive Relief ...................... 220
15 Exhibit 44  E-mail Chain Aug. 14, 2017,
16     AOL-DEF-00723886 ........................ 223
17 Exhibit 45  Confidential Al Otro Lado Lawsuit
18     Document, AOL-DEF-00723887 .............. 225
19 Exhibit 46  E-mail from William Haralson,
20     March 15, 2017, NTEU 000132 ............. 229
21 Exhibit 47  Search Results Report and E-mail
22     from Eddie Arias, July 3, 2018 .......... 243

Page 9

```
1            P R O C E E D I N G S
2  Whereupon,
3              TODD OWEN,
4      having been first duly sworn was
5      examined and testified as follows:
6                  - - -
7          EXAMINATION CONDUCTED
8  BY MR. MEDLOCK:
9      Q.  Good morning, sir.
10     A.  Good morning.
11     Q.  Can you please state and spell your name
12 for the record.
13     A.  My name is Todd Owen, T-O-D-D, O-W-E-N.
14     Q.  Have you ever gone by any other names, sir?
15     A.  No.
16     Q.  Are you presently employed?
17     A.  Yes.
18     Q.  Where are you employed?
19     A.  With U.S. Customs and Border Protection,
20 Washington, D.C.
21     Q.  What is your -- if I refer to U.S. Customs
22 and Border Protection as CBP, you'll understand that?
```



| | Page 10 |
|---|---|
| 1 | A. Yes, I will. |
| 2 | Q. What is your present job title at CBP? |
| 3 | A. I'm the executive assistant commissioner |
| 4 | for the Office of Field Operations. |
| 5 | Q. How long have you held that title? |
| 6 | A. Since February of 2015. |
| 7 | Q. What's your present work address? |
| 8 | A. 1300 Pennsylvania Avenue, Washington, D.C. |
| 9 | Q. So Ronald Reagan Building? |
| 10 | A. Yes. Ronald Reagan Building. |
| 11 | Q. And what's your home address, sir? |
| 12 | MS. SHINNERS: Objection. Is that |
| 13 | necessary? |
| 14 | MR. MEDLOCK: If I have to serve a subpoena |
| 15 | to get him to testify at trial, it is. |
| 16 | MS. SHINNERS: I don't think I -- |
| 17 | MR. MEDLOCK: Are you going to instruct him |
| 18 | not to answer. |
| 19 | MS. SHINNERS: I am not. I -- |
| 20 | MR. MEDLOCK: Either object and instruct |
| 21 | him not to answer, or he'll answer the question. |
| 22 | MS. SHINNERS: Object. Intimidating. It's |

| | Page 11 |
|---|---|
| 1 | not relevant. |
| 2 | BY MR. MEDLOCK: |
| 3 | Q. Okay. You live you in McLean, sir; is that |
| 4 | right? |
| 5 | A. Yes. |
| 6 | Q. Okay. Perry William Drive? |
| 7 | A. Correct. |
| 8 | Q. Okay. In fact, 1222 Perry William Drive; |
| 9 | is that right? |
| 10 | A. Correct. |
| 11 | Q. Okay. That wasn't hard, was it. |
| 12 | So, sir, have you ever testified in court |
| 13 | before? |
| 14 | A. In court, no. |
| 15 | Q. Have you ever testified in a deposition |
| 16 | before? |
| 17 | A. Yes. |
| 18 | Q. How many times? |
| 19 | A. Twice. |
| 20 | Q. What were the nature of those cases? |
| 21 | A. They were both EEO nonselection cases in my |
| 22 | previous position in Los Angeles. |

| | Page 12 |
|---|---|
| 1 | Q. What was your previous position in Los |
| 2 | Angeles? |
| 3 | A. I was the Director of Field Operations for |
| 4 | the Los Angeles field office. |
| 5 | Q. And what's an EEO -- this EEO action that |
| 6 | you were talking about? |
| 7 | A. Equal Employment Opportunity. |
| 8 | Q. So those were essentially employment cases? |
| 9 | A. Employment cases. Yes, sir. |
| 10 | Q. And you have testified before for |
| 11 | committees and subcommittees of the U.S. Congress; is |
| 12 | that right? |
| 13 | A. Yes. |
| 14 | Q. You testified before the Senate Judiciary |
| 15 | Committee on May 8, 2019; is that right? |
| 16 | A. I don't recall the date, but if that's what |
| 17 | the record says. Yes. |
| 18 | Q. Okay. And you testified before the House |
| 19 | Ways and Means Committee Subcommittee on Trade, on |
| 20 | April 25, 2018; is that right? |
| 21 | A. Again, if that's the date, I've testified |
| 22 | several times before Congress in many committees. |

| | Page 13 |
|---|---|
| 1 | Q. And you have testified to the Senate |
| 2 | Homeland Security and Governmental Affairs Committee |
| 3 | before, correct? |
| 4 | A. Yes. |
| 5 | Q. And that would have happened in 2018, |
| 6 | correct? |
| 7 | A. Again, I've testified several times in this |
| 8 | position since 2015, so every year between different |
| 9 | committees. |
| 10 | Q. And you've testified before the House |
| 11 | Committee on Transportation Infrastructure; is that |
| 12 | right? |
| 13 | A. I believe so. |
| 14 | Q. And you've testified before the House |
| 15 | Oversight and Government Reform Committee too as well? |
| 16 | A. Yes. |
| 17 | Q. Have you ever provided any other testimony |
| 18 | before a House or Senate committee or subcommittee |
| 19 | other than the ones I've just listed? |
| 20 | A. Again, I've testified several times in the |
| 21 | last four and a half years, and then in my previous |
| 22 | position at headquarters. So you have listed some. |



Page 14

1 I'm not sure if that's inclusive of all.
2 Q. Have you ever provided written testimony in
3 the form of an affidavit or declaration?
4 MS. SHINNERS: Objection. Vague.
5 Q. Do you understand my question, sir?
6 A. Yes.
7 Q. Okay. Go ahead and answer.
8 A. I have provided --
9 MS. SHINNERS: Uh --
10 THE WITNESS: Go ahead.
11 MR. MEDLOCK: If you are going to instruct
12 him not to answer, you can --
13 MS. SHINNERS: I'm not instructing him not
14 to answer. I apologize.
15 THE WITNESS: Okay.
16 MS. SHINNERS: You can answer.
17 A. I provided affidavits.
18 BY MR. MEDLOCK:
19 Q. Do you remember what cases you provided
20 affidavits in?
21 A. No. Most of those were employment related
22 again.

Page 15

1 Q. Do you remember how many affidavits you
2 were provided in court cases?
3 A. No.
4 Q. Do you have an approximation?
5 A. Through out my career.
6 Q. Yes.
7 A. Several dozen.
8 Q. All right. Sounds like you have got some
9 experience testifying before, but I'm going to go over
10 just a few ground rules so that we are all on the same
11 page here today. This is a conversation between you
12 and me in which I ask questions and you answer them.
13 There's a court reporter sitting to my
14 left, your right. She's taking down everything I say
15 and that you say. That means there's a couple of
16 things we need to keep in mind, or else the court
17 reporter will kill both of us. That is that you must
18 give audible answers to my questions. The court
19 reporter is extremely good. She can't take down
20 shakes of the head or nods of the head. And the
21 phrase uh-huh and huh-uh can sound very similar.
22 Do you understand that, sir?

Page 16

1 A. Yes.
2 Q. It's also important that we not talk over
3 each other. I'll try to do my best to not start a
4 question while you are still answering, if you can do
5 the same while I'm trying to finish a question. Okay,
6 sir?
7 A. Yes.
8 Q. It's important that if you don't understand
9 any of my questions today, that you say so. And I'll
10 do my best to ask the question better. Sometimes I
11 ask a C-plus question. I'll try to get back to my
12 usual B-plus, A-minus work, if you let me know. Okay?
13 A. Yes.
14 Q. From time to time your attorney will
15 object. You have already heard that. The objections
16 from your attorney are for the record. A judge rules
17 on them later. Unless your attorney instructs you not
18 to answer, I'm going to ask that you answer my
19 questions today. Okay, sir?
20 A. Yes.
21 Q. We will take breaks approximately every
22 hour. We can take them more often if you would like.

Page 17

1 My only request to you is that if there's a question
2 pending and you are in the middle of an answer, that
3 you finish your answer before we take the break. Do
4 you understand that?
5 A. Yes.
6 Q. All right. So unless I tell you otherwise,
7 my questions will relate to the time period from
8 January 1, 2016, through the present day. Do you
9 understand that, sir?
10 A. Yes.
11 Q. And during this deposition, I'm going to
12 refer the U.S. Department of Homeland Security as DHS.
13 Do you understand what that acronym means sir?
14 A. Yes.
15 Q. And I'm going to refer the Office of Field
16 Operations as OFO. Do you understand that?
17 A. Yes.
18 Q. I'm going to refer to ports of entries as
19 POEs. Do you understand that?
20 A. Yes.
21 Q. From time to time, I'm going to ask you
22 about certain practices that have been implemented at



Page 18

1  CBP. When I do that, I'm asking for your personal
2  knowledge, not the knowledge of CBP. Do you
3  understand that?
4      A.  Yes.
5      Q.  And do you understand that you have taken
6  an oath to tell the truth today, sir?
7      A.  Yes.
8      Q.  That's the same oath that you would take
9  when testifying in court. Do you understand that?
10     A.  Yes.
11     Q.  Is there any reason why you can't tell me
12 the complete and honest truth in response to my
13 questions today?
14     A.  No.
15     Q.  And you understand there could be criminal
16 consequences for lying under oath?
17     A.  Yes.
18     Q.  And you understand that lying under oath
19 could violate CBP's ethics policies as well?
20     A.  Yes.
21     Q.  All right. I'm going to mark the first
22 exhibit as Exhibit 20.

Page 19

1           - - -
2      (A document was marked as Deposition
3  Exhibit Number 20.)
4           - - -
5  BY MR. MEDLOCK:
6      Q.  So I'm showing you what we have marked as
7  Exhibit 20 to your deposition, sir. It's a multi-page
8  document that on the first page has a caption that
9  says, Plaintiff's First Deposition Notices.
10          Please take a moment to review it, and let
11 me know audibly when you are done reviewing it, sir.
12     A.  I've finished.
13     Q.  Okay. This is a deposition notice that
14 contains your name on page 3; is that right?
15     A.  Yes.
16     Q.  And you understand that you are here to
17 testify today pursuant to this deposition notice; is
18 that right?
19     A.  Yes.
20     Q.  Okay. And are you being represented by any
21 attorneys in connection with your deposition today?
22     A.  These attorneys. Yes. Yes.

Page 20

1      Q.  Without going into the substance of any
2  conversations that you have had with attorneys
3  regarding this case, can you tell me whether you met
4  with anyone in preparation for your deposition today?
5      A.  I did meet with the attorneys.
6      Q.  When you say the attorneys can you define
7  what that means?
8      A.  The attorneys from chief counsel with CBP
9  as well as Department of Justice.
10     Q.  When did you meet with them to prepare for
11 your deposition?
12     A.  Yesterday and the day before.
13     Q.  Over those two days, approximately how long
14 did you meet with those attorneys to prepare for your
15 deposition?
16     A.  Yesterday about four or five hours, the day
17 before about 45 minutes.
18     Q.  So in total we are talking about somewhere
19 besetment five and almost six hours; is that right?
20     A.  That would be right.
21     Q.  During the time that you met with those
22 attorneys, were there any non attorneys present in the

Page 21

1  room with you?
2      A.  No.
3      Q.  Did anyone participate in the meetings that
4  you had to prepare for today's deposition by
5  telephone?
6      A.  No.
7      Q.  Did anybody participate in the those
8  meetings by video conference?
9      A.  No.
10     Q.  Prior to the meeting did you receive any
11 documents that you were supposed to review prior to
12 your deposition preparation session?
13     A.  Prior to the meeting documents that --
14     Q.  Yes.
15     A.  -- I pulled to review?
16     Q.  That were sent to you by counsel?
17     A.  Yes.
18     Q.  Approximately how many did you receive?
19     A.  Four.
20     Q.  And when you say they were sent to you by
21 counsel, were they sent to you by counsel for CBP or
22 DOJ?



Page 22

1     A.   CBP counsel.
2     Q.   Did reviewing those documents refresh your
3   memory about any events that had happened in the past
4   with respect to the metering policies?
5     A.   Yes.
6     Q.   What were the documents that refreshed your
7   recollection about the metering policy?
8         MS. SHINNERS:  Objection.  I think it makes
9   -- work product -- but I think it makes more sense to
10   if in the context of the specific questions because
11   the -- in order to fall within the refresh
12   recollection exception, it would need to actually --
13   he would need to rely on it for his testimony.  So if
14   you would like to ask him if he reviewed any documents
15   to refresh his memory about specific facts,
16     Q.   So, as you know, under Rule 30(D)(1),
17   objections are supposed to be stated concisely in a
18   nonargumentative and nonsuggestive manner.  I have let
19   you make several speaking objections today.  It's
20   going to stop.  Okay.  You've got an objection --
21         MS. SHINNERS:  That was not a speaking
22   objection.  It was a privilege objection.

Page 23

1         MR. MEDLOCK:  -- you can object to the
2   form.  So you are objecting to him talking about
3   documents that refreshed his recollection that he
4   already testified as privileged; is that right?
5         MS. SHINNERS:  I'm objecting to --
6         MR. MEDLOCK:  Are you going to talk --
7         MS. SHINNERS:  -- the question as
8   potentially revealing work product.
9         MR. MEDLOCK:  Are you going to stop him
10   from testifying about documents that he said refreshed
11   his recollection?
12         MS. SHINNERS:  I am not.
13         MR. MEDLOCK:  Okay.  So my --
14         MS. SHINNERS:  However, in this --
15     BY MR. MEDLOCK:
16     Q.   My question to you, sir, is what were those
17   documents, to the best of your recollection?
18         MS. SHINNERS:  Objection.  Work product.
19         MR. MEDLOCK:  Okay.  Are you going to stop
20   him from testifying?
21         MS. SHINNERS:  I instruct you not to answer
22   this question.  And I am state --

Page 24

1         MR. MEDLOCK:  Okay.  We will move on that
2   issue.  We will bring him back to testify again.  As
3   you know, when he testified that it refreshed his
4   recollection, that is an exception to the work product
5   doctrine, and I am entitled to know that.  Okay.
6     BY MR. MEDLOCK:
7     Q.   So, sir, are you going to follow your
8   counsel's instruction and not testify about the
9   documents that you said refreshed your recollection?
10     A.   I will follow my counsel's instructions.
11     Q.   Okay.  You said there were approximately
12   four documents that were sent to you.
13         How long did you spend reviewing those
14   documents?
15     A.   Two or three minutes.
16     Q.   And then when were those documents sent to
17   you prior to your meetings with counsel?
18     A.   They wee provided to me at the first
19   meeting with counsel.
20     Q.   Okay.  That's the 45-minute --
21     A.   Yes.
22     Q.   -- meeting that happened two days ago?

Page 25

1     A.   Yes.
2     Q.   During the longer meeting that you
3   discussed that happened yesterday, were you shown any
4   documents during that meeting?
5     A.   Yes.
6     Q.   Approximately how many documents were you
7   shown?
8     A.   Three.
9     Q.   And during those three documents that you
10   were shown, I take it they were different than the
11   four that you were shown the day before?
12     A.   Correct.
13     Q.   Okay.  Did those three documents refresh
14   your memory about events that happened in the past
15   with respect to the metering policy?
16     A.   No.
17     Q.   During the 45-minute session two days ago,
18   who were the attorneys that were in the room with you?
19     A.   My attorneys from chief counsel with the
20   CBP, Louisa and Christine.
21     Q.   And during the meeting that happened
22   yesterday for about four hours, how -- who were the



| | |
|---|---|
| **Page 26** | **Page 28** |

**Page 26**

1 attorneys that were in the room with you that day?
2    A.   The two attorneys from the Department of
3 Justice and the two attorneys from CBP counsel.
4    Q.   Did you review any deposition transcripts
5 prior to today's deposition?
6    A.   I reviewed my deposition that I had
7 provided some time ago.
8    Q.   In what case?
9    A.   In this case. Oh, I'm sorry. I'm
10 referring to the interrogatories.
11    Q.   I see.
12    A.   That's right. I'm sorry. I was confused.
13    Q.   That's all right. So I take it you didn't
14 review any depositions?
15    A.   Not a deposition, no.
16    Q.   Okay. Did you speak to anybody else at CBP
17 or DHS to -- about today's deposition?
18    A.   No.
19    Q.   Does anybody else other than counsel know
20 that you are here today?
21    A.   Yes.
22    Q.   Who?

**Page 27**

1    A.   My leadership team knows that I'm out of
2 pocket today because I'm giving a deposition.
3    Q.   But they don't know what case?
4    A.   They know what's on the metering case.
5 Yes.
6    Q.   What did you specifically tell your
7 leadership team about it?
8    A.   That I would be unavailable throughout the
9 day because I'm here giving a deposition on the
10 metering case.
11    Q.   Did your leadership team have any questions
12 for you --
13    A.   No.
14    Q.   -- about today's deposition? When you say
15 your leadership team, who is on your leadership team?
16    A.   My deputy commissioner, my direct boss, as
17 well as my executive director for operations, as well
18 as my executive director for admissibility, and my
19 executive director for the National Targeting Center.
20 Those are the four that I routinely engage with
21 throughout the day on operational matters.
22      I felt it was important for them to know I

**Page 28**

1 wouldn't be available throughout the day.
2    Q.   And those four that you just named, those
3 four roles are direct reports to you?
4    A.   The three are direct reports. The one I am
5 the direct report to, my deputy commissioner.
6    Q.   Fair point. Can you give me the names of
7 those individuals along with their titles?
8    A.   Yes. The deputy commissioner is Robert
9 Perez. The executive director for operations is Randy
10 Howell. The executive director for admissibility
11 programs is Todd Hoffman. And the executive director
12 for the National Targeting Center is Vernon Foray.
13    Q.   And how often on an average day do you meet
14 with those four individuals?
15    A.   Multiple times.
16    Q.   Are you all in the same office in the
17 Ronald Reagan building?
18    A.   Yes, we were.
19    Q.   Do you have any standing meetings with your
20 leadership committee on a weekly or daily basis?
21    A.   I have a daily 8:15 with the leadership of
22 field operations. And there is a daily nine o'clock

**Page 29**

1 three days ad week with the commissioner and the
2 deputy commissioner on intelligence matters in the
3 SCIF.
4    Q.   The weekly 8:15, that's not in the SCIF; is
5 that right?
6    A.   No, it's not.
7    Q.   During that 8:15 meeting who exactly is
8 present at that meeting?
9    A.   There are six executive directors. My
10 deputy executive assistant commissioner, my chief of
11 staff, his chief of staff.
12    Q.   Okay. Does anybody attend that meeting via
13 telephone?
14    A.   No.
15    Q.   Are any minutes of that meeting kept?
16    A.   No.
17    Q.   Are any notes sent around after that
18 meeting?
19    A.   No.
20    Q.   Are there any standing topics at that
21 meeting?
22    A.   Standing topics, no.



Page 30

1    Q.    Are there any topics that are typically
2    discussed at that meeting?
3    A.    It is a 24-hour recap of the activities
4    that took place in the ports of entry.
5    Q.    And when you say in the ports of entry, are
6    you talking about ports of entry on the southwest
7    board ports of entry generally?
8    A.    Ports of entry throughout the country.
9    Q.    And do event that occur at ports of entry
10   on the southwest border come up during that meeting?
11   A.    Yes.
12   Q.    Has the metering policy ever come up during
13   that meeting?
14   A.    Yes.
15   Q.    Has the -- has the migration crisis action
16   team ever come up during that meeting?
17   A.    Yes.
18   Q.    Have members of the migration crisis action
19   team ever been invited to that meeting?
20   A.    No.
21   Q.    Has anybody other than the individuals that
22   you already listed ever been invited to that meeting

Page 31

1    on an ad hoc basis?
2    A.    There will be.  On -- again this is an
3    operational meeting.  So depending if an event occurs
4    in a subject matter has information to add, they will
5    be included.
6    Q.    Have you ever discussed investigations by
7    the Office of Civil Rights and Civil Liberties during
8    those meetings?
9    A.    No.
10   Q.    During the 8:15 meeting have you ever
11   discussed investigations by the DHS Office of
12   Inspector General?
13   A.    We have discussed incidents that have been
14   relayed -- or have been referred to OIG for
15   investigation.
16   Q.    Have you ever discussed incidents related
17   to the metering policy that have been referred to OIG
18   for investigation during that meeting, the 8:15
19   meeting?
20   A.    Yes.
21   Q.    Can you describe those discussions that
22   have happened at the 8:15 meeting about the DHS-OIG

Page 32

1    investigation into metering?
2        MS. SHINNERS:  Object to the extent it
3    would cause you to -- answering would cause you to
4    reveal deliberations that are predecisional.  If you
5    can answer without revealing such predeliberations,
6    you may do so.
7    A.    So, I'm sorry, specific to the metering
8    policy.
9    Q.    Correct.
10   A.    I can recall two events where policy was
11   not followed in terms of the metering policy.  We had
12   discussions of those events, and to ensure that they
13   were referred to our Office of Professional
14   Responsibility.
15   Q.    What was the first event?
16   A.    As best as I can recall, one event was --
17   occurred in Laredo.
18   Q.    What was that event in Laredo?
19   A.    To the best of my recollection, individuals
20   who had crossed into the U.S. were returned by the
21   officers back into Mexico.
22   Q.    So the individuals actually stepped foot on

Page 33

1    U.S. soil and then were moved back --
2    A.    Yes.
3    Q.    -- to Mexican soil; is that right?
4    A.    Yes.
5    Q.    Who reported to you about the incident in
6    Laredo?
7    A.    That was reported up from the Laredo field
8    office, the Laredo leadership.
9    Q.    Who in Laredo leadership?
10   A.    I don't recall.
11   Q.    When did this event occur?
12   A.    Best of my recollection, two years ago.
13   Q.    So 2017?
14   A.    Sometime in 2018.
15   Q.    Okay.  And do you recall what month of
16   2018?
17   A.    No, I do not.
18   Q.    And this event was referred to the Office
19   of Professional Responsibilities; is that right?
20   A.    It was.
21   Q.    Do you know what the outcome of the Office
22   of Professional Responsibilities investigation was



Page 34

1  into this incident?
2      A.  I do not.
3      Q.  Who at the Office of Professional
4  Responsibility would this have been referred to?
5      A.  We have an intake center that receives
6  these allegations.  And then they are assigned within
7  the Office of Professional Responsibility.  So we sent
8  them into the joint intake center, as it's called; and
9  it starts the process from there.
10     Q.  And you said this instant happened in
11 Laredo.  Are you referring to the Laredo field office;
12 is that right?
13     A.  I believe this was the port of Laredo.
14     Q.  Okay.  So who at the port of Laredo was
15 directly responsible for directing individuals that
16 were on U.S. soil back to Mexico?
17     A.  Who were the subjects of this action?
18     Q.  Correct.
19     A.  I do not know.
20     Q.  Do you know any CBP officers' names who
21 were involved with the action?
22     A.  I do not.

Page 35

1      Q.  Do you recall who would have been port
2  director at Laredo at the time?
3      A.  At the time, it was likely Greg Alvarez.
4      Q.  You say likely.  Are you --
5      A.  Because Greg Alvarez stepped into a new
6  position around the same time, so --
7      Q.  I see.  Is there anything else you can
8  recall right now sitting here today about this Laredo
9  incident that happened sometime in 2018 that was
10 discussed at the 8:15 meeting?
11     A.  Just again that it was referred to the JIC,
12 the Joint Intake Center.
13     Q.  Okay.  Now you said there was a second
14 incident with respect to the metering policy that was
15 at the 8:15 meeting.  What was that second incident?
16     A.  I believe it occurred in Brownsville.  And
17 it was similar circumstances.  Individuals that had
18 set foot on U.S. soil were taken back.
19     Q.  When did that incident occur?
20     A.  Around the same time.
21     Q.  In 2018?
22     A.  As far as I can recall, 2018.

Page 36

1      Q.  Who reported to you initially about this
2  incident in Brownsville?
3      A.  It would have come up again through the
4  Laredo field office leadership.
5      Q.  And who specifically in Laredo field office
6  leadership would have reported up?
7      A.  It would likely have been whoever the watch
8  commander was that day.
9      Q.  But you don't know the name?
10     A.  No, I do not.
11     Q.  What was discussed at the 8:15 meeting
12 regarding this incident in Brownsville?
13     A.  As far as I can --
14         MS. SHINNERS:  Objection to the extent it
15 would cause you to reveal predecisional deliberations.
16 To the extent you can answer without doing so.
17     A.  Okay.  Just again that we ensured that it
18 was referred to the Joint Intake Center for
19 investigation review by Office of Professional
20 Responsibility.
21     Q.  Do you know what the results of that
22 referral to the Office of Professional Responsibility

Page 37

1  was?
2      A.  I do not.
3      Q.  Did you ever follow up regarding either of
4  these incidents after they were raised at the 8:15
5  meeting?
6      A.  I did not.
7      Q.  Did you ever instruct anyone to do so?
8      A.  No.  I instructed to make sure it was in
9  fact referred, that both were referred.
10     Q.  Did an incident where individuals were on
11 U.S. soil and were returned to Mexican can soil at the
12 Tecate point of entry ever come up during your 8:15
13 meeting?
14     A.  Not through the 8:15.
15     Q.  Okay.  But it may have come up in a
16 different meeting; is that right?
17     A.  It did not come up through a meeting.  It
18 came up with the production of the OIG report.
19     Q.  I see.  Okay.  Can you -- besides this
20 incident in the Laredo Port of Entry and this incident
21 at the Brownsville Port of Entry, can you recall any
22 other discussions regarding the metering policy that



Page 38

1  occurred at the 8:15 meeting?
2      A.   The metering policy?
3      Q.   Correct.
4      A.   Is part of general discussions on our
5  operational flow at the ports of entry.
6      Q.   So it sort of gets wrapped up into that
7  general discussion?
8      A.   Some days it gets wrapped up in that
9  general conversation.  We have been dealing with
10 metering since 2016.
11     Q.   And you are still dealing with it today?
12     A.   We still implement as we need to
13 operationally.  Yes.
14     Q.   Okay.  And it still -- the metering policy
15 is being implemented at ports of entry today?
16     A.   As needed, yes.
17     Q.   Do you know whether it's being implemented
18 at San Ysidro today?
19     A.   It is likely at San Ysidro today.
20     Q.   Otay Mesa?
21     A.   I don't know for sure.
22     Q.   Hidalgo?

Page 39

1      A.   When you say today, are you speaking
2  physically today or --
3      Q.   This week.
4      A.   This week, Hidalgo, not likely.
5      Q.   Not likely.  Why do you say not likely?
6      A.   Because the migrant flows have diminished
7  through the Hidalgo and far ports of entry.
8      Q.   How about Laredo?
9      A.   Likely in Laredo.
10     Q.   Brownsville?
11     A.   Not certain on Brownsville.
12     Q.   Nogales?
13     A.   Definitely being implemented in Nogales.
14     Q.   El Paso?
15     A.   Yes, it's being implemented in El Paso.
16     Q.   And --
17     A.   And these are the ports of entry that I'm
18 referencing.
19     Q.   Correct.  And that's what I mean to say as
20 well.
21     A.   Right.
22     Q.   Are there any ports, other ports of entry

Page 40

1  other than the ones that we have mentioned right now
2  that you are aware of where metering is occurring this
3  week?
4      A.   No.
5      Q.   Okay.  You mentioned that there's a second
6  meeting that occurs in the SCIF.
7      A.   Yes.
8      Q.   On a daily basis.  What time does that
9  meeting happen at?
10     A.   Nine o'clock.
11     Q.   Who attends the nine o'clock meeting?
12     A.   That is the senior leadership of CBP,
13 whereas the 8:15 is the senior leadership of field
14 operations.  And it's an operational discussion.  The
15 nine o'clock meeting in the SCIF is an
16 intelligence-driven discussion between the
17 commissioner, the deputy commissioner, and the six
18 operational leads, myself being one of them.
19     Q.   Who are the six operational leads besides
20 yourself?
21     A.   Chief of the border patrol.  The chief of
22 what's called Enterprise Services, chief of

Page 41

1  Operational Support, the Office of Trade.  Who am I
2  forgetting -- oh, and the deputy commissioner.  Oh,
3  and Air and Marine is the sixth one.  I'm sorry.
4      Q.   So you referred to the commissioner of CBP.
5  That individual is sometimes referred to as C1 in
6  e-mail traffic, right?
7      A.   Yes.  Or AC1 as Acting C1.  We have had
8  actings for some time.
9      Q.   Understand.  And have you ever seen an
10 individual referred to as C2 in the e-mails?
11     A.   That is the deputy commissioner.
12     Q.   And if there's --
13     A.   Or DC2.
14     Q.   -- an acting --
15     A.   Yes, sir.  Yes, sir.
16     Q.   And you were referred sometimes referred to
17 as EAC in e-mails; is that right?
18     A.   That is my title, executive assistant
19 commissioner.
20     Q.   Okay.  And that's just an abbreviation of
21 your title; is that right?
22     A.   Yes.  And there's also others that share



Page 42

1  that title.
2      Q.  Okay.  Now, besides this -- so this 9:00
3  a.m. meeting that occurs in the SCIF that you said is
4  intelligence driven, are notes taken at that meeting?
5      A.  No.
6      Q.  Are any summaries of that meeting
7  distributed after it occurs?
8      A.  No.
9      Q.  And the individuals that you listed
10 attending that meeting, are there other individuals
11 who sometimes attend that meeting an ad hoc basis?
12     A.  There are.
13     Q.  Of those -- the individuals that attend on
14 ad hoc basis, can you recall who they would be?
15     A.  They are generally representatives from the
16 Office of Intelligence that are briefing on specific
17 intelligence products.
18     Q.  Has the metering policy ever been discussed
19 in the 9:00 a.m. meeting?
20     A.  No.
21     Q.  Has queue management ever been discussed in
22 the 9:00 a.m. meeting?

Page 43

1      A.  No.
2      Q.  Do you understand there to be a difference
3  between metering and queue management, sir?
4      A.  No.  I view it as the same.
5      Q.  They are synonymous terms?
6      A.  Yes.
7      Q.  Okay.  Have members of the Migration Crisis
8  Action Team ever attended the 9:00 a.m. meeting in the
9  SCIF?
10     A.  Yes.
11     Q.  Which ones?
12     A.  Which?
13     Q.  Members of MCAT?
14     A.  They have different folks who come and
15 report the stats on a weekly basis.
16     Q.  And when you say report the stats, can you
17 tell me what you mean by that?
18         MS. SHINNERS:  Objection.  I'm going to
19 object to the extent it calls for classified
20 information or law enforcement privileged information.
21 To the extent that you can answer without revealing
22 it, you can.  If you need to consult with your counsel

Page 44

1  from CBP as to what constitutes law enforcement
2  privileged information, we can do so.  I know that
3  counsel instructed you, you can't take a break, but we
4  can take a break to discuss --
5         MR. MEDLOCK:  You can take it to discuss
6  privilege -- let me ask a different question.
7      BY MR. MEDLOCK:
8      Q.  Have you seen e-mails from the Migration
9  Crisis Action Team that list data about processing and
10 throughput at ports of entry?
11     A.  Yes.
12     Q.  And those e-mails go out on a daily basis;
13 is that right?
14     A.  Yes.
15     Q.  And you consume that those e-mails as a
16 part of your official duties; is that right?
17     A.  Yes.
18     Q.  And those e-mails for the Migration Crisis
19 Action Team are sometimes referred to as MCAT reports,
20 sometimes they are referred to as queue management
21 reports; is that right?
22     A.  Mostly referred to as MCAT reports.

Page 45

1      Q.  But you've seen reports called queue
2  management reports before?
3      A.  Yes.
4      Q.  And those are also drafted by the MCAT team
5  as well?
6      A.  Yes.
7      Q.  And those MCAT and queue management reports
8  operationally important for you, right?
9      A.  They provide an operational snapshot.
10     Q.  And are those operational snapshots useful
11 to you in your day-to-day business?
12     A.  To some degree.
13     Q.  And why are they useful to some degree?
14     A.  Because they again are just a snapshot in
15 time and are not very detailed.  So they often don't
16 give you the reasons behind the numbers.
17     Q.  But you do use them; is that right?
18     A.  I use them to, again, to give me some
19 visibility as to what's going on in the ports.
20     Q.  The presentations that are made by the MCAT
21 team at the 9:00 a.m. meeting and the SCIF, are they
22 -- is the information presented different than what is



Page 46

1  presented in those daily e-mails?
2     A.   No.
3     Q.   So it's just simply a recitation of what
4  you could get by reading those e-mails; is that right?
5     A.   Correct.
6     Q.   Got it.  And just presented verbally; is
7  that right?
8     A.   Yes.
9     Q.   Okay.  And do the MCAT team members -- does
10 an MCAT team member regularly attend the 9:00 a.m.
11 meeting in the SCIF?
12    A.   They present generally once a week.  I
13 think someone from MCAT may attend throughout the week
14 but not necessarily every day.
15    Q.   What day --
16    A.   So --
17    Q.   -- of the week does the MCAT presentation
18 usually happen?
19    A.   Generally at the start of the week, but it
20 will also align with when the commissioner and the
21 deputy are attending.  They may not attend every day,
22    Q.   So C1 and C2, or AC1 and AC2, are not at

Page 47

1  the Monday meeting that might get bumped to Tuesday or
2  Wednesday?
3     A.   Correct.
4     Q.   All right.  So we have talked about the
5  8:15 meeting and the 9:00 a.m. meeting in the SCIF.
6  Actually, I should go back to the 9:00 a.m. meeting.
7        Are there any standing topics that are
8  discussed at the 9:00 a.m.  meeting?
9        MS. SHINNERS:  Objection.  I believe that
10 veers in towards --
11       MR. MEDLOCK:  It's just a yes or no.  I was
12 just asking yes or no.
13       MS. SHINNERS:  Fair enough.  I will allow
14 the witness.
15    A.   Standing topics.  Yes.
16    Q.   Okay.  And the members of that meeting,
17 they know what those standing topics are; is that
18 right?
19    A.   There's generally a recurring reporting of
20 certain intelligence matters that are being tracked.
21 Now that recurring reporting could go on for several
22 months.  It could go on for a few days.  It's, again,

Page 48

1  these are the intelligence discussions in the SCIF as
2  to what the event or the threat may be.
3     Q.   Okay.  So you have the 8:15 meeting, you
4  have a 9:00 a.m. meeting.  Do you have any other daily
5  meetings either with your direct reports or people you
6  directly report to?
7     A.   No.
8     Q.   Do you have any weekly meetings with your
9  direct reports or people you directly report to?
10    A.   Outside of the 8:15, no.
11    Q.   Okay.  And so the 8:15 is a weekly meeting?
12    A.   Every day.
13    Q.   It's a daily meeting.
14    A.   Daily.
15    Q.   So every weekday; is that right?
16    A.   Every weekday.
17    Q.   And the 9:00 am meeting is every weekday as
18 well?
19    A.   The 9:00 a.m. is intended to be every
20 weekday but many days through the week it's canceled
21 for whatever reason.
22    Q.   Oh, so --

Page 49

1     A.   So it may not happen five days a week.
2     Q.   I see.  So is that generally when the
3  commissioner and deputy commissioner can't be there?
4     A.   Are on travel or whatnot.
5     Q.   Okay.  Let me move to the next exhibit.
6            -  -  -
7         (A document was marked as Deposition
8  Exhibit Number 21.)
9            -  -  -
10       BY MR. MEDLOCK:
11    Q.   I think you might be familiar with this
12 exhibit.
13    A.   Yes.
14    Q.   But humor me, and let me know when you have
15 read through it.
16    A.   Yes.  Yes.
17    Q.   All right.  So Exhibit 21 is a copy of a
18 printout from a website that at the stop is entitled
19 Executive Assistant Commissioner Todd Owen.
20       Do you see that?
21    A.   Yes.
22    Q.   And that's you, obviously?



Page 50

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Okay. |
| 3 | A. Yes. |
| 4 | Q. Okay. This website lists some of your |
| 5 | educational and career highlights; is that right? |
| 6 | A. Yes. |
| 7 | Q. And you were consulted when this website |
| 8 | was drafted; is that right? |
| 9 | A. I'm sure I reviewed a draft. Yes. |
| 10 | Q. And you approved what went on this; is that |
| 11 | right? |
| 12 | A. Yes. |
| 13 | Q. Is there anything that's missing from this |
| 14 | page or that you think is inaccurate on it? |
| 15 | A. The budget figure is inaccurate. |
| 16 | Q. It's increased since then? |
| 17 | A. Yes, it has. |
| 18 | Q. Other than that, is there anything else |
| 19 | that you would change about this website? |
| 20 | A. Doesn't appear so. |
| 21 | Q. Okay. So what's the budget that you manage |
| 22 | today? |

Page 51

| | |
|---|---|
| 1 | A. 6.5 billion. |
| 2 | Q. Okay. And how many employees do you |
| 3 | oversee at CBP today? |
| 4 | A. Just on -- just under 30,000. |
| 5 | Q. How many of those 30,000 are sworn law |
| 6 | enforcement officers? |
| 7 | A. 24,600 approximately. |
| 8 | Q. And one of the things that you do in your |
| 9 | role as EAC is you set an example for the other CBP |
| 10 | employees; is that right? |
| 11 | A. Try to. |
| 12 | Q. And would you agree with me that it's |
| 13 | important for a CBP officer to be honest when they are |
| 14 | on and off duty; is that right? |
| 15 | A. Yes. |
| 16 | Q. And as a member of CBP senior leadership, |
| 17 | you try to hold yourself to that standard, and in fact |
| 18 | to a higher standard; is that right? |
| 19 | A. Yes. |
| 20 | Q. Okay. |
| 21 | - - - |
| 22 | (A document was marked as Deposition |

Page 52

| | |
|---|---|
| 1 | Exhibit Number 22.) |
| 2 | - - - |
| 3 | BY MR. MEDLOCK: |
| 4 | Q. Let me show you a copy of Exhibit 22. It's |
| 5 | a long document. I'm sure you have probably seen it |
| 6 | in your career. Take a moment to flip through it. |
| 7 | I'll direct you to the parts I want to talk about. |
| 8 | A. Okay. |
| 9 | Q. All right, sir. Exhibit 22 is a multi-page |
| 10 | document entitled U.S. Customs and Border Protection |
| 11 | Standards Of Conduct. Do you see that, sir? |
| 12 | A. Yes. |
| 13 | Q. And, for the record, it begins with |
| 14 | AOL-DEF-00669013 in the bottom right corner. |
| 15 | Do you see that? |
| 16 | A. Yes. |
| 17 | Q. Lawyers call those Bates numbers. I have |
| 18 | no idea why. But I may refer to them as Bates numbers |
| 19 | throughout today's deposition. |
| 20 | Can you flip through to the Section 3.2. |
| 21 | I'm sorry. It's on the first page. I apologize. You |
| 22 | don't need to flip anywhere. Section 3.2 on the first |

Page 53

| | |
|---|---|
| 1 | page that ends in 69013. Do you see that? |
| 2 | A. Yes. |
| 3 | Q. Okay. And this section here notes that a |
| 4 | CBP employee that does not comply with the standards |
| 5 | of conduct can face disciplinary action; is that |
| 6 | right? |
| 7 | A. Yes. |
| 8 | Q. And if you move up, and Section 3.1 on the |
| 9 | same page, that section begins, "In fulfilling its |
| 10 | mission, CBP and its employees must sustain the trust |
| 11 | and confidence of the public they serve." |
| 12 | Did I read that correctly? |
| 13 | A. Yes. |
| 14 | Q. In your opinion, why is it important for |
| 15 | CBP to sustain the trust of the public? |
| 16 | A. In my opinion as a law enforcement agency, |
| 17 | if you lose the public trust, you won't be able to |
| 18 | perform the mission that you are entitled -- you're |
| 19 | expected to perform. |
| 20 | Q. Is it important for a law enforcement |
| 21 | agency to be candid with the public about what it's |
| 22 | doing and why? |



Page 54

1    A.   Yes, it is.
2    Q.   Do you believe that CBP has been candid
3  with the public regarding the metering policy?
4    A.   I know that I have been candid with the
5  metering with the public.  I can't speak for the
6  entire Agency.
7    Q.   Are you aware of any instances where any of
8  the law enforcement officers that you oversee have not
9  been candid with the public about the metering policy?
10   A.   Have not been candid, not that I can
11 recall.
12   Q.   Are you aware of any instances in which CBP
13 employees have been told that they have not been
14 candid about the metering policy?
15   A.   Can you repeat the question.
16   Q.   Yeah.  Are you aware of any instances in
17 which CBP employees have been told that they weren't
18 candid about the metering policy?
19   A.   Not that I can recall.
20   Q.   Are you aware of any instance in which CBP
21 officers were told that the metering policy broke the
22 law?

Page 55

1    A.   No.
2    Q.   Are you aware of any instances in which CBP
3  officers admitted to third parties that the metering
4  policy broke the law?
5    A.   I don't believe the metering policy has
6  broken the law.
7    Q.   I understand that, but are you aware of any
8  instances in which CBP officers admitted that?
9    A.   Not that I'm aware of.
10   Q.   Let's turn to Section 6.1, which is on the
11 page that ends in 669015.
12   A.   I'm sorry, 66?
13   Q.   9015.  Should be the third page of the
14 document.
15   A.   Third page.
16   Q.   And in the bottom right, it should end in
17 901.
18   A.   Oh, I'm sorry.  I'm looking in the 6.1,
19 6.2.  Okay.
20   Q.   No, I get it.  There's page numbers, then
21 there's Bates number --
22   A.   Got it.

Page 56

1    Q.   -- then there's the sections, so I get it.
2    A.   Okay.
3    Q.   So I'm under Standards of Conduct, 6.1,
4  conduct prejudicial to the government.  Do you see
5  that?
6    A.   Yes.
7    Q.   All right.  That section, the body of that
8  section reads, quote, Employees will not engage on or
9  off duty in criminal, infamous, dishonest or
10 notoriously disgraceful conduct, or any other conduct
11 prejudicial to the government.
12       Did I read that correctly?
13   A.   Yes.
14   Q.   So there can be disciplinary actions if CBP
15 officers are dishonest when they are on duty; is that
16 right?
17   A.   Yes.
18   Q.   And are you aware of any instance in which
19 CBP officers have been dishonest about the metering
20 policy?
21   A.   No.
22   Q.   You yourself have always been honest about

Page 57

1  the metering policy; is that right?
2    A.   Yes.
3    Q.   You have always been honest about the
4  purpose of the metering policy?
5    A.   Yes.
6    Q.   You've always been honest about the reasons
7  why CBP was implementing the metering policy?
8    A.   Yes.
9    Q.   In your written communications regarding
10 the metering policy, you have been honest and complete
11 about the reasons why CBP was implementing the
12 metering policy; is that correct?
13   A.   I believe so.
14   Q.   Can you think of any instance in which you
15 in your written communications about the metering
16 policy withheld material information about the purpose
17 of the policy?
18   A.   No.  I would like to go back.  You asked
19 the question about officers that have been dishonest
20 with the metering policy.
21   Q.   Yes.
22   A.   There have been several allegations that



Page 58

1   officers have not followed the policy.
2      Q.   Correct.
3      A.   And have said things like asylum is closed
4   and things of that nature.  I'm aware of those
5   incidences.  And when we become aware of those, those
6   have been referred to the check again.
7      Q.   You refer to those as allegations.  Are
8   those allegations or have OPR determined that those
9   instances occurred?
10      A.   To my knowledge, they were allegations.  I
11   don't have the outcome of the OPR or the OIG
12   investigations.
13      Q.   So they may have occurred, they may not
14   have occurred.  You just don't know as you sit here
15   today; is that right?
16      A.   Correct.
17      Q.   Now, I'd like to move to the next -- to
18   page Section 6.4.1, Which is on the Bates numbered
19   page that ends in 669017.  Do You see Section 6.4.1,
20   sir?
21      A.   Yes.
22      Q.   And that's under the Section 6.4 which is

Page 59

1   entitled False Statements?
2      A.   Correct.
3      Q.   And 6.4.1 reads, "Employees will not
4   knowingly make false, misleading, incomplete or
5   ambiguous statements, whether oral or written, in
6   connection with any matter of official interest."
7      Did I read that correctly?
8      A.   Yes.
9      Q.   You would agree with me that the metering
10   policy is a matter of official interest, correct?
11      A.   Yes.
12      Q.   Are you aware of any employee who has made
13   a false statement regarding the metering policy?
14      A.   I'm not aware of that.  But, again, I have
15   30,000 employees under me.  I don't know.
16      Q.   Are you aware of any instance in which an
17   employee has made a misleading statement about the
18   metering policy?
19      A.   Again, I am aware of allegations.  And
20   those have been referred to the JIC.
21      Q.   Besides those allegations, are you aware of
22   any other misleading statements?

Page 60

1      A.   Not that I'm aware of.
2      Q.   Are you aware of any incomplete statements
3   that have been made regarding the metering policy?
4      A.   Not that I'm aware of.
5      Q.   How about ambiguous statements?  Are you
6   aware of any ambiguous statements that have been made
7   regarding the metering policy?
8      A.   I would say ambiguous how?  I mean, some
9   people may feel it's ambiguous or incomplete, others
10   may not.  I think that's an awful general statement.
11      Q.   Okay.  Are you aware of anybody who has --
12   any CBP employee who has ever told you that the
13   metering policy is ambiguous?
14      A.   I know that our union representatives have
15   asked for more clarification on the union policy.
16      Q.   The union represents you are referring to
17   is the National Treasury Employees Union or NTEU?
18      A.   Correct.
19      Q.   Do you recall whether it was the national
20   chapter or local chapter that asked for more clarity?
21      A.   I primarily deal with the national.
22      Q.   And the national chapter, who's the head of

Page 61

1   the national chapter?
2      A.   Tony Reardon.
3      Q.   How often do you interact with Mr. Reardon?
4      A.   Few times a year.
5      Q.   Does Mr. Reardon ever forward you e-mails
6   regarding union activities that you should be aware
7   of?
8      A.   Yes.
9      Q.   Does Mr. Reardon ever forward you union
10   grievances that you should be aware of?
11      A.   Not Mr. Reardon.  His vice president Jim
12   Bailey will sometimes call my attention to a specific
13   grievance or not.
14      Q.   How often do you interact with Mr. Bailey?
15      A.   About once a month.
16      Q.   Are those standing meetings or they just
17   happen to happen once a month.
18      A.   No.  They are mostly telephone calls as
19   issues come up.
20      Q.   Besides Mr. Bailey and Mr. Reardon is there
21   anybody else from the NTEU national chapter or any of
22   the local chapters that you deal with?



Page 62

1    A.   From the national chapter, Jonathan Levine,
2    who is -- I'm not quite sure what his title is, but he
3    handles a lot of the CBP OFO matters.  So I will
4    receive messages from him periodically, but Jim Bailey
5    is my primary contact.
6        Q.   And do you ever receive any information
7    from field offices or port directors regarding ongoing
8    grievances filed by NTEU members?
9        A.   I mean, sometimes, yes.  But not every
10   grievance or matter that is filed in the field is
11   raised to my attention.
12       Q.   Sure.  So it's the things that are at least
13   your deputies perceive as more important that
14   percolate up to you?
15       A.   Yes.
16       Q.   With respect to grievances?
17       A.   I would say yes.
18       Q.   It's probably the most important grievances
19   that hit your desk; is that right?
20       A.   Yes.
21       Q.   All right.  Mark the next exhibit.
22            - - -

Page 63

1        (A document was marked as Deposition
2    Exhibit Number 23.)
3            - - -
4    BY MR. MEDLOCK:
5        Q.   All right, sir.  I've marked as Exhibit 23
6    a one-page document.  Again this is probably one you
7    are familiar with.  That was previously marked in
8    another deposition in this matter as Exhibit 3.
9            Can you please take a moment to review
10   Exhibit 23, and let know when you are done doing so.
11       MS. SHINNERS:  Exhibit 3?
12       MR. MEDLOCK:  Well, I marked it as 23 as
13   well.
14       MS. SHINNERS:  Okay.
15       THE WITNESS:  Okay.
16   BY MR. MEDLOCK:
17       Q.   Exhibit 23 is a one-page memorandum
18   entitled Metering Guidance, that is dated April 27,
19   2018; is that right?
20       A.   Yes.
21       Q.   And the memorandum is from you; is that
22   right?

Page 64

1        A.   Yes.
2        Q.   You wrote the memorandum shown in Exhibit
3    23 as part of your job at CBP, correct?
4        A.   Well, my executive director for
5    Admissibility Programs would have written the initial
6    draft.  I would have commented on the draft, and then
7    I would have signed the official guidance that went
8    out, so --
9        Q.   Who's the individual that would have
10   drafted this?
11       A.   Todd Hoffman.
12       Q.   And would Mr. Hoffman have received any
13   input from any of his reports, do you know?
14       A.   I don't know.
15       Q.   Do you know if Ryan Koseor had any input
16   into this guidance?
17       A.   Ryan Koseor does not work for Mr. Hoffman,
18   so I would doubt it.
19       Q.   Do you know if anybody else at CBP had any
20   input into this metering guidance?
21       A.   Mr. Hoffman's director deals with all
22   immigration matters.  So subject matters on his staff

Page 65

1    may very well help contribute to this.
2        Q.   But you don't know one way or the other as
3    you sit here today?
4        A.   I don't know within his staff who helped
5    draft this memo.  No.
6        Q.   So this memorandum was prepared for your
7    signature; is that right?
8        A.   Yes, it was.
9        Q.   And you had the opportunity to give
10   feedback on a draft of this memorandum?
11       A.   I believe so.  Yes.
12       Q.   Do you recall when in relation to April 27,
13   2018, you would have received the draft?
14       A.   No.
15       Q.   Do you recall whether you actually had any
16   edits to this memorandum?
17       A.   I don't recall.
18       Q.   You may have, you may not have.  You just
19   don't recall?
20       A.   I sign a lot of memos.  I don't recall on
21   this specific one I had comments on the draft or not.
22       Q.   Do you recall how long you spent reviewing



Page 66

1  this memo?
2      A.  No, I do not.
3      Q.  How long would you typically spend
4  reviewing a one-page memo?
5      A.  I mean, not very long.  I mean, I would
6  look to make sure that the guidance I felt was clear
7  from this.
8      Q.  Okay.
9      A.  So not very long.
10     Q.  When you say not very long, can you give me
11 an estimate?
12     A.  You know maybe five or ten minutes.
13     Q.  So --
14     A.  Some documents I will review and let them
15 sit and then come back to them and review them again
16 with fresh eyes at a later time.  I mean, I don't
17 recall this one specifically.
18     Q.  Do you recall whether you reviewed this
19 memorandum more than one time?
20     A.  Yes.
21     Q.  How many times did you review it?
22     A.  Prior to its issuance or since then or --

Page 67

1      Q.  Prior to its issuance?
2      A.  Prior to it issuance, I don't recall.
3      Q.  You cite in this memorandum as part of your
4  official duties as the EAC at CBP's Office of Field
5  Operations; is that correct?
6      A.  Yes.
7      Q.  And you would have been knowledgeable about
8  the contents of this memorandum at the time you signed
9  it; is that right?
10     A.  Yes.
11     Q.  And you signed it on or about the date list
12 on the memorandum, April 27, 2018; is that right?
13     A.  Correct. On or about the date.
14     Q.  Correct.
15     A.  Because when the memos come to me, they
16 don't have a date on them yet.  And then when the
17 executive secretaries issue it, within the next day or
18 two that's when they date stamp it.
19     Q.  Okay.  And from reviewing this memorandum,
20 other than the fact there's been a few redactions on
21 it, to your knowledge is this memorandum accurate and
22 correct?

Page 68

1      A.  Yes.
2      Q.  And if I refer to this memorandum as the
3  metering policy, you'll understand that?
4      A.  Metering guidance.  Yes, sir.
5      Q.  Okay.  It's your position, isn't it, sir,
6  that the metering policy was motivated by capacity
7  constraints at ports of entry on the Mexico border?
8      A.  In 2016 in San Ysidro.  Yes.
9      Q.  Any other ports of entry where there were
10 capacity constraints that you believe justified this
11 memorandum?
12     A.  The metering practice started in 2016.  It
13 started in San Ysidro.  As other ports were
14 overwhelmed with the volume of migrants, then we
15 adopted the same practice across the southwest border
16 as needed.  That was throughout 2016.
17        In 2017, the migrant numbers subsided
18 significantly.  It was less necessary to implement
19 metering throughout 2017.  In 2018, the migrants
20 numbers again started to increase, starting to reach a
21 high point in the spring of 2018.  That was what drove
22 this message, this guidance across our southwest

Page 69

1  border.
2      Q.  At the time this memorandum was issued,
3  what were the capacity -- what ports of entry were
4  capacity constrained that you felt justified the
5  issuance of this metering guidance?
6      A.  I don't recall specifically what ports, but
7  our primary gateway ports in the southwest border
8  began to experience capacity issues again throughout
9  2016.  Those would be the major ports, the San
10 Ysidros, the Calexico, Nogales, El Paso, Laredo,
11 Hidalgo off and on, Brownsville off and on.
12     Q.  And it's your assumption that those were
13 the ports that were capacity constrained at that time;
14 is that right?
15     A.  At that time, but again we have 26 ports
16 along the southwest border, 46 actual crossings.  A
17 port of entry may have multiple crossings.  El Paso
18 has four crossings.  At some point because of the
19 migrant situation which ebbs and flows, one of those
20 bridges might have capacity while the other three do
21 not.  It really is a very fluid situation at the ports
22 from port to port, day to day.

MAGNA
LEGAL SERVICES

Page 70

1    Q.   Is it your position that the metering
2  policy was not motivated by a desire to deter asylum
3  seekers from entering the U.S.?
4    A.   The policy was not desired to deter
5  migrants from entering the U.S.  No, it was not.
6    Q.   And there was no communication that went to
7  any field office or port director that -- from you,
8  that would have led those field offices or port
9  directors to believe that the metering policy should
10 be used to deter asylum seekers; is that right?
11   A.   The metering policy, which again began in
12 2016, was used to address the capacity when we were
13 having large numbers of volumes.
14   Q.   And that's it?
15   A.   That's the reason we do the metering in the
16 ports of entry.
17   Q.   There's no other reason?
18   A.   No other reason.
19   Q.   So I shouldn't see any e-mails or
20 correspondence that would indicate there was another
21 reason; is that right?
22   A.   I can't speak for the whole agency.

Page 71

1    Q.   Okay.  But you would be surprised to see
2  that, wouldn't you?
3    A.   This is the official guidance that I issued
4  to the directors to cascade down through their
5  leadership.  This is why we do metering, because of
6  the operational necessity based on the capacity at the
7  ports.
8    Q.   Okay.  So there shouldn't be any port
9  director or CBP officer who would believe that there
10 was a policy to deter asylum seekers; is that right?
11   A.   If they are following the April 2018 memo,
12 they should not believe there's any other reason.
13   Q.   Okay.  You mentioned that in 2017 the
14 migrant numbers went down; is that right?
15   A.   Correct.
16   Q.   Isn't it the case that some ports of entry
17 continued to meter, even though the number of migrants
18 went down?
19   A.   The number of migrants went down compared
20 th 2016.  We had 154,000 inadmissibles in 2016.  We
21 had 111,000 inadmissibles in 2017.
22       So while the numbers did go down somewhat,

Page 72

1  there were still large numbers of migrants seeking
2  entry into the country, primarily through the gateway
3  land borders, which there would then be a need to
4  meter, as the operational needs dictated.
5    Q.   So the answer to my question is yes, there
6  was metering that occurred in 20 --
7    A.   In 2017.  Yes.
8    Q.   Okay.  And metering occurred in 2018 as
9  well; is that right?
10   A.   Yes.
11   Q.   And 2019 it still occurs.
12   A.   Still occurs.
13   Q.   The metering policy did have a deterrent
14 effect though, didn't it?
15       MS. SHINNERS:  Objection argumentative.
16 You can answer.
17   A.   I don't believe it had a deterrent effect.
18 When you look at the number of migrants that have come
19 in and sought refuge at the ports of entry, the flows
20 -- there have been ebbs and flows as we typically see.
21 But again, last year 126,000 migrants came in and
22 sough refuge; 124,000 the year before.  So I don't

Page 73

1  believe the metering had a chilling effect.
2    Q.   You were told that the metering policy had
3  a deterrent effect, weren't you?
4    A.   I was told?
5    Q.   Yes.
6    A.   I do not recall being told.  I believe some
7  feel that it has a deterrent effect.
8    Q.   But you don't recall ever been told that
9  the metering policy had a deterrent effect?
10   A.   I may have.  I don't recall.
11   Q.   Were you told at any point that the
12 metering policy was working because it was cutting
13 down on the number of asylum seekers that came to the
14 port of entry?
15   A.   I don't recall that.
16   Q.   Were you told that the metering policy
17 created a humanitarian disaster?
18   A.   Humanitarian disaster?
19   Q.   Yeah.
20   A.   No.
21   Q.   Do you believe that the metering policy
22 created a humanitarian disaster?



Page 74

1    A.   No.  Disaster, no.
2    Q.   If somebody told you that the metering
3  policy created a humanitarian disaster, you would have
4  told them that's not correct; is that right?
5    A.   Well, I would tell them if that's their
6  opinion and I don't share that opinion.
7    Q.   Isn't it true that metering occurred at
8  ports of entry even when those ports have excess
9  capacity?
10    A.   You have to define capacity.
11    Q.   How do you define capacity?
12    A.   I define capacity as two parts.  There is
13  the physical capacity which is the space within the
14  detention cells.  Then there's the operational
15  capacity which takes into consideration such things as
16  the demographics of those in custody, the conditions
17  of those in custody T, the issues and sickness issues,
18  the other operational priorities as to how the
19  resources in the ports are being directed that day,
20  all of these other day-to-day operational
21  considerations which may keep a port from reaching the
22  full physical space that they have.

Page 75

1    Q.   So if a port decides to prioritize other
2  matters over processing migrants without proper travel
3  documents, they may have a lower operational capacity;
4  is that right?
5    A.   Could you repeat that question.
6    Q.   Sure.
7    A.   Trying to follow.
8    Q.   If as a policy matter a port decides that
9  they are going to prioritize other missions besides
10  inspecting and processing individuals that don't have
11  proper travel documents, that port will effectively
12  have a lower operational capacity; is that right?
13    A.   Correct.  The finite resources that we have
14  are directed amongst multiple priorities in the ports
15  of entry.  The more you direct towards narcotics
16  intradiction or the counter-terrorism threat means
17  there's less to do other things in, whether that's the
18  migrant processing, the trade enforcement, the
19  agriculture mission.  The full scope of what we do at
20  the ports of entry, if you push resources in one area,
21  there will be less resources in other areas including
22  migrant process.

Page 76

1    Q.   And if you wanted to intentionally lower
2  the operational capacity to process migrants, you
3  could assign more front-line officers to those other
4  missions; is that right?
5        MS. SHINNERS:  Objection.  Argumentative.
6  You can answer.
7    A.   The capacity drives the decisions.  And,
8  again, the capacity is not just the physical space but
9  the operational aspects of what's taking place.  There
10  are certain priority missions within CBP that we do
11  not pull officers off of to process the migrants.  We
12  will not sacrifice the counter-terrorism mission.  we
13  will not sacrifice the narcotics mission.
14        We would not reassign officers from those
15  key missions to process more migrants.
16    Q.   But you have a legal duty to process asylum
17  seekers, right?
18    A.   And we do.
19    Q.   And so but you won't sacrifice the
20  counter-terrorism mission and the narcotics mission to
21  process asylum seekers; is that right?
22    A.   I will not redirect resources from those

Page 77

1  priority missions to process migrants quicker.
2    Q.   Do you believe that counter-terrorism and
3  anti-narcotics are higher priority missions that
4  processing asylum seekers?
5    A.   Yes, I do.
6    Q.   Do you believe that having a orderly flow
7  of trade is a higher priority mission than processing
8  asylum seekers?
9    A.   Yes, I do.
10    Q.   Do you ever interact with individuals in
11  the Mexican government?
12    A.   Yes.
13    Q.   Have you ever -- do you know of an agency
14  in the Mexican government called INM or --
15    A.   INAMI.
16    Q.   -- or INAMI?
17    A.   Yes.  It's Mexican immigration.
18    Q.   Have you ever interacted with the
19  commissioner of INAMI?
20    A.   No.
21    Q.   Do you know of a commissioner of INAMI
22  called Commissioner Vargas?



Page 78

1    A.   I believe I recall the name.
2    Q.   Okay.  Did you ever receive any e-mail
3 traffic regarding Commissioner Vargas?
4    A.   Generally, I -- can you be more specific?
5    Q.   Well, let me ask it this way, CBP has
6 liaison units for foreign governments, correct?
7    A.   Correct.
8    Q.   And one of those liaison -- some of those
9 liaison units are stationed in Mexico City; is that
10 right?
11   A.   Yes.
12   Q.   And they interact with -- those liaison
13 units interact with agencies in the Mexican
14 government, correct?
15   A.   Correct.
16   Q.   Including INAMI, right?
17   A.   Correct.
18   Q.   And that would also include interactions
19 with the commissioner of INAMI, correct?
20   A.   Correct.
21   Q.   And as the EAC, occasionally you would get
22 communications from the liaison unit regarding the

Page 79

1 interactions with the Commissioner of INAMI; is that
2 right?
3    A.   I would receive meetings -- messages on
4 discussions that may have taken place on operational
5 issues.  Those are usually sent through the leadership
6 then cascaded down.  So I would see e-mails like that,
7 but I don't communicate directly with Commissioner
8 Vargas.
9    Q.   Okay.  Do you have any opinion about
10 whether Commissioner Vargas is an honest man?
11   A.   I don't know the man.
12   Q.   Do you believe that INAMI as an agency --
13 it to be dishonest in its interactions with CBP?
14   A.   Dishonest with its interactions with CBP?
15 I don't engage with them directly enough to have an
16 opinion.
17   Q.   Has anybody ever told you that INAMI has
18 been dishonest with respect to CBP?
19   A.   Dishonest with respect to CBP, no.
20   Q.   We talked a little bit about the MCAT and
21 queue management reports that you said gave an
22 operational snapshot.  Do you recall that?

Page 80

1    A.   Yes.
2    Q.   The MCAT and queue management reports, do
3 they list operational capacities in those reports?
4    A.   They list the physical capacity in those
5 reports.
6    Q.   And do they give commentary occasionally on
7 operational capacity issues?
8    A.   Occasionally.
9    Q.   And occasionally those MCAT reports will
10 say whether there are issues that are affecting the
11 port at the time; is that right?
12   A.   They may.
13   Q.   Okay.  Isn't it true that metering has
14 occurred at ports of entry even when those ports
15 reported that the number of asylum seekers that were
16 being processed had no impact on port operations?
17        MS. SHINNERS:  Objection as to
18 characterization of form.  You can answer.
19   A.   I'm not sure I understand the question.
20   Q.   Sure.  The MCAT reports will occasionally
21 have a column that lists whether there is an impact to
22 port operations based on the number of migrants that

Page 81

1 are being processed; correct?
2    A.   That column is more inclusive than simply
3 the number of migrants that may be impacting the port
4 operations.
5    Q.   Sure.  So there are times at which people
6 -- the reports will say that people are being held at
7 the boundary line, even though there's no impact to
8 port operations; is that right?
9        MS. SHINNERS:  Objection.  Assumes facts
10 not in evidence.  Are you referring to the MCAT
11 report?
12        BY MR. MEDLOCK:you know what, I'll make
13 those facts in evidence.  Hold on one second.
14        MS. SHINNERS:  That's fine, I just --
15        MR. MEDLOCK:  No.  No.  That's fine.  I get
16 it.  Let's go ahead and mark this next exhibit.
17            - - -
18        (A document was marked as Deposition
19 Exhibit Number 24.)
20            - - -
21        BY MR. MEDLOCK:
22   Q.   Sir, I put in front of you what we marked



Page 82

1  as Exhibit 24 to your deposition.  It's a two-page
2  e-mail that begins with the Bates number
3  AOL-DEF-00088501 through '502.  Please take a moment
4  to review it, and let me know when you are done doing
5  so.
6      A.    Okay.
7      Q.    All right.  So this is a June 19, 2018
8  e-mail chain between Randy Howe, Ryan Koseor, yourself
9  and others; is that right?
10     A.    Yes.
11     Q.    And you received the top e-mail in this
12 chain; correct, sir?
13     A.    Yes.
14     Q.    You received that e-mail on or about June
15 19, 2018, at 4:22 p.m.; is that right?
16     A.    According to this document, yes.
17     Q.    And if you look on the second page, it
18 looks like you may have printed this e-mail out and
19 circled the number; is that right?
20     A.    May have.
21     Q.    You would have received this e-mail,
22 Exhibit 24, in the course of your duties at CBP,

Page 83

1  correct?
2      A.    Yes.
3      Q.    You would have been knowledgeable about the
4  contents of this e-mail at the time you received it,
5  correct?
6      A.    In terms of knowledgeable of the contents?
7      Q.    Yes.  When you received it?
8      A.    I'm not sure I understand, because there's
9  a whole lot that goes in behind these reports that I'm
10 not knowledgeable of.
11     Q.    But you would have been knowledgeable about
12 what's said in e-mail at the time you received it; is
13 that right?
14     A.    I'm still not following.
15     Q.    You would have read and understood this
16 e-mail at the time you received it?
17     A.    I would have read and understood this
18 report.  Yes.
19     Q.    Okay.  And you would have received this
20 e-mail on or about the time listed on the top e-mail,
21 June 19, 2018 at 4:22 p.m.?
22     A.    Yes.

Page 84

1      Q.    Okay.  The e-mail below the top, the
2  subject line on that e-mail is:  Field Office, Queue
3  Management, 6/19/2018, correct?
4      A.    June 19, 2018.  Yes.
5      Q.    Okay.  And that's sent by Ryan Koseor?
6      A.    Yes.
7      Q.    Who's the deputy commander for the
8  Migration Crisis Action Team; is that right?
9      A.    In 2018, he was.
10     Q.    Okay.  And on there's a table in of Mr.
11 Koseor's e-mail; is that right?
12     A.    Yes.
13     Q.    And the -- there are various columns that
14 go from left to right on the e-mail, on the table; is
15 that right?
16     A.    Yes.
17     Q.    From left to right, those columns are
18 labeled:  Field Office, Port, Total Number of
19 Detainees, Percentage of Capacity, Number in Queue at
20 Boundary Line, and Impact to Port Operations; is that
21 right?
22     A.    Yes.

Page 85

1      Q.    And at the top of that -- of those columns,
2  there's another sort of column that runs across the
3  top that says:  Report Date, June 19, 2018.  Do you
4  see that?
5      A.    Yes.
6      Q.    Okay.  So I want to focus on the San Ysidro
7  Port Of Entry.  Do you see that entry?
8      A.    Yes.
9      Q.    And the San Ysidro Port of Entry is one of
10 the gateway ports that you listed?
11     A.    Correct.
12     Q.    How many gateway ports are there on the
13 southwestern border?
14     A.    I would say the major ports would be San
15 Ysidro, Calexico, Nogales, El Paso, Laredo;
16 Brownsville, Hidalgo, somewhat gateways.
17     Q.    They might be a gateway?
18     A.    They might, you know, they are kind of the
19 next band.
20     Q.    Okay.  Have you ever heard the term Class A
21 Port of Entry?
22     A.    Yes.



| | |
|---|---|
| **Page 86** | **Page 88** |

Page 86

1  Q.   What's a Class A Port of Entry?
2  A.   Class A Port is generally a port that can
3  handle all CBP functions.
4  Q.   And there are also Class B and Class C
5  ports?
6  A.   There are Class Bs and Cs.
7  Q.   What's the difference between a Class A
8  Port of Entry and a Class B Port of Entry?
9  A.   Deals with what they can handle, whether
10  they handle the full scope of CBP operations.  They
11  may only handle cargo.  They may only handle certain
12  types of cargo.  It differentiates those.
13  Q.   As a general matter, does a Class B Port
14  of Entry not have an AEU?
15  A.   As a general matter, a Class B port does
16  not have an AEU, AEU meaning the Admissibility
17  Enforcement Unit?
18  Q.   Correct.
19  A.   Your larger ports have admissibility units.
20  They are called different things.  But most of your
21  larger ports that are either Class As or Class Bs
22  would have individuals trained to deal with migrant

Page 87

1  processing.  Yes.
2  Q.   And do Class A and Class B ports both --
3  are they both able to process pedestrian traffic?
4  A.   I don't recall.  I would assume so.
5  Q.   Okay.
6  A.   I don't recall.  I mean, those are the
7  larger ports.  Now whether they even have pedestrian
8  traffic, I don't know.
9  Q.   Right.  Okay.  Have you ever heard of an
10  effort to create a Class D Port of Entry?
11  A.   Yes.
12  Q.   What was the effort to create a Class D
13  part of entry about?
14  MS. SHINNERS:  Objection to the extent it
15  causes you to reveal pre-decisional deliberations,
16  especially if there's a non-final policy?
17  A.   There's a non-final policy on that
18  discussion.
19  Q.   Okay.  So you are not going to testify
20  about that today?
21  A.   No.
22  Q.   Okay.  Let's look at the San Ysidro entry

Page 88

1  again.  It lists the total number of detainees as 236;
2  is that right?
3  A.   Yes.
4  Q.   And the percentage of capacity is 75
5  percent; is that right?
6  A.   Yes.
7  Q.   And that's -- you are saying that that is
8  not operational, but that's physical?
9  A.   That's physical.  San Ysidro has 315
10  holding positions, if you will, within their 31 cells.
11  Q.   Okay.
12  A.   So I would think 236 out of 315 is probably
13  75 percent?
14  Q.   Your math might be better than mine.
15  That's why I'm a lawyer.
16  The number in K at boundary line is listed
17  as 950, and then parentheses, in Mexico; do you see
18  that?
19  A.   Yes.
20  Q.   And you understand that to mean there are
21  950 individuals waiting in shelters in Mexico to be
22  processed at the port of entry; is that right?

Page 89

1  A.   Those are approximates, based on what we
2  receive from the Mexican authorities.
3  Q.   Okay.  From INAMI and Grupo Beta?
4  A.   Or the NGOs, whoever is controlling the
5  process on the Mexican side.
6  Q.   And then to the right of that, there is a
7  column that says, Impact to Port Operation.  You see
8  that?
9  A.   Yes.
10  Q.   And for San Ysidro it lists no impact,
11  correct?
12  A.   Correct.
13  Q.   And in fact -- so there's 950 people that
14  are believed to be in the queue, but there's impact to
15  port operations; is that right?
16  A.   Correct.
17  Q.   For Calexico, this is one of the other
18  gateway ports you mentioned; is that right?
19  A.   Yes.
20  Q.   There are a total number of 50 detainees
21  listed here?
22  A.   Yes.

**MAGNA**
LEGAL SERVICES

Page 90

1    Q.  And that is 74 percent of you were saying
2  physical capacity; is that right?
3    A.  Yes.
4    Q.  And there are 32 that are in the queue at
5  the boundary line?
6    A.  Correct.
7    Q.  And it lists no impact to port operations.
8  Is that right?
9    A.  Yes.
10   Q.  All right.  Do you see the Brownsville Port
11 of Entry?
12   A.  Yes.
13   Q.  On the second page?
14   A.  Yes.
15   Q.  Okay.  And this is going to require
16 probably a little bit of flipping to the top of the
17 column to refresh your recollection here, but the
18 total number of detainees listed is six; is that
19 right?
20   A.  Yes.
21   Q.  And that's 17 percent of capacity; is that
22 right?

Page 91

1    A.  Yes.
2    Q.  And there are 19 individuals -- migrants at
3  the boundary line, correct?
4    A.  Correct.
5    Q.  And under impact --
6        MS. SHINNERS:  Objection.  Just to clarify,
7  you are stating what's listed in the report?
8    Q.  That's correct.  And then impact to port
9  operations it lists none; is that right?
10   A.  Yes.
11   Q.  Okay.  So there are in fact instances where
12 these snapshots that are taken by the MCAT, it lists
13 no impact to port operations.  And less than 100
14 percent physical capacity where there are individuals
15 being held at the boundary lines; is that right?
16   A.  Yes.
17   Q.  Okay.  Isn't it true that the metering
18 policy was being used to return individuals who
19 entered the U.S. back to Mexico?
20   A.  There were issues of misconduct where
21 individuals that had stepped foot on U.S. soil were
22 returned back.

Page 92

1    Q.  Those would be in instances of misconduct
2  where people weren't following the policy; is that
3  right?
4    A.  Yes.
5    Q.  As part of the metering policy, ports of
6  entry, directors of ports of entry on the U.S.-Mexico
7  border were able to create limit line positions; is
8  that right?
9    A.  In 2018, yes.
10   Q.  Okay.  So beginning of 2018 those limit
11 line positions were created by some ports of entry; is
12 that right?
13   A.  In 2018, we started to station officers at
14 the limit line.
15   Q.  Okay.  In some ports of entry were officers
16 a few feet back of the limit line?
17   A.  Yes.
18   Q.  Which ports of entry would those be?
19   A.  Tecate and Otay Mesa for a short period of
20 time.
21   Q.  Any others?
22   A.  Not that I'm aware of.

Page 93

1    Q.  And so at Tecate and Otay Mesa, a
2  individual without proper documents -- proper travel
3  documents would actually cross the boundary line and
4  then come up to -- potentially come up to the limit
5  line position before they interacted with the CBP
6  officer; is that correct?
7    A.  In Tecate, the canopy that was erected to
8  protect the officers from the elements was about ten
9  feet over the limit line.  So, theoretically,
10 individuals could have stepped within those 10 feet.
11       In Otay Mesa, the jersey barrier that was
12 placed to secure the officers from a car that may try
13 to veer towards them was placed just a few feet across
14 the limit line.
15   Q.  Right.
16   A.  Those individuals probably did not cross.
17 They probably could have handed the documents right at
18 the limit line.
19   Q.  When you say a few feet, how far?
20   A.  A few feet, literally a few feet.
21   Q.  Like two feet, three feet?
22   A.  Probably about three or four feet.



Page 94

1    Q.  Do you know any individual with three-feet
2  arm, three-foot arms?
3    A.  No.
4    Q.  Okay.  So let's just be straight here.
5    A.  Well, let me also be clear, though, that
6  our officers may not have been standing behind the
7  jersey barriers at three or four, five feet, and they
8  could have walked up to the limit line.
9    Q.  Do you know -- it's possible, right, that
10  asylum seekers walked onto U.S. soil at Otay Mesa and
11  interacted with a CBP officer before they -- when they
12  got to the limit line position, isn't it?
13    A.  It's possible over the past four years,
14  depending on where those officers with stationed
15  throughout the day.
16    Q.  You can't rule it out as you sit here
17  today?
18    A.  I can't rule it out.
19    Q.  Have you ever asked?
20    A.  Yes.
21    Q.  And have you ever been told that asylum
22  seekers stepped onto U.S. soil at Otay Mesa before

Page 95

1  they were turned back to Mexico?
2    A.  We had an issue at Otay Mesa with a
3  congressional representative who brought migrants
4  back.  And that is when it became aware that the
5  officers needed to reposition closer to the limit
6  line.
7    Q.  Who was that Congressional representative?
8    A.  I don't recall.
9    Q.  When did that occur?
10    A.  Sometime within the last twelve months,
11  five, six months ago, perhaps.  No.  Wait.  It was
12  earlier than that.  I believe it would have been last
13  summer, summer of 2018, perhaps the fall.
14    Q.  Okay.  So there was a period between April
15  2018 and the summer of 2018 when this issue at Otay
16  Mesa had not been brought to your attention; is that
17  right?
18    A.  Correct.
19    Q.  And during that time period before the
20  officers were restationed, asylum seekers that came to
21  the limit line position at Otay Mesa may have stepped
22  onto U.S. soil to interact with a CBP officer before

Page 96

1  they were directed back to Mexican soil; is that
2  right?
3    A.  Again, I don't know that, because the
4  officers could have physically been stationed at the
5  limit line, even though the jersey barrier was several
6  feet in.
7    Q.  But as you sit here today, you can't
8  actually rule that out?
9    A.  I can't rule that out.
10    Q.  Okay.  And -- sorry?
11    MS. SHINNERS:  I have to visit the
12  restroom.  Is it okay if we take a break?
13    MR. MEDLOCK:  We can take a break.
14    - - -
15    (Recessed at 10:56 a.m.)
16    (Reconvened at 11:08 a.m.)
17    - - -
18  BY MR. MEDLOCK:
19    Q.  Sir, welcome back.  I understand that you
20  had a few points you wanted to clarify about your
21  deposition?
22    A.  Yes.  I just want to correct on my prep

Page 97

1  session, it was actually with the DOJ and the OCC
2  lawyers on Wednesday, not Thursday.
3    Q.  Okay.
4    A.  And it was with the CBP counsel on Tuesday,
5  not Wednesday.
6    Q.  Okay.
7    A.  And at the Tuesday session, it was only
8  with Christine.  Louisa was at the Wednesday session,
9  but she left early, which is what I got confused with.
10  So I was off by a day with those prep sessions.
11    Q.  Let me see if I get all that.  There was no
12  prep on Thursday.
13    A.  There was no prep on Thursday.
14    Q.  There was on Wednesday and Tuesday,
15  correct?
16    A.  Yes, sir.
17    Q.  Okay.  Thank you for clarifying.  I
18  appreciate it.
19    Could you turn back for a second to Exhibit
20  23, the copy --
21    A.  Yes.
22    Q.  -- of the metering policy.  There's no



Page 98

1  reference in the metering policy to deterrents
2  anywhere in there right?  It doesn't even use the
3  words; is that right?
4      A.  No.
5      Q.  So the metering policy doesn't say one way
6  or another whether the purpose of it is to deter
7  people; is that right?
8      A.  Deterrence is not mentioned in the
9  deposition.
10     Q.  Sure.  So someone reading the document
11 would not know whether the metering guidance is aimed
12 at deterrence; is that right?
13         MS. SHINNERS:  Objection.  Calls for
14 speculation.  You can answer.
15     A.  I would think that the officers, the
16 leadership that read this are clear that this is being
17 done for operational reasons.  And it also very
18 clearly outlines that we are not to discourage a
19 travel waiting to be processed from claiming fear or
20 seeking other protections.
21         It's also very clear that once a traveler
22 is in the U.S., he or she must be fully processed.

Page 99

1  That is the guidance from this.
2      Q.  Okay.  So my question was -- and maybe I
3  can ask it little bit better, the metering guidance
4  memo here in front of you does not take a position one
5  way or another in the written words that are used
6  about whether the policy is being driven by a
7  deterrence rationale?
8      A.  The memo states the policy's been written
9  to ensure the orderly processing and security and
10 safety of the ports.
11     Q.  Does it say that that's the only reason?
12         MS. SHINNERS:  Objection.  Document speaks
13 for itself.  You can answer.
14     A.  That is what's in the document.  There's no
15 reference to deterrents throughout the document.
16     Q.  So it's your view that the metering
17 guidance that is in this April 27, 2018 memorandum at
18 Exhibit 23, the exclusive reason for metering are the
19 operational reasons stated in the memorandum; is that
20 right?
21     A.  Yes.  The memo that I signed, the direction
22 for guidance or the direction for metering is done for

Page 100

1  operational purposes, not for deterrence.
2      Q.  We talked about this a little bit earlier,
3  some ports of entry began metering before April 2018;
4  is that right?
5      A.  We began metering in the early part of
6  2016.
7      Q.  In fact that metering started at the San
8  Ysidro Port of Entry?
9      A.  It started at San Ysidro to deal with the
10 influx of Haitians.
11     Q.  And that began in May 2016; is that right?
12     A.  It was the early part of '16, April, May.
13     Q.  Was it on Memorial Day?
14     A.  I believe it was before Memorial Day, but I
15 don't recall specifically.
16     Q.  All right.  Let me see if I can refresh
17 your recollection.
18             - - -
19         (A document was marked as Deposition
20 Exhibit Number 25.)
21             - - -
22     BY MR. MEDLOCK:

Page 101

1      Q.  All right, sir.  I've put in front of you a
2  multi-page e-mail, two-page e-mail marked as Exhibit
3  25 to your deposition.  The leading Bates number on
4  the document is AOL-DEF-00328857.
5          Please take a moment to flip through it.
6  And when you are done doing so, please let me know.
7          And while you are doing that, we had
8  somebody join us on the phone.  Could you please enter
9  your appearance.
10         MR. FENN:  Hi.  This is Matt Fenn from
11 Mayer Brown.
12         MR. MEDLOCK:  Thank you.
13         THE WITNESS:  Okay.
14     BY MR. MEDLOCK:
15     Q.  All right.  And Exhibit 25 is an August 2,
16 2017 e-mail chain between Robert Hood, Sidney Aki,
17 Johnny Armijo and others; is that correct?
18     A.  Yes.
19     Q.  Who is Robert W. Hood?
20     A.  Robert Hood is one of the assistant port
21 directors at the part of San Ysidro.
22     Q.  And Sidney Aki is the port director?



Page 102

1    A.   He's the port director.
2    Q.   At San Ysidro?
3    A.   At San Ysidro.
4    Q.   And what is Johnny Armijo's position, if
5    you know?
6    A.   Johnny Armijo was assigned to the field
7    office. He's held various positions. This one he's
8    the assistant director. He had been the border
9    security. He's in leadership at the field office.
10   Q.   When you say the field office, you mean the
11   San Diego field office?
12   A.   The San Diego field office.
13   Q.   Okay.the subject line in this e-mail
14   reads, RE: Interview with OIG Special Agents.
15       Do you see that?
16   A.   Yes.
17   Q.   And if you look down in Mr. Armijo's August
18   2, 2017 e-mail from 5:50 p.m., the bottom e-mail in
19   the chain; do you see that e-mail?
20   A.   Yes.
21   Q.   The number 3 on the list of topics in the
22   e-mail is metering start and stop frames. And then

Page 103

1    below that in a bullet he writes, quote, I indicated
2    the first week of June 2016 at the start, and the
3    first week of February 2017 at the stop.
4        Did I read that correctly?
5    A.   Yes.
6    Q.   And then Sidney Aki, who was the port
7    director, responds to Mr. Armijo's e-mail; is that
8    right?
9    A.   Yes.
10   Q.   And he writes, Johnny, I believe the
11   metering started in May 2016. THX. Or thanks.
12       Did I read that correctly?
13   A.   Yes.
14   Q.   And then Mr. Hood responds to Mr. Aki's
15   e-mail writing, quote, Correct. I think right before
16   Memorial Day in May 2016, 5/24. Question mark. Did I
17   read that correctly?
18   A.   Yes.
19   Q.   Does this refresh your recollection that
20   the metering began sometime around Memorial Day
21   weekend in 2016?
22   A.   Yes.

Page 104

1        MS. SHINNERS: Objection. Improper
2    refreshing of recollection. Continue.
3    Q.   Go ahead.
4    A.   I still seem to think it started around
5    April or May.
6    Q.   Okay.
7    A.   To my recollection, in San Ysidro at the
8    time, we were having the influx of Haitians. The port
9    was under construction. We had lost holding capacity.
10   I remember having discussions with the DFO about them
11   needing to control the flow into the port.
12       I thought it was around April, May. This
13   document seems to indicate the end of May.
14   Q.   Okay. So the answer to my question is you
15   think it began sometime around April or May?
16   A.   I think it began in April or May.
17   Q.   Of 2016. Is that right?
18   A.   Yes, sir.
19   Q.   Okay. Let's mark the next exhibit.
20       - - -
21       (A document was marked as Deposition
22   Exhibit Number 26.)

Page 105

1        - - -
2    BY MR. MEDLOCK:
3    Q.   All right, sir. I've put in front of you
4    Exhibit 26 to your deposition. It is a two-page
5    e-mail bearing the Bates number AOL-DEF-00761338
6    through 39.
7        Please take a moment to review the e-mail,
8    and let me know audibly when you are done doing so.
9    A.   Okay.
10   Q.   All right. So Exhibit 26 is a May 25
11   through 26, 2016 e-mail chain between yourself, Carlos
12   Martel, John Wagner, Todd Hoffman and others; is that
13   correct?
14   A.   Correct.
15   Q.   And you would have received this e-mail as
16   part of your job at CBP; is that right?
17   A.   Correct.
18   Q.   And you would have read and understood the
19   contents of this e-mail at or about the time that you
20   received it; is that right?
21   A.   Yes.
22   Q.   And in reviewing this e-mail chain, you

MAGNA
LEGAL SERVICES

## Page 106

1  believe it to be accurate and complete; is that right?

2     A.   Yes.

3     Q.   And you would have received the e-mails in

4  this chain on or about the dates listed in the

5  e-mails; is that right?

6     A.   Yes.

7     Q.   Okay.  The e-mail chain starts with an

8  e-mail from Johnny Armijo, who we were just talking

9  about, on May 26, 2016, at 1:59 a.m.  Do you see that?

10     A.   Yes.

11     Q.   Okay.  And Mr. Armijo at the beginning of

12  the e-mail notes that the San Diego field office has

13  received media requests regarding an increased number

14  of credible fear, slash, asylum applicants at the San

15  Ysidro point of entry; is that right?

16     A.   Correct.

17     Q.   And if you look at the second page of the

18  document, the Bates Number 761339, Mr. Armijo states

19  that the San Ysidro, slash, Otay Mesa AEU, or

20  Admissibility Enforcement Unit, has exceeded its

21  temporary detention capabilities, correct?

22     A.   Correct.

## Page 107

1     Q.   And then he goes on to list remedies that

2  have been undertaken to create additional space; is

3  that right?

4     A.   Correct.

5     Q.   Okay.  The first remedy he lists is, quote,

6  utilized several border patrol stations to temporarily

7  house -- hold detainees awaiting transfer to ICE-ERO.

8     Did I read that correctly?

9     A.   Yes.

10     Q.   So in the -- near San Ysidro, that would be

11  the Imperial Beach Border Patrol Station?

12     A.   Yes.

13     Q.   And would there be other border patrol

14  stations would have been utilized?

15     A.   I'm not that familiar with the border

16  patrol structure throughout San Diego, but Imperial

17  Beach Station One, as they call it, is the primary.

18     Q.   And then there are substations near --

19     A.   There are substations.  There's check

20  points, there's other facilities.

21     Q.   And ICE-ERO, can you define what that

22  means?

## Page 108

1     A.   Immigration and Customs Enforcement.

2  Enforcement Removal Office is what I believe they are

3  still called by ERO.

4     Q.   And transfer to ICE-ERO means transfer to

5  an ICE detention facility; is that --

6     A.   Right.  Once we complete the processing in

7  our temporary facilities, we transfer them to ICE-ERO

8  comes and picks them up and takes them to a

9  longer-term detention facility.

10     Q.   When you say "them" you mean asylum

11  seekers?

12     A.   The migrants.  Yes, sir.  The asylum

13  seekers.

14     Q.   And when an individual comes to a port of

15  entry and expresses a credible fear, a CBP officer in

16  secondary has -- can take several steps to process

17  that individual, correct?

18     MS. SHINNERS:  Object to the use of the

19  term credible fear.  You can answer.

20     A.   When the asylum seekers come in, the CBP

21  officer begins the process.  We are the initial intake

22  face.

## Page 109

1     Q.   Correct.  An asylum seeker could get a

2  notice to appear, correct?

3     A.   They could.  Correct.

4     Q.   They could be paroled into the United

5  States, correct?

6     A.   They could be.

7     Q.   And they could also be put into expedited

8  removal proceedings and then detained?

9     A.   And held in detention by ERO.  Yes.

10     Q.   So those are three options that are

11  available when an individual without proper travel

12  documentation comes to a port of entry and expresses a

13  credible fear of persecution?

14     A.   Can you list the three you mentioned again?

15     Q.   Notice to appear.

16     A.   Yes.

17     Q.   Parole.

18     A.   Parole.

19     Q.   And expedited removal and detention.

20     A.   If the individual is claiming fear.  Yes.

21     Q.   But all those are options that are

22  available?

MAGNA
LEGAL SERVICES

Page 110

1    A.   All those are options.
2    Q.   Okay.  The second -- the second remedy that
3    is listed in Mr. Armijo's e-mail is, "Transferred all
4    accompanied and unaccompanied unit processing to the
5    Old Port overflow processing area."
6        Did I read that correctly?
7    A.   Yes.
8    Q.   The Old Port refers to the older part of
9    part of the port of San Ysidro, correct?
10   A.   Correct.
11   Q.   The next remedy that is listed here is,
12   quote, Transferred all permit, open parens, I-94,
13   closed parens, processing to the Otay Mesa Port of
14   Entry in order to secure additional workstations to
15   conduct in-person or virtual interviews.
16       Did I read that correctly?
17   A.   Correct.
18   Q.   Can you explain what I-94 permit processing
19   is?
20   A.   I-94 is a permit, a authorization to travel
21   beyond the border zone by Mexican citizens primarily
22   through San Ysidro, Otay Mesa.

Page 111

1    Q.   Okay.  And when the reference to secure
2    additional workstations.  That refers to workstations
3    in the secondary inspection processing area, correct?
4        MS. SHINNERS: Objection.  Foundation.
5    Continue.
6    A.   As I recall, at the time in 2016 the
7    permits, the I-94s were being issues out of the Old
8    Port building.  So in relation to the second bullet
9    and the third bullet, it would make sense to me that
10   they would have moved the processing of the I-94s out
11   of the Old Port building to Otay Mesa.
12   Q.   To make space.
13   A.   Which would have created more space in the
14   Old Port building.  Thus the reference to workstations
15   and such, as I recall.  In 2016, San Ysidro was
16   undergoing the construction.  Different parts of it
17   were being torn down.  We used temporary trailers for
18   a while.
19       We had a reduction in the overall
20   detention space.  And the port management was trying
21   to make work arounds throughout all of this
22   construction.

Page 112

1    Q.   There's a reference here to virtual
2    interviews.  What does that mean?
3    A.   Virtual interviews is something that Border
4    patrol primarily does where you can set up the migrant
5    seeker.  That initial Q and A, that a question and
6    answer, the sworn statement can be done through a
7    video conference with an officer or agent that is
8    stationed somewhere else.
9    Q.   CBP has utilized virtual interviews in the
10   past, hasn't it?
11   A.   Border Patrol primarily uses --
12   Q.   I understand they primarily use it, but
13   hasn't CBP done it?
14   A.   Well, CBP is border patrol.  We are one and
15   the same.
16   Q.   I'm sorry.  OFO has done it, has used it?
17   A.   We have done it in a much less extent.
18   Yes.
19   Q.   OFO has used virtual interviews at ports of
20   entry, correct?
21   A.   Correct.
22   Q.   OFO has used virtual interviews for

Page 113

1    individuals expressing incredible fear and
2    persecution, correct?
3    A.   To my recollection.
4    Q.   OFO has used virtual interviews for
5    secondary processing of asylum seekers at ports of
6    entry, correct?
7    A.   I believe so.
8    Q.   OFO has used virtual interviews to increase
9    the throughput of ports of entry with respect to
10   asylum seekers, correct?
11   A.   Correct.  Terms of the processing.
12   Q.   Virtual interviews are one way that OFO can
13   increase the throughput of a port of entry with
14   respect to asylum seekers, correct?
15   A.   Incorrect.  Virtual interviews are one way
16   to increase the processing, but not the throughput.
17   Q.   Okay.  So, but if I wanted to increase the
18   processing capacity of a port of entry, virtual
19   interviews are one tool that is available to me,
20   correct?
21   A.   The processing capability only.
22   Q.   Correct.  So if I wanted to process more

Page 114

1  asylum seekers, if that was my goal, virtual
2  interviews are a tool that is available to me?
3      A.   Without the accompanying detention space to
4  hold them, or the ability to turn them over to ERO, we
5  would not increase the processing with any tool.  You
6  can't just process somebody.  You have to have
7  someplace to put them when the processing is done.
8      Q.   My question more simple.  Virtual
9  interviews are a way of increasing the processing
10 capacity of a port of entry; is that right?
11     A.   You said increased throughput.
12     Q.   I was talking about processing though, just
13 processing?
14     A.   Virtual interviews can assist with the
15 processing.
16     Q.   They can increase the processing
17 capabilities of a port of entry; is that right?
18     A.   By diverting resources from other
19 activities.
20     Q.   Certainly.  But you could have somebody in
21 Detroit or Miami conduct a virtual interview at San
22 Ysidro using the virtual interview technology that's

Page 115

1  available to OFO?
2      A.   If you are willing to accept the impact to
3  Detroit and Miami, you could use those officers to
4  help process the migrants through virtual processing.
5      Q.   Okay.  The next remedy that is listed in
6  Mr. Armijo's e-mail is, quote, converted GSA's
7  recently vacated maintenance working area at the Old
8  Port into a temporary holding room.
9          Did I read that correctly?
10     A.   Yes.
11     Q.   And this is simply taking available space
12 and using it as a temporary holding area; is that
13 right?
14     A.   I can't speak to that.  I'm not familiar
15 with what that space was or how they intended to use
16 it.
17     Q.   All right.  But you did receive this
18 e-mail; is that right?
19     A.   Yes.
20     Q.   Okay.  And then the next, below those four
21 listed items Mr. Armijo's e-mail he writes, quote,
22 Port management is currently working with San Diego

Page 116

1  Sector Border Patrol to utilize the Imperial Beach
2  station to hold and process single adult males
3  awaiting credible fear.
4          Did I read that correctly?
5      A.   Yes.
6      Q.   Please take a moment to read Mr. Armijo's
7  e-mail.  Does Mr. Armijo anywhere in his e-mail
8  request that the San Ysidro Port of Entry begin
9  metering?
10     A.   As I read this, I would reach the
11 conclusion that they need to meter.
12     Q.   Okay.
13     A.   He does not come out and ask for
14 permission.  He does not need to ask for permission.
15 The port leadership has the flexibility to implement
16 metering as they need to.  And looking at this, he's
17 referencing infra structure complaints.  He's
18 referencing a large influx of Haitians.  He's
19 referencing the inability for ERO and such to pick up
20 folks.
21          So as I read this, again leadership at the
22 ports does not need to ask for permission to begin

Page 117

1  metering.
2      Q.   So that's not my question.  My questions
3  was does Mr. Armijo, anywhere in his e-mail, reference
4  metering?
5      A.   He does not.
6      Q.   And regardless of whether one could imply
7  that metering should occur, he doesn't say it, right?
8      A.   He does not use the term metering in his
9  e-mail.
10     Q.   He doesn't use the term queue management
11 either?
12     A.   He does not.
13     Q.   He doesn't talk about putting officers at
14 the limit line, does he?
15     A.   No.
16     Q.   So and Mr. Armijo lists several remedies
17 that are being taken, right?
18     A.   Yes.  Temporary.
19     Q.   And he said temporary remedy that might be
20 available to a port director at this time would be
21 metering, correct?
22     A.   Yes.

MAGNA >
LEGAL SERVICES

Page 118

1    Q.   And he doesn't list metering as one of
2  those remedies that's being undertaken, correct?
3    A.   He may already be doing metering.
4    Q.   Me doesn't list it here, does he?
5    A.   He hasn't.
6    Q.   So you are just assuming that he might have
7  been metering?
8    A.   I'm assuming based on the conditions that
9  he clearly outlines here, that they have already been
10 metering to control the influx because they have
11 infrastructure constraints.  They have no one being
12 picked up from ERO.
13   Q.   But you are reading that into his e-mail,
14 correct?
15   A.   Yes.
16   Q.   You are assuming that's correct, right?
17   A.   I believe it to be correct.
18   Q.   That's a guess, right?  That's a guess as
19 you sit here today?
20   A.   As I read this, that would bring me to that
21 conclusion.
22   Q.   I'm not asking whether it led you to that

Page 119

1  conclusion.  There's nothing in this e-mail that says
2  that the port is metering, correct?
3    A.   They are receiving inquiries from the media
4  about the queuing area, the asylum line.  To me that
5  indicates they are metering, that they are holding.
6    Q.   Where does he say they are holding?
7    A.   It says the inquiries are most likely
8  attributed to our usage of designated queuing area,s
9  asylum line.
10   Q.   Where does he say holding?
11   A.   He doesn't say holding.
12   Q.   Where does he say that individuals are
13 being told that the port is at capacity and to come
14 back at a later date?
15       MS. SHINNERS:  Objection.
16   A.   That's not listed in this e-mail.
17   Q.   Okay.  And Mr. Armijo is sending this
18 bottom e-mail to Carlos Martel?
19   A.   Yes.
20   Q.   And Margaret Braunstein, correct?
21   A.   Correct.
22   Q.   And Carlos Martel is the acting executive

Page 120

1  director for operations of OFO?
2    A.   At that time he was.  Yes.
3    Q.   So he would have been Mr. Armijo's boss,
4  correct?
5    A.   No.  Mr. Armijo would report the director
6  of field operations.
7    Q.   Okay.
8    A.   And the director would report to
9  Mr. Martel.
10   Q.   And who's Margaret Braunstein?
11   A.   That was the deputy executive director for
12 operations at the time.
13   Q.   Okay.  And would he have been a direct
14 report to Margaret Braunstein?
15   A.   No.
16   Q.   There are -- is there's also -- is there
17 anybody on this e-mail who would have been Mr.
18 Armijo's direct supervisor?
19   A.   Pete Flores.
20   Q.   Anyone else?
21   A.   No.  Mr. Armijo reports to Pete Flores.
22   Q.   So Mr. Armijo did cc Pete Flores on this

Page 121

1  e-mail, correct?
2    A.   Yes.
3    Q.   And then Carlos Martel forwards this e-mail
4  correspondence from Mr. Armijo to you --
5    A.   Yes.
6    Q.   -- John Wagner, and Todd Hoffman, correct?
7    A    Correct.
8    Q.   With a copy to Margaret Braunstein?
9    A.   Yes.
10   Q.   What was John Wagner's position at this
11 time in May 2016?
12   A.   He's the deputy executive assistant
13 commissioner for field operations.
14   Q.   And was Mr. Hoffman's position the same as
15 what we talked about earlier?
16   A.   Yes, it was.
17   Q.   Okay.  And Carlos Martel writes, quote,
18 Gentlemen, FYSA, significant increase in CF cases at
19 SYS/Otay, POEs resulting in saturation of detention
20 space.  Mitigation actions are enumerated below to
21 include virtual processing assistance from Detroit and
22 MIA.  Media coverage is expected.



Page 122

1    Did I read that correctly?
2    A.   Yes.
3    Q.   And FYSA means For Your Situational
4 Awareness?
5    A.   Yes.
6    Q.   CF refers to Credible Fear?
7    A.   Yes.
8    Q.   And MIA is Miami?
9    A.   Right.
10   Q.   Okay.  I'm sorry.  Decoding stuff here.
11 SYS is San Ysidro?
12   A.   San Ysidro.
13   Q.   Okay.  And nowhere in Mr. Martel's e-mail
14 does he say that one of the mitigation actions is
15 being undertaken is metering, correct?
16   A.   He does not mention metering.
17   Q.   Okay.  You then respond and say, "Kirby,
18 PLS advise the status of the cap waiver request for
19 San Diego.  Need to know by 11:00 a.m. Thursday.  In
20 speaking with Pete Flores, we need to get this
21 approved immediately.  PLS advise."
22        Did I read that correctly?

Page 123

1    A.   Yes.
2    Q.   You are referring to the -- gain a waiver
3 on the cap overtime?
4    A.   The overtime cap waiver.  Yes.
5    Q.   And in your e-mail that was sent on May 25,
6 2016 at 10:19 p.m., do you suggest that the port begin
7 metering?
8    A.   No.
9    Q.   Did Carlos Martel in his e-mail suggest the
10 port begin metering?
11   A.   No.
12   Q.   Okay.
13              - - -
14        (A document was marked as Deposition
15 Exhibit Number 27.)
16              - - -
17 BY MR. MEDLOCK:
18   Q.   All right, sir.  I've put in front of you
19 what we've marked as Exhibit 27 to your deposition.
20 It's a multi-page e-mail chain that begins with
21 AOL-DEF-00762746 and ends with the Bates Number 48.
22        Did I read that correct?  Do you see that,

Page 124

1 sir?
2    A.   Ends with what again?
3    Q.   The page number 48.
4    A.   Yes.  46.
5    Q.   To 48.  There is a September 13, 2016
6 e-mail chain, September 12 through September 13, 2016
7 e-mail chain with the subject line:  Haitians arriving
8 Tijuana.  Do you see that, sir?
9    A.   Yes.
10   Q.   All right.  You received some of the
11 e-mails in this chain, but you did not receive the top
12 e-mail in this chain; is that correct?
13   A.   The top e-mail.
14   Q.   The top e-mail from John Wagner to Maureen
15 Dugan?
16   A.   Maureen Dugan.  There's doesn't seem to be
17 anything in there.
18   Q.   Correct.  But you didn't receive that?
19   A.   No, I did not receive that.
20   Q.   Okay.  You received every other e-mail in
21 the chain; is that right?
22   A.   Yes.

Page 125

1    Q.   Okay.  And for those e-mails, you received
2 them as part of your job at CBP, correct?
3    A.   Yes.
4    Q.   You would have received them on or about
5 the dates and times listed in those e-mails, correct?
6    A.   Correct.
7    Q.   You would have read and understood those
8 e-mails at the time you received them, correct?
9    A.   Yes.
10   Q.   And you have no reason to believe as you
11 are sitting here today that this -- these e-mails,
12 other than the redactions that appear on them, are
13 inaccurate or incomplete in any way, correct?
14   A.   No.
15   Q.   Okay.  I want to focus on the e-mail from
16 Carlos L. Gonzalez on Tuesday, September 13, 2016 at
17 8:54 a.m.?
18   A.   Yes.
19   Q.   And at the time Mr. Gonzalez sent this
20 e-mail, he was the attache for CBP at the U.S. Embassy
21 in Mexico City; is that right?
22   A.   He was.

MAGNA
LEGAL SERVICES

**Page 126**

1    Q.   And Mr. Gonzalez writes in this e-mail,
2  quote, Commissioner Vargas is now advising that he is
3  under immense pressure from the Governor of Baja
4  California and Mayor of Tijuana for assisting us in
5  processing the migrants in Tijuana while they wait for
6  appointments.  They blame him for the migrants hanging
7  out in their city longer than they should, thus
8  causing a local humanitarian crisis.
9         Did I read that correctly?
10    A.   Yes.
11    Q.   So Carlos Gonzalez reported that Mexican
12  officials believed there was a local humanitarian
13  crisis in Tijuana as of September 2016, correct?
14    A.   From this it appears as though the mayor
15  believed that it was a humanitarian crisis.  Yes.
16    Q.   And that e-mail was sent to you correct?
17    A.   Yes, it was.
18    Q.   And so in September 2016 you knew that some
19  Mexican officials believed that there was a local
20  humanitarian crisis going on in Tijuana, correct?
21    A.   I received this e-mail in 2016, so, yes, I
22  would have read that.

**Page 127**

1    Q.   So earlier we talked about whether there
2  was a humanitarian crisis going on in Tijuana.  Does
3  this refresh your recollection that Mexican officials
4  believed there was a humanitarian crisis going on in
5  that city?
6    A.   Based on this e-mail, the mayor of Tijuana
7  was concerned about the level of migrants in his city.
8  Yes.  And felt it was a humanitarian crisis.
9    Q.   And this would have been during the time
10  period during which the San Ysidro Port of Entry was
11  engaged in metering, correct?
12    A.   Correct.
13    Q.   And there's a reference to waiting for
14  appointments in this e-mail, correct?
15    A.   Correct.
16    Q.   And for a time when the metering policy was
17  first issued, individuals without proper travel
18  documents who approached a port of entry were given
19  physical appointments, correct?
20         MS. SHINNERS:  Objection.  Vague as to
21  geographic scope.
22    Q.   Do you understand my questions?

**Page 128**

1    A.   I believe at the time we started to use
2  metering, Grupo Beta handed out appointment tickets.
3  I don't recall CBP doing that.
4    Q.   Okay.
5    A.   But again, this was in 2016 when we started
6  this process.  Best of my recollection, it was Grupo
7  Beta that was trying to control the flow through
8  appointment tickets.  I don't believe we gave out any
9  tickets.
10    Q.   Okay.  Thank you for clarifying.
11    A.   To the best of my recollection.
12    Q.   So the phrase wait for appointments here is
13  in reference to the metering policy, correct?
14    A.   Waiting for available space to process.
15  Yes.
16    Q.   So what Mr. Gonzalez is reporting in his
17  e-mail is that Mexican officials believe that due to
18  the metering policy, there is a humanitarian crisis
19  going on in Tijuana, correct?
20    A.   The Mexican mayor, Mayor of Tijuana
21  believes.  Yes.
22    Q.   And the governor of Baja, California,

**Page 129**

1  correct?
2    A.   Apparently, yes.
3    Q.   And do you believe that the Mayor of
4  Tijuana was lying when he called it a humanitarian
5  crisis?
6    A.   It's his view that it was a humanitarian
7  crisis.
8    Q.   Do you believe that his view is inaccurate?
9    A.   I'm not in Tijuana.  I can't speak to that.
10    Q.   Do you have any way -- do you have any
11  reason as you sit here today to dispute the
12  characterization of what was going on Tijuana in
13  September 2016 as a humanitarian crisis?
14    A.   I couldn't speculate as to the conditions
15  in Tijuana at that time.
16    Q.   So as you sit here today, you don't have
17  any evidence that there was not a humanitarian crisis
18  going on in September 2016 in Tijuana due to the
19  metering policy; is that right?
20    A.   I would have to understand better what they
21  mean by humanitarian crisis.  It was clear that they
22  had large numbers of Haitians awaiting in Tijuana for



ER 01122

Page 130

1  entry into the United States.  Now if they view that
2  as a humanitarian crisis, that's their view.  Again,
3  I'm not the local politician.  I don't understand
4  what's the basis for his view that it's a humanitarian
5  crisis.
6      Q.   But you certainly knew by September of
7  2016, when you received this e-mail, that some Mexican
8  officials viewed the metering policy as having caused
9  a humanitarian crisis; is that right?
10     A.   Based on this e-mail the local officials
11 feel it was a humanitarian crisis.
12     Q.   So the answer to my question is yes, you
13 knew in September 2016 that Mexican officials believed
14 that metering had caused a humanitarian crisis in
15 Tijuana; is that right?
16     A.   I believe that the presence of a large
17 number of migrants in Tijuana was creating
18 humanitarian crisis.  Now whether all of those were
19 attributed to the metering process, I don't know.
20     Q.   So, sir, when you were -- no one told you
21 to avoid answering my questions today, did they?
22     A.   No.

Page 131

1      Q.   No one told you to come here and
2  filibuster, did they?
3      A.   No.
4      Q.   So you are capable of giving a yes or no
5  answer to a question, right?
6      A.   Not to something that I have to speculate
7  on.
8      Q.   So I don't think this requires speculation,
9  sir.
10     A.   The mayor from Tijuana --
11     Q.   Can I -- can I just --
12     A.   Yes, sir.
13     Q.   -- ask you the question though, before you
14 go into the answer.
15         My question is, yes or no, you knew in
16 September 2016 that the Mayor of Tijuana and the
17 Governor of Baja, California, were claiming that there
18 was a local humanitarian crisis in Tijuana that had
19 been caused by the metering policy?
20     A.   Based on this e-mail that I received in
21 2016, it does indicate the Mayor thought it was a
22 local humanitarian crisis, as did the Governor.

Page 132

1      Q.   And you knew that they were making that
2  claim in September 2016?
3      A.   By refreshing my recollection of this
4  e-mail, I am on the e-mail's distribution.
5      Q.   Okay.  So you would have known that in
6  September of 2016, right?
7      A.   I would have received this e-mail and known
8  that in September of 2016.
9      Q.   Okay.  Thank you, sir.  All right.  Let's
10 move on to our next exhibit.
11          - - -
12         (A document was marked as Deposition
13 Exhibit Number 28.)
14          - - -
15 BY MR. MEDLOCK:
16     Q.   All right, sir.  I've marked as Exhibit 28
17 a three-page e-mail that begins with the Bates number
18 AOL-DEF-00762523, ends with the Bates number trailing
19 in 525.  Sir, Exhibit 28 is an e-mail chain from
20 September 16, 2016, that was exchanged between Todd
21 Hoffman, Pete Flores, Sidney Aki, Johnny Armijo and
22 others, correct?

Page 133

1      A.   Yes.
2      Q.   And you were aware in 2016 that senior
3  government officials were interested in what was
4  occurring at the San Ysidro Port of Entry with respect
5  to the Haitians; is that correct?
6      A.   Yes.  I remember Secretary Johnson was
7  interested in what was taking place in San Diego.
8      Q.   When you say Secretary Johnson, you mean J.
9  Johnson, who was at the time --
10     A.   DHS?
11     Q.   -- DHS secretary?
12     A.   Yes, sir.
13     Q.   And in fact the National Security Council
14 was getting updates on what was going on at San Ysidro
15 at that time?
16     A.   Apparently, yes.
17     Q.   And the deputy's committee actually held a
18 meeting about what was going on in San Ysidro,
19 correct?
20     A.   According to this e-mail.
21         MS. SHINNERS:  Can we take a quick break
22 just to look at this document and discuss among

MAGNA
LEGAL SERVICES

Page 134

1  counsel? We just want to make sure there's no
2  redactions that need to be made. I'm not saying there
3  will be, just potentially if there's potential claw
4  back, we want to just take a look.
5       MR. MEDLOCK: Okay. Sure. We can do that.
6           - - -
7       (Recessed at 11:45 a.m.)
8       (Reconvened at 11:47 a.m.)
9           - - -
10  BY MR. MEDLOCK:
11      Q.  Sir, did you ever attend any of these
12  deputy's committee meetings or National Security
13  Council meetings regarding what was going on in San
14  Ysidro in 2016?
15      A.  No. Not that I recall. No.
16      Q.  Did you ever get a readout of those
17  meetings?
18      A.  I'm sure the deputy, when he came back,
19  probably would have discussed what occurred at those
20  meetings. That's generally the way these things go.
21      Q.  Do you have any recollection of your
22  interactions with the deputy regarding those meetings?

Page 135

1      A.  No.
2      Q.  Who would the Deputy or C2 have been at
3  that time?
4      A.  At that time it would have been Kevin
5  McAleenan.
6      Q.  Do you know whether the deputy's Committee
7  of the National Security Council or the National
8  Security Council was aware that metering was going on
9  at the San Ysidro Port of Entry in September 2016?
10      A.  I don't know if they were aware.
11          - - -
12      (A document was marked as Deposition
13  Exhibit Number 29.)
14          - - -
15  BY MR. MEDLOCK:
16      Q.  Sir, I've put in front of you a multi-page
17  e-mail chain that begins with the Bates number
18  AOL-DEF-00761290 through 294. It's an e-mail chain
19  that begins in August 17, 2016, and ends on September
20  7, 2016.
21      Do you see that, sir?
22      A.  Yes.

Page 136

1      Q.  And this is an e-mail -- a chain of e-mails
2  between Katherine Stark, Johnny Armijo, Pete Flores
3  and others, correct?
4      A.  Correct.
5      Q.  And the subject line of the e-mail is
6  Asylum Claims at San Ysidro/Ped West, correct?
7      A.  Correct.
8      Q.  Ped West is a portion of the San Ysidro
9  Port of Entry, correct?
10      A.  Pedestrian West. Yes.
11      Q.  And there's also a pedestrian east as well,
12  correct?
13      A.  Yes.
14      Q.  We talked a little bit earlier about a
15  Grupo Beta. What is Grupo Beta to your knowledge?
16      A.  Grupo Beta, to my knowledge, is a arm or
17  branch within Mexican immigration, Mexican INAMI.
18      Q.  What does Grupo Beta do, if you know?
19      A.  To the best of my recollection, they deal
20  with the asylum, the migrant processing, those types
21  of things. I'm not real clear on the distinction
22  between what Grupo Beta does as a part of INAMI and

Page 137

1  the broader units within IMANI. I don't know.
2      Q.  Nor am I. I was hoping you would. Is it
3  correct that Grupo Beta coordinates with OFO regarding
4  the implementation of the metering policy?
5      A.  During the beginning of the implementation,
6  we did coordinate with Grupo Beta. I do not know if
7  San Ysidro still does that.
8      Q.  Do ports of entry, when implementing the
9  metering policy, coordinate with individuals in Mexico
10  to meter the asylum seekers that come to the port of
11  entry?
12      A.  Could you just restate that again?
13      Q.  Sure. I guess -- I can break it down a
14  little bit for you.
15      A.  Okay. Because I think I want to make sure
16  I'm clear on the process, explain the process, because
17  there is interaction at some point.
18      Q.  Right.
19      A.  In order to say we have capacity, bring
20  up --
21      Q.  And that's what I was going to get to.
22      A.  That that occurs. Yes.



Page 138

1    Q.   Okay.  So when a port is metering, there
2    has to be someone that they interact with on the
3    Mexican side of the border to say we have capacity for
4    5 more or 10 more or 20 more correct?
5    A.   Correct, if the migrants have returned to
6    the shelters.
7    Q.   Correct.
8    A.   In some locations they may be waiting on
9    the bridge.  And at that location, there's no reason
10   to coordinate.  You would just bring in the next 10
11   that are waiting in line on the bridge, if you will.
12   Q.   So there -- but there are some ports for --
13   A.   There are some -- right.  But I'm saying
14   it's a different process at each port.
15   Q.   Understood.
16   A.   But yes, in some locations like San Ysidro,
17   generally the migrants have returned to the shelters.
18   And San Diego would coordinate with somebody to say we
19   now have capacity, bring up 10 or 20; or we have space
20   specifically for family units.  Bring up family units.
21   That coordination would take place.
22   Q.   Okay.

Page 139

1    A.   If that answers where you were.
2    Q.   I think it does.  So, for example, the San
3    Ysidro Port of Entry is located next to the Mexican
4    city of Tijuana, correct?
5    A.   Correct.
6    Q.   And there are individuals without proper
7    travel documents who are in shelters in Tijuana due to
8    the metering policy, correct?
9    A.   They are in shelters not just because of
10   the metering.  There are individuals awaiting to come
11   to the U.S. in shelters.
12   Q.   Okay.  And under the metering policy,
13   someone at the San Ysidro Port of Entry would need to
14   contact someone in Mexico to coordinate bringing up a
15   certain number of individuals to be processed at the
16   port, correct?
17   A.   Correct.
18   Q.   And that also happens with Brownsville and
19   Matamoros at times, correct?
20   A.   Again, depending, you know, Brownsville and
21   Matamoros, I mean, some of those are bridges with
22   folks waiting.  And because there is capacity, the

Page 140

1    line may not be that long.  So they may not have
2    actually returned to a shelter.  They may wait a few
3    hours and then come across.
4         So in those situations we wouldn't
5    coordinate with someone because the asylum seekers
6    would be there physically across the line, if you
7    understand that.
8    Q.   Understood.
9    A.   Yeah.
10   Q.   And are you aware that there are in some
11   cases lists of individuals that like to be processed
12   for asylum in ports of entry that are kept on the
13   Mexican side of the border?
14   A.   Yes.
15   Q.   And in instances where OFO is interacting
16   with someone on the Mexican side of the border to
17   bring people up to the port for processing, the wait
18   lists are used to determine who will become next,
19   correct?
20   A.   Correct.
21   Q.   I want to go back to the e-mail I've marked
22   in front of you.  And I'm looking at the September 7,

Page 141

1    2016 e-mail from Johnny Armijo at 1:02 p.m.
2    A.   Okay.
3    Q.   And he says, "Good morning, Ms. Stark.
4    Affixed below in red are responses to the questions
5    submitted."  Do you see that, sir?
6    A.   Yes.
7    Q.   I'll represent to you  there's no red on
8    this document, but it looks like there are questions
9    and then answers set out below them, correct?
10   A.   Correct.
11   Q.   Okay.  Do you know who Katherine Stark is?
12   A.   No.
13   Q.   Okay.  The first question is, "I believe in
14   the call, the port director said on behalf of CBP,
15   there is currently no coordination with Grupo Beta.
16   Is that accurate."
17        Do you see that, sir?
18   A.   Yes.
19   Q.   And then below that there is an answer that
20   begins with, "At the outset, CBP SYS did not
21   coordinate with Grupo Beta on the development of the
22   numbering system in which Grupo Beta currently



Page 142

1  utilizes to meter the flow of potential asylum claims
2  into our custody. However, subsequent to the
3  development of this system, CBP SYS does routinely
4  coordinate with Grupo Beta to ensure that there is a
5  consistent, slash, metered flow."
6      Did I read that correctly?
7  A.  Correct.
8  Q.  And does that accurately describe the
9  interactions between the San Ysidro Port of Entry and
10 Grupo Beta as it existed in September 2016?
11 A.  To my recollection in September 2016 that
12 would be accurate.
13 Q.  Okay. Sir, I've marked as Exhibit 30 a
14 two-page e-mail, begins with the Bates number
15 AOL-DEF-00761340 and continues over to 341.
16             - - -
17     (A document was marked as Deposition
18 Exhibit Number 30.)
19             - - -
20 BY MR. MEDLOCK:
21 Q.  This is a August 17, 2016 e-mail chain
22 between yourself, James R. Hutton and John P. Wagner

Page 143

1  and Todd Hoffman, correct?
2  A.  Correct.
3  Q.  And just so we get this correct, the e-mail
4  chain starts on august 17, 2016, with a e-mail sent at
5  12:46 p.m. by Katherine Stark, correct?
6  A.  Correct.
7  Q.  And it appears she goes by the name Kylie
8  Stark in her e-mail signature, correct?
9  A.  Okay. Yes. Now, seeing that she's in the
10 Office of Congressional Affairs, I do know a Kylie in
11 Congressional Affairs.
12 Q.  Okay. So that refreshes your recollection
13 of who Katherine Stark --
14 A.  I do know who Katherine Stark was. Okay.
15 Q.  And do you know who James R. Hutton or J.
16 Ryan Hutton is?
17 A.  Yes. Goes by Ryan Hutton. Yes.
18 Q.  And what was -- his position was deputy
19 executive director, admissibility?
20 A.  Yes.
21 Q.  And Passenger Programs at the time?
22 A.  He was the deputy of Todd Hoffman at this

Page 144

1  time.
2  Q.  Okay. And we already discussed John
3  Wagner's position.
4  A.  Yes.
5  Q.  So I won't belabor that. Ryan Hutton
6  writes, on August 17, 2016 at 1:08 p.m., quote, Gary
7  Merson, in parentheses, Democratic Chief Council
8  Subcommittee on Immigration and Border Security,
9  Committee of the Judiciary, end parentheses, would
10 like to have a conference call with the PD at San
11 Ysidro, and the appropriate HQ SME to discuss the
12 processing of asylum claims at San Ysidro, slash, Ped
13 West.
14     Did I read that correctly?
15 A.  Yes.
16 Q.  HQ SME refers to a headquarters subject
17 matter expert, correct?
18 A.  Right. Correct.
19 Q.  And Mr. Hutton goes on to state, quote,
20 This relates to a call you, XD Hoffman and PD Aki
21 recently had with DHS on this very issue in which NGOs
22 were claiming that POE was turning away people

Page 145

1  claiming the CF, when in fact Government of Mexico is
2  assisting with metering pedestrians due to current
3  construction. Did I read that correctly?
4  A.  Yes.
5  Q.  So in August 2016 counsel for the
6  Subcommittee on Immigration and Border Security
7  reached out with questions regarding allegations that
8  individuals were being turned away at the San Ysidro
9  Port of Entry, correct?
10 A.  With the allegations. Yes.
11 Q.  And those allegations related to
12 implementation of the metering policy, correct?
13 A.  I don't know. It just says alleging that
14 CBP officers are turning Mexicans away from the port.
15 Q.  Correct. And then later in the e-mail it
16 refers to assisting with metering pedestrians,
17 correct?
18 A.  Yes.
19 Q.  Okay. So is it your understanding that
20 this inquiry related to the implementation of the
21 metering policy at San Ysidro?
22 A.  I have no reason not to think so.

ER 01126

MAGNA
LEGAL SERVICES

Page 146

1    Q.   Okay.  Do you recall at all what the
2  outcome of this inquiry from the subcommittee on
3  immigration and border security on he -- of the
4  committee on the judiciary was?
5    A.   No, I do not.
6    Q.   But you did know in August 2016 that
7  counsel for a congressional subcommittee had questions
8  about how the metering was being implemented at the
9  San Ysidro Port of Entry, correct?
10    A.   Yes.
11              - - -
12         (A document was marked as Deposition
13  Exhibit Number 31.)
14              - - -
15    BY MR. MEDLOCK:
16    Q.   All right.  Exhibit 31 is a one-page e-mail
17  from November 10 to 11, 2016, With a Bates number
18  AOL-DEF-00272936.  Do you see that, sir?
19    A.   Yes.
20    Q.   And this is an e-mail exchange between
21  yourself, Kevin McAleenan, John Wagner, Gloria Chavez
22  and others, correct?

Page 147

1    A.   Correct.
2    Q.   Do you see an individual in this e-mail
3  referred to as Patrick Flanagan?
4    A.   Yes.
5    Q.   What's Patrick Flanagan's position?
6    A.   Where -- is that in the body of the e-mail?
7    Q.   It's not.  That's why I'm asking.
8    A.   Oh, I see the cc there.  He was the chief
9  of staff to the deputy commissioner in 2016.
10    Q.   Okay.  And Enrique Tamayo, what was his or
11  her position at the time?
12    A.   I believe at this time he was also assigned
13  to the Crisis Action Team, which was the precursor to
14  the MCAT.
15    Q.   Okay.  So it started out as Crisis Action
16  team and became MCAT?
17    A.   Border patrol had a stats unit, field op
18  had a stats unit.  They brought the two together to
19  try to have some greater visibility and reconcile the
20  numbers because we were reporting things differently.
21  the CAT then became the MCAT at some point.
22    Q.   But you don't recall when?

Page 148

1    A.   I don't recall when.
2    Q.   Okay, and there's also a reference in here
3  to Beverly Good?
4    A.   Beverly Good.
5    Q.   Who's Beverly Good at this time?
6    A.   At this time, I believe this was in the
7  latter part of '16.  I believe at this time Beverly
8  Good would have been the acting executive director for
9  operations.
10    Q.   Okay.  All right.  So I'm starting down at
11  the e-mail from Gloria Chavez to Beverly Good at the
12  bottom of the e-mail chain.  Do you see that?
13    A.   Yes.
14    Q.   Okay.  That e-mail was sent November 10,
15  2016 at 2:48 p.m., correct?
16    A.   Yes.
17    Q.   All right.  And it begins, quote, One other
18  top that C2 discussed at the NAC meeting today was the
19  ability to meter the flow of FMUAs at the POE bridges,
20  in open parentheses, at the middle the bridge, closed
21  parentheses, at some of our Texas POEs to prevent the
22  overflow at the actual POEs.

Page 149

1         Did I read that correctly?
2    A.   Yes.
3    Q.   What does FMUAs mean?
4    A.   Family units.
5    Q.   What is the NAC meeting?
6    A.   The NAC was the location of DHS
7  headquarters.
8    Q.   And do you recall whether this is referring
9  to an ad hoc meeting or a standing meeting?
10    A.   I don't know.
11    Q.   Okay.  Did you attend this meeting, do you
12  recall?
13    A.   No.  I don't recall.
14    Q.   Okay.  Then Ms. Chavez goes on to state in
15  the e-mail, further down in the same paragraph, I'm
16  sorry, actually the next paragraph, quote, I just
17  received word from Commissioner staff that this
18  proposal that C2 introduced to S1 for consideration
19  earlier today was approved by S1 and to make
20  notification to OFO.
21         Did I read that correctly?
22    A.   Yes.



Page 150

1    Q.   So if I could decode some jargon here, the
2    deputy commissioner made a proposal to the secretary
3    to begin metering flow of family units at ports of
4    entry in Texas, and that was approved by the
5    secretary; is that correct?
6    A.   I'm not sure if this was to begin the
7    metering or the placement of the officers at the limit
8    line.
9    Q.   Okay.  But a proposal was made by the
10   deputy secretary that was approved -- by the deputy
11   commissioner that was approved by the deputy
12   secretary?
13   A.   Correct.  Correct.
14   Q.   And at this time, November 2016, the
15   secretary would have been J. Johnson?
16   A.   I believe so.  Yes.  Yes.  Because I --
17   yes, because Mr. Johnson stayed until the change of
18   the administration in January of '17.  He didn't leave
19   early, as far as I recall, so...
20   Q.   Okay.  And Ms. Chavez goes on to say that
21   OFO field leadership should be told that some of the
22   Texas POEs can start engaging in this new operational

Page 151

1    alignment, correct?
2    A.   Correct?
3    Q.   So sometime around November 10, 2016, some
4    of the ports of entry in Texas began metering the flow
5    of family units on POE bridges, correct?
6    A.   Again, according to this, I'm not sure if
7    it was to begin the metering or the placement of the
8    officers at the limit line, because we had been
9    metering throughout 2016 at different places at
10   different times.
11   Q.   But when that metering occurred at some --
12   it sounds like there were instances where officers
13   weren't at the limit line, correct?
14   A.   When we started the metering in 2016, we
15   did not hold at the limit line.  We simply allowed
16   people to line up outside the doors to the port and
17   wait to be processed.
18   Q.   I see.
19   A.   Our processing capability was not
20   sufficient to handle the flows we had.  You ended up
21   with individuals camping out outside, outside the port
22   limits without shelter, without food, without

Page 152

1    bathrooms.
2    Q.   I see?
3    A.   As the situations deteriorated and we had
4    unsafe conditions, then we started to hold at the
5    limit line so that the migrants could return to the
6    shelters where there was food, there was bathrooms.
7    And then we would process them from the limit line.
8        That was how the metering process
9    transitioned from where we started in 2016 holding at
10   the doors, to beginning to place officers at the limit
11   line so that they would remain in the shelters, as
12   opposed to outside the port exposed to the elements
13   without restrooms and such.
14   Q.   Can I -- thank you for that explanation.  I
15   just want to unpack a couple things.
16       So you said originally when metering was
17   first implemented, people were held at the doors to
18   the actual port building, correct?
19   A.   Correct.
20   Q.   And the port building is on U.S. soil?
21   A.   Correct.
22   Q.   It's actually set back from the boundary

Page 153

1    line, correct?
2    A.   Correct, in most ports.
3    Q.   In most ports it's actually set back
4    several feet from the boundary line?
5    A.   Correct.
6    Q.   Can it be several yards from the boundary
7    line?
8    A.   It could be.
9    Q.   What's the furthest distance between the
10   boundary line and a port that you are aware of on the
11   southwestern border?
12   A.   Oh, I think Anzalduas from the limit line
13   to the port is about a mile, 1.2 miles.
14   Q.   How about San Ysidro, how far back is the
15   port building from the boundary line?
16   A.   I couldn't speculate.  It's a huge port.
17   From where the limit line is and where pedestrians
18   come, it's a short walk to the old port building.
19   It's a long walk to primary.  The POV lanes is
20   different.
21   Q.   Yeah.  But from the boundary line to the
22   port building, whether it's the --

MAGNA◆
LEGAL SERVICES

Page 154

1    A.   Correct.
2    Q.   -- old port or the new port, it's several
3    feet, correct?
4    A.   Correct.
5    Q.   That's true in Otay Mesa, true, as well?
6    A.   I believe so.  Yes.
7    Q.   That's also true in Hidalgo, correct?
8    A.   Hidalgo, correct.
9    Q.   And Laredo it's also true?
10   A.   Correct.
11   Q.   Is it true in Brownsville as well, that
12   there's several feet between the boundary line and the
13   port building?
14   A.   Yes.
15   Q.   How about El Paso, several feet between --
16   A.   Yes.
17   Q.   Okay.  So when metering was first
18   implemented at those ports, individuals actually --
19   individuals who were seeking asylum actually crossed
20   the boundary line onto U.S. soil and were waiting on
21   U.S. soil, before they were metered, correct?
22   A.   Right.  They remained on U.S. soil until we

Page 155

1    had the capacity to bring them into the office to
2    process them.
3    Q.   All right.  So they were on U.S. soil when
4    they were told to wait until they had capacity,
5    correct?
6    A.   They were told to wait.  We -- they stayed
7    where they were on U.S. soil.  They were not returned
8    to Mexico.
9    Q.   Correct.  I guess I want to make sure I
10   understand exactly the -- how this worked.  And then
11   at some point there was a decision made to move
12   officers to the limit line, correct?
13   A.   Correct.
14   Q.   And the limit line refers to the boundary
15   line between the actual physical boundary between the
16   U.S. and Mexico, correct?
17   A.   Yes.
18   Q.   Who made the decision, to your knowledge,
19   to move the officers to the limit line?
20   A.   I don't think it was a single decision.  I
21   think it was in discussions based on the operational
22   situations at each locations.  But we did have

Page 156

1    discussions throughout 2016, and then into 2017 when
2    the migrants slowed down, that allowing people to wait
3    within the U.S. space, exposed to the elements,
4    without the bathrooms, without food, was not the way
5    we were going to do this if we had to again.
6    Q.   And when to the best of your knowledge was
7    that decision actually made about moving officers to
8    the limit line?
9    A.   I don't recall when it was made.  It may
10   have been made sometime in late 2016.  Again, the
11   numbers came down significantly in 2017.  And clearly
12   in 2018, we held folks at the limit lines.
13   Q.   And this is just a question -- a yes or no
14   question.  Was legal counsel looped in on the
15   discussion regarding moving officers to the limit
16   lines?
17   A.   Not to my recollection.
18   Q.   Was this limit line ever discussed during
19   your 8:15 standing meeting?
20   A.   I can't recall.  I have no reason to think
21   we -- that we would not have discussed it at some
22   point.

Page 157

1    Q.   How about the standing meeting in the SCIF
2    with the commissioner and deputy commissioner?
3    A.   No.
4    Q.   It wouldn't have been discussed?
5    A.   Those meetings are intelligence driven, not
6    operationally.
7    Q.   So do you recall when ports of entry in
8    Texas began implementing metering in 2016?
9    A.   No.  I don't recall.
10   Q.   It would have been sometime after San
11   Ysidro did it though?
12   A.   Yes.  San Ysidro started and then --
13   Q.   What was the second port that was --
14   A.   I don't recall as the -- I believe it would
15   have likely have been Calexico, because the Haitians
16   moved then from Tijuana to Mexicali.  They then moved
17   to San Luis and then into Nogales.
18        So if I had to, to the best of my
19   recollection those were probably the next three that
20   would have started to metering, because the metering,
21   again, was a direct response to the Haitian arrivals.
22   Q.   In November 2016 when this decision in this



Page 158

1 e-mail was made to move officers either to the limit
2 line or start metering at Texas ports of entry --
3     A.   Yes.
4     Q.   -- you would have been aware that Mexican
5 government officials had said that there was a local
6 humanitarian crisis going on in Tijuana, correct?
7     A.   Based on your other mail, yes.
8     Q.   And you also would have been aware at this
9 point in November of 2016 that the Subcommittee on
10 Immigration and Border Security and the commissioner
11 of the committee of the judiciary had questions about
12 the metering policy, correct?
13     A.   Yes.
14     Q.   And do you recall raising any concerns at
15 that time that Mexican authorities believed that there
16 was a local humanitarian crisis going on when this
17 discussion regarding the Texas ports of entry was
18 going on?
19     A.   I don't recall those discussions.  No.
20     Q.   Do you recall anyone saying, hey, we are
21 getting congressional inquiries; should we rethink how
22 we are rolling out metering in the Texas Port of

Page 159

1 Entry?
2     A.   No.  I mean, we took the steps we needed to
3 operationally.
4     -  -  -
5     (A document was marked as Deposition
6 Exhibit Number 32.)
7     -  -  -
8     BY MR. MEDLOCK:
9     Q.   Sir, we've put in front of you what we've
10 marked as Exhibit 32 to your deposition.  It's a
11 two-page e-mail beginning with AOL-DEF-00259454 and
12 ending with 455.  This is an e-mail exchange from
13 November 16, 2016, that involves you, John Wagner,
14 Mark Koumans and others, correct?
15     A.   Correct.
16     Q.   And you would have sent and received the
17 e-mails in this chain as part of your job at CBP,
18 correct?
19     A.   Correct.
20     Q.   And you would have read and understood the
21 e-mails in this chain at the time you received them,
22 correct?

Page 160

1     A.   Yes.
2     Q.   And you would have received these e-mails
3 on or about the time listed in the time and date
4 listed in the e-mails, correct?
5     A.   Correct.
6     Q.   And you have no reason as you sit here
7 today to believe that these e-mails, other than the
8 redactions that appear in some parts of them are
9 incomplete or inaccurate, correct?
10     A.   Correct.
11     Q.   Okay.  Do you remember --
12     MS. SHINNERS:  I'm so sorry.  This seems as
13 if the redactions on this document are insufficient to
14 protect the deliberations regarding decisions that are
15 being made about policy.  So I am --
16     MR. MEDLOCK:  Are you going to claw this
17 back?
18     MS. SHINNERS:  I am going to claw it back.
19     MR. MEDLOCK:  Okay.
20     MS. SHINNERS:  If you want to go off the
21 record for a moment, perhaps we can discuss.
22     MR. MEDLOCK:  Well, maybe I can just ask it

Page 161

1 without the document.
2     MS. SHINNERS:  Okay.
3     BY MR. MEDLOCK:
4     Q.   Do you ever recall telling anyone -- you
5 can put the document aside, sir.  I don't want you to
6 look at it when answering the question.
7     Do you ever recall telling anyone that
8 maybe Mexico should start metering?
9     A.   Yes.
10     Q.   And you believe that Mexico should start
11 metering in order reduce the flow of migrants to the
12 U.S., correct?
13     A.   Not to reduce the flow but to control the
14 flow so that we can handle it operationally.
15     Q.   And you are talking about metering
16 happening on the southern border?
17     A.   On the southern border.
18     Q.   And you believe that Mexico should be
19 metering to control the flow of migrants, correct?
20     A.   As opposed to letting them line up outside
21 the door, which is what we started with.
22     Q.   You want Mexico to do its fair share to

MAGNA
LEGAL SERVICES

Page 162

1  control the flow of migrants, correct?
2     A.  I want Mexico to control the flow into the
3  United States so we can handle it operationally.
4     Q.  And you believe that Mexico wasn't being --
5  wasn't doing enough to make that happen, correct?
6     A.  At times Mexico was not doing enough to
7  assist us in controlling the flow.
8     Q.  Was there ever a time period in which ports
9  of entry were actually handing out appointments to
10 individuals who were metered?
11    A.  Again I referenced the San Ysidro at the
12 start, I believe appointment tickets were handed out.
13 I don't again remember if it was Grupo Beta or us in
14 the very beginning.  I don't recall other ports doing
15 that.
16    Q.  Do you recall El Paso doing that?
17    A.  I don't recall El Paso doing it.
18    Q.  All right.
19                    - - -
20        (A document was marked as Deposition
21 Exhibit Number 33.)
22                    - - -

Page 163

1     BY MR. MEDLOCK:
2     Q.  All right.  Exhibit 33 is a one-page e-mail
3  that bears the Bates number AOL-DEF-00081089.  It's a
4  November 22, 2016 e-mail chain between yourself and
5  Hector Mancha.  Do you see that?
6     A.  Yes.
7     Q.  And at this time Hector Mancha was the
8  director of field operations for the El Paso field
9  office, correct?
10    A.  Correct.
11    Q.  The title -- the subject of the e-mail is
12 call today, correct?
13    A.  Okay.  Yes, correct.
14    Q.  And you write in the bottom e-mail, on
15 November 22, 2016 at 7:58 a.m., quote, Hector, I need
16 to give you a call later today re: the metering and
17 how it is going, and if we are giving appointments
18 out.  Thanks.
19        Do you see that?
20    A.  Yes.
21    Q.  You get into the office pretty early.  And
22 then Hector responds to your e-mail, correct?

Page 164

1     A.  Correct.
2     Q.  At 10:16 a.m., correct?
3     A.  Correct.
4     Q.  And he writes, quote, Will be on standby
5  ready for your call.  El Paso started out by giving
6  appointments and has since course corrected and
7  stopped with the appointments and is now just advising
8  immigrants to come back at a later time if the POE is
9  at detention capacity.
10        Did I read that correctly?
11    A.  Correct.
12    Q.  Does that refresh your recollection that
13 some ports may have been giving out appointments?
14    A.  Yes.  At some point in 2016 it must have
15 come to my attention that El Paso was using tickets,
16 which generated my message to the DFO.
17    Q.  Was there a concern about giving out
18 tickets?
19    A.  We don't want to be giving out tickets.
20    Q.  Why?
21    A.  Because we want to -- we are simply
22 controlling the flow based on our operation.  We are

Page 165

1  not getting into a scheduling system.  We didn't want
2  to be getting in to giving out tickets anywhere.
3     Q.  Did anyone tell you that there was a legal
4  risk to giving out tickets?
5        MS. SHINNERS:  Objection.  That calls for
6  attorney-client communications.
7        MR. MEDLOCK:  That's just a yes or no.
8        MS. SHINNERS:  But it asks a question about
9  legal risk, so it's not actually yes or no.
10    Q.  Okay.  To the extent you can answer that
11 without giving communications to attorneys, go ahead.
12        Can you tell me whether you believe there's
13 a legal risk to giving out tickets?
14    A.  Do I personally believe there's a legal
15 risk?
16    Q.  Yeah.
17    A.  I don't.  I'm not a lawyer.  I don't --
18    Q.  Did you believe that giving out tickets to
19 immigrants could cause them to rely on a promise that
20 they would be called back to the port to be processed?
21    A.  No.  I recall that in the early discussions
22 we were very concerned that giving out tickets would



Page 166

1  just lead to a lot of fake tickets and a lot of misuse
2  of a system that we weren't prepared to handle with
3  the influx of migrants.  So I think my operational
4  concern on giving out tickets was more of a, you know,
5  how are we going to control this.  How do we know the
6  ticket we give them is legitimate.
7      You know, we just continue with the process
8  that we were adopting with the folks holding the
9  folks.  So my concerns were more operational, not
10  legal.
11    Q.  And course corrected is in this e-mail from
12  Hector Mancha, is it, the statement that the -- is
13  essentially him saying that they fixed the problem,
14  correct?
15    A.  That they stopped.  Yes.
16    Q.  And Mr. Mancha goes on to write, quote,
17  Metering is definitely working.  Overall numbers for
18  POEs are significantly down since initiating metering,
19  while in comparison the BP numbers for between the
20  ports are showing an upward trend.
21      Did I read that correctly?
22    A.  Yes.

Page 167

1    Q.  BP refers to border patrol, correct?
2    A.  Correct.
3    Q.  Okay.  Put that aside.
4        - - -
5      (A document was marked as Deposition
6  Exhibit Number 34.)
7        - - -
8  BY MR. MEDLOCK:
9    Q.  All right, sir.  I show you what we've
10  marked as Exhibit --
11      MS. SHINNERS:  Yeah.  I'm sorry.  This has
12  -- definitely contains attorney reference to legal
13  advice, attorney-client communications.  We are going
14  to have to claw it back again.  We can discuss a
15  solution.  We may be able to redact it on the fly
16  here.
17      MR. MEDLOCK:  Okay.  I'm going to ask
18  about this document.  So we need to redact it on the
19  fly.  Here's what I would suggest.  It is about 12:30.
20  Let's break for lunch, you guys can redact and let me
21  know what you are going to take out, and then I can
22  ask about the other parts.

Page 168

1      MS. SHINNERS:  That sounds fine, as long as
2  -- yes, as long as everyone is not using the document
3  in the meantime.
4      MR. MEDLOCK:  No.  I'll put it right here.
5      MS. SHINNERS:  Great.  Thank you.
6      MR. MEDLOCK:  All right.
7        - - -
8    (Recessed for lunch at 12:22 p.m.)
9      (Reconvened at 1:06 p.m.)
10        - - -
11  BY MR. MEDLOCK:
12    Q.  So we are back on the record.  Thank you
13  for -- welcome back, sir.  I think your counsel had a
14  few notes regarding documents that have been either
15  clawed back and redacted on the fly, or will be clawed
16  back in their entirety at this time.
17      MS. SHINNERS:  Thank you, Counsel.  So,
18  yes, defendants are clawing back what had been marked
19  as Exhibit 32.  It's Bates stamped AOL-DEF-00259454
20  through 259455.  We are clawing back the basis being
21  that there are additional redactions needed to protect
22  information protected by the deliberative process

Page 169

1  privilege.
2      Second, with respect to the document that
3  has been marked as Exhibit 34, we have -- it is Bates
4  labeled AOL-DEF-00032389.  Defendants have clawed back
5  the unredacted version to assert attorney-client and
6  deliberative process privileges over a portion of that
7  document.  For purposes of today's deposition, we have
8  redacted the version that is being used as the exhibit
9  to this deposition.
10      MR. MEDLOCK:  Okay.  And just so I'm clear,
11  I think you handed Exhibit 32 back to the witness, and
12  you probably want to still have a copy of that.
13      MS. SHINNERS:  It was actually exhibit --
14  yes.  I'm so sorry.  That's what I did.  Thank you.
15      MR. MEDLOCK:  Okay.  No problem.  Just want
16  to make sure we are all on the same page here.
17      MS. SHINNERS:  Excellent.  Thanks for that
18  catch.
19  BY MR. MEDLOCK:
20    Q.  All right, sir.  You have Exhibit 34 in
21  front of you.  It's a one-page e-mail with the Bates
22  number AOL-DEF-00032389; correct, sir?



Page 170

1    A.   Yes.
2    Q.   And that's a November 22, 2016 e-mail
3  exchange between yourself, Beverly Good, Enrique
4  Tamayo, Todd Hoffman, John Wagner; is that correct?
5    A.   Correct.
6    Q.   And I'm going to focus just for a second on
7  the bottom e-mail that you sent.  And I just want to
8  get the gist of it.  I'm not going to get into
9  anything that's been redacted.  But the gist of your
10 e-mail is that you have some questions about whether
11 CBP is giving out appointments at ports of entry,
12 correct?
13   A.   Correct.
14   Q.   And that's in relation to the
15 implementation of the metering policy, correct?
16   A.   Correct.
17   Q.   Okay.  Let's move up to the top e-mail from
18 Beverly Good.  She responds to your e-mail, November
19 22, 2016, at 11:41 a.m., correct?
20   A.   Correct.
21   Q.   And she gives you answers with respect to
22 the El Paso, Laredo, Tucson and San Diego field

Page 171

1  offices, correct?
2    A.   Correct.
3    Q.   Okay.  So this is an e-mail exchange that
4  you received in the course of your duties at CBP,
5  correct?
6    A.   Correct.
7    Q.   And you would have received these e-mails
8  on or about the times and dates listed on the e-mails,
9  correct?
10   A.   Correct.
11   Q.   And you would have read and understood
12 these e-mails at the time you received them, right?
13   A.   Correct.
14   Q.   And apart from the redactions that were
15 just made, these -- this e-mail exchange appears to be
16 true and correct, correct?
17   A.   Correct.
18   Q.   All right.  Let's start with the El Paso
19 field office.  For that field office, Miss Good
20 writes, quote, El Paso started giving out appointments
21 and has since course corrected, open parens, this
22 occurred sometime mid to end of last week, closed

Page 172

1  parens, and stopped with the appointments and is now
2  just advising immigrants to come back at a later time
3  if the POE is at detention capacity.
4        Did I read that correctly?
5    A.   Correct.
6    Q.   And that's very similar to the e-mail
7  exchange that you had with Hector Mancha that we
8  looked at earlier?
9    A.   Correct.
10   Q.   Okay.  And then the next field office
11 that's listed is Laredo, correct?
12   A.   Correct.
13   Q.   All right.  And for Laredo, Miss Good
14 writes, quote, Laredo gives them an appointment open
15 parens, verbally, closed parens, and tells them when
16 to come back.  Officers are on the bridge now as well
17 as -- as well but the metering seems to have had a
18 deterrent effect and they are not seeing too many
19 cases daily, so they don't really have to meter at the
20 moment.  However, they are prepared to do so at any
21 moment their capacity reaches its maximum.
22        Did I read that correctly?

Page 173

1    A.   Correct?
2    Q.   So Miss Good told you that at least at the
3  Laredo field office the metering policy was having a
4  deterrent effect, correct?
5    A.   It seemed to have a deterrent effect.
6    Q.   So when we talked earlier about -- and you
7  said that you couldn't recall anyone ever telling you
8  that the metering policy had a deterrent effect, in
9  fact Ms. Good did tell you that?
10   A.   I did not recall this e-mail from November
11 of 2016.
12   Q.   But you do recall now that in November 2016
13 you were told that metering was having a deterrent
14 effect, correct?
15   A.   Reading this e-mail, it appears to have a
16 deterrent effect.  Metering is having deterrent
17 effect.  Yes.
18   Q.   Okay.  Do you recall following up
19 Ms. Good to understand what the phrase deterrent
20 effect meant?
21   A.   No, I don't.
22   Q.   Do you recall telling Miss Good that the

Page 174

1  purpose of metering was not to -- was not having a
2  deterrent effect?
3      A.  Can you --
4      Q.  Yeah.  That was a bad question, so I'll ask
5  it a different way.
6          Do you recall telling Miss Good that the
7  purpose, that deterrence was not a purpose of
8  metering?
9      A.  No.  I don't believe I corrected Ms. Good
10  and told her that deterrent was not the purpose.
11     Q.  Okay.
12              - - -
13          (A document was marked as Deposition
14  Exhibit Number 35.)
15              - - -
16  BY MR. MEDLOCK:
17     Q.  All right, sir.  I've put in font of you
18  what's been marked as Exhibit 35 to your deposition.
19     A.  Okay.
20     Q.  It is a one-page e-mail with the Bates
21  number AOL-DEF-00576607.  And it is a November 12
22  through 14, 2016 e-mail exchange amongst Frank

Page 175

1  Longoria, Alberto Flores and others.  Do you see that?
2      A.  Yes.
3      Q.  Do you recall what Albert Flores's position
4  was in the Laredo Port of Entry at this time?
5      A.  Looking at the e-mail, he was a deputy port
6  director for Laredo.
7      Q.  Thank you.  And looking at the e-mail Frank
8  Longoria --
9      A.  Longoria.
10     Q.  Thank you.  Was the assistant director of
11  field operations for border security in the Laredo
12  field office?
13     A.  In the field office.  Correct.
14     Q.  Okay.
15     A.  The ports report to the field office.
16     Q.  Yeah.  Let's actually go through that.
17     A.  Yeah.
18     Q.  So starting at the line officers.
19     A.  Yes.
20     Q.  You have CBP officers, got the very bottom
21  of the law enforcement pyramid, correct?
22     A.  Correct.

Page 176

1      Q.  And then they can report up to supervisory
2  officers?
3      A.  First line, second line --
4      Q.  Second line.
5      A.  -- watch commander, deputy, dependent on
6  the structure, how big of the port, who then reports
7  to generally an assistant port director, to a port
8  director.  Then the port director reports to the
9  director of field operations who has several port
10  directors under him within that geographical area.
11         Now each director of field operations may
12  have two or three deputies depending on the size.
13  There are operational deputies, but technically the
14  port director reports to the DFO.
15     Q.  I see.
16     A.  But the deputies help do what deputies do.
17  So you'll see messages like this from the deputy down
18  to --
19     Q.  Yeah.  And it says in a situation like this
20  the deputy is essentially managing up, for lack of a
21  better word for his --
22     A.  The deputy port director --

Page 177

1      Q.  -- DFO?
2      A.  -- was managing up for his port director to
3  the deputy DFO, who was managing for his DF.  Yes.
4      Q.  Yes.  This is how it works in the
5  government.  The deputies help their principals out,
6  right?
7      A.  Correct.  Yes, sir.
8      Q.  And then from those DFOs, they report up as
9  well?
10     A.  The DFOs report to the executive director
11  for operations, who reports to the deputy executive
12  assistant commissioner, who reports to me.
13     Q.  Okay.  And then who do --
14     A.  And then I report to the deputy
15  commissioner the highest career person, who reports to
16  the commissioner that is a political.
17     Q.  Okay.  Thank you.  I appreciate that.  And
18  I take it the commissioner reports to the secretary?
19     A.  Correct.
20     Q.  Okay.
21     A.  Yes, sir.
22     Q.  Okay.  So you testified earlier that you



Page 178

```
1    couldn't recall exactly whether in November 2016
2    whether the -- whether ports of entry in Texas were
3    being -- were actually being authorized to put
4    officers at limit line positions or if they were being
5    authorized to start metering. Do you recall that?
6        A.  Yes.
7        Q.  Okay. I'm focused down on the November 12,
8    2016 e-mail, 2:42 p.m., sent by Frank Longoria --
9    wait.
10                      - - -
11   (Sirens interrupted, recessed at 1:16 p.m.)
12              (Reconvened at 1:19 p.m.)
13                      - - -
14   BY MR. MEDLOCK:
15       Q.  All right, sir. Focused on the November
16   12, 2016 e-mail at 2:42 p.m. at
17   the bottom of the e-mail chain. Do you see that?
18       A.  Yes.
19       Q.  All right. That e-mail has the subject
20   line Meeting with INM. Do you see that?
21       A.  Yes.
22       Q.  INM is a reference to INAMI, correct?
```

Page 179

```
1        A.  Correct.
2        Q.  And that e-mail reads, Port directors, at
3    the request of C-1 and C22, you are to meet your INM
4    counterpart and request they control the flow of
5    aliens to the port of entry. For example, if you
6    determine you can only process 50 aliens at a time,
7    you will request that INM release only 50.
8            Did I read that correctly?
9        A.  Yes.
10       Q.  And then it goes on to give more details
11   about controlling the flow and the relationship with
12   INAMI, correct?
13       A.  Correct.
14       Q.  Does this refresh your recollection that in
15   November 2016 port directors in the Laredo field
16   office were given authorization to begin metering?
17       A.  Again I still believe the metering was
18   occurring before November.
19       Q.  Okay.
20       A.  I mean, 2016 was the year we had to do the
21   metering because the volumes were so great. And by
22   November, we were putting up soft-sided facilities to
```

Page 180

```
1    handle the overflow.
2            So in my recollection, we started metering
3    in the Laredo field office before November.
4        Q.  Okay. But this e-mail certainly is
5    giving --
6        A.  It was taking place in November.
7        Q.  This -- sorry. And this e-mail from Frank
8    Longoria is definitely giving the port directors
9    authority to meter if they aren't already doing so,
10   correct?
11       A.  To engage with the Mexicans to control the
12   flow. Yes.
13       Q.  Okay.
14                      - - -
15       (A document was marked as Deposition
16   Exhibit Number 36.)
17                      - - -
18   BY MR. MEDLOCK:
19       Q.  Sir, I have marked for you Exhibit 36.
20   It's a multi-page document that begins with the Bates
21   number AOL-DEF-00703133 through 139. Do you see that?
22       A.  Yes.
```

Page 181

```
1        MS. SHINNERS:  Again, I'm sorry, this
2    document is labeled as protected by attorney-client
3    and deliberative process privileges. I'm afraid I'm
4    going to have to claw this back. It looks like it's
5    insufficient -- I mean, it looks like it needs to be
6    clawed back in full.
7            So, again, defendant's have produced a
8    large volume of documents in this litigation, and we
9    continue to produce documents. It looks like this one
10   was just missed. I know that other versions of this
11   document were withheld in full.
12       MR. MEDLOCK:  Okay. And you anticipate
13   clawing back and withholding it in full; is that
14   right?
15       MS. SHINNERS:  Yes. I do need to review --
16   yes. I can review a little more carefully on the
17   break, but yes.
18   BY MR. MEDLOCK:
19       Q.  Okay. I would ask you, if you can take the
20   document away from him I'll ask you just some general
21   questions.
22           Sir, are you aware of an office within CBP
```



| Page 182 |
|---|

1   called the Office of Civil Rights and Civil Liberties?
2      A.  That office is within DHS not CBP.
3      Q.  Thank you for the correction.  And it's
4   sometimes called CRCL?
5      A.  Yes.
6      Q.  Are you aware whether CRCL undertook any
7   investigation related to metering at ports of entry?
8      A.  I'm aware that CRCL received allegations
9   that individuals who had crossed were returned, and
10  that they were looking at those allegations, so yes.
11     Q.  And were you spoken with or interviewed by
12  anybody from CRCL in connection with that?
13     A.  I was not interviewed with CRCL.
14     Q.  Did you receive any findings or conclusions
15  from that CRCL investigation?
16     A.  I can't recall.  I received quite a few
17  documents from CRCL in this capacity.  I can't recall
18  if there's one specific to metering.  There may have
19  well been.  I just don't recall.
20     Q.  To the best of your recollection, when did
21  this CRCL investigation with respect to allegations
22  about metering begin?

| Page 183 |
|---|

1      A.  To my recollection, in the first year or so
2   of metering, so throughout 2016, early '17.
3      Q.  Okay.  So certainly before you signed the
4   metering memorandum that we looked at earlier.
5      A.  In 2018.
6      Q.  You were aware that CRCL had investigated
7   allegations related to metering, correct?
8      A.  Correct.
9      Q.  You were aware that the judiciary committee
10  had questions about it?
11     A.  Correct.
12     Q.  You were aware that -- you had gotten
13  e-mails before then saying that the policy had a
14  deterrent effect, correct?
15     A.  You have refreshed my recollection on one
16  e-mail that used the word deterrent.
17     Q.  Right.  But you did receive an e-mail
18  saying it was --
19     A.  I received that one e-mail.  Yes.
20     Q.  And you also received an e-mail saying that
21  Mexican officials said that the metering policy was
22  causing the humanitarian crisis as well?

| Page 184 |
|---|

1      A.  In their view.  Yes.
2      Q.  Okay.  And you also received MCAT reports
3   that said that individuals were being either held at
4   the line or held in shelters when there was no impact
5   to port capacity, correct?
6      MS. SHINNERS:  Objection.  Mischaracterizes
7   the document.
8      A.  The no-impact deport capacity on that
9   report is a general snapshot of significant issues to
10  be brought to our attention.  So I have, you know, I
11  disagree with the fact that it says no impact,
12  negative, non-- that that indicates there was no
13  impact to port operations.  That column is used to
14  call senior leadership's attention to something
15  significant that had happened, such as a large number
16  of port runners, an outbreak of tuberculosis, things
17  of that nature.
18      I don't take the presence of no, negative,
19  none as meaning the metering is not having an impact
20  to the ports.
21     Q.  Okay.  Let's go back -- and I apologize.
22  I'm about to do a little bit of flipping through to

| Page 185 |
|---|

1   find the prior e-mail we looked at.
2      A.  Yes.
3      Q.  From I believe it was June 19, 2018.  Do
4   you have that in front of you, sir?
5      A.  Sure.
6      Q.  Which exhibit is that, if you could help me
7   do my job.
8      A.  Exhibit 24.
9      Q.  So Exhibit 24 lists percentage capacities
10  for various ports, correct?
11     A.  Correct.
12     Q.  And you said that that is physical
13  capacity, not the actual detention capacity, correct?
14     A.  Not operational capacity.
15     Q.  Oh, I'm sorry.  I got the wrong word.
16  Operational capacity.  Okay.
17      Did you ever tell anyone from MCAT they
18  should start listing operational capacities, not
19  physical?
20     A.  No.
21     Q.  Did you ever criticize MCAT for not using
22  the operational capacities?

MAGNA
LEGAL SERVICES

Page 186

1    A.   No.  Because as this report as I use it,
2  since it gives me a snapshot as to the number of folks
3  that are in our custody, how many folks are waiting in
4  Mexico, and any significant issues to be aware of,
5  that's how I used it.  I didn't correct them on each
6  heading of the category of the report.
7    Q.   Sure.  Did anybody to your knowledge in
8  senior leadership at CVP or OFO correct the -- request
9  that MCAT put together a version of this report that
10  actually used operational capacities?
11    A.   No.  Because the operational capacity
12  differs from port to port and from day-to-day.  And
13  that would just be too cumbersome to record every
14  event that's taking place in the port through out the
15  day, which has had an impact on how many migrants we
16  could come across.  If a port was working multiple
17  simultaneous seizures, and then we had to pull
18  officers to do that, we wouldn't record all of those
19  activities.  It's just too cumbersome of a report to
20  come together for the 46 crossings along the southwest
21  border as to what's taking place.
22    And again, the operational capacity is

Page 187

1  fluid.  It fluctuates from day to day.  There may be
2  no capacity at 9:00 a.m, but ERO comes and picks folks
3  up at 11:00.  And at 12 o'clock we have capacity.
4    So this is a static view that gives us a
5  high level understanding of what's taking place in the
6  ports in terms of our capacity.  The migrants that
7  have come in, the migrants that are waiting, and any
8  operation issues.  That's how I see this report.
9  That's how I use the report.
10    Q.   And --
11    A.   And similar reports like this.
12    Q.   Yeah, sure.  The queue management report as
13  well?
14    A.   Yeah.  It's modeled differently, but
15  generally the same information.
16    Q.   Okay.  Is it the case that there is no
17  regularly generated report at CBP or OFO that lists
18  the operational capacities for ports of entry on a
19  daily basis?
20    A.   No.  There are multiple reports that deal
21  with our different mission sense.  So there is
22  reporting that comes into what we call our situation

Page 188

1  room.  And there is a threshold limit as to what needs
2  to be reported.
3    So seizures of certain amounts have to be
4  reported.  There's a report that captures all of that
5  every day.  Our counter-terrorism connections or
6  encounters gets reported up a different way, and we
7  receive a report on that.  If we have outbound
8  operations underway, we would be made aware of those
9  that rise to a certain level of outbound operations.
10    So the migrant processing is just one
11  aspect of what we do within the port every single day.
12  And there are different reports for those other
13  activities.  And again, based on the operational area
14  we are talking about, the reports for the southern
15  border are different that the reports for the
16  airports, the sea ports, the northern border, and our
17  foreign operations.
18    So to understand the operational aspect of
19  what's taking place at any one port at any one given
20  time, you need to look at all of those mission sets
21  and what's being done with all of that.  And you also
22  have to then consider the staffing that we have on

Page 189

1  hand, things like that.  When you look at Calexico
2  here, 74 percent of capacity -- but we have 20 percent
3  of our officers vacant in El Paso -- I'm sorry,  in
4  Calexico.
5    So we have a huge staffing issue in
6  Calexico, which impacts our ability to bring more
7  folks in to process them for their asylum claims.
8    Q.   So I think my question -- and I appreciate
9  your answer, but I think my question was just a little
10  bit more focused, which was there's no single report
11  that's generated that lists the operational capacities
12  for migrant processing at each port of entry on a
13  daily basis, is there?
14    A.   No, because the operational capacity is
15  influenced by all of our other mission sets.  And
16  there's separate reports for those other missions
17  sets.
18    Q.   So is there any way that I could go back to
19  2016, 2017, or 2018 and reconstruct what the
20  operational capacity would have been at that port of
21  entry on a given day?
22    A.   I think it would be very, very difficult to



Page 190

1  do that because of all the barriers that you would
2  need to consider, including how many officers called
3  in sick that day, how many may have been out at the
4  range, how many may have been processing seizures.
5  All of those variables impact our operational
6  capacity.
7       You will not find that in one port or in
8  one report because the nuance is of everything that we
9  do in the port of entry. We haven't talked about the
10  trade mission. We haven't talked about passenger --
11  or traveler processing and wait times, cargo. We
12  haven't talked about the agriculture mission.
13       We compete for limited resources in the
14  ports of entry. Migrant processing is one aspect of
15  what we do.
16    Q.  Okay.
17    A.  You are looking for a totality across the
18  board. There is not a single report that captures
19  that totality.
20    Q.  Okay. So as we sit here today, although
21  it's imperfect, the best snapshot we have of what was
22  going on with capacity in the port would be these MCAT

Page 191

1  reports.
2    Q.  From the headquarters visibility aspect,
3  yes. But this is why we allow the queue management,
4  the metering to be controlled by the local port
5  directors and their management teams because they have
6  the day-to-day visibility as to what's going on.
7    Q.  I see.
8    A.  This report again gives me a snapshot at a
9  very high level from my position as the executive
10  assistant commissioner what's taking place in this one
11  mission space.
12    Q.  I see. Okay. We talked a little bit about
13  the metering guidance. Was there ever any subsequent
14  guidance that was given to field offices or port
15  directors regarding the implementation of the April
16  2018 metering guidance?
17    A.  I am not sure I follow. There was guidance
18  from Secretary Neilson a month or two later.
19    Q.  That's what I'm getting at.
20    A.  Yeah. Prioritizing the missions that we
21  have within the port. Yes. And that was sometime in
22  June of 2018.

Page 192

1    Q.  Okay. And I think you testified to this
2  earlier. In 2018 -- so in general, just looking at
3  numbers of inadmissibles?
4    A.  Yes.
5    Q.  There's a fairly large number in 2016?
6    A.  Yes.
7    Q.  There was a large number but reduced in
8  2017?
9    A.  Correct.
10    Q.  2018 was a very high year for
11  inadmissibles, correct?
12    A.  Correct. And '19 even higher.
13    Q.  So if I'm looking at this in sort of a
14  stair step fashion, was 2018 --
15    A.  Can I give you the --
16    Q.  Yeah. If you have got the numbers, I'll
17  take them.
18    A.  FY '15, about 111 -- I'm sorry, 113,000
19  inadmissibles.
20    Q.  Okay.
21    A.  FY '16 about 154,000 inadmissibles; '17
22  dropped to 111,000; '18 was 124,000, And '19 was

Page 193

1  126,000.
2    Q.  Okay.
3    A.  So those are in our inadmissible numbers
4  across the southwest border. I'm not giving you
5  airport inadmissibles and all of that.
6    Q.  And inadmissibles is a broader category of
7  an asylum seeker? That's how --
8    A.  Correct.
9    Q.  -- are part of it.
10    A  In a -- yes, sir.
11    Q.  Okay. So in 2018 is a year where you are
12  seeing increased numbers of inadmissibles coming to
13  the ports?
14    A.  Compared to '17, yes.
15    Q.  Okay.
16    A.  But not as large as '16.
17    Q.  Right. And not as large as '19?
18    A.  Correct.
19    Q.  Okay.
20         - - -
21    (A document was marked as Deposition
22  Exhibit Number 37.)

Page 194

1           - - -
2    BY MR. MEDLOCK:
3    Q.   All right. 37 is a one-page e-mail, Bates
4  number AOL-DEF-00371176?
5    A.   Correct.
6    Q.   And it's a e-mail from Valerie Boyd that
7  you are copied on, dated May 29, 2018, correct?
8    A.   Correct.
9    MS. SHINNERS: I'm so sorry.
10   MR. MEDLOCK: There you go again.
11   MS. SHINNERS: Here I go again. This
12 contains insufficient redactions to protect the
13 deliberative process privilege and potentially
14 attorney-client, but I think the main issue is
15 deliberative process. This is an mail from the deputy
16 chief of staff to office of chief counsel.
17   MR. MEDLOCK: I see that.
18   MS. SHINNERS: At CBP.
19   MR. MEDLOCK: Yes.
20   MS. SHINNERS: So I -- yeah I think we have
21 to claw this one back in full.
22   MR. MEDLOCK: Okay.

Page 195

1    MS. SHINNERS: I'm not seeing anything
2  that's possible to redact here.
3    MR. MEDLOCK: Okay. So you are redacting
4  -- sorry. You are clawing back 37 in full; is that
5  correct?
6    MS. SHINNERS: Correct.
7    BY MR. MEDLOCK:
8    Q.   Okay. So let me ask you a more simple
9  question out of the document. You said at some point
10 there was an effort to put together a memorandum from
11 the Secretary of Homeland Security regarding
12 prioritization-based queue management, right?
13   A.   Prioritization resources, yeah, in relation
14 to queue management.
15   Q.   And that memorandum was released in June of
16 2018, correct?
17   A.   Yes, sir.
18   Q.   And were you -- yes or no, were you
19 involved in the effort to put together that
20 memorandum?
21   A.   Yes.
22   Q.   Who else was?

Page 196

1    A.   Folks -- as I recall from the commissioner
2  staff, as well as executive director Todd Hoffman,
3  again my admissibility lead.
4    MR. MEDLOCK: Can we go off the record for
5  just a second.
6           - - -
7    (Discussion off the Record)
8           - - -
9    (A document was marked as Deposition Exhibit
10 Number 38.)
11          - - -
12   BY MR. MEDLOCK:
13   Q.   All right, sir. We've put in front of you
14 what we've marked as Exhibit 38 to your deposition. I
15 is a one-page e-mail that has the Bates number
16 AOL-DEF-0027393. It is an e-mail exchange between
17 Valerie Boyd, yourself, John Wagner, Randy Howe and
18 others, correct?
19   A.   Correct.
20   Q.   And this is an e-mail you would have
21 received in the course of your duties at CBP, correct?
22   A.   Correct.

Page 197

1    Q.   And you would have received this e-mail at
2  or about the times listed in the e-mail chain,
3  correct?
4    A.   Correct.
5    Q.   And you would have read and understood the
6  e-mail at the time you received it?
7    A.   Correct.
8    Q.   And you have no reason, sitting here, to
9  believe that this e-mail is incomplete or inaccurate,
10 right?
11   A.   No.
12   Q.   All right. The title of the e-mail is S1
13 Memo Prioritization-based Queue Management. Do you
14 see that?
15   A.   Yes.
16   Q.   And this is consistent with what you were
17 saying earlier, there was a memo that was issued by
18 the Secretary of Homeland Security in June 2018
19 regarding prioritization-based queue management,
20 correct?
21   A.   Yes.
22   Q.   In the top e-mail, Valerie Boyd wrote on



Page 198

1  June 5, 2018, at 5:45 p.m.: OFO leadership, should we
2  gather with OPA, OCA and IPL to discuss the public
3  message around this 30-day pilot. Did I read that
4  correctly?
5      A.  Yes.
6      Q.  What is OPA?
7      A.  Office of Public Affairs.
8      Q.  What is OCA?
9      A.  Office of Congressional Affairs.
10     Q.  What is IPL?
11     A.  It's the office that deals with state and
12  local governments. I don't know what IPL stands for.
13     Q.  Okay. Fair enough. Do you understand what
14  the reference to 30-day pilot means in this e-mail?
15     A.  The secretary's memo called for a 30-day
16  pilot of directing resources towards certain priority
17  activities and assessing the results.
18     Q.  Okay. And do you know whether that 30-day
19  pilot was extended at any point?
20     A.  It was extended.
21     Q.  Was it made permanent?
22     A.  The activities continue today. Yes.

Page 199

1      Q.  So from at least until today it's been
2  going on?
3      A.  It continues. Yes.
4      Q.  Okay. All right. Let's put 38 aside.
5              - - -
6          (A document was marked as Deposition
7  Exhibit Number 39.)
8              - - -
9  BY MR. MEDLOCK:
10     Q.  Sir, I'm showing you what I've marked as
11  Exhibit 39 to your deposition. I hope and pray this
12  is the final one and there will be no need to claw it
13  back. It is a multi-page memorandum that begins with
14  Bates number AOL-DEF-00273294 and continues to 296.
15          Do you see that, sir?
16     A.  Yes.
17     Q.  And this is a June 5, 2018 memorandum for
18  Kevin McAleenan and Commissioner of CBP, from Kirstjen
19  Nielson, Secretary of Homeland Security, correct?
20     A.  Yes.
21     Q.  You would have received a copy of this
22  memorandum in the course of your work at CBP, correct?

Page 200

1      A.  Yes.
2      Q.  And at the time you received the
3  memorandum, you would have read and understood it.
4  Correct?
5      A.  Yes.
6      Q.  And you would have -- this memo was dated
7  June 5, 2018, correct?
8      A.  Yes.
9      Q.  You would have received this memo on or
10  about June 5, 2018, correct?
11     A.  On or about. Yes.
12     Q.  And from looking at this memorandum, it
13  doesn't appear to be incomplete or inaccurate, does
14  it?
15     A.  No.
16     Q.  Okay. This is the June 2018
17  prioritization-based queue management memorandum that
18  we were talking about earlier, correct?
19     A.  Yes.
20     Q.  All right. I want to ask you about a few
21  statements in this memorandum. On the first page, the
22  third full paragraph that begins, CBP must.

Page 201

1      A.  Okay.
2      Q.  That sentence begins, "CBP must focus on
3  its primary mission to protect the American people
4  from dangerous people."
5          Did I read that correctly?
6      A.  Yes.
7      Q.  Do you agree with that statement?
8      A.  Yes.
9      Q.  Do you think that is CBP's primary mission?
10     A.  Counter-terrorism, our primary mission.
11  Yes. So dangerous people, counter-terrorism mission.
12     Q.  Okay. And then on the third page of the
13  memo, there on the page Bates number AOL-DEF-00273296,
14  do you see that there's a numbered list from 1 to 4
15  about in the middle of that page?
16     A.  Yes.
17     Q.  Okay. And right above that, do you see the
18  third line up ends with the phrase "I direct you."
19     A.  Yes.
20     Q.  Or I direct. That reads, "I direct you to
21  initiate a 30-day pilot program to prioritize staffing
22  and operations in accordance with following order of

MAGNA
LEGAL SERVICES

Page 202

1    priority at all southwest and border ports of entry."
2         Did I read that correctly?
3    A.   Yes.
4    Q.   And the first priority is national security
5    efforts?
6    A.   Yes.
7    Q.   Second is counter-narcotics operations?
8    A.   Yes.
9    Q.   Third is economic security?
10   A.   Yes.
11   Q.   And the fourth is trade and travel
12   facilitation?
13   A.   Yes.
14   Q.   And within trade and travel facilitation is
15   where processing of asylum seekers would fall,
16   correct?
17   A.   No.  That trade and travel facilitation is
18   those that have lawful documents to enter the country.
19   Q.   I see.  So processing asylum seekers does
20   not fall on this one through four prioritization,
21   correct?
22   A.   Correct.

Page 203

1    Q.   It would be somewhere below the top four
2    priorities?
3    A.   Correct.
4    Q.   The next sentence after the one through
5    four prioritization reads, "Processing persons without
6    documents required by law for admission arriving at
7    the southwest border remains a component of CBP's
8    mission but priorities should be above to the efforts
9    described above in the prescribed order."
10        Did I read that correctly?
11   A.   Yes.
12   Q.   And that is consistent with CBPs policy to
13   the present day, correct?
14   A.   This is CBP's policy since we were created
15   in 2003.
16   Q.   So it's always been -- this merely
17   memorializes a preexisting prioritization?
18   A.   Correct.  Counter-terrorism, followed by
19   narcotics, trade and travel, and economic security
20   have always been our four top priority missions.
21   Q.   And it's always been the case that those
22   four top priority missions had a higher priority than

Page 204

1    processing asylum seekers; is that right?
2    A.   And other activities as well.
3    Q.   Sure.  Are there other activities that you
4    would put above processing asylum seekers in the
5    prioritization list for CBP?
6    A.   That's really hard to say because depending
7    on, you know, the four categories you have, certain
8    aspects of our mission set that may not be directly
9    listed would fall under, you know, our agriculture
10   inspection mission, the pest and the disease on plants
11   and things of that nature.  You could put that as
12   economic security.  You could also put it as trade and
13   facilitation.
14        There are other things that are probably
15   outside of that area.  I'm just trying to think.  I
16   mean, I think the top four, which have always been our
17   primary focus, capture that on processing the
18   undocumented as, you know, not been within the top
19   four.
20   Q.   It never has been during the time you have
21   been at CBP, correct?
22   A.   Not -- no, not in the time we have been

Page 205

1    CBP.
2    Q.   So would you say that the agriculture
3    mission that you've described has a higher priority
4    than processing asylum seekers?
5    A.   Yes.
6    Q.   Can you think of any activities that CBP is
7    required to do by statute that are of a lower priority
8    than processing asylum seekers?
9    A.   That we are required to do by statute.
10   Q.   Yes.
11   A.   I mean, all cargo and passengers, travelers
12   entering the country have to be presented for
13   inspection.  I can't think of anything by statute that
14   would be lower priority.
15   Q.   So the lowest priority for CBP of the
16   things it's required to do by statute is processing
17   asylum seekers; is that right?
18   A.   Yes.  Processing the undocumented.
19   Q.   Right.  They --
20   A.   The may or may not be --
21   Q.   Of the things you are required to do, they
22   come last?



Page 206

1    A.   Right.  But as they present without
2    documentation, they may or may not be requesting
3    asylum.
4    Q.   Right.
5    A.   Right.
6    Q.   So processing the undocumented is the
7    lowest of the statutorily required priorities; is that
8    right?
9    A.   Yes.
10   Q.   And that's true even when the number of
11   undocumented migrants presenting at ports of entry are
12   -- is increasing, correct?
13   A.   Can you rephrase?  Ask the question.
14   Q.   Sure.  I guess my question is we talked
15   about in 2018 the number of inadmissibles coming to
16   ports of entry had increased over 2017?
17   A.   Correct.
18   Q.   And in response to that, CBP did not
19   reorder its prioritization, did it?
20   A.   Correct.  We did not reassign officers from
21   counter-terrorism, narcotics, economic security, trade
22   facilitation so that we could process more

Page 207

1    undocumented migrants or process them quicker.  We
2    left those resources aligned with the priority
3    mission.
4    Q.   Theoretically, you could -- CBP could do
5    that, but it chooses not to do that, correct?
6    A.   Theoretically, it would be a trade-off.
7    And would you make the choice to have less folks
8    working the counter-terrorism mission set, or less
9    folks working the narcotics mission set, et cetera.
10   Those are trade-offs that I'm not willing to make.
11   Q.   Okay.  And you are not willing to trade off
12   between the agriculture mission set and the processing
13   undocumented migrants?
14   A.   I am not, because the agriculture mission
15   set prevents plant and animal diseases from entering
16   the country.  If we allowed the fruit fly to get in,
17   it would devastate economies in Florida and
18   California.  If we allow the Asian swine flu and
19   things of that nature to get in, it would decimate our
20   pork industry.
21   So the agriculture priority of preventing
22   pests and disease from entering is a top priority for

Page 208

1    the Agency.
2    Q.   So fruit flies higher priority than the
3    asylum seekers, right?
4    A.   Wiping out --
5    MS. SHINNERS:  Objection.  Argumentative.
6    THE WITNESS:  I'm sorry.
7    BY MR. MEDLOCK:
8    Q.   Go ahead.
9    MS. SHINNERS:  You can answer.
10   A.   I would say wiping out the economies in
11   Florida and California because of an infestation of
12   fruit flies remains a high priority to prevent that,
13   as opposed to processing an undocumented migrant
14   quicker.
15   Q.   Inspecting pigs is a higher priority than
16   inspecting asylum seekers, right?
17   A.   Preventing Asian swine flu from entering
18   the country and decimating the pork industry of the
19   United States and likely Canada is a high priority.
20   Q.   But the way you do that is you look at pigs
21   coming into --
22   A.   We inspect agriculture and agricultural

Page 209

1    products entering the country.
2    Q.   And in the case of swine flu, you are
3    looking at pigs, right?
4    A.   Pigs and meat.
5    Q.   They are the carriers of swine flu?
6    A.   Right.  Pork products.  Yes.
7    Q.   And --
8    A.   Not necessarily pigs.  It may be --
9    Q.   Chicken too, right?
10   A.   -- pig products.  It may be, you know,
11   different types of consumables involving pork.
12   Q.   Sure.  It could be live pigs or dead pigs
13   or parts of dead pigs?
14   A.   There's different pathways for these
15   diseases to come into the country.
16   Q.   And CBP has chosen to prioritize inspecting
17   those products over inspecting asylum seekers, right?
18   A.   We have chose to prioritize preventing
19   dangerous animal and plant disease from entering the
20   country at the exchange of processing migrants slower.
21   Q.   Right.  Got it.  So what that looks like at
22   a port level is if a shipment of pork products comes



## Page 210

1  in, and there are migrants that are -- there's a line
2  of migrants waiting to be processed, you are going to
3  prioritize inspecting the pork products over
4  inspecting the asylum -- the migrants, correct?
5      A.   We will prioritize the inspection of
6  harmful products over time quickly processing an
7  undocumented migrant seeking entry.  If the
8  undocumented migrant has to wait in line longer
9  because we have to conduct those inspections, then
10 that's what we will do.
11     Q.   So be it, right?
12     A.   So be it.
13     Q.   Got it.  So you have a -- CBP has a
14 statutory duty to inspect products that are coming
15 into the U.S. for harmful diseases, correct?
16     A.   As well as health and safety issues, the
17 whole gamut of what we do at the port of entry,
18 counterfeit goods, you know.
19     Q.   Those are statutory duties though, right?
20     A.   We have statutory to inspect, right.
21     Q.   And you have a statutory duty to inspect
22 asylum seekers?

## Page 211

1      A.   We have responsibility to inspect --
2  everyone who's presented themselves for entry into the
3  United States.
4      Q.   Right.  So you have to do it all.  It's not
5  a question of prioritizing.  The statute says you have
6  to do both, right?
7          MS. SHINNERS:  Objection to the extent it
8  calls for a legal conclusion from a lay witness.
9      Q.   Okay.
10     A.   We have a wide scope of responsibilities in
11 the ports every day.  We have to prioritize those
12 activities, direct the limited resources that we have
13 to those that are of greater concern.
14     Q.   Yeah.  And my question is you have to
15 inspect plants, animals, people to include
16 undocumented migrants; those are all duties you have?
17     A.   And we do inspect undocumented migrants.
18     Q.   Sure.  But you have chosen to prioritize
19 inspecting plants and animals over inspecting
20 undocumented migrants, correct?
21     A.   We will inspect undocumented migrants.
22     Q.   Not my question.  You have chosen --

## Page 212

1          (Phone interruption)
2      BY MR. MEDLOCK:
3      Q.   My question was you have chosen as an
4  agency to prioritize inspecting plants and animals
5  over inspecting undocumented migrants, correct?
6      A.   Since CBP was created in 2003, yes.
7      Q.   Okay.  All right, sir.  Do you still have
8  Exhibit 39 in front of you?
9      A.   Yes.
10     Q.   Okay.  So 39 is dated June 5, 2018,
11 correct?
12     A.   I'm sorry.  39.  Yes.
13     Q.   And we read some language in there that
14 referred to it as a 30-day pilot, correct?
15     A.   Correct.
16                    - - -
17         (The documents were marked as Deposition
18 Exhibit Numbers 40 and 41.)
19                    - - -
20     BY MR. MEDLOCK:
21     Q.   And I've put in front of you what we've
22 marked Exhibits 40 and 41.  40 is a one-page document

## Page 213

1  with the Bates number AOL-DEF-00039620.  And 41 is a
2  two-page document with the Bates numbers ending in 621
3  through 622.  And I want to focus on 40 for a minute.
4          It is a document with the subject line
5  Evaluation of Queue Management Pilot.  Do you see
6  that?
7      A.   Yes.
8      Q.   And it's listed as from Kevin McAleenan,
9  correct?
10     A.   Correct.
11     Q.   And it's dated August 1, 2018, correct?
12     A.   Correct.
13     Q.   And then the bottom there are boxes for
14 approve/date, disapproved/date, needs discussions/date
15 and modify/date.  Do you see that?
16     A.   Yes.
17     Q.   And there was -- this was a form for
18 evaluating and approving whether the pilot project
19 discussed in Exhibit 39 would be continued, correct?
20     A.   It appears so.
21     Q.   Okay.  And then if you look at Exhibit 41,
22 on the first page it says, Evaluation of

Page 214

1  Prioritization Queue Management Pilot.  Do you see
2  that?
3      A.   Yes.
4      Q.   And it says, Action Required, quote,
5  Approval from the Secretary of Homeland Security to
6  implement queue management protocols along the
7  southwest border.  Do you see that?
8      A.   I see where it says that.
9      Q.   Okay.  And this is consistent with your
10  recollection that after the 30-day pilot described in
11  Exhibit 39 concluded, it was extended by the Secretary
12  of Homeland Security, correct?
13      A.   I do not recall a document that said
14  continue the pilot.  I just know we remain under these
15  priorities today, as we did since 2003 priority to the
16  issuance of this letter.
17      Q.   I see so.  It's regardless of whether 40
18  and 41 were actually executed, that's still what's
19  going on today?
20      A.   This has now been updated.
21      Q.   And I'll show you that in a second.
22      A.   Right.  So this was going on until the

Page 215

1  updated memo from Commissioner Morgan.
2      Q.   Okay.  I will not keep you in suspense on
3  that.
4              -  -  -
5          (A document was marked as Deposition
6  Exhibit Number 42.)
7              -  -  -
8  BY MR. MEDLOCK:
9      Q.   Put in front of you what we've marked as
10  Exhibit 42 to your deposition.  It is a multi-page
11  memorandum that bears the leading Bates number CBP AL
12  OTRO 000303 and ends with 308.  This is the memorandum
13  from Mark Morgan that you were referring to, correct?
14      A.   Correct.
15      Q.   And just for clarity, Mark Morgan is the
16  acting commissioner of CBP, correct?
17      A.   Correct.  Today.  Yes.
18      Q.   And the memorandum is for you, correct?
19      A.   Correct.
20      Q.   All right.  And it's dated November 27,
21  2019?
22      A.   Yes.

Page 216

1      Q.   So this is a formal memorandum that you
2  would have received on or about November 27, 2019,
3  correct?
4      A.   Yes.
5      Q.   And you would have received this as part of
6  your job at CBP, correct?
7      A.   Yes.
8      Q.   And when you look at this memorandum, does
9  anything in the memorandum appear to be missing or
10  incomplete to you?
11      A.   No.
12      Q.   And when you received this memorandum, you
13  would have read and understood its contents, correct?
14      A.   Yes.
15      Q.   Okay.  And at the -- I'm on the first page
16  of the memorandum, the page ending 303.  It has a
17  section called Background and Purpose.  Do you see
18  that?
19      A.   Yes.
20      Q.   And it makes reference to the June 5, 2018
21  memorandum called Prioritization-Based Queue
22  Management, correct?

Page 217

1      A.   Yes.
2      Q.   And it indicates that that memorandum is
3  attached, correct?
4      A.   Correct.
5      Q.   And if you actually flip through, there's a
6  copy of the prior -- what we previously looked at as
7  Exhibit 39 attached to Exhibit 42, correct?
8      A.   Yes.
9      Q.   And the subject line of the November 27,
10  2019, memorandum depicted at the page in ending in 303
11  is Prioritization-Based Queue Management, correct?
12      A.   Correct.
13      Q.   And this memorandum, if you start on the
14  first page ending in 303, going on to the page ending
15  in 304, has a four-pronged prioritization of the
16  missions at CBP, correct?
17      A.   Correct.
18      Q.   And those are the same four priority
19  missions that were listed in the June 5, 2018
20  memorandum?
21      A.   Except for number 2, counter narcotics has
22  now been expanded for a renewed focus on outbound

Page 218

```
1   operations.
2       Q.  Can you just define really quickly for me
3   what outbound operations means?
4       A.  Outbound operations along the southwest
5   border are targeted enforcement actions to keep the
6   money and the guns from flowing south into Mexico.
7       Q.  Okay.  Drugs come up --
8       A.  Money goes down.
9       Q.  Money goes down.  Got it.  Okay.  With that
10  one change, this is essentially -- this memorandum in
11  Exhibit 42 is memorializing the same practices that
12  were memorialized in Exhibit 39, correct?
13      A.  Yes.  With current updated statistics.
14      Q.  Right.  And as you testified earlier, this
15  has been the -- whether it's been memorialized in a
16  memo or not, this has been how the policy of CBP has
17  operated since it became CBP?
18      A.  Correct.
19      Q.  Okay.  So I take it that your answers
20  regarding prioritization and trade-offs with respect
21  to Exhibit 39 would be the same with respect to
22  Exhibit 42?
```

Page 219

```
1       A.  Yes, sir.
2       Q.  Do you know why it was necessary to draft
3   another memorandum if you already had the Secretary
4   memorandum?
5       A.  The new memorandum includes outbound.
6       Q.  Okay.
7       A.  And that has been an issue of discussion
8   between this administration and the Mexican
9   administration.  They believe we should be doing more
10  to prevent weapons from entering Mexico.  That's the
11  general basis for why the new memo -- because it
12  includes outbound.
13      Q.  Okay.  Thank you for clarifying.  That was
14  a bit of a mystery to me, to be honest.
15      A.  Yes.
16      Q.  Okay.  Do you recall receiving a copy of
17  the complaint in this litigation shortly after it was
18  filed in 2017?
19      A.  I remember receiving it.  I don't remember
20  if it came from counsel or if it was received direct,
21  but I remember seeing it.  Yes.
22      Q.  Okay.  Mark the next exhibit.
```

Page 220

```
1           - - -
2           (A document was marked as Deposition
3   Exhibit Number 43.)
4           - - -
5       BY MR. MEDLOCK:
6       Q.  All right gith.  Marked a copy of a
7   multi-page document that I'll represent to you is the
8   complaint in this litigation.  It begins with the
9   Bates number AOL-DEF-00088503.  Do you see that, sir?
10      A.  Yes, sir.
11      Q.  And there's handwriting on this document?
12      A.  Yes.
13      Q.  Do you see that?  At the top, I believe it
14  says something like received?
15      A.  Reviewed.
16      Q.  Or reviewed 7/14/17, correct?
17      A.  Yes.
18      Q.  Is that your handwriting?
19      A.  Yes, it is.
20      Q.  So if you look at the very top of the
21  document in the middle, it says filed 7/12/17,
22  correct?  Very, very top?
```

Page 221

```
1       A.  Where?
2       Q.  Of the first page?
3       A.  Filed 7/12.
4       Q.  7/12/17.
5       A.  Okay.
6       Q.  So it appears this document was filed on
7   July 12, 2017.  And you reviewed it two days later on
8   the 14th, correct?
9       A.  Correct.
10      Q.  And if you flip through the document, for
11  example, looking at the page in 8505, the introduction
12  page, it looks like you've underlined a few phrases in
13  here; is that correct?
14      A.  Appears so.  Yes.
15      Q.  And then if you look at page 4, at
16  paragraph 11, you circled a few things as well,
17  correct.
18      A.  Circled things.  Okay.  Correct.
19      Q.  Is that usually your process when you are
20  reviewing documents?
21      A.  Legal documents when I'm not a lawyer.
22      Q.  Right.  That is very fair.  Starting in
```

MAGNA
LEGAL SERVICES

Page 222

1  paragraph 19, on page 6, which ends in the Bates
2  Number 8510; do you see that paragraph, sir?
3      A.  Yes.
4      Q.  There's a reference to a plaintiff named
5  Abigail Doe who is referred to by the pseudonym AD.
6  Do you see that?
7      A.  Yes, sir.
8      Q.  Did you ever participate in any effort to
9  unmask the pseudonyms of the plaintiffs in this
10  litigation?
11      A.  No.  No.
12      Q.  Did anybody ever tell you, ever unmask for
13  you the pseudonyms of the plaintiffs in this
14  litigation?
15      A.  No.
16      Q.  Okay.  Without going into any conversations
17  you had with attorneys in this case for the
18  government, can you tell me why you reviewed,
19  underlined and circled things on this document in
20  2017?
21      A.  Because I was named in the lawsuit.
22      Q.  That was your primary concern?

Page 223

1      A.  That was my concern.  That's why on page 3
2  it also said circled -- I'm being sued in my official
3  capacity, you know, so I circled that.
4      Q.  That would have been important to you, I
5  suppose?
6      A.  Yes, sir.
7      Q.  Yes.  All right.  I think I understand the
8  reason for that.
9      A.  Yes.
10              - - -
11      (A document was marked as Deposition
12  Exhibit Number 44.)
13              - - -
14      BY MR. MEDLOCK:
15      Q.  All right, sir.  I've put in front of you
16  what we have marked as Exhibit 44 to your deposition.
17  It's a one page e-mail exchange that bears the Bates
18  number AOL-DEF-00723886.
19          Do you see that, sir?
20      A.  Yes.
21      Q.  All right.  This is an e-mail exchange
22  dated from August 1 through August 14, 2017, with

Page 224

1  Rodriguez -- Charmaine Rodriguez, Pete Flores, Rosa
2  Hernandez, Robert Hood and others.  Do you see that?
3      A.  Yes.
4      Q.  Okay.  And the title of the e-mail is
5  Lawsuit Documents, correct?
6      A.  Yes.
7      Q.  And in the bottom e-mail from Charmaine
8  Rodriguez there is -- Charmaine says, quote, Attached
9  are the two documents we looked at today from the
10  lawsuit.  I will update them as soon as we know more
11  information from Berg Electric on the issue with AEU
12  video.
13          Did I read that correctly?
14      A.  Yes.
15      Q.  Were you aware of any meetings that were
16  going on regarding the lawsuit, this lawsuit between
17  Charmaine Rodriguez, Pete Flores and others in August
18  2017?
19      A.  No, not that I recall.
20      Q.  So you weren't read into the loop on this
21  effort?
22      A.  I'm not on the e-mail distribution here.  I

Page 225

1  don't know who Burg Electric is.
2      Q.  Okay.  Mark the next exhibit.
3              - - -
4      (A document was marked as Deposition
5  Exhibit Number 45.)
6              - - -
7      BY MR. MEDLOCK:
8      Q.  So I'll try to marry these two documents up
9  together, but if you look at Exhibit 44 --
10      MS. SHINNERS:  If I may interrupt.  Is this
11  attached to an e-mail to counsel?
12      MR. MEDLOCK:  No.  It's actually attached
13  to Exhibit 44.
14      MS. SHINNERS:  Oh, it was attached.
15      BY MR. MEDLOCK:  Yeah.  I'll make that
16  clear in just a second.
17      BY MR. MEDLOCK:
18      Q.  So do you see at the top of Exhibit 44
19  there's an e-mail from Moises Castillo to Variza
20  Marin?
21      A.  Yes.
22      Q.  And at least one other person.  And there's



Page 226

1  an attachment to that e-mail called AL Otro Lado
2  complaint dot -- doc X. Do you see that?
3      A.  Yes.
4      Q.  Okay. And I'll represent to you that this
5  document, Exhibit 45, is that attachment.
6      A.  Okay.
7      Q.  And it bears the Bates numbers
8  AOL-DEF-00723887 through 892. Do you see that?
9      A.  Yes.
10         MS. SHINNERS: I mean, this is quite
11  clearly work product. I mean, I apologize for the
12  interruption, and again if it was produced without
13  appropriate markings, but this appears to be an
14  analysis of -- or a summary of the lawsuit.
15         MR. MEDLOCK: So --
16         MS. SHINNERS: And we wouldn't even have to
17  -- well, continue.
18         MR. MEDLOCK: Okay. Just so we are clear,
19  I don't know if you are clawing it back, if that's
20  what your game is but --
21         MS. SHINNERS: Go ahead.
22         MR. MEDLOCK: Okay. But this does not

Page 227

1  appear to be an e-mail exchange that counsel is on.
2  This seems to be an effort done by people other than
3  counsel to do this. I haven't seen any -- to be
4  frank, I haven't seen any e-mail that indicates this
5  was directed by counsel.
6         MS. SHINNERS: Which wouldn't actually
7  matter, because such materials could be prepared by a
8  party. However, even --
9         MR. MEDLOCK: That's not how work product
10  works. But continue.
11         MS. SHINNERS: We are clawing back the
12  document. If further investigation reveals that it is
13  not work product -- but at this time I have no reason
14  to believe it is not work product, whether done by
15  counsel or at the direction of counsel. If you want
16  to ask questions about the facts that you are trying
17  to get at, Mr. Owen is not even on these e-mails so --
18         MR. MEDLOCK: Okay. So here's -- if you
19  want to claw it back, that's fine. We can handle that
20  through separate correspondence. I do want to just
21  make a record that there's now been five or six
22  documents that have been clawed back either in full or

Page 228

1  in part during this deposition. Obviously we need to
2  work through these issues and you, know, we are going
3  to have to hold the deposition open because of those
4  claw backs. If we determine that there's not a valid
5  basis for the privilege, I was prepared to ask the
6  witness questions about them, and I want to ask him
7  questions about them.
8         MS. SHINNERS: Are you speaking just of the
9  document that's in front of you now?
10         MR. MEDLOCK: I do agree there are some
11  documents in here that I think you probably have a
12  pretty strong privilege claim for, but this document
13  in particular I would like to ask questions about.
14  And if we have to come back and do that, we'll do it.
15         MS. SHINNERS: Perhaps on the next break --
16  if we can do some investigation on the next break,
17  perhaps we can. But, for the record, there are
18  270,000 documents, over 270,000 documents produced in
19  this litigation, so just responding to your point
20  regarding the claw-backs. And at least if we can come
21  to the agreement right now, if you would like to allow
22  us to do some further investigation, at this time I

Page 229

1  believe we'll be clawing it back. I think it's quite
2  clearly work product, but --
3         MR. MEDLOCK: Okay. Why don't we do this.
4  I'll move on to a different topic, and then we can
5  take a break, and you guys can take look at that, at
6  those documents.
7         MS. SHINNERS: We don't want to waive any
8  protections that --
9         MR. MEDLOCK: I understood.
10                    - - -
11         (A document was marked as Deposition
12  Exhibit Number 46.)
13                    - - -
14      BY MR. MEDLOCK:
15      Q.  I've put in front of you a document,
16  Exhibit 46 is a document bearing the Bates number
17  NTEU-000132. It's an e-mail from William T. Haralson
18  to David Higgerson with cc's to David Atkinson, Eric
19  Claw and Eduardo Ponce.
20         Do you see that, sir?
21      A.  I see that.
22      Q.  And this e-mail is dated March 15, 2017?

Page 230

1    A.   Correct.
2    Q.   Okay.  And we talked -- this is an e-mail
3  with -- from an NTEU representative, correct?
4    A.   Correct.
5    Q.   And we talked about NTEU earlier.  They are
6  -- it's the National Treasury Employees Union.  They
7  represent CBP officers at some of the ports of entry
8  on the southwest border, correct?
9    A.   They represent all CBP officers.
10   Q.   Okay,
11   A.   Yeah.
12   Q.   And this e-mail is to David Higgerson.  Do
13 you remember what his position would have been at this
14 time?
15   A.   He was the -- at this time the director of
16 field operations for the Laredo field office.
17   Q.   Okay.  This e-mail from William Haralson
18 begins, "During the grievance meetings, Agency
19 representatives acknowledge that the Agency's
20 unilateral work policies broke CBP mandates, federal
21 immigration rules and laws in formally processing
22 persons who seek political asylum, and screening for

Page 231

1  possible terrorist or fugitive status, which places
2  CBP officers' safety, integrity and position to be
3  questioned, as the Agency lacks candor to the public
4  in stating the true facts that the Agency
5  intentionally placed the changes of denying and
6  blocking asylum to persons and families in order to
7  block the flow of asylum applicants in a chilling
8  affects to all others attempting entry into the United
9  States.
10        Did I read that first paragraph correctly?
11   A.   Yes.
12   Q.   Okay.  Did Mr. Higgerson ever make you
13 aware of that e-mail?
14   A.   No.  Not that I recall.  Chapter 149 of the
15 local, Local NTEU Chapter 149 is one of our most
16 problematic local chapters.  And they file grievances
17 on everything.  So I'm not -- I don't recall this
18 grievance, but this type of language where they
19 believe we are breaking federal laws is consistent
20 with every grievance that they file.
21   Q.   Okay.  So they are just problematic in your
22 view, correct, this chapter 149?

Page 232

1    A.   What I'm saying is they make so many
2  allegations about every issue in the Hidalgo area that
3  this is in line with what I typically see coming out
4  of that chapter.
5    Q.   So in March 15, 2017, the metering policy
6  would have been in effect at the Hidalgo Port of
7  Entry, correct?
8    A.   Correct.
9    Q.   Okay.  And there is a grievance from the
10 NTEU Chapter 149 that claims that the CBP is denying
11 blocking asylum to persons and families in order to
12 block the flow of asylum applicants, correct?
13   A.   That's what the e-mail says.
14   Q.   And the e-mail also says it's having
15 chilling effects, correct?
16   A.   According to the chapter.
17   Q.   Okay.  Is it your position that the chapter
18 is just making that up?
19   A.   It is my position that related to the
20 metering the chapter wanted more officers on the limit
21 line on overtime.
22   Q.   Let me make the question even clearer.  Is

Page 233

1  William Haralson lying about what's going on in this
2  e-mail?
3    A.   That is William Haralson's view.
4    Q.   Do you think that it's a lie?
5    A.   I think it's inaccurate.
6    Q.   Do you think it's a lie?
7    A.   I think it's inaccurate.
8    Q.   Do you think intentionally inaccurate?
9    A.   I think it's intentionally inaccurate.
10   Q.   So that would be a lie, right?
11   A.   He believes it to be true.
12   Q.   So the question -- so the question that --
13 so it's an open question whether William Haralson is
14 telling the truth or CBP management is telling the
15 truth about what's going on in the Hidalgo Port of
16 Entry, correct?
17   A.   He has a different view than the policies
18 we have implemented.
19   Q.   Okay.  So looking at this e-mail, what you
20 are saying is you are correct that CBP wasn't breaking
21 the law, and Mr. Haralson is being intentionally
22 incorrect?



Page 234

1    A.   I don't believe Mr. Haralson has enough
2    knowledge to know if we are breaking the law.  We are
3    not breaking the law.
4    Q.   Do you know if William Haralson is actually
5    a CBP employee who worked at the Hidalgo Port of
6    Entry?
7    A.   I don't know if he is, but our chapter
8    representatives are CBP employees.
9    Q.   And do you know -- so do you not trust his
10   word on this issue?
11   A.   I do not trust his word, especially this
12   chapter, which has been problematic throughout my time
13   in my current position.
14   Q.   So -- and I want to make this crystal clear
15   for Judge Bishan, (ph) the judge looking at this case.
16   Your position that you want to tell Judge Bishan is
17   that William Haralson is lying in this e-mail; is that
18   right?
19        MS. SHINNERS:  Objection.
20   Q.   Go ahead.
21   A.   I do not agree with Mr. Haralson's
22   assessment as to the situation on the ground.

Page 235

1    Q.   Were you on the ground on March 15, 2017?
2    A.   No, I was not.
3    Q.   When in 2017 did you visit the Hidalgo Port
4    of Entry?
5    A.   Oh, I don't recall, but I have visited all
6    of our southwest border ports many times.
7    Q.   Okay.  Do you recall whether in March 2017
8    you actually visited the Hidalgo Port of Entry?
9    A.   I don't recall.
10   Q.   What specifically about the NTEU Chapter
11   149 is problematic in your view?
12   A.   In my view, just the history of raising
13   complaints on every issue that is there.  The same
14   issues would exist in every other port and no
15   complaints are raised there.  They are in my view a
16   very problematic chapter that likes to file grievances
17   on everything.
18   Q.   So the same issues that are discussed in
19   this e-mail would be present at every other port; is
20   that right?
21   A.   No.  I said the same issues that occur in
22   different ports that no other chapters file grievance

Page 236

1    on, this chapter will file grievances on.
2    Q.   Okay.  So one of your problems with this
3    chapter is that they speak up and file grievances,
4    right?
5    A.   No.  I think they lack credibility in the
6    complaints that they raise.
7    Q.   So you just put no stock in this e-mail
8    whatsoever, right?
9    A.   In this e-mail which I've never seen until
10   today?
11   Q.   Yeah.  Yeah.  That's what I'm asking.  Can
12   you answer my question, sir?
13   A.   Let me read the e-mail, sir.
14   Q.   Sure.  Go ahead.
15   A.   From this e-mail, the third paragraph where
16   he talks about the officers' working conditions out on
17   the middle -- and this would be in the middle of the
18   bridges, I don't disagree with that.  Those are issues
19   that we worked on with the national union to bring
20   more safety at the middle of the bridges.  But again,
21   the next sentence they are looking for back pay
22   compensation.

Page 237

1    Q.   And why does that make this e-mail less
2    credible?
3    A.   Because this chapter is always looking for
4    additional compensation for doing their duties.
5    Throughout the migrant issues, they have always wanted
6    more officers on overtime for what they believe are
7    unsafe working conditions.  So I disagree with his
8    first two paragraphs, and his assessment as to the
9    metering and what it's doing to the asylum seekers,
10   but I agree that we have to work with the union on
11   enhancing the working conditions.
12        I do not agree with the remedy always being
13   bring more officers on and pay them over time.
14   Q.   Would it surprise you -- so you disagree
15   that -- sorry.  Let me ask a better question.
16        You disagree that CBP was breaking federal
17   immigration law, correct?
18   A.   I disagree.
19   Q.   And you specifically disagree that CBP was
20   breaking federal immigration law when it implemented
21   the metering policy, correct?
22   A.   The metering policy was implemented for



Page 238

1  operational concerns.  I do not believe it was
2  breaking federal law.
3      Q.   Okay.  And would it surprise you to know
4  that other CBP officer, front-line officers, also had
5  concerns?
6      A.   No.
7      Q.   About breaking -- about the metering policy
8  breaking the law?
9      A.   No.  It would not surprise me.
10     Q.   In fact you know that other CBP front-line
11 officers had concerns that the metering policy broke
12 the law?
13     A.   Yes.
14     Q.   You know that there was a whistleblower in
15 the Tecate Port of Entry who raised concerns about the
16 metering policy breaking the law?
17     A.   Yes.
18     Q.   And you know that there was a DHS OIG
19 investigation of that, correct?
20     A.   Correct.
21     Q.   And you were contacted as part of that
22 investigation, correct?

Page 239

1      A.   I don't believe I was contacted as part of
2  that investigation.  I have seen the report.
3      Q.   And you know that DHS OIG did conclude that
4  part -- that as part of the way the metering policy
5  was implemented at the Tecate Port of Entry, that that
6  implementation broke the law?
7      A.   That implementation was not directed by
8  management.  And the OIG report found it was not the
9  standard protocols for the agency.
10     Q.   Let me ask you a question.  Do you take
11 responsibility for -- ultimate responsibility for what
12 happens at the ports of entry?
13     A.   Do I take ultimate --
14     Q.   Yeah.  For the actions of your officers?
15     A.   I am not -- I am the leader of field
16 operations.  And when our officers engage in
17 misconduct, they are held accountable for it.  As
18 those officers that have improperly returned people
19 back into Mexico after having been on U.S. soil, those
20 cases go to the OIG to OPR for investigation.  And if
21 found valid, they are held accountable.
22     Q.   Do you take responsibility for -- do you

Page 240

1  take responsibility for instances where the metering
2  policy was implemented in ways that broke the law?
3      A.   Do I take -- my direction was very clear.
4  And I do not take responsibility for the 30,000
5  officers that work under me if they do not follow the
6  guidance of the policies.
7      Q.   Let me ask you, the concerns that are
8  raised in the first paragraph of this e-mail from
9  William Haralson to David Higgerson, have those
10 concerns been investigated by anyone at CBP, to your
11 knowledge?
12     A.   I'm not quite sure I even understand what
13 his concerns are.  I mean, that we --
14     Q.   Well, Mr. Haralson is concerned that the
15 metering policy as it was implemented at the Hidalgo
16 Port of Entry broke the law and had a chilling effect
17 on others trying to attempt to enter the U.S.
18     Do you know whether the Office of
19 Professional Responsibility, the Office of the
20 Inspector General, or anyone else at DHS or CBP ever
21 investigated the allegation made in the first
22 paragraph of this e-mail?

Page 241

1      A.   This specific allegation on Hidalgo, I do
2  not know.
3      Q.   Do you know whether anybody who -- at CBP
4  has ever disproven the allegations in the first
5  paragraph of this e-mail?
6      A.   To disprove whether or not our process had
7  a chilling effect on migrants, I don't know that.
8      Q.   You don't know as you sit here today
9  whether the metering policy had a chilling effect,
10 right?
11     A.   I do not.
12     Q.   You don't know as you sit here today
13 whether the metering policy had a deterrent effect, do
14 you?
15     A.   I know what our statistics show, and that
16 the migrants, 126,000 last year, were not deterred,
17 were not chilled.  They came in.  They were not
18 discouraged from crossing.
19     Q.   Isn't it the case that CBP actually
20 investigated whether the metering policy had a
21 chilling -- had a deterring effect?
22     A.   It's not aware of that.

MAGNA
LEGAL SERVICES

Page 242

1    Q.    Were you ever read into any sort of effort
2  to do that?
3    A.    Not that I recall.  No.
4    Q.    Would it surprise you if CBP officers were
5  investigating that issue?
6    A.    CBP officers.
7    Q.    Yes.
8    A.    You mean the Office of Professional
9  Responsibility.
10   Q.    No, just line -- people --
11   A.    Line officers?
12   Q.    -- people in the field in the San Diego
13  field office.
14   A.    That they were investigating that?
15   Q.    Yeah.
16   A.    I'm not aware of that.
17   Q.    Would it surprise you if they were?
18   A.    It would, because it's not our role.  Our
19  role when we suspect misconduct is to refer that to
20  the OPR and to OIG.
21   Q.    So that would have been beyond their role
22  to do that sort of investigation in your view?

Page 243

1    A.    Unless it was one of our integrity officers
2  in the port.
3                    -  -  -
4           (A document was marked as Deposition
5  Exhibit Number 47.)
6                    -  -  -
7    BY MR. MEDLOCK:
8    Q.    Sir, I'm showing you a multi-page document.
9  And I apologize I didn't print the Bates numbers on
10  this, but I'll represent to you begins with the
11  AOL-DEF-00205672 and is designated highly
12  confidential.
13          Sir, can you take a moment to review this
14  document and let me know when you are done with it.
15          Sir, have you finished reviewing it?
16   A.    Not yet.
17   Q.    Okay.  Sorry.
18   A.    Okay.
19   Q.    All right, sir.  I'm focused on the second
20  and third pages of the document.  That's a copy of a
21  July 3, 2018 e-mail from Eddy Arias to Johnny Armijo,
22  correct?

Page 244

1    A.    Yes.
2    Q.    And we already talked about Johnny Armijo.
3  He works in the San Diego field office, correct?
4    A.    Yes.
5    Q.    And Eddie Arias at the time was with CBP
6  Border Security program manager, TAU, in the San Diego
7  field office, correct?
8    A.    According to the e-mail.
9    Q.    And what does TAU stand for?
10   A.    Tactical Analysis Unit.
11   Q.    Okay.  And what's the Tactical Analysis
12  Unit do?
13   A.    They are a -- help target and do intel-type
14  research in things.
15   Q.    And when he's talking about intel, this is
16  developing some of the intel information that would
17  feed into the meeting the SCIF?
18   A.    No.  No.  This is more tactical information
19  rather than intel, so identifying, you know,
20  shipments, loads, individuals, those types of things.
21   Q.    Okay.
22   A.    It's not classified information like we

Page 245

1  have at the SCIF.
2    Q.    Okay.  So the e-mail begins:  Sir, as
3  requested over the past week, I have worked towards
4  gauging the overall sentiment of subjects detained at
5  the San Ysidro SYS Port of Entry.  My goal was to
6  determine what effect, if any, are measures such as,
7  quote, unquote, zero tolerance, end quote, metering,
8  end quote, implemented by U.S./CBP making on subjects
9  attempting entry either illegally or through the
10  credible fear/asylum process.
11          Did I read that correctly?
12   A.    Yes.
13   Q.    And then in the next paragraph Mr. Arias
14  states that he reviewed 75 detainee I-213 interview
15  narratives, correct?
16   A.    Correct.
17   Q.    What's an I-213 interview narrative?
18   A.    It's one of the immigration forms.  It's
19  the Q&A, the question and answer.
20   Q.    And then he also states that he spoke with
21  deferred inspections officers from the San Ysidro AEU,
22  correct?

Page 246

1    A.   Yes.
2    Q.   That's the Admissibility Enforcement Unit
3  in San Ysidro?
4    A.   Part of it.  Yes.
5    Q.   And then he goes on to say, quote, I assess
6  that the Mexican, Honduran, El Salvadorian, and
7  Guatemalan citizen sentiment detained at the POE is
8  unshaken.  Detainees did not claim fear of inspection,
9  possible separation of family units, and long wait
10 times in Mexico as deterrent factors.
11       Did I read that correctly?
12   A.   Yes.
13   Q.   Are you surprised to see that in July 2018
14 officials in the San Diego field office were
15 investigating whether there -- whether the metering
16 policy had a deterrent factor?
17   A.   Well, they are also talking about zero
18 tolerance, which in July 2018 was in the high point of
19 family separation activities that were taking place.
20   Q.   I get that, but they are also talking about
21 metering.
22   A.   They are.

Page 247

1    Q.   And they are also talking about whether
2  long wait times in Mexico are a deterrent factor,
3  right?
4    A.   Correct.
5    Q.   Does that surprise you?
6    A.   It does surprise me.
7    Q.   And you weren't read into that effort, were
8  your?
9    A.   No, not that I recall.  No.
10   Q.   Did anybody ever report up to you about
11 anything relating to this apparent study done by the
12 TAU?
13   A.   No.  This is the first time that I recall
14 seeing this.
15   Q.   Okay.  Do you know Elizabeth Kingma is?
16   A.   No.
17   Q.   I'll represent to you that Elizabeth Kingma
18 is a investigator with the Office of Inspector General
19 at the Department of Homeland Security.  Okay?
20   A.   Okay.
21   Q.   All right.  Mark the next exhibit.
22       - - -

Page 248

1        (A document was marked as Deposition
2  Exhibit Number 48.)
3        - - -
4    BY MR. MEDLOCK:
5    Q.   And while you look at 48, sir, I just want
6  to explain a couple things to you.  Have you ever
7  marked up a PDF before, sir?
8    A.   If I've marked up a PDF?
9    Q.   Right.  Ever made comments on a PDF?
10   A.   Ever?
11   Q.   Yeah.
12   A.   Like in the computer, like adding a
13 footnote --
14   Q.   Yeah, in the course of your work?
15   A.   I guess I have.
16   Q.   You see how there's in the -- in Exhibit 47
17 there's some highlighting and there's some comment
18 bubbles underneath some of the paragraphs?
19   A.   Yes.
20   Q.   All right.  And there's actually sort of a
21 comment bubble right off of the phrase, the phrase
22 deterrent factor is underlined, and there's a comment

Page 249

1  bubble next to it?
2    A.   Yes.  Okay.
3    Q.   Okay.  So I'm back on 48, and I'll
4  represent to you this is the metadata taken from this
5  document, AOL-DEF-00205672.  Okay.  And I am on page 3
6  of the metadata sheet in front of you.  Do you see
7  that?
8    A.   Yes.
9    Q.   Page 3?
10   A.   Page 3.
11   Q.   And confusingly, halfway -- more than
12 halfway down the bottom of the page it says, Page 2 of
13 3. Do you see that?
14   A.   Yes.
15   Q.   Okay.  And there's something that says
16 "annotations," correct?
17   A.   Yes.
18   Q.   And it says "Author, Kingma, E," do you see
19 that?
20   A.   Yes.
21   Q.   And it says created on, 3/31/2019, 3:56
22 p.m.?



Page 250

1    A.   Okay.
2    Q.   Then it says "contents." Do you see that?
3    A.   Yes.
4    Q.   And that section reads, Deterrents, hmm.
5    H-M-M. Could CBP have several goals for queue
6    management? Slowing intake to reasonable levels and
7    deterrents. Did I read that correctly?
8    A.   Yes.
9    Q.   And if -- so it appears that someone named
10   Elizabeth Kingma marked up this e-mail and asked
11   whether one of the goals of queue management was
12   deterrents, correct?
13   A.   Correct.
14   Q.   And that occurred on March 31, 2019,
15   correct?
16   A.   Correct.
17   Q.   So, and were you made aware at all that the
18   Office of Inspector General at DHS had questions about
19   whether one of the motivations for the queue
20   management or metering policy was deterrents?
21        MS. SHINNERS: Objection. This is quite
22   clearly an OIG document. I just want to make --

Page 251

1        MR. MEDLOCK: I'm asking whether he's aware
2    of that.
3    A.   I don't recall being aware of anything like
4    that with OIG.
5        BY MR. MEDLOCK:
6    Q.   Did anyone in your reporting or command
7    structure ever tell you whether -- ever tell you that
8    there were questions being asked about whether one of
9    the purposes of the queue management or metering
10   policy was deterrents?
11   A.   Well, you showed me an e-mail earlier from
12   one of my staff that said deterrents was named.
13   Q.   Right.
14   A.   So I can't -- I can't say for certain that
15   I haven't received some documents for folks that have
16   expressed concern. But I know why the policy was set
17   up, and deterrents was not why the policy was set up.
18   Q.   Right. So you -- but can you just help me
19   out here and explain if deterrents isn't one of the
20   reasons why the policy is set up, why is Eddie Arias
21   going through the AEU at San Ysidro and asking people
22   whether they were deterred by long waits in Mexico?

Page 252

1        MS. SHINNERS: Objection. Foundation,
2    knowledge.
3    Q.   I'm asking whether he know.
4    A.   I don't know. I don't know who Eddy Arias
5    is. I don't know the reason to start that inquiry. I
6    don't know.
7    Q.   And he was reporting to Johnny Armijo,
8    correct?
9    A.   Correct.
10   Q.   You do know Johnny Armijo?
11   A.   I do know Johnny Armijo.
12   Q.   Do you trust Johnny Armijo's work?
13   A.   Yes.
14   Q.   Do you think he's a good CBP officer?
15   A.   I do.
16   Q.   And do you -- and Johnny Armijo just never
17   brought this up with you, correct?
18   A.   He is several steps down below my chain of
19   command. He's never brought this up to me.
20   Q.   Do you know for what purpose Mr. Arias and
21   Mr. Armijo exchanged this e-mail about whether long
22   wait times in Mexico were a deterrent factor?

Page 253

1        MS. SHINNERS: Objection to the
2    characterization of the document.
3    A.   I do not know. I don't know.
4    Q.   So as you sit here today, this is the first
5    time you have ever scene this e-mail, correct?
6    A.   Correct.
7    Q.   And you don't have an explanation for why
8    the TAU and the San Diego field office was looking at
9    whether the metering policy had a deterrent factor do
10   you? You don't have an explanation for that?
11   A.   No.
12   Q.   And you don't have an explanation for why
13   someone named Elizabeth Kingma in March 31, 2019 was
14   asking whether the queue management policy, one of the
15   purposes of the queue management policy was
16   deterrents, do you?
17   A.   No. I mean, lower-level employees
18   throughout the agency, throughout OIG have their
19   views. My policy memo from April of 2018 is very
20   clear.
21   Q.   Okay. So let me get this straight. You
22   believe your policy memo is clear, correct?



Page 254

1    A.   I do.
2    Q.   But you received e-mails saying -- that
3  indicated to you that some people that purported to
4  you thought that the policy had a deterrent effect,
5  correct?  We looked at that e-mail earlier.
6    A.   Right.  From that e-mail, I recall that.
7    Q.   And you were getting questions from CRCL
8  about whether one of the purposes for the metering
9  policy was deterrents, correct?
10   A.   CRCL was investigating that.  I was not
11 getting questions from that.
12   Q.   There was an investigation.  You knew that?
13   A.   From CR.  Right.
14   Q.   And you also knew that there was a DHS OIG
15 investigation about the metering policy in 2018, 2019,
16 correct?
17   A.   I'm aware there was a review about how the
18 policy was implemented and the misconduct of some
19 officers, not if it had a deterrent effect.
20   Q.   And you now know there was also an e-mail
21 sent in 2017 by someone with the NTEU chapter claiming
22 that the metering policy broke the law, correct?

Page 255

1    A.   In their view, yes.
2    Q.   And you also know that somebody named
3  Elizabeth Kingma was raising questions about the
4  purpose of the --
5    A.   Based on the documents you just provided
6  me, yes.
7    Q.   And your -- but despite all of that, you
8  believe your policy was crystal clear?
9    A.   I do.
10   Q.   Okay.  Got it.  All right.  Let's go to the
11 next document.
12        Are you good?  Do you need a break?
13   A.   No, I'm good.
14              -  -  -
15       (A document was marked as Deposition
16 Exhibit Number 49.)
17              -  -  -
18   BY MR. MEDLOCK:
19   Q.   Sir, I've marked as Exhibit 49 a multi-page
20 e-mail attachment that begins with NTEU-000110 and
21 goes all the way to NTEU-000126.
22        Take a moment to review the document.  Let

Page 256

1  me know when you have finished doing so.
2    A.   Okay.
3    Q.   All right, sir.  You've seen a copy of this
4  e-mail before?
5    A.   I believe I have.
6    Q.   And when I say "this e-mail" I'm referring
7  to the March 19, 2019 e-mail from David Atkinson to
8  Kevin McAleenan with William Haralson and Romualdo
9  Iglesias, Jr. copied.  Do you see that e-mail, sir?
10   A.   Yes, sir.
11   Q.   And the subject line of that e-mail is
12 safety alert, slash, rule clarification?
13   A.   Correct.
14   Q.   And you would have -- you received that
15 e-mail in the course of your duties at CBP, correct?
16   A.   I believe either I received this from
17 Mr. McAleenan or I may have received it from the
18 national NTEU.
19   Q.   Okay.  But either way, you received it in
20 the course of your duties?
21   A.   I do recall seeing this.  Yes.
22   Q.   Okay.  And you would have received it on or

Page 257

1  around March 19, 2019?
2    A.   Generally speaking.
3    Q.   Give or take?
4    A.   Give or take.  Yeah.
5    Q.   And at the time you received the e-mail,
6  you would have read it and understood it, correct?
7    A.   Yes.
8    Q.   And from looking at the e-mail and
9  attachment, the e-mail attachment appears to be true
10 and correct; is that right?
11   A.   Best as I can recall.  Yes.
12   Q.   Okay.  Do you think David Atkinson is a
13 problem employee?
14   A.   He is the same chapter as the last e-mail
15 you showed me.  Yes.
16   Q.   Do you think he's a liar?
17   A.   I question his assessments.  Yes.  I think
18 he misleads.
19   Q.   Question his veracity?
20   A.   Define veracity.
21   Q.   It's another fancy -- it's a 25 cent way of
22 asking do you think he's a liar?

MAGNA
LEGAL SERVICES

Page 258

1    A.   I think he misleads.  Yes.
2    Q.   So, I mean, we looked at the CBP ethics
3  policy earlier.  How many times has -- it's a
4  violation of the ethics policy to lie, correct?
5    A.   Correct.
6    Q.   And mislead, correct?
7    A.   Correct.
8    Q.   Do you think he's an unethical officer?
9    A.   Do I think he's an unethical officer.
10   Q.   Yes.
11   A.   Yes.
12   Q.   How many times to your knowledge has David
13 Atkinson been reprimanded for violating the CBP ethics
14 policy?
15   A.   I don't have that data.
16   Q.   Would it -- do you have any information as
17 you sit here today that he's ever been reprimanded?
18   A.   I don't.  I know he's received cease and
19 desist orders on things.
20   Q.   Did he receive a cease and desist order for
21 this e-mail?
22   A.   Not that I'm aware of.

Page 259

1    Q.   When you say he's received cease and desist
2  orders from a court or from officials at CBP?
3    A.   From his leadership at CBP.
4    Q.   When you say cease and desist order, is it
5  the leadership asked him to stop doing certain things?
6    A.   Certain things, yes, in terms of his
7  conduct towards other employees
8    Q.   Okay.  Did the leadership at CBP ever ask
9  Mr. Atkinson to stop making complaints?
10   A.   No.  No.  The cease and desist was in his
11 relationship to how he was engaging with other
12 employee.
13   Q.   All right.  Let's look at the e-mail that
14 Mr. Atkinson sent to Mr. McAleenan.  It reads, the
15 first paragraph, quote, First, the port of Hidalgo,
16 Texas employees would like a written order provided to
17 them that mirrors their instructions to return
18 individuals who enter the U.S. And request asylum
19 back to Mexico without appointment for a future
20 appointment.  The Agency is allowing the Mexican
21 officials to create a list and detention area mid
22 bridge to facilitate who would be next to enter the

Page 260

1  United States from that detention site on the Mexican
2  side which is under the control and direction of CBP
3  officers on the U.S. side.
4        Did I read that correctly?
5    A.   Yes.
6    Q.   Do you agree with anything in that
7  paragraph?
8    A.   Do I agree with anything in this paragraph.
9    Q    Yeah.
10   A.   I believe the Mexican officials did create
11 a list on the other side of Hidalgo.
12   Q.   So that at least is accurate as far as
13 you --
14   A.   Right.  I mean, they did request a written
15 order on our policy.  That's accurate.
16   Q.   Anything else?
17   A.   Well, just again when he says, Return
18 individuals who enter the U.S, if again they have
19 crossed over into the U.S. they are not to be
20 returned; I don't know if he means actually entered or
21 just at the limit line.  I don't know where he's going
22 with that.

Page 261

1    Q.   Okay.  so you may disagree with that, you
2  may not.  You just don't understand his phrasing; is
3  that right?
4    A.   I know that, again, it's against policy to
5  return folks who have already crossed into the U.S.  I
6  don't know if that's what he is meaning.
7    Q.   And Mr. Atkinson states that there were
8  instructions to return individuals who enter the U.S.
9  And request asylum back to Mexico, correct?
10   A.   That's what his e-mail says.
11   Q.   If that occurred, that was a violation of
12 your metering policy, correct?
13   A.   If they had already stepped foot in the
14 United States.  If they were still at the limit line
15 and we were beyond capacity, to tell them at that
16 point to return to Mexico would not violate the
17 metering policy.
18   Q.   Right.  In fact that's what the policy sort
19 of describes, right?
20   A.   That's what it describes.
21   Q.   So you don't -- we can go back to this
22 e-mail for a second.  I just want to make sure I

ER 01155



Page 262

1 understand it. We don't dispute a couple facts here.
2 We don't -- you don't dispute that officers
3 are placed -- have been placed at the limit line of
4 ports of entry on the southwestern border, right?
5     A.   No.
6     Q.   You don't dispute that those officers have
7 been instructed, per your memorandum, to state that
8 the port is at capacity and that people should come
9 back at a later time, correct?
10    A.   Correct.
11    Q.   And you don't dispute that individuals who
12 come to the actual boundary between the U.S. And
13 Mexico are told that by CBP officers, and as a result
14 return to Mexico, correct?
15    A.   At the limit line, if we are beyond
16 capacity, they are told to return to Mexico, and we
17 will process them when we have capacity, if that's
18 what you are asking.
19    Q.   Right.  There's no dispute about those
20 facts, right?
21    A.   No, but again, at the limit line.
22    Q.   Right.

Page 263

1     A.   If they have stepped into the U.S., that's
2 different.
3     Q.   Right.  Right.  So if somebody is at the
4 limit line but on Mexican soil --
5     A.   Correct.
6     Q.   -- CBP officers are instructed to engage in
7 metering per your policy which would include telling
8 people that the port is at capacity and that they
9 should return at a later date, correct?
10    A.   That's right.
11    Q.   Okay.  I just want to make sure that we
12 have that correct.  Okay.  Let's go back to the memo,
13 to the e-mail for a second.
14         If people actually stepped foot on -- if
15 asylum seekers actually stepped foot on U.S. soil and
16 were returned back to Mexico, you would agree with me
17 that it violates your policy, right?
18    A.   The policy says that.
19    Q.   And to your understanding it would also
20 violate the law, right?
21    A.   To my understanding, yes.
22    Q.   Okay.  And so you may or may not dispute

Page 264

1 the phrasing of what Mr. Atkinson is actually saying
2 in this first paragraph.  It just depends on what he
3 means by entering, correct?
4     A.   Correct.
5     Q.   But if he is saying that people actually
6 step foot on U.S. soil, you would dispute that?  You
7 would dispute that that was actually occurring at the
8 Hidalgo Port of Entry?
9     A.   I can't speak to what happened on March 19
10 at the Hidalgo Port of Entry.
11    Q.   Okay.
12    A.   I'm saying is if they step foot at any port
13 into the United States, they are to be brought in and
14 be processed.
15    Q.   Okay.  And one of the reasons that Mr.
16 Atkinson was asking for a written order was he
17 apparently believed that your April 2018 memorandum
18 was unclear?
19         MS. SHINNERS:  Objection.  Calls for
20 speculation.  You can answer.
21    A.   I don't know why he wanted more than what
22 we have already put out.

Page 265

1     Q.   Okay.  Let's move to the page that ends in
2 115.  That is a letter that appears to begin with a
3 "To Whom It May Concern," correct?
4     A.   Correct.
5     Q.   It's dated March 6, 2019?
6     A.   Yes.
7     Q.   And there's heading at the top that says,
8 CBP Officers, U.S. Customs and Border Protection, U.S.
9 Port of Hidalgo, Texas.  Do you see that?
10    A.   Yes.
11    Q.   You reviewed this attachment at the time
12 that you also reviewed the e-mail that was sent to Mr.
13 McAleenan, correct?
14    A.   I believe so.
15    Q.   Okay.  And the "To Whom It May Concern"
16 letter reads, "We CBP officers assigned the port of
17 Hidalgo, Texas, have been ordered by CBP supervisors
18 to inspect persons seeking, slash, requesting asylum
19 status near the middle of the United States-Mexico
20 bridge in Hidalgo, Texas, on the U.S. side."
21         Did I read that correctly?
22    A.   I'm sorry.  On the U.S. side.  Yes.



Page 266

1      Q.   And that's a correct statement of the
2  metering policy, correct?  Of how it's supposed to
3  operate?
4      A.   Operate at the limit line which is
5  generally in the middle of the bridges.
6      Q.   Okay.  And the next sentence "reads, We are
7  posted mere feet into the U.S. from the U.S.-Mexico
8  border line, and are intercepting and immediately
9  preventing asylees who request asylum entering the
10  United States.
11        Did I read that correctly?
12     A.   Yes.
13     Q.   Is that how the metering policy is supposed
14  to work?
15     A.   Immediately preventing asylees.
16     Q.   Yes.
17     A.   If we were at capacity, we are to direct
18  the asylees to go back to Mexico, remain in the
19  shelters until we have capacity.
20     Q.   So it may not be phrased the way that you
21  want but --
22     A.   Well, I would not use the word preventing.

Page 267

1      Q.   Okay.  But that's just a word choice issue,
2  correct?
3      A.   But I think preventing gives the wrong
4  connotation.
5      Q.   Right.  It does, doesn't it?
6      A.   It does.
7      Q.   Because you wouldn't view immediately
8  preventing asylees as the purpose of your metering
9  policy, correct?
10     A.   I would not.
11     Q.   But the officers who signed this letter
12  appeared to believe that that was a purpose of the
13  metering policy?
14     A.   The officers who signed this letter were
15  more concerned with the safety of being now posted mid
16  bridge.
17     Q.   Not my question.
18     A.   Well --
19     Q.   My question is these officers used the
20  phrase "immediately preventing asylees," correct?
21     A.   That's the term they used.
22     Q.   And they have -- it appears that these

Page 268

1  officers believed that immediately preventing asylees
2  from entering the U.S. was a purpose of the metering
3  policy, correct?
4      A.   I don't know if that's -- they believe that
5  was the purpose.
6      Q.   But anyone who read your metering policy
7  should not have come away with the impression of it
8  was immediately preventing asylees from entering the
9  U.S., right?
10        MS. SHINNERS:  Objection.
11     Q.   You never wanted to convey that sentiment;
12  is that right?
13     A.   Metering has never been designed to be a
14  deterrent.
15     Q.   Can you explain to me why these officers
16  who are implementing the metering policy at the
17  Hidalgo point of entry believe that it is being used
18  to intercept and immediately prevent asylees who
19  request asylum from entering the U.S.?
20     A.   I don't believe this is an accurate
21  reflection of the policy or what's taking place.
22     Q.   Do you think these officers are being

Page 269

1  inaccurate in their statements?
2      A.   I think these officers signed a petition
3  provided to them by their union chapter president.
4      Q.   Do you think that these officers were
5  forced to sign this?
6      A.   No.
7      Q.   Do you think that these officers have free
8  will?
9      A.   Yes.
10     Q.   Do you think these officers have the
11  ability to decide that they didn't agree with this and
12  didn't want to sign it?
13     A.   Yes.
14     Q.   Do you think that the officers who signed
15  this letter agreed with the statements in it?
16     A.   I believe so.
17     Q.   Can you explain to me why the 187 officers
18  who signed this letter had the impression that the
19  metering policy was designed to immediately prevent
20  asylees from entering the U.S.?
21        MS. SHINNERS:  Objection, foundation.
22     Q.   So how many -- will you take my word for it

MAGNA
LEGAL SERVICES

Page 270

1 that 187 officers signed this?
2     A.   Okay.
3     Q.   I counted it, but do you have any reason to
4 dispute that?
5     A.   No.
6     Q.   And have you spoken to any of these
7 officers?
8     A.   No.
9     Q.   Have you attempted to ask them what -- why
10 they would come away with the impression that
11 immediately -- that the metering policy was designed
12 to immediately prevent asylees from requesting asylum
13 in the U.S.?
14     A.   I have not spoken with these officers.
15     Q.   So you don't know where they got this
16 phrase "immediately preventing asylees who request
17 asylum from entering the U.S."?
18     A.   I know the policy doesn't say that.
19     Q.   And you can't explain why 187 officers
20 would sign a letter indicating that that's how the
21 policy was being implemented?
22     MS. SHINNERS:  Same objection.  Foundation.

Page 271

1     A.   I don't know why they would sign this memo.
2     Q.   So --
3     A.   But I know from the e-mail that is attached
4 to this, there are other issues at play here besides
5 simply the metering.
6     Q.   Do you think these officers are just out
7 to get some back pay, these 187 officers?
8     A.   I think these officers don't like being
9 stationed mid bridge.  I think they feel that more
10 needs to be done mid bridge.  And I also do believe
11 they want more officers on overtime at mid bridge.
12     Q.   So you think these 187 officers are just
13 out for some more overtime?
14     A.   I think there's a lot of reasons behind why
15 they are unhappy with being stationed mid bridge.
16     Q.   Do you think these 187 officers have
17 legitimate concerns about their safety?
18     A.   Legitimate concerns about their safety mid
19 bridge, yes.  And we have worked with national union
20 and we've worked to address the safety issues mid
21 bridge.
22     Q.   Is officer safety a priority for you --

Page 272

1     A.   Yes, it is.
2     Q.   -- at the --
3     A.   Yes, it is.
4     Q.   And it's something you want to try to
5 guarantee as best you can --
6     A.   Yes.
7     Q.   -- correct?  So isn't it true that when the
8 metering policy was rolled out, there were concerns
9 about office safety at multiple ports of entry?
10     A.   There were.
11     Q.   There were concerns at the Tecate Port of
12 Entry, correct?
13     A.   I don't recall Tecate, but there were
14 concerns at multiple ports expressed.
15     Q.   And there certainly were concerns at
16 Hidalgo, correct?
17     A.   At the -- particularly in the Laredo area
18 where the bridges are long.  Yes.
19     Q.   Was the metering policy rolled out before
20 the officer safety aspect of putting people at mid
21 bridge could be fully considered?
22     A.   No.  Metering policy, again, began in 2016.

Page 273

1 It was when we started stationing officers at the
2 limit line.  That is what caused some greater concern
3 for officer safety.
4     Q.   So you didn't know about the officer safety
5 concerns until officers were put at the limit line,
6 right?
7     A.   Until officers started raising their
8 concerns, yes.
9     Q.   If a -- if you learned the metering policy
10 was causing concerns about officer safety, and officer
11 safety was a paramount concern for yourself, why not
12 pull back the policy and say we are going to work it
13 out so that we can do this safely, and then we'll roll
14 it out again?
15     A.   Because we addressed the physical safety
16 aspects of what their concerns were.  And working with
17 the national chapter at all of the crossings, we
18 addressed, location by location, safety aspects to
19 address their concerns.  We built protection booths,
20 if you will.  We had vehicles out there.
21     We have the heaters, the lighting.  All of
22 the efforts that are needed to enhance officer safety



Page 274

1  at the limit line was the direction we went. We did
2  not pull back the policy. We enhanced the officer
3  safety.
4     Q.   That happened after the metering policy was
5  rolled out, correct?
6     A.   The metering policy again started in 2016.
7  These concerns came up when we started posting
8  officers mid bridge. And we have worked to address
9  those issues since that time.
10    Q.   If you are going to roll out a new policy,
11 why not look at officer safety first and then
12 implement the policy? Why do it backwards?
13    A.   We were facing a crisis with the level of
14 migrants that were coming in. We were overwhelmed.
15 What we did in 2016 also created officer safety issues
16 when we brought in as many migrants as we physically
17 could, when we converted conference rooms to provide
18 them space, when we allowed them to stay outside of
19 the doors of the offices and defecate all over the
20 property. That was creating officer safety issues
21 too. So we had to take actions then.
22           And we were not going to repeat the

Page 275

1  conditions that existed in 2016 when the migrants
2  started surging again in 2018. So there are no easy
3  answers when you implement these policies in the
4  ports.
5     Q.   There are no easy answers but you still
6  have to follow the law, right?
7     A.   And we do follow the law.
8     MS. SHINNERS:  I think it's time for a
9  break.
10    MR. MEDLOCK:  Do you need a break, sir?
11    THE WITNESS:  I do need a break.
12    MR. MEDLOCK:  Okay.
13          - - -
14    (Recessed at 3:11 p.m.)
15    (Reconvened at 3:25 p.m.)
16          - - -
17 BY MR. MEDLOCK:
18    Q.   All right, sir. You still have --
19    A.   Yes.
20    Q.   -- the current exhibit in front of you,
21 sir. I want to direct your attention to the e-mail
22 from David Atkinson, and specifically the picture that

Page 276

1  appears on the fourth page of the e-mail with the what
2  appears to be sort of grainy picture of a secondary
3  inspection area. Do you see that, sir?
4     A.   Okay.
5     Q.   Does that -- is that a secondary inspection
6  area at Hidalgo, do you know?
7     A.   I mean it -- it could be. It could be the
8  permit area.
9     Q.   Okay.
10    A.   I mean, it could be.
11    Q.   You are not clear as you look -- I gather
12 it's a bad photo, but you can't tell where it's taken?
13    A.   I can't tell. No, sir.
14    Q.   Okay. And below that it says, Chairs
15 reduced to minimize the amount of persons held in the
16 seating area, leaving a huge blank space.
17          Did I read that correctly?
18    A.   Okay.
19    Q.   Are you aware of any effort to reduce the
20 number of chairs at the Hidalgo Port of Entry to
21 reduce the throughput of the port?
22    A.   No. I'm aware we changed some of the

Page 277

1  secondary areas because we had absconders. And we
2  took measures such as moving chairs, reducing chairs,
3  adding specialized locks to the doors to reduce the
4  absconders.
5     Q.   Okay. So there was a time period in which
6  the number of chairs in the port facility were
7  reduced; is that right?
8     A.   I remember there was issues with absconders
9  at Hidalgo. And port management took measures to
10 address that. I don't know if that included removing
11 chairs or what.
12    Q.   My question was -- I think you just said
13 there was an absconder issue and there were --
14    A.   Right. And they reconfigured areas.
15    Q.   They reconfigured the space. And as part
16 of the reconfigures of space is that chairs were
17 removed from them; is that right?
18    A.   Well, they reconfigured space; they added
19 additional security measures to prevent the
20 absconders. I can't attest whether or not they
21 removed chairs as part of that reconfiguration.
22    Q.   So you can't tell me one way or the other

Page 278

1  whether this sentence about removing chairs is
2  accurate?
3      A.  No.
4      Q.  Okay.  Do you ever investigate whether that
5  was accurate?
6      A.  No.  I did not investigate whether chairs
7  were removed.
8      Q.  Did you ever ask anyone to do so?
9      A.  No.
10     Q.  Did you think it was part of your duty as
11 the EAC and oversees more than 20,000 law enforcement
12 officers to determine whether this statement was true?
13     A.  No.  This would be a relatively local
14 matter if somebody removed chairs from a holding area.
15     Q.  And so it just didn't have any significance
16 in your mind?
17     A.  No.
18     Q.  It was a local issue?
19     A.  It did not rise up to my level to
20 investigate whether some chairs were removed.
21     Q.  So you just didn't review determining
22 whether this was accurate or not as your

Page 279

1  responsibility?
2      A.  I did not.  No.
3      Q.  And then the next page, page 5, there's a
4  picture that appears to be of some workstations.  Do
5  you see that?
6      A.  Yes.
7      Q.  And then there's -- it look likes there's
8  no one sitting at any of those workstations, correct?
9      A.  That's correct.
10     Q.  And beneath that it says, No officer
11 stationed to process work at 10:00 to 11:00 p.m.  And
12 only for employees to process family unit credible
13 fear cases.  Did I read that correctly?
14     A.  Yes.
15     Q.  Did you do anything to investigate whether
16 this picture of and the sentence below it are
17 accurate?
18     A.  No.  I don't investigate staffing levels on
19 a particular shift.
20     Q.  Did you ask anyone to look into whether
21 this photo was accurate?
22     A.  No.

Page 280

1      Q.  Do you know whether Commissioner McAleenan
2  did?
3      A.  I don't know if he did.
4      Q.  Do you know whether Commissioner McAleenan
5  ever asked whether the number of chairs had been
6  reduced?
7      A.  I find it highly unlikely that at the
8  commissioner's level he would be asking about the
9  number of chairs in a waiting area.
10     Q.  Did he ever staff anyone to do that
11 investigation?
12     A.  Not to my knowledge.
13     Q.  Did you?
14     A.  No.  I mean, again, when we have
15 allegations of alleged misconduct, I would refer that
16 to the JIC.  With this specific instance where the
17 chairs were removed, or why there was no officers from
18 10:00 to 11:00 in this particular work unit, I would
19 not investigate that.
20     Q.  Would you refer this issue to the JIC?
21     A.  No.
22     Q.  Did you do that?

Page 281

1      A.  No, I did not.
2      Q.  Do you know whether Commissioner McAleenan
3  did?
4      A.  I do not.
5      Q.  Do you know if anyone referred this issue
6  to the Joint Intake Center, or JIC?
7      A.  I don't know if anything was referred.  I
8  don't know if any local efforts were taken.
9      Q.  Did you ever talk just informally to David
10 Higgerson to determine whether these photos and the
11 statements below them were true?
12     A.  I did not speak to David Higgerson about
13 the staffing from 10:00 to 11:00, or the number of
14 chairs.  I did speak to David Higgerson about the
15 overall safety issues at the limit line.
16     Q.  So the allegations about no officers being
17 stationed at the workstation, and the number of chairs
18 being reduced are, in your view, local issues that
19 don't raise to your level?
20     A.  Yes.
21     Q.  And you don't take responsibility for
22 determining whether these statements are true or



Page 282

1  accurate, correct?
2      A.  In this form, correct.
3      Q.  All right.  Now back on page 1 of
4  Mr. Atkinsons' e-mail, and I'm looking at the second
5  paragraph.  It reads, "The employees would like you to
6  provide them the proper authority and sections of law
7  that allows them to detain these asylum seekers on the
8  Mexican side and prevent them from entering the U.S.
9  after presenting themselves for inspection and
10  requesting asylum.  The employees would like something
11  in writing to protect their ordered activities as the
12  Agency is claiming publicly that they are not
13  conducting these activities when they really are."
14          Did I read that correctly?
15      A.  You read it correctly.
16      Q.  Do you have any understanding of what the
17  phrase, "the Agency is claiming publicly they are not
18  conducting these activities when they really are"
19  means?
20      A.  No.
21      Q.  Do you believe that statement is true?
22      A.  I don't know what he means by that

Page 283

1  statement.
2      Q.  Do you believe -- do you have any
3  information that regardless of what was written in the
4  official policy that you promulgated for metering,
5  that the Hidalgo Port of Entry was engaged in some
6  form of informal turn-back action with respect to
7  asylum seekers?
8      A.  I'm not sure I understand your question.
9      Q.  Sure.  So you have your written policy?
10      A.  Right.
11      Q.  The metering policy?
12      A.  Right.
13      Q.  And you expected that policy to be
14  followed?
15      A.  Correct.
16      Q.  And a good CBP officer should follow that
17  order, correct?
18      A.  Correct.
19      Q.  Now, isn't it the case that there's
20  basically two ways in which a policy can be
21  disseminated to your front-line officers?  There's
22  written orders and musters, and then there's, you

Page 284

1  know, verbal orders and verbal musters that can come
2  down?
3      A.  Yes.
4      Q.  Do you know whether there was ever a verbal
5  order or verbal muster to turn back asylum seekers at
6  the Hidalgo Port of Entry?
7      A.  No.  But if there was, it would be against
8  policy.
9      Q.  Did you ever ask anyone to investigate
10  whether there was such a verbal order?
11      A.  No.
12      Q.  So as you sit here today, you don't know
13  one way or the other whether that verbal order was
14  ever given?
15      A.  I can't say what was said.  I know what the
16  official policies that's been distributed.
17      Q.  Okay.
18      A.  There's other statements in here, ask about
19  detaining asylum seekers on the Mexican side.  I know
20  that to be false.  Our officers do not cross into
21  Mexico to detain Mexicans on the Mexican side.  We do
22  not cross that limit line.

Page 285

1      Q.  All right.  And do your officers prevent --
2  your officers at limit line prevent foreign nationals
3  from entering the U.S. after -- for the purpose of
4  preventing -- let me ask this question better because
5  I just got tied up.
6          Is one of the purposes of putting CBP
7  officers at the limit line to stop asylum seekers from
8  setting foot on U.S. soil?
9      A.  It is to control the access based on our
10  capacity.  In 2016 we did not set up at the limit
11  line, and we ended up with unacceptable conditions at
12  our ports of entry.  So when we re-established the
13  metering across the southwest border in response to
14  this surge of migrants, we set up at the limit line so
15  that the Mexicans -- those that are seeking entry when
16  we were beyond capacity would return and wait in the
17  shelters, as opposed to waiting outside the doors of
18  the ports unprotected, without bathrooms, without
19  food.
20          We believed it was the more responsible
21  thing to do, to ask them to return and wait in the
22  shelters.

MAGNA
LEGAL SERVICES

Page 286

1    Q.    Right.
2    A.    Than wait in our courtyards where 2016 it
3    was creating unsafe conditions.  It was -- there was
4    no shelter.  The migrants are defecating all over the
5    port.
6    Q.    Is it your belief that conditions in
7    Mexican border towns are safer than outside U.S. ports
8    of entry?
9    A.    I'm sorry?
10   Q.    Yeah.  You said you wanted the migrants to
11   return to the shelters.
12   A.    Right.
13   Q.    Are those shelters safer than being outside
14   of the port of entry?
15   A.    I believe those shelters provide shelter.
16   They provide security.  They provide food.  They
17   provide bathrooms.
18         When migrants are camped out in the
19   courtyards of the ports, they don't have shelter.
20   They don't have bathrooms.  They don't have food.  I
21   think it is better to have them wait in a shelter than
22   in a open courtyard exposed to the elements without

Page 287

1    food, without bathrooms.
2    Q.    Would it surprise you to learn that
3    migrants in shelters on the Mexican side of the border
4    have been assaulted?
5    A.    No.
6    Q.    Would it surprise you to learn that
7    migrants in shelters on the Mexican border have been
8    murdered?
9    A.    Migrants on the Mexican -- migrants being
10   murdered in Mexico.
11   Q.    Correct.
12   A.    I would not -- that's common.  That's
13   understood.
14   Q.    It's common, right?
15   A.    It's common knowledge that -- yeah.
16   Q.    And would it surprise you to learn that
17   migrants in the shelters on the Mexican side of the
18   border do not have easy access to food or employment?
19   A.    I don't know that to be true.
20   Q.    You don't know one way or the other?
21   A.    I know the Mexican government has been
22   offering the migrants that are waiting with work

Page 288

1    permits.
2    Q.    And it's still your position -- so that I'm
3    clear on this, that it's safer to wait in a shelter on
4    the Mexican side of the border than it is to wait on
5    U.S. soil outside of the port of entry building?
6    A.    Yes.
7    Q.    Okay.
8    A.    I believe it's better to be in a shelter
9    with food and security and bathrooms, than it is to be
10   exposed outdoors in the elements for days on end with
11   no shelter, no food, no bathrooms.
12   Q.    Do you know if migrants on the Mexican side
13   of the border are exposed to the elements outside with
14   no access to food or shelter or -- and are in the
15   heat?
16   A.    There are government-run shelters.  There
17   are shelters run by private entities.  And then there
18   are migrants that choose not to go to shelters for
19   whatever reason.
20   Q.    There are migrants who sleep on the -- who
21   sleep outside the ports of entry, correct?
22   A.    I would assume so.

Page 289

1    Q.    And there are migrants who sleep outside in
2    100-degree weather, correct?
3    A.    I would assume so.
4    Q.    And do you think that's safer than being
5    outside the port?
6    A.    I have a responsibility to create safe
7    working conditions for the traveling public and for
8    our officers in the ports of entry.
9    Q.    And you are responsible --
10   A.    Having migrant camps --
11   Q.    -- stops at the border, right?
12   A.    My responsibility starts at the border, the
13   board U.S. Border.
14   Q.    Correct.  So you don't view yourself as
15   having any responsibility to migrants who are in
16   shelters on the Mexican side?
17   A.    No.  Mexico is a sovereign country.  They
18   have a responsibility to protect the people in their
19   borders, as I have the responsibility to police what
20   comes across our borders.
21   Q.    Do you take any responsibility for what's
22   happened to Mexican -- to migrants who are living on

Page 290

1  the Mexican side of the border due to the metering
2  policy?
3      A.   Do I take --
4      Q.   Yeah.  Do you take any responsibility for
5  that?
6      A.   No.
7      Q.   Okay.  Do you sympathize with their
8  situation?
9      A.   Yes.
10     Q.   Do you -- do you wish those would be --
11 those asylum seekers were in better conditions on the
12 Mexican side of the border?
13     A.   I wish our immigration policy would be
14 fixed so that we wouldn't have to deal with these
15 issues.
16     Q.   My question is, is it your desire that
17 those Mexicans can -- sorry, that those individuals in
18 Mexico due to the metering policy would be living in
19 better conditions?
20     A.   That's Mexico's responsibility to provide
21 the conditions for the people in their borders.
22     Q.   Okay.  Mark the next exhibit.

Page 291

1           - - -
2      (A document was marked as Deposition
3  Exhibit Number 50.)
4           - - -
5  BY MR. MEDLOCK:
6      Q.   Sir, this is a picture taken on August 2019
7  by an Associated Press reporter in Matamoros, Mexico,
8  of a migrant mother sleeping with her child outside of
9  a shelter because the shelter had lacked space.  And
10 as you can see, the child is not even wearing any
11 pants.
12     Do you take any responsibility for this
13 happening?
14     A.   No.
15     Q.   Okay.  Do you take any responsibility for
16 what occurs to asylum seekers who, when forced with
17 waiting in -- waiting for months in Mexico due to
18 metering decide to cross illegally between ports and
19 are harmed?  Do you take any responsibility for that?
20     A.   No.
21     Q.   Okay.
22     A.   There's a lawful way to enter.  And I'll --

Page 292

1  go ahead.  Show me the pictures from the river.
2      Q.   Sure.  Here you go.
3           - - -
4      (A document was marked as Deposition
5  Exhibit Number 51.)
6           - - -
7  BY MR. MEDLOCK:
8      Q.   This is a picture taken of a father with
9  his less-than-two-year-old child in the river in the
10 Rio Grande.
11     MS. SHINNERS:  Counsel, you are really just
12 berating the witness at this time.
13     MR. MEDLOCK:  I'm not.  I'm not.  His name
14 was Oscar Alberto Martinez Ramirez.  And his
15 daughter's name -- his daughter was less than two
16 years old.
17     These individuals were forced to wait in
18 matamoros and then try to cross the Rio Grande and
19 then drowned.  Do you take any responsibility for
20 that?
21     A.   No.
22     Q.   Okay.  You said there's a lawful way to

Page 293

1  enter, correct?
2      A.   Correct.
3      Q.   Do you agree that migrants who are metered
4  to the port of entry are seeking to enter the U.S.
5  lawfully?
6      A.   Through the port of entry, yes.
7      Q.   Okay.  Do you recall there being any follow
8  up to this e-mail from David Atkinson that we have
9  been looking at?
10     A.   Follow up with Mr. Atkinson or --
11     Q.   No.  With other people in leadership at
12 CBP?
13     A.   I've discussed with Mr. Higgerson, the DFO,
14 about enhancing the security at the limit lines.
15     Q.   Do you recall discussing anything else with
16 Mr. Higgerson?
17     A.   I would need some more specifics.
18     Q.   Sure.  I'll mark the next exhibit.
19          - - -
20     (A document was marked as Deposition
21 Exhibit Number 52.)
22          - - -



Page 294

1      BY MR. MEDLOCK:
2     Q.  All right. So I've marked as Exhibit 52 a
3 multi-page e-mail that begins with AOL-DEF-00269970
4 and goes to 71. This appears to be a continuation of
5 the e-mail chain that began David Atkinson's e-mail;
6 is that correct?
7     A.  Yes.
8     Q.  And it goes -- it all occurs on March 19,
9 2019, correct?
10     A.  Yes.
11     Q.  And this -- these are e-mails that were
12 sent between you and Kevin McAleenan and David
13 Higgerson, correct?
14     A.  Yes.
15     Q.  And you would have received these e-mails
16 in the course of your duties as CBP officer?
17     A.  Yes.
18     Q.  And you would have read and understood
19 these e-mails at the time you received them?
20     A.  Yes.
21     Q.  And you would have received these e-mails
22 on or about March 19, 2019?

Page 295

1     A.  Yes.
2     Q.  And these e-mails, other than some
3 redactions to them, appear, to be full and correct
4 copies of the e-mail chain?
5     A.  They appear to.
6     Q.  Okay. So Mr. McAleenan forwards on
7 Mr. Atkinson's mail to you and writes, EAC, neither
8 response coordinated with the front office and
9 counsel, thank you, KM, correct?
10     A.  Correct.
11     Q.  And the EAC refers to you correct?
12     A.  Yes.
13     Q.  And you write back, Sir, will do?
14     A.  Yes.
15     Q.  And then it appears that Mr. Higgerson next
16 wrote, "never stops," correct?
17     A.  Correct.
18     Q.  And then you wrote, "this guy, I tell you,
19 I am tired. You must be exhausted," correct?
20     A.  Yes.
21     Q.  And you were writing that regarding David
22 Atkinson, correct?

Page 296

1     A.  Yes.
2     Q.  All right. Do you recall if there was any
3 more to that e-mail chain?
4     A.  I don't recall, but again Mr. Atkinson
5 files and writes on everything dealing with the ports.
6     Q.  Um-hmm. All right.
7         - - -
8     (A document was marked as Deposition
9 Exhibit Number 53.)
10         - - -
11     BY MR. MEDLOCK:
12     Q.  All right. I've marked a document Exhibit
13 53. It's again a multi-page e-mail chain with the
14 Bates numbers AOL-DEF-00270451 through 452. This
15 appears to be a continuation of the same e-mail chain,
16 correct?
17     A.  Yes.
18     Q.  And again you would have sent and received
19 these e-mails in the course of your duties at CBP on
20 or about March 19, 2019?
21     A.  Correct.
22     Q.  And you would have read and understood them

Page 297

1 at that time?
2     A.  Yes.
3     Q.  Okay. And so it appears that after you
4 wrote, "this guy, I tell you, I'm tired. You must be
5 exhausted," Mr. Higgerson responded?
6     A.  Yes, he did.
7     Q.  And he wrote back, "Sadly, we have real
8 work to do. This guy is not helping his folks."
9     Did I read that correctly?
10     A.  Yes.
11     Q.  Do you understand what Mr. Higgerson meant
12 by real work?
13     A.  We have a multitude of priorities within
14 the port of entry. And now the senior leadership
15 there, senior leadership within OFO is again having to
16 take time out to address Mr. Atkinson's latest
17 complaint.
18     Q.  Do you think that raising complaints about
19 possible illegal conduct at a port of entry is not --
20 does not constitute real work?
21     A.  Again, I disagree with his assessment that
22 there's illegal activity going on in the port of



Page 298

1  entry.
2  Q. If someone believes that there is illegal
3  conduct going on, don't they have a duty to report
4  that up?
5  A. As did Mr. Atkinson. And he chose to
6  report it to the commissioner.
7  Q. But not real work though that he reported
8  it up? Having -- what do you take that to mean, that
9  sadly we have real work to do?
10  A. We have real work to do. We have real
11  activities to be focused on, and here we are spending
12  time discussing Mr. Atkinson's latest complaint.
13  Q. Which you never investigated, correct?
14  A. Which we -- no, that is not true. I did
15  investigate, and we took actions against the officer
16  safety issues that he outlines in the middle of his
17  e-mail.
18  Q. So you know for a fact that the first
19  paragraph in his e-mail is not true?
20  A. That he's requesting instructions?
21  Q. Yeah.
22  MS. SHINNERS: Objection. Asked and

Page 299

1  answered.
2  Q. I just want to make sure I understand that.
3  You don't think that's true?
4  A. That what, that he asked for instructions?
5  Q. Yeah.
6  A. He did ask for instruction.
7  Q. Were they ever given to him?
8  A. He received a copy of the April 2018
9  metering memo.
10  Q. And were further instructions or
11  clarifications given to him?
12  A. No. That memo was what was given to him.
13  Q. So he would have already had -- known about
14  that memorandum because it had been mustered to all of
15  the CBP officers, first and second-level CBP officers
16  at ports of entry, correct?
17  A. I assume so, that he was present when it
18  was mustered.
19  Q. And the 187 individuals who signed his
20  letter, that letter, would have also been present for
21  that muster?
22  A. Assuming.

Page 300

1  Q. Do you think 187 people at a port of entry
2  missed a muster about -- like that?
3  A. I think the direction was clear. I think
4  the officers didn't like that direction. And I think
5  spun up by the union, 187 officers all signed their
6  name to that document. That's what I think.
7  Q. You think that they didn't like that
8  direction?
9  A. They didn't like being posted mid bridge.
10  Q. They didn't like having to be posted mid
11  bridge to meter a site?
12  A. They didn't like being posted mid bridge
13  exposed to the elements. And their primary complaints
14  were about assigning more officers on overtime to do
15  that.
16  Q. Where in his e-mail did it say his primary
17  complaint was about overtime?
18  A. That has been his primary complaint dealing
19  with the metering. This is not the only communication
20  from Mr. Atkinson or from the union.
21  Q. Right. But where did he say that his
22  primary complaint in March 2019 was overtime?

Page 301

1  A. It is not in this e-mail.
2  Q. That's an assumption you are making, right?
3  A. The other e-mail you provided from the same
4  chapter talked about back pay compensation.
5  Q. That's correct, but it also raised issues
6  about the -- about the purported illegality of
7  metering, correct?
8  A. I don't believe the metering policy is
9  illegal.
10  Q. I understand that, but that's a concern
11  that's raised in both of these e-mails.
12  A. He raised that concern, yes, amongst
13  others.
14  Q. So he's been -- the union's been
15  consistent, right? In 2017 they raised concerns about
16  the legality of metering. And then 2019 they raised
17  concerns about the legality of metering, correct?
18  A. The Hidalgo chapter has been consistent.
19  Q. Yes. That's correct.
20  A. Yes. The other 12 chapters along the
21  southern border have not raised those concerns,
22  Q. Okay. So, but my question is there's been

MAGNA
LEGAL SERVICES

Page 302

1  a three-year period where they have been raising this
2  concern, but you say it's really just about back pay?
3     A.  I'm saying that is driving a lot of their
4  concerns along with the security mid bridge.
5     Q.  And you don't think that the legality is a
6  real concern of theirs at all?
7     A.  No.  I believe we are acting legally.
8     Q.  You believe that their purported concerns
9  about the legality of metering is just a cover to get
10 some better conditions at the mid bridge and some back
11 pay, right?
12    A.  I believe that is what is primarily driving
13 their concerns, yes.
14    Q.  They don't actually state that in the
15 e-mails, correct?
16    A.  Not in this e-mail that you showed me.  No.
17    Q.  And you never -- in either of them, right?
18    A.  The other e-mail does talk about back pay
19 compensation.
20    Q.  It does say that, but it doesn't say that's
21 their primary concern, does it?
22    A.  No.

Page 303

1     Q.  That's an assumption you are making,
2  correct?
3     A.  Correct.
4     Q.  Okay.  So, and you've never actually talked
5  to William T. Haralson, have you?
6     A.  No.
7     Q.  You've never talked to David Atkinson, have
8  you?
9     A.  Not on this matter.
10    Q.  Not regarding metering?
11    A.  Not regarding metering.
12    Q.  You have talked to him about other matters?
13    A.  Yes, at union president meetings.
14    Q.  At those meetings did you ever tell him to
15 stop filing grievances?
16    A.  No, I don't -- I don't ever told him to
17 stop filing grievances.
18    Q.  Did you ever tell him you thought his
19 grievances had no factual basis?
20    A.  No.  I don't view their grievances.
21    Q.  Well, you did get these?
22    A.  These weren't grievances.  These were

Page 304

1  e-mails.
2     Q.  So let's take -- do you still have William
3  Haralson's e-mail in front of you?
4        MS. SHINNERS:  What's the exhibit number,
5  do you have it?
6     A.  I have it, 46.
7     Q.  46.  What are the first four words of the
8  body of that e-mail?
9     A.  During the grievance meeting.
10    Q.  Okay.  So it was a grievance, wasn't it?
11    A.  This message wasn't addressed to me.
12    Q.  Right, but you had -- but you now know that
13 during grievance meetings, metering was discussed,
14 right?
15    A.  Apparently during a grievance meeting at
16 the local level, the issue was discussed.
17    Q.  And these concerns that were raised about
18 metering and grievance meetings weren't raised to your
19 level, were they?
20    A.  What was raised in a grievance at these
21 local grievance meetings?
22    Q.  Yeah.

Page 305

1     A.  No.
2     Q.  So, sir, were you -- and this is just a yes
3  or no.  You were -- you understood that you were to
4  preserve documents related to this litigation?
5     A.  Yes.
6     Q.  And you have done so, right?
7     A.  Yes, I have.
8     Q.  And can you explain to me why we can't find
9  this e-mail, Exhibit 46, anywhere in David Higgerson's
10 files?
11       MS. SHINNERS:  Objection.  Foundation.
12    Q.  Can you explain that to me?
13       MS. SHINNERS:  Objection.  Calls for
14 speculation.
15    Q.  Okay.  Would it surprise you that David
16 Higgerson appears to have deleted this e-mail?
17    A.  I have no knowledge of how the records were
18 pulled or what Mr. Higgerson has done.  I don't know.
19       MS. SHINNERS:  For the record, defendants
20 have not completed their production from Custodian
21 Higgerson.
22    Q.  Okay.  That's fine.  We have a lot of

MAGNA
LEGAL SERVICES

Page 306

1  documents from Mr. Higgerson from this time period,
2  but strangely but we don't have this e-mail.
3      Can you explain that for me?
4  A.  I cannot.
5  Q.  Okay.
6      MS. SHINNERS:  I'm happy to discuss with
7  you the mechanics of how e-mails are retained at CBP
8  on a break.
9      MR. MEDLOCK:  You can discuss whatever you
10 want with me during a break.
11 BY MR. MEDLOCK:
12 Q.  Let's go back to the March 2019 e-mail from
13 Mr. Atkinson with the attachment of the To Whom It May
14 Concern letter.  Do you see the sentence that begins
15 after their immediate request?
16 A.  Which paragraph?
17 Q.  I'm in the To Whom It May Concern Letter.
18 A.  Oh.
19 Q.  Sorry.  It says, quote, After their
20 immediate request, we are instantly sending them back
21 to Mexico without date, time or appointment to be
22 allowed in the United States for processing.  We are

Page 307

1  not aware of any process used to inform these asylum
2  seekers to return to the port for processing into the
3  U.S. and feel there is need for clarification for the
4  authority or law allowing us to immediately deny entry
5  to these asylum seekers into the United States and
6  returning them back to Mexico.
7      Did I read that correctly?
8  A.  Yes.
9  Q.  Did it cause you any concern that 187
10 officers believed that they needed further guidance
11 about what the -- about the metering policy?
12 A.  No.
13 Q.  Okay.  Sir, are you aware that there was a
14 preliminary injunction granted in this case?
15 A.  I'm not sure.
16 Q.  Okay.  Were you aware that there was a
17 preliminary injunction issued by the court that
18 prevented some individuals without proper travel
19 documents from being denied entry to the United States
20 based on the -- their having transited another
21 country?
22 A.  Yes.  Recently?

Page 308

1  Q.  Yes.
2  A.  Yes.  That I'm aware of.
3  Q.  Okay.  Are you aware of any -- yes or no --
4  aware of any guidance that was issued --
5  A.  Yes.
6  Q.  -- to implement that?
7  A.  Yes.
8  Q.  In implementing that guidance, what are CBP
9  officers supposed to do?
10 A.  If the individual who approaches the
11 officers indicates that they are part of the Al Otro
12 Lado, I think it was the Al Otro Lado part of that
13 case, they are to tell us that so we can notate it in
14 the file.  So that when their case goes to CIS, CIS
15 can then consider that as they adjudicate the claim.
16 Q.  And when you say there are these questions
17 that are asked, is that asked at primary or secondary,
18 to your knowledge?
19 A.  To my knowledge, it would be after we had
20 the capacity to receive them and began their
21 processing as part of the sworn statement process.
22 Q.  Okay.  So this would be part of the

Page 309

1  credible fear interview?
2  A.  Well, we don't do the credible fear
3  interview.
4  Q.  Right.  That's what I'm trying to
5  understand.
6  A.  No.  When they come across and we start the
7  processing, so again if we were beyond capacity, they
8  wouldn't come into the port.  If we had capacity and
9  we started their credible fear claim, where we take
10 the sworn statement, my understanding is it would be
11 asked as part of that.  And the file would be notated
12 as it then moved through the immigration process.
13 Q.  Do you, to your knowledge, do CBP officers
14 do anything to investigate whether individuals that
15 claim to be part of the Al Otro Lado preliminary
16 injunction -- do you anything to investigate whether
17 they are on any sort of wait list on the Mexican side?
18 A.  No.
19 Q.  As a part of implementing that preliminary
20 injunction, are you aware of any efforts by CBP to get
21 a copy of those wait lists on the Mexican side?
22 A.  I'm not aware of those activities, but I

Page 310

1 know there's discussions on moving forward with what
2 was ordered by the courts.
3     Q.  Okay.
4     A.  Again, this was just within the last week
5 or so, so --
6     Q.  Right.  I'm just trying to understand
7 what's going on.  So what's happening in those sworn
8 statements essentially is that the officer is asking a
9 few extra questions to determine whether the person
10 fits into the Al Otro Lado injunction; is that right?
11    A.  I don't know.
12    Q.  Okay.  Do you know who would know the
13 answer to that question at CBP?
14    A.  That would have come out from again our
15 executive director for passenger -- for admissibility,
16 Todd Hoffman.
17    Q.  Yeah?
18    A.  Yeah.
19    Q.  Okay.  When did you learn of the
20 injunction?
21    A.  I don't recall.  Within the last week or
22 so.

Page 311

1     Q.  Was it before or after Thanksgiving?
2     A.  I don't recall.
3     Q.  Okay.  Let me pause here.
4              - - -
5         (Recessed at 3:59 p.m.)
6         (Reconvened at 4:09 p.m.)
7              - - -
8     BY MR. MEDLOCK:
9     Q.  Sir, thank you for indulging me.  You
10 mentioned that there was guidance that would have been
11 sent by Todd Hoffman regarding the preliminary
12 injunction in this case?
13    A.  Yes.
14    Q.  Do you know when that guidance was sent
15 out?
16    A.  Within a few days ago.
17    Q.  Few days being how many?
18    A.  What is today, the 13th.
19    Q.  Yeah.
20    A.  Maybe the start of this week, the end of
21 last week.
22    Q.  So possible --

Page 312

1     A.   As far as I can recall.  I don't have the
2 exact date.
3     Q.  So best recollection would be Friday the
4 6th or Monday the 9th?
5     A.  Best recollection maybe a little before the
6 6th.  I'm trying to think with the Thanksgiving, it
7 was -- it was within the last, you know, 10 days
8 maybe.
9         MR. MEDLOCK:  Okay.  All right.  I have no
10 further questions at this time, sir.
11        THE WITNESS:  Okay.  Thank you.
12        MS. SHINNERS:  Defendant's counsel would
13 like to do redirect.  We'll take a quick break.
14             - - -
15        (Recessed at 4:10 p.m.)
16        (Reconvened at 4:20 p.m.)
17             - - -
18        EXAMINATION CONDUCTED
19    BY MS. SHINNERS:
20    Q.  Mr. Owen, I'd like to ask you if -- to the
21 extent of your recollection, if you could explain to
22 me the sequence of events in 2016 in San Ysidro in

Page 313

1 terms of accommodations that were made at the San
2 Ysidro port with respect to the Haitian migrant surge?
3         MR. LEV:  Objection.  Vague.  I don't know
4 what accommodations means.
5     Q.  Do you understand my question?
6     A.  I can talk about what processes we
7 implemented to address the Haitians.
8     Q.  That's fine.
9     A.  Okay.  So, to put this in context, the
10 migrants have undergone waves as they have come into
11 the United States.  In 2014, it was unaccompanied
12 alien children.  They were primarily entering between
13 the ports, which is a border responsibility.  It was
14 not an OFO issue.
15        So we really did not start to engage with
16 the high numbers of migrants until 2016.  So that
17 started in the early part of 2016 with the Haitians
18 that were leaving Brazil.  Historically, the
19 earthquake Haiti, destruction in Haiti.  Brazil opened
20 their doors to the Haitians.  They needed cheap labor
21 to build the venues for the Olympics.
22        By 2015, those venues were built.  They



Page 314

1  canceled all of the Haitian work permits and directed
2  the Haitians to leave. The Haitians did not go back
3  to Haiti because Haiti was still in bad shape. They
4  came up through the southern border and arrived in San
5  Ysidro.
6      So at the start of 2006 is when we started
7  to sea all of these Haitians, which quickly began to
8  overwhelm our detention and processing capabilities.
9  The entire system was overwhelmed with the Haitians.
10  ERO, who would remove the Haitians from our temporary
11  detention, put them into permanent detention where it
12  was also overwhelmed. So this is what started the
13  metering.
14      So we needed to control the flow, because
15  we simply had no more processing or holding capacity.
16  What we did throughout 2016, and this started to
17  spread with the Haitians as they went east into
18  Calexico, into San Luis, Arizona, into Nogales,
19  because this was our first dealing with such large
20  numbers, we would start to convert conference space,
21  training facilities room like this into temporary
22  holding facilities.

Page 315

1      So they were not designed for holing
2  individuals in detention, but because the numbers were
3  so overwhelming us, we would convert space like this.
4  And we had way too many people beyond our official
5  detention capacity. Throughout 2006, the numbers
6  started to increase across the entire southwest
7  border, not just San Diego.
8      And then they started becoming not just
9  Haitians, but more family units as they were coming in
10  through out 2016, which is why we then rolled out the
11  metering across the southern border where it was
12  needed operationally. We employed the same tactics at
13  those ports that we would convert conference space and
14  wherever we could make space to hold people.
15      Again ERO who is supposed to take them from
16  our temporary storage, temporary detention space to
17  the permanent detention facilities to was overwhelmed
18  as well.
19      2017 came along, and the numbers came down
20  to more manageable levels. We had less metering at
21  that time. And we assessed what we did in '16 in
22  terms of converting conference space and such into

Page 316

1  holding people. And I really believed that in 2016,
2  we got lucky when we had so many people in our
3  facilities, that there was not a fire, that there was
4  not acts of violence, that there was not disease that
5  would spread through the community.
6      So when '17 came along and we assessed
7  that, we said we would not do that again. We would
8  only hold to what we had the physical capacity and the
9  operational capacity to do. When 2018 came along and
10  the migrant numbers again started to increase, that's
11  when we decided operationally to hold at the limit
12  line to have folks remain in Mexico as opposed to
13  our non-official detention space, you know, creating
14  unsafe conditions, not allowing people to remain at
15  the corridors in the open areas of the ports waiting
16  to be processed.
17      So that is why we switched from holding at
18  the doors of the port to holding at the limit line '16
19  versus '18.
20  Q.   Okay. A couple times in your response you
21  mentioned in 2006. Were you referring to 2016?
22  A.   Oh, 2016. Yes. Sorry.

Page 317

1  Q.   You also mentioned that -- I believe you
2  mentioned that ports of entry were receiving family
3  units.
4      Can you explain the impact, if any, of
5  receiving more family units through ports of entry, of
6  the receipt of more family units in ports of entry on
7  the capacity of the port of entry?
8  A.   Yes. ports of entry are not designed for
9  long-term holdings. Our detention cells are like jail
10  cells in a police station. They are intended for
11  short-term detention, primarily of single adults,
12  while we are waiting to turn them over to another
13  agency or to, you know, immigration and customs
14  enforcement, whatnot.
15      So as the composition of the migrants
16  started to change throughout 2016 and we started to
17  receive more and more family units, our space is not
18  designed for family units. You look at a lot of our
19  ports, the cells are very small. Some are what we
20  call wet cells, meaning they have toilets. Some are
21  not.
22      So the increase in family units further



Page 318

1 taxed our abilities to bring in large numbers of folks
2 and hold them, because our cells were simply not
3 designed to do that. We talked about the physical
4 capacity and the operational capacity. If you take a
5 place like Hidalgo that has four cells designed to
6 hold 42 people, but only 3 of those cells has
7 bathrooms. Okay. So that is our total physical
8 capacity of 42.
9      When you start to factor in the operational
10 considerations, the demographics of who has come
11 across and filed a claim today. Right? So if you
12 have a family unit, you have to put them in one cell.
13 Another family unit comes in and they have scabies or
14 lice. You can't put them in with the first family.
15 You Would put them into a second cell.
16      If you had an adult male, he would not go
17 in with the families and the children. He would go
18 into a different cell. If you -- we have to separate
19 individuals from different countries with different
20 gang affiliations as notated through their tattoos,
21 because they will not -- there will be trouble in the
22 cells. So you have to separate those.

Page 319

1      Anybody that we arrest, and we make 40,000
2 arrests a year, they go into a cell separate from the
3 migrants. The migrants are here for an administrative
4 matter, if you will. Anyone that we arrest for a
5 criminal matter goes into a separate cell by
6 themselves. So you may have a physical capacity of
7 42, but in this example you actually only have 7
8 people in your cells, and you are a full capacity.
9   Q. Thank you. Can you explain what impacts
10 there might be on trade and travel, in general, at any
11 port of entry, if resources are diverted from
12 facilitating trade and travel?
13   A. Okay.
14      MR. LEV: Objection. Calls for
15 speculation.
16   A. I do understand.
17   Q. Just to clarify, I'm asking can you explain
18 to your knowledge --
19   A. This is confusing with you objecting. Do I
20 look at you or do I look at her. Can I answer?
21   Q. You may answer, but I'm going to go ahead
22 and rephrase.

Page 320

1   A. Okay.
2   Q. So can you explain, based on your knowledge
3 and your experience, in general any impacts on trade
4 and travel from -- if you divert resources, or if a
5 port of entry diverts resources from the facilitation
6 of trade or travel?
7      MR. LEV: Same objection.
8   A. Okay. From my knowledge, we prioritize our
9 mission sets within the ports of entry along the
10 guidance that we receive from the secretary. So if we
11 had to divert officers from the counter-terrorism
12 mission, or if we had to divert officers to put more
13 officers towards the processing of undocumented
14 migrants, we would not pull them from the
15 counter-terrorism mission. We would not pull them
16 from the narcotics intradiction mission.
17      So the two missions that they would be
18 pulled from, one would be the facilitation of lawful
19 trade and travel. So those are folks who have lawful
20 documents to enter the country. Most of the
21 cross-border traffic on the southern border comes and
22 goes with border crossing cards.

Page 321

1      We would reduce travel lanes so you would
2 have fewer booths open. This would impact the
3 business community as they crossed. This would impact
4 the school kids that cross every day. This would
5 impact the people coming for medical treatments, to do
6 their business, to do their shopping. It Would result
7 in longer wait times to cross the border if we pulled
8 individuals from that mission set.
9      If we pulled officers from the processing
10 cargo mission set, your summer produce would be
11 delayed. All of your cargo processing would be
12 delayed. In the summer -- the spring and summer of
13 2019, when we reassigned 731 officers from field
14 operations from the ports of entry to assist the
15 border patrol because of the migrant crisis that they
16 were facing at that time, we saw cargo wait times in
17 places like El Paso and San Ysidro go up from 45
18 minutes to over five hours.
19      Those are the types of real impacts that
20 we would experience if we diverted more resources away
21 from the trade and travel mission, from the economic
22 security mission to put towards the migrant



Page 322

1  processing.
2      MS. SHINNERS:  All right.  Mr. Owen, thank
3  you.  I don't have any questions.  I don't have
4  further questions for Mr. Owen.
5      MR. LEV:  Can we take two minutes.
6            - - -
7      (Recessed at 4:30 p.m.)
8      (Reconvened at 4:35 p.m.)
9            - - -
10         EXAMINATION CONDUCTED
11  BY MR. LEV:
12     Q.   I just have a few more questions for you.
13     A.   Yes, sir.
14     Q.   You just testified that in 2017 you
15  assessed what you did in 2016 in terms of converting
16  conference spaces and other rooms into holding
17  facilities and determined that you wouldn't do that
18  again.
19     A.   Yes.
20     Q.   Who conducted that assessment?
21     A.   We did internally, just with our leadership
22  at the ports.  It was not a formal report or anything

Page 323

1  like that.  When we did just an after action amongst
2  ourselves talking of what we did right and what was
3  concerning to us, converting and holding people in
4  space that's not designed for that, we decided that
5  was not the safest thing that we should have done.
6      Q.   Was that assessment memorialized in any
7  writing?
8      A.   No.  It was just discussions between the
9  leadership within field operations.
10     Q.   Who was part of those discussions?
11     A.   Myself and the four southwest border DFOs,
12  directors.
13     Q.   And who were those four southwest --
14     A.   It would be Pete Flores.  Will Brooks,
15  Hector Mancha, and David Higgerson.
16     Q.   So the five of you had an after-action
17  report discussion about -- let me finish my question.
18  You had an after-action report discussion about how
19  you handled this major migrant surge in 2016, and
20  based on that informal discussion with the five of
21  you, you decided that it wasn't handled appropriately;
22  is that correct?

Page 324

1      A.   We decided the informal discussions -- and
2  it's not that it occurred, you know, at one meeting.
3  It was kind of ongoing discussions throughout 2017 as
4  we were no longer faced with the migrant numbers that
5  we were faced with in '16.
6          It was through those discussions that we
7  felt very fortunate that nothing terrible happened
8  based on creating space that was not designed to hold
9  people.
10     Q.   And did you rely on any documentation, data
11  in reaching these conclusions?
12     A.   We relied on our knowledge of what was a
13  safe condition to hold people in and not.
14     Q.   You talked a little bit earlier with
15  Mr. Medlock about the MCAT reports?
16     A.   Yes.
17     Q.   Did you undertake any activity to ascertain
18  whether the metering guidance you issued was being
19  implemented in a manner that was solely tied to
20  operational capacity at specific ports of entry?
21     A.   I'm not sure I understand the question.
22     Q.   The metering guidance, I believe you

Page 325

1  testified provided discretion to the port directors to
2  implement it as they deemed appropriate based on
3  capacity concerns, correct?
4      A.   Correct.
5      Q.   An individual port director might exercise
6  that discretion appropriately by limiting -- what you
7  would view I believe as appropriately by metering
8  migrants because the port was truly at its operational
9  capacity limit?
10     A.   Correct.
11     Q.   A port director might exercise that
12  discretion inappropriately by limiting migrants more
13  than is necessary due to capacity constraints at a
14  port, correct?
15     A.   Understood.
16     Q.   Did you ever undertake any sort of
17  oversight or analysis to ascertain whether port
18  directors were implementing the guidance in the first
19  form and not in the second form that I just discussed?
20     A.   Not at my level.  The four directors of
21  field operations have that responsibility to directly
22  oversee the day-to-day operations at their ports.  It

MAGNA
LEGAL SERVICES

Page 326

1    was my clear expectation to them that folks were
2    knowledgeable with the direction and were carrying it
3    out appropriately.
4            If we became aware of instances when that
5    was not done, that was to be referred to the JIC
6    again, the Joint Intake Center, to Office of
7    Professional Responsibilities.
8        Q.   Are you aware of instances such as that
9    being referred to the JIC?
10       A.   Of?
11       Q.   Of ports implementing metering beyond the
12   extent due to their capacity constraints?
13       A.   I am not.  I am aware of individual actions
14   where individuals who are already in the U.S. were
15   sent back, and those were reported.
16       Q.   And I take it from your testimony that
17   beyond the ordinary expectations that supervisors
18   oversee their subordinates, there was no organized
19   effort undertaken to ensure that the metering guidance
20   was being implemented in the way that you intended,
21   and would only limit asylum applicants based on actual
22   capacity constraints?

Page 327

1        A.   There was no activity to such directed from
2    headquarters.  I don't know if individual field
3    directors took any such assessment.
4        Q.   Are you aware of any such assessment?
5        A.   I am not.
6        Q.   Would you expect your individual field
7    directors to let you know if they had done so?
8        A.   Not necessarily.
9        MR. LEV:  I don't think we have anything
10   else.  We are going to keep the deposition open as we
11   previously indicated, based on various documents that
12   have been clawed back and that we need to ascertain
13   whether they were appropriately clawed back or whether
14   we want to ask further questions about them.
15       MS. SHINNERS:  Okay.  Any other basis for
16   keeping the deposition open?
17       MR. LEV:  I don't think so.
18       MS. SHINNERS:  Okay.  And, for the record,
19   the witness -- I would like to request that the
20   witness be able to read and sign the deposition.  We
21   would like to designate the transcript confidential
22   for the 30-day period while we determine which

Page 328

1    portions would be designated confidential.
2            And defendants are making note of their
3    intent to claw back the exhibit that was briefly
4    marked as 44.  I'm not sure if -- it's not in the
5    pile, but it's AOL-DEF-00723887.  And we will follow
6    up for this and other claw backs with the formal
7    claw-back assertion.  We just wanted to make sure that
8    we put those on the record today.
9
10                 -  -  -
11       (The deposition was concluded at 4:41 p.m.)
12       (Reading and signature not being waived.)
13                 -  -

Page 329

1    UNITED STATES OF AMERICA  )
2                ss:
3    DISTRICT OF COLUMBIA      )
4
5            I, TODD OWEN, the witness herein, having
6    read the foregoing testimony of the pages of this
7    deposition do hereby certify it to be a true and
8    correct transcript, subject to the corrections, if
9    any, shown on the attached page.
10                 -  -  -
11
12
13            _____
14                 TODD OWEN
15
16   Subscribed and sworn to before me
17   this _____ day of _____, 20_____.
18
19   _____.
20       SIGNATURE
21
22



Page 330

```
 1          C E R T I F I C A T E
 2    UNITED STATES OF AMERICA  )
 3                    ss:
 4    DISTRICT OF COLUMBIA      )
 5          I, ELIZABETH MINGIONE, Registered
 6    Professional Reporter and Notary Public within and for
 7    the District of Columbia, do hereby certify:
 8          That the witness whose testimony appears in
 9    the foregoing deposition was duly sworn, and that the
10    within transcript is a true record of the testimony
11    given by such witness.
12          I further certify that I am not related to
13    any of the parties to this action by blood or
14    marriage,  and that I am in no way interested in the
15    outcome of this matter.
16          IN WITNESS WHEREOF, I have hereunto set my
17    hand this _____ day of _____, 20_____.
18
19          _____
20    My Commission Expires:
21    June 14, 2020
22
```

Page 332

```
 1          E R R A T A   S H E E T
 2    PAGE    LINE #    CORRECTION AND REASON
 3    -----------------------------------------------
 4    -----------------------------------------------
 5    -----------------------------------------------
 6    -----------------------------------------------
 7    -----------------------------------------------
 8    -----------------------------------------------
 9    -----------------------------------------------
10    -----------------------------------------------
11    -----------------------------------------------
12    -----------------------------------------------
13    -----------------------------------------------
14    -----------------------------------------------
15    -----------------------------------------------
16    -----------------------------------------------
17    -----------------------------------------------
18    -----------------------------------------------
19
20    _____        _____
21      WITNESS SIGNATURE              DATE
22
```

Page 331

```
 1          ERRATA SHEET INSTRUCTIONS
 2    WITNESS:  It is your right to read your deposition and
 3    make any changes in form or substance.  Note the
 4    reason for any changes directly on the errata sheet.
 5       Please sign and date the errata sheet and your
 6    deposition in the spaces provided.  You are signing
 7    this transcript subject to the changes you have made
 8    on the errata sheet.  Unless otherwise agreed to by
 9    counsel to this deposition, you must sign before a
10    notary public.
11       Return the original errata sheet and signature
12    page to the deposing attorney (attorney asking
13    questions) promptly!  Court rules require completion
14    of this process within 30 days after receipt of the
15    transcript or signature is deemed waived.
16    DEPOSING ATTORNEY:  Upon receipt of the signed errata
17    sheet and signature page, please distribute copies to
18    all parties in attendance and place the original
19    signed pages in the original transcript.
20       If you do not receive the signed errata sheet and
21    signature page within 30 days after receipt of the
22    transcript, you may assume signature is waived.
```



**A**

**abbreviation** 41:20
**Abigail** 222:5
**abilities** 318:1
**ability** 114:4
148:19 189:6
269:11
**able** 53:17 87:3
92:7 167:15
327:20
**absconder** 277:13
**absconders** 277:1,4
277:8,20
**accept** 115:2
**access** 285:9 287:18
288:14
**accommodations**
313:1,4
**accompanied** 110:4
**accompanying**
114:3
**accountable** 239:17
239:21
**accurate** 67:21
106:1 141:16
142:12 260:12,15
268:20 278:2,5,22
279:17,21 282:1
**accurately** 142:8
**acknowledge**
230:19
**acronym** 17:13
**acting** 41:7,14
119:22 148:8
215:16 302:7
**actings** 41:8
**action** 12:5 30:15
30:18 34:17,21
43:8 44:9,19 53:5
84:8 147:13,15
214:4 283:6 323:1
330:13
**actions** 56:14
121:20 122:14
218:5 239:14

274:21 298:15
326:13
**activities** 30:3 61:6
114:19 186:19
188:13 198:17,22
204:2,3 205:6
211:12 246:19
282:11,13,18
298:11 309:22
**activity** 297:22
324:17 327:1
**acts** 316:4
**actual** 69:16 148:22
152:18 155:15
185:13 262:12
326:21
**AC1** 41:7 46:22
**AC2** 46:22
**ad** 29:1 31:1 42:11
42:14 149:9 222:5
**add** 31:4
**added** 277:18
**adding** 248:12
277:3
**additional** 107:2
110:14 111:2
168:21 237:4
277:19
**address** 10:7,11
70:12 271:20
273:19 274:8
277:10 297:16
313:7
**addressed** 273:15
273:18 304:11
**adjudicate** 308:15
**administration**
150:18 219:8,9
**administrative**
319:3
**admissibility** 27:18
28:10 64:5 86:16
86:19 106:20
143:19 196:3
246:2 310:15
**admission** 203:6

**admitted** 55:3,8
**adopted** 68:15
**adopting** 166:8
**adult** 116:2 318:16
**adults** 317:11
**advice** 167:13
**advise** 122:18,21
**advising** 126:2
164:7 172:2
**AEU** 86:14,16,16
106:19 224:11
245:21 251:21
**Affairs** 13:2 143:10
143:11 198:7,9
**affidavit** 14:3
**affidavits** 14:17,20
15:1
**affiliations** 318:20
**Affixed** 141:4
**afraid** 181:3
**after-action** 323:16
323:18
**agencies** 78:13
**agency** 53:16,21
54:6 70:22 77:13
79:12 208:1 212:4
230:18 231:3,4
239:9 253:18
259:20 282:12,17
317:13
**Agency's** 230:19
**agent** 112:7
**Agents** 102:14
**ago** 24:22 25:17
26:7 33:12 95:11
311:16
**agree** 51:12 59:9
201:7 228:10
234:21 237:10,12
260:6,8 263:16
269:11 293:3
**agreed** 269:15
331:8
**agreement** 228:21
**agricultural** 208:22
**agriculture** 75:19

190:12 204:9
205:2 207:12,14
207:21 208:22
**ahead** 14:7,10
81:16 104:3
165:11 208:8
226:21 234:20
236:14 292:1
319:21
**aimed** 98:11
**Air** 41:3
**airport** 193:5
**airports** 188:16
**Aki** 101:16,22
103:6 132:21
144:20
**Aki's** 103:14
**al** 1:4,4,7 7:17
215:11 226:1
308:11,12 309:15
310:10
**Albert** 175:3
**Alberto** 6:21 175:1
292:14
**alert** 256:12
**alien** 313:12
**aliens** 179:5,6
**align** 46:20
**aligned** 207:2
**alignment** 151:1
**allegation** 240:21
241:1
**allegations** 34:6
57:22 58:7,8,10
59:19,21 145:7,10
145:11 182:8,10
182:21 183:7
232:2 241:4
280:15 281:16
**alleged** 280:15
**alleging** 145:13
**allow** 47:13 191:3
207:18 228:21
**allowed** 115:15
207:16 274:18
306:22

**allowing** 156:2
259:20 307:4
316:14
**allows** 282:7
**Alvarez** 35:3,5
**ambiguous** 59:5
60:5,6,8,9,13
**AMERICA** 329:1
330:2
**American** 4:4
201:3
**amount** 276:15
**amounts** 188:3
**analysis** 226:14
244:10,11 325:17
**Angeles** 11:22 12:2
12:4
**animal** 207:15
209:19
**animals** 211:15,19
212:4
**annotations** 8:2
249:16
**answer** 10:18,21,21
14:7,12,14,16
15:12 16:18,18
17:2,3 23:21 32:5
36:16 43:21 72:5
72:16 76:6 80:18
98:14 99:13
104:14 108:19
112:6 130:12
131:5,14 141:19
208:9 236:12
245:19 264:20
310:13 319:20,21
**answered** 299:1
**answering** 16:4
32:3 130:21 161:6
**answers** 15:18
139:1 141:9
170:21 218:19
275:3,5
**anticipate** 181:12
**anti-narcotics** 77:3



**anybody** 21:7
26:16,19 29:12
30:21 60:11 61:21
64:19 79:17
120:17 182:12
186:7 222:12
241:3 247:10
319:1
**Anzalduas** 153:12
**AOL-DEF-00032...**
6:20 169:4,22
**AOL-DEF-00039...**
7:9 213:1
**AOL-DEF-00039...**
7:11
**AOL-DEF-00081...**
6:18 163:3
**AOL-DEF-00088...**
5:21 82:3
**AOL-DEF-00088...**
220:9
**AOL-DEF-00205...**
243:11 249:5
**AOL-DEF-00259...**
159:11 168:19
**AOL-DEF-00269...**
8:8 294:3
**AOL-DEF-00270...**
8:10 296:14
**AOL-DEF-00272...**
6:15 146:18
**AOL-DEF-00273...**
7:5
**AOL-DEF-00273...**
7:7 199:14
**AOL-DEF-00273...**
201:13
**AOL-DEF-00273...**
196:16
**AOL-DEF-00328...**
6:3 101:4
**AOL-DEF-00371...**
194:4
**AOL-DEF-00576...**
6:22 174:21
**AOL-DEF-00669...**

5:17 52:14
**AOL-DEF-00703...**
180:21
**AOL-DEF-00723...**
7:16 223:18
**AOL-DEF-00723...**
7:18 226:8 328:5
**AOL-DEF-00761...**
6:11 135:18
**AOL-DEF-00761...**
6:5 105:5
**AOL-DEF-00761...**
6:13 142:15
**AOL-DEF-00762...**
6:9 132:18
**AOL-DEF-00762...**
6:7 123:21
**apart** 171:14
**apologize** 14:14
52:21 184:21
226:11 243:9
**apparent** 247:11
**apparently** 129:2
133:16 264:17
304:15
**appear** 50:20 109:2
109:15 125:12
160:8 200:13
216:9 227:1 295:3
295:5
**appearance** 101:9
**Appearances** 3:21
**appeared** 267:12
**appears** 126:14
143:7 171:15
173:15 213:20
221:6,14 226:13
250:9 257:9 265:2
267:22 276:1,2
279:4 294:4
295:15 296:15
297:3 305:16
330:8
**applicants** 106:14
231:7 232:12
326:21

**appointment** 128:2
128:8 162:12
172:14 259:19,20
306:21
**appointments**
126:6 127:14,19
128:12 162:9
163:17 164:6,7,13
170:11 171:20
172:1
**appreciate** 97:18
177:17 189:8
**approached** 127:18
**approaches** 308:10
**appropriate** 144:11
226:13 325:2
**appropriately**
323:21 325:6,7
326:3 327:13
**Approval** 214:5
**approved** 50:10
122:21 149:19
150:4,10,11
**approve/date**
213:14
**approving** 213:18
**approximately**
16:21 20:13 21:18
24:11 25:6 51:7
**approximates** 89:1
**approximation**
15:4
**April** 5:19 12:20
63:18 65:12 67:12
71:11 95:14 99:17
100:3,12 104:5,12
104:15,16 191:15
253:19 264:17
299:8
**area** 75:20 110:5
111:3 115:7,12
119:4 176:10
188:13 204:15
232:2 259:21
272:17 276:3,6,8
276:16 278:14

280:9
**areas** 75:21 277:1
277:14 316:15
**area,s** 119:8
**argumentative**
72:15 76:5 208:5
**Arias** 7:22 243:21
244:5 245:13
251:20 252:4,20
**Arizona** 314:18
**arm** 94:2 136:16
**Armijo** 101:17
102:6 106:8,11,18
116:7 117:3,16
119:17 120:5,21
120:22 121:4
132:21 136:2
141:1 243:21
244:2 252:7,10,11
252:16,21
**Armijo's** 102:4,17
103:7 110:3 115:6
115:21 116:6
120:3,18 252:12
**arms** 94:2
**arounds** 111:21
**arrest** 319:1,4
**arrests** 319:2
**arrivals** 157:21
**arrived** 314:4
**arriving** 124:7
203:6
**ascertain** 324:17
325:17 327:12
**Asian** 207:18
208:17
**aside** 161:5 167:3
199:4
**asked** 57:18 60:15
60:20 94:19
250:10 251:8
259:5 280:5
298:22 299:4
308:17,17 309:11
**asking** 18:1 47:12
118:22 147:7

236:11 251:1,21
252:3 253:14
257:22 262:18
264:16 280:8
310:8 319:17
331:12
**asks** 165:8
**aspect** 188:11,18
190:14 191:2
272:20
**aspects** 76:9 204:8
273:16,18
**assaulted** 287:4
**assert** 169:5
**assertion** 328:7
**assess** 246:5
**assessed** 315:21
316:6 322:15
**assessing** 198:17
**assessment** 234:22
237:8 297:21
322:20 323:6
327:3,4
**assessments** 257:17
**assign** 76:3
**assigned** 34:6 102:6
147:12 265:16
**assigning** 300:14
**assist** 114:14 162:7
321:14
**assistance** 121:21
**assistant** 10:3
29:10 41:18 49:19
101:20 102:8
121:12 175:10
176:7 177:12
191:10
**assisting** 126:4
145:2,16
**Associated** 291:7
**assume** 87:4 288:22
289:3 299:17
331:22
**Assumes** 81:9
**assuming** 118:6,8
118:16 299:22



**assumption** 69:12
301:2 303:1
**asylees** 266:9,15,18
267:8,20 268:1,8
268:18 269:20
270:12,16
**asylum** 58:3 70:2
70:10 71:10 73:13
76:16,21 77:4,8
80:15 94:10,21
95:20 106:14
108:10,12,20
109:1 113:5,10,14
114:1 119:4,9
136:6,20 137:10
140:5,12 142:1
144:12 154:19
189:7 193:7
202:15,19 204:1,4
205:4,8,17 206:3
208:3,16 209:17
210:4,22 230:22
231:6,7 232:11,12
237:9 259:18
261:9 263:15
265:18 266:9
268:19 270:12,17
282:7,10 283:7
284:5,19 285:7
290:11 291:16
307:1,5 326:21
**Atkinson** 8:3
229:18 256:7
257:12 258:13
259:9,14 261:7
264:1,16 275:22
293:8,10 295:22
296:4 298:5
300:20 303:7
306:13
**Atkinsons** 282:4
**Atkinson's** 294:5
295:7 297:16
298:12
**attache** 125:20
**attached** 8:14

217:3,7 224:8
225:11,12,14
271:3 329:9
**attachment** 226:1,5
255:20 257:9,9
265:11 306:13
**attempt** 240:17
**attempted** 270:9
**attempting** 231:8
245:9
**attend** 29:12 42:11
42:13 46:10,13,21
134:11 149:11
**attendance** 331:18
**attended** 43:8
**attending** 42:10
46:21
**attends** 40:11
**attention** 61:12
62:11 95:16
164:15 184:10,14
275:21
**attest** 277:20
**attorney** 16:14,16
16:17 167:12
331:12,12,16
**attorneys** 19:21,22
20:2,5,6,8,14,22
20:22 25:18,19
26:1,2,3 165:11
222:17
**attorney-client**
165:6 167:13
169:5 181:2
194:14
**attributed** 119:8
130:19
**audible** 15:18
**audibly** 19:11
105:8
**Aug** 7:15
**august** 6:2,12 7:8
101:15 102:17
135:19 142:21
143:4 144:6 145:5
146:6 213:11

223:22,22 224:17
291:6
**Author** 249:18
**authorities** 89:2
158:15
**authority** 180:9
282:6 307:4
**authorization**
110:20 179:16
**authorized** 178:3,5
**available** 28:1
109:11,22 113:19
114:2 115:1,11
117:20 128:14
**Avenue** 10:8
**average** 28:13
**avoid** 130:21
**awaiting** 107:7
116:3 129:22
139:10
**aware** 40:2 54:7,12
54:16,20 55:2,7,9
56:18 58:4,5
59:12,14,16,19,21
60:1,2,4,6,11 61:6
61:10 92:22 95:4
133:2 135:8,10
140:10 153:10
158:4,8 181:22
182:6,8 183:6,9
183:12 186:4
188:8 224:15
231:13 241:22
242:16 250:17
251:1,3 254:17
258:22 276:19,22
307:1,13,16 308:2
308:3,4 309:20,22
326:4,8,13 327:4
**Awareness** 122:4
**awful** 60:10
**A-minus** 16:12
**a.m** 1:15 2:4 42:3
42:19,22 43:8
45:21 46:10 47:5
47:6,8 48:4,19

96:15,16 106:9
122:19 125:17
134:7,8 163:15
164:2 170:19
187:2

---

### B

**B** 86:4,8,13,15 87:2
**back** 16:11 24:2
32:21 33:1 34:16
35:18 47:6 57:18
66:15 91:19,22
92:16 95:1,4 96:1
96:19 97:19
119:14 134:4,18
140:21 152:22
153:3,14 160:17
160:18 164:8
165:20 167:14
168:12,13,15,16
168:18,20 169:4
169:11 172:2,16
181:4,6,13 184:21
189:18 194:21
195:4 199:13
226:19 227:11,19
227:22 228:14
229:1 236:21
239:19 249:3
259:19 261:9,21
262:9 263:12,16
266:18 271:7
273:12 274:2
282:3 284:5
295:13 297:7
301:4 302:2,10,18
306:12,20 307:6
314:2 326:15
327:12,13 328:3
**Background**
216:17
**backs** 228:4 328:6
**backwards** 274:12
**bad** 174:4 276:12
314:3
**Bailey** 61:12,14,20

62:4
**Baja** 126:3 128:22
131:17
**band** 85:19
**barrier** 93:11 96:5
**barriers** 94:7 190:1
**based** 71:6 80:22
89:1 118:8 127:6
130:10 131:20
155:21 158:7
164:22 188:13
255:5 285:9
307:20 320:2
323:20 324:8
325:2 326:21
327:11
**basically** 283:20
**basis** 28:20 31:1
40:8 42:11,14
43:15 44:12 130:4
168:20 187:19
189:13 219:11
228:5 303:19
327:15
**Bates** 52:17,18
55:21 58:18 82:2
101:3 105:5
106:18 123:21
132:17,18 135:17
142:14 146:17
163:3 168:19
169:3,21 174:20
180:20 194:3
196:15 199:14
201:13 213:1,2
215:11 220:9
222:1 223:17
226:7 229:16
243:9 296:14
**bathrooms** 152:1,6
156:4 285:18
286:17,20 287:1
288:9,11 318:7
**Beach** 107:11,17
116:1
**bearing** 105:5



229:16
**bears** 163:3 215:11
  223:17 226:7
**becoming** 315:8
**began** 69:8 70:11
  100:3,5,11 103:20
  104:15,16 151:4
  157:8 272:22
  294:5 308:20
  314:7
**beginning** 92:10
  106:11 137:5
  152:10 159:11
  162:14
**begins** 52:13 53:9
  82:2 108:21
  123:20 132:17
  135:17,19 141:20
  142:14 148:17
  180:20 199:13
  200:22 201:2
  220:8 230:18
  243:10 245:2
  255:20 294:3
  306:14
**behalf** 3:2,11
  141:14
**belabor** 144:5
**belief** 286:6
**believe** 13:13 34:13
  35:16 47:9 54:2
  55:5 57:13 65:11
  68:10 70:9 71:9
  71:12 72:17 73:1
  73:6,21 77:2,6
  78:1 79:12 95:12
  100:14 103:10
  106:1 108:2 113:7
  118:17 125:10
  128:1,8,17 129:3
  129:8 130:16
  141:13 147:12
  148:6,7 150:16
  154:6 157:14
  160:7 161:10,18
  162:4,12 165:12

165:14,18 174:9
  179:17 185:3
  197:9 219:9
  220:13 227:14
  229:1 231:19
  234:1 237:6 238:1
  239:1 253:22
  255:8 256:5,16
  260:10 265:14
  267:12 268:4,17
  268:20 269:16
  271:10 282:21
  283:2 286:15
  288:8 301:8 302:7
  302:8,12 317:1
  324:22 325:7
**believed** 89:14
  126:12,15,19
  127:4 130:13
  158:15 264:17
  268:1 285:20
  307:10 316:1
**believes** 128:21
  233:11 298:2
**Ben** 3:15
**beneath** 279:10
**berating** 292:12
**Berg** 224:11
**besetment** 20:19
**best** 16:3,10 23:17
  32:16,19 33:12
  128:6,11 136:19
  156:6 157:18
  182:20 190:21
  257:11 272:5
  312:3,5
**Beta** 89:3 128:2,7
  136:15,15,16,18
  136:22 137:3,6
  141:15,21,22
  142:4,10 162:13
**better** 16:10 88:14
  99:3 129:20
  176:21 237:15
  285:4 286:21
  288:8 290:11,19

302:10
**Beverly** 6:19 148:3
  148:4,5,7,11
  170:3,18
**beyond** 110:21
  242:21 261:15
  262:15 285:16
  309:7 315:4
  326:11,17
**big** 176:6
**billion** 51:1
**Bishan** 234:15,16
**bit** 79:20 90:16
  99:3 100:2 136:14
  137:14 184:22
  189:10 191:12
  219:14 324:14
**blame** 126:6
**blank** 276:16
**block** 231:7 232:12
**blocking** 231:6
  232:11
**blood** 330:13
**board** 30:7 190:18
  289:13
**Bodies** 8:6
**body** 56:7 147:6
  304:8
**booths** 273:19
  321:2
**border** 5:16 9:19
  9:22 30:10 40:21
  52:10 68:7,15
  69:1,7,16 85:13
  92:7 102:8 107:6
  107:11,13,15
  110:21 112:3,11
  112:14 116:1
  138:3 140:13,16
  144:8 145:6 146:3
  147:17 153:11
  158:10 161:16,17
  167:1 175:11
  186:21 188:15,16
  193:4 202:1 203:7
  214:7 218:5 230:8

235:6 244:6 262:4
  265:8 266:8
  285:13 286:7
  287:3,7,18 288:4
  288:13 289:11,12
  289:13 290:1,12
  301:21 313:13
  314:4 315:7,11
  320:21,22 321:7
  321:15 323:11
**borders** 72:3
  289:19,20 290:21
**boss** 27:16 120:3
**bottom** 52:14 55:16
  102:18 119:18
  148:12 163:14
  170:7 175:20
  178:17 213:13
  224:7 249:12
**boundary** 81:7
  84:20 88:16 90:5
  91:3,15 93:3
  152:22 153:4,6,10
  153:15,21 154:12
  154:20 155:14,15
  262:12
**Box** 3:16
**boxes** 213:13
**Boyd** 7:4 194:6
  196:17 197:22
**BP** 166:19 167:1
**branch** 136:17
**Braunstein** 119:20
  120:10,14 121:8
**Brazil** 313:18,19
**break** 17:3 44:3,4
  96:12,13 133:21
  137:13 167:20
  181:17 228:15,16
  229:5 255:12
  275:9,10,11 306:8
  306:10 312:13
**breaking** 231:19
  233:20 234:2,3
  237:16,20 238:2,7
  238:8,16

**breaks** 16:21
**bridge** 138:9,11
  148:20 172:16
  259:22 265:20
  267:16 271:9,10
  271:11,15,19,21
  272:21 274:8
  300:9,11,12 302:4
  302:10
**bridges** 69:20
  139:21 148:19
  151:5 236:18,20
  266:5 272:18
**briefing** 42:16
**briefly** 328:3
**bring** 24:2 118:20
  137:19 138:10,19
  138:20 140:17
  155:1 189:6
  236:19 237:13
  318:1
**bringing** 139:14
**broader** 137:1
  193:6
**broke** 54:21 55:4
  230:20 238:11
  239:6 240:2,16
  254:22
**broken** 55:6
**Brooks** 323:14
**brought** 95:3,16
  147:18 184:10
  252:17,19 264:13
  274:16
**Brown** 2:3 3:3
  101:11
**Brownsville** 35:16
  36:2,12 37:21
  39:10,11 69:11
  85:16 90:10
  139:18,20 154:11
**Bs** 86:6,21
**bubble** 248:21
  249:1
**bubbles** 248:18
**budget** 50:15,21



**build** 313:21
**building** 10:9,10
28:17 111:8,11,14
152:18,20 153:15
153:18,22 154:13
288:5
**built** 273:19 313:22
**bullet** 103:1 111:8
111:9
**bumped** 47:1
**Burg** 225:1
**Burney** 4:3
**business** 45:11
321:3,6
**B-plus** 16:12

**C**

**C** 3:1,1 5:1 9:1 86:4
330:1,1
**Calexico** 69:10
85:15 89:17
157:15 189:1,4,6
314:18
**California** 1:2
126:4 128:22
131:17 207:18
208:11
**call** 52:17 61:12
107:17 141:14
144:10,20 163:12
163:16 164:5
184:14 187:22
317:20
**called** 34:8 40:22
45:1 77:14,22
86:20 108:3 129:4
165:20 182:1,4
190:2 198:15
216:17,21 226:1
**calls** 43:19 61:18
98:13 165:5 211:8
264:19 305:13
319:14
**camped** 286:18
**camping** 151:21
**camps** 289:10

**Canada** 208:19
**canceled** 48:20
314:1
**candid** 53:21 54:2,4
54:9,10,14,18
**candor** 231:3
**canopy** 93:7
**cap** 122:18 123:3,4
**capabilities** 106:21
114:17 314:8
**capability** 113:21
151:19
**capable** 131:4
**capacities** 80:3
185:9,18,22
186:10 187:18
189:11
**capacity** 68:6,10
69:3,4,8,13,20
70:12 71:6 74:9
74:10,11,12,13,15
75:3,12 76:2,7,8
80:4,7 84:19 88:4
90:2,21 91:14
104:9 113:18
114:10 119:13
137:19 138:3,19
139:22 155:1,4
164:9 172:3,21
182:17 184:5,8
185:13,13,14,16
186:11,22 187:2,3
187:6 189:2,14,20
190:6,22 223:3
261:15 262:8,16
262:17 263:8
266:17,19 285:10
285:16 308:20
309:7,8 314:15
315:5 316:8,9
317:7 318:4,4,8
319:6,8 324:20
325:3,9,13 326:12
326:22
**caption** 19:8
**capture** 204:17

**captures** 188:4
190:18
**car** 93:12
**cards** 320:22
**career** 15:5 50:5
52:6 177:15
**carefully** 181:16
**cargo** 86:11,12
190:11 205:11
321:10,11,16
**Carlos** 105:11
119:18,22 121:3
121:17 123:9
125:16 126:11
**carriers** 209:5
**carrying** 326:2
**cascade** 71:4
**cascaded** 79:6
**case** 1:5 20:3 26:8,9
27:3,4,10 71:16
187:16 203:21
209:2 222:17
234:15 241:19
283:19 307:14
308:13,14 311:12
**cases** 11:20,21 12:8
12:9 14:19 15:2
121:18 140:11
172:19 239:20
279:13
**Castillo** 225:19
**CAT** 147:21
**catch** 169:18
**categories** 204:7
**category** 186:6
193:6
**cause** 32:3,3 36:15
165:19 307:9
**caused** 130:8,14
131:19 273:2
**causes** 87:15
**causing** 126:8
183:22 273:10
**CBP** 9:22 10:2 18:1
18:2 20:8 21:21
22:1 25:20 26:3

26:16 34:20 40:12
41:4 44:1 51:3,9
51:13,16 53:4,10
53:15 54:2,12,17
54:20 55:2,8
56:14,19 57:7,11
60:12 62:3 64:3
64:19 71:9 76:10
78:5 79:13,14,18
79:19 82:22 86:3
86:10 93:5 94:11
95:22 97:4 105:16
108:15,20 112:9
112:13,14 125:2
125:20 128:3
141:14,20 142:3
145:14 159:17
170:11 171:4
175:20 181:22
182:2 187:17
194:18 196:21
199:18,22 200:22
201:2 204:5,21
205:1,6,15 206:18
207:4 209:16
210:13 212:6
215:11,16 216:6
217:16 218:16,17
230:7,9,20 231:2
232:10 233:14,20
234:5,8 237:16,19
238:4,10 240:10
240:20 241:3,19
242:4,6 244:5
245:8 250:5
252:14 256:15
258:2,13 259:2,3
259:8 260:2
262:13 263:6
265:8,16,17
283:16 285:6
293:12 294:16
296:19 299:15,15
306:7 308:8
309:13,20 310:13
**CBPALTR00003...**

7:12
**CBPs** 203:12
**CBP's** 18:19 67:4
201:9 203:7,14
**cc** 120:22 147:8
**cc's** 229:18
**cease** 258:18,20
259:1,4,10
**cell** 318:12,15,18
319:2,5
**cells** 74:14 88:10
317:9,10,19,20
318:2,5,6,22
319:8
**cent** 257:21
**center** 27:19 28:12
34:5,8 35:12
36:18 281:6 326:6
**certain** 17:22 39:11
47:20 76:10 86:11
139:15 188:3,9
198:16 204:7
251:14 259:5,6
**certainly** 114:20
130:6 180:4 183:3
272:15
**certify** 329:7 330:7
330:12
**cetera** 207:9
**CF** 121:18 122:6
145:1
**chain** 6:6,8,12,14
7:15 8:7,9 82:8,12
101:16 102:19
105:11,22 106:4,7
123:20 124:6,7,11
124:12,21 132:19
135:17,18 136:1
142:21 143:4
148:12 159:17,21
163:4 178:17
197:2 252:18
294:5 295:4 296:3
296:13,15
**chairs** 276:14,20
277:2,2,6,11,16



277:21 278:1,6,14 278:20 280:5,9,17 281:14,17
**change** 50:19 150:17 218:10 317:16
**changed** 276:22
**changes** 231:5 331:3,4,7
**chapter** 60:20,20 60:22 61:1,21 62:1 231:14,15,22 232:4,10,16,17,20 234:7,12 235:10 235:16 236:1,3 237:3 254:21 257:14 269:3 273:17 301:4,18
**chapters** 61:22 231:16 235:22 301:20
**characterization** 80:18 129:12 253:2
**Charmaine** 224:1,7 224:8,17
**Chavez** 146:21 148:11 149:14 150:20
**cheap** 313:20
**check** 58:6 107:19
**Chicken** 209:9
**chief** 20:8 25:19 29:10,11 40:21,21 40:22 144:7 147:8 194:16,16
**child** 8:5 291:8,10 292:9
**children** 313:12 318:17
**chilled** 241:17
**chilling** 73:1 231:7 232:15 240:16 241:7,9,21
**choice** 207:7 267:1
**choose** 288:18

**chooses** 207:5
**chose** 209:18 298:5
**chosen** 209:16 211:18,22 212:3
**Christine** 25:20 97:8
**circled** 82:19 221:16,18 222:19 223:2,3
**circumstances** 35:17
**CIS** 308:14,14
**cite** 67:3
**citizen** 246:7
**citizens** 110:21
**city** 78:9 125:21 126:7 127:5,7 139:4
**Civil** 31:7,7 182:1,1
**claim** 132:2 228:12 246:8 308:15 309:9,15 318:11
**claiming** 98:19 109:20 131:17 144:22 145:1 254:21 282:12,17
**claims** 136:6 142:1 144:12 189:7 232:10
**clarification** 60:15 256:12 307:3
**clarifications** 299:11
**clarify** 91:6 96:20 319:17
**clarifying** 97:17 128:10 219:13
**clarity** 60:20 215:15
**Class** 85:20 86:1,2 86:4,4,6,7,8,13,15 86:21,21 87:2,2 87:10,12
**classified** 43:19 244:22
**claw** 134:3 160:16

160:18 167:14 181:4 194:21 199:12 227:19 228:4 229:19 328:3,6
**clawed** 168:15,15 169:4 181:6 227:22 327:12,13
**clawing** 168:18,20 181:13 195:4 226:19 227:11 229:1
**claw-back** 328:7
**claw-backs** 228:20
**clear** 66:6 94:5 98:16,21 129:21 136:21 137:16 169:10 225:16 226:18 234:14 240:3 253:20,22 255:8 276:11 288:3 300:3 326:1
**clearer** 232:22
**clearly** 98:18 118:9 156:11 226:11 229:2 250:22
**closed** 58:3 110:13 148:20 171:22 172:15
**closer** 95:5
**Columbia** 329:3 330:4,7
**column** 80:21 81:2 85:2 89:7 90:17 184:13
**columns** 84:13,17 85:1
**come** 30:10,12,16 36:3 37:12,15,17 43:14 61:19 66:15 67:15 72:18 93:4 93:4 108:20 116:13 119:13 131:1 137:10 139:10 140:3 153:18 164:8,15

172:2,16 186:16 186:20 187:7 205:22 209:15 218:7 228:14,20 262:8,12 268:7 270:10 284:1 309:6,8 310:14 313:10 318:10
**comes** 108:8,14 109:12 187:2,22 209:22 289:20 318:13 320:21
**coming** 193:12 206:15 208:21 210:14 232:3 274:14 315:9 321:5
**command** 251:6 252:19
**commander** 36:8 84:7 176:5
**commencing** 2:4
**comment** 248:17 248:21,22
**commentary** 80:6
**commented** 64:6
**comments** 65:21 248:9
**Commission** 330:20
**commissioner** 10:3 27:16 28:5,8 29:1 29:2,10 40:17,17 41:2,4,11,19 46:20 49:3,3,19 77:19,21,22 78:3 78:19 79:1,7,10 121:13 126:2 147:9 149:17 150:2,11 157:2,2 158:10 177:12,15 177:16,18 191:10 196:1 199:18 215:1,16 280:1,4 281:2 298:6
**commissioner's**

280:8
**committee** 12:15 12:19 13:2,11,15 13:18 28:20 133:17 134:12 135:6 144:9 146:4 158:11 183:9
**committees** 12:11 12:22 13:9
**common** 287:12,14 287:15
**Commonwealth** 2:7
**communicate** 79:7
**communication** 70:6 300:19
**communications** 57:9,15 78:22 165:6,11 167:13
**community** 316:5 321:3
**compared** 71:19 193:14
**comparison** 166:19
**compensation** 236:22 237:4 301:4 302:19
**compete** 190:13
**complaint** 7:13 219:17 220:8 226:2 297:17 298:12 300:17,18 300:22
**complaints** 116:17 235:13,15 236:6 259:9 297:18 300:13
**complete** 18:12 57:10 106:1 108:6
**completed** 305:20
**completion** 331:13
**comply** 53:4
**component** 203:7
**composition** 317:15
**computer** 248:12
**concern** 164:17



166:4 211:13
222:22 223:1
251:16 265:3,15
273:2,11 301:10
301:12 302:2,6,21
306:14,17 307:9
**concerned** 127:7
165:22 240:14
267:15
**concerning** 323:3
**concerns** 158:14
166:9 238:1,5,11
238:15 240:7,10
240:13 271:17,18
272:8,11,14,15
273:5,8,10,16,19
274:7 301:15,17
301:21 302:4,8,13
304:17 325:3
**concisely** 22:17
**conclude** 239:3
**concluded** 214:11
328:11
**conclusion** 116:11
118:21 119:1
211:8
**conclusions** 182:14
324:11
**condition** 324:13
**conditions** 74:16
118:8 129:14
152:4 236:16
237:7,11 275:1
285:11 286:3,6
289:7 290:11,19
290:21 302:10
316:14
**conduct** 5:17 52:11
53:5 56:3,4,10,10
110:15 114:21
210:9 259:7
297:19 298:3
**conducted** 9:7
312:18 322:10,20
**conducting** 282:13
282:18

**conference** 21:8
112:7 144:10
274:17 314:20
315:13,22 322:16
**confidence** 53:11
**confidential** 1:11
7:17 243:12
327:21 328:1
**confused** 26:12
97:9
**confusing** 319:19
**confusingly** 249:11
**Congress** 12:11,22
**congressional** 95:3
95:7 143:10,11
146:7 158:21
198:9
**connection** 19:21
59:6 182:12
**connections** 188:5
**connotation** 267:4
**consequences**
18:16
**consider** 188:22
190:2 308:15
**consideration**
74:15 149:18
**considerations**
74:21 318:10
**considered** 272:21
**consistent** 142:5
197:16 203:12
214:9 231:19
301:15,18
**constitute** 297:20
**constitutes** 44:1
**constrained** 69:4
69:13
**constraints** 68:7,10
118:11 325:13
326:12,22
**construction** 104:9
111:16,22 145:3
**consult** 43:22
**consulted** 50:7
**consumables**

209:11
**consume** 44:15
**contact** 62:5 139:14
**contacted** 238:21
239:1
**contains** 19:14
167:12 194:12
**contents** 67:8 83:4
83:6 105:19
216:13 250:2
**context** 22:10 313:9
**continuation** 294:4
296:15
**continue** 104:2
111:5 166:7 181:9
198:22 214:14
226:17 227:10
**continued** 3:21
5:22 71:17 213:19
**continues** 142:15
199:3,14
**contribute** 65:1
**control** 104:11
118:10 128:7
161:13,19 162:1,2
166:5 179:4
180:11 260:2
285:9 314:14
**controlled** 191:4
**controlling** 89:4
162:7 164:22
179:11
**conversation** 15:11
38:9
**conversations** 20:2
222:16
**convert** 314:20
315:3,13
**converted** 115:6
274:17
**converting** 315:22
322:15 323:3
**convey** 268:11
**coordinate** 137:6,9
138:10,18 139:14
140:5 141:21

142:4
**coordinated** 295:8
**coordinates** 137:3
**coordination**
138:21 141:15
**copied** 194:7 256:9
**copies** 295:4 331:17
**copy** 49:17 52:4
97:20 121:8
169:12 199:21
217:6 219:16
220:6 243:20
256:3 299:8
309:21
**corner** 52:14
**correct** 11:7,10
13:3,6 25:12 32:9
34:18 38:3 39:19
46:5 47:3 57:12
58:2,16 59:2,10
60:18 64:3 67:5
67:13,14,22 71:15
74:4 75:13 78:6,7
78:14,15,17,19,20
81:1 82:12 83:1,5
84:3 85:11 86:18
89:11,12,16 90:6
91:3,4,8 93:6
95:18 96:22 97:15
101:17 103:15
105:13,14,17
106:16,21,22
107:4 108:17
109:1,2,3,5 110:9
110:10,17 111:3
112:20,21 113:2,6
113:10,11,14,20
113:22 117:21
118:2,14,16,17
119:2,20,21 120:4
121:1,6,7 122:15
123:22 124:12,18
125:2,5,6,8,13
126:13,16,20
127:11,12,14,15
127:19 128:13,19

129:1 132:22
133:5,19 136:3,4
136:6,7,9,12
137:3 138:4,5,7
139:4,5,8,16,17
139:19 140:19,20
141:9,10 142:7
143:1,2,3,5,6,8
144:17,18 145:9
145:12,15,17
146:9,22 147:1
148:15 150:5,13
150:13 151:1,2,5
151:13 152:18,19
152:21 153:1,2,5
154:1,3,4,7,8,10
154:21 155:5,9,12
155:13,16 158:6
158:12 159:14,15
159:18,19,22
160:4,5,9,10
161:12,19 162:1,5
163:9,10,12,13,22
164:1,2,3,11
166:14 167:1,2
169:22 170:4,5,12
170:13,15,16,19
170:20 171:1,2,5
171:6,9,10,13,16
171:16,17 172:5,9
172:11,12 173:1,4
173:14 175:13,21
175:22 177:7,19
178:22 179:1,12
179:13 180:10
183:7,8,11,14
184:5 185:10,11
185:13 186:5,8
192:9,11,12 193:8
193:18 194:5,7,8
195:5,6,16 196:18
196:19,21,22
197:3,4,7,20
199:19,22 200:4,7
200:10,18 202:16
202:21,22 203:3



203:13,18 204:21 206:12,17,20 207:5 210:4,15 211:20 212:5,11 212:14,15 213:9 213:10,11,12,19 214:12 215:13,14 215:16,17,18,19 216:3,6,13,22 217:3,4,7,11,12 217:16,17 218:12 218:18 220:16,22 221:8,9,13,17,18 224:5 230:1,3,4,8 231:22 232:7,8,12 232:15 233:16,20 237:17,21 238:19 238:20,22 243:22 244:3,7 245:15,16 245:22 247:4 249:16 250:12,13 250:15,16 252:8,9 252:17 253:5,6,22 254:5,9,16,22 256:13,15 257:6 257:10 258:4,5,6 258:7 261:9,12 262:9,10,14 263:5 263:9,12 264:3,4 265:3,4,13 266:1 266:2 267:2,9,20 268:3 272:7,12,16 274:5 279:8,9 282:1,2 283:15,17 283:18 287:11 288:21 289:2,14 293:1,2 294:6,9 294:13 295:3,9,10 295:11,16,17,19 295:22 296:16,21 298:13 299:16 301:5,7,17,19 302:15 303:2,3 323:22 325:3,4,10 325:14 329:8
**corrected** 164:6

166:11 171:21 174:9
**correction** 182:3 332:2
**corrections** 329:8
**correctly** 53:12 56:12 59:7 103:4 103:12,17 107:8 110:6,16 115:9 116:4 122:1,22 126:9 142:6 144:14 145:3 149:1,21 164:10 166:21 172:4,22 179:8 198:4 201:5 202:2 203:10 224:13 231:10 245:11 246:11 250:7 260:4 265:21 266:11 276:17 279:13 282:14,15 297:9 307:7
**correspondence** 70:20 121:4 227:20
**corridors** 316:15
**Council** 4:4 133:13 134:13 135:7,8 144:7
**counsel** 20:8 21:16 21:21,22 22:1 24:17,19 25:19 26:3,19 43:22 44:3 97:4 134:1 145:5 146:7 156:14 168:13,17 194:16 219:20 225:11 227:1,3,5 227:15,15 292:11 295:9 312:12 331:9
**counsel's** 24:8,10
**counted** 270:3
**counter** 217:21
**counterfeit** 210:18

**counterpart** 179:4
**counter-narcotics** 202:7
**counter-terrorism** 75:16 76:12,20 77:2 188:5 201:10 201:11 203:18 206:21 207:8 320:11,15
**countries** 318:19
**country** 30:8 72:2 202:18 205:12 207:16 208:18 209:1,15,20 289:17 307:21 320:20
**couple** 15:15 152:15 248:6 262:1 316:20
**course** 82:22 164:6 166:11 171:4,21 196:21 199:22 248:14 256:15,20 294:16 296:19
**court** 1:1 11:12,14 15:2,13,16,18 18:9 259:2 307:17 331:13
**courts** 310:2
**courtyard** 286:22
**courtyards** 286:2 286:19
**cover** 302:9
**coverage** 121:22
**CR** 254:13
**CRCL** 182:4,6,8,12 182:13,15,17,21 183:6 254:7,10
**create** 87:10,12 92:7 107:2 259:21 260:10 289:6
**created** 73:17,22 74:3 92:11 111:13 203:14 212:6 249:21 274:15
**creating** 130:17

274:20 286:3 316:13 324:8
**credibility** 236:5
**credible** 106:14 108:15,19 109:13 116:3 122:6 237:2 245:10 279:12 309:1,2,9
**criminal** 18:15 56:9 319:5
**crisis** 30:15,18 43:7 44:9,18 84:8 126:8,13,15,20 127:2,4,8 128:18 129:5,7,13,17,21 130:2,5,9,11,14 130:18 131:18,22 147:13,15 158:6 158:16 183:22 274:13 321:15
**criticize** 185:21
**cross** 93:3,16 284:20,22 291:18 292:18 321:4,7
**crossed** 32:20 154:19 182:9 260:19 261:5 321:3
**crossing** 241:18 320:22
**crossings** 69:16,17 69:18 186:20 273:17
**cross-border** 320:21
**crystal** 234:14 255:8
**Cs** 86:6
**cumbersome** 186:13,19
**current** 145:2 218:13 234:13 275:20
**currently** 115:22 141:15,22
**Custodian** 305:20

**custody** 74:16,17 142:2 186:3
**customs** 5:16 9:19 9:21 52:10 108:1 265:8 317:13
**cutting** 73:12
**CVP** 186:8
**C-plus** 16:11
**C-1** 179:3
**C1** 41:5,7 46:22
**C2** 41:10 46:22 135:2 148:18 149:18
**C22** 179:3

---

**D**

**D** 9:1 87:10,12
**daily** 28:20,21,22 40:8 44:12 46:1 48:4,13,14 172:19 187:19 189:13
**dangerous** 201:4 201:11 209:19
**data** 44:9 258:15 324:10
**date** 5:18 12:16,21 67:11,13,16,18 85:3 119:14 160:3 263:9 306:21 312:2 331:5 332:21
**dated** 63:18 194:7 200:6 212:10 213:11 215:20 223:22 229:22 265:5
**dates** 106:4 125:5 171:8
**daughter** 292:15
**daughter's** 292:15
**David** 3:14 8:3 229:18,18 230:12 240:9 256:7 257:12 258:12 275:22 281:9,12 281:14 293:8



294:5,12 295:21
303:7 305:9,15
323:15
**day** 17:8 20:12,16
25:11 26:1 27:9
27:21 28:1,13
36:8 46:14,15,21
48:12 67:17 69:22
69:22 74:19 94:15
97:10 100:13,14
103:16,20 186:15
187:1,1 188:5,11
189:21 190:3
203:13 211:11
321:4 329:17
330:17
**days** 20:13 24:22
25:17 29:1 38:8
47:22 48:20 49:1
221:7 288:10
311:16,17 312:7
331:14,21
**day-to-day** 45:11
74:20 186:12
191:6 325:22
**DC** 3:7,17
**DC2** 41:13
**dead** 209:12,13
**deal** 60:21 61:22
86:22 100:9
136:19 187:20
290:14
**dealing** 38:9,11
296:5 300:18
314:19
**deals** 64:21 86:9
198:11
**December** 1:14 2:5
**decide** 269:11
291:18
**decided** 316:11
323:4,21 324:1
**decides** 75:1,8
**decimate** 207:19
**decimating** 208:18
**decision** 155:11,18

155:20 156:7
157:22
**decisions** 76:7
160:14
**declaration** 14:3
**Declaratory** 7:13
**decode** 150:1
**Decoding** 122:10
**deemed** 325:2
331:15
**defecate** 274:19
**defecating** 286:4
**defendants** 1:8
3:11 168:18 169:4
305:19 328:2
**defendant's** 181:7
312:12
**deferred** 245:21
**define** 20:6 74:10
74:11,12 107:21
218:2 257:20
**definitely** 39:13
166:17 167:12
180:8
**degree** 45:12,13
**delayed** 321:11,12
**deleted** 305:16
**deliberations** 32:4
36:15 87:15
160:14
**deliberative** 168:22
169:6 181:3
194:13,15
**Democratic** 144:7
**demographics**
74:16 318:10
**denied** 307:19
**deny** 307:4
**denying** 231:5
232:10
**Department** 3:12
17:12 20:9 26:2
247:19
**dependent** 176:5
**depending** 31:3
94:14 139:20

176:12 204:6
**depends** 264:2
**depicted** 217:10
**deport** 184:8
**deposing** 331:12,16
**deposition** 1:11,12
2:2 5:10,13 11:15
17:11 19:2,7,9,13
19:17,21 20:4,11
20:15 21:4,12
26:4,5,6,15,17
27:2,9,14 49:7
51:22 52:19 63:1
63:8 81:18 82:1
96:21 98:9 100:19
101:3 104:21
105:4 123:14,19
132:12 135:12
142:17 146:12
159:5,10 162:20
167:5 169:7,9
174:13,18 180:15
193:21 196:9,14
199:6,11 212:17
215:5,10 220:2
223:11,16 225:4
228:1,3 229:11
243:4 248:1
255:15 291:2
292:4 293:20
296:8 327:10,16
327:20 328:11
329:7 330:9 331:2
331:6,9
**depositions** 26:14
**deputies** 62:13
176:12,13,16,16
177:5
**deputy** 27:16 28:5
28:8 29:2,10
40:17 41:2,11
46:21 49:3 84:7
120:11 121:12
134:18,22 135:2
143:18,22 147:9
150:2,10,10,11

157:2 175:5 176:5
176:17,20,22
177:3,11,14
194:15
**deputy's** 133:17
134:12 135:6
**describe** 31:21
142:8
**described** 203:9
205:3 214:10
**describes** 261:19
261:20
**Description** 5:12
5:15 6:1 7:1 8:1
**designate** 327:21
**designated** 119:8
243:11 328:1
**designed** 268:13
269:19 270:11
315:1 317:8,18
318:3,5 323:4
324:8
**desire** 70:2 290:16
**desired** 70:4
**desist** 258:19,20
259:1,4,10
**desk** 62:19
**despite** 255:7
**destruction** 313:19
**detailed** 45:15
**details** 179:10
**detain** 282:7
284:21
**detained** 109:8
245:4 246:7
**detainee** 245:14
**detainees** 84:19
88:1 89:20 90:18
107:7 246:8
**detaining** 284:19
**detention** 74:14
106:21 108:5,9
109:9,19 111:20
114:3 121:19
164:9 172:3
185:13 259:21

260:1 314:8,11,11
315:2,5,16,17
316:13 317:9,11
**deter** 70:2,4,10
71:10 98:6
**deteriorated** 152:3
**determine** 140:18
179:6 228:4 245:6
278:12 281:10
310:9 327:22
**determined** 58:8
322:17
**determining**
278:21 281:22
**deterred** 241:16
251:22
**deterrence** 98:8,12
99:7 100:1 174:7
**deterrent** 72:13,17
73:3,7,9 172:18
173:4,5,8,13,16
173:16,19 174:2
174:10 183:14,16
241:13 246:10,16
247:2 248:22
252:22 253:9
254:4,19 268:14
**deterrents** 98:1
99:15 250:4,7,12
250:20 251:10,12
251:17,19 253:16
254:9
**deterring** 241:21
**Detroit** 114:21
115:3 121:21
**devastate** 207:17
**developing** 244:16
**development**
141:21 142:3
**DF** 177:3
**DFO** 104:10 164:16
176:14 177:1,3
293:13
**DFOs** 177:8,10
323:11
**DHS** 17:12 26:17



MAGNA
LEGAL SERVICES

31:11 133:10,11
144:21 149:6
182:2 238:18
239:3 240:20
250:18 254:14
**DHS-OIG** 31:22
**dictated** 72:4
**Diego** 102:11,12
106:12 107:16
115:22 122:19
133:7 138:18
170:22 242:12
244:3,6 246:14
253:8 315:7
**difference** 43:2
86:7
**different** 13:8
25:10 37:16 43:14
44:6 45:22 86:20
111:16 138:14
151:9,10 153:20
174:5 187:21
188:6,12,15
209:11,14 229:4
233:17 235:22
263:2 318:18,19
318:19
**differentiates** 86:12
**differently** 147:20
187:14
**differs** 186:12
**difficult** 189:22
**diminished** 39:6
**direct** 27:16 28:3,4
28:5 48:5,9 52:7
75:15 120:13,18
157:21 201:18,20
201:20 211:12
219:20 266:17
275:21
**directed** 74:19
75:14 96:1 227:5
239:7 314:1 327:1
**directing** 34:15
198:16
**direction** 99:21,22

227:15 240:3
260:2 274:1 300:3
300:4,8 326:2
**directly** 34:15 48:6
48:9 79:7,15
204:8 325:21
331:4
**director** 12:3 27:17
27:18,19 28:9,10
28:11 35:2 64:4
64:21 70:7 71:9
101:22 102:1,8
103:7 117:20
120:1,5,8,11
141:14 143:19
148:8 163:8 175:6
175:10 176:7,8,8
176:9,11,14,22
177:2,10 196:2
230:15 310:15
325:5,11
**directors** 29:9 62:7
70:9 71:4 92:6
101:21 176:10
179:2,15 180:8
191:5,15 323:12
325:1,18,20 327:3
327:7
**disagree** 184:11
236:18 237:7,14
237:16,18,19
261:1 297:21
**disapproved/date**
213:14
**disaster** 73:17,18
73:22 74:1,3
**disciplinary** 53:5
56:14
**discourage** 98:18
**discouraged** 241:18
**discretion** 325:1,6
325:12
**discuss** 44:4,5
133:22 144:11
160:21 167:14
198:2 306:6,9

**discussed** 25:3 30:2
31:6,11,13,16
35:10 36:11 42:18
42:21 47:8 134:19
144:2 148:18
156:18,21 157:4
213:19 235:18
293:13 304:13,16
325:19
**discussing** 293:15
298:12
**discussion** 38:7
40:14,16 87:18
156:15 158:17
196:7 219:7
323:17,18,20
**discussions** 31:21
32:12 37:22 38:4
48:1 79:4 104:10
155:21 156:1
158:19 165:21
310:1 323:8,10
324:1,3,6
**discussions/date**
213:14
**disease** 204:10
207:22 209:19
316:4
**diseases** 207:15
209:15 210:15
**disgraceful** 56:10
**dishonest** 56:9,15
56:19 57:19 79:13
79:14,18,19
**disprove** 241:6
**disproven** 241:4
**dispute** 129:11
262:1,2,6,11,19
263:22 264:6,7
270:4
**disseminated**
283:21
**distance** 153:9
**distinction** 136:21
**distribute** 331:11
**distributed** 42:7

284:16
**distribution** 132:4
224:22
**District** 1:1,2 329:3
330:4,7
**divert** 320:4,11,12
**diverted** 319:11
321:20
**diverting** 114:18
**diverts** 320:5
**doc** 226:2
**doctrine** 24:5
**document** 7:18 8:2
19:2,8 49:7 51:22
52:5,10 55:14
63:1,6 81:18
82:16 98:10 99:12
99:14,15 100:19
101:4 104:13,21
106:18 123:14
132:12 133:22
135:12 141:8
142:17 146:12
159:5 160:13
161:1,5 162:20
167:5,18 168:2
169:2,7 174:13
180:15,20 181:2
181:11,20 184:7
193:21 195:9
196:9 199:6
212:22 213:2,4
214:13 215:5
220:2,7,11,21
221:6,10 222:19
223:11 225:4
226:5 227:12
228:9,12 229:11
229:15,16 243:4,8
243:14,20 248:1
249:5 250:22
253:2 255:11,15
255:22 291:2
292:4 293:20
296:8,12 300:6
**documentation**

109:12 206:2
324:10
**documents** 21:11
21:13 22:2,6,14
23:3,10,17 24:9
24:12,14,16 25:4
25:6,9,13 66:14
75:3,11 93:2,3,17
127:18 139:7
168:14 181:8,9
182:17 202:18
203:6 212:17
221:20,21 224:5,9
225:8 227:22
228:11,18,18
229:6 251:15
255:5 305:4 306:1
307:19 320:20
327:11
**Doe** 222:5
**doing** 36:16 53:22
63:10 82:4 101:6
101:7 105:8 118:3
128:3 162:5,6,14
162:16,17 180:9
219:9 237:4,9
256:1 259:5
**DOJ** 21:22 97:1
**door** 161:21
**doors** 151:16
152:10,17 274:19
277:3 285:17
313:20 316:18
**dot** 226:2
**doubt** 64:18
**dozen** 15:7
**draft** 50:9 64:6,6
65:5,10,13,21
219:2
**drafted** 45:4 50:8
64:10
**Drive** 11:6,8
**driven** 42:4 99:6
157:5
**drives** 76:7
**driving** 302:3,12



**dropped** 192:22
**drove** 68:21
**drowned** 292:19
**Drugs** 218:7
**due** 128:17 129:18
139:7 145:2 290:1
290:18 291:17
325:13 326:12
**Dugan** 124:15,16
**duly** 9:4 330:9
**duties** 44:16 67:4
82:22 171:4
196:21 210:19
211:16 237:4
256:15,20 294:16
296:19
**duty** 51:14 56:9,15
76:16 210:14,21
278:10 298:3
**D.C** 1:13 2:4 9:20
10:8

———— **E** ————
**E** 3:1,1,1 4:1,1 5:1
9:1,1 249:18
330:1,1 332:1,1,1
**EAC** 41:17 51:9
67:4 78:21 278:11
295:7,11
**earlier** 95:12 100:2
121:15 127:1
136:14 149:19
172:8 173:6
177:22 183:4
192:2 197:17
200:18 218:14
230:5 251:11
254:5 258:3
324:14
**early** 97:9 100:5,12
150:19 163:21
165:21 183:2
313:17
**earthquake** 313:19
**east** 136:11 314:17
**easy** 275:2,5 287:18

**ebbs** 69:19 72:20
**economic** 202:9
203:19 204:12
206:21 321:21
**economies** 207:17
208:10
**Eddie** 7:22 244:5
251:20
**Eddy** 243:21 252:4
**edits** 65:16
**Eduardo** 229:19
**educational** 50:5
**EEO** 11:21 12:5,5
**effect** 72:14,17 73:1
73:3,7,9 172:18
173:4,5,8,14,16
173:17,20 174:2
183:14 232:6
240:16 241:7,9,13
241:21 245:6
254:4,19
**effectively** 75:11
**effects** 232:15
**effort** 87:10,12
195:10,19 222:8
224:21 227:2
242:1 247:7
276:19 326:19
**efforts** 202:5 203:8
273:22 281:8
309:20
**either** 10:20 37:3
48:5 86:21 117:11
158:1 168:14
184:3 227:22
245:9 256:16,19
302:17
**EI** 39:14,15 69:10
69:17 85:15
154:15 162:16,17
163:8 164:5,15
170:22 171:18,20
189:3 246:6
321:17
**Electric** 224:11
225:1

**elements** 93:8
152:12 156:3
286:22 288:10,13
300:13
**Elizabeth** 1:22 2:6
247:15,17 250:10
253:13 255:3
330:5
**Embassy** 125:20
**employed** 9:16,18
315:12
**employee** 53:4
59:12,17 60:12
234:5 257:13
259:12
**employees** 51:2,10
53:10 54:13,17
56:8 59:3,15
60:17 230:6 234:8
253:17 259:7,16
279:12 282:5,10
**employment** 12:7,8
12:9 14:21 287:18
**encounters** 188:6
**ended** 151:20
285:11
**ends** 53:1 55:11
58:19 123:21
124:2 132:18
135:19 201:18
215:12 222:1
265:1
**enforcement** 43:20
44:1 51:6 53:16
53:20 54:8 75:18
86:17 106:20
108:1,2 175:21
218:5 246:2
278:11 317:14
**engage** 27:20 56:8
79:15 180:11
239:16 263:6
313:15
**engaged** 127:11
283:5
**engaging** 150:22

259:11
**enhance** 273:22
**enhanced** 274:2
**enhancing** 237:11
293:14
**Enrique** 147:10
170:3
**ensure** 32:12 99:9
142:4 326:19
**ensured** 36:17
**enter** 101:8 202:18
240:17 259:18,22
260:18 261:8
291:22 293:1,4
320:20
**entered** 91:19
260:20
**entering** 70:3,5
205:12 207:15,22
208:17 209:1,19
219:10 264:3
266:9 268:2,8,19
269:20 270:17
282:8 285:3
313:12
**Enterprise** 40:22
**entire** 54:6 314:9
315:6
**entirety** 168:16
**entities** 288:17
**entitled** 24:5 49:18
52:10 53:18 59:1
63:18
**entries** 17:18
**entry** 30:4,5,6,7,8,9
37:12,20,21 38:5
38:15 39:7,17,22
44:10 68:7,9 69:3
69:17 70:16 71:16
72:2,19 73:14
74:8 75:15,20
80:14 85:7,7,9,21
86:1,8,8,14 87:10
87:13,22 88:22
90:11 92:6,6,11
92:15,18 100:3,8

106:15 108:15
109:12 110:14
112:20 113:6,9,13
113:18 114:10,17
116:8 127:10,18
130:1 133:4 135:9
136:9 137:8,11
139:3,13 140:12
142:9 145:9 146:9
150:4 151:4 157:7
158:2,17 159:1
162:9 170:11
175:4 178:2 179:5
182:7 187:18
189:12,21 190:9
190:14 202:1
206:11,16 210:7
210:17 211:2
230:7 231:8 232:7
233:16 234:6
235:4,8 238:15
239:5,12 240:16
245:5,9 262:4
264:8,10 268:17
272:9,12 276:20
283:5 284:6
285:12,15 286:8
286:14 288:5,21
289:8 293:4,6
297:14,19 298:1
299:16 300:1
307:4,19 317:2,5
317:6,7,8 319:11
320:5,9 321:14
324:20
**enumerated** 121:20
**Equal** 12:7
**erected** 93:7
**Eric** 229:18
**ERO** 108:3 109:9
114:4 116:19
118:12 187:2
314:10 315:15
**errata** 331:1,4,5,8
331:11,16,20
**especially** 87:16



234:11
Esquire 3:4,5,13,14
4:2
essentially 12:8
166:13 176:20
218:10 310:8
estimate 66:11
et 1:4,7 207:9
ethics 18:19 258:2
258:4,13
evaluating 213:18
Evaluation 7:10
213:5,22
event 30:9 31:3
32:15,16,18 33:11
33:18 48:2 186:14
events 22:3 25:14
32:10,12 312:22
evidence 81:10,13
129:17
exact 312:2
exactly 29:7 155:10
178:1
EXAMINATION
5:3 9:7 312:18
322:10
examined 9:5
example 51:9 139:2
179:5 221:11
319:7
exceeded 106:20
Excellent 169:17
exception 22:12
24:4
excess 74:8
exchange 146:20
159:12 170:3
171:3,15 172:7
174:22 196:16
209:20 223:17,21
227:1
exchanged 132:20
252:21
exclusive 99:18
executed 214:18
executive 10:3

27:17,18,19 28:9
28:10,11 29:9,10
41:18 49:19 64:4
67:17 119:22
120:11 121:12
143:19 148:8
177:10,11 191:9
196:2 310:15
exercise 325:5,11
exhausted 295:19
297:5
exhibit 5:13,14,16
5:18,20 6:2,4,6,8
6:10,12,14,16,16
6:17,19,21 7:2,2,3
7:3,4,6,8,10,12,13
7:15,17,19,21 8:2
8:3,5,6,7,9 18:22
18:22 19:3,7 49:5
49:8,12,17 52:1,4
52:9 62:21 63:2,5
63:8,10,11,17
64:2 81:16,19
82:1,22 97:19
99:18 100:20
101:2,15 104:19
104:22 105:4,10
123:15,19 132:10
132:13,16,19
135:13 142:13,18
146:13,16 159:6
159:10 162:21
163:2 167:6,10
168:19 169:3,8,11
169:13,20 174:14
174:18 180:16,19
185:6,8,9 193:22
196:9,14 199:7,11
212:8,18 213:19
213:21 214:11
215:6,10 217:7,7
218:11,12,21,22
219:22 220:3
223:12,16 225:2,5
225:9,13,18 226:5
229:12,16 243:5

247:21 248:2,16
255:16,19 275:20
290:22 291:3
292:5 293:18,21
294:2 296:9,12
304:4 305:9 328:3
Exhibits 5:10,22
8:14 212:22
exist 235:14
existed 142:10
275:1
expanded 217:22
expect 327:6
expectation 326:1
expectations
326:17
expected 53:19
121:22 283:13
expedited 109:7,19
experience 15:9
69:8 320:3 321:20
expert 144:17
Expires 330:20
explain 110:18
137:16 248:6
251:19 268:15
269:17 270:19
305:8,12 306:3
312:21 317:4
319:9,17 320:2
explanation 152:14
253:7,10,12
exposed 152:12
156:3 286:22
288:10,13 300:13
expressed 251:16
272:14
expresses 108:15
109:12
expressing 113:1
extended 198:19,20
214:11
extent 32:2 36:14
36:16 43:19,21
87:14 112:17
165:10 211:7

312:21 326:12
extra 310:9
extremely 15:19
eyes 66:16
e-mail 5:20 6:2,4,6
6:8,10,12,14,17
6:19,21 7:4,15,19
7:21 8:3,7,9 41:6
78:2 82:2,8,11,14
82:18,21 83:4,12
83:16,20,20 84:1
84:2,11,14 101:2
101:2,16 102:13
102:18,18,19,22
103:7,15 105:5,7
105:11,15,19 106:2
106:7,8,12 110:3
115:6,18,21 116:7
116:7 117:3,9
118:13 119:1,16
119:18 120:17
121:1,3 122:13
123:5,9,20 124:6
124:7,12,13,14,20
125:15,20 126:1
126:16,21 127:6
127:14 128:17
130:7,10 131:20
132:4,7,17,19
133:20 135:17,18
136:1,5 140:21
141:1 142:14,21
143:3,4,8 145:15
146:16,20 147:2,6
148:11,12,14
149:15 158:1
159:11,12 163:2,4
163:11,14,22
166:11 169:21
170:2,7,10,17,18
171:3,15 172:6
173:10,15 174:20
174:22 175:5,7
178:8,16,17,19
179:2 180:4,7
183:16,17,19,20

185:1 194:3,6
196:15,16,20
197:1,2,6,9,12,22
198:14 223:17,21
224:4,7,22 225:11
225:19 226:1
227:1,4 229:17,22
230:2,12,17
231:13 232:13,14
233:2,19 234:17
235:19 236:7,9,13
236:15 237:1
240:8,22 241:5
243:21 244:8
245:2 250:10
251:11 252:21
253:5 254:5,6,20
255:20 256:4,6,7
256:9,11,15 257:5
257:8,9,14 258:21
259:13 261:10,22
263:13 265:12
271:3 275:21
276:1 282:4 293:8
294:3,5,5 295:4
296:3,13,15
298:17,19 300:16
301:1,3 302:16,18
304:3,8 305:9,16
306:2,12
e-mails 41:10,17
44:8,12,15,18
46:1,4 61:5 70:19
79:6 106:3,5
124:11 125:1,5,8
125:11 136:1
159:17,21 160:2,4
160:7 171:7,8,12
183:13 227:17
254:2 294:11,15
294:19,21 295:2
296:19 301:11
302:15 304:1
306:7
e-mail's 132:4



**F**

**F** 3:1 330:1
**face** 53:5 108:22
**faced** 324:4,5
**facilitate** 259:22
**facilitating** 319:12
**facilitation** 202:12
  202:14,17 204:13
  206:22 320:5,18
**facilities** 107:20
  108:7 179:22
  314:21,22 315:17
  316:3 322:17
**facility** 108:5,9
  277:6
**facing** 274:13
  321:16
**fact** 11:8 37:9 51:17
  67:20 89:13 91:11
  100:7 133:13
  145:1 173:9
  184:11 238:10
  261:18 298:18
**factor** 246:16 247:2
  248:22 252:22
  253:9 318:9
**factors** 246:10
**facts** 22:15 81:9,13
  227:16 231:4
  262:1,20
**factual** 303:19
**fair** 28:6 47:13
  161:22 198:13
  221:22
**fairly** 192:5
**fake** 166:1
**fall** 22:11 95:13
  202:15,20 204:9
**false** 59:1,4,13
  284:20
**familiar** 49:11 63:7
  107:15 115:14
**families** 231:6
  232:11 318:17
**family** 138:20,20

149:4 150:3 151:5
246:9,19 279:12
315:9 317:2,5,6
317:17,18,22
318:12,13,14
**fancy** 257:21
**far** 35:22 36:13
  39:7 93:19 150:19
  153:14 260:12
  312:1
**fashion** 192:14
**father** 292:8
**fear** 98:19 106:14
  108:15,19 109:13
  109:20 113:1
  116:3 122:6 246:8
  279:13 309:1,2,9
**fear/asylum** 245:10
**February** 10:6
  103:3
**federal** 230:20
  231:19 237:16,20
  238:2
**feed** 244:17
**feedback** 65:10
**feel** 60:9 73:7
  130:11 271:9
  307:3
**feet** 92:16 93:9,10
  93:13,19,20,20,21
  93:21,22 94:7
  96:6 153:4 154:3
  154:12,15 266:7
**felt** 27:22 66:6 69:4
  127:8 324:7
**Fenn** 4:6 101:10,10
**fewer** 321:2
**field** 10:4 12:3,4
  17:15 28:22 33:7
  34:11 36:4,5
  40:13 62:7,10
  67:4 70:7,8 84:2
  84:18 102:6,9,10
  102:11,12 106:12
  120:6 121:13
  147:17 150:21

163:8,8 170:22
171:19,19 172:10
173:3 175:11,12
175:13,15 176:9
176:11 179:15
180:3 191:14
230:16,16 239:15
242:12,13 244:3,7
246:14 253:8
321:13 323:9
325:21 327:2,6
**figure** 50:15
**file** 231:16,20
  235:16,22 236:1,3
  308:14 309:11
**filed** 62:8,10 219:18
  220:21 221:3,6
  318:11
**files** 296:5 305:10
**filibuster** 131:2
**filing** 303:15,17
**final** 199:12
**find** 185:1 190:7
  280:7 305:8
**findings** 182:14
**fine** 81:14,15 168:1
  227:19 305:22
  313:8
**finish** 16:5 17:3
  323:17
**finished** 19:12
  243:15 256:1
**finite** 75:13
**fire** 316:3
**first** 9:4 18:21 19:8
  19:9 24:18 32:15
  52:21,22 103:2,3
  107:5 127:17
  141:13 152:17
  154:17 176:3
  183:1 200:21
  202:4 213:22
  216:15 217:14
  221:2 231:10
  237:8 240:8,21
  241:4 247:13

253:4 259:15,15
264:2 274:11
298:18 299:15
304:7 314:19
318:14 325:18
**fits** 310:10
**five** 20:16,19 49:1
  66:12 94:7 95:11
  227:21 321:18
  323:16,20
**Five-Page** 8:2
**fixed** 166:13 290:14
**Flanagan** 147:3
**Flanagan's** 147:5
**flexibility** 116:15
**flies** 208:2,12
**flip** 52:6,20,22
  101:5 217:5
  221:10
**flipping** 90:16
  184:22
**Flores** 6:21 120:19
  120:21,22 122:20
  132:21 136:2
  175:1 224:1,17
  323:14
**Flores's** 175:3
**Florida** 207:17
  208:11
**flow** 38:5 77:6
  104:11 128:7
  142:1,5 148:19
  150:3 151:4
  161:11,13,14,19
  162:1,2,7 164:22
  179:4,11 180:12
  231:7 232:12
  314:14
**flowing** 218:6
**flows** 39:6 69:19
  72:19,20 151:20
**flu** 207:18 208:17
  209:2,5
**fluctuates** 187:1
**fluid** 69:21 187:1
**fly** 167:15,19

168:15 207:16
**FMUAs** 148:19
  149:3
**focus** 85:6 125:15
  170:6 201:2
  204:17 213:3
  217:22
**focused** 178:7,15
  189:10 243:19
  298:11
**fof** 7:13
**folks** 43:14 116:20
  139:22 156:12
  166:8,9 186:2,3
  187:2 189:7 196:1
  207:7,9 251:15
  261:5 297:8
  316:12 318:1
  320:19 326:1
**follow** 24:7,10 37:3
  75:7 191:17 240:5
  275:6,7 283:16
  293:7,10 328:5
**followed** 32:11 58:1
  203:18 283:14
**following** 71:11
  83:14 92:2 173:18
  201:22
**follows** 9:5
**font** 174:17
**food** 151:22 152:6
  156:4 285:19
  286:16,20 287:1
  287:18 288:9,11
  288:14
**foot** 32:22 35:18
  91:21 261:13
  263:14,15 264:6
  264:12 285:8
**footnote** 248:13
**Foray** 28:12
**forced** 269:5
  291:16 292:17
**foregoing** 329:6
  330:9
**foreign** 78:6 188:17



285:2
**forgetting** 41:2
**form** 14:3 23:2
  80:18 213:17
  282:2 283:6
  325:19,19 331:3
**formal** 216:1
  322:22 328:6
**formally** 230:21
**forms** 245:18
**fortunate** 324:7
**forward** 61:5,9
  310:1
**forwards** 121:3
  295:6
**found** 239:8,21
**foundation** 111:4
  252:1 269:21
  270:22 305:11
**four** 13:21 20:16
  21:19 24:12 25:11
  25:22 27:20 28:2
  28:3,14 69:18
  93:22 94:7,13
  115:20 202:20
  203:1,5,20,22
  204:7,16,19
  217:18 304:7
  318:5 323:11,13
  325:20
**fourth** 202:11
  276:1
**four-pronged**
  217:15
**frames** 102:22
**frank** 174:22 175:7
  178:8,16 180:7
  227:4
**Franklin** 3:15
**free** 269:7
**fresh** 66:16
**Friday** 1:14 2:4
  312:3
**front** 81:22 99:4
  101:1 105:3
  123:18 135:16

140:22 159:9
169:21 185:4
196:13 212:8,21
215:9 223:15
228:9 229:15
249:6 275:20
295:8 304:3
**front-line** 76:3
  238:4,10 283:21
**fruit** 207:16 208:2
  208:12
**fugitive** 231:1
**fulfilling** 53:9
**full** 74:22 75:19
  86:10 181:6,11,13
  194:21 195:4
  200:22 227:22
  295:3 319:8
**fully** 98:22 272:21
**functions** 86:3
**further** 149:15
  227:12 228:22
  299:10 307:10
  312:10 317:22
  322:4 327:14
  330:12
**furthest** 153:9
**future** 259:19
**FY** 192:18,21
**FYSA** 121:18 122:3

**G**

**G** 9:1
**gain** 123:2
**game** 226:20
**gamut** 210:17
**gang** 318:20
**Gary** 144:6
**gateway** 69:7 72:2
  85:10,12,17 89:18
**gateways** 85:16
**gather** 198:2
  276:11
**gauging** 245:4
**general** 31:12 38:4
  38:7,9 60:10

86:13,15 181:20
184:9 192:2
219:11 240:20
247:18 250:18
319:10 320:3
**generally** 30:7
  42:15 46:12,19
  47:19 49:2 78:4
  86:2 134:20
  138:17 176:7
  187:15 257:2
  266:5
**generated** 164:16
  187:17 189:11
**Gentlemen** 121:18
**geographic** 127:21
**geographical**
  176:10
**getting** 133:14
  158:21 165:1,2
  191:19 254:7,11
**gist** 170:8,9
**gith** 220:6
**give** 15:18 28:6
  45:16,18 65:9
  66:10 80:6 163:16
  166:6 179:10
  192:15 257:3,4
**given** 127:18
  179:16 188:19
  189:21 191:14
  203:8 284:14
  299:7,11,12
  330:11
**gives** 170:21 172:14
  186:2 187:4 191:8
  267:3
**giving** 27:2,9 131:4
  163:17 164:5,13
  164:17,19 165:2,4
  165:11,13,18,22
  166:4 170:11
  171:20 180:5,8
  193:4
**Gloria** 146:21
  148:11

**go** 14:7,10 15:9
  44:12 47:6,21,22
  57:18 71:22 81:16
  84:14 104:3
  131:14 134:20
  140:21 160:20
  165:11 175:16
  184:21 189:18
  194:10,11 196:4
  208:8 226:21
  234:20 236:14
  239:20 255:10
  261:21 263:12
  266:18 288:18
  292:1,2 306:12
  314:2 318:16,17
  319:2,21 321:17
**goal** 114:1 245:5
**goals** 250:5,11
**goes** 83:9 107:1
  143:7,17 144:19
  149:14 150:20
  166:16 179:10
  218:8,9 246:5
  255:21 294:4,8
  308:14 319:5
  320:22
**going** 10:17 14:11
  15:9 16:18 17:11
  17:15,18,21 18:21
  20:1 22:20 23:6,9
  23:19 24:7 43:18
  45:19 75:9 87:19
  90:15 126:20
  127:2,4 128:19
  129:12,18 133:14
  133:18 134:13
  135:8 137:21
  156:5 158:6,16,18
  160:16,18 163:17
  166:5 167:13,17
  167:21 170:6,8
  181:4 190:22
  191:6 199:2 210:2
  214:19,22 217:14
  222:16 224:16

228:2 233:1,15
251:21 260:21
273:12 274:10,22
297:22 298:3
310:7 319:21
327:10
**Gonzalez** 125:16,19
  126:1,11 128:16
**good** 6:19 9:9,10
  15:19 141:3 148:3
  148:4,5,8,11
  170:3,18 171:19
  172:13 173:2,9,19
  173:22 174:6,9
  252:14 255:12,13
  283:16
**goods** 210:18
**gotten** 183:12
**government** 13:15
  56:4,11 77:11,14
  78:14 133:3 145:1
  158:5 177:5
  222:18 287:21
**Governmental** 13:2
**governments** 78:6
  198:12
**government-run**
  288:16
**governor** 126:3
  128:22 131:17,22
**grainy** 276:2
**Grande** 292:10,18
**granted** 307:14
**great** 168:5 179:21
**greater** 147:19
  211:13 273:2
**Greg** 35:3,5
**grievance** 61:13
  62:10 230:18
  231:18,20 232:9
  235:22 304:9,10
  304:13,15,18,20
  304:21
**grievances** 61:10
  62:8,16,18 231:16
  235:16 236:1,3



303:15,17,19,20
303:22
**ground** 15:10
234:22 235:1
**Grupo** 89:3 128:2,6
136:15,15,16,18
136:22 137:3,6
141:15,21,22
142:4,10 162:13
**GSA's** 115:6
**guarantee** 272:5
**Guatemalan** 246:7
**guess** 118:18,18
137:13 155:9
206:14 248:15
**guidance** 5:18
63:18 64:7,16,20
66:6 68:4,22 69:5
71:3 98:11 99:1,3
99:17,22 191:13
191:14,16,17
240:6 307:10
308:4,8 311:10,14
320:10 324:18,22
325:18 326:19
**guns** 218:6
**guy** 295:18 297:4,8
**guys** 167:20 229:5

**H**

**H** 332:1
**Haiti** 313:19,19
314:3,3
**Haitian** 157:21
313:2 314:1
**Haitians** 100:10
104:8 116:18
124:7 129:22
133:5 157:15
313:7,17,20 314:2
314:2,7,9,10,17
315:9
**half** 13:21
**halfway** 249:11,12
**hand** 189:1 330:17
**handed** 93:17

128:2 162:12
169:11
**handing** 162:9
**handle** 86:3,9,10,11
86:11 151:20
161:14 162:3
166:2 180:1
227:19
**handled** 323:19,21
**handles** 62:3
**handwriting**
220:11,18
**hanging** 126:6
**happen** 40:9 46:18
49:1 61:17,17
162:5
**happened** 13:5
22:3 24:22 25:3
25:14,21 31:22
34:10 35:9 184:15
264:9 274:4
289:22 324:7
**happening** 161:16
291:13 310:7
**happens** 139:18
239:12
**happy** 306:6
**Haralson** 7:19
229:17 230:17
233:1,13,21 234:1
234:4,17 240:9,14
256:8 303:5
**Haralson's** 233:3
234:21 304:3
**hard** 11:11 204:6
**harmed** 291:19
**harmful** 210:6,15
**head** 15:20,20
60:22
**heading** 186:6
265:7
**headquarters**
13:22 144:16
149:7 191:2 327:2
**health** 210:16
**heard** 16:15 85:20

87:9
**heat** 288:15
**heaters** 273:21
**Hector** 6:17 163:5
163:7,15,22
166:12 172:7
323:15
**held** 2:2 10:5 81:6
91:15 102:7 109:9
133:17 152:17
156:12 184:3,4
239:17,21 276:15
**help** 65:1 115:4
176:16 177:5
185:6 244:13
251:18
**helped** 65:4
**helping** 297:8
**hereunto** 330:16
**Hernandez** 224:2
**hey** 158:20
**he'll** 10:21
**Hi** 101:10
**Hidalgo** 38:22 39:4
39:7 69:11 85:16
154:7,8 232:2,6
233:15 234:5
235:3,8 240:15
241:1 259:15
260:11 264:8,10
265:9,17,20
268:17 272:16
276:6,20 277:9
283:5 284:6
301:18 318:5
**Higgerson** 229:18
230:12 231:12
240:9 281:10,12
281:14 293:13,16
294:13 295:15
297:5,11 305:16
305:18,21 306:1
323:15
**Higgerson's** 305:9
**high** 68:21 187:5
191:9 192:10

208:12,19 246:18
313:16
**higher** 51:18 77:3,7
192:12 203:22
205:3 208:2,15
**highest** 177:15
**highlighting** 248:17
**highlights** 50:5
**highly** 243:11
280:7
**Historically** 313:18
**history** 235:12
**hit** 62:19
**hmm** 250:4
**hoc** 31:1 42:11,14
149:9
**Hoffman** 6:8 28:11
64:11,12,17
105:12 121:6
132:21 143:1,22
144:20 170:4
196:2 310:16
311:11
**Hoffman's** 64:21
121:14
**hold** 51:17 81:13
107:7 114:4 116:2
151:15 152:4
228:3 315:14
316:8,11 318:2,6
324:8,13
**holding** 88:10
104:9 115:8,12
119:5,6,10,11
152:9 166:8
278:14 314:15,22
316:1,17,18
322:16 323:3
**holdings** 317:9
**holing** 315:1
**home** 10:11
**Homeland** 7:6 13:2
17:12 195:11
197:18 199:19
214:5,12 247:19
**Honduran** 246:6

**honest** 18:12 51:13
56:22 57:3,6,10
79:10 219:14
**Hood** 6:2 101:16,19
101:20 103:14
224:2
**hope** 199:11
**hoping** 137:2
**hour** 16:22
**hours** 20:16,19
25:22 140:3
321:18
**house** 12:18 13:10
13:14,18 107:7
**Howe** 5:20 82:8
196:17
**Howell** 28:10
**HQ** 144:11,16
**huge** 153:16 189:5
276:16
**huh-uh** 15:21
**humanitarian**
73:17,18,22 74:3
126:8,12,15,20
127:2,4,8 128:18
129:4,6,13,17,21
130:2,4,9,11,14
130:18 131:18,22
158:6,16 183:22
**humor** 49:14
**Hutton** 142:22
143:15,16,17
144:5,19
**H-M-M** 250:5

**I**

**ICE** 108:5
**ICE-ERO** 107:7,21
108:4,7
**idea** 52:18
**identifying** 244:19
**Iglesias** 256:9
**illegal** 297:19,22
298:2 301:9
**illegality** 301:6
**illegally** 245:9



291:18
IMANI 137:1
immediate 306:15
306:20
immediately
122:21 266:8,15
267:7,20 268:1,8
268:18 269:19
270:11,12,16
307:4
immense 126:3
immigrants 164:8
165:19 172:2
immigration 4:4
64:22 77:17 108:1
136:17 144:8
145:6 146:3
158:10 230:21
237:17,20 245:18
290:13 309:12
317:13
impact 80:16,21
81:7 84:20 89:7
89:10,14 90:7
91:5,8,13 115:2
184:4,11,13,19
186:15 190:5
317:4 321:2,3,5
impacting 81:3
impacts 189:6
319:9 320:3
321:19
imperfect 190:21
Imperial 107:11,16
116:1
implement 38:12
68:18 116:15
214:6 274:12
275:3 308:6 325:2
implementation
137:4,5 145:12,20
170:15 191:15
239:6,7
implemented 17:22
38:15,17 39:13,15
146:8 152:17

154:18 233:18
237:20,22 239:5
240:2,15 245:8
254:18 270:21
313:7 324:19
326:20
implementing 57:7
57:11 137:8 157:8
268:16 308:8
309:19 325:18
326:11
imply 117:6
important 16:2,8
27:22 45:8 51:13
53:14,20 62:13,18
223:4
impression 268:7
269:18 270:10
Improper 104:1
improperly 239:18
inability 116:19
inaccurate 50:14
50:15 125:13
129:8 160:9 197:9
200:13 233:5,7,8
233:9 269:1
inadmissible 193:3
inadmissibles
71:20,21 192:3,11
192:19,21 193:5,6
193:12 206:15
INAMI 77:15,16,19
77:21 78:16,19
79:1,12,17 89:3
136:17,22 178:22
179:12
inappropriately
325:12
incidences 58:5
incident 33:5 34:1
35:9,14,15,19
36:2,12 37:10,20
37:20
incidents 31:13,16
37:4
include 78:18

121:21 211:15
263:7
included 31:5
277:10
includes 219:5,12
including 75:21
78:16 190:2
inclusive 14:1 81:2
incomplete 59:4
60:2,9 125:13
160:9 197:9
200:13 216:10
incorrect 113:15
233:22
increase 68:20
113:8,13,16,17
114:5,16 121:18
315:6 316:10
317:22
increased 50:16
106:13 114:11
193:12 206:16
increasing 114:9
206:12
incredible 113:1
indicate 70:20
104:13 131:21
indicated 4:6 103:1
254:3 327:11
indicates 119:5
184:12 217:2
227:4 308:11
indicating 270:20
individual 41:5,10
64:9 93:2 94:1
108:14,17 109:11
109:20 147:2
308:10 325:5
326:13 327:2,6
individuals 28:7,14
30:21 32:19,22
34:15 35:17 37:10
42:9,10,13 75:10
77:10 86:22 88:21
91:2,14,18,21
93:10,16 113:1

119:12 127:17
137:9 139:6,10,15
140:11 145:8
151:21 154:18,19
162:10 182:9
184:3 244:20
259:18 260:18
261:8 262:11
290:17 292:17
299:19 307:18
309:14 315:2
318:19 321:8
326:14
indulging 311:9
industry 207:20
208:18
infamous 56:9
infestation 208:11
influenced 189:15
influx 100:10 104:8
116:18 118:10
166:3
inform 307:1
informal 283:6
323:20 324:1
informally 281:9
information 31:4
43:20,20 44:2
45:22 57:16 62:6
168:22 187:15
224:11 244:16,18
244:22 258:16
283:3
infra 116:17
infrastructure
13:11 118:11
initial 64:5 108:21
112:5
initially 36:1
initiate 201:21
initiating 166:18
injunction 307:14
307:17 309:16,20
310:10,20 311:12
Injunctive 7:14
INM 77:14 178:20

178:22 179:3,7
input 64:13,15,20
inquiries 119:3,7
158:21
inquiry 145:20
146:2 252:5
inspect 208:22
210:14,20,21
211:1,15,17,21
265:18
inspecting 75:10
208:15,16 209:16
209:17 210:3,4
211:19,19 212:4,5
inspection 111:3
204:10 205:13
210:5 246:8 276:3
276:5 282:9
inspections 210:9
245:21
Inspector 31:12
240:20 247:18
250:18
instance 54:20
56:18 57:14 59:16
280:16
instances 54:7,12
54:16 55:2,8 58:9
91:11 92:1 140:15
151:12 240:1
326:4,8
instant 34:10
instantly 306:20
instruct 10:17,20
14:11 23:21 37:7
instructed 37:8
44:3 262:7 263:6
instructing 14:13
instruction 24:8
299:6
instructions 24:10
259:17 261:8
298:20 299:4,10
331:1
instructs 16:17
insufficient 160:13



181:5 194:12
**intake** 34:5,8 35:12
36:18 108:21
250:6 281:6 326:6
**integrity** 231:2
243:1
**intel** 244:15,16,19
**intelligence** 29:2
42:4,16,17 47:20
48:1 157:5
**intelligence-driven**
40:16
**intel-type** 244:13
**intended** 48:19
115:15 317:10
326:20
**intent** 328:3
**intentionally** 76:1
231:5 233:8,9,21
**interact** 61:3,14
77:10 78:12,13
95:22 138:2
**interacted** 77:18
93:5 94:11
**interacting** 140:15
**interaction** 137:17
**interactions** 78:18
79:1,13,14 134:22
142:9
**intercept** 268:18
**intercepting** 266:8
**interest** 59:6,10
**interested** 133:3,7
330:14
**internally** 322:21
**interrogatories**
26:10
**interrupt** 225:10
**interrupted** 178:11
**interruption** 212:1
226:12
**interview** 102:14
114:21,22 245:14
245:17 309:1,3
**interviewed** 182:11
182:13

**interviews** 110:15
112:2,3,9,19,22
113:4,8,12,15,19
114:2,9,14
**Intimidating** 10:22
**intradiction** 75:16
320:16
**introduced** 149:18
**introduction**
221:11
**investigate** 278:4,6
278:20 279:15,18
280:19 284:9
298:15 309:14,16
**investigated** 183:6
240:10,21 241:20
298:13
**investigating** 242:5
242:14 246:15
254:10
**investigation** 31:15
31:18 32:1 33:22
36:19 182:7,15,21
227:12 228:16,22
238:19,22 239:2
239:20 242:22
254:12,15 280:11
**investigations** 31:6
31:11 58:12
**investigator** 247:18
**invited** 30:19,22
**involved** 34:21
195:19
**involves** 159:13
**involving** 209:11
**in-person** 110:15
**IPL** 198:2,10,12
**issuance** 66:22 67:1
67:2 69:5 214:16
**issue** 24:2 67:17
95:2,15 144:21
189:5 194:14
219:7 224:11
232:2 234:10
235:13 242:5
267:1 277:13

278:18 280:20
281:5 304:16
313:14
**issued** 69:2 71:3
127:17 197:17
307:17 308:4
324:18
**issues** 61:19 69:8
74:17,17 79:5
80:7,10 91:20
111:7 184:9 186:4
187:8 210:16
228:2 235:14,18
235:21 236:18
237:5 271:4,20
274:9,15,20 277:8
281:15,18 290:15
298:16 301:5
**items** 115:21
**I-213** 245:14,17
**I-94** 110:12,18,20
**I-94s** 111:7,10

———————
**J**
**J** 3:13 133:8 143:15
150:15
**jail** 317:9
**James** 142:22
143:15
**January** 17:8
150:18
**jargon** 150:1
**jersey** 93:11 94:7
96:5
**JIC** 35:11 59:20
280:16,20 281:6
326:5,9
**Jim** 61:11 62:4
**job** 1:20 10:2 64:3
105:16 125:2
159:17 185:7
216:6
**John** 105:12 121:6
121:10 124:14
142:22 144:2
146:21 159:13

170:4 196:17
**Johnny** 101:17
102:4,6 103:10
106:8 132:21
136:2 141:1
243:21 244:2
252:7,10,11,12,16
**Johnson** 133:6,8,9
150:15,17
**join** 101:8
**joint** 34:8 35:12
36:18 281:6 326:6
**Jonathan** 62:1
**Jr** 256:9
**judge** 16:16 234:15
234:15,16
**judiciary** 12:14
144:9 146:4
158:11 183:9
**July** 7:22 221:7
243:21 246:13,18
**June** 5:20 7:4,6
82:7,14 83:21
84:4 85:3 103:2
185:3 191:22
195:15 197:18
198:1 199:17
200:7,10,16
212:10 216:20
217:19 330:21
**Justice** 3:12 20:9
26:3
**justified** 68:10 69:4

———————
**K**
**K** 1:7 2:3 3:6 88:16
**Karolina** 4:4
**Katherine** 3:13
6:10 136:2 141:11
143:5,13,14
**Katherine.J.Shin...**
3:19
**keep** 15:16 74:21
215:2 218:5
327:10
**keeping** 327:16

**kept** 29:15 140:12
**Kevin** 1:7 7:8 135:4
146:21 199:18
213:8 256:8
294:12
**key** 76:15
**kids** 321:4
**kill** 15:17
**kind** 85:18 324:3
**King** 4:5
**Kingma** 247:15,17
249:18 250:10
253:13 255:3
**Kirby** 122:17
**Kirstjen** 199:18
**KM** 295:9
**knew** 126:18 130:6
130:13 131:15
132:1 254:12,14
**know** 16:12 19:11
22:16 24:3,5
26:19 27:3,4,22
33:21 34:19,20
36:9,21 38:17,21
44:2 47:17 49:14
54:4 58:14 59:15
60:14 63:10 64:13
64:14,15,19 65:2
65:4 66:12 77:13
77:21 79:11 81:12
82:4 85:18 87:8
94:1,9 96:3 98:11
101:6 102:5 105:8
122:19 130:19
135:6,10 136:18
137:1,6 139:20
141:11 143:10,14
143:15 145:13
146:6 149:10
166:4,5,7 167:21
181:10 184:10
198:12,18 204:7,9
204:18 209:10
210:18 214:14
219:2 223:3
224:10 225:1



226:19 228:2
234:2,4,7,9 238:3
238:10,14,18
239:3 240:18
241:2,3,7,8,12,15
243:14 244:19
247:15 251:16
252:3,4,4,5,6,10
252:11,20 253:3,3
254:20 255:2
256:1 258:18
260:20,21 261:4,6
264:21 268:4
270:15,18 271:1,3
273:4 276:6
277:10 280:1,3,4
281:2,5,7,8
282:22 284:1,4,12
284:15,19 287:19
287:20,21 288:12
298:18 304:12
305:18 310:1,11
310:12,12 311:14
312:7 313:3
316:13 317:13
324:2 327:2,7
**knowingly** 59:4
**knowledge** 18:2,2
58:10 67:21
136:15,16 155:18
156:6 186:7 234:2
240:11 252:2
258:12 280:12
287:15 305:17
308:18,19 309:13
319:18 320:2,8
324:12
**knowledgeable**
67:7 83:3,6,10,11
326:2
**known** 132:5,7
299:13
**knows** 27:1
**Koseor** 64:15,17
82:8 84:5
**Koseor's** 84:11

**Koumans** 159:14
**Kristine** 4:5
**Kylie** 143:7,10
_____
**L**
**L** 3:1 4:1 125:16
**labeled** 84:18 169:4
181:2
**labor** 313:20
**lack** 176:20 236:5
**lacked** 291:9
**lacks** 231:3
**Lado** 1:4 7:17
226:1 308:12,12
309:15 310:10
**land** 72:3
**lanes** 153:19 321:1
**language** 212:13
231:18
**Laredo** 32:17,18
33:6,7,8,9 34:11
34:11,13,14 35:2
35:8 36:4,5 37:20
39:8,9 69:10
85:15 154:9
170:22 172:11,13
172:14 173:3
175:4,6,11 179:15
180:3 230:16
272:17
**large** 70:13 72:1
116:18 129:22
130:16 181:8
184:15 192:5,7
193:16,17 314:19
318:1
**larger** 86:19,21
87:7
**late** 156:10
**latest** 297:16
298:12
**law** 43:20 44:1 51:5
53:16,20 54:8,22
55:4,6 175:21
203:6 233:21
234:2,3 237:17,20

238:2,8,12,16
239:6 240:2,16
254:22 263:20
275:6,7 278:11
282:6 307:4
**lawful** 202:18
291:22 292:22
320:18,19
**lawfully** 293:5
**laws** 230:21 231:19
**lawsuit** 7:17 222:21
224:5,10,16,16
226:14
**lawyer** 88:15
165:17 221:21
**lawyers** 52:17 97:2
**lay** 211:8
**lead** 166:1 196:3
**leader** 239:15
**leadership** 27:1,7
27:11,15,15 28:20
28:21 33:8,9 36:4
36:6 40:12,13
51:16 71:5 79:5
98:16 102:9
116:15,21 150:21
186:8 198:1 259:3
259:5,8 293:11
297:14,15 322:21
323:9
**leadership's** 184:14
**leading** 101:3
215:11
**leads** 40:18,19
**learn** 287:2,6,16
310:19
**learned** 273:9
**leave** 150:18 314:2
**leaving** 276:16
313:18
**led** 70:8 118:22
**left** 15:14 84:14,17
97:9 207:2
**legal** 76:16 156:14
165:3,9,13,14
166:10 167:12

211:8 221:21
**legality** 301:16,17
302:5,9
**legally** 302:7
**legitimate** 166:6
271:17,18
**less-than-two-ye...**
292:9
**letter** 214:16 265:2
265:16 267:11,14
269:15,18 270:20
299:20,20 306:14
306:17
**letting** 161:20
**let's** 55:10 81:16
87:22 94:4 104:19
132:9 167:20
170:17 171:18
175:16 184:21
199:4 255:10
259:13 263:12
265:1 304:2
306:12
**Lev** 3:5 5:6 313:3
319:14 320:7
322:5,11 327:9,17
**level** 127:7 187:5
188:9 191:9
209:22 274:13
278:19 280:8
281:19 304:16,19
325:20
**levels** 250:6 279:18
315:20
**Levine** 62:1
**liaison** 78:6,8,9,12
78:22
**liar** 257:16,22
**Liberties** 31:7
182:1
**lice** 318:14
**lie** 233:4,6,10 258:4
**lighting** 273:21
**likes** 235:16 279:7
**limit** 92:7,10,14,16
93:4,9,14,18 94:8

94:12 95:5,21
96:5 117:14 150:7
151:8,13,15 152:5
152:7,10 153:12
153:17 155:12,14
155:19 156:8,12
156:15,18 158:1
178:4 188:1
232:20 260:21
261:14 262:3,15
262:21 263:4
266:4 273:2,5
274:1 281:15
284:22 285:2,7,10
285:14 293:14
316:11,18 325:9
326:21
**limited** 190:13
211:12
**limiting** 325:6,12
**limits** 151:22
**line** 81:7 84:2,20
88:16 90:5 91:3
92:7,11,14,16
93:3,5,9,14,18
94:8,12 95:6,21
96:5 102:13
117:14 119:4,9
124:7 136:5
138:11 140:1,6
150:8 151:8,13,15
151:16 152:5,7,11
153:1,4,7,10,12
153:15,17,21
154:12,20 155:12
155:14,15,19
156:8,18 158:2
161:20 175:18
176:3,3,4 178:4
178:20 184:4
201:18 210:1,8
213:4 217:9 232:3
232:21 242:10,11
256:11 260:21
261:14 262:3,15
262:21 263:4



266:4,8 273:2,5
274:1 281:15
284:22 285:2,7,11
285:14 316:12,18
332:2
**lines** 91:15 156:12
156:16 293:14
**list** 44:9 67:11 80:3
80:4 102:21 107:1
109:14 118:1,4
201:14 204:5
259:21 260:11
309:17
**listed** 13:19,22
30:22 42:9 83:20
85:10 88:16 89:21
90:18 91:7 106:4
110:3,11 115:5,21
119:16 125:5
160:3,4 171:8
172:11 197:2
204:9 213:8
217:19
**listing** 185:18
**lists** 50:4 80:21
88:1 89:10 90:7
91:9,12 107:5
117:16 140:11,18
185:9 187:17
189:11 309:21
**literally** 93:20
**litigation** 181:8
219:17 220:8
222:10,14 228:19
305:4
**little** 79:20 90:16
99:3 100:2 136:14
137:14 181:16
184:22 189:9
191:12 312:5
324:14
**live** 11:3 209:12
**living** 289:22
290:18
**LLP** 2:3 3:3
**loads** 244:20

**local** 60:20 61:22
126:8,12,19 130:3
130:10 131:18,22
158:5,16 191:4
198:12 231:15,15
231:16 278:13,18
281:8,18 304:16
304:21
**located** 139:3
**location** 138:9
149:6 273:18,18
**locations** 138:8,16
155:22
**locks** 277:3
**long** 10:5 20:13
24:13 52:5 65:22
66:3,5,9,10 140:1
153:19 168:1,2
246:9 247:2
251:22 252:21
272:18
**longer** 25:2 126:7
210:8 321:7 324:4
**longer-term** 108:9
**Longoria** 175:1,8,9
178:8,16 180:8
**long-term** 317:9
**look** 66:6 72:18
82:17 87:22
102:17 106:17
133:22 134:4
161:6 188:20
189:1 208:20
213:21 216:8
220:20 221:15
225:9 229:5 248:5
259:13 274:11
276:11 279:7,20
317:18 319:20,20
**looked** 172:8 183:4
185:1 217:6 224:9
254:5 258:2
**looking** 55:18
116:16 140:22
175:5,7 182:10
190:17 192:2,13

200:12 209:3
221:11 233:19
234:15 236:21
237:3 253:8 257:8
282:4 293:9
**looks** 82:18 141:8
181:4,5,9 209:21
221:12
**loop** 224:20
**looped** 156:14
**Los** 11:22 12:1,4
**lose** 53:17
**lost** 104:9
**lot** 62:3 65:20 83:9
166:1,1 271:14
302:3 305:22
317:18
**Louisa** 4:2 25:20
97:8
**lower** 75:3,12 76:1
205:7,14
**lower-level** 253:17
**lowest** 205:15
206:7
**lucky** 316:2
**Luis** 157:17 314:18
**lunch** 167:20 168:8
**lying** 18:16,18
129:4 233:1
234:17

---

**M**

**M** 3:4
**mail** 158:7 194:15
295:7
**main** 194:14
**maintenance** 115:7
**major** 69:9 85:14
323:19
**making** 132:1
232:18 245:8
259:9 301:2 303:1
328:2
**male** 318:16
**males** 116:2
**man** 79:10,11

**manage** 50:21
**manageable** 315:20
**management** 7:11
42:21 43:3 44:20
45:2,7 79:21 80:2
84:3 111:20
115:22 117:10
187:12 191:3,5
195:12,14 197:13
197:19 200:17
213:5 214:1,6
216:22 217:11
233:14 239:8
250:6,11,20 251:9
253:14,15 277:9
**manager** 244:6
**managing** 176:20
177:2,3
**Mancha** 6:17 163:5
163:7 166:12,16
172:7 323:15
**mandates** 230:20
**manner** 22:18
324:19
**March** 7:20 8:4,7,9
229:22 232:5
235:1,7 250:14
253:13 256:7
257:1 264:9 265:5
294:8,22 296:20
300:22 306:12
**Margaret** 119:20
120:10,14 121:8
**Marin** 225:20
**Marine** 41:3
**mark** 7:12 18:21
62:21 81:16
103:16 104:19
159:14 215:13,15
219:22 225:2
247:21 290:22
293:18
**marked** 1:11 19:2,6
49:7 51:22 63:1,5
63:7,12 81:18,22
100:19 101:2

104:21 123:14,19
132:12,16 135:12
140:21 142:13,17
146:12 159:5,10
162:20 167:5,10
168:18 169:3
174:13,18 180:15
180:19 193:21
196:9,14 199:6,10
212:17,22 215:5,9
220:2,6 223:11,16
225:4 229:11
243:4 248:1,7,8
250:10 255:15,19
291:2 292:4
293:20 294:2
296:8,12 328:4
**markings** 226:13
**marriage** 330:14
**marry** 225:8
**Martel** 105:12
119:18,22 120:9
121:3,17 123:9
**Martel's** 122:13
**Martinez** 292:14
**matamoros** 139:19
139:21 291:7
292:18
**material** 57:16
**materials** 227:7
**math** 88:14
**Matt** 101:10
**matter** 31:4 59:6,10
62:10 63:8 75:8
86:13,15 144:17
227:7 278:14
303:9 319:4,5
330:15
**matters** 27:21 29:2
47:20 62:3 64:22
64:22 75:2 303:12
**Matthew** 4:6
**Maureen** 124:14,16
**maximum** 172:21
**Mayer** 2:3 3:3
101:11



**mayor** 126:4,14
127:6 128:20,20
129:3 131:10,16
131:21
**McAleenan** 1:7 7:8
135:5 146:21
199:18 213:8
256:8,17 259:14
265:13 280:1,4
281:2 294:12
295:6
**MCAT** 43:13 44:19
44:22 45:4,7,20
46:9,10,13,17
79:20 80:2,9,20
81:10 91:12
147:14,16,21
184:2 185:17,21
186:9 190:22
324:15
**McLean** 11:3
**mean** 39:19 43:17
60:8 62:9 66:5,5
66:16 87:6 88:20
102:10 108:10
112:2 129:21
133:8 139:21
149:3 159:2
179:20 181:5
204:16 205:11
226:10,11 240:13
242:8 253:17
258:2 260:14
276:7,10 280:14
298:8
**meaning** 86:16
184:19 261:6
317:20
**means** 12:19 15:15
17:13 20:7 75:16
107:22 108:4
122:3 198:14
218:3 260:20
264:3 282:19,22
313:4
**meant** 173:20

297:11
**measures** 245:6
277:2,9,19
**meat** 209:4
**mechanics** 306:7
**media** 106:13 119:3
121:22
**medical** 321:5
**Medlock** 3:4 5:4
9:8 10:14,17,20
11:2 14:11,18
19:5 23:1,6,9,13
23:15,19 24:1,6
44:5,7 47:11
49:10 52:3 63:4
63:12,16 81:15,21
96:13,18 100:22
101:12,14 105:2
123:17 132:15
134:5,10 135:15
142:20 146:15
159:8 160:16,19
160:22 161:3
163:1 165:7 167:8
167:17 168:4,6,11
169:10,15,19
174:16 178:14
180:18 181:12,18
194:2,10,17,19,22
195:3,7 196:4,12
199:9 208:7 212:2
212:20 215:8
220:5 223:14
225:7,12,15,17
226:15,18,22
227:9,18 228:10
229:3,9,14 243:7
248:4 251:1,5
255:18 275:10,12
275:17 291:5
292:7,13 294:1
296:11 306:9,11
311:8 312:9
324:15
**MEDLOCK:you**
81:12

**meet** 20:5,10,14
28:13 179:3
**meeting** 21:10,13
24:19,22 25:2,4
25:21 29:7,8,12
29:15,18,21 30:2
30:10,13,16,19,22
31:3,10,18,19,22
35:10,15 36:11
37:5,13,16,17
38:1 40:6,9,11,15
42:3,4,6,10,11,19
42:22 43:8 45:21
46:11 47:1,5,5,6,8
47:16 48:3,4,11
48:13,17 133:18
148:18 149:5,9,9
149:11 156:19
157:1 178:20
244:17 304:9,15
324:2
**meetings** 21:3,8
24:17 28:19 31:8
48:5,8 61:16 79:3
134:12,13,17,20
134:22 157:5
224:15 230:18
303:13,14 304:13
304:18,21
**member** 46:10
51:16
**members** 30:18
43:7,13 46:9
47:16 62:8
**memo** 7:6,8,12 65:5
66:1,4 71:11 99:4
99:8,21 197:13,17
198:15 200:6,9
201:13 215:1
218:16 219:11
253:19,22 263:12
271:1 299:9,12
**memorandum** 5:18
64:2 65:2,4
65:6,10,16 66:19
67:3,8,12,19,21

68:2,11 69:2
99:17,19 183:4
195:10,15,20
199:13,17,22
200:3,12,17,21
215:11,12,18
216:1,8,9,12,16
216:21 217:2,10
217:13,20 218:10
219:3,4,5 262:7
264:17 299:14
**Memorial** 100:13
100:14 103:16,20
**memorialized**
218:12,15 323:6
**memorializes**
203:17
**memorializing**
218:11
**memory** 22:3,15
25:14
**memos** 65:20 67:15
**mention** 122:16
**mentioned** 40:1,5
71:13 89:18 98:8
109:14 311:10
316:21 317:1,2
**mere** 266:7
**merely** 203:16
**Merson** 144:7
**Mesa** 38:20 92:19
93:1,11 94:10,22
95:2,16,21 106:19
110:13,22 111:11
154:5
**message** 68:22
164:16 198:3
304:11
**messages** 62:4 79:3
176:17
**met** 20:3,21
**metadata** 249:4,6
**meter** 71:17 72:4
116:11 137:10
142:1 148:19
172:19 180:9

300:11
**metered** 142:5
154:21 162:10
293:3
**metering** 5:18 22:4
22:7 25:15 27:4
27:10 30:12 31:17
32:1,7,11 35:14
37:22 38:2,10,14
40:2 42:18 43:3
54:3,5,9,14,18,21
55:3,5 56:19 57:1
57:4,7,10,12,15
57:20 59:9,13,18
60:3,7,13 63:18
64:20 68:3,4,6,12
68:19 69:5 70:1,9
70:11,15 71:5
72:6,8,13 73:1,2,9
73:12,16,21 74:2
74:7 80:13 91:17
92:5 97:22 98:1,5
98:11 99:3,16,18
99:22 100:3,5,7
102:22 103:11,20
116:9,16 117:1,4
117:7,8,21 118:1
118:3,7,10 119:2
119:5 122:15,16
123:7,10 127:11
127:16 128:2,13
128:18 129:19
130:8,14,19
131:19 135:8
137:4,9 138:1
139:8,10,12 145:2
145:12,16,21
146:8 150:3,7
151:4,7,9,11,14
152:8,16 154:17
157:8,20,20 158:2
158:12,22 161:8
161:11,15,19
163:16 166:17,18
170:15 172:17
173:3,8,13,16



174:1,8 178:5
179:16,17,21
180:2 182:7,18,22
183:2,4,7,21
184:19 191:4,13
191:16 232:5,20
237:9,21,22 238:7
238:11,16 239:4
240:1,15 241:9,13
241:20 245:7
246:15,21 250:20
251:9 253:9 254:8
254:15,22 261:12
261:17 263:7
266:2,13 267:8,13
268:2,6,13,16
269:19 270:11
271:5 272:8,19,22
273:9 274:4,6
283:4,11 285:13
290:1,18 291:18
299:9 300:19
301:7,8,16,17
302:9 303:10,11
304:13,18 307:11
314:13 315:11,20
324:18,22 325:7
326:11,19
**Mexicali** 157:16
**Mexican** 33:3
37:11 77:11,14,17
78:13 89:2,5 96:1
110:21 126:11,19
127:3 128:17,20
130:7,13 136:17
136:17 138:3
139:3 140:13,16
158:4,15 183:21
219:8 246:6
259:20 260:1,10
263:4 282:8
284:19,21 286:7
287:3,7,9,17,21
288:4,12 289:16
289:22 290:1,12
309:17,21

**Mexicans** 145:14
180:11 284:21
285:15 290:17
**Mexico** 32:21 34:16
68:7 78:9 88:17
88:21 91:19 92:6
95:1 125:21 137:9
139:14 145:1
155:8,16 161:8,10
161:18,22 162:2,4
162:6 186:4 218:6
219:10 239:19
246:10 247:2
251:22 252:22
259:19 261:9,16
262:13,14,16
263:16 266:7,18
284:21 287:10
289:17 290:18
291:7,17 306:21
307:6 316:12
**Mexico's** 290:20
**MIA** 121:22 122:8
**Miami** 114:21
115:3 122:8
**mid** 171:22 259:21
267:15 271:9,10
271:11,15,18,20
272:20 274:8
300:9,10,12 302:4
302:10
**middle** 17:2 148:20
201:15 220:21
236:17,17,20
265:19 266:5
298:16
**migrant** 39:6 68:17
69:19 71:14 75:18
75:22 86:22 112:4
136:20 188:10
189:12 190:14
208:13 210:7,8
237:5 289:10
291:8 313:2
316:10 321:15,22
323:19 324:4

**migrants** 68:14,19
70:5 71:17,19
72:1,18,21 75:2
76:2,11,15 77:1
80:22 81:3 91:2
95:3 108:12 115:4
126:5,6 127:7
130:17 138:5,17
152:5 156:2
161:11,19 162:1
166:3 186:15
187:6,7 206:11
207:1,13 209:20
210:1,2,4 211:16
211:17,20,21
212:5 241:7,16
274:14,16 275:1
285:14 286:4,10
286:18 287:3,7,9
287:9,17,22
288:12,18,20
289:1,15,22 293:3
313:10,16 317:15
319:3,3 320:14
325:8,12
**migration** 30:15,18
43:7 44:8,18 84:8
**mile** 153:13
**miles** 153:13
**mind** 15:16 278:16
**mine** 88:14
**Mingione** 1:22 2:6
330:5
**minimize** 276:15
**minute** 213:3
**minutes** 20:17
24:15 29:15 66:12
321:18 322:5
**mirrors** 259:17
**Mischaracterizes**
184:6
**misconduct** 91:20
92:1 239:17
242:19 254:18
280:15
**mislead** 258:6

**misleading** 59:4,17
59:22
**misleads** 257:18
258:1
**missed** 181:10
300:2
**missing** 50:13
216:9
**mission** 53:10,18
75:19 76:12,13,20
76:20 77:7 187:21
188:20 189:15
190:10,12 191:11
201:3,9,10,11
203:8 204:8,10
205:3 207:3,8,9
207:12,14 320:9
320:12,15,16
321:8,10,21,22
**missions** 75:9 76:4
76:10,15 77:1,3
189:16 191:20
203:20,22 217:16
217:19 320:17
**misuse** 166:1
**mitigation** 121:20
122:14
**modeled** 187:14
**modify/date** 213:15
**Moises** 225:19
**moment** 19:10 52:6
63:9 82:3 101:5
105:7 116:6
160:21 172:20,21
243:13 255:22
**Monday** 47:1 312:4
**money** 218:6,8,9
**month** 33:15 61:15
61:17 191:18
**months** 47:22
95:10,11 291:17
**Morgan** 7:12 215:1
215:13,15
**morning** 9:9,10
141:3
**mother** 8:5 291:8

**motivated** 68:6
70:2
**motivations** 250:19
**move** 24:1 49:5
53:8 58:17 132:10
155:11,19 158:1
170:17 229:4
265:1
**moved** 33:1 111:10
157:16,16 309:12
**moving** 156:7,15
277:2 310:1
**multiple** 28:15
69:17 75:14
186:16 187:20
272:9,14
**multitude** 297:13
**multi-page** 19:7
52:9 101:2 123:20
135:16 180:20
199:13 215:10
220:7 243:8
255:19 294:3
296:13
**murdered** 287:8,10
**muster** 284:5
299:21 300:2
**mustered** 299:14
299:18
**musters** 283:22
284:1
**mystery** 219:14

**N**

**N** 3:1,1 4:1 5:1,1
9:1
**NAC** 148:18 149:5
149:6
**name** 9:11,13 19:14
36:9 78:1 143:7
292:13,15 300:6
**named** 28:2 222:4
222:21 250:9
251:12 253:13
255:2
**names** 9:14 28:6

34:20
**narcotics** 75:15
76:13,20 203:19
206:21 207:9
217:21 320:16
**narrative** 245:17
**narratives** 245:15
**national** 27:19
28:12 60:17,19,21
60:22 61:1,21
62:1 133:13
134:12 135:7,7
202:4 230:6
236:19 256:18
271:19 273:17
**nationals** 285:2
**nature** 11:20 58:4
184:17 204:11
207:19
**near** 107:10,18
265:19
**necessarily** 46:14
209:8 327:8
**necessary** 10:13
68:18 219:2
325:13
**necessity** 71:6
**need** 15:16 22:12
22:13 38:12 43:22
52:22 72:3 116:11
116:14,16,22
122:19,20 134:2
139:13 163:15
167:18 181:15
188:20 190:2
199:12 228:1
255:12 275:10,11
293:17 307:3
327:12
**needed** 38:16 68:16
95:5 159:2 168:21
273:22 307:10
313:20 314:14
315:12
**needing** 104:11
**needs** 72:4 181:5

**188**:1 213:14
271:10
**negative** 184:12,18
**Neilson** 191:18
**neither** 295:7
**never** 204:20 236:9
252:16,19 268:11
268:13 295:16
298:13 302:17
303:4,7
**new** 35:5 150:22
154:2 219:5,11
274:10
**NGOs** 89:4 144:21
**Nielson** 199:19
**nine** 28:22 40:10,11
40:15
**nods** 15:20
**Nogales** 39:12,13
69:10 85:15
157:17 314:18
**non** 20:22 184:12
**nonargumentative**
22:18
**nonselection** 11:21
**nonsuggestive**
22:18
**non-final** 87:16,17
**non-official** 316:13
**northern** 188:16
**Northwest** 2:3 3:6
**Nos** 8:15
**notary** 2:7 330:6
331:10
**notate** 308:13
**notated** 309:11
318:20
**note** 328:2 331:3
**notes** 29:17 42:4
53:3 106:12
168:14
**notice** 5:13 19:13
19:17 109:2,15
**Notices** 19:9
**notification** 149:20
**notoriously** 56:10

**Nov** 6:19
**November** 6:21
146:17 148:14
150:14 151:3
157:22 158:9
159:13 163:4,15
170:2,18 173:10
173:12 174:21
178:1,7,15 179:15
179:18,22 180:3,6
215:20 216:2
217:9
**Novemer** 6:14
**no-impact** 184:8
**NTEU** 7:20 60:17
61:21 62:8 230:3
230:5 231:15
232:10 235:10
254:21 256:18
**NTEU-000110** 8:4
255:20
**NTEU-000126**
255:21
**NTEU-000132**
229:17
**nuance** 190:8
**number** 5:12 6:1
7:1 8:1 19:3 49:8
52:1 55:21 63:2
71:17,19 72:18
73:13 80:15,22
81:3,19 82:2,19
84:18,19 88:1,16
89:20 90:18
100:20 101:3
102:21 104:22
105:5 106:13,18
123:15,21 124:3
130:17 132:13,17
132:18 135:13,17
139:15 142:14,18
146:13,17 159:6
162:21 163:3
167:6 169:22
174:14,21 180:16
180:21 184:15

186:2 192:5,7
193:22 194:4
196:10,15 199:7
199:14 201:13
206:10,15 213:1
215:6,11 217:21
220:3,9 222:2
223:12,18 225:5
229:12,16 243:5
248:2 255:16
276:20 277:6
280:5,9 281:13,17
291:3 292:5
293:21 296:9
304:4
**numbered** 58:18
201:14
**numbering** 141:22
**numbers** 45:16
52:17,18 55:20
68:17,20 70:13
71:14,22 72:1
129:22 147:20
156:11 166:17,19
192:3,16 193:3,12
212:18 213:2
226:7 243:9
296:14 313:16
314:20 315:2,5,19
316:10 318:1
324:4

---
**O**

**O** 3:1,1 4:1 5:1 9:1
**oath** 18:6,8,16,18
**object** 10:20,22
16:15 23:1 32:2
43:19 108:18
**objecting** 23:2,5
319:19
**objection** 10:12
14:4 22:8,20,22
22:22 23:18 36:14
43:18 47:9 72:15
76:5 80:17 81:9
87:14 91:6 98:13

99:12 104:1 111:4
119:15 127:20
165:5 184:6 208:5
211:7 234:19
250:21 252:1
253:1 264:19
268:10 269:21
270:22 298:22
305:11,13 313:3
319:14 320:7
**objections** 16:15
22:17,19
**obviously** 49:22
228:1
**OCA** 198:2,8
**OCC** 97:1
**occasionally** 78:21
80:6,8,9,20
**occur** 30:9 33:11
35:19 95:9 117:7
235:21
**occurred** 32:17
35:16 38:1 58:9
58:13,14 72:6,8
74:7 80:14 134:19
151:11 171:22
250:14 261:11
324:2
**occurring** 40:2
133:4 179:18
264:7
**occurs** 31:3 40:6
42:3,7 72:11,12
137:22 291:16
294:8
**offering** 287:22
**office** 10:4 12:4
17:15 28:16 31:7
31:11 32:13 33:8
33:18,21 34:3,7
34:11 36:4,5,19
36:22 41:1 42:16
67:4 70:7 84:2,18
102:7,9,10,11,12
106:12 108:2
143:10 155:1



163:9,21 171:19
171:19 172:10
173:3 175:12,13
175:15 179:16
180:3 181:22
182:1,2 194:16
198:7,9,11 230:16
240:18,19 242:8
242:13 244:3,7
246:14 247:18
250:18 253:8
272:9 295:8 326:6
**officer** 51:13 71:9
93:6 94:11 95:22
108:15,21 112:7
238:4 252:14
258:8,9 271:22
272:20 273:3,4,10
273:10,22 274:2
274:11,15,20
279:10 283:16
294:16 298:15
310:8
**officers** 32:21
34:20 51:6 54:8
54:21 55:3,8
56:15,19 57:19
58:1 76:3,11,14
92:13,15 93:8,12
94:6,14 95:5,20
96:4 98:15 115:3
117:13 145:14
150:7 151:8,12
152:10 155:12,19
156:7,15 158:1
172:16 175:18,20
176:2 178:4
186:18 189:3
190:2 206:20
230:7,9 231:2
232:20 236:16
237:6,13 238:4,11
239:14,16,18
240:5 242:4,6,11
243:1 245:21
254:19 260:3

262:2,6,13 263:6
265:8,16 267:11
267:14,19 268:1
268:15,22 269:2,4
269:7,10,14,17
270:1,7,14,19
271:6,7,8,11,12
271:16 273:1,5,7
274:8 278:12
280:17 281:16
283:21 284:20
285:1,2,7 289:8
299:15,15 300:4,5
300:14 307:10
308:9,11 309:13
320:11,12,13
321:9,13
**offices** 2:2 62:7
70:8 171:1 191:14
274:19
**official** 44:16 59:6
59:10 64:7 67:4
71:3 223:2 283:4
284:16 315:4
**officials** 126:12,19
127:3 128:17
130:8,10,13 133:3
158:5 183:21
246:14 259:2,21
260:10
**OFO** 17:16 62:3
112:16,19,22
113:4,8,12 115:1
120:1 137:3
140:15 149:20
150:21 186:8
187:17 198:1
297:15 313:14
**oh** 26:9 41:2,2
48:22 55:18 147:8
153:12 185:15
225:14 235:5
306:18
**Oh,2016** 316:22
**OIG** 31:14,17
37:18 58:11

102:14 238:18
239:3,8,20 242:20
250:22 251:4
253:18 254:14
**okay** 11:3,6,8,11
12:18 14:7,15
16:5,12,19 19:13
19:20 22:20 23:13
23:19 24:1,5,11
24:20 25:13 26:16
29:12 33:15 34:14
35:13 36:17 37:15
37:19 38:14 40:5
41:20 42:2 43:7
46:9 47:16 48:3
48:11 49:5 50:2,4
50:21 51:2,20
52:8 53:3 55:19
56:2 60:11 63:14
63:15 66:8 67:19
68:5 71:1,8,13
72:8 78:2 79:9
80:13 82:6 83:19
84:1,5,10 85:6,20
87:5,9,19,22
88:11 89:3 90:15
91:11,17 92:10,15
94:4 95:14 96:10
96:12 97:3,6,17
99:2 101:13 104:6
104:14,19 105:9
106:7,11 107:5
110:2 111:1
113:17 115:5,20
116:12 119:17
120:7,13 121:17
122:10,13,17
123:12 124:20
125:1,15 128:4,10
132:5,9 134:5
137:15 138:1,22
139:12 141:2,11
141:13 142:13
143:9,12,14 144:2
145:19 146:1
147:10,15 148:2

148:10,14 149:11
149:14 150:9,20
154:17 160:11,19
161:2 163:13
165:10 167:3,17
169:10,15 170:17
171:3 172:10
173:18 174:11,19
175:14 177:13,17
177:20,22 178:7
179:19 180:4,13
181:12,19 183:3
184:2,21 185:16
187:16 190:16,20
191:12 192:1,20
193:2,11,15,19
194:22 195:3,8
198:13,18 199:4
200:16 201:1,12
201:17 207:11
211:9 212:7,10
213:21 214:9
215:2 216:15
218:7,9,19 219:16
219:13,16,22
221:5,18 222:16
224:4 225:2 226:4
226:6,18,22
227:18 229:3
230:2,10,17
231:12,21 232:9
232:17 233:19
235:7 236:2 238:3
243:17,18 244:11
244:21 245:2
247:15,19,20
249:2,3,5,15
250:1 253:21
255:10 256:2,19
256:22 257:12
259:8 261:1
263:11,12,22
264:11,15 265:1
265:15 266:6
267:1 270:2
275:12 276:4,9,14

276:18 277:5
278:4 284:17
288:7 290:7,22
291:15,21 292:22
293:7 295:6 297:3
301:22 303:4
304:10 305:15,22
306:5 307:13,16
308:3,22 310:3,12
310:19 311:3
312:9,11 313:9
316:20 318:7
319:13 320:1,8
327:15,18
**Okay.the** 102:13
**old** 110:5,8 111:7
111:11,14 115:7
153:18 154:2
292:16
**older** 110:8
**Olympics** 313:21
**once** 46:12 61:15
61:17 98:21 108:6
**ones** 13:19 40:1
43:11
**one-page** 63:6,17
66:4 146:16 163:2
169:21 174:20
194:3 196:15
212:22
**ongoing** 62:7 324:3
**op** 147:17
**OPA** 198:2,6
**open** 110:12 148:20
171:21 172:14
228:3 233:13
286:22 316:15
321:2 327:10,16
**opened** 313:19
**operate** 266:3,4
**operated** 218:17
**operation** 89:7
164:22 187:8
**operational** 27:21
31:3 38:5 40:14
40:18,19 41:1



45:9,10 71:6 72:4
74:14,18,20 75:3
75:12 76:2,9 79:4
79:22 80:3,7 88:8
98:17 99:19 100:1
150:22 155:21
166:3,9 176:13
185:14,16,18,22
186:10,11,22
187:18 188:13,18
189:11,14,20
190:5 238:1 316:9
318:4,9 324:20
325:8
**operationally** 38:13
45:8 157:6 159:3
161:14 162:3
315:12 316:11
**operations** 10:4
12:3 17:16 27:17
28:9,22 40:14
67:5 80:16,22
81:4,8 84:20
86:10 89:15 90:7
91:9,13 120:1,6
120:12 121:13
148:9 163:8
175:11 176:9,11
177:11 184:13
188:8,9,17 201:22
202:7 218:1,3,4
230:16 239:16
321:14 323:9
325:21,22
**opinion** 53:14,16
74:6,6 79:9,16
**opportunity** 12:7
65:9
**opposed** 152:12
161:20 208:13
285:17 316:12
**OPR** 58:8,11
239:20 242:20
**options** 109:10,21
110:1
**oral** 59:5

**order** 22:11 110:14
137:19 161:11
201:22 203:9
231:6 232:11
258:20 259:4,16
260:15 264:16
283:17 284:5,10
284:13
**ordered** 265:17
282:11 310:2
**orderly** 77:6 99:9
**orders** 258:19
259:2 283:22
284:1
**ordinary** 326:17
**organized** 326:18
**Ori** 3:5
**original** 331:11,18
331:19
**originally** 152:16
**Oscar** 292:14
**Otay** 38:20 92:19
93:1,11 94:10,22
95:2,15,21 106:19
110:13,22 111:11
154:5
**Otro** 1:4 7:17
215:12 226:1
308:11,12 309:15
310:10
**outbound** 188:7,9
217:22 218:3,4
219:5,12
**outbreak** 184:16
**outcome** 33:21
58:11 146:2
330:15
**outdoors** 288:10
**outlines** 98:18
118:9 298:16
**outset** 141:20
**outside** 48:10
151:16,21,21
152:12 161:20
204:15 274:18
285:17 286:7,13

288:5,13,21 289:1
289:5 291:8
**overall** 111:19
166:17 245:4
281:15
**overflow** 110:5
148:22 180:1
**oversee** 51:3 54:8
325:22 326:18
**oversees** 278:11
**oversight** 13:15
325:17
**overtime** 123:3,4
232:21 237:6
271:11,13 300:14
300:17,22
**overwhelm** 314:8
**overwhelmed**
68:14 274:14
314:9,12 315:17
**overwhelming**
315:3
**Owen** 1:12 2:2 5:2
5:11,14 6:4,12 9:3
9:13 49:19 227:17
312:20 322:2,4
329:5,14
**o'clock** 28:22 40:10
40:11,15 187:3
**O-W-E-N** 9:13

---

**P**

**P** 3:1,1 4:1 9:1
142:22
**page** 5:3,12 6:1 7:1
8:1 15:11 19:8,14
50:14 52:21 53:1
53:9 55:11,13,15
55:20 58:18,19
82:17 90:13
106:17 124:3
169:16 200:21
201:12,13,15
213:22 216:15,16
217:10,14,14
221:2,11,12,15

222:1 223:1,17
249:5,9,10,12,12
265:1 276:1 279:3
279:3 282:3 329:9
331:12,17,21
332:2
**pages** 1:21 243:20
329:6 331:19
**pants** 291:11
**paragraph** 149:15
149:16 200:22
221:16 222:1,2
231:10 236:15
240:8,22 241:5
245:13 259:15
260:7,8 264:2
282:5 298:19
306:16
**paragraphs** 237:8
248:18
**paramount** 273:11
**parens** 110:12,13
171:21 172:1,15
172:15
**parentheses** 88:17
144:7,9 148:20,21
**Parole** 109:17,18
**paroled** 109:4
**part** 38:4 44:16
64:3 67:3 87:13
92:5 100:5,12
101:21 105:16
110:8,9 125:2
136:22 148:7
159:17 193:9
216:5 228:1
238:21 239:1,4,4
246:4 277:15,21
278:10 308:11,12
308:21,22 309:11
309:15,19 313:17
323:10
**participate** 21:3,7
222:8
**particular** 228:13
279:19 280:18

**particularly** 272:17
**parties** 55:3 330:13
331:18
**parts** 52:7 74:12
111:16 160:8
167:22 209:13
**party** 227:8
**Paso** 39:14,15
69:10,17 85:15
154:15 162:16,17
163:8 164:5,15
170:22 171:18,20
189:3 321:17
**passenger** 143:21
190:10 310:15
**passengers** 205:11
**pathways** 209:14
**Patrick** 147:3,5
**patrol** 40:21 107:6
107:11,13,16
112:4,11,14 116:1
147:17 167:1
321:15
**pause** 311:3
**pay** 236:21 237:13
301:4 302:2,11,18
**pay,these** 271:7
**PD** 144:10,20
**PDF** 248:7,8,9
**Ped** 136:8 144:12
**pedestrian** 87:3,7
136:10,11
**pedestrians** 145:2
145:16 153:17
**pending** 17:2
**Pennsylvania** 10:8
**people** 48:5,9 60:9
81:5,6 89:13 92:2
98:7 140:17
144:22 151:16
152:17 156:2
201:3,4,11 211:15
227:2 239:18
242:10,12 251:21
254:3 262:8 263:8
263:14 264:5



272:20 289:18
290:21 293:11
300:1 315:4,14
316:1,2,14 318:6
319:8 321:5 323:3
324:9,13
**perceive** 62:13
**percent** 88:5,13
90:1,21 91:14
189:2,2
**percentage** 84:19
88:4 185:9
**percolate** 62:14
**Perez** 28:9
**perform** 53:18,19
**period** 17:7 92:19
95:14,19 127:10
162:8 277:5 302:1
306:1 327:22
**periodically** 62:4
**permanent** 198:21
314:11 315:17
**permission** 116:14
116:14,22
**permit** 110:12,18
110:20 276:8
**permits** 111:7
288:1 314:1
**Perry** 11:6,8
**persecution** 109:13
113:2
**person** 177:15
225:22 310:9
**personal** 18:1
**personally** 165:14
**persons** 203:5
230:22 231:6
232:11 265:18
276:15
**pest** 204:10
**pests** 207:22
**Pete** 120:19,21,22
122:20 132:21
136:2 224:1,17
323:14
**petition** 269:2

**ph** 234:15
**phone** 4:6 101:8
212:1
**photo** 276:12
279:21
**Photograph** 8:5,6
**photos** 281:10
**phrase** 15:21
128:12 173:19
201:18 248:21,21
267:20 270:16
282:17
**phrased** 266:20
**phrases** 221:12
**phrasing** 261:2
264:1
**physical** 74:13,22
76:8 80:4 88:8,9
90:2 91:14 127:19
155:15 185:12,19
273:15 316:8
318:3,7 319:6
**physically** 39:2
96:4 140:6 274:16
**pick** 116:19
**picked** 118:12
**picks** 108:8 187:2
**picture** 275:22
276:2 279:4,16
291:6 292:8
**pictures** 292:1
**pig** 209:10
**pigs** 208:15,20
209:3,4,8,12,12
209:13
**pile** 328:5
**pilot** 7:11 198:3,14
198:16,19 201:21
212:14 213:5,18
214:1,10,14
**place** 30:4 76:9
79:4 133:7 138:21
152:10 180:6
186:14,21 187:5
188:19 191:10
246:19 268:21

318:5 331:18
**placed** 93:12,13
231:5 262:3,3
**placement** 150:7
151:7
**places** 151:9 231:1
321:17
**plaintiff** 222:4
**plaintiffs** 1:5 3:2
222:9,13
**Plaintiff's** 19:9
**plant** 207:15
209:19
**plants** 204:10
211:15,19 212:4
**play** 271:4
**please** 9:11 19:10
63:9 82:3 101:5,6
101:8 105:7 116:6
331:5,17
**PLS** 122:18,21
**PO** 3:16
**pocket** 27:2
**POE** 144:22 148:19
151:5 164:8 172:3
246:7
**POEs** 17:19 121:19
148:21,22 150:22
166:18
**point** 28:6 37:12
68:21 69:18 73:11
106:15 137:17
147:21 155:11
156:22 158:9
164:14 195:9
198:19 228:19
246:18 261:16
268:17
**points** 96:20 107:20
**police** 289:19
317:10
**policies** 18:19 22:4
230:20 233:17
240:6 275:3
284:16
**policy** 22:7 25:15

30:12 31:17 32:8
32:10,11 35:14
37:22 38:2,14
42:18 54:3,9,14
54:18,21 55:4,5
56:20 57:1,4,7,10
57:12,16,17,20
58:1 59:10,13,18
60:3,7,13,15 68:3
68:6 70:2,4,9,11
71:10 72:13 73:2
73:9,12,16,21
74:3 75:8 87:16
87:17 91:18 92:2
92:5 97:22 98:1,5
99:6 127:16
128:13,18 129:19
130:8 131:19
137:4,9 139:8,12
145:12,21 158:12
160:15 170:15
173:3,8 183:13,21
203:12,14 218:16
232:5 237:21,22
238:7,11,16 239:4
240:2,15 241:9,13
241:20 246:16
250:20 251:10,16
251:17,20 253:9
253:14,15,19,22
254:4,9,15,18,22
255:8 258:3,4,14
260:15 261:4,12
261:17,18 263:7
263:17,18 266:2
266:13 267:9,13
268:3,6,16,21
269:19 270:11,18
270:21 272:8,19
272:22 273:9,12
274:2,4,6,10,12
283:4,9,11,13,20
284:8 290:2,13,18
301:8 307:11
**policy's** 99:8
**political** 177:16

230:22
**politician** 130:3
**Ponce** 229:19
**pork** 207:20 208:18
209:6,11,22 210:3
**port** 34:13,14 35:1
37:20,21 62:7
69:17,22,22 70:7
70:8 71:8 73:14
74:21 75:1,8,11
80:11,16,22 81:3
81:8 84:18,20
85:7,9,21 86:1,2,2
86:8,8,13,15
87:10 88:22 89:7
89:15 90:7,10
91:8,13 100:8
101:20,22 102:1
103:6 104:8,11
108:14 109:12
110:5,8,9,13
111:8,11,14,20
113:13,18 114:10
114:17 115:8,22
116:8,15 117:20
119:2,13 123:6,10
127:10,18 133:4
135:9 136:9
137:10 138:1,14
139:3,13,16
140:17 141:14
142:9 145:9,14
146:9 151:16,21
152:12,18,20
153:10,13,15,16
153:18,22 154:2,2
154:13 157:13
158:22 165:20
175:4,5 176:6,7,7
176:8,9,14,22
177:2 179:2,5,15
180:8 184:5,13,16
186:12,12,14,16
188:11,19 189:12
189:20 190:7,9,22
191:4,14,21



MAGNA
LEGAL SERVICES

209:22 210:17
232:6 233:15
234:5 235:3,8,14
235:19 238:15
239:5 240:16
243:2 245:5
259:15 262:8
263:8 264:8,10,12
265:9,16 272:11
276:20,21 277:6,9
283:5 284:6 286:5
286:14 288:5
289:5 293:4,6
297:14,19,22
300:1 307:2 309:8
313:2 316:18
317:7 319:11
320:5 325:1,5,8
325:11,14,17
**portion** 136:8
169:6
**portions** 328:1
**ports** 17:18 30:4,5
30:6,7,8,9 38:5,15
39:7,17,22,22
44:10 45:19 68:7
68:9,13 69:3,6,7,9
69:13,15,21 70:16
71:7,16 72:19
74:8,8,19 75:14
75:20 80:14,14
85:10,12,14 86:5
86:19,21 87:2,7
89:18 92:5,6,11
92:15,18 99:10
100:3 112:19
113:5,9 116:22
137:8 138:12
140:12 150:3
151:4 153:2,3
154:18 157:7
158:2,17 162:8,14
164:13 166:20
170:11 175:15
178:2 182:7
184:20 185:10

187:6,18 188:16
190:14 193:13
202:1 206:11,16
211:11 230:7
235:6,22 239:12
262:4 272:9,14
275:4 285:12,18
286:7,19 288:21
289:8 291:18
296:5 299:16
313:13 315:13
316:15 317:2,5,6
317:8,19 320:9
321:14 322:22
324:20 325:22
326:11
**position** 11:22 12:1
13:8,22 35:6 68:5
70:1 93:5 94:12
95:21 99:4 102:4
121:10,14 143:18
144:3 147:5,11
175:3 191:9
230:13 231:2
232:17,19 234:13
234:16 288:2
**positions** 88:10
92:7,11 102:7
178:4
**possible** 94:9,13
195:2 231:1 246:9
297:19 311:22
**posted** 266:7
267:15 300:9,10
300:12
**posting** 274:7
**potential** 134:3
142:1
**potentially** 23:8
93:4 134:3 194:13
**POV** 153:19
**practice** 68:12,15
**practices** 17:22
218:11
**pray** 199:11
**precursor** 147:13

**predecisional** 32:4
36:15
**predeliberations**
32:5
**preexisting** 203:17
**prejudicial** 56:4,11
**preliminary** 307:14
307:17 309:15,19
311:11
**prep** 96:22 97:10
97:12,13
**preparation** 20:4
21:12
**prepare** 20:10,14
21:4
**prepared** 65:6
166:2 172:20
227:7 228:5
**prescribed** 203:9
**presence** 130:16
184:18
**present** 10:2,7 17:8
20:22 29:8 46:12
203:13 206:1
235:19 299:17,20
**presentation** 46:17
**presentations**
45:20
**presented** 45:22
46:1,6 205:12
211:2
**presenting** 206:11
282:9
**presently** 9:16
**preserve** 305:4
**president** 61:11
269:3 303:13
**Press** 291:7
**pressure** 126:3
**pretty** 163:21
228:12
**prevent** 148:21
208:12 219:10
268:18 269:19
270:12 277:19
282:8 285:1,2

**prevented** 307:18
**preventing** 207:21
208:17 209:18
266:9,15,22 267:3
267:8,20 268:1,8
270:16 285:4
**prevents** 207:15
**previous** 11:22
12:1 13:21
**previously** 63:7
217:6 327:11
**pre-decisional**
87:15
**primarily** 60:21
72:2 110:21 112:4
112:11,12 302:12
313:12 317:11
**primary** 62:5 69:7
107:17 153:19
201:3,9,10 204:17
222:22 300:13,16
300:18,22 302:21
308:17
**principals** 177:5
**print** 243:9
**printed** 82:18
**printout** 5:14 49:18
**prior** 21:10,11,13
24:17 26:5 66:22
67:1,2 185:1
217:6
**priorities** 74:18
75:14 203:2,8
206:7 214:15
297:13
**prioritization** 7:10
195:13 202:20
203:5,17 204:5
206:19 214:1
217:15 218:20
**prioritization-ba...**
195:12 197:13,19
200:17 216:21
217:11
**prioritize** 75:1,9
201:21 209:16,18

210:3,5 211:11,18
212:4 320:8
**prioritizing** 191:20
211:5
**priority** 76:10 77:1
77:3,7 198:16
202:1,4 203:20,22
203:22 205:3,7,14
205:15 207:2,21
207:22 208:2,12
208:15,19 214:15
217:18 271:22
**private** 288:17
**privilege** 22:22
44:6 169:1 194:13
228:5,12
**privileged** 23:4
43:20 44:2
**privileges** 169:6
181:3
**probably** 52:5
62:18 63:6 88:12
90:16 93:16,17,22
134:19 157:19
169:12 204:14
228:11
**problem** 166:13
169:15 257:13
**problematic** 231:16
231:21 234:12
235:11,16
**problems** 236:2
**proceedings** 109:8
**process** 34:9 75:22
76:2,11,15,16,21
77:1 87:3 89:5
108:16,21 113:22
114:6 115:4 116:2
128:6,14 130:19
137:16,16 138:14
152:7,8 155:2
166:7 168:22
169:6 179:6 181:3
189:7 194:13,15
206:22 207:1
221:19 241:6



245:10 262:17
279:11,12 307:1
308:21 309:12
331:14
**processed** 80:16
81:1 88:22 98:19
98:22 139:15
140:11 151:17
165:20 210:2
264:14 316:16
**processes** 313:6
**processing** 44:9
75:2,10,18 77:4,7
87:1 99:9 108:6
110:4,5,13,18
111:3,10 113:5,11
113:16,18,21
114:5,7,9,12,13
114:15,16 115:4
121:21 126:5
136:20 140:17
144:12 151:19
188:10 189:12
190:4,11,14
202:15,19 203:5
204:1,4,17 205:4
205:8,16,18 206:6
207:12 208:13
209:20 210:6
230:21 306:22
307:2 308:21
309:7 314:8,15
320:13 321:9,11
322:1
**produce** 181:9
321:10
**produced** 181:7
226:12 228:18
**product** 22:9 23:8
23:18 24:4 226:11
227:9,13,14 229:2
**production** 37:18
305:20
**products** 42:17
209:1,6,10,17,22
210:3,6,14

**Professional** 2:6
32:13 33:19,22
34:3,7 36:19,22
240:19 242:8
326:7 330:6
**program** 201:21
244:6
**programs** 28:11
64:5 143:21
**project** 213:18
**promise** 165:19
**promptly** 331:13
**promulgated** 283:4
**proper** 75:2,11
93:2,2 109:11
127:17 139:6
282:6 307:18
**property** 274:20
**proposal** 149:18
150:2,9
**protect** 93:8 160:14
168:21 194:12
201:3 282:11
289:18
**protected** 168:22
181:2
**protection** 5:16
9:19,22 52:10
265:8 273:19
**protections** 98:20
229:8
**protocols** 214:6
239:9
**provide** 45:9
274:17 282:6
286:15,16,16,17
290:20
**provided** 13:17
14:2,8,17,19 15:2
24:18 26:7 255:5
259:16 269:3
301:3 325:1 331:6
**pseudonym** 222:5
**pseudonyms** 222:9
222:13
**public** 2:7 53:11,15

53:17,21 54:3,5,9
198:2,7 231:3
289:7 330:6
331:10
**publicly** 282:12,17
**pull** 76:11 186:17
273:12 274:2
320:14,15
**pulled** 21:15
305:18 320:18
321:7,9
**purported** 254:3
301:6 302:8
**purpose** 57:4,16
98:6 174:1,7,7,10
216:17 252:20
255:4 267:8,12
268:2,5 285:3
**purposes** 100:1
169:7 251:9
253:15 254:8
285:6
**pursuant** 19:17
**push** 75:20
**put** 81:22 101:1
105:3 109:7
123:18 135:16
159:9 161:5
168:4 174:1
178:3 186:9
195:10,19 196:3
199:4 204:4
212:21 219:9
223:15 229:16
236:7 264:22
273:5 313:9
314:11 318:12
318:15 320:14
321:22 328:8
**putting** 117:13
179:22 272:20
285:6
**pyramid** 175:2
**p.m** 82:15 83:20
102:18 123:6
141:1 148:5

148:15 158:8
178:8,11 124:3
198:1 249:22
275:14,15 284:19
311:5,6 312:11
322:7,8 328:19

---

**Q**

**question** 10:21 14:5
16:4,5,10,11 17:1
23:7,16,22 44:6
54:15 57:19 72:5
75:5 80:19 99:2
103:16 104:14
112:5 114:8 117:2
130:12 131:5,13
131:15 141:13
156:13,14 161:6
165:8 174:4 189:8
189:9 195:9
206:13,14 211:5
211:14,22 212:3
232:22 233:12,12
233:13 236:12
237:15 239:10
245:17 257:17,19
267:17,19 277:12
283:7 285:4
290:16 301:22
310:13 313:5
323:17 324:21
**questioned** 231:3
**questions** 15:12,18
16:9,19 17:7
218:13 22:10 27:11
117:2 127:22
130:21 141:4,8
145:7 146:7
158:11 170:10
181:21 183:10
207:16 228:6,7,13
250:18 251:8
254:7,11 255:3
298:16 310:9
322:3,4,12 331:13

148:15 158:8
**queue** 7:10 42:21
44:20 45:1,7
80:2 84:2
89:14 90:4
157:10 187:12
191:3 195:12,14
197:13,19 200:17
213:5 214:1,6
216:21 217:11
250:5,11,19 251:9
253:14,15
**queuing** 119:4,8
**quick** 133:21
312:13
**quicker** 77:1 207:1
208:14
**quickly** 210:6
218:2 314:7
**quite** 62:2 182:16
226:10 229:1
240:12 250:21
**quote** 56:8 103:1,15
107:5 110:12
115:6,21 121:17
126:2 144:6,19
148:17 149:16
163:15 164:4
166:16 171:20
172:14 214:4
224:8 245:7,7,8
246:5 259:15
306:19
**Q&A** 245:19

---

**R**

**R** 3:1 4:1 9:1
142:11 143:15
330:1 332:1,1
**raise** 236:6 281:19
**raised** 37:4 62:11
235:15 238:15
240:8 301:5,11,12
301:15,16,21
304:17,18,20
**raising** 158:14
235:12 255:3



MAGNA
LEGAL SERVICES

273:7 297:18
302:1
**Rameez** 4:3
**Ramirez** 292:14
**Randy** 5:20 28:9
82:8 196:17
**range** 190:4
**rationale** 99:7
**reach** 68:20 116:10
**reached** 145:7
**reaches** 172:21
**reaching** 74:21
324:11
**read** 49:15 53:12
56:12 59:7 83:15
83:17 98:16 103:4
103:12,17 105:18
107:8 110:6,16
115:9 116:4,6,10
116:21 118:20
122:1,22 123:22
125:7 126:9,22
142:6 144:14
145:3 149:1,21
159:20 164:10
166:21 171:11
172:4,22 179:8
197:5 198:3 200:3
201:5 202:2
203:10 212:13
216:13 224:13,20
231:10 236:13
242:1 245:11
246:11 247:7
250:7 257:6 260:4
265:21 266:11
268:6 276:17
279:13 282:14,15
294:18 296:22
297:9 307:7
327:20 329:6
331:2
**reading** 46:4 98:10
118:13 173:15
328:12
**readout** 134:16

**reads** 56:8 59:3
102:14 179:2
201:20 203:5
250:4 259:14
265:16 266:6
282:5
**ready** 164:5
**Reagan** 10:9,10
28:17
**real** 136:21 297:7
297:12,20 298:7,9
298:10,10 302:6
321:19
**really** 69:21 172:19
204:6 218:2
282:13,18 292:11
302:2 313:15
316:1
**Reardon** 61:2,3,5,9
61:11,20
**reason** 18:11 48:21
70:15,17,18,21
71:12 99:11,18
125:10 129:11
138:9 145:22
156:20 160:6
197:8 223:8
227:13 252:5
270:3 288:19
331:4 332:2
**reasonable** 250:6
**reasons** 45:16 57:6
57:11 98:17 99:19
251:20 264:15
271:14
**reassign** 76:14
206:20
**reassigned** 321:13
**recall** 12:16 32:10
32:16 33:10,15
35:1,8,22 37:21
42:14 54:11,19
60:19 65:12,15,17
65:19,20,22 66:17
66:18 67:2 69:6
73:6,8,10,15 78:1

79:22 87:4,6 95:8
100:15 111:6,15
128:3 134:15
146:1 147:22
148:1 149:8,12,13
150:19 156:9,20
157:7,9,14 158:14
158:19,20 161:4,7
162:14,16,17
165:21 173:7,10
173:12,18,22
174:6 175:3 178:1
178:5 182:16,17
182:19 196:1
214:13 219:16
224:19 231:14,17
235:5,7,9 242:3
247:9,13 251:3
254:6 256:21
257:11 272:13
293:7,15 296:2,4
310:21 311:2
312:1
**recap** 30:3
**receipt** 317:6
331:14,16,21
**receive** 21:10,18
62:4,6 78:2 79:3
89:2 115:17
124:11,18,19
182:14 183:17
188:7 258:20
308:20 317:17
320:10 331:20
**received** 64:12
65:13 82:11,14,21
83:4,7,12,16,19
105:15,20 106:3
106:13 124:10,20
125:1,4,8 126:21
130:7 131:20
132:7 149:17
159:16,21 160:2
171:4,7,12 182:8
182:16 183:19,20
184:2 196:21

197:1,6 199:21
200:2,9 216:2,5
216:12 219:20
220:14 251:15
254:2 256:14,16
256:17,19,22
257:5 258:18
259:1 294:15,19
294:21 296:18
299:8
**receives** 34:5
**receiving** 119:3
219:16,19 317:2,5
**recessed** 96:15
134:7 168:8
178:11 275:14
311:5 312:15
322:7
**recitation** 46:3
**recollection** 22:7
22:12 23:3,11,17
24:4,9 32:19
33:12 90:17
100:17 103:19
104:2,7 113:3
127:3 128:6,11
132:3 134:21
136:19 142:11
143:12 156:17
157:19 164:12
179:14 180:2
182:20 183:1,15
214:10 312:3,5,21
**reconcile** 147:19
**reconfiguration**
277:21
**reconfigured**
277:14,15,18
**reconfigures**
277:16
**reconstruct** 189:19
**Reconvened** 96:16
134:8 168:9
178:12 275:15
311:6 312:16
322:8

**record** 9:12 12:17
16:16 52:13
160:21 168:12
186:13,18 196:4,7
227:21 228:17
305:19 327:18
328:8 330:10
**records** 305:17
**recurring** 47:19,21
**red** 141:4,7
**redact** 167:15,18
167:20 195:2
**redacted** 168:15
169:8 170:9
**redacting** 195:3
**redactions** 67:20
125:12 134:2
160:8,13 168:21
171:14 194:12
295:3
**redirect** 76:22
312:13
**reduce** 161:11,13
276:19,21 277:3
321:1
**reduced** 192:7
276:15 277:7
280:6 281:18
**reducing** 277:2
**reduction** 111:19
**refer** 9:21 17:12,15
17:18 52:18 58:7
68:2 242:19
280:15,20
**reference** 98:1
99:15 111:1,14
112:1 117:3
127:13 128:13
148:2 167:12
178:22 198:14
216:20 222:4
**referenced** 162:11
**referencing** 39:18
116:17,18,19
**referral** 36:22
**referred** 31:14,17



32:13 33:18 34:4
35:11 36:18 37:9
37:9 41:4,5,10,16
41:16 44:19,20,22
58:6 59:20 147:3
212:14 222:5
281:5,7 326:5,9
**referring** 26:10
34:11 60:16 81:10
123:2 149:8
215:13 256:6
316:21
**refers** 110:8 111:2
122:6 144:16
145:16 155:14
167:1 295:11
**reflection** 268:21
**Reform** 13:15
**refresh** 22:2,11,15
25:13 90:17
100:16 103:19
127:3 164:12
179:14
**refreshed** 22:6 23:3
23:10 24:3,9
183:15
**refreshes** 143:12
**refreshing** 104:2
132:3
**refuge** 72:19,22
**regarding** 20:3
36:12 37:3,22
54:3 57:9 59:13
60:3,7 61:6 62:7
78:3,22 106:13
134:13,22 137:3
145:7 156:15
158:17 160:14
168:14 191:15
195:11 197:19
218:20 224:16
228:20 295:21
303:10,11 311:11
**regardless** 117:6
214:17 283:3
**Registered** 2:6

330:5
**regularly** 46:10
187:17
**relate** 17:7
**related** 14:21 31:16
145:11,20 182:7
183:7 232:19
305:4 330:12
**relates** 144:20
**relating** 247:11
**relation** 65:12
111:8 170:14
195:13
**relationship** 179:11
259:11
**relatively** 278:13
**relayed** 31:14
**release** 179:7
**released** 195:15
**relevant** 11:1
**relied** 324:12
**Relief** 7:14
**rely** 22:13 165:19
324:10
**remain** 152:11
214:14 266:18
316:12,14
**remained** 154:22
**remains** 203:7
208:12
**remedies** 107:1
117:16 118:2
**remedy** 107:5
110:2,11 115:5
117:19 237:12
**remember** 14:19
15:1 104:10 133:6
160:11 162:13
219:19,19,21
230:13 277:8
**removal** 108:2
109:8,19
**remove** 314:10
**removed** 6:16 7:2,3
277:17,21 278:7
278:14,20 280:17

**removing** 277:10
278:1
**renewed** 217:22
**reorder** 206:19
**repeat** 54:15 75:5
274:22
**rephrase** 206:13
319:22
**report** 7:21 28:5
37:18 43:15,16
48:6,9 81:11
83:18 85:3 91:7
120:5,8,14 175:15
176:1 177:8,10,14
184:9 186:1,6,9
186:19 187:8,9,12
187:17 188:4,7
189:10 190:8,18
191:8 239:2,8
247:10 298:3,6
322:22 323:17,18
**reported** 1:22 33:5
33:7 36:1,6 80:15
126:11 188:2,4,6
298:7 326:15
**reporter** 2:6 15:13
15:17,19 291:7
330:6
**reporting** 47:19,21
128:16 147:20
187:22 251:6
252:7
**reports** 28:3,4
44:19,21,22 45:1
45:2,7 48:5,9
64:13 79:21 80:2
80:3,5,9,20 81:6
83:9 120:21 176:6
176:8,14 177:11
177:12,15,18
184:2 187:11,20
188:12,14,15
189:16 191:1
324:15
**reposition** 95:5
**represent** 141:7

220:7 226:4 230:7
230:9 243:10
247:17 249:4
**representative** 95:3
95:7 230:3
**representatives**
42:15 60:14
230:19 234:8
**represented** 19:20
**represents** 60:16
**reprimanded**
258:13,17
**request** 17:1 116:8
122:18 179:3,4,7
186:8 259:18
260:14 261:9
266:9 268:19
270:16 306:15,20
327:19
**requested** 245:3
**requesting** 206:2
265:18 270:12
282:10 298:20
**requests** 106:13
**require** 90:15
331:13
**required** 203:6
205:7,9,16,21
206:7 214:4
**requires** 131:8
**research** 244:14
**resources** 74:19
75:13,20,21 76:22
114:18 190:13
195:13 198:16
207:2 211:12
319:11 320:4,5
321:20
**respect** 22:4 25:15
35:14 62:16 79:18
79:19 113:9,14
133:4 169:2
170:21 182:21
218:20,21 283:6
313:2
**respond** 122:17

**responded** 297:5
**responding** 228:19
**responds** 103:7,14
163:22 170:18
**response** 18:12
157:21 206:18
285:13 295:8
316:20
**responses** 141:4
**responsibilities**
33:19,22 211:10
326:7
**responsibility**
32:14 34:4,7
36:20,22 211:1
239:11,11,22
240:1,4,19 242:9
279:1 281:21
289:6,12,15,18,19
289:21 290:4,20
291:12,15,19
292:19 313:13
325:21
**responsible** 34:15
285:20 289:9
**restate** 137:12
**restationed** 95:20
**restroom** 96:12
**restrooms** 152:13
**result** 262:13 321:6
**resulting** 121:19
**results** 7:21 36:21
198:17
**retained** 306:7
**rethink** 158:21
**return** 91:18 152:5
259:17 260:17
261:5,8,16 262:14
262:16 263:9
285:16,21 286:11
307:2 331:11
**returned** 32:20
37:11 91:22 138:5
138:17 140:2
155:7 182:9
239:18 260:20



263:16
**returning** 307:6
**reveal** 32:4 36:15
43:21 87:15
**revealing** 23:8 32:5
43:21
**reveals** 227:12
**review** 19:10 21:11
21:15 26:4,14
36:19 63:9 66:14
66:15,21 82:4
105:7 181:15,16
243:13 254:17
255:22 278:21
**reviewed** 22:14
26:6 50:9 66:18
220:15,16 221:7
222:18 245:14
265:11,12
**reviewing** 19:11
22:2 24:13 65:22
66:4 67:19 105:22
221:20 243:15
**re-established**
285:12
**right** 11:4,9 12:12
12:15,20 13:12
15:8,14 17:6
18:21 19:14,18
20:19,20 23:4
26:12,13 29:5
33:3,19 34:12
35:8 37:16 39:21
40:1 41:6,17,21
44:13,16,21 45:8
45:17 46:4,7 47:4
47:18 48:15 49:17
50:5,8,11 51:10
51:14,18 52:9,14
53:6 55:16 56:7
56:16 57:1 58:15
62:19,21 63:5,19
63:22 65:7 67:9
67:12 69:14 70:10
70:21 71:10,14
72:9 74:4 75:4,12

76:4,17,21 78:10
78:16 79:2 80:11
81:8 82:7,9,15,19
83:13 84:8,11,14
84:15,17,21 87:9
88:2,5,22 89:6,15
89:18 90:2,8,10
90:19,22 91:9,15
92:3,8,12 93:15
93:17 94:9 95:17
96:2 98:2,3,7,12
99:20 100:4,11,16
101:1,15 103:8,15
104:17 105:3,10
105:16,20 106:1,5
106:15 107:3
108:6 114:10,17
115:13,17,18
117:7,17 118:16
118:18 122:9
123:18 124:10,21
125:21 129:19
130:9,15 131:5
132:6,9,16 137:18
138:13 144:18
146:16 148:10,17
154:22 155:3
162:18 163:2
167:9 168:4,6
169:20 171:12,18
172:13 174:17
177:6 178:15,19
181:14 183:17
193:17 194:3
195:12 196:13
197:10,12 199:4
200:20 201:17
204:1 205:17,19
206:1,4,5,8 208:3
208:16 209:3,6,9
209:17,21 210:11
210:19,20 211:4,6
212:7 214:22
215:20 218:14
220:6 221:22
223:7,15,21

228:21 233:10
234:18 235:20
236:4,8 241:10
243:19 247:3,21
248:9,20,21
251:13,18 254:6
254:13 255:10
256:3 257:10
259:13 260:14
261:3,18,19 262:4
262:19,20,22
263:3,3,10,17,20
267:5 268:9,12
273:6 275:6,18
277:7,14,17 282:3
283:10,12 285:1
286:1,12 287:14
289:11 294:2
296:2,6,12 300:21
301:2,15 302:11
302:17 304:12,14
305:6 309:4 310:6
310:10 312:9
318:11 322:2
323:2 331:2
**Rights** 31:7 182:1
**Rio** 292:10,18
**rise** 188:9 278:19
**risk** 165:4,9,13,15
**river** 292:1,9
**Robert** 6:2 28:8
101:16,19,20
224:2
**Rodriguez** 224:1,1
224:8,17
**role** 51:9 242:18,19
242:21
**roles** 28:3
**roll** 273:13 274:10
**rolled** 272:8,19
274:5 315:10
**rolling** 158:22
**Romualdo** 256:8
**Ronald** 10:9,10
28:17
**room** 21:1 25:18

26:1 115:8 188:1
314:21
**rooms** 274:17
322:16
**Rosa** 224:1
**routinely** 27:20
142:3
**RPR** 1:22
**rule** 22:16 94:16,18
96:8,9 256:12
**rules** 15:10 16:16
230:21 331:13
**run** 288:17
**runners** 184:16
**runs** 85:2
**Ryan** 64:15,17 82:8
84:5 143:16,17
144:5

---

**S**

**S** 3:1,1 4:1,1 5:1 9:1
332:1
**sacrifice** 76:12,13
76:19
**sadly** 297:7 298:9
**safe** 289:6 324:13
**safely** 273:13
**safer** 286:7,13
288:3 289:4
**safest** 323:5
**safety** 99:10 210:16
231:2 236:20
256:12 267:15
271:17,18,20,22
272:9,20 273:3,4
273:10,11,15,18
273:22 274:3,11
274:15,20 281:15
298:16
**Salvadorian** 246:6
**San** 38:18,19 68:8
68:13 69:9 85:6,9
85:14 87:22 88:9
89:10 100:7,9
101:21 102:2,3,11
102:12 104:7

106:12,14,19
107:10,16 110:9
110:22 111:15
114:21 115:22
116:8 122:11,12
122:19 127:10
133:4,7,14,18
134:13 135:9
136:6,8 137:7
138:16,18 139:2
139:13 142:9
144:10,12 145:8
145:21 146:9
153:14 157:10,12
157:17 162:11
170:22 242:12
244:3,6 245:5,21
246:3,14 251:21
253:8 312:22
313:1 314:4,18
315:7 321:17
**saturation** 121:19
**saw** 321:16
**saying** 88:7 90:1
134:2 138:13
158:20 166:13
183:13,18,20
197:17 232:1
233:20 254:2
264:1,5,12 302:3
**says** 12:17 19:9
85:3 89:7 119:1,7
141:3 145:13
176:19 184:11
211:5 213:22
214:4,8 220:14,21
224:8 232:13,14
249:12,15,18,21
250:2 260:17
261:10 263:18
265:7 276:14
279:10 306:19
**scabies** 318:13
**scene** 253:5
**scheduling** 165:1
**school** 321:4



**SCIF** 29:3,4 40:6
40:15 42:3 43:9
45:21 46:11 47:5
48:1 157:1 244:17
245:1
**scope** 75:19 86:10
127:21 211:10
**screening** 230:22
**sea** 188:16 314:7
**Search** 7:21
**seating** 276:16
**second** 35:13,15
40:5 81:13 82:17
90:13 97:19
106:17 110:2,2
111:8 157:13
169:2 170:6 176:3
176:4 196:5 202:7
214:21 225:16
243:19 261:22
263:13 282:4
318:15 325:19
**secondary** 108:16
111:3 113:5 276:2
276:5 277:1
308:17
**second-level** 299:15
**secretaries** 67:17
**secretary** 133:6,8
133:11 150:2,5,10
150:12,15 177:18
191:18 195:11
197:18 199:19
214:5,11 219:3
320:10
**secretary's** 198:15
**section** 52:20,22
53:3,8,9 55:10
56:7,8 58:18,19
58:22 216:17
250:4
**sections** 56:1 282:6
**Sector** 116:1
**secure** 93:12
110:14 111:1
**security** 7:6 13:2

17:12 99:9 102:9
133:13 134:12
135:7,8 144:8
145:6 146:3
158:10 175:11
195:11 197:18
199:19 202:4,9
203:19 204:12
206:21 214:5,12
244:6 247:19
277:19 286:16
288:9 293:14
302:4 321:22
**see** 26:11 35:7
37:19 49:2,20
52:11,15 53:1
56:4 58:19 70:19
71:1 72:20 79:6
85:4,7 88:17 89:7
90:10 97:11
100:16 102:15,19
106:9 123:22
124:8 135:21
141:5,17 146:18
147:2,8 148:12
151:18 152:2
163:5,19 175:1
176:15,17 178:17
178:20 180:21
187:8 191:7,12
194:17 197:14
199:15 201:14,17
202:19 213:5,15
214:1,7,8,17
216:17 220:9,13
222:2,6 223:19
224:2 225:18
226:2,8 229:20,21
232:3 246:13
248:16 249:6,13
249:18 250:2
256:9 265:9 276:3
279:5 291:10
306:14
**seeing** 143:9 172:18
193:12 195:1

219:21 247:14
256:21
**seek** 230:22
**seeker** 109:1 112:5
193:7
**seekers** 70:3,10
71:10 73:13 76:17
76:21 77:4,8
80:15 94:10,22
95:20 108:11,13
108:20 113:5,10
113:14 114:1
137:10 140:5
202:15,19 204:1,4
205:4,8,17 208:3
208:16 209:17
210:22 237:9
263:15 282:7
283:7 284:5,19
285:7 290:11
291:16 307:2,5
**seeking** 72:1 98:20
154:19 210:7
265:18 285:15
293:4
**seen** 41:9 44:8 45:1
52:5 227:3,4
236:9 239:2 256:3
**seizures** 186:17
188:3 190:4
**Senate** 12:14 13:1
13:18
**sending** 119:17
306:20
**senior** 40:12,13
51:16 133:2
184:14 186:8
297:14,15
**sense** 22:9 111:9
187:21
**sent** 21:16,20,21
24:12,16 29:17
34:7 79:5 84:5
123:5 125:19
126:16 143:4
148:14 159:16

170:7 178:8
254:21 259:14
265:12 294:12
296:18 311:11,14
326:15
**sentence** 201:2
203:4 236:21
266:6 278:1
279:16 306:14
**sentiment** 245:4
246:7 268:11
**separate** 189:16
227:20 318:18,22
319:2,5
**separation** 246:9
246:19
**Sept** 6:6,9,10
**September** 124:5,6
124:6 125:16
126:13,18 129:13
129:18 130:6,13
131:16 132:2,6,8
132:20 135:9,19
140:22 142:10,11
**sequence** 312:22
**serve** 10:14 53:11
**Services** 40:22
**session** 21:12 25:17
97:1,7,8
**sessions** 97:10
**set** 35:18 51:9
112:4 141:9
152:22 153:3
204:8 207:8,9,12
207:15 251:16,17
251:20 285:10,14
321:8,10 330:16
**sets** 188:20 189:15
189:17 320:9
**setting** 285:8
**shakes** 15:20
**shape** 314:3
**share** 41:22 74:6
161:22
**sheet** 249:6 331:1,4
331:5,8,11,17,20

**shelter** 140:2
151:22 286:4,15
286:19,21 288:3,8
288:11,14 291:9,9
**shelters** 88:21
138:6,17 139:7,9
139:11 152:6,11
184:4 266:19
285:17,22 286:11
286:13,15 287:3,7
287:17 288:16,17
288:18 289:16
**shift** 279:19
**Shinners** 3:13 5:5
10:12,16,19,22
14:4,9,13,16 22:8
22:21 23:5,7,12
23:14,18,21 32:2
36:14 43:18 47:9
47:13 63:11,14
72:15 76:5 80:17
81:9,14 87:14
91:6 96:11 98:13
99:12 104:1
108:18 111:4
119:15 127:20
133:21 160:12,18
160:20 161:2
165:5,8 167:11
168:1,5,17 169:13
169:17 181:1,15
184:6 194:9,11,18
194:20 195:1,6
208:5,9 211:7
225:10,14 226:10
226:16,21 227:6
227:11 228:8,15
229:7 234:19
250:21 252:1
253:1 264:19
268:10 269:21
270:22 275:8
292:11 298:22
304:4 305:11,13
305:19 306:6
312:12,19 322:2



327:15,18
shipment 209:22
shipments 244:20
shopping 321:6
short 92:19 153:18
shortly 219:17
short-term 317:11
show 52:4 167:9
  214:21 241:15
  292:1
showed 251:11
  257:15 302:16
showing 19:6
  166:20 199:10
  243:8
shown 25:3,7,10,11
  64:2 329:9
sick 190:3
sickness 74:17
side 89:5 138:3
  140:13,16 260:2,3
  260:11 265:20,22
  282:8 284:19,21
  287:3,17 288:4,12
  289:16 290:1,12
  309:17,21
Sidney 101:16,22
  103:6 132:21
sign 65:20 269:5,12
  270:20 271:1
  327:20 331:5,9
signature 65:7
  143:8 328:12
  329:20 331:11,15
  331:17,21,22
  332:21
signed 64:7 67:8,11
  99:21 183:3
  267:11,14 269:2
  269:14,18 270:1
  299:19 300:5
  331:16,19,20
significance 278:15
significant 121:18
  184:9,15 186:4
significantly 68:18

156:11 166:18
signing 331:6
similar 15:21 35:17
  172:6 187:11
simple 114:8 195:8
simply 46:3 81:2
  115:11 151:15
  164:21 271:5
  314:15 318:2
simultaneous
  186:17
single 116:2 155:20
  188:11 189:10
  190:18 317:11
sir 9:9,14 10:11
  11:3,12 12:9 14:5
  15:22 16:6,19
  17:9,13 18:6 19:7
  19:11 23:16 24:7
  41:15,15 43:3
  52:9,11 58:20
  63:5 68:4,5 81:22
  82:12 96:19 97:16
  101:1 104:18
  105:3 108:12
  123:18 124:1,8
  130:20 131:9,12
  132:9,16,19
  133:12 134:11
  135:16,21 141:5
  141:17 142:13
  146:18 159:9
  161:5 167:9
  168:13 169:20,22
  174:17 177:7,21
  178:15 180:19
  181:22 185:4
  193:10 195:17
  196:13 199:10,15
  212:7 219:1 220:9
  220:10 222:2,7
  223:6,15,19
  229:20 236:12,13
  243:8,13,15,19
  245:2 248:5,7
  255:19 256:3,9,10

275:10,18,21
  276:3,13 291:6
  295:13 305:2
  307:13 311:9
  312:10 322:13
Sirens 178:11
sit 58:14 65:3 66:15
  94:16 96:7 118:19
  129:11,16 160:6
  190:20 241:8,12
  253:4 258:17
  284:12
site 260:1 300:11
sitting 15:13 35:8
  125:11 197:8
  279:8
situation 69:19,21
  176:19 187:22
  234:22 290:8
Situational 122:3
situations 140:4
  152:3 155:22
six 20:19 29:9
  40:17,19 90:18
  95:11 227:21
sixth 41:3
size 176:12
slash 106:14,19
  142:5 144:12
  256:12 265:18
sleep 288:20,21
  289:1
sleeping 291:8
Slocum 4:2
slowed 156:2
slower 209:20
Slowing 250:6
small 317:19
SME 144:11,16
Smedlock@maye...
  3:9
snapshot 45:9,14
  79:22 184:9 186:2
  190:21 191:8
snapshots 45:10
  91:12

soft-sided 179:22
soil 33:1,3 34:16
  35:18 37:11,11
  91:21 94:10,22
  95:22 96:1 152:20
  154:20,21,22
  155:3,7 239:19
  263:4,15 264:6
  285:8 288:5
solely 324:19
solution 167:15
somebody 74:2
  101:8 114:6,20
  138:18 255:2
  263:3 278:14
someplace 114:7
somewhat 71:22
  85:16
soon 224:10
sorry 26:9,12 32:7
  41:3 52:21 55:12
  55:18 96:10
  112:16 122:10
  149:16 160:12
  167:11 169:14
  180:7 181:1
  185:15 189:3
  192:18 194:9
  195:4 208:6
  212:12 237:15
  243:17 265:22
  286:9 290:17
  306:19 316:22
sort 38:6 85:2
  192:13 242:1,22
  248:20 261:18
  276:2 309:17
  325:16
sough 72:22
sought 72:19
sound 15:21
sounds 15:8 151:12
  168:1
south 218:6
southern 1:2
  161:16,17 188:14

301:21 314:4
  315:11 320:21
southwest 30:6,10
  68:15,22 69:7,16
  186:20 193:4
  202:1 203:7 214:7
  218:4 230:8 235:6
  285:13 315:6
  323:11,13
southwestern 85:13
  153:11 262:4
sovereign 289:17
space 74:13,22 76:8
  107:2 111:12,13
  111:20 114:3
  115:11,15 121:20
  128:14 138:19
  156:3 191:11
  274:18 276:16
  277:15,16,18
  291:9 314:20
  315:3,13,14,16,22
  316:13 317:17
  323:4 324:8
spaces 322:16
  331:6
speak 26:16 54:5
  70:22 115:14
  129:9 236:3 264:9
  281:12,14
speaking 22:19,21
  39:1 122:20 228:8
  257:2
speaks 99:12
Special 102:14
specialized 277:3
specific 22:10,15
  32:7 42:16 61:12
  65:21 78:4 182:18
  241:1 280:16
  324:20
specifically 27:6
  36:5 66:17 69:6
  100:15 138:20
  235:10 237:19
  275:22



specifics 293:17
speculate 129:14
 131:6 153:16
speculation 98:14
 131:8 264:20
 305:14 319:15
spell 9:11
spend 24:13 66:3
spending 298:11
spent 65:22
spoke 245:20
spoken 182:11
 270:6,14
spread 314:17
 316:5
spring 68:21
 321:12
spun 300:5
Sreet 2:3
ss 329:2 330:3
staff 29:11,11 64:22
 65:4 147:9 149:17
 194:16 196:2
 251:12 280:10
staffing 188:22
 189:5 201:21
 279:18 281:13
stair 192:14
stamp 67:18
stamped 5:19
 168:19
stand 244:9
standard 5:17
 51:17,18 239:9
standards 52:11
 53:4 56:3
standby 164:4
standing 28:19
 29:20,22 47:7,15
 47:17 61:16 94:6
 149:9 156:19
 157:1
stands 198:12
Stark 6:10 136:2
 141:3,11 143:5,8
 143:13,14

start 16:3 46:19
 102:22 103:2
 150:22 158:2
 161:8,10 162:12
 171:18 178:5
 185:18 217:13
 252:5 309:6
 311:20 313:15
 314:6,20 318:9
started 68:12,13,20
 92:13 100:7,9
 103:11 104:4
 128:1,5 147:15
 151:14 152:4,9
 157:12,20 161:21
 164:5 171:20
 180:2 273:1,7
 274:6,7 275:2
 309:9 313:17
 314:6,12,16 315:6
 315:8 316:10
 317:16,16
starting 68:20
 148:10 175:18
 221:22
starts 34:9 106:7
 143:4 289:12
state 9:11 23:22
 144:19 149:14
 198:11 262:7
 302:14
stated 22:17 99:19
statement 59:13,17
 60:10 112:6
 166:12 201:7
 266:1 278:12
 282:21 283:1
 308:21 309:10
statements 59:1,5
 59:22 60:2,5,6
 200:21 269:1,15
 281:11,22 284:18
 310:8
states 1:1 99:8
 106:18 109:5
 130:1 162:3

208:19 211:3
 231:9 245:14,20
 260:1 261:7,14
 264:13 266:10
 306:22 307:5,19
 313:11 329:1
 330:2
States-Mexico
 265:19
static 187:4
stating 91:7 231:4
station 3:15 92:13
 107:11,17 116:2
 317:10
stationed 78:9
 94:14 96:4 112:8
 271:9,15 279:11
 281:17
stationing 273:1
stations 107:6,14
statistics 218:13
 241:15
stats 43:15,16
 147:17,18
status 122:18 231:1
 265:19
statute 205:7,9,13
 205:16 211:5
statutorily 206:7
statutory 210:14,19
 210:20,21
stay 274:18
stayed 150:17
 155:6
stenographically
 2:5
step 192:14 264:6
 264:12
Stephen 3:4
stepped 32:22 35:5
 91:21 93:10 94:22
 95:21 261:13
 263:1,14,15
steps 108:16 159:2
 252:18
stock 236:7

stop 22:20 23:9,19
 49:18 102:22
 103:3 259:5,9
 285:7 303:15,17
stopped 164:7
 166:15 172:1
stops 289:11
 295:16
storage 315:16
straight 94:4
 253:21
strangely 306:2
Street 3:6
strong 228:12
structure 107:16
 116:17 176:6
 251:7
study 247:11
stuff 122:10
subcommittee
 12:19 13:18 144:8
 145:6 146:2,7
 158:9
subcommittees
 12:11
subject 31:4 64:22
 84:2 102:13 124:7
 136:5 144:16
 163:11 178:19
 213:4 217:9
 256:11 329:8
 331:7
subjects 34:17
 245:4,8
submitted 141:5
subordinates
 326:18
subpoena 10:14
Subscribed 329:16
subsequent 142:2
 191:13
subsided 68:17
substance 20:1
 331:3
substations 107:18
 107:19

sued 223:2
sufficient 151:20
suggest 123:6,9
 167:19
summaries 42:6
summary 226:14
summer 95:13,13
 95:15 321:10,12
 321:12
supervisor 120:18
supervisors 265:17
 326:17
supervisory 176:1
Support 41:1
suppose 223:5
supposed 21:11
 22:17 266:2,13
 308:9 315:15
sure 14:1 37:8
 38:21 50:9 52:5
 62:2,12 66:6 75:6
 80:19,20 81:5
 83:8 98:10 134:1
 134:5,18 137:13
 137:15 150:6
 151:6 155:9
 169:16 185:5
 186:7 187:12
 191:17 204:3
 206:14 209:12
 211:18 236:14
 240:12 261:22
 263:11 283:8,9
 292:2 293:18
 299:2 307:15
 324:21 328:4,7
surge 285:14 313:2
 323:19
surging 275:2
surprise 237:14
 238:3,9 242:4,17
 247:5,6 287:2,6
 287:16 305:15
surprised 71:1
 246:13
suspect 242:19



**suspense** 215:2
**sustain** 53:10,15
**swine** 207:18
  208:17 209:2,5
**switched** 316:17
**sworn** 9:4 51:5
  112:6 308:21
  309:10 310:7
  329:16 330:9
**sympathize** 290:7
**synonymous** 43:5
**SYS** 122:11 141:20
  142:3 245:5
**system** 141:22
  142:3 165:1 166:2
  314:9
**SYS/Otay** 121:19
**S1** 149:18,19
  197:12

**T**

**T** 4:1 5:1,1 74:17
  229:17 303:5
  330:1,1 332:1,1
**table** 84:10,14
**tactical** 244:10,11
  244:18
**tactics** 315:12
**take** 15:19 16:21,22
  17:3 18:8 19:10
  25:10 26:13 44:3
  44:4,5 52:6 63:9
  82:3 96:12,13
  99:4 101:5 105:7
  108:16 116:6
  133:21 134:4
  138:21 167:21
  177:18 181:19
  184:18 192:17
  218:19 229:5,5
  239:10,13,22
  240:1,3,4 243:13
  255:22 257:3,4
  269:22 274:21
  281:21 289:21
  290:3,4 291:12,15

291:19 292:19
297:16 298:8
304:2 309:9
312:13 315:15
318:4 322:5
326:16
**taken** 2:5 18:5
  35:18 42:4 79:4
  91:12 117:17
  249:4 276:12
  281:8 291:6 292:8
**takes** 74:15 108:8
**talk** 16:2 23:6 52:7
  117:13 281:9
  302:18 313:6
**talked** 47:4 79:20
  100:2 121:15
  127:1 136:14
  173:6 190:9,10,12
  191:12 206:14
  230:2,5 244:2
  301:4 303:4,7,12
  318:3 324:14
**talking** 12:6 20:18
  23:2 30:6 106:8
  114:12 161:15
  188:14 200:18
  244:15 246:17,20
  247:1 323:2
**talks** 236:16
**Tamayo** 147:10
  170:4
**target** 244:13
**targeted** 218:5
**Targeting** 27:19
  28:12
**tattoos** 318:20
**TAU** 244:6,9
  247:12 253:8
**taxed** 318:1
**TBD** 8:15
**team** 27:1,7,11,15
  27:15 30:16,19
  43:8 44:9,19 45:4
  45:21 46:9,10
  84:8 147:13,16

**teams** 191:5
**Tecate** 37:12 92:19
  93:1,7 238:15
  239:5 272:11,13
**technically** 176:13
**technology** 114:22
**telephone** 21:5
  29:13 61:18
**tell** 17:6 18:6,11
  20:3 27:6 43:17
  74:5 165:3,12
  173:9 185:17
  222:12,18 234:16
  251:7,7 261:15
  276:12,13 277:22
  295:18 297:4
  303:14,18 308:13
**telling** 161:4,7
  173:7,22 174:6
  233:14,14 263:7
**tells** 172:15
**temporarily** 107:6
**temporary** 106:21
  108:7 111:17
  115:8,12 117:18
  117:19 314:10,21
  315:16,16
**ten** 66:12 93:8
**term** 85:20 108:19
  117:8,10 267:21
**terms** 32:11 43:5
  83:6 113:11 187:6
  259:6 313:1
  315:22 322:15
**terrible** 324:7
**terrorist** 231:1
**testified** 9:5 11:12
  11:15 12:10,14,18
  12:21 13:1,7,10
  13:14,20 23:4
  24:3 177:22 192:1
  218:14 322:14
  325:1
**testify** 10:15 19:17
  24:2,8 87:19
**testifying** 15:9 18:9

23:10,20
**testimony** 13:17
  14:2 22:13 326:16
  329:6 330:8,10
**Texas** 148:21 150:4
  150:22 151:4
  157:8 158:2,17,22
  178:2 259:16
  265:9,17,20
**th** 71:20
**thank** 97:17 101:12
  128:10 132:9
  152:14 168:5,12
  168:17 169:14
  175:7,10 177:17
  182:3 219:13
  295:9 311:9
  312:11 319:9
  322:2
**thanks** 103:11
  163:18 169:17
**Thanksgiving**
  311:1 312:6
**theirs** 302:6
**theoretically** 93:9
  207:4,6
**thing** 285:21 323:5
**things** 15:16 51:8
  58:3,4 62:12
  74:15 75:17 86:20
  134:20 136:21
  147:20 152:15
  184:16 189:1
  204:11,14 205:16
  205:21 207:19
  221:16,18 222:19
  244:14,20 248:6
  258:19 259:5,6
**think** 10:16 22:8,9
  46:13 49:11 50:14
  57:14 60:10 88:12
  98:15 103:15
  104:4,15,16 131:8
  137:15 139:2
  145:22 153:12
  155:20,21 156:20

166:3 168:13
169:11 189:8,9,22
192:1 194:14,20
201:9 204:15,16
205:6,13 223:7
228:11 229:1
233:4,5,6,7,8,9
236:5 252:14
257:12,16,17,22
258:1,8,9 267:3
268:22 269:2,4,7
269:10,14 271:6,8
271:9,12,14,16
275:8 277:12
278:10 286:21
289:4 297:18
299:3 300:1,3,3,4
300:6,7 302:5
308:12 312:6
327:9,17
**third** 55:3,13,15
  111:9 200:22
  201:12,18 202:9
  236:15 243:20
**thought** 104:12
  131:21 254:4
  303:18
**threat** 48:2 75:16
**three** 24:15 25:8,9
  25:13 28:4 29:1
  69:20 93:21,22
  94:7 109:10,14
  157:19 176:12
**three-feet** 94:1
**three-foot** 94:2
**three-page** 132:17
**three-year** 302:1
**threshold** 188:1
**throughput** 44:10
  113:9,13,16
  114:11 276:21
**Thursday** 97:2,12
  97:13 122:19
**THX** 103:11
**ticket** 166:6
**tickets** 128:2,8,9



MAGNA
LEGAL SERVICES

162:12 164:15,18
164:19 165:2,4,13
165:18,22 166:1,4
**tied** 285:5 324:19
**Tijuana** 124:8
126:4,5,13,20
127:2,6 128:19,20
129:4,9,12,15,18
129:22 130:15,17
131:10,16,18
139:4,7 157:16
158:6
**time** 16:14,14 17:7
17:21,21 20:21
26:7 35:2,3,6,20
40:8 41:8 45:15
66:16,19 67:8
69:2,13,15 80:11
83:4,12,16,20
92:20 95:19 104:8
105:19 111:6
117:20 120:2,12
121:11 125:8,19
127:9,16 128:1
129:15 133:9,15
135:3,4 143:21
144:1 147:11,12
148:5,6,7 150:14
158:15 159:21
160:3,3 162:8
163:7 164:8
168:16 171:12
172:2 175:4 179:6
188:20 197:6
200:2 204:20,22
210:6 227:13
228:22 230:14,15
234:12 237:13
244:5 247:13
253:5 257:5 262:9
265:11 274:9
275:8 277:5
292:12 294:19
297:1,16 298:12
306:1,21 312:10
315:21 321:16

**times** 11:18 12:22
13:7,20 28:15
61:4 66:21 81:5
125:5 139:19
151:10 162:6
171:8 190:11
197:2 235:6
246:10 247:2
252:22 258:3,12
316:20 321:7,16
**tired** 295:19 297:4
**title** 10:2,5 41:18
41:21 42:1 62:2
163:11 197:12
224:4
**titles** 28:7
**today** 15:11 16:9,19
18:6,13 19:17,21
20:4 22:19 26:20
27:2 35:8 38:11
38:15,18,19 39:1
39:2 50:22 51:3
58:15 65:3 87:20
94:17 96:7 118:19
125:11 129:11,16
130:21 148:18
149:19 160:7
163:12,16 190:20
198:22 199:1
214:15,19 215:17
224:9 236:10
241:8,12 253:4
258:17 284:12
311:18 318:11
328:8
**today's** 21:4 26:5
26:17 27:14 52:19
169:7
**Todd** 1:12 2:2 5:2
5:11,14 6:4,8,12
9:3,13 28:11
49:19 64:11
105:12 121:6
132:20 143:1,22
170:4 196:2
310:16 311:11

329:5,14
**toilets** 317:20
**told** 54:13,17,21
60:12 73:2,4,6,8
73:11,16 74:2,4
79:17 94:21
119:13 130:20
131:1 150:21
155:4,6 173:2,13
174:10 262:13,16
303:16
**tolerance** 245:7
246:18
**Tony** 61:2
**tool** 113:19 114:2,5
**top** 82:11 83:20
84:1 85:1,3 90:16
124:11,13,14
148:18 170:17
197:22 203:1,20
203:22 204:16,18
207:22 220:13,20
220:22 225:18
265:7
**topic** 229:4
**topics** 29:20,22
30:1 47:7,15,17
102:21
**torn** 111:17
**total** 20:18 84:18
88:1 89:20 90:18
318:7
**totality** 190:17,19
**towns** 286:7
**tracked** 47:20
**trade** 12:19 41:1
75:18 77:7 190:10
202:11,14,17
203:19 204:12
206:21 207:11
319:10,12 320:3,6
320:19 321:21
**trade-off** 207:6
**trade-offs** 207:10
218:20
**traffic** 41:6 78:3

87:3,8 320:21
**trailers** 111:17
**trailing** 132:18
**trained** 86:22
**training** 314:21
**transcript** 8:14
327:21 329:8
330:10 331:7,15
331:19,22
**transcripts** 26:4
**transfer** 107:7
108:4,4,7
**Transferred** 110:3
110:12
**transited** 307:20
**transitioned** 152:9
**Transportation**
13:11
**travel** 49:4 75:2,11
93:2 98:19 109:11
110:20 127:17
139:7 202:11,14
202:17 203:19
307:18 319:10,12
320:4,6,19 321:1
321:21
**traveler** 98:21
190:11
**travelers** 205:11
**traveling** 289:7
**Treasury** 60:17
230:6
**treatments** 321:5
**trend** 166:20
**trial** 10:15
**trouble** 318:21
**true** 74:7 80:13
91:17 154:5,5,7,9
154:11 171:16
206:10 231:4
233:11 257:9
272:7 278:12
281:11,22 282:21
287:19 298:14,19
299:3 329:7
330:10

**truly** 325:8
**trust** 53:10,15,17
234:9,11 252:12
**truth** 18:6,12
233:14,15
**try** 16:3,11 51:11
51:17 93:12
147:19 225:8
272:4 292:18
**trying** 16:5 75:7
111:20 128:7
204:15 227:16
240:17 309:4
310:6 312:6
**tuberculosis** 184:16
**Tucson** 170:22
**Tuesday** 47:1 97:4
97:7,14 125:16
**turn** 55:10 97:19
114:4 284:5
317:12
**turned** 95:1 145:8
**turning** 144:22
145:14
**turn-back** 283:6
**twelve** 95:10
**Twice** 11:19
**two** 20:13 24:15,22
25:17 26:2,3
32:10 33:12 67:18
74:12 93:21
147:18 176:12
191:18 221:7
224:9 225:8 237:8
283:20 292:15
320:17 322:5
**two-page** 82:1
101:2 105:4
142:14 159:11
213:2
**type** 231:18
**types** 86:12 136:20
209:11 244:20
321:19
**typically** 30:1 66:3
72:20 232:3

ER 01208



**T-O-D-D** 9:13

**U**

**U** 3:1
**Uh** 14:9
**uh-huh** 15:21
**ultimate** 239:11,13
**Um-hmm** 296:6
**unacceptable**
285:11
**unaccompanied**
110:4 313:11
**unavailable** 27:8
**unclear** 264:18
**undergoing** 111:16
**undergone** 313:10
**underlined** 221:12
222:19 248:22
**underneath** 248:18
**understand** 9:22
14:5 15:22 16:8
17:4,9,13,16,19
18:3,5,9,15,18
19:16 41:9 43:2
55:7 68:3 80:19
83:8 88:20 96:19
112:12 127:22
129:20 130:3
140:7 155:10
173:19 188:18
198:13 223:7
240:12 261:2
262:1 283:8
297:11 299:2
301:10 309:5
310:6 313:5
319:16 324:21
**understanding**
145:19 187:5
263:19,21 282:16
309:10
**understood** 83:15
83:17 105:18
125:7 138:15
140:8 159:20
171:11 197:5

200:3 216:13
229:9 257:6
287:13 294:18
296:22 305:3
325:15
**undertake** 324:17
325:16
**undertaken** 107:2
118:2 122:15
326:19
**undertook** 182:6
**underway** 188:8
**undocumented**
204:18 205:18
206:6,11 207:1,13
208:13 210:7,8
211:16,17,20,21
212:5 320:13
**unethical** 258:8,9
**unhappy** 271:15
**unilateral** 230:20
**union** 60:14,15,16
60:17 61:6,9
230:6 236:19
237:10 269:3
271:19 300:5,20
303:13
**union's** 301:14
**unit** 78:22 86:17
106:20 110:4
147:17,18 244:10
244:12 246:2
279:12 280:18
318:12,13
**United** 1:1 109:4
130:1 162:3
208:19 211:3
231:8 260:1
261:14 264:13
265:19 266:10
306:22 307:5,19
313:11 329:1
330:2
**units** 78:6,9,13
86:19 137:1
138:20,20 149:4

150:3 151:5 246:9
315:9 317:3,5,6
317:17,18,22
**unmask** 222:9,12
**unpack** 152:15
**unprotected** 285:18
**unquote** 245:7
**unredacted** 169:5
**unsafe** 152:4 237:7
286:3 316:14
**unshaken** 246:8
**update** 224:10
**updated** 214:20
215:1 218:13
**updates** 133:14
**upward** 166:20
**usage** 119:8
**use** 45:17,18 98:2
108:18 112:12
115:3,15 117:8,10
128:1 186:1 187:9
266:22
**useful** 45:10,13
**uses** 112:11
**usual** 16:12
**usually** 46:18 79:5
221:19
**utilize** 116:1
**utilized** 107:6,14
112:9
**utilizes** 142:1
**U.S** 3:12 5:16 9:19
9:21 12:11 17:12
32:20 33:1 34:16
35:18 37:11 52:10
70:3,5 91:19,21
92:6 94:10,22
95:22 98:22
125:20 139:11
152:20 154:20,21
154:22 155:3,7,16
156:3 161:12
210:15 239:19
240:17 245:8
259:18 260:3,18
260:19 261:5,8

262:12 263:1,15
264:6 265:8,8,20
265:22 266:7,7
268:2,9,19 269:20
270:13,17 282:8
285:3,8 286:7
288:5 289:13
293:4 307:3
326:14

**V**

**vacant** 189:3
**vacated** 115:7
**Vague** 14:4 127:20
313:3
**Valerie** 7:4 194:6
196:17 197:22
**valid** 228:4 239:21
**Vargas** 77:22 78:3
79:8,10 126:2
**variables** 190:5
**various** 84:13
102:7 185:10
327:11
**Variza** 225:19
**veer** 93:13
**veers** 47:10
**vehicles** 273:20
**venues** 313:21,22
**veracity** 257:19,20
**verbal** 284:1,1,4,5
284:10,13
**verbally** 46:6
172:15
**Vernon** 28:12
**version** 169:5,8
186:9
**versions** 181:10
**versus** 316:19
**vice** 61:11
**video** 21:8 112:7
224:12
**view** 43:4 99:16
129:6,8 130:1,2,4
184:1 187:4
231:22 233:3,17

235:11,12,15
242:22 255:1
267:7 281:18
289:14 303:20
325:7
**viewed** 130:8
**views** 253:19
**violate** 18:19
261:16 263:20
**violates** 263:17
**violating** 258:13
**violation** 258:4
261:11
**violence** 316:4
**Virginia** 2:7
**virtual** 110:15
112:1,3,9,19,22
113:4,8,12,15,18
114:1,8,14,21,22
115:4 121:21
**visibility** 45:19
147:19 191:2,6
**visit** 96:11 235:3
**visited** 235:5,8
**volume** 68:14 181:8
**volumes** 70:13
179:21
**vs** 1:6

**W**

**W** 101:19
**Wagner** 105:12
121:6 124:14
142:22 146:21
159:13 170:4
196:17
**Wagner's** 121:10
144:3
**wait** 95:11 126:5
128:12 140:2,17
151:17 155:4,6
156:2 178:9
190:11 210:8
246:9 247:2
252:22 285:16,21
286:2,21 288:3,4



292:17 309:17,21
321:7,16
**waiting** 88:21
98:19 127:13
128:14 138:8,11
139:22 154:20
186:3 187:7 210:2
280:9 285:17
287:22 291:17,17
316:15 317:12
**waits** 251:22
**waive** 229:7
**waived** 328:12
331:15,22
**waiver** 122:18
123:2,4
**walk** 153:18,19
**walked** 94:8,10
**Walters** 4:4
**want** 52:7 85:6
96:22 125:15
134:1,4 137:15
140:21 152:15
155:9 160:20
161:5,22 162:2
164:19,21 165:1
169:12,15 170:7
200:20 213:3
227:15,19,20
228:6 229:7
234:14,16 248:5
250:22 261:22
263:11 266:21
269:12 271:11
272:4 275:21
299:2 306:10
327:14
**wanted** 76:1 96:20
113:17,22 232:20
237:5 264:21
268:11 286:10
328:7
**Washington** 1:13
2:4 3:7,17 9:20
10:8
**wasn't** 11:11 162:4

162:5 233:20
304:10,11 323:21
**watch** 36:7 176:5
**Water** 8:6
**waves** 313:10
**way** 65:2 78:5 98:5
99:5 113:12,15
114:9 125:13
129:10 134:20
156:4 174:5 188:6
189:18 208:20
239:4 255:21
256:19 257:21
266:20 277:22
284:13 287:20
291:22 292:22
315:4 326:20
330:14
**ways** 12:19 240:2
283:20
**weapons** 219:10
**wearing** 291:10
**weather** 289:2
**website** 5:14 49:18
50:4,7,19
**Wednesday** 47:2
97:2,5,8,14
**wee** 24:18
**week** 29:1 39:3,4
40:3 46:12,13,17
46:19 48:20 49:1
103:2,3 171:22
245:3 310:4,21
311:20,21
**weekday** 48:15,16
48:17,20
**weekend** 103:21
**weekly** 28:20 29:4
43:15 48:8,11
**welcome** 96:19
168:13
**went** 50:10 64:7
70:6 71:14,18,19
274:1 314:17
**weren't** 54:17 73:3
92:2 151:13 166:2

224:20 247:7
303:22 304:18
**West** 136:6,8,10
144:13
**wet** 317:20
**we'll** 228:14 229:1
273:13 312:13
**we've** 123:19 159:9
159:9 167:9
196:13,14 212:21
215:9 271:20
**whatnot** 49:4
317:14
**whatsoever** 236:8
**WHEREOF**
330:16
**whistleblower**
238:14
**White** 3:14
**wide** 211:10
**William** 7:19 11:6
11:8 229:17
230:17 233:1,3,13
234:4,17 240:9
256:8 303:5 304:2
**willing** 115:2
207:10,11
**wiping** 208:4,10
**wish** 290:10,13
**withheld** 57:16
181:11
**withholding** 181:13
**witness** 5:2 14:10
14:15 47:14 63:15
101:13 169:11
208:6 211:8 228:6
275:11 292:12
312:11 327:19,20
329:5 330:8,11,16
331:2 332:21
**word** 149:17
176:21 183:16
185:15 234:10,11
266:22 267:1
269:22
**words** 98:3 99:5

304:7
**work** 10:7 16:12
22:9 23:8,18 24:4
64:17 111:21
199:22 226:11
227:9,13,14 228:2
229:2 230:20
237:10 240:5
248:14 252:12
266:14 273:12
279:11 280:18
287:22 297:8,12
297:20 298:7,9,10
314:1
**worked** 155:10
234:5 236:19
245:3 271:19,20
274:8
**working** 73:12
115:7,22 166:17
186:16 207:8,9
236:16 237:7,11
273:16 289:7
**works** 177:4 227:10
244:3
**workstation** 281:17
**workstations**
110:14 111:2,2,14
279:4,8
**wouldn't** 28:1 71:2
140:4 157:4
186:18 226:16
227:6 267:7
290:14 309:8
322:17
**wrapped** 38:6,8
**write** 163:14
166:16 295:13
**writes** 103:1,10
115:21 121:17
126:1 144:6 164:4
171:20 172:14
295:7 296:5
**writing** 103:15
282:11 295:21
323:7

**written** 14:2 57:9
57:15 59:5 64:5
99:5,8 259:16
260:14 264:16
283:3,9,22
**wrong** 185:15
267:3
**wrote** 64:2 197:22
295:16,18 297:4,7

———————
**X**
———————
**x** 1:3,9 226:2
**XD** 144:20

———————
**Y**
———————
**yards** 153:6
**yeah** 54:16 73:19
140:9 153:21
165:16 167:11
174:4 175:16,17
176:19 187:12,14
191:20 192:16
194:20 195:13
211:14 225:15
230:11 236:11,11
239:14 242:15
248:11,14 257:4
260:9 286:10
287:15 290:4
298:21 299:5
304:22 310:17,18
311:19
**year** 13:8 61:4
72:21,22 179:20
183:1 192:10
193:11 241:16
319:2
**years** 13:21 33:12
94:13 292:16
**yesterday** 20:12,16
25:3,22
**Ysidro** 38:18,19
68:8,13 85:6,9,15
87:22 88:9 89:10
100:8,9 101:21
102:2,3 104:7



106:15,19 107:10
110:9,22 111:15
114:22 116:8
122:11,12 127:10
133:4,14,18
134:14 135:9
136:8 137:7
138:16 139:3,13
142:9 144:11,12
145:8,21 146:9
153:14 157:11,12
162:11 245:5,21
246:3 251:21
312:22 313:2
314:5 321:17
**Ysidros** 69:10
**Ysidro/Ped** 136:6

**Z**
**zero** 245:7 246:17
**zone** 110:21

**0**
**000132** 7:20
**000303** 215:12

**1**
**1** 1:21 7:8 17:8
201:14 213:11
223:22 282:3
**1.2** 153:13
**1:02** 141:1
**1:06** 168:9
**1:08** 144:6
**1:16** 178:11
**1:19** 178:12
**1:59** 106:9
**10** 93:10 138:4,10
138:19 146:17
148:14 151:3
312:7
**10:00** 279:11
280:18 281:13
**10:16** 164:2
**10:19** 123:6
**10:56** 96:15

**100** 6:3 91:13
**100-degree** 289:2
**104** 6:5
**11** 6:14 146:17
221:16
**11:00** 122:19 187:3
279:11 280:18
281:13
**11:08** 96:16
**11:41** 170:19
**11:45** 134:7
**11:47** 134:8
**111** 192:18
**111,000** 71:21
192:22
**113,000** 192:18
**115** 265:2
**12** 124:6 174:21
178:7,16 187:3
221:7 301:20
**12:22** 168:8
**12:30** 167:19
**12:46** 143:5
**1222** 11:8
**123** 6:7
**124,000** 72:22
192:22
**126,000** 72:21
193:1 241:16
**13** 1:14 2:5 6:6
124:5,6 125:16
**13th** 311:18
**1300** 10:8
**132** 6:9
**135** 6:11
**139** 180:21
**14** 6:22 7:15 174:22
223:22 330:21
**14th** 221:8
**142** 6:13
**146** 6:15
**149** 231:14,15,22
232:10 235:11
**15** 7:20 192:18
229:22 232:5
235:1

**154,000** 71:20
192:21
**16** 6:9 100:12
132:20 148:7
159:13 192:21
193:16 315:21
316:18 324:5
**162** 6:18
**167** 6:20
**17** 6:13 90:21
135:19 142:21
143:4 144:6
150:18 183:2
192:21 193:14
316:6
**17-cv-02366-BAS...**
1:6
**174** 6:22
**18** 192:22 316:19
**187** 269:17 270:1
270:19 271:7,12
271:16 299:19
300:1,5 307:9
**19** 5:13,20 8:4,7,9
82:7,15 83:21
84:4 85:3 91:2
185:3 192:12,22
193:17 222:1
256:7 257:1 264:9
294:8,22 296:20
**196** 7:5
**199** 7:7
**1999** 2:3 3:6

**2**
**2** 6:3 101:15 102:18
217:21 249:12
**2:42** 178:8,16
**2:48** 148:15
**20** 5:13 18:22 19:3
19:7 72:6 138:4
138:19 189:2
329:17 330:17
**20,000** 278:11
**20006** 3:7
**2003** 203:15 212:6

214:15
**20044** 3:17
**2006** 314:6 315:5
316:21
**2014** 313:11
**2015** 10:6 13:8
313:22
**2016** 6:5,6,9,11,13
6:14,20,22 17:8
38:10 68:8,12,16
69:9 70:12 71:20
71:20 100:6,11
103:2,11,16,21
104:17 105:11
106:9 111:6,15
121:11 123:6
124:5,6 125:16
126:13,18,21
128:5 129:13,18
130:7,13 131:16
131:21 132:2,6,8
132:20 133:2
134:14 135:9,19
135:20 141:1
142:10,11,21
143:4 144:6 145:5
146:6,17 147:9
148:15 150:14
151:3,9,14 152:9
156:1,10 157:8,22
158:9 159:13
163:4,15 164:14
170:2,19 173:11
173:12 174:22
178:1,8,16 179:15
179:20 183:2
189:19 192:5
272:22 274:6,15
275:1 285:10
286:2 312:22
313:16,17 314:16
315:10 316:1,21
317:16 322:15
323:19
**2017** 6:3 7:15,20
33:13 68:17,19

71:13,21 72:7
101:16 102:18
103:3 156:1,11
189:19 192:8
206:16 219:18
221:7 222:20
223:22 224:18
229:22 232:5
235:1,3,7 254:21
301:15 315:19
322:14 324:3
**2018** 5:19,21 7:5,7
7:9,22 12:20 13:5
33:14,16 35:9,21
35:22 63:19 65:13
67:12 68:19,21
71:11 72:8 82:7
82:15 83:21 84:4
84:9 85:3 92:9,10
92:13 95:13,15,15
99:17 100:3
156:12 183:5
185:3 189:19
191:16,22 192:2
192:10,14 193:11
194:7 195:16
197:18 198:1
199:17 200:7,10
200:16 206:15
212:10 213:11
216:20 217:19
243:21 246:13,18
253:19 254:15
264:17 275:2
299:8 316:9
**2019** 1:14 2:5 8:4,7
8:9 12:15 72:11
215:21 216:2
217:10 250:14
253:13 254:15
256:7 257:1 265:5
291:6 294:9,22
296:20 300:22
301:16 306:12
321:13
**202** 3:8,18



**2020** 330:21
**21** 5:14 49:8,17
**213** 7:9,11,12
**22** 5:16 6:19 52:1,4
    52:9 163:4,15
    170:2,19
**220** 7:14
**223** 7:16
**225** 7:18
**229** 7:20
**23** 5:18 63:2,5,10
    63:12,17 64:3
    97:20 99:18
**236** 88:1,12
**24** 5:20 81:19 82:1
    82:22 185:8,9
**24,600** 51:7
**24-hour** 30:3
**243** 7:22
**248** 8:2
**25** 6:2,4 12:20
    100:20 101:3,15
    105:10 123:5
    257:21
**255** 8:4
**259455** 168:20
**26** 6:4 69:15 104:22
    105:4,10,11 106:9
**263-3000** 3:8
**27** 5:19 6:6 63:18
    65:12 67:12 99:17
    123:15,19 215:20
    216:2 217:9
**270,000** 228:18,18
**28** 6:8 132:13,16,19
**29** 6:10 135:13
    194:7
**291** 8:5
**292** 8:6
**293** 8:8
**294** 135:18
**296** 8:10 199:14

**3**
**3** 7:22 19:14 63:8
    63:11 102:21

223:1 243:21
    249:5,9,10,13
    318:6
**3.1** 53:8
**3.2** 52:20,22
**3/31/2019** 249:21
**3:11** 275:14
**3:25** 275:15
**3:56** 249:21
**3:59** 311:5
**30** 6:12 142:13,18
    331:14,21
**30(D)(1)** 22:16
**30,000** 51:4,5 59:15
    240:4
**30-day** 198:3,14,15
    198:18 201:21
    212:14 214:10
    327:22
**303** 216:16 217:10
    217:14
**304** 217:15
**308** 215:12
**31** 6:14 88:10
    146:13,16 250:14
    253:13
**312** 5:5
**315** 88:9,12
**32** 6:16 8:15 90:4
    159:6,10 168:19
    169:11
**322** 5:6
**33** 6:17 162:21
    163:2
**332** 1:21
**34** 6:19 167:6 169:3
    169:20
**341** 142:15
**35** 6:21 174:14,18
**36** 7:2 8:15 180:16
    180:19
**37** 7:3 8:15 193:22
    194:3 195:4
**38** 7:4 196:10,14
    199:4
**39** 7:6 105:6 199:7

199:11 212:8,10
    212:12 213:19
    214:11 217:7
    218:12,21

**4**
**4** 201:14 221:15
**4:09** 311:6
**4:10** 312:15
**4:20** 312:16
**4:22** 82:15 83:21
**4:30** 322:7
**4:35** 322:8
**4:41** 328:11
**40** 7:8 212:18,22,22
    213:3 214:17
**40,000** 319:1
**41** 7:10 212:18,22
    213:1,21 214:18
**42** 7:12 215:6,10
    217:7 218:11,22
    318:6,8 319:7
**43** 7:13 220:3
**44** 7:15 223:12,16
    225:9,13,18 328:4
**45** 7:17 20:17 225:5
    226:5 321:17
**45-minute** 24:20
    25:17
**452** 296:14
**455** 159:12
**46** 7:19 69:16 124:4
    186:20 229:12,16
    304:6,7 305:9
**47** 7:21 243:5
    248:16
**48** 8:2 123:21 124:3
    124:5 248:2,5
    249:3
**49** 5:15 8:3 255:16
    255:19

**5**
**5** 7:4,6 138:4 198:1
    199:17 200:7,10
    212:10 216:20

217:19 279:3
**5/24** 103:16
**5:45** 198:1
**5:50** 102:18
**50** 8:5 89:20 179:6
    179:7 291:3
**502** 82:3
**51** 5:17 8:6 292:5
**52** 8:7 293:21 294:2
**525** 132:19
**529549** 1:20
**53** 8:9 296:9,13
**598-8259** 3:18

**6**
**6** 222:1 265:5
**6th** 312:4,6
**6.1** 55:10,18 56:3
**6.2** 55:19
**6.4** 58:22
**6.4.1** 58:18,19 59:3
**6.5** 51:1
**6/19/2018** 84:3
**621** 213:2
**622** 213:3
**63** 5:19
**66** 55:12
**669015** 55:11
**669017** 58:19
**69013** 53:1

**7**
**7** 6:10 135:20
    140:22 319:7
**7/12** 221:3
**7/12/17** 220:21
    221:4
**7/14/17** 220:16
**7:58** 163:15
**71** 294:4
**731** 321:13
**74** 90:1 189:2
**75** 88:4,13 245:14
**761339** 106:18

**8**

**8** 12:15
**8:15** 28:21 29:4,7
    31:10,18,22 35:10
    35:15 36:11 37:4
    37:12,14 38:1
    40:13 47:5 48:3
    48:10,11 156:19
**8:54** 125:17
**81** 5:21
**8505** 221:11
**8510** 222:2
**868** 3:16
**892** 226:8

**9**
**9** 5:4
**9th** 312:4
**9:00** 42:2,19,22
    43:8 45:21 46:10
    47:5,6,8 48:4,17
    48:19 187:2
**9:40** 1:15 2:4
**901** 55:17
**9015** 55:13
**950** 88:17,21 89:13



# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 19-56417

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Volume 5 of the Supplemental Excerpts of Record, containing (a) Expert Report of Stephanie Leutert; and (b) Todd Owen Deposition Transcript.

**Signature** | s/Ori Lev        **Date** | December 23, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*